NO. 24-1453

---

In The

United States Court of Appeals
For The Fourth Circuit

---

DONNA BUETTNER-HARTSOE; N.H., by and through her Parent and Next
Friend Donna Buettner-Hartsoe

Plaintiffs - Appellees

v.

BALTIMORE LUTHERAN HIGH SCHOOL ASSOCIATION, d/b/a
Concordia Preparatory School

Defendant - Appellant

ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF MARYLAND

---

**JOINT APPENDIX**

---

Gregg E. Viola
Mark P. Johnson
Eccleston and Wolf, P.C.
7240 Parkway Drive, 4th Floor
Hanover, MD 21076
(410) 752-7474
Counsel for Defendant – Appellant

Christina Graziano
Justin Browne
Brian Ketterer
Ketterer, Browne & Associates, LLC
336 S. Main Street
Bel Air, MD 21014
(410) 989-4927
Counsel for Plaintiffs - Appellees

# TABLE OF CONTENTS

District Court Docket Report...…………………………………………....…JA1

Amended Complaint and Jury Demand [ECF 69]……………………....…JA15

Partial Motion to Dismiss or in the Alternative, for Summary Judgment
[ECF 108]...………………………….…………………....…...JA38

Memorandum of Law in Support of Defendant's Partial Motion to
Dismiss or in the Alternative, for Summary Judgment [ECF 108-1]…..……….JA41

Exhibit 1 to Memorandum of Law in Support of Defendant's
Partial Motion to Dismiss or in the Alternative, for Summary Judgment
[ECF 108-2]……...………………………………………… …...…JA51

Plaintiffs' Opposition to Defendant Baltimore Lutheran High School
Association's Motion to Dismiss and/or Partial Motion for Summary
Judgment and Request for Hearing [ECF 109]………………...…………….JA52

Reply to Plaintiffs' Opposition to Defendant's Partial Motion to
Dismiss or in the Alternative for Summary Judgment [ECF 116]…..………….JA76

Exhibit 1 to Reply to Plaintiffs' Opposition to Defendant's Partial
Motion to Dismiss or in the Alternative for Summary Judgment
[ECF 116-1]………………………………………………JA96

Exhibit 2 to Reply to Plaintiffs' Opposition to Defendant's Partial
Motion to Dismiss or in the Alternative for Summary Judgment
[ECF 116-2]………………………………………………JA99

United States District Court for the District of Maryland Memorandum
Opinion dated July 21, 2022 [ECF 130]………...……...………………JA105

United States District Court for the District of Maryland Order
dated July 21, 2022 [ECF 131]…….……………...………………...JA118

Motion for Reconsideration, or in the Alternative, Motion to
Certify Order for Interlocutory Appeal [ECF 132]………..………………JA121

Memorandum of Law in Support of Motion for Reconsideration,
or in the Alternative, Motion to Certify Order for Interlocutory Appeal
[ECF 132-1]……………………………………………………...…….JA123

Exhibit 1 to Memorandum of Law in Support of Motion for
Reconsideration, or in the Alternative, Motion to Certify Order for
Interlocutory Appeal [ECF 132-2]……………..………………...…………...JA153

Exhibit 2 to Memorandum of Law in Support of Motion for
Reconsideration, or in the Alternative, Motion to Certify Order for
Interlocutory Appeal [ECF 132-3]…………..………………..…….…..…...JA291

United States District Court for the District of Maryland Order
dated August 8, 2022 [ECF 133]……..…………..………………………...JA294

Plaintiffs' Opposition to Defendant Baltimore Lutheran High School
Association's Motion to Reconsider and Motion to Certify Order for
Interlocutory Appeal [ECF 140]…..……………………………………..….JA296

Reply to Plaintiffs' Opposition to Motion for Reconsideration, or in
the Alternative, Motion to Certify Order for Interlocutory Appeal
[ECF 144]…..………………………………………………………...JA337

Transcript of Motions Hearing on September 1, 2022……..………………….JA357

United States District Court for the District of Maryland Memorandum
Opinion dated September 6, 2022 [ECF 146]…..……………..……………...JA468

United States District Court for the District of Maryland Order
dated September 6, 2022 [ECF 147]…………..……………………………JA478

Amicus Brief of The Association of Independent Maryland &
DC Schools in Support of Motion to Reconsider or to Certify Order
for Interlocutory Appeal [ECF 148]……..…………………………….....JA481

Brief of Amici Curiae the National Association of Independent
Schools, the National Business Officers Association, the Association
of Independent Schools of Greater Washington, the Southern
Association of Independent Schools, the Virginia Association of
Independent Schools, the North Carolina Association of Independent

Schools, and the Palmetto Association of Independent Schools in
Support of Defendant's Motions for Reconsideration, or in the Alternative,
 to Certify Order for Interlocutory Appeal [ECF 149]…………………………JA492

Exhibit 1 to Brief of Amici Curiae the National Association of
Independent Schools, the National Business Officers Association, the
Association of Independent Schools of Greater Washington, the
Southern Association of Independent Schools, the Virginia
Association of Independent Schools, the North Carolina Association of
Independent Schools, and the Palmetto Association of Independent
Schools in Support of Defendant's Motions for Reconsideration,
or in the Alternative, to Certify Order for Interlocutory Appeal
[ECF 149-1]………………………………………………………………...JA507

Petition for Leave to Appeal Pursuant to 28 U.S.C. § 1292(B)
[USCA4 Appeal: 22-272 Doc: 2-1]…..…………………………..………..…..JA510

Appellees' Opposition to Appellant's Petition for Leave to Appeal
Pursuant to 28 U.S.C. § 1292(B) [USCA4 Appeal: 22-272 Doc: 13]....…………JA570

Reply to Opposition to Petition for Leave to Appeal Pursuant
to 28 U.S.C. § 1292(B) [USCA4 Appeal: 22-272 Doc: 14]………..……...……..JA599

United States Court of Appeals for the Fourth Circuit Order
dated April 26, 2023 [USCA4 Appeal: 22-272 Doc: 15]..……………………..JA605

APPEAL,CASREF,STAYED

# U.S. District Court
## District of Maryland (Baltimore)
## CIVIL DOCKET FOR CASE #: 1:20–cv–03132–RDB

Buettner–Hartsoe et al v. Baltimore Lutheran High School Association
Assigned to: Judge Richard D. Bennett
Referred to: Magistrate Judge J. Mark Coulson (Settlement)
Demand: $75,000
 Case in other court:  USCA, 23–01453
Cause: 28:1343 Violation of Civil Rights

Date Filed: 10/28/2020
Jury Demand: Plaintiff
Nature of Suit: 360 P.I.: Other
Jurisdiction: Federal Question

**Plaintiff**

**Donna Buettner–Hartsoe**

represented by **Justin Anthony Browne**
Ketterer, Browne & Associates, LLC
336 S. Main Street
Bel Air, MD 21014
8555225297
Fax: 8553345626
Email: Justin@KBAattorneys.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Brian Ketterer**
Ketterer Browne and Associates, LLC
6 Liberty Square 2372
Boston, MA 02109
8555225297
Fax: 8553345626
Email: brian@kbaattorneys.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Christina Graziano**
Ketterer Browne and Associates LLC
6 Liberty Square #2372
Boston, MA 02109
8555225297
Fax: 8553345626
Email: christina@kbaattorneys.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Derek T Braslow**
Ketterer Browne & Associates, LLC
336 S. Main St.
Ste 2a–C
Bel Air, MD 21014
410–855–6267
Fax: 855–572–4637
Email: derek@kbaattorneys.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**N.H., a minor**
*by and through her Parent and Next Friend Donna Buettner–Hartsoe*

represented by **Justin Anthony Browne**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Brian Ketterer**

(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Christina Graziano**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Derek T Braslow**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

**Baltimore Lutheran High School Association**
*doing business as*
Concordia Preparatory School

represented by **Gregg Edward Viola**
Eccleston and Wolf PC
Baltimore Washington Law Center
7240 Pkwy Dr Fourth Fl
Hanover, MD 21076–1378
14107527474
Fax: 14107520611
Email: viola@ewmd.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**James Sunderland Aist**
Anderson Coe and King LLP
Seven Saint Paul St 1600
Baltimore, MD 21202–1653
14107521630
Fax: 14107529173
Email: aist@acklaw.com
*TERMINATED: 07/15/2021*
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Lauren Royer Driver**
Anderson Coe and King
Seven Saint Paul Street, Suite 1600
Baltimore, MD 21202
United Sta
4107521630
Fax: 4107520085
Email: driver@acklaw.com
*TERMINATED: 07/15/2021*
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Eric Matthew Rigatuso**
Eccleston and Wolf PC
Baltimore Washington Law Center
7240 Parkway Dr Fourth Fl
Hanover, MD 21076
14107527474
Fax: 14107520611
Email: rigatuso@ewmd.com
*ATTORNEY TO BE NOTICED*

**Mark Patrick Johnson**
Eccleston and Wolf PC
Baltimore Washington Law Center

7240 Pkwy Dr Fourth Fl
Hanover, MD 21076
14107527474
Fax: 14107520611
Email: johnson@ewmd.com
*ATTORNEY TO BE NOTICED*

**Defendant**

**Lutheran Church–Missouri Synod,**
**Southeastern District**

represented by    **Brian S Goodman**
Goodman & Donohue, LLC
9199 Reistertown Road
Suite 213C
Owings Mills, MD 21117
14438240659
Fax: 14439579032
Email: brian@goodmandonohue.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Amicus**

**The Association of Independent**
**Maryland & DC Schools**

represented by    **Geoffrey H Genth**
Kramon and Graham PA
One South St Ste 2600
Baltimore, MD 21202–3201
14107526030
Fax: 14105391269
Email: ggenth@kg–law.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Steven Michael Klepper**
Kramon & Graham PA
One South St Ste 2600
Baltimore, MD 21202–3201
14107526030
Fax: 14103618226
Email: sklepper@kg–law.com
*ATTORNEY TO BE NOTICED*

**Amicus**

**National Association of Independent**
**Schools**

represented by    **Evan T Shea**
Venable LLP
750 E. Pratt Street, Suite 900
Baltimore, MD 21202
14105284649
Fax: 14102447742
Email: etshea@venable.com
*ATTORNEY TO BE NOTICED*

**Amicus**

**National Business Officers Association**

represented by    **Evan T Shea**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Amicus**

**Association of Independent Schools of**
**Greater Washington**

represented by    **Evan T Shea**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Amicus**

represented by

**Southern Association of Independent Schools**

**Evan T Shea**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Amicus**

**Virginia Association of Independent Schools**

represented by **Evan T Shea**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Amicus**

**North Carolina Association of Independent Schools**

represented by **Evan T Shea**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Amicus**

**Palmetto Association of Independent Schools**

represented by **Evan T Shea**
(See above for address)
*ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|---|---|---|
| 10/28/2020 | 1 | COMPLAINT against Baltimore Lutheran High School Association d/b/a Concordia Preparatory School ( Filing fee $ 400 receipt number 0416–8934497.), filed by Donna Buettner–Hartsoe, N.H., a minor. (Attachments: # 1 Civil Cover Sheet, # 2 Summons)(Browne, Justin) (Entered: 10/28/2020) |
| 10/28/2020 | | Case Assigned to Judge George Levi Russell, III. (ko, Deputy Clerk) (Entered: 10/28/2020) |
| 10/28/2020 | 2 | Summons Issued 21 days as to Baltimore Lutheran High School Association.(ko, Deputy Clerk) (Entered: 10/28/2020) |
| 11/17/2020 | 3 | SUMMONS Returned Executed by Donna Buettner–Hartsoe, N.H., a minor. Baltimore Lutheran High School Association served on 11/6/2020, answer due 11/27/2020. (Attachments: # 1 Attachment Certified Mail Receipt & Tracking)(Browne, Justin) (Entered: 11/17/2020) |
| 11/20/2020 | 4 | Consent MOTION for Extension of Time to File Answer re 1 Complaint, by Baltimore Lutheran High School Association (Attachments: # 1 Text of Proposed Order)(Driver, Lauren) (Entered: 11/20/2020) |
| 11/20/2020 | 5 | ORDER GRANTING 4 Motion for Extension of Time to Answer re 1 Complaint. Baltimore Lutheran High School Association's answer due 12/4/2020. Signed by Judge George Levi Russell, III on 11/20/2020. (hmls, Deputy Clerk) (Entered: 11/20/2020) |
| 11/23/2020 | 6 | MOTION to Appear Pro Hac Vice for Christina Graziano (Filing fee $100, receipt number 0416–8978088.) by Donna Buettner–Hartsoe, N.H., a minor (Attachments: # 1 Attachment Christina Graziano Pro Hac Vice Admissions)(Browne, Justin) (Entered: 11/23/2020) |
| 11/23/2020 | 7 | PAPERLESS ORDER granting 6 Motion to Appear Pro Hac Vice on behalf of Christina Graziano. Directing attorney Christina Graziano to use the attorney's existing CM/ECF login and password previously issued in this Court. The account password can be reset at http://www.mdd.uscourts.gov/electronic–case–filing–password–reset. Signed by Clerk on 11/23/2020. (srd, Deputy Clerk) (Entered: 11/23/2020) |
| 12/04/2020 | 8 | ANSWER to 1 Complaint, by Baltimore Lutheran High School Association.(Aist, James) (Entered: 12/04/2020) |
| 12/04/2020 | 9 | NOTICE of Appearance by Lauren Royer Driver on behalf of Baltimore Lutheran High School Association (Driver, Lauren) (Entered: 12/04/2020) |
| 12/15/2020 | 10 | (FILED IN ERROR) Local Rule 103.3 Disclosure Statement by Baltimore Lutheran High School Association identifying Corporate Parent Baltimore Lutheran High School Association d/b/a Concordia Preparatory School for Baltimore Lutheran High |

| | | |
|---|---|---|
| | | School Association.(Driver, Lauren) Modified on 12/16/2020 (bmhs, Deputy Clerk). (Entered: 12/15/2020) |
| 12/16/2020 | 11 | QC NOTICE: 10 Local Rule 103.3 Disclosure Statement filed by Baltimore Lutheran High School Association was filed incorrectly. *\*\*The Local Rule 103.3 Disclosure Statement needs to be refiled. Everyone designated on your disclosure statement as having financial interest in the outcome of the case needs to be added as a corporate parent or other affiliate when the system prompts you. It has been noted as FILED IN ERROR, and the document link has been disabled.* (bmhs, Deputy Clerk) (Entered: 12/16/2020) |
| 12/16/2020 | 12 | Local Rule 103.3 Disclosure Statement by Baltimore Lutheran High School Association identifying Other Affiliate Philadelphia Indemnity Insurance Company, Other Affiliate Baltimore Lutheran High School Association d/b/a Concordia Preparatory School for Baltimore Lutheran High School Association.(Driver, Lauren) (Entered: 12/16/2020) |
| 01/22/2021 | 13 | SCHEDULING ORDER: Status Report due by 6/7/2021. Signed by Judge George Levi Russell, III on 1/22/2021. (Attachments: # 1 Scheduling Order, # 2 Standing Order on Discovery Procedures)(bmhs, Deputy Clerk) (Entered: 01/22/2021) |
| 01/28/2021 | 14 | STATUS REPORT *Joint Initial Report of Counsel* by Baltimore Lutheran High School Association(Driver, Lauren) (Entered: 01/28/2021) |
| 01/28/2021 | 15 | MOTION to Appear Pro Hac Vice for Brian Ketterer (Filing fee $100, receipt number 0416–9085302.) by Donna Buettner–Hartsoe, N.H., a minor(Browne, Justin) (Entered: 01/28/2021) |
| 01/29/2021 | 16 | PAPERLESS ORDER granting 15 Motion to Appear Pro Hac Vice on behalf of Brian Ketterer. Directing attorney Brian Ketterer to register online for CM/ECF at http://www.mdd.uscourts.gov/electronic–case–filing–registration. Signed by Clerk on 1/29/2021. (srd, Deputy Clerk) (Entered: 01/29/2021) |
| 02/04/2021 | 17 | ORDER to Counsel memorializing the agreements reached during the teleconference. Status Report due by 10/15/2021. Signed by Judge George Levi Russell, III on 2/4/2021. (bmhs, Deputy Clerk) (Entered: 02/04/2021) |
| 02/04/2021 | 18 | ORDER REFERRING CASE to Magistrate Judge J. Mark Coulson for Settlement. Signed by Judge George Levi Russell, III on 2/4/2021. (hmls, Deputy Clerk) (Entered: 02/04/2021) |
| 02/04/2021 | | Telephone Conference re: Scheduling held on 2/4/2021 before Judge George Levi Russell, III. (kmts, Deputy Clerk) (Entered: 02/04/2021) |
| 02/08/2021 | 19 | ORDER Scheduling Settlement Conference. Signed by Magistrate Judge J. Mark Coulson on 2/8/2021. (daws, Chambers) (Entered: 02/08/2021) |
| 02/08/2021 | 20 | AMENDED ORDER Scheduling Settlement Conference. Signed by Magistrate Judge J. Mark Coulson on 2/8/2021. (daws, Chambers) (Entered: 02/08/2021) |
| 02/10/2021 | 21 | (FILED IN ERROR) Consent to Magistrate Judge (Aist, James) Modified on 2/11/2021 (bmhs, Deputy Clerk). (Entered: 02/10/2021) |
| 02/10/2021 | 22 | Consent to Magistrate Judge (Graziano, Christina) (Entered: 02/10/2021) |
| 02/11/2021 | 23 | QC NOTICE: 21 Consent to Magistrate Judge filed by Baltimore Lutheran High School Association was filed incorrectly. *\*\*Incorrect event selected. Please refile using the event under Correspondence > Miscellaneous. It has been noted as FILED IN ERROR, and the document link has been disabled.* (bmhs, Deputy Clerk) (Entered: 02/11/2021) |
| 02/11/2021 | 24 | Corrected Correspondence re: does not consent to magistrate (Aist, James) (Entered: 02/11/2021) |
| 02/19/2021 | 25 | NOTICE of Appearance by Gregg Edward Viola on behalf of Baltimore Lutheran High School Association (Viola, Gregg) (Entered: 02/19/2021) |
| 02/19/2021 | 26 | NOTICE of Appearance by Eric Matthew Rigatuso on behalf of Baltimore Lutheran High School Association (Rigatuso, Eric) (Entered: 02/19/2021) |

| 02/19/2021 | 27 | NOTICE of Appearance by Mark Patrick Johnson on behalf of Baltimore Lutheran High School Association (Johnson, Mark) (Entered: 02/19/2021) |
|---|---|---|
| 03/19/2021 | 28 | Joint MOTION for Extension of Time *re Scheduling Order* by Baltimore Lutheran High School Association (Attachments: # 1 Text of Proposed Order Order)(Johnson, Mark) (Entered: 03/19/2021) |
| 03/19/2021 | 29 | ORDER granting 28 Joint MOTION for Extension of Time re Scheduling Order. Signed by Judge George Levi Russell, III on 3/19/2021. (kw2s, Deputy Clerk) (Entered: 03/19/2021) |
| 04/05/2021 | 30 | Correspondence re: Discovery Dispute (Viola, Gregg) (Entered: 04/05/2021) |
| 04/05/2021 | 31 | Correspondence re: Discovery Dispute (Graziano, Christina) (Entered: 04/05/2021) |
| 04/06/2021 | 32 | ORDER to Counsel. Signed by Judge George Levi Russell, III on 4/6/2021. (bmhs, Deputy Clerk) (Entered: 04/06/2021) |
| 04/06/2021 | 33 | ORDER REFERRING CASE to Magistrate Judge Beth P. Gesner for all Discovery. Signed by Judge George Levi Russell, III on 4/6/2021. (cags, Deputy Clerk) (Entered: 04/06/2021) |
| 04/07/2021 | | Case reassigned to Magistrate Judge Deborah L. Boardman for all Discovery. Magistrate Judge Beth P. Gesner no longer assigned to the case. (cags, Deputy Clerk) (Entered: 04/07/2021) |
| 04/12/2021 | 34 | MOTION for Judgment on the Pleadings *With Regard to Counts II, IV, V and VI* by Baltimore Lutheran High School Association (Attachments: # 1 Memorandum in Support Memorandum of Law in Support of Defendant's Partial Motion for Judgment on Pleadings With Regard to Counts II, IV, V and VI, # 2 Text of Proposed Order Order)(Rigatuso, Eric) (Entered: 04/12/2021) |
| 04/12/2021 | 35 | Correspondence re: Discovery Disputes (Viola, Gregg) (Entered: 04/12/2021) |
| 04/12/2021 | 36 | Correspondence re: Discovery Dispute (Attachments: # 1 Exhibit 1)(Graziano, Christina) (Entered: 04/12/2021) |
| 04/12/2021 | 37 | ORDER Scheduling a Call for Friday, April 23, 2021 at 10 a.m.. Signed by Magistrate Judge Deborah L. Boardman on 4/12/2021. (bas, Deputy Clerk) (Entered: 04/13/2021) |
| 04/13/2021 | 38 | ORDER to Counsel. Signed by Magistrate Judge Deborah L. Boardman on 4/13/2021. (bmhs, Deputy Clerk) (Entered: 04/13/2021) |
| 04/13/2021 | 39 | ORDER re: informal discovery dispute procedure. Signed by Magistrate Judge Deborah L. Boardman on 4/13/2021. (bmhs, Deputy Clerk) (Entered: 04/13/2021) |
| 04/20/2021 | 40 | Correspondence re: Discovery Disputes (Attachments: # 1 Attachment, # 2 Attachment, # 3 Attachment, # 4 Attachment, # 5 Attachment, # 6 Attachment, # 7 Attachment, # 8 Attachment)(Johnson, Mark) (Entered: 04/20/2021) |
| 04/20/2021 | 41 | –SEALED – NOTICE of Filing Under Seal Exhibits to Correspondence by Baltimore Lutheran High School Association re 40 Miscellaneous Correspondence (Attachments: # 1 Exhibit, # 2 Exhibit, # 3 Exhibit, # 4 Exhibit, # 5 Exhibit, # 6 Exhibit, # 7 Exhibit)(Johnson, Mark) (Entered: 04/20/2021) |
| 04/20/2021 | 42 | MOTION to Seal *Leave to file Exhibits Under Seal* by Baltimore Lutheran High School Association (Attachments: # 1 Text of Proposed Order Order)(Johnson, Mark) (Entered: 04/20/2021) |
| 04/20/2021 | 43 | Correspondence re: Discovery Disputes (Attachments: # 1 Exhibit 1)(Graziano, Christina) (Entered: 04/20/2021) |
| 04/20/2021 | 44 | NOTICE by Donna Buettner–Hartsoe, N.H., a minor *Change of Counsel Firm Name* (Graziano, Christina) (Entered: 04/20/2021) |
| 04/26/2021 | 45 | RESPONSE in Opposition re 34 MOTION for Judgment on the Pleadings *With Regard to Counts II, IV, V and VI* filed by Donna Buettner–Hartsoe, N.H., a minor.(Graziano, Christina) (Entered: 04/26/2021) |

| | | |
|---|---|---|
| 04/27/2021 | 46 | ORDER to Counsel regarding discovery; and granting 42 Motion to Seal. Signed by Magistrate Judge Deborah L. Boardman on 4/27/2021. (bmhs, Deputy Clerk) (Entered: 04/27/2021) |
| 05/10/2021 | 47 | Correspondence re: Request to Vacate Settlement Conference (Graziano, Christina) (Entered: 05/10/2021) |
| 05/10/2021 | 48 | REPLY to Response to Motion re 34 MOTION for Judgment on the Pleadings *With Regard to Counts II, IV, V and VI* filed by Baltimore Lutheran High School Association.(Rigatuso, Eric) (Entered: 05/10/2021) |
| 05/11/2021 | 49 | PAPERLESS ORDER: Per the parties' request, the settlement conference currently scheduled for June 14, 2021 is hereby cancelled. If the parties wish to reschedule, please contact Chambers. Signed by Magistrate Judge J. Mark Coulson on 5/11/2021. (daws, Chambers) (Entered: 05/11/2021) |
| 05/18/2021 | | Case Reassigned to Judge Richard D. Bennett. Judge George Levi Russell, III no longer assigned to the case. (kns, Deputy Clerk) (Entered: 05/18/2021) |
| 06/01/2021 | 50 | Request for Conference (Attachments: # 1 Exhibit 1 – Sentencing Transcript, # 2 Exhibit 2 – Notice of Filing Exhibit Under Seal)(Graziano, Christina) (Entered: 06/01/2021) |
| 06/01/2021 | 51 | –SEALED – NOTICE of Filing Under Seal Exhibit 2 to Pl.'s Letter Requesting Conference Regarding Discovery Issues by Donna Buettner–Hartsoe, N.H., a minor re 50 Request for Conference (Graziano, Christina) (Entered: 06/01/2021) |
| 06/01/2021 | 52 | MOTION to Seal *Exhibit 2 to Pl.'s Letter Requesting Conference Regarding Discovery Issues* by Donna Buettner–Hartsoe, N.H., a minor (Attachments: # 1 Text of Proposed Order)(Graziano, Christina) (Entered: 06/01/2021) |
| 06/01/2021 | 53 | ORDER granting 52 Motion to Seal. Signed by Judge Richard D. Bennett on 6/1/2021. (bmhs, Deputy Clerk) (Entered: 06/01/2021) |
| 06/02/2021 | 54 | PAPERLESS ORDER: The Court is in receipt of ECF 50. IF Defendant would like to file a response to ECF 50, Defendant is directed to file any response by COB Friday June 4, 2021. Signed by Magistrate Judge A. David Copperthite on 6/2/2021. (Chambers) (Entered: 06/02/2021) |
| 06/03/2021 | 55 | Supplemental to 50 Request for Conference filed by Donna Buettner–Hartsoe, N.H., a minor *Providing Deposition Transcript* (Attachments: # 1 Exhibit 1 – Deposition Transcript)(Graziano, Christina) (Entered: 06/03/2021) |
| 06/03/2021 | 56 | –SEALED – NOTICE of Filing Under Seal Exhibit 1 to Pl.'s Supplemental Letter Providing Deposition Transcript by Donna Buettner–Hartsoe, N.H., a minor re 55 Supplemental (Graziano, Christina) (Entered: 06/03/2021) |
| 06/03/2021 | 57 | MOTION to Seal *Exhibit 1 to Pl.'s Supplemental Letter Providing Deposition Transcript* by Donna Buettner–Hartsoe, N.H., a minor (Attachments: # 1 Text of Proposed Order)(Graziano, Christina) (Entered: 06/03/2021) |
| 06/04/2021 | 58 | –SEALED – NOTICE of Filing Under Seal Judge–6A (Copperthite – Discovery) with Six Exhibits by Baltimore Lutheran High School Association (Attachments: # 1 Exhibit 1, # 2 Exhibit 2, # 3 Exhibit 3, # 4 Exhibit 4, # 5 Exhibit 5, # 6 Exhibit 6)(Johnson, Mark) (Entered: 06/04/2021) |
| 06/04/2021 | 59 | MOTION for Leave to File *Under Seal* by Baltimore Lutheran High School Association (Attachments: # 1 Text of Proposed Order Order)(Johnson, Mark) (Entered: 06/04/2021) |
| 06/08/2021 | 60 | ORDER granting 57 Motion to Seal. Signed by Magistrate Judge A. David Copperthite on 6/8/2021. (Copperthite, A.) (Entered: 06/08/2021) |
| 06/08/2021 | 61 | ORDER granting 59 Motion for Leave to File. Signed by Magistrate Judge A. David Copperthite on 6/8/2021. (Copperthite, A.) (Entered: 06/08/2021) |
| 06/08/2021 | 62 | ORDER to Counsel. Signed by Magistrate Judge A. David Copperthite on 6/8/2021. (bmhs, Deputy Clerk) (Entered: 06/08/2021) |

| 06/08/2021 | | Case Reassigned to Magistrate Judge A. David Copperthite for Discovery and Related Scheduling. Magistrate Judge Deborah L. Boardman no longer assigned to the case. (kns, Deputy Clerk) (Entered: 06/08/2021) |
|---|---|---|
| 06/23/2021 | 63 | MEMORANDUM OPINION. Signed by Judge Richard D. Bennett on 6/23/2021. (kns, Deputy Clerk) (Entered: 06/23/2021) |
| 06/23/2021 | 64 | ORDER granting in part and denying in part 34 Motion or Judgment on the Pleadings With Regard to Counts II, IV, V and VI. Signed by Judge Richard D. Bennett on 6/23/2021. (kns, Deputy Clerk) (Entered: 06/23/2021) |
| 06/23/2021 | 65 | ORDER CONSOLIDATING cases RDB 20–cv–3132, RDB 20–cv–3214, RDB 20–cv–3229, RDB 20–cv–3267 and RDB 21–0691 for DISCOVERY AND MOTIONS. Signed by Judge Richard D. Bennett on 6/23/2021. (kns, Deputy Clerk) (Entered: 06/23/2021) |
| 06/30/2021 | 66 | RESPONSE re 65 Order *Joint Proposed Scheduling Order* filed by Donna Buettner–Hartsoe, N.H., a minor. (Attachments: # 1 Text of Proposed Order)(Graziano, Christina) (Entered: 06/30/2021) |
| 07/02/2021 | 67 | MOTION for Leave to File *Amended Complaint* by Donna Buettner–Hartsoe, N.H., a minor (Attachments: # 1 Memorandum in Support, # 2 Exhibit Ex. A – Amended Complaint, # 3 Exhibit Ex. B – Redlined Amended Complaint, # 4 Text of Proposed Order)(Graziano, Christina) (Entered: 07/02/2021) |
| 07/02/2021 | 68 | ORDER granting 67 Motion for Leave to File Amended Complaint; directing that Defendant Baltimore Lutheran High School's 8 Answer will apply to the amended complaint without need for further responsive pleading. Signed by Judge Richard D. Bennett on 7/2/2021. (dass, Deputy Clerk) (Entered: 07/02/2021) |
| 07/02/2021 | 69 | AMENDED COMPLAINT against Baltimore Lutheran High School Association, Lutheran Church–Missouri Synod, Southeastern District, filed by Donna Buettner–Hartsoe, N.H., a minor. (Attachments: # 1 red line copy)(dass, Deputy Clerk) (Entered: 07/02/2021) |
| 07/02/2021 | 70 | QC NOTICE to Plaintiffs: *\*\*Please file a completed summons for newly added defendant Lutheran Church–Missouri Synod, Southeastern District using the event "notice (other)" and link it to the 69 amended complaint. Thank you.* (dass, Deputy Clerk) (Entered: 07/02/2021) |
| 07/02/2021 | 71 | REVISED SCHEDULING ORDER: Status Report due by 4/8/2022. Signed by Judge Richard D. Bennett on 7/2/2021. (dass, Deputy Clerk) (Entered: 07/02/2021) |
| 07/02/2021 | 72 | NOTICE by Donna Buettner–Hartsoe, N.H., a minor re 69 Amended Complaint *Request for Issuance of Summons to Defendant Lutheran Church–Missouri Synod, Southeastern District* (Graziano, Christina) (Entered: 07/02/2021) |
| 07/06/2021 | 73 | Summons Issued 21 days as to Lutheran Church–Missouri Synod, Southeastern District. (dass, Deputy Clerk) (Entered: 07/06/2021) |
| 07/07/2021 | 74 | WAIVER OF SERVICE Returned Executed by Donna Buettner–Hartsoe, N.H., a minor. Lutheran Church–Missouri Synod, Southeastern District waiver sent on 7/2/2021, answer due 8/31/2021.(Graziano, Christina) (Entered: 07/07/2021) |
| 07/15/2021 | 75 | Consent MOTION to Withdraw as Attorney by Baltimore Lutheran High School Association (Attachments: # 1 Text of Proposed Order)(Driver, Lauren) (Entered: 07/15/2021) |
| 07/15/2021 | 76 | ORDER granting 75 Motion to Withdraw as Attorney. Attorney James Sunderland Aist and Lauren Royer Driver terminated. Signed by Judge Richard D. Bennett on 7/15/2021. (bmhs, Deputy Clerk) (Entered: 07/15/2021) |
| 07/22/2021 | 77 | (FILED IN ERROR – DISCOVERY) AFFIDAVIT *of Service re: The Center for Trauma, Stress, and Anxiety, LLC* by Baltimore Lutheran High School Association(Johnson, Mark) Modified on 7/23/2021 (hmls, Deputy Clerk). (Entered: 07/22/2021) |

| | | |
|---|---|---|
| 07/23/2021 | 78 | QC NOTICE: 77 Affidavit of Service (Subpoena) re: The Center for Trauma, Stress, and Anxiety, LLC filed by Baltimore Lutheran High School Association was filed incorrectly.<br>**Pursuant to Local Rule 104.5, discovery materials should not be filed with the Court. It has been marked FILED IN ERROR, and the document link has been disabled.* (hmls, Deputy Clerk) (Entered: 07/23/2021) |
| 08/03/2021 | 79 | –SEALED – NOTICE of Filing Under Seal Judge Bennett–2 by Baltimore Lutheran High School Association ((ATTACHMENTS FILED IN ERROR – Counsel will refile) Attachments: # 1 Supplement Motion for Leave to File Under Seal, # 2 Text of Proposed Order Order)(Johnson, Mark) Modified on 8/3/2021 (bmhs, Deputy Clerk). (Entered: 08/03/2021) |
| 08/03/2021 | 80 | MOTION to Seal *re Leave to File Under Seal* by Baltimore Lutheran High School Association (Attachments: # 1 Text of Proposed Order Order)(Johnson, Mark) (Entered: 08/03/2021) |
| 08/05/2021 | 81 | PAPERLESS ORDER: A Discovery Conference call has been scheduled for Monday, August 9, 2021 at 2:30 pm. Defendants Counsel is asked to arrange for and initiate the call to Chambers at the scheduled time. Signed by Magistrate Judge A. David Copperthite on 8/5/2021. (Chambers) (Entered: 08/05/2021) |
| 08/09/2021 | 82 | ORDER granting 80 Motion to Seal. Signed by Magistrate Judge A. David Copperthite on 8/9/2021. (Copperthite, A.) (Entered: 08/09/2021) |
| 08/09/2021 | 83 | PAPERLESS ORDER: A telephone conference call was conducted with counsel, Christina Graziano, Esquire for Plaintiffs and Gregg Viola, Esquire and Mark Johnson, Esquire for Defendant, regarding ECF 79 (Under Seal). After hearing from counsel, Defendant will promptly provide an appropriate Order as discussed for the Courts signature. Plaintiff will notify the Court if there are objections to the proposed Order. I commend counsel on their efforts to resolve these matters without the Courts intervention. Signed by Magistrate Judge A. David Copperthite on 8/9/2021. (Chambers) (Entered: 08/09/2021) |
| 08/09/2021 | | Telephone Conference held on 8/9/2021 before Magistrate Judge A. David Copperthite. (bmhs, Deputy Clerk) (Entered: 08/09/2021) |
| 08/10/2021 | 84 | Correspondence re: Conference Call Order 8.9.21 (Johnson, Mark) (Entered: 08/10/2021) |
| 08/10/2021 | 85 | Request for Conference (Attachments: # 1 Attachment Wright–Order)(Johnson, Mark) (Entered: 08/10/2021) |
| 08/10/2021 | 86 | ORDER directing the Baltimore County Police Department to produce to counsel for Defendant Baltimore Lutheran High School Association, Inc. all audio or video recordings. Signed by Magistrate Judge A. David Copperthite on 8/10/2021. (bmhs, Deputy Clerk) (Entered: 08/10/2021) |
| 08/10/2021 | 87 | ORDER directing Jessica Wright, LCSW produce to counsel for Defendant Baltimore Lutheran High School Association, Inc. full and complete medical, pharmacy, mental health, and therapy records. Signed by Magistrate Judge A. David Copperthite on 8/10/2021. (bmhs, Deputy Clerk) (Entered: 08/10/2021) |
| 08/18/2021 | 88 | Request for Conference (Attachments: # 1 Exhibit Exhibit A)(Graziano, Christina) (Entered: 08/18/2021) |
| 08/18/2021 | 89 | Request for Conference (Attachments: # 1 Exhibit A, # 2 Exhibit B)(Graziano, Christina) (Entered: 08/18/2021) |
| 08/30/2021 | 90 | ANSWER to 69 Amended Complaint by Lutheran Church–Missouri Synod, Southeastern District.(Goodman, Brian) (Entered: 08/30/2021) |
| 09/07/2021 | 91 | Request for Conference (Attachments: # 1 Exhibit One)(Browne, Justin) (Entered: 09/07/2021) |
| 09/14/2021 | 92 | PAPERLESS ORDER. A Virtual Status Hearing on the record regarding discovery in this case has been Scheduled for Wednesday, September 29, 2021 at 10:00 a.m.. Signed by Magistrate Judge A. David Copperthite on 9/14/2021. (Chambers) (Entered: 09/14/2021) |

| | | |
|---|---|---|
| 09/15/2021 | 93 | Correspondence re: Request to Reschedule Virtual Status Hearing regarding Discovery (Viola, Gregg) (Entered: 09/15/2021) |
| 09/15/2021 | 94 | PAPERLESS ORDER. At the request of Counsel, the Virtual Status Hearing on the record regarding discovery in this case has been Rescheduled for Thursday, October 28, 2021 at 10:00 a.m. Signed by Magistrate Judge A. David Copperthite on 9/15/2021. (Chambers) (Entered: 09/15/2021) |
| 09/28/2021 | 95 | MOTION to Amend/Correct *Scheduling Order* by Donna Buettner–Hartsoe, N.H., a minor (Attachments: # 1 Text of Proposed Order)(Graziano, Christina) (Entered: 09/28/2021) |
| 09/28/2021 | 96 | ORDER on 95 Motion to Modify Scheduling Order. Signed by Magistrate Judge A. David Copperthite on 9/28/2021. (bmhs, Deputy Clerk) (Entered: 09/28/2021) |
| 10/21/2021 | 97 | Correspondence re: discovery conference (Attachments: # 1 Exhibit Exhibit 3, # 2 Exhibit, # 3 Exhibit, # 4 Exhibit)(Viola, Gregg) (Entered: 10/21/2021) |
| 10/21/2021 | 98 | –SEALED – NOTICE of Filing Under Seal Exhibits to Correspondence by Baltimore Lutheran High School Association re 97 Miscellaneous Correspondence (Attachments: # 1 Exhibit Exhibit 1, # 2 Exhibit Exhibit 2, # 3 Exhibit Exhibit 4)(Viola, Gregg) (Entered: 10/21/2021) |
| 10/21/2021 | 99 | MOTION to Seal *Exhibits* by Baltimore Lutheran High School Association (Attachments: # 1 Text of Proposed Order Order)(Viola, Gregg) (Entered: 10/21/2021) |
| 10/21/2021 | 100 | ORDER granting 99 Defendant Baltimore Lutheran High School Association, Inc.'s Motion for Leave to File Exhibits Under Seal. Signed by Magistrate Judge A. David Copperthite on 10/21/2021. (bmhs, Deputy Clerk) (Entered: 10/21/2021) |
| 10/28/2021 | 101 | Status Conference held on 10/28/2021 before Magistrate Judge A. David Copperthite.(Court Reporter: FTR) (J Herndons, Deputy Clerk) (Entered: 10/28/2021) |
| 10/28/2021 | 102 | ORDER re: Hearing on Discovery Disputes. Signed by Magistrate Judge A. David Copperthite on 10/28/2021. (ols, Deputy Clerk) (Entered: 10/28/2021) |
| 11/12/2021 | 103 | Request for Conference (Graziano, Christina) (Entered: 11/12/2021) |
| 11/22/2021 | 104 | Request for Hearing (Attachments: # 1 Exhibit A)(Graziano, Christina) (Entered: 11/22/2021) |
| 11/24/2021 | 105 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT of Proceedings held on 10/28/2021, before Judge A. David Copperthite. Court Reporter/Transcriber CompuScribe, Telephone number 301–577–5882. Total number of pages filed: 59. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained from the Court Reporter or through PACER. Redaction Request due 12/15/2021. Redacted Transcript Deadline set for 12/27/2021. Release of Transcript Restriction set for 2/22/2022.(bmhs, Deputy Clerk) (Entered: 11/24/2021) |
| 12/08/2021 | 106 | PAPERLESS ORDER: In response to ECF 104, the parties are directed to provide the redacted copies of the documents, the basis for the objections to the privilege log, any responses to the objections and unredacted copies of the documents for the Courts in camera review. The documents are to be provided directly to my chambers by COB December 15, 2021. The request for a hearing regarding the additional issues raised by Plaintiffs is DENIED. Signed by Magistrate Judge A. David Copperthite on 12/8/2021. (Chambers) (Entered: 12/08/2021) |
| 12/16/2021 | 107 | PAPERLESS ORDER: The Court is in receipt of the documents in dispute that were submitted for in camera review. Because of the voluminous number of documents, the parties are directed to promptly submit the documents to an agreed upon third party for review. Defendant is Ordered to pay any expense incurred by the third party. This Order is entered in consultation with Judge Bennett who referred this matter to me for all discovery. The parties may select a neutral third party or special master or request the assistance of the Court if necessary. Signed by Magistrate Judge A. David Copperthite on 12/16/2021. (Chambers) (Entered: 12/16/2021) |
| 01/07/2022 | 108 | MOTION to Dismiss *Partial Motion to Dismiss or in the Alternative, for Summary Judgment* by Baltimore Lutheran High School Association (Attachments: # 1 |

| | | Memorandum in Support Memorandum of Law in Support of Defendant's Partial Motion to Dismiss or in the Alternative for Summary Judgment, # 2 Exhibit Exhibit 1, # 3 Text of Proposed Order Order)(Johnson, Mark) (Entered: 01/07/2022) |
|---|---|---|
| 01/21/2022 | 109 | RESPONSE in Opposition re 108 MOTION to Dismiss *Partial Motion to Dismiss or in the Alternative, for Summary Judgment* filed by Donna Buettner–Hartsoe, N.H., a minor. (Attachments: # 1 Exhibit Notice of Filing Exhibits 1–11 Under Seal)(Graziano, Christina) (Entered: 01/21/2022) |
| 01/21/2022 | 110 | –SEALED – NOTICE of Filing Under Seal Exhibits 1–11 to Pls.' Opp. to Def.'s Motion by Donna Buettner–Hartsoe, N.H., a minor re 109 Response in Opposition to Motion, (Attachments: # 1 Attachment, # 2 Attachment, # 3 Attachment, # 4 Attachment, # 5 Attachment, # 6 Attachment, # 7 Attachment, # 8 Attachment, # 9 Attachment, # 10 Attachment)(Graziano, Christina) (Entered: 01/21/2022) |
| 01/21/2022 | 111 | MOTION to Seal *Exhibits 1–11 to Pls.' Opp. to Def.'s Partial Motion to Dismiss* by Donna Buettner–Hartsoe, N.H., a minor (Attachments: # 1 Text of Proposed Order)(Graziano, Christina) (Entered: 01/21/2022) |
| 01/21/2022 | 112 | ORDER granting 111 Plaintiffs' Motion for Leave to File Exhibits Under Seal. Signed by Judge Richard D. Bennett on 1/21/2022. (bmhs, Deputy Clerk) (Entered: 01/24/2022) |
| 01/24/2022 | 113 | NOTICE by Donna Buettner–Hartsoe, N.H., a minor re 109 Response in Opposition to Motion, *Proposed Order* (Graziano, Christina) (Entered: 01/24/2022) |
| 02/02/2022 | 114 | Consent MOTION to Amend/Correct *Scheduling Order* by Baltimore Lutheran High School Association (Attachments: # 1 Text of Proposed Order)(Johnson, Mark) (Entered: 02/02/2022) |
| 02/03/2022 | 115 | ORDER granting 114 Consent Motion to Modify Scheduling Order. Status Report Deadline 7/5/2022. Signed by Magistrate Judge A. David Copperthite on 2/3/2022. (bmhs, Deputy Clerk) (Entered: 02/03/2022) |
| 02/04/2022 | 116 | REPLY to Response to Motion re 108 MOTION to Dismiss *Partial Motion to Dismiss or in the Alternative, for Summary Judgment* filed by Baltimore Lutheran High School Association. (Attachments: # 1 Exhibit, # 2 Exhibit, # 3 Attachment)(Johnson, Mark) (Entered: 02/04/2022) |
| 02/04/2022 | 117 | –SEALED – NOTICE of Filing Under Seal Exhibit 3 to Reply to Opposition to Partial Motion to Dismiss or in the Alternative, for Summary Judgment by Baltimore Lutheran High School Association re 116 Reply to Response to Motion, (Johnson, Mark) (Entered: 02/04/2022) |
| 02/04/2022 | 118 | MOTION to Seal *Exhibits* by Baltimore Lutheran High School Association (Attachments: # 1 Text of Proposed Order)(Johnson, Mark) (Entered: 02/04/2022) |
| 02/09/2022 | 119 | Request for Conference (Johnson, Mark) (Entered: 02/09/2022) |
| 02/09/2022 | 120 | PAPERLESS ORDER: I am in receipt of ECF 119. Any opposition to the relief requested by any party shall be filed by noon on Friday February 11, 2022. Signed by Magistrate Judge A. David Copperthite on 2/9/2022. (Chambers) (Entered: 02/09/2022) |
| 02/09/2022 | 121 | RESPONSE re 119 Request for Conference filed by Donna Buettner–Hartsoe, N.H., a minor.(Graziano, Christina) (Entered: 02/09/2022) |
| 02/10/2022 | 122 | ORDER denying Plaintiffs' demand to have a parent present in the examinations by Defendants' expert. Signed by Magistrate Judge A. David Copperthite on 2/10/2022. (bmhs, Deputy Clerk) (Entered: 02/10/2022) |
| 03/15/2022 | 123 | ORDER granting 118 Defendant's Motion for Leave to File Exhibits Under Seal. Signed by Judge Richard D. Bennett on 3/15/2022. (bmhs, Deputy Clerk) (Entered: 03/15/2022) |
| 03/17/2022 | 124 | Request for Conference (Attachments: # 1 Exhibit, # 2 Exhibit, # 3 Text of Proposed Order)(Viola, Gregg) (Entered: 03/17/2022) |

| 03/17/2022 | 125 | ORDER directing Dr. Michelle Perry of The Center for Trauma, Stress, and Anxiety, LLC shall produce documents and appear and testify at deposition. Signed by Magistrate Judge A. David Copperthite on 3/17/2022. (bmhs, Deputy Clerk) (Entered: 03/17/2022) |
| 06/23/2022 | 126 | MOTION to Appear Pro Hac Vice for Derek Braslow (Filing fee $100, receipt number AMDDC–10010418.) by Donna Buettner–Hartsoe, N.H., a minor (Attachments: # 1 Attachment U.S. Court Admissions)(Browne, Justin) (Entered: 06/23/2022) |
| 06/30/2022 | 127 | PAPERLESS ORDER granting 126 Motion to Appear Pro Hac Vice on behalf of Derek T Braslow. Directing attorney Derek T Braslow to register for pro hac vice filing in the District of Maryland through PACER at https://pacer.uscourts.gov/ if attorney has not already done so. The *Pro Hac Vice* option must be selected when registering. Signed by Clerk on 6/30/2022. (mh4s, Deputy Clerk) (Entered: 06/30/2022) |
| 07/05/2022 | 128 | STATUS REPORT *JOINT* by Donna Buettner–Hartsoe (Attachments: # 1 Text of Proposed Order)(Graziano, Christina) (Entered: 07/05/2022) |
| 07/05/2022 | 129 | ORDER Revising Scheduling Order. Signed by Judge Richard D. Bennett on 7/5/2022. (ols, Deputy Clerk) (Entered: 07/05/2022) |
| 07/21/2022 | 130 | MEMORANDUM OPINION. Signed by Judge Richard D. Bennett on 7/21/2022. (bmhs, Deputy Clerk) (Entered: 07/21/2022) |
| 07/21/2022 | 131 | ORDER denying 108 Defendant Concordia Preparatory School's Partial Motion to Dismiss, or in the Alternative, for Summary Judgment, construed as Partial Motion for Summary Judgment. Signed by Judge Richard D. Bennett on 7/21/2022. (bmhs, Deputy Clerk) (Entered: 07/21/2022) |
| 08/04/2022 | 132 | MOTION for Reconsideration re 131 Order on Motion to Dismiss, *Motion for Reconsideration, or in the Alternative, Motion to Certify Order for Interlocutory Appeal* by Baltimore Lutheran High School Association (Attachments: # 1 Memorandum in Support Memo of Law, # 2 Exhibit 1, # 3 Exhibit 2, # 4 Text of Proposed Order Order)(Johnson, Mark) (Entered: 08/04/2022) |
| 08/08/2022 | 133 | ORDER scheduling a hearing on the pending Motion for Reconsideration. Signed by Judge Richard D. Bennett on 8/8/2022. (bmhs, Deputy Clerk) (Entered: 08/08/2022) |
| 08/11/2022 | 134 | MOTION for Leave to File *Amicus Brief* by The Association of Independent Maryland & DC Schools (Attachments: # 1 Attachment Amicus Brief, # 2 Text of Proposed Order)(Genth, Geoffrey) (Entered: 08/11/2022) |
| 08/11/2022 | 135 | Local Rule 103.3 Disclosure Statement by The Association of Independent Maryland & DC Schools identifying Corporate Parent The Association of Independent Maryland & DC Schools, Other Affiliate Educators Benefits Services, Inc. for The Association of Independent Maryland & DC Schools.(Genth, Geoffrey) (Entered: 08/11/2022) |
| 08/11/2022 | 136 | MOTION for Leave to File *Amicus Brief* by National Association of Independent Schools, National Business Officers Association, Association of Independent Schools of Greater Washington, Southern Association of Independent Schools, Virginia Association of Independent Schools, North Carolina Association of Independent Schools, Palmetto Association of Independent Schools (Attachments: # 1 Exhibit A to Motion [Amicus Brief], # 2 Exhibit 1 to Amicus Brief [Letter to the Court])(Shea, Evan) (Entered: 08/11/2022) |
| 08/11/2022 | 137 | Local Rule 103.3 Disclosure Statement by Association of Independent Schools of Greater Washington, National Association of Independent Schools, National Business Officers Association, North Carolina Association of Independent Schools, Palmetto Association of Independent Schools, Southern Association of Independent Schools, Virginia Association of Independent Schools (Shea, Evan) (Entered: 08/11/2022) |
| 08/12/2022 | 138 | QC NOTICE: 136 Motion for Leave to File,, filed by Southern Association of Independent Schools, Association of Independent Schools of Greater Washington, National Association of Independent Schools, Virginia Association of Independent Schools, Palmetto Association of Independent Schools, North Carolina Association of Independent Schools, National Business Officers Association was filed incorrectly. ***The following attachments or exhibits are missing – Proposed Order. To correct** |

| | | |
|---|---|---|
| | | *this problem, file Proposed Order using the event Notice (Other) and link Proposed Order to 136* . (ols, Deputy Clerk) (Entered: 08/12/2022) |
| 08/13/2022 | 139 | NOTICE by Association of Independent Schools of Greater Washington, National Association of Independent Schools, National Business Officers Association, North Carolina Association of Independent Schools, Palmetto Association of Independent Schools, Southern Association of Independent Schools, Virginia Association of Independent Schools re 136 MOTION for Leave to File *Amicus Brief Proposed Order* (Shea, Evan) (Entered: 08/13/2022) |
| 08/22/2022 | 140 | RESPONSE in Opposition re 132 MOTION for Reconsideration re 131 Order on Motion to Dismiss, *Motion for Reconsideration, or in the Alternative, Motion to Certify Order for Interlocutory Appeal* filed by Donna Buettner–Hartsoe, N.H., a minor. (Attachments: # 1 Text of Proposed Order)(Graziano, Christina) (Entered: 08/22/2022) |
| 08/22/2022 | 141 | STATUS REPORT *JOINT* by Baltimore Lutheran High School Association (Attachments: # 1 Text of Proposed Order Order)(Johnson, Mark) (Entered: 08/22/2022) |
| 08/23/2022 | 142 | ORDER on 141 Joint Status Report and revised Scheduling Order. Signed by Judge Richard D. Bennett on 8/23/2022. (bmhs, Deputy Clerk) (Entered: 08/23/2022) |
| 08/24/2022 | 143 | NOTICE of Appearance by Steven Michael Klepper on behalf of The Association of Independent Maryland & DC Schools (Klepper, Steven) (Entered: 08/24/2022) |
| 08/26/2022 | 144 | REPLY to Response to Motion re 132 MOTION for Reconsideration re 131 Order on Motion to Dismiss, *Motion for Reconsideration, or in the Alternative, Motion to Certify Order for Interlocutory Appeal* filed by Baltimore Lutheran High School Association.(Johnson, Mark) (Entered: 08/26/2022) |
| 09/01/2022 | 145 | Motion Hearing held on 9/1/2022 re 132 MOTION for Reconsideration re 131 Order on Motion to Dismiss, *Motion for Reconsideration, or in the Alternative, Motion to Certify Order for Interlocutory Appeal* filed by Baltimore Lutheran High School Association before Judge Richard D. Bennett. (R. Carrick – Courtroom 5D)(Court Reporter: Ronda Thomas) (rc2s, Deputy Clerk) (Entered: 09/01/2022) |
| 09/06/2022 | 146 | MEMORANDUM OPINION. Signed by Judge Richard D. Bennett on 9/6/2022. (bmhs, Deputy Clerk) (Entered: 09/06/2022) |
| 09/06/2022 | 147 | ORDER granting 134 The Association of Independent Maryland & DC Schools' Motion for Leave to File Amicus Brief; granting 136 National Association of Independent Schools, National Business Officers Association, Southern Association of Independent Schools, Virginia Association of Independent Schools, North Carolina Association of Independent Schools, Palmetto Association of Independent Schools' Motion for Leave to File Amicus Brief; granting in part and denying in part 132 Defendant Concordia Preparatory School's Motion for Reconsideration, or in the Alternative, Motion to Certify Order for Interlocutory Appeal; and STAYING the remainder of the case pending review from the United States Court of Appeals for the Fourth Circuit. Signed by Judge Richard D. Bennett on 9/6/2022. (bmhs, Deputy Clerk) (Entered: 09/06/2022) |
| 09/06/2022 | 148 | AMICUS BRIEF of The Association of Independent Maryland & DC Schools in Support of Motion to Reconsider or to Certify Order for Interlocutory Appeal. (bmhs, Deputy Clerk) (Entered: 09/06/2022) |
| 09/06/2022 | 149 | BRIEF OF AMICI CURIAE by Association of Independent Schools of Greater Washington, National Association of Independent Schools, National Business Officers Association, North Carolina Association of Independent Schools, Palmetto Association of Independent Schools, Southern Association of Independent Schools, Virginia Association of Independent Schools in Support of Defendant's Motions for Reconsideration or, in the Alternative, to Certify Order for Interlocutory Appeal. (Attachments: # 1 Exhibit 1)(bmhs, Deputy Clerk) (Entered: 09/06/2022) |
| 09/06/2022 | | Magistrate Judge A. David Copperthite no longer assigned to case. (bmhs, Deputy Clerk) (Entered: 09/06/2022) |

| 09/06/2022 | | Case Stayed (kns, Deputy Clerk) (Entered: 10/25/2022) |
|---|---|---|
| 09/12/2022 | 150 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT of Motions Proceedings held on 9/1/2022, before Judge Richard D. Bennett. Court Reporter Ronda Thomas, ronda_thomas@mdd.courts.gov, Telephone number 410–962–4504. Total number of pages filed: 111. Transcript may be viewed at the court public terminal or purchased through the Court Reporter before the deadline for Release of Transcript Restriction. After that date it may be obtained from the Court Reporter or through PACER. Redaction Request due 10/3/2022. Redacted Transcript Deadline set for 10/13/2022. Release of Transcript Restriction set for 12/12/2022.(rt, Court Reporter) (Entered: 09/12/2022) |
| 04/26/2023 | 151 | USCA Order "Granting" motion for permission to appeal by Baltimore Lutheran High School Association. (bw5s, Deputy Clerk) (Entered: 04/27/2023) |
| 04/26/2023 | 152 | USCA Case Number 23–1453 for 151 Notice of Appeal filed by Baltimore Lutheran High School Association. Case Manager – Jeffrey S. Neal (bw5s, Deputy Clerk) (Entered: 04/27/2023) |
| 05/10/2023 | | USCA Appeal Fees received $ 505 receipt number 4427 re 151 Notice of Appeal filed by Baltimore Lutheran High School Association (kos, Deputy Clerk) (Entered: 05/10/2023) |

**UNITED STATES DISTRICT COURT**
**DISTRICT OF MARYLAND**
**Northern Division**

| | |
|---|---|
| **DONNA BUETTNER-HARTSOE** | |
| 4804 WATERPARK DRIVE | |
| BELCAMP, MD 21017 | |
| [Harford County, MD] | |
| | |
| and | |
| | |
| **N.H., a Minor,** by and through her Parent | **Case No. _____** |
| and Next Friend | |
| **DONNA BUETTNER-HARTSOE** | **JURY TRIAL DEMANDED** |
| 4804 WATERPARK DRIVE | |
| BELCAMP, MD 21017 | |
| [Harford County, MD] | |
| | |
| *Plaintiffs* | |
| | |
| v. | |
| | |
| **BALTIMORE LUTHERAN HIGH** | |
| **SCHOOL ASSOCIATION, D/B/A** | |
| **CONCORDIA PREPARATORY SCHOOL** | |
| 1145 CONCORDIA DRIVE | |
| TOWSON, MD 21286 | |
| [Baltimore County, MD] | |
| | |
| <u>SERVE ON RESIDENT AGENT:</u> | |
| | |
| BRENT JOHNSON | |
| 521 IDLEWILD ROAD | |
| BEL AIR, MD 21014 | |
| | |
| And | |
| | |
| **LUTHERAN CHURCH-MISSOURI** | |
| **SYNOD, SOUTHEASTERN DISTRICT** | |
| 6315 GROVEDALE DRIVE | |
| ALEXANDRIA, VA 22310 | |
| | |
| *Defendant.* | |

1

JA015

## AMENDED COMPLAINT AND JURY DEMAND

**NOW COME** the Plaintiffs, N.H., by and through her parent and next friend Donna Buettner-Hartsoe, by and through their attorneys, Ketterer, Browne & Associates, LLC, and bring forth this Complaint against the Defendant, Baltimore Lutheran High School Association d/b/a Concordia Preparatory School, and the Lutheran Church-Missouri Synod, Southeastern District and in support sets forth the following:

### PARTIES, JURISDICTION, AND VENUE

1.      At all times relevant to this action, Plaintiff N.H. is a minor resident of Harford County, Maryland (hereinafter referred to as "N.H.").

2.      At all times relevant to this action, Plaintiff Donna Buettner-Hartsoe is an adult resident of Harford County, Maryland, and is the mother of the minor Plaintiff N.H.

3.      Plaintiffs N.H. and Donna Buettner-Hartsoe will be referred to collectively as "Plaintiffs".

4.      At all times relevant to this action, Defendant Baltimore Lutheran High School Association d/b/a Concordia Preparatory School (hereinafter referred to as "Defendant" or "CPS") is a corporation organized and existing under the laws of the State of Maryland that maintains its principal place of business at 1145 Concordia Drive, Towson, Maryland.

5.      At all times relevant to this action, Defendant Lutheran Church-Missouri Synod, Southeastern District (hereafter referred to as "LCMS") is a regional district of The Lutheran Church- Missouri Synod and maintains central offices at 6315 Grovedale Drive, Alexandria, Virginia. The District appears to be an unincorporate association of member congregations, missions and schools that conduct activities and affairs, and provide financial support to member entities, in various states including Maryland.

6.      Defendant CPS and Defendant LCMS will be referred to collectively as "Defendants".

7.      This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1343, because Plaintiffs' statutory claim asserts a federal question over which this Court has jurisdiction and Plaintiffs asserts state-law claims over which this Court has supplemental jurisdiction.

8.      This Court has personal jurisdiction over Defendant pursuant to Fed. R. Civ. P. 4(k)(1)(a) because Defendant is domiciled in and conducts business within this judicial district.

9.      Venue in this Court is proper pursuant to 28 U.S.C. § 1391(b) because all the acts and omissions alleged herein occurred in this judicial district.

10.      The Northern District is the proper venue per 28 U.S.C. § 100(1).


**FACTUAL ALLEGATIONS COMMON TO ALL COUNTS**

11.      N.H. enrolled at CPS in the fall of 2017, when she was just fourteen old.

12.      CPS is an elite, co-educational parochial secondary school serving grades 6-12.

13.      CPS holds itself out as a "compassionate, Christ-centered community of servant leaders" that "strive[s] to create an environment that nurtures our students' spiritual, academic, physical, and social growth to become men and women of faith and service."

14.      It invites those looking to be "active participants in a safe and nurturing environment."

15.      Originally known as Baltimore Lutheran School, CPS is operated by the Baltimore Lutheran High School Association, Inc., (hereafter, "Defendant") an organization of Lutheran churches in the Baltimore area.

16.     Like most Lutheran schools and churches, CPS is overseen by the Lutheran Church-Missouri Synod, the governing body of the Lutheran church

17.     The Synod is divided into 35 districts, each with its own district president and staff of coordinators and overseers tasked with handling issues within member congregation and schools.

18.     According to CPS's website, the estimated annual cost of attendance for a high school enrollee is over $15,000.

19.     Prior to enrolling at CPS, N.H. thrived in middle school, where she excelled in sports and enjoyed numerous close friendships.

20.     N.H. grew up in a closely-knit family and had strong relationships with her parents, her twin sister, and her older siblings.

21.     Although N.H. had a variety of options for her high school education, she and her family chose CPS due to CPS representatives' promises of a safe, tight-knit community.

22.     CPS representatives told N.H. and her parents that the school offered a caring, closely-knit community in which she would have teachers and administrators looking out for her safety and well-being.

23.     N.H. and her parents believed she would be safe and would thrive at CPS as she had in middle school.

24.     N.H.'s parents paid the full tuition and fees for attendance at CPS and did not receive financial aid from CPS.

**CPS'S HYPER-SEXUALIZED CULTURE**

25.     N.H. found CPS to be far from the safe, nurturing community that she was promised.

4

26.     From the time she arrived on campus, N.H. experienced unwelcome sexual advances from some male students who were emboldened by formal and informal "traditions" at the school.

27.     Unbeknownst to N.H., older boys started to sexually target her the moment she set foot on campus.

28.     The concept of CPS students engaging in sexual behavior on CPS property, often during the school day, has long been part of CPS's ethos.

29.     One of the frequent venues for sexual behavior on CPS's campus is the visiting sports team's locker room (hereinafter the "Locker Room"), which is largely unused during the school day.

30.     The culture of using the Locker Room as a venue for engaging in sexual behavior during the school day was a prevalent part of CPS's culture while N.H. was a student, and was well known to the faculty and administrators.

31.     This hyper-sexualized culture at CPS was fueled in large part by a general consensus that student-athletes – especially male student-athletes, whose athletic programs drew in large alumni donations – were "above the law" and free from recrimination for rule-breaking.

### CPS'S FAILURE TO PREVENT AND STOP SEXUAL HARASSMENT AND ASSAULT ON ITS CAMPUS

32.     CPS failed to investigate, report, or take any meaningful action to curb instances of sexual harassment and assault on its campus prior to N.H.'s enrollment.

33.     Upon information and belief, a CPS teacher's daughter was assaulted while she was a student at CPS, and CPS' failure to act in response to the assault caused the teacher to un-enroll her daughter and to cease working for the institution.

34.     Upon information and belief, other former CPS students, who are still minors, were the victims of sexual assault during their tenure at CPS for which no investigation took place.

35.     This failure is not surprising given CPS' pattern of ignoring sexual assault and harassment.

36.     CPS was, or should have been, aware that many of its male students (some of them over the age of 18) had escalated the Locker Room tradition by using that space as a venue for forced sexual encounters with female students.

37.     CPS knew or should have known that students used the Locker Room as a venue for sexual harassment and/or statutory rape and secured CPS facilities that students used as "hook-up" spots or venues for sexual behavior.

38.     CPS took no significant action to investigate this allegation or any other instances of alleged aggressive sexual behavior by its male students.

39.     Similarly, CPS failed to investigate the usage of the Locker Room as a venue for sexual encounters, despite CPS' use of key cards and electronic tracking that would have made it possible for CPS to determine which male students were luring female students into the Locker Room for sexual encounters.

40.     Had CPS conducted the careful investigation that was plainly warranted and taken appropriate action, these known instances of sexual assault could have been easily prevented.

41.     CPS' failure to act resulted in, among other harms, N.H.'s sexual assault in April 2018 as described herein.

**N.H. IS REPEATEDLY ASSAULTED ON CPS' CAMPUS**

42.     In or around January 2018, N.H. began a friendship with a classmate, "John".

6

43.    John engaged in a series of non-consensual sexual acts with N.H., including filming a FaceTime call with N.H. in which N.H. masturbated (hereinafter, the "Video").

44.    N.H. did not consent to being filmed without her knowledge, nor did she consent to the dissemination of the Video.

45.    Unbeknownst to N.H., the Video was circulated around CPS via the iPhone "Air Drop" method of sharing and downloading files.

46.    Within weeks, the Video had circulated amongst the student body to the point that administrators and teachers were aware of its existence.

47.    In fact, N.H.'s guidance counselor, Ms. Gill, called a meeting with N.H. in which she discussed "rumors" about N.H. that she had heard. Ms. Gill did not inform N.H.'s parents about the Video.

48.    Meanwhile, the existence of the Video caused several male CPS students to fixate on N.H. as the object of their sexual obsessions.

49.    N.H. began receiving threatening phone calls from two such male CPS students, demanding that she perform oral sex and engage in other sexual acts with them or else they would post the Video to various social media accounts, including SnapChat and Instagram.

50.    The student callers also threatened to release additional photos and videos of N.H. performing sexual acts; because N.H. was not aware that that the Video was being taken of her in the first place, she lived in fear that others of her private sexual encounters were clandestinely filmed and disseminated.

51.    During one such phone call, N.H.'s twin sister was present and heard these threats being made.

7

52.    Another male student, "C", began to harass N.H. on CPS grounds during the school day.

53.    C was a prominent student-athlete at CPS and had previously been recruited to play on the basketball team.

54.    In or around February 2018, C stuck his hand up N.H.'s skirt during a religion class. N.H. immediately told C to stop and left the classroom to inform the assistant principal, Mr. Miller. No action was taken on the part of Mr. Miller.

55.    N.H. also informed Ms. Gill of the assault; Ms. Gill informed N.H. that she had, in fact, told Mr. Miller about the Video. Still, no action was taken and N.H.'s parents were not informed.

56.    C continued his practice of verbally and physically harassing N.H. on CPS grounds.

57.    On or around April 13, 2018, N.H. was lured to the Locker Room after her track practice by a senior CPS student who wanted to "make out" with N.H. (hereinafter, the "Locker Room Assault"). The senior CPS student pressured her to perform oral sex on him. He then instructed N.H. to remain in the locker room and to walk further back in the room. In the back of the locker room, a group of male CPS students were waiting for her and pushed her to the back of the room and turned out the lights. A student bear hugged N.H. and dragged her to the back wall while others students barricaded the door. C groped N.H. from behind and attempted to digitally rape her, while rubbing her hand against his erect penis. N.H. repeatedly told the students to stop and attempted to claw her way out of C's grip.

58.    Another CPS student who was in the Locker Room at the time intervened and helped N.H. escape the assault.

8

59.    Once outside the Locker Room, the male student and N.H. came face to face with N.H.'s twin sister, who saw the look of shock and anguish on N.H.'s face.

60.    N.H. and her sister reported the incident to CPS administrators on the next school day, but once more, the school failed to take any action and did not call N.H.'s parents.

61.    A female CPS student reported the blackmailing suffered by N.H. to Ms. Gill. CPS later expelled that student for having drugs on campus, not for his sexual misconduct with regard to N.H..

62.    The expelled student called N.H. weeks after the Locker Room Assault and demanded that she lie and tell his aunt that he did not disseminate the Video so that he would avoid punishment at home, which N.H. refused to do.

63.    Shortly after the Locker Room Assault, N.H.'s mental health and academic performance began to noticeably suffer.

64.    In or around April 2018, C approached N.H. while she was seated in the library and began screaming at her, calling her a "stupid bitch" for sitting in his chair, and threw her personal items on the ground. N.H. and her sister (who was also in the library) reported the incident to the principal, but again, C evaded punishment. N.H. was told to return to the library.

65.    Both male and female CPS students, including middle school students who saw the Video, began to bully and ridicule N.H..

66.    Male students told N.H. that they routinely masturbated to her images.

67.    N.H. was forced to change her phone number to evade constant harassment via social media and text messages.

68.    N.H. began seeing a counselor for PTSD symptoms and depression.

69.    N.H. informed Ms. Gill that she was experiencing symptoms of depression.

JA023

70.     Among other things, N.H. began to engage in self-harming behavior and promiscuity, which is attributed clinically to her experiences of having been sexually assaulted.

71.     N.H. disclosed her sexual assaults and harassment to CPS administrators who failed to report the sexual assault to state or local authorities, failed to alert N.H.'s parents, failed to conduct any investigation, failed to do anything to stop the ongoing sexual assaults and harassment, and failed to offer N.H. *any* accommodations based on the sexual harassment and assaults she had reported.

72.     Despite CPS' action in expelling one of the assailants, albeit for reasons unrelated to the Locker Room Assault, administrators at CPS failed to make any report to state or local authorities, failed to conduct any investigation, failed to even inform N.H.'s parents, and failed to offer N.H. any accommodations for the sexual assaults and harassment that she had experienced on CPS' campus.

73.     CPS and LCMS failed to make any report to state or local authorities, failed to conduct a thorough investigation, and failed to offer N.H. any accommodations for the sexual assaults and harassment that she had experienced on CPS' campus.

74.     Upon information and belief, these issues continue to pervade the CPS campus.

## N.H. IS TREATED LIKE A PROBLEM, NOT A SURVIVOR

75.     Shortly after administrators at CPS became aware that N.H. was sexually assaulted, they began to treat her like a problem on their campus.

76.     In one of her initial "counseling sessions" with Ms. Gill, N.H. recalls that Ms. Gill reacted negatively to N.H.'s use of the phrase "sexual assault" and told her "you shouldn't call it that." N.H. got the distinct impression that Ms. Gill thought that she was lying or that the encounter was consensual. N.H. felt abandoned by Ms. Gill in processing her trauma.

77.    Aside from baselessly insinuating that N.H. was not the survivor of assault, Ms. Gill did not investigate the allegations, and failed to report the allegations to authorities or to N.H.'s parents.

78.    N.H.'s health and academic performance continued to suffer throughout the spring semester of that academic year.

79.    Although administrators at CPS communicated their concerns about N.H.'s academic performance to her parents during routine parent/teacher conferences, they made *no* mention of the assaults against N.H..

80.    Overwhelmed by trauma and CPS' failure to do anything about it, N.H. began to engage in increasingly self-harming behavior.

81.    Based on her experience at CPS, N.H.'s parents decided not to enroll N.H. in the school for the following year, which resulted in N.H. having to adjust to a new environment while still processing the sexual assault that occurred months earlier.

82.    Due to the severity of her emotional distress stemming from her encounters of sexual assault at CPS, the sexually hostile environment at CPS, and the treatment she received from administrators at CPS and LCMS, N.H. was forced to undergo extensive mental health treatment.

83.    Despite enrolling at a different educational institution after CPS, the students at N.H.'s new school learned through social media and rumors that N.H. had been involved in a sexual encounter at CPS. Without knowing that N.H. was assaulted, her new classmates conferred on N.H. an unfair and hurtful reputation that she was unable to move beyond during the new school year.

84.    Thereafter, N.H. and her family elected to finish her high school education at home, far below the expectation of someone with her talent and intelligence.

## CAUSES OF ACTION

### COUNT I – *Violation of 20 U.S.C. § 1681, et. seq.*
### *Title IX of the Education Amendments Act*

**Against Defendant CPS**

85.    Plaintiffs incorporate and reallege all paragraphs of this Complaint into this Count.

86.    During the relevant timeframe, Defendant was a recipient of federal education funding within the meaning of Title IX, 20 U.S.C. § 1681(a).

87.    Defendant exercised substantial control over both students who assaulted N.H. and over the boys who harassed her. All the events giving rise to this claim occurred on CPS' grounds.

88.    In or about April 2018, N.H. faced severe discrimination based on sex when she was sexually assaulted verbally, physically and digitally on school grounds by CPS students, some of whom were over the age of 18. N.H. was also the victim of attempted statutory rape and of a pattern of unrelenting sexual harassment. The sexual assaults and harassment N.H. endured were sufficiently severe, pervasive, and objectively offensive to constitute a hostile educational environment for her at CPS.

89.    Defendant was on actual notice of the sexual assaults committed on N.H. and the hypersexual hostile environment that existed at the school during N.H.'s time there.

90.    Despite being on actual notice of the assaults on and harassment of N.H., CPS failed to take meaningful action to investigate the assault and/or to protect N.H. from retaliation

12

on the part of faculty, staff, and fellow students regarding N.H.'s attempts to seek out a safe educational environment.

91. Defendant acted with deliberate indifference to the complaints and other notice regarding the ongoing hostile education environment, ongoing threats, bullying, and retaliation faced by N.H. after reporting that she was sexually assaulted.

92. The hostile educational environment at CPS effectively barred N.H.'s access to educational opportunities and benefits because she was forced to leave CPS due to the continuing hostile environment at the school and due to ongoing bullying and retaliation at the school.

93. In addition to the foregoing violations of Title IX, CPS violated its Title IX obligations by:

    a. Failing to have a Title IX coordinator or any other person to receive complaints about gender-based discrimination, harassments, and/or assaults;

    b. Failing to have any policy for a student's reporting of sexual harassment and/or sexual assault;

    c. Failing to have a program for prevention of sexual harassment and sexual assault;

    d. Failing to have a program or policy for investigating sexual harassment or sexual assault;

    e. Failing to have a program or policy for offering accommodations to victims of sexual assault;

    f. Failing to have a program or policy for preventing retaliation against those who report sexual harassment and/or sexual assault;

    g. Failing to supervise, monitor, and/or train staff to handle reports of sexual assault appropriately and adequately; and,

h.  Retaliating against N.H. for reporting that she was sexually assaulted by subjecting her to arbitrary, capricious, and unwarranted "discipline" for pretextual reasons that masked the discriminatory nature of the school's treatment of her.

94.     As a direct and proximate cause of Defendant's violation of Title IX, N.H. has been deprived of educational opportunities and benefits that delayed her academic attainment during her high school education and thereafter. This deprivation was the result of Defendant's deliberate indifference to the hostile educational environment at CPS.

95.     As a direct and proximate cause of Defendant's violation of Title IX, N.H. has experienced and will likely continue to experience severe emotional distress accompanied by objective physical manifestations and/or symptoms (such as nausea, vomiting, elevated heart rate, sweating, nightmares, night terrors, and inability to sleep), loss of functioning, loss of earning potential, medical bills, and other pecuniary harms to be established at trial.

**WHEREFORE** Plaintiffs demand compensatory damages to be proven at trial in excess of the jurisdictional amount of $75,000; all costs and expenses of this lawsuit, including attorneys' fees; enhanced compensatory damages as permitted by law; punitive damages in an amount to be determined at trial; and all other and further relief that justice may require.

### COUNT II – *Negligent Supervision and Retention*

### Against Defendant CPS and Defendant LCMS

96.     Plaintiffs incorporate and reallege all paragraphs of this Complaint into this Count.

97.     Defendants had a fiduciary relationship with N.H. as both a student and minor under the age of 18.

14

98.    As a Maryland educational institution, CPS owed N.H. a special duty of trust and confidence to ensure her safety and well-being.

99.    Defendant CPS, through its Board of Directors, administrators, faculty, or staff, and Defendant LCMS breached their duty owed to N.H. by, among other things:

   a.   Failing to properly protect N.H., a minor, from sexual abuse and harassment;

   b.   Improperly protecting N.H., a minor, from sexual abuse and harassment;

   c.   Failing to investigate, correct, and/or otherwise address the openly pervasive environment of sexual harassment and sexual objectification of its female students by its male students;

   d.   Failing to investigate, correct, and/or otherwise address the Locker Room tradition that emerged from this environment;

   e.   Failing to investigate, prohibit, and/or otherwise address the formation of the illicit use of CPS facilities for sexual exploits and use of CPS email, networks, Internet connections, and other devices to ritualize, coordinate, and otherwise openly discuss those exploits;

   f.   Ignoring and/or otherwise failing to properly address complaints about numerous instances of sexual assaults occurring on the CPS campus;

   g.   Failing to promptly report N.H.'s sexual assaults to the authorities;

   h.   Failing to take any action to prevent retaliation against N.H. after her assaults were reported to CPS;

   i.   Failing to conduct an exit interview with N.H. when she left the school;

   j.   Failing to heed numerous warnings regarding after-hours security and lax disciplinary policies;

15

JA029

k.  Failing to supervise, monitor, and/or train staff to handle reports of sexual assault appropriately and adequately; and,

l.  Retaliating against N.H. for reporting that she was sexually assaulted by subjecting her to arbitrary, capricious, and unwarranted "discipline" for pretextual reasons that masked the discriminatory nature of the school's treatment of her.

100.  Defendant, LCMS and Defendant CPS, through its Board of Directors, administrators, faculty, or staff, knew or should have known that it had created an opportunity for N.H. to be sexually assaulted and harassed and that the lack of protocols for which incidents of sexual assault were reported were woefully insufficient.

101.  Defendants failed to provide adequate training, monitoring, and supervision of its administrators, faculty, and/or staff concerning reports of sexual assault.

102.  Defendants carelessly and recklessly failed to supervise its male students, even after specific complaints of **sexual** assault and harassment had been lodged against them by various students, including N.H..

103.  Defendants failed to implement training and monitoring mechanisms by which sexual assaults such as those suffered by N.H. could have been prevented, or at the very least, appropriately reported to parents and law enforcement authorities.

104.  Defendants' conduct was wanton, malicious, or oppressive in that Defendant disregarded or exhibited reckless indifference to the foreseeable risks of harm and acted with ill will, hatred, hostility, a bad motive, or the intent to abuse its power.

105.  As a direct and proximate cause of Defendants' violation of its fiduciary duty to her, N.H. has experienced and will likely continue to experience severe emotional distress

16

accompanied by physical manifestations (such as nausea, vomiting, elevated heart rate, sweating, nightmares, night terrors, and inability to sleep) and other harms to be established at trial.

106.    As a direct and proximate result of Defendants' negligence, Plaintiff N.H. sustained serious injuries, had to undergo treatment and medical care, to incur medical expenses, incur lost wages, to lose time from her daily pursuits, to lose the ability to function normally, and she suffered impairment of her future earnings.

**WHEREFORE** Plaintiffs demand compensatory damages to be proven at trial in excess of the jurisdictional amount of $75,000; all costs and expenses of this lawsuit, including attorneys' fees; enhanced compensatory damages as permitted by law; punitive damages in an amount to be determined at trial; and all other and further relief that justice may require.

## COUNT III – *Negligence*

## AGAINST DEFENDANT CPS AND DEFENDANT LCMS

107.    Plaintiffs incorporate and reallege all paragraphs of this Complaint into this Count.

108.    In the fall of 2017, N.H. enrolled at CPS and was thereby deprived of the protection of her parents while on school grounds and during the school day.

109.    Upon N.H.'s enrollment, Defendant assumed custody of her and other students while on the school's premises.

110.    In so doing, Defendant entered into a relationship with N.H. that imposed on it a duty of reasonable care, including, among other things, a duty of supervision to protect N.H. from reasonably foreseeable harm.

111.    Defendant LCMS and Defendant CPS, through its Board of Directors, administrators, faculty, or staff, breached their duty owed to N.H. by, among other things:

17

a.  Failing to properly protect N.H., a minor, from sexual abuse and harassment;

b.  Failing to identify and eliminate, minimize, and/or address known and foreseeable risks of physical and emotional injury;

c.  Improperly protecting N.H., a minor, from sexual abuse and harassment;

d.  Failing to investigate, correct, and/or otherwise address the openly pervasive environment of sexual harassment and sexual objectification of its female students by its male students;

e.  Failing to investigate, correct, and/or otherwise address the Locker Room tradition that emerged from this environment;

f.  Failing to investigate, prohibit, and/or otherwise address the formation of the illicit use of CPS facilities for sexual exploits and use of CPS email, networks, Internet connections, and other devices to ritualize, coordinate, and otherwise openly discuss those exploits;

g.  Ignoring and/or otherwise failing to properly address complaints about numerous instances of sexual assaults occurring on the CPS campus;

h.  Failing to promptly report N.H.'s sexual assaults to the authorities;

i.  Failing to take any action to prevent retaliation against N.H. after her assaults were reported to CPS;

j.  Failing to conduct an exit interview with N.H. when she left the school;

k.  Failing to heed numerous warnings regarding after-hours security and lax disciplinary policies;

l.  Failing to supervise, monitor, and/or train staff to handle reports of sexual assault appropriately and adequately; and,

m. Retaliating against N.H. for reporting that she was sexually assaulted by subjecting her to arbitrary, capricious, and unwarranted "discipline" for pretextual reasons that masked the discriminatory nature of the school's treatment of her.

112.    Defendant LCMS and Defendant CPS, through its Board of Directors, administrators, faculty, or staff, knew or should have known that it had created an opportunity for N.H. to be sexually assaulted and harassed.

113.    Defendants' conduct was wanton, malicious, or oppressive in that Defendants disregarded or exhibited reckless indifference to the foreseeable risks of harm and acted with ill will, hatred, hostility, a bad motive, or the intent to abuse its power.

114.    As a direct and proximate cause of Defendants' violation of its fiduciary duty to her, N.H. has experienced and will likely continue to experience severe emotional distress accompanied by physical manifestations (such as nausea, vomiting, elevated heart rate, sweating, nightmares, night terrors, and inability to sleep) and other harms to be established at trial.

115.    As a direct and proximate result of Defendants' negligence, Plaintiff N.H. sustained serious injuries, had to undergo treatment and medical care, to incur medical expenses, incur lost wages, to lose time from her daily pursuits, to lose the ability to function normally, and she suffered impairment of her future earnings.

**WHEREFORE** Plaintiffs demand compensatory damages to be proven at trial in excess of the jurisdictional amount of $75,000; all costs and expenses of this lawsuit, including attorneys' fees; enhanced compensatory damages as permitted by law; punitive damages in an amount to be determined at trial; and all other and further relief that justice may require.

### COUNT IV – *Intentional Infliction of Emotional Distress*

### Against Defendant CPS

19

116.    Plaintiffs incorporate and reallege all paragraphs of this Complaint into this Count.

117.    While on CPS' premises, N.H. was a business invitee of CPS.

118.    CPS owed N.H. a duty to use reasonable care under all circumstances in the maintenance and operation of the premises, and to take reasonable precautions to protect her against foreseeable dangers arising out of the arrangements or use of the premises.

119.    CPS, through its Board of Directors, administrators, faculty, or staff, failed to act with reasonable care to protect N.H. and her fellow female students from foreseeable dangers of which CPS had ample actual notice, including, among other things:

    a.  Failing to properly protect N.H., a minor, from sexual abuse and harassment;

    b.  Improperly protecting N.H., a minor, from sexual abuse and harassment;

    c.  Failing to investigate, correct, and/or otherwise address the openly pervasive environment of sexual harassment and sexual objectification of its female students by its male students;

    d.  Failing to investigate, correct, and/or otherwise address the Locker Room tradition that emerged from this environment;

    e.  Failing to investigate, prohibit, and/or otherwise address the formation of the illicit use of CPS facilities for sexual exploits and use of CPS email, networks, Internet connections, and other devices to ritualize, coordinate, and otherwise openly discuss those exploits;

    f.  Ignoring and/or otherwise failing to properly address complaints about numerous instances of sexual assaults occurring on the CPS campus;

    g.  Failing to promptly report N.H.'s sexual assaults to the authorities;

     h.   Failing to take any action to prevent retaliation against N.H. after her assaults were reported to CPS;

     i.   Failing to conduct an exit interview with N.H. when she left the school;

     j.   Failing to heed numerous warnings regarding after-hours security and lax disciplinary policies;

     k.   Failing to supervise, monitor, and/or train staff to handle reports of sexual assault appropriately and adequately; and,

     l.   Retaliating against N.H. for reporting that she was sexually assaulted by subjecting her to arbitrary, capricious, and unwarranted "discipline" for pretextual reasons that masked the discriminatory nature of the school's treatment of her.

120.    Defendant, through its Board of Directors, administrators, faculty, or staff, knew or should have known that it had created an opportunity for N.H. to be sexually assaulted and harassed.

121.    Defendant's conduct was extreme and outrageous, and it intentionally or recklessly caused N.H. severe emotional distress.

122.    Defendant's conduct was so outrageous in character, and so extreme in degree, that it exceeds all possible bounds of decency, is atrocious, and is utterly intolerable in a civilized community.

123.    Defendant purposefully intended to cause or recklessly disregarded the high probability of causing a disturbance of N.H.'s emotional tranquility that was so severe that harmful physical consequences resulted.

124.    As a direct and proximate cause of Defendant's violation of its fiduciary duty to her, N.H. has experienced and will likely continue to experience severe emotional distress

JA035

accompanied by physical manifestations (such as nausea, vomiting, elevated heart rate, sweating, nightmares, night terrors, and inability to sleep) and other harms to be established at trial.

125.　As a direct and proximate result of Defendant's negligence, Plaintiff N.H. sustained serious injuries, had to undergo treatment and medical care, to incur medical expenses, incur lost wages, to lose time from her daily pursuits, to lose the ability to function normally, and she suffered impairment of her future earnings.

**WHEREFORE** Plaintiffs demand compensatory damages to be proven at trial in excess of the jurisdictional amount of $75,000; all costs and expenses of this lawsuit, including attorneys' fees; enhanced compensatory damages as permitted by law; punitive damages in an amount to be determined at trial; and all other and further relief that justice may require.

## <u>DEMAND FOR JURY TRIAL</u>

Plaintiffs demand a trial by jury on all issues in this action so triable.

Dated: <u>July 1, 2021</u>　　　　　　　Respectfully submitted,

　<u>/s/　　Christina Graziano　　　　　　</u>
Justin Browne (Bar No. 29164)
Christina Graziano (*admitted pro hac vice* )
Brian Ketterer (*admitted pro hac vice*)
KETTERER, BROWNE & ASSOCIATES, LLC
336 S Main Street
Suite 2A-C
Bel Air, MD 21014
Phone: (410) 885-6267
Fax: (855) 334-5626
Justin@KBAAttorneys.com
Christina@KBAAttorneys.com
Brian@KBAAttorneys.com

JA036

JA037

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| **DONNA BUETTNER-HARTSOE, et al.**<br><br>    **Plaintiffs**<br><br>**v.**<br><br>**BALTIMORE LUTHERAN HIGH SCHOOL ASSOCIATION d/b/a CONCORDIA PREPARATORY SCHOOL, et al.**<br><br>    **Defendants** | **Case No.:  1:20-cv-03132-RDB** |

## PARTIAL MOTION TO DISMISS OR IN THE ALTERNATIVE, FOR SUMMARY JUDGMENT

Defendant Baltimore Lutheran High School Association d/b/a Concordia Preparatory School ("CPS"), by and through undersigned counsel, pursuant to Federal Rules of Civil Procedure 12 and 56, moves this Court for an Order dismissing Count I of the Plaintiffs' Amended Complaint, for violation of Title IX, or in the alternative for summary judgment in CPS' favor as to Count I, and for good cause states as follows:

1.      This matter arises out of Plaintiffs' allegations of student-on-student sexual harassment and/or assault, and Defendant's response thereto, while Plaintiff N.H. was a student at CPS.  As to Plaintiffs' claims in Count I of the Amended Complaint, for violation of Title IX, such claims are subject to dismissal for lack of subject matter jurisdiction, as CPS is not a recipient of Federal financial assistance under Title IX.  Alternatively, as there are no disputes of material fact that CPS is not a recipient of Federal financial assistance, CPS is entitled to judgment as a matter of law with regard to Plaintiffs' claims in Count I in the Amended Complaint.

J:\1C158\Motion\MTD-MSJ.Docx

2.      CPS hereby incorporates by reference the accompanying Memorandum of Law in support of Defendant's Partial Motion to Dismiss, or in the Alternative, for Summary Judgment, with the same force and effect as if it were fully restated herein.

WHEREFORE, for the reasons set forth herein, and in the accompanying Memorandum of Law, which is expressly incorporated by reference, CPS requests that the Court grant CPS' Motion, and dismiss Count I of the Plaintiffs' Amended Complaint, or in the alternative, enter judgment in CPS' favor as to claims in Count I of the Amended Complaint, and that the Court issue any and all other relief it deems just and appropriate.

Respectfully submitted,

*/s/Gregg E. Viola*
Gregg E. Viola (25737)
ECCLESTON & WOLF, P.C.
Baltimore-Washington Law Center
7240 Parkway Drive, 4th Floor
Hanover, MD 21076-1378
(410) 752-7474 (phone)
(410) 752-0611 (fax)
E-mail: viola@ewmd.com
*Attorney for Defendant*

*/s/Eric M. Rigatuso*
Eric M. Rigatuso (27605)
ECCLESTON & WOLF, P.C.
Baltimore-Washington Law Center
7240 Parkway Drive, 4th Floor
Hanover, MD 21076-1378
(410) 752-7474 (phone)
(410) 752-0611 (fax)
E-mail: rigatuso@ewmd.com
*Attorney for Defendant*

*/s/Mark P. Johnson*
Mark P. Johnson (29091)
ECCLESTON & WOLF, P.C.
Baltimore-Washington Law Center
7240 Parkway Drive, 4th Floor
Hanover, MD 21076-1378
(410) 752-7474
(410) 752-0611 (fax)
E-mail: johnson@ewmd.com
*Attorney for Defendant*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 7th day of January, 2022, copies of the foregoing were

served via the Court's ECF System to:

> Justin Browne, Esq.
> Christina Graziano, Esq.
> Brian Ketterer, Esq.
> Ketterer Browne & Anderson
> 336 S. Main Street, Suite 2A-C
> Bel Air, MD 21014
> justin@kbaattorneys.com
> christina@kbaattorneys.com
> brian@kbaattorneys.com
> *Attorney for Plaintiff*
>
> Brian S. Goodman, Esq.
> Goodman & Donohue LLC
> 9199 Reisterstown Road, Suite 213 C
> Owings Mills, MD 21117
> brian@goodmandonohue.com

> */s/Eric M. Rigatuso*
> Eric M. Rigatuso (Bar # 27605)

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| **DONNA BUETTNER-HARTSOE, et al.**<br><br>    **Plaintiffs**<br><br>**v.**<br><br>**BALTIMORE LUTHERAN HIGH SCHOOL ASSOCIATION d/b/a CONCORDIA PREPARATORY SCHOOL, et al.**<br><br>    **Defendants** | **Case No.:  1:20-cv-03132-RDB** |

## MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT'S PARTIAL MOTION TO DISMISS OR IN THE ALTERNATIVE FOR SUMMARY JUDGMENT

Defendant Baltimore Lutheran High School Association d/b/a Concordia Preparatory School ("CPS"), by and through undersigned counsel, hereby submits this Memorandum of Law in support of its Partial Motion To Dismiss or in the Alternative, for Summary Judgment as to Count I of the Plaintiffs' Amended Complaint, for violation of Title IX.

## INTRODUCTION

This matter arises out of Plaintiffs Donna Buettner-Hartsoe and her daughter N.H.'s allegations of student-on-student sexual harassment and/or assault, and the Defendant's response thereto, while Plaintiff N.H. (hereafter "Plaintiff") was a student at CPS.  Among others, Plaintiffs have asserted a cause of action against CPS for Violation of Title IX (Count I).

Plaintiffs' claim in Count I of the Amended Complaint, alleging violation of Title IX, fails as a matter of law, in that Defendant CPS is not a recipient of federal financial assistance, and thus is not subject to the requirements of Title IX.  As is demonstrated in greater detail below, Plaintiffs have failed to come forth with any support or evidence of the receipt of federal financial assistance

by CPS sufficient to support a Title IX claim; and thus has failed to satisfy its burden to proceed with such claim.  Rather, during the time period relevant to this matter, CPS received no direct federal funding; but rather received government funding only through State and County sources, insufficient to trigger Title IX's requirements Consequently, the claim must be dismissed for lack of subject matter jurisdiction, or alternatively, judgment entered in favor of CPS.

## STATEMENT OF UNDISPUTED FACTS[1]

Plaintiff N.H. enrolled at CPS during the Fall of 2017.  Am. Compl. ¶ 11.  Plaintiffs allege sexual harassment and assault commencing in or around January 2018, and continuing through the remainder of that school year.  Plaintiff N.H. did not return to CPS for the 2018-2019 school year. Am. Compl. ¶¶ 42-81.

During the 2017-2018 time period, and the time preceding, CPS did not receive any direct federal education funding.  CPS' governmental educational funding during that period of time was received only from  the State of Maryland,  including grants, scholarships, development funds, and emergency funds. CPS faculty members also received reimbursement for classes, courses,  or other professional development from funds designated for CPS staff by     Baltimore County Public Schools System.  Ex. 1, Affidavit of Brent Johnson.

## STANDARD OF REVIEW

Federal district courts are courts of limited jurisdiction, and, at all times, are obligated to be assured of their subject matter jurisdiction over matters before them. *Durant, Nichols, Houston, Hodgson & Cortese-Costa P.C. v. Dupont,* 565 F.3d 56, 62-63 (2d Cir. 2009). In deciding a motion

---

[1] Several facts identified herein pertaining to the substance of Plaintiffs' claims are accepted as true solely for purposes of this Motion.  To the extent the matter were to proceed, CPS disputes these factual allegations vehemently. Nevertheless, they are undisputed solely for the purposes of this Motion, in that even when such facts are viewed in the light most favorable to the Plaintiffs, the Title IX claim necessarily fails due to the lack of federal financial assistance to CPS.

2

to dismiss for lack of subject matter jurisdiction pursuant to Rule 12(b)(1), the Court generally accepts the alleged facts as true, although when necessary to resolve a factual dispute, may consider evidentiary submissions outside of the pleadings. *Makarova v. U.S.*, 201 F.3d 110, 113 (2d Cir. 2000). Because there is not diversity of citizenship in this matter pursuant to 28 U.S.C. § 1332, federal subject matter jurisdiction for Plaintiffs' Title IX claim is asserted pursuant to 28 U.S.C. § 1331. The absence of support for an allegation that a defendant is the recipient of federal financial assistance deprives the court of jurisdiction to adjudicate a Title IX claim, and dismissal is required. *Sorvillo v. St. Francis Preparatory Sch.*, 2014 U.S. Dist. LEXIS 186923 (E.D. N.Y. 2014).

As the party invoking federal jurisdiction, Plaintiffs have "the burden of proving by a preponderance of the evidence the subject matter jurisdiction exists." *Tandon v. Captains Cove Marina of Bridgeport, Inc.*, 752 F.3d 239, 243 (2nd Circuit, 2014). To this end, Plaintiffs are afforded the opportunity to develop such an issue during discovery in order to meet its burden. *Doe v. Meisels*, 2016 U.S. Dist. LEXIS 66740, *5 (E.D. N.Y. 2016). At the close of such discovery, an insufficient showing of the basis to satisfy jurisdiction and to move forward renders a claim inadequate, and a lack of jurisdiction for the Court. *Id.*

Summary judgment is appropriate under Rule 56(c) of the Federal Rules of Civil Procedure when there is no genuine issue as to any material fact, and the moving party is plainly entitled to judgment in its favor as a matter of law. In undertaking this inquiry, a court must view the facts and reasonable inferences drawn therefrom "in the light most favorable to the party opposing the motion." *Matsushita Blec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (quoting *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962)); see also *EEOC v. Navy Federal Credit Union*, 424 F.3d 397, 405 (4th Cir. 2005). "Once the movant has established the absence of any

3

genuine issue of material fact, the opposing party has an obligation to present some type of evidence to the court demonstrating the existence of an issue of fact." *Pension Benefit Guar. Corp. v. Beverley*, 404 F.3d 243, 246-47 (4th Cir. 2005). A "party cannot create a genuine dispute of material fact from your speculation or compilation of inferences." *Shin v. Shalala*, 166 F.Supp.2d 373, 375 (D. Md. 2001) (citations omitted). The Supreme Court has clarified that this does not mean that any factual dispute will defeat the motion:

> "By its very terms the standard provides that the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact. *Anderson v. Liberty Lobby LLC.*, 477 U.S. 242, 247-48 (1986)."

In fact, "the party opposing a properly supported motion for summary judgment 'may not rest upon the mere allegations or denials of [his] pleadings,' but rather must 'set forth specific facts showing that there is a genuine issue for trial.'" *Bouchat v. Baltimore Ravens Football Club, Inc.*, 346 F.3d 514, 525 (4th Cir. 2003) (alteration in original) (quoting Federal Rule of Civil Procedure 56(e)). The court must abide by the "affirmative obligation of the trial judge to prevent factually unsupported claims and defenses from proceeding to trial." *Bouchat*, 346 F.3d at 526 (internal quotation marks omitted) (quoting *Drewitt v. Pratt*, 999 F.2d 774, 778-79 (4th Cir. 1993), and citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986).

## **ARGUMENT**

1. **Plaintiffs' Title IX Claim in Count I of the Amended Complaint Fails as a Matter of Law as CPS is Not a Recipient of Federal Financial Assistance, and Thus Not Subject to Title IX Requirements**

Title IX is what is known as spending clause legislation, applicable to schools and educational programs receiving federal funds. Title IX provides that no person "shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subject to discrimination" in a federally-funded program. *Borkowski v. Balt. City*, 414 F. Supp. 3d 788, 817-818 (D. Md.

4

2019). Title IX "conditions an offer of federal funding on a promise by the recipient not to discriminate, in what amounts essentially to a contract between the government and the recipient of funds." *Gebser v. Lago Vista Indep. Sch. Dist.*, 524 U.S. 274, 286 (1998). Only "recipients" are bound by the statute. *Doe v. Meisels,* 2016 U.S. Dist. LEXIS 66740, *2 (E.D. N.Y. 2016). A "recipient" is an entity "to whom federal financial assistance is extended directly or through another recipient." *NCAA v. Smith*, 525 U.S. 459, 468 (1999). To clarify the scope of the statute, the Court noted that entities that receive federal assistance, whether directly or through an intermediary, are recipients within the meaning of Title IX; entities that only benefit economically from federal assistance are not. *Id.* An entity does not need to be a direct recipient of federal funds, but can also be an entity or organization that receives federal assistance "through another recipient." *Alston v. Va. High Sch. League, Inc.*, 144 F. Supp. 2d 526, 530 (W.D. Va. 1999). The Plaintiffs, however, have the burden to prove whether the Defendant receives federal financial assistance indirectly. *Id.*

"Federal financial assistance" encompasses direct transfers of federal money, property, or services from the government to a program. *Johnny's Icehouse, Inc. v. Amateur Hockey Ass'n.*, 134 F. Supp. 2d 965, 972 (N.D. Ill. 2001).

Conclusory allegations and unsubstantiated assertions are not evidence and are not enough to defeat a well-supported motion for summary judgment. *Kane v. Leona Ohio Empl. Grp., LLC*, 2020 U.S. Dist. LEXIS 138702, *4 (N.D. Oh. 2020) (citing *Lujan v. Nat'l. Wildlife Fed'n.*, 497 U.S. 871, 888). A party that does not bear the burden of persuasion may move for summary judgment by "pointing out to the District Court-that there is an absence of evidence to support the non-moving party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). "If after an adequate opportunity for discovery, the non-movant does not come forward with evidence that

5

would reasonably permit the finder of fact to find in her favor on a material question, then the Court *must* enter summary judgment against her." *Modrowski v. Pigatto*, 712 F.3d 1166, 1167 (7th Circuit 2013) (quoting *Waldridge v. Amer. Hoechst Corp.,* 24 F.3d 918, 920 (7th Circuit 1994) (emphasis in original)).

To establish that an entity receives federal assistance through an intermediary or indirectly, and thus constitutes a recipient, as opposed to an entity that only benefits economically from federal assistance, and is not subject to Title IX, it is necessary to establish that the entity was provided "with federal funds earmarked for that purpose." *Sharer v. Oregon*, 581 F.3d 1176, 1181 (9th Cir., 2009) (quoting *NCAA v. Smith*, 525 U.S. 459, 468 (1999)).   Stated otherwise, it is necessary to establish the source of funds to the Defendant; and in cases not involving direct funds from the federal government, that such other funds were originally derived from the federal government and earmarked for the specific purpose. *Lynn v. St. Anne Inst.*, 2006 U.S. Dist. LEXIS 18786, *37-38 (N.D. N.Y. 2006).

Plaintiffs have failed to satisfy their burden in establishing CPS is a recipient of federal financial assistance, and thus subject to Title IX.  Plaintiffs' Amended Complaint contains only a single reference to the issue.  Plaintiffs assert that during the relevant time CPS was a "recipient of federal education funding within the meaning of 20 U.S.C. § 1681(a)."  Am. Compl. ¶ 86.  The Amended Complaint does not identify any specific funding, revenue, or other assistance CPS received.  Furthermore, the Amended Complaint does not identify the manner or means in which any such assistance or funding was received, or the specific source of <u>any</u> funding.  In short, the Amended Complaint contains nothing more than a conclusory allegation that CPS is a "recipient."  It does not identify the facts necessary to establish that CPS received federal financial assistance sufficient to subject it to the requirements and strictures of Title IX.   This constitutes an

insufficiency on the Plaintiffs' part, and an inability to meet their burden.  It is sufficient for CPS

to merely point out the inadequacy in Plaintiffs' Amended Complaint and subsequent production

of evidence in discovery to warrant summary judgment in its favor on the Title IX Count.

*Modrowski v. Pigatto*, 712 F.3d 1166, 1167 (7ᵗʰ Cir. 2013).  Nevertheless, the record goes beyond

that.  CPS notes that it did not, in fact, receive federal education funding during the 2017-2018

time period in which Plaintiffs allege incidents of sexual harassment and assault occurred.  Ex. 1,

Affidavit of Brent Johnson.  Although CPS received some governmental funding, it is insufficient

upon which to base a Title IX claim.  Plaintiffs have not come forward and demonstrated that any

State or local government funding received by CPS is, in any way sufficient to trigger Title IX.

As the U.S. District Court for the Northern District of New York noted:

> "The St. Anne Defendants move to dismiss the Title IX claim on the ground
> that they are not subject to Title IX because they do not receive federal
> funding. In support of this claim, the St. Anne Defendant submitted
> affidavits stating that St. Anne does not receive any federal funding. In
> response, Plaintiffs fail to offer any evidence that St. Anne receives federal
> funding. Instead, Plaintiffs argue that St. Anne receives state funding, some
> of which may have been derived from the federal government. Plaintiffs'
> argument is conclusory and, in any event, is precluded by the Supreme
> Court's holding in *NCAA v. Smith*, 525 U.S. 459, 119 S. Ct. 924, 929, 142
> L. Ed. 2d 929 (1999).
>
> First, Plaintiffs have provided no evidence concerning the source of the state
> money paid to St. Anne. Second, in Smith, the Supreme Court held that
> "entities that receive federal assistance, whether directly or through an
> intermediary, are recipients within the meaning of Title IX; entities that only
> benefit economically from federal assistance are not." There is no evidence
> that St. Anne received federal assistance directly or through an
> intermediary. **Assuming St. Anne receives monies from the state that
> were originally derived from the federal government, it can only be said
> that St. Anne benefits economically from federal assistance.** There is no
> evidence that the federal funds were earmarked for St. Anne (or foster care).
> Accordingly, St. Anne is not subject to Title IX."

*Lynn v. St. Anne Inst*., 2006 U.S. Dist. LEXIS 18786, *37-38 (N.D. N.Y. 2006) (emphasis added).

The *Lynn* case is strikingly similar to the current matter. The Plaintiffs have provided nothing other than their own conclusory allegation that CPS received federal education funding, but without any support. There is no indication of any direct federal education funding, or derivative funds "earmarked" for such purpose. The fact that CPS received some funding at the State or local level is not indicative of recipient status. Even if such funding was assumed to have originally been derived from the federal government (which it cannot), it could still only be said that CPS benefitted from federal assistance, which is insufficient to trigger Title IX. Plaintiffs plainly failed to meet their burden, and have not sufficiently developed necessary evidence to proceed with this claim to trial. *Buckley v. Archdiocese of Rockville Centre*, 992 F. Supp. 586, 588-90 (E.D. N.Y. 1998) (in the absence of any factual allegations that the Defendant received federal funds itself or had any formal institutional affiliation with an entity that did, Title IX claim could not be maintained). Thus, there being no dispute in material fact, Plaintiffs have failed to adduce the necessary factual support for their contention that CPS is a recipient of federal financial assistance, sufficient to render CPS subject to the requirements of Title IX. As CPS is not such a recipient, and the requirements of Title IX do not apply, Plaintiffs' Count I for violation of Title IX fails as a matter of law. The Court thus lacks jurisdiction to proceed with Count I, and it must be dismissed, or CPS is entitled to judgment as to Count I.[2]

---

[2] Courts are split as to the procedural disposition when there is an absence of federal financial assistance to sustain a Title IX claim. Some courts dismiss the claim for lack of subject matter jurisdiction pursuant to Fed. R. Civ. P. 12(b)(1). *Sorvillo v. St. Francis Preparatory Sch.*, 2014 U.S. Dist. LEXIS 186923 (E.D. N.Y. 2014). Others have entered summary judgment for the defendant. *Sharer v. Oregon*, 581 F.3d 1176 (9th Cir. 2009).

8

JA048

## CONCLUSION

For the reasons set forth herein, and CPS' Partial Motion to Dismiss or in the Alternative, for Summary Judgment, CPS requests that the Court grants its Motion, and dismiss Count I of the Amended Complaint for lack of subject matter jurisdiction, or in the alternative enter summary judgment on CPS' behalf with regard to Count I of Plaintiffs' Amended Complaint, and issue any and all other relief it deems just and appropriate.

Respectfully submitted,

*/s/Gregg E. Viola*
———————————————
Gregg E. Viola (25737)
ECCLESTON & WOLF, P.C.
Baltimore-Washington Law Center
7240 Parkway Drive, 4th Floor
Hanover, MD 21076-1378
(410) 752-7474 (phone)
(410) 752-0611 (fax)
E-mail: viola@ewmd.com
*Attorney for Defendant*

*/s/Mark P. Johnson*
———————————————
Mark P. Johnson (29091)
ECCLESTON & WOLF, P.C.
Baltimore-Washington Law Center
7240 Parkway Drive, 4th Floor
Hanover, MD 21076-1378
(410) 752-7474
(410) 752-0611 (fax)
E-mail: johnson@ewmd.com
*Attorney for Defendant*

*/s/Eric M. Rigatuso*
———————————————
Eric M. Rigatuso (27605)
ECCLESTON & WOLF, P.C.
Baltimore-Washington Law Center
7240 Parkway Drive, 4th Floor
Hanover, MD 21076-1378
(410) 752-7474 (phone)
(410) 752-0611 (fax)
E-mail: rigatuso@ewmd.com
*Attorney for Defendant*

JA049

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 7th day of January, 2022, copies of the foregoing were

served via the Court's ECF System to:

> Justin Browne, Esq.
> Christina Graziano, Esq.
> Brian Ketterer, Esq.
> Ketterer Browne & Anderson
> 336 S. Main Street, Suite 2A-C
> Bel Air, MD 21014
> justin@kbaattorneys.com
> christina@kbaattorneys.com
> brian@kbaattorneys.com
> *Attorney for Plaintiff*
>
> Brian S. Goodman, Esq.
> Goodman & Donohue LLC
> 9199 Reisterstown Road, Suite 213 C
> Owings Mills, MD 21117
> brian@goodmandonohue.com

> */s/Eric M. Rigatuso*
> Eric M. Rigatuso (Bar # 27605)

USCA4 Appeal: 23-1453    Doc: 17    Filed: 06/05/2023    Pg: 55 of 610

## AFFIDAVIT OF BRENT JOHNSON

1.      I, Brent Johnson, am over the age of eighteen (18) and am competent to be a witness in this matter.  I have personal knowledge of the facts set forth herein.

2.      I am currently the Headmaster of the Baltimore Lutheran High School Association d/b/a Concordia Preparatory School ("CPS") and have been in that position since 2016.

3.      In my capacity as Headmaster, I have access to, and have reviewed CPS files and documentation pertaining to CPS' receipt of governmental funding since 2014.

4.      CPS records indicate that, from 2014 through February 29, 2020, CPS did not receive any direct Federal funding or Federal financial assistance.

5.      During that time, CPS received governmental funding only from the State of Maryland,  including grants, scholarships, development funds, and emergency funds. CPS faculty members also received reimbursement for classes, courses of other professional development from funds designated for CPS staff by Baltimore County Public Schools System.

**I SOLEMNLY AFFIRM UNDER THE PENALTIES OF PERJURY AND UPON PERSONAL KNOWLEDGE THAT THE CONTENTS OF THE FOREGOING PAPER ARE TRUE.**

*1-7-22*
‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾
Date

Brent Johnson

J:\IC158\Motion\Aff-Johnson.Docx


EXHIBIT

JA051

UNITED STATES DISTRICT COURT
DISTRICT OF MARYLAND
Northern Division

| | | |
|---|---|---|
| **DONNA BUETTNER-HARTSOE, et al.** | * | |
| *Plaintiffs,* | * | |
| v. | * | **Case No.: 1:20-cv-03132-RDB** |
| **BALTIMORE LUTHERAN HIGH SCHOOL ASSOCIATION d/b/a CONCORDIA PREPARATORY SCHOOL, et al.** | * | |
| | * | |
| *Defendants.* | | |

\*       \*       \*       \*       \*       \*       \*       \*       \*       \*       \*       \*

## PLAINTIFFS' OPPOSITION TO DEFENDANT BALTIMORE LUTHERAN HIGH SCHOOL ASSOCIATION'S MOTION TO DISMISS AND/OR PARTIAL MOTION FOR SUMMARY JUDGMENT AND REQUEST FOR HEARING

Plaintiffs Donna Buettner-Hartsoe and N.H., a minor, file this Opposition to Defendant's Motion to Dismiss or in the alternative, Partial Motion for Summary Judgment.

## STATEMENT OF UNDISPUTED FACTS

1. Defendant CPS is a recipient of federal financial assistance[1], having received federal financial assistance directly in 2009-2010[2], 2010-2011[3], 2011-2012[4], 2012-2013[5], 2013-2014[6], 2014-2015[7], 2015-2016[8], 2016-2017[9], 2017-2018[10], 2018-2019[11] [12], and 2019-2020[13].

---

[1] *See* Plaintiffs' Amd. Compl. at ¶ 86.
[2] (Ex. 1, CPS006774-6776)(Audited Financial Statement)
[3] (Ex. 1, CPS006796.) (Audited Financial Statement)
[4] (Ex. 1, CPS006814.) (Audited Financial Statement)
[5] (Ex. 1, CPS006832.) (Audited Financial Statement)
[6] (Ex. 1, CPS006849.) (Audited Financial Statement)
[7] (Ex. 1, CPS006867.) (Audited Financial Statement)
[8] (Ex. 1, CPS006905.) (Audited Financial Statement)
[9] (Ex. 1, CPS006923.) (Audited Financial Statement)
[10] (Ex. 1, CPS006943.) (Audited Financial Statement)
[11] (Ex. 1, CPS006943.) (Audited Financial Statement)
[12] (Ex. 2, Dep. CPS, 2.11.2021 391:17-392:20)
[13] (Ex. 3, CPS 005704-005705)(Email from Board Member Ron Jaison to CPS Headmaster)

2.  Defendant CPS received direct federal financial assistance prior to the incidents alleged by Plaintiffs in their Amended Complaint. *See* Plaintiffs' Amd. Compl. pp 6-11.

3.  It is undisputed that Defendant CPS received federal financial assistance indirectly in 2016, 2017, 2018, 2019, and 2020.[14] [15]

4.  Defendant CPS received indirect federal assistance prior to and subsequent to the incidents alleged by Plaintiffs in the Amended Complaint. *See* Plaintiffs' Amd. Compl. pp 6-11.

## ARGUMENT

### I.   Plaintiff Sets Forth Sufficient Facts to State a Title IX Claim

#### A.  Title IX Claim, Generally

Title IX provides in pertinent part:

> No person . . . shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance.

20 U.S.C. § 1681(a).

The key Supreme Court case that defines the contours of an educational institution's liability for sexual harassment under Title IX is *Gebser v. Lago Vista Independent School District*, 524 U.S. 274 (1998). In *Gebser*, the Supreme Court noted that Congress had two principal objectives in passing Title IX: (1) to avoid the use of federal resources to support discriminatory practices and (2) to provide individual citizens effective protection against those practices. *Gebser*, 524 U.S. at 286 (quoting *Cannon v. University of Chicago*, 441 U.S. 677, 704, 99 S.Ct. 1946 (1979)).

In its memorandum of law, Defendant CPS claims that Plaintiffs' Title IX claim (Count I of the Amended Complaint) fails as a matter of law because Defendant CPS was not a recipient of

---

[14] (Ex. 3, CPS 005704-005705.)(Email from Board Member Ron Jaison to CPS Headmaster)
[15] (Ex. 4, Defendant CPS's 2nd Supplemental Responses to Interrogatories No. 14); (Ex. 2, Dep. CPS, 2.11.2021, 392-393.)

federal assistance during the time in which Plaintiff N.H. alleges she was sexually harassed and assaulted, and therefore is not subject to Title IX requirements. (*See* Def.'s Memo. at 4.) As shown below, none of Defendant CPS's arguments justify dismissal under Rule 12(b)(1) or summary judgment under Rule 56.  Plaintiffs have sufficiently pled Title IX's operability and based on the evidence, no genuine dispute of material fact when the evidence is viewed in the light most favorable to Plaintiffs that Defendant CPS received federal funding.

Although Defendant CPS claims that it was neither a direct nor an indirect recipient of Federal financial assistance during a time period that would infer liability in this case, the facts and pleadings belie their position.

**B.  CPS's Tax-Exempt Status Constitutes Federal Financial Assistance**

**i.    Defendant CPS is a Tax-Exempt Non-Profit Company**

Courts across the country have held that private schools and educational entities that are organized as tax-exempt non-profits are subject to Title IX. Federal tax-exemption is a form of federal assistance that triggers Title IX liability. In *M.H.D. v. Westminster Schools*, a Georgia district court found that a private high school's tax-exempt status constituted federal financial assistance to render it subject to Title IX. 172 F.3d 797 (11th Cir.1999) (dismissed on other grounds relating to statute of limitations); *see also See McGlotten v. Connally*, 338 F. Supp. 448, 461 (D.D.C.1972) (Because Title IX was modeled after Title VI, *McGlotten* provides support for Plaintiffs' position.); *Fulani v. League of Women Voters Educ. Fund*, 684 F. Supp. 1185, 1192 (S.D.N.Y.1988) (concluding that defendant received "Federal financial assistance" within the meaning of both Title VI and Title IX because it had tax-exempt status). It is undisputed that Defendant CPS is a non-profit institution that takes full advantage of federal tax exemptions. As such, Defendant CPS is bound to the tenets of Title IX.

Defendant CPS conducts all its activities on a daily basis, since the very date of its inception, under the aegis of tax exemption for non-profit organizations pursuant to section 501(c)(3) of the Internal Revenue Code (hereafter "the Code"). Defendant CPS's documents lay bare its status as a 501(c) tax-exempt entity.[16] In Baltimore Lutheran High School Association's Audited Financial Statements for 2010-2019, Defendant expressly states its tax-exempt status under IRS Code 501(c)(3) in each of its annual reports, beginning in 2010 and continuing into the most recent statement for the 2019-2020 fiscal year.[17] The Code states that:

> Both tax exemptions and tax deductibility are a form of subsidy that is administered through the tax system. A tax exemption has much the same effect as a cash grant to the organization of the amount of the tax it would have to pay on its income. Deductible contributions are similar to cash grants of the amount of a portion of the individual's contributions. The system Congress has enacted provides this kind of subsidy to nonprofit civic welfare organizations generally, and an additional subsidy to those charitable organizations that do not engage in substantial lobbying.

*Regan v. Taxation with Representation of Washington*, 461 U.S. 540, 544, (1983) (footnote omitted). In tracing the history of tax exemptions for charitable and nonprofit purposes, the Supreme Court has stated that "these statements [of Congressional intent] clearly reveal the legal background against which Congress enacted the first charitable exemption statute in 1894: charities were to be given preferential treatment because they provide a benefit to society." *Bob Jones University v. United States*, 461 U.S. 574, 589, (1983). The Court then quoted from the original 1938 report of the House of Representatives summarizing the purposes behind the Code provisions for tax exemption:

> The exemption from taxation of money or property devoted to charitable and other purposes is based upon the theory that the Government is compensated for the loss of revenue by its relief from financial burdens which would otherwise have to be met by appropriations from other public funds, and by the benefits resulting from the promotion of the general welfare.

---

[16] (Ex. 1, CPS006767-006952)(Audited Financial Statements)
[17] *Id.*

*Id*. at 590 (quoting H.R. Rep. No. 1860, 75th Cong., 3d Sess., 19 (1938).) In light of this direct relationship between the government and tax-exempt organizations, Courts routinely find that Congress, either on its own or through the IRS, can and does decide what activities are appropriate for the use of public monies provided through tax exemptions and deductions. *See Regan*, 461 U.S. at 550-51 (Congress may permissibly decide not to provide "public money" through tax exemptions to certain nonprofit organizations for lobbying purposes, even though Congress has rationally chosen to "subsidize" lobbying by other organizations, namely veterans' organizations, through the same exemptions).

This symbiotic relationship - whereby the government receives a benefit for subsidizing charitable organizations and in return grants public monies to the organization through exemption - has consistently been the basis for Courts throughout the country to conclude that nonprofit organizations are subject to the restrictions and requirements of the public policy of the United States, as expressed in constitutional and statutory antidiscrimination pronouncements. *Bob Jones University*, 461 U.S. at 592 (upholding revocation of tax exempt status to universities which discriminate, because tax exempt institutions "must demonstrably serve and be in harmony with the public interest."); *Jackson v. Statler Foundation*, 496 F.2d 623, 633 (2nd Cir. 1974) (tax exempt organizations are subject to Civil Rights Act since acts of application and approval of tax exempt status are not value neutral: "In effect, the government would appear to be certifying that every foundation on its tax-exempt list is laboring in the public interest."); *Green V. Connally*, 330 F. Supp. 1150, 1162 (D.D.C. 1971) (private schools that discriminate are not entitled to tax exemptions, referring to "general and well-established principle that the Congressional intent in providing tax deductions and exemptions is not construed to be applicable to activities that are either illegal or contrary to public policy").

ii.    **The Religious Exemption Under Title IX is Narrow and Does Not Apply**

Plaintiffs note that Title IX does provide a religious exception, but that it does not apply to CPS in this case. *See* 20 U.S.C. § 1681(a)(3) ("Educational institutions of religious organizations with contrary religious tenets.") Defendant CPS will likely argue in response to this Memorandum that because it is a religious entity, albeit a tax-exempt non-profit, it is nevertheless not subject to the mandates of Title IX. While Title IX's broad mandate contains few and narrowly defined exceptions, including an exemption for educational institutions controlled by religious organizations, this exemption is narrowly tailored, rarely applied, and must be predicated on that religious entity's showing that its espoused beliefs are in direct conflict with specific provisions of Title IX. *See Jackson*, 544 U.S. at 175 ("Title IX is a broadly written general prohibition on discrimination, followed by specific, narrow exceptions to that broad prohibition."); 20 U.S.C. § 1681(a)(3). Specifically, this exemption states:

> No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance, except that … this section shall not apply to an educational institution which is controlled by a religious organization if the application of this subsection would not be consistent with the religious tenets of such organization ....

20 U.S.C. § 1681(a)(3); *see also* 20 U.S.C. § 1687. An educational institution that is controlled by a religious organization is exempt *only to the extent* that Title IX's requirements conflict with the organization's religious tenets. *See* 20 U.S.C. § 1681(a)(3); 34 C.F.R. § 106.12(a); *see also* U.S. Dep't of Educ., Questions and Answers on Title IX and Sexual Violence, at 1 n. 3 (Apr. 29, 2014).[18]

The Section 1681(a)(3) exemption is narrow, in light of both its language and in practical

---

[18] http://www2.ed.gov/about/offices/list/ocr/docs/qa-201404-title-ix.pdf

application by the Courts. Very few Courts have analyzed the Section 1681(a)(3) exemption, and those that have describe it as a "narrow" exception to Title IX. *See, e.g., Doe v. Salvation Army in the U.S.*, 685 F.3d 564, 572-73 (6th Cir. 2012) (describing Section 1681(a)(3) as a "narrow but express exception[]" and noting Congress did not draft it as a "broad implied exception"). Indeed, this very Court considered these arguments in *Goodman v. Archbishop Curley High School, Inc.*, 195 F.Supp.3d 767 (D. Md. 2016) and arrived at the conclusion warranted here, to deny the defendant's motion to dismiss and motion for summary judgment where defendant had offered no convincing evidence that its religious teachings were inapposite to any specific tenet of Title IX. Here, there is no evidence at all before the Court, and therefore, Defendant's Motion fails as a matter of law.

Nonetheless, to make the result even more definitive, publicly available information has not yielded a single Lutheran educational institution – or any religious organization for that matter – that has sought (or been granted) a Section 1681(a)(3) exemption to permit sexual harassment in education or allow retaliation for reporting sexual abuse.[19] Educational institutions can seek a Section 1681(a)(3) exemption through the Department of Education's Office for Civil Rights ("OCR"). OCR has codified a procedure whereby:

> an educational institution which wishes to claim the exemption [pertaining to its religious tenets] shall do so by submitting in writing to the Assistant Secretary a statement by the highest ranking official of the institution, identifying the provisions of this part which conflict with a specific tenet of the religious organization.

---

[19] To the contrary, educational institutions affiliated with the Roman Catholic Church – schools subject vastly similar religious tenets as Lutheran Christian schools– are under OCR investigation for their sexual harassment and assault policies and procedures. See, e.g., Wash. Post, Sexual assault investigations in K-12 schools https://www.washingtonpost.com/apps/g/page/local/sexual-assault-investigations-in-k-12-schools/1935/ (Archbishop Williams High School in Massachusetts investigated for handling reports of sexual violence); U.S. Dep't of Educ., U.S. Department of Education Releases List of Higher Education Institutions with Open Title IX Sexual Violence Investigations (May 1, 2014), http://www.ed.gov/news/press-releases/us-department-education-releases-list-higher-education-institutions-open-title-ix-sexual-violence-investigations (Catholic University of America in Washington, D.C., under investigation for Title IX compliance).

34 C.F.R. § 106.12.4. OCR has granted very specific exemptions to educational institutions controlled by religious organizations under Section 1681(a)(3) only upon showing that the application of one or more Title IX regulation conflicts with a particular religious tenant. For example:

> • Brigham Young University, a Utah university controlled by The Church of Jesus Christ of Latter-day Saints, received an exemption from Title IX to the extent that 34 C.F.R. § 106.32 interferes with its policy of requiring sex-segregated housing by off-campus landlords as a condition of being given approval to house BYU students. In its request, BYU articulated that the teachings of its sponsoring church regarding sexual morality and marriage were inconsistent with housing arrangements in which single students share the same facilities. *See Wilson v. Glenwood Intermountain Props.*, 876 F. Supp. 1231, 1244 (D. Utah 1995).

> • Belmont Abbey College, a North Carolina university controlled by the Roman Catholic Church, received an exemption from Title IX to the extent that it prohibits discrimination based on gender identity. To support its request, Belmont Abbey quoted Biblical verses in Genesis and Matthew for the religious tenet that "human beings, fashioned by God in His own image and likeness are thus created male and female" and "heterosexual creation of human beings express God's creative intention." OCR granted Belmont Abbey an exemption to ten specific OCR Title IX regulations "only to the extent they prohibit discrimination based on gender identity."[20]

> • Franciscan University of Steubenville, an Ohio university controlled by the Roman Catholic Church, received an exemption from Title IX to the extent that it required "treating] students consistent with their gender identity" in housing, facilities, and athletics. To support its request, Franciscan articulated the religious tenet that "human beings are created male or female."[21]

> • St. Gregory University, an Oklahoma university controlled by the Roman Catholic Church, requested an exemption to the extent Title IX regulations were interpreted to prohibit gender identity discrimination, which it alleged was inconsistent with the religious tenet that "' [b]eing man' or 'being woman' is a reality which is good and willed by God." OCR granted St. Gregory a narrow exemption with respect to specific regulations of Title IX and only to the extent the regulation prohibited discrimination based on gender identity.[22]

In granting these exemptions, OCR further stated:

> Please note that this letter should not be construed to grant exemption from the

---

[20] (Ex. 5, OCR Letters)
[21] *Id.*
[22] *Id.*

requirements of Title IX and the regulations other than as stated above. … Also, in the unlikely event that a complainant alleges that the practices followed by the institution are not based on the religious tenets of the controlling organization, OCR is obligated to contact the controlling organization to verify those tenets. If the organization provides an interpretation of tenets that has a different practical impact than that described by the institution, or if the organization denies that it controls the institution, this exemption will be rescinded.[23]

These examples are clear: to receive a Section 1681(a)(3) exemption, religiously affiliated educational institutions must point to a conflict between their religious tenets and a specific application of Title IX. No such conflict exists here between the teachings of the Lutheran Church about sexual harassment and sexual assault and the express requirements of Title IX. Indeed, their handbooks expressly prohibit it.[24] As such, Defendant cannot, and did not for good reason, argue it is exempt from Title IX by arguing a religious exception to its status as a tax-exempt non-profit that is thereby required to follow Title IX.

The old adage of "having your cake and eating it too" comes to mind here. Tax breaks from the federal government of any kind are clearly financial benefits; Courts have already considered this issue in the realm of Title IX and tax-exemption and have held schools to task on the receipt of these benefits as being adequate triggers for Title IX. Defendant CPS, by availing itself to tax-exemption status as a nonprofit religious entity, has derived a financial benefit from the Federal government sufficient to trigger Title IX liability.

### C. Defendant CPS Received Federal Financial Assistance During the Relevant Timeframe

The evidence shows that Defendant CPS received direct federal financial assistance from 2009-2020, which is both before and after the time period of Plaintiffs' allegations.[25] [26] For this

---

[23] *Id.*
[24] (Ex. 6, CPS000681-728) (2019-2020 CPS Upper School Handbook)
[25] See Footnotes 1-13.
[26] *See* Plaintiffs' Amd. Compl. pp 4-7, 8-14.

reason alone, Defendant CPS's Motion fails. But even taking just Defendant CPS's admission as fact, which is that it didn't receive federal financial assistance until 2020, Plaintiffs' Title IX claims still survive.

In its Memorandum of Law, Defendant CPS argues that it did not receive federal financial assistance during "the time period relevant to this matter" and so liability under a Title IX framework is inappropriate[27]. However, Defendant CPS fails to cite to a single case in support of its arbitrary time limitation and its position is wholly contrary to established law in the arena of Title IX.

Defendant CPS argues in support of its Motion that, despite the fact that CPS itself admits that it did receive federal funds, CPS is not subject to Title IX liability because those funds were received after the allegations of sexual assault and harassment brought by Plaintiff N.H. as a result of Defendant CPS's conscious decisions to create and foster a dangerous environment that it knew was hurting young girls.[28] In stating that it did not receive federal financial assistance during the "time period when Plaintiff alleges incidents of sexual harassment and assault occurred", Defendant CPS implies that a parsing out of the specific months in which CPS received federal funding and Plaintiff experienced sexual harassment and sexual misconduct at CPS is necessary to infer liability; it does not.[29]

Defendant CPS's argument that Plaintiffs' Title IX claims are restricted to just the period of her attendance, and thus not viable because the school did not receive federal financial assistance until sometime after she was harassed and abused, is flatly contradicted by law. Courts have recognized that actionable Title IX claims may arise out of two different "harassment time

---

[27] Def. Memo. at p2.
[28] Def. Mot. at pp.6-7.
[29] Def. Memo at p7.

periods": before or after Plaintiffs' assault or harassment, and the time period concurrent to her claims. *See, e.g., Doe v. Bibb Cnty. Sch. Dist.*, 83 F. Supp. 3d 1300, 1306 (M.D. Ga. 2015) (the Court does not foreclose the possibility of Title IX liability based on a defendant's knowledge of prior or subsequent harassment of victims other than the plaintiff by different perpetrators); *Lopez v. Metro. Govt' of Nashville and Davidson Cnty.*, 646 F. Supp. 2d 891, 917 (M.D. Tenn. 2009)(same).

The first and most typical harassment that damages are sought for occurs "after" or "post-assault." In that circumstance the student seeks Title IX damages for the "hostile environment" the victim experiences in the school's educational programs after reporting the assault, created by the assailant's continuing presence on campus. *Id*. The second actionable harassment for which damages may be sought are the damages from the sexual assault itself, where the school is shown to have had, prior to the assault on the plaintiff, actual knowledge of a risk that the plaintiff would be sexually assaulted, or that the assailant would sexually assault someone. *See Doe v. Stegall*, 367 F.3d 668, 672 (7th Cir. 2004). At least one court has referred to this second category as "heightened risk claims." *See Doe 1 v. Baylor Univ.,* No. 6:16-CV-173-RP, 2017 WL 1831996 at * 6 (W.D. Tex. Mar. 7, 2017). These Courts have not limited the retroactive or forward-looking application of Title IX in a manner suggested by Defendant CPS. *Id.; see also Williams v. Paint Valley Local Sch.,* 400 F.3d 360, 364 (6th Cir.2005)([a] school district can "be liable for acting with deliberate indifference" in either of these timeframes if a plaintiff "demonstrate[s] by a preponderance of the evidence that the School District had actual knowledge of prior facts to which it responded unreasonably.").

Plaintiff N.H. was a student at CPS in the 2017-2018 school year. *See* Plaintiffs' Amd. Compl. at ¶ 11.  However, her allegations are not simply that she was sexually harassed, assaulted,

and bullied in that timeframe; her allegations are also that CPS's overt and covert actions, *before, during, and after the time of her enrollment at CPS,* created a culture where she and others like her were more likely to be victimized and injured by the culture of rampant sexual misconduct within the school. *See* Plaintiffs' Amd. Compl. at ¶¶ 23-4, 29-30, 31-42. This is corroborated by evidence in the record by a member of the CPS Board of Directors, who sounded the alarm bell with the Board and Headmaster Brent Johnson, decrying the culture of sexual misconduct in existence at CPS before and during the 2019-2020 school year[30], emails from parents to CPS administration regarding concerns of sexual misconduct on campus in 2019[31], testimony from CPS administration concerning its knowledge of rumors of sexual misconduct on campus as far back as 2008 and even up until 2020[32]; testimony from CPS administration concerning its knowledge of inappropriate sexual conduct on campus involving nude photos as far back as 2009[33]; and testimony from CPS administration and related documents concerning the school's knowledge of child pornography circulating on campus in 2018[34].

As stated throughout this Memorandum, there are multiple instances of both direct and indirect funding that Defendant CPS received before, during, and after Plaintiffs' tenure at CPS, such that CPS was obligated to have followed the tenets of Title IX but failed to do so. Courts around the country have routinely found Title IX liability in cases where the Plaintiff has alleged a pattern and practice of misconduct, whether consisting of subsequent harassment or conditions prior to Plaintiffs' allegations that made her more vulnerable to later harassment; if the harm alleged falls into one of the actionable harassment time periods, liability attaches. *See, e.g., Doe v.*

---

[30] (Ex. 3, CPS 005704-005705)
[31] (Ex. 7, CPS 002591-002595)
[32] (Ex. 8, Dep. of Kim Grill, p.110-121)
[33] (Ex. 8, Dep. of Kim Grill, p. 105-110)
[34] (Ex. 9, Dep. of Curtis Miller, p. 271-300); (Ex. 10, Dep. of Sara Welinsky, p. 108-111)

*Pawtucket School Department,* 969 F.3d 1(D. R.I. 2020) (Holding that student could be able to show that, had the school behaved as demanded by Title IX in response to her alleged rape by first older student, second older student's subsequent repeated improper entries into her classroom in the presence of a teacher would have been dealt with very differently, frustrating second older student's attempt to rape student in the school); *Murrell v. School Dist. No. 1*, 186 F.3d 1238 (Colo. 1999) (Finding Title IX liability where student alleged that she was victimized subsequent to school officials' failure to adhere to Title IX requirements that resulted in prior assault); *Oona R.-S. by Kate S. v. Santa Rosa City Schools*, 890 F.Supp. 1452 (N.D.Cal.1995), certiorari denied 526 U.S. 1154 (Student stated civil rights claim against teacher, principal, and of director of elementary education for Title IX violation by alleging that male students engaged in harassment, that teacher refused to take sufficient action to counter persistent harassment and retaliated against student for objecting to the harassment, and that principal and director failed to adequately investigate or punish those responsible for repeated instances of harassment that was reported to them); *Cavalier v. Catholic University of America*, 306 F.Supp.3d (D.D.C.201) (Student was able to bring Title IX claim against university alleging that university was deliberatively indifferent to prior instances of sexual harassment by male students that lead to plaintiff experiencing harassment years later under theory that plaintiff was subjected to "repeated conduct" that occurred over a period of years within the school).

　　As the case law shows, Defendant CPS's actions and inactions with respect to its obligations under Title IX, even if prior to the date of Plaintiffs' specific allegations, can proceed to the jury where Plaintiffs allege that their injuries resulted from the school's prior practice of misconduct with respect to Title IX. Here, there is ample evidence that Defendant CPS received

federal financial assistance on a consistent and ongoing basis starting years before Plaintiffs' allegations took place and continuing through to 2020.[35]

Perhaps, based on the Affidavit supplied with Defendant CPS's Motion, Defendant CPS believes its first acceptance of federal financial assistance came with the issuance of the SBA loan in 2020. Even if that were the case, which Plaintiffs argue it is not, the application for the SBA loan had to have been submitted to the SBA prior to the April 8, 2020 date in order for the application to be processed and the funds to be released by April 2020; as such, Defendant CPS's careful wordsmithing in its Memorandum of Law that it did not receive federal funding in the "relevant timeframe" for Plaintiffs' allegations still fails. In either event, Defendant CPS failed to adhere to Title IX and Plaintiffs were injured as a result.

### i.     Defendant CPS is a Direct Recipient of Federal Funding

Despite Defendant CPS's contention in its Memorandum of Law that Plaintiffs' claims for relief under Title IX should be dismissed because Plaintiffs did not state adequately in their Amended Complaint that CPS is a recipient of federal assistance, Plaintiffs' allegations are more than sufficient under the law because, quite frankly, they are true. In her Amended Complaint, Plaintiffs allege that

> During the relevant timeframe, Defendant CPS was a recipient of federal education funding within the meaning of Title IX, 20 U.S.C. § 1681(a).

*See* Plaintiffs' Amd. Compl. at ¶ 86. Contrary to Defendant CPS's position in its Memorandum of Law that it did not benefit from federal assistance, CPS has clearly received federal aid and benefits over the course of the past several years, including before, during and after Plaintiff N.H. was a student at CPS, detailed as follows:

---

[35] See Footnotes 1-14.

### a. CPS Received Federal Aid in the Form of Grants for Emergency Repairs and Aging Buildings

In their Memorandum of Law, Defendant CPS falsely claims that Plaintiffs "have not sufficiently developed necessary evidence" to proceed to trial with their Title IX claims. (*See* Def.'s Memo. at 8.) The record, however, shows that CPS did in fact receive funds. Discovery produced by CPS itself lays bare several instances in which the school received federal funding. For example, financial documents prepared on behalf of Defendant CPS's own Board of Directors reveals the school's years-long pattern and practice of accepting federal funding in the form of tax benefits[36]. As a second example, Ron Jaison, a member of the Concordia Preparatory School Board of Directors, identified CPS's receipt of federal funding in an email to Brent Johnson in which the board member actually voiced his concerns about Title IX liability:

> In the private sector, any complaint of sexual harassment must be investigated, and documented. Whether the school is bound by Title IX or not (**and we may well be after receiving federal funding for the fieldhouse collapse, for aging building grants, and for textbook assistance**), we have a duty to investigate any and all accusations.[37] [38]

The record shows that Defendant CPS was a recipient of federal financial aid as far back as 2009 and this aid took various forms, including tax breaks, federal grants for building repair, and emergency funds for a collapsed roof. It is not the size of the award, nor the number of instances of federal funding, that is determinative here: grants and awards of any kind by the federal government are sufficient to trigger Title IX liability. *See National Collegiate Athletic Ass'n v. Smith*, 525 U.S. 459, on remand 266 F.3d 152 (entities that receive federal assistance, whether directly or through an intermediary, are "recipients" within the meaning of Title IX); *Rice v.*

---

[36] (Ex. 1, CPS006767-6952)

[37] (Ex. 3, CPS 005704-005705) (emphasis added).

[38] Plaintiffs do not dispute that the textbook funding referenced here is given through the State of Maryland with no influx of federal funding. This is separate and apart from the instances of indirect federal assistance identified later in this memorandum.

*President and Fellows of Harvard College,* 663 F.2d 336, certiorari denied 456 U.S. 928 (federal funding for even one aspect of university, in this case work-study program, sufficient to trigger Title IX liability; *Huber v. Howard County,* Md., 849 F. Supp. 407, 415 (D. Md. 1994) aff'd without opinion, 56 F.3d 61 (4th Cir. 1995), cert. denied, 516 U.S. 916 (1995) (Even a modest award of money from federal government, even if attenuated from allegations, sufficient to trigger Title IX liability); *see also Delmonte v. Department of Bus. Profl Regulation, Div. Of Alcohol, Beverages and Tobacco of Fla*., 877 F. Supp. 1563 (S.D. Fla. 1995) (Even quid pro quo for receipt of federal training assistance sufficient to trigger Title IX liability).

### b. CPS Received a Loan from the Small Business Administration, a Federal Agency

Publicly available documents clearly show that Baltimore Lutheran High School Association, doing business as Concordia Preparatory School, has received loans from the Small Business Administration in the total amount of $491,714.48.[39] The Small Business Administration (SBA) is an agency of the Federal government tasked with providing capital to small businesses, including schools.[40] The date on which the funds were made available to Defendant CPS is April 8, 2020.[41]  As stated above, it is without dispute that the receipt of federal assistance in the form of grants and loans is sufficient to trigger Title IX liability. *See National Collegiate Athletic Ass'n v. Smit*h, 525 U.S. 459, supra; *Gebser v. Lago Vista Independent School District*, 524 U.S. 274, supra. This is simply one instance in a years-long pattern and practice of Defendant CPS having received federal financial assistance, and not as Defendant CPS argues, the first instance in which it took federal money.

---

[39] Ex. 11, USASpending.org profile.
[40] https://www.sba.gov/about-sba
[41] Ex. 11, USASpending.org profile.

ii.    **Defendant CPS is an Indirect Recipient of Federal Funding**

Defendant CPS suggests that it cannot be subject to Title IX liability because Plaintiffs have not established that money it received indirectly from the federal government was specifically earmarked for the school.[42] In support, Defendant CPS cites to the one opinion in the country that purportedly imposed such a burden on Plaintiff.[43] Defendant CPS failed to provide the Court with contrary, controlling authority. According to well-established law, an entity becomes an indirect recipient of federal funding if they are given, for example, monies from their home state that flow from federal stipends or grants. *NCAA v. Smith*, 525 U.S. 459, 468 (1999)). Indeed, Title IX encompasses "all forms of federal aid to education, direct or indirect". *Id.* at 467.

Under federal regulations, an indirect recipient of federal funding is still a recipient even if the institution only receives "one dollar" of assistance. *Id., quoting Grove City Coll. v. Bell*, 465 U.S. 555, 563-70 (1984)(overturned on other grounds). Thus, an entity may receive federal financial assistance indirectly and still be considered a recipient for purposes of Title IX. *Id.* As described below, Defendant CPS is an indirect recipient of federal financial assistance vis a vis monies it receives from the State of Maryland.

a.    **CPS Indirectly Receives Federal Assistance vis a vis the Maryland Department of Education**

Private schools are subject to Title IX liability if they receive state funds that originated with or were granted by the federal government. *See, e.g., Jacobson v. Delta Airlines, Inc.,* 42 F.2d 1202, 1211-12 (9th Cir. 1984), cert. denied, 471 U.S. 1062 (1985); 45 C.F.R. § 80.13 (i); 34 C.F.R. § 100.13 (i) ("recipient means any State, political subdivision of any State, or instrumentality of any State or political subdivision, any public or private agency, institution, or organization, or

---

[42] Def. Mot. at pp.8-10.
[43] *Id., Lynn v. St. Anne Inst.*, 2006 U.S. Dist. LEXIS 18786, *37-38 (N.D. N.Y. 2006)

other entity, or any individual, in any State, to whom Federal financial assistance is extended, directly or through another recipient, including any successor, assign, or transferee thereof, but such term does not include any ultimate beneficiary.") Plaintiffs must merely show that that the defendant school or entity receives federal financial assistance, even indirectly, in the form of federal money delegated to defendant by a state recipient or another federally-funded entity. *See, e.g, A. B. by C.B. v. Hawaii State Department of Education*, 386 F.Supp.3d 1352 (D. Haw. 2019) (Court found that because the Hawaii Department of Education received federal financial assistance, and that assistance was given to athletes within the Department's member schools' interscholastic athletic programs, the programs were subject to Title IX); *Horner v. Kentucky High School Athletic Ass'n,* 43 F.3d 265 (Ky. 1994) (Court found that athletic association was an indirect recipient of federal funding by virtue of fees given by federally-funded state schools); *Dennin v. Connecticut Interscholastic Athletic Conference,* 913 F. Supp. 663 (D. Conn. 1996), appeal dismissed as moot, 94 F.3d 96 (2d Cir. 1996) (Athletic conference was deemed indirect recipient of federal funding where it received fees paid by federally-funded schools in Connecticut); *Graham v. Tennessee Secondary Sch. Athletic Ass'n*, 1995 W.L. 115 890 (E.D. Tenn. 1995), appeal dismissed, 107 F.3d 870 (6th Cir. 1997) (Athletic association deemed indirect recipient of federal funding where state's schools provided it with federal money for athletic extracurriculars).

Here, Defendant CPS receives federal financial aid through the Maryland Department of Education (DOE) such that it has subjected itself to Title IX liability. The Federal government provides federal assistance to the Maryland DOE for the express purpose of helping fund or offset costs accrued by private schools. For example, the Federal government has allocated $130 billion dollars for state DOEs to spend on schools both public and private; Maryland has received over $1.9 billion as part of the American Rescue Plan Elementary and Secondary School Emergency

Relief (ARP ESSER) plan[44]. A portion of that money is given to Maryland's nonpublic schools, which includes CPS.[45]

Furthermore, the U.S. Department of Education and U.S. Office of Innovation & Improvement each require state DOE's and governments to allocate financial resources for teacher certification funding and funding for health-department initiatives (such as hearing and vision screening) for students at Maryland's nonpublic schools.[46] As Defendant CPS's own Affidavit in support of their Motion sets forth, and Defendant CPS's responses to Interrogatories confirms, CPS has received the benefits of these allocations and grants particularly in the area of teacher certification and training as far back as 2016, before Plaintiffs even entered the CPS community.[47]

Defendant CPS's reliance on a slip opinion from the Northern District of New York is misplaced, where Defendant CPS argues that Plaintiffs must show definitively that monies received by a state entity vis a vis the federal government were "earmarked" for CPS's use. *See Lynn v. St. Anne Inst.,* 2006 U.S. Dist. LEXIS 18786, *37-38 (N.D. N.Y. 2006). In *Lynne,* the Court noted that it was impossible to make a determination of whether the defendant received federal financial assistance directly or indirectly because "Plaintiffs failed to offer any evidence" concerning defendant's receipt of funding. *Id.* at *11. Further, the crux of the *Lynn* Court's analysis on the Plaintiffs' Title IX claim centered on whether the Plaintiffs' sufficiently plead that they were excluded from or denied any benefit of any education program or activity because of their sex, a requirement for Title IX claims to survive dispositive motion practice. *Id.*

Here, Plaintiffs have plead and presented evidence of Defendant CPS's receipt of federal

---

[44] https://www.ed.gov/news/press-releases/us-department-education-approves-marylands-plan-use-american-rescue-plan-funds-support-k-12-schools-and-students-distributes-remaining-more-651-million-state
[45] https://oese.ed.gov/offices/education-stabilization-fund/emergency-assistance-non-public-schools/
[46] https://www2.ed.gov/about/inits/ed/non-public-education/regulation-map/maryland.html
[47] *See* Def.'s Mot., Ex. 1, Affidavit of Brent Johnson; Ex. 4, CPS 2nd Supplemental ATIs

19

financial assistance, both directly and indirectly, as required under *Jacobson,* 45 C.F.R. § 80.13 (i); and 34 C.F.R. § 100.13 (i). Considering the context of *Lynn* in conjunction with the authoritative cases on the issue of indirect federal funding, Plaintiffs have clearly and sufficiently demonstrated that Defendant CPS is an indirect recipient of federal financial assistance such that Title IX liability is triggered. Thus, as the Court found in *Jacobson* and *Horner,* Defendant CPS is subject to Title IX. *See* 42 F.2d at 1211-12; 43 F.3d 265. Thus, as a matter of law, Defendant CPS's Motion fails.

## II.     Defendant CPS's Affidavit in Support of their Motion is Conclusory, Self-Serving and Inadmissible

In their Memorandum of Law, Defendant CPS decries Plaintiffs' "conclusory" language in their Amended Complaint asserting that CPS receives federal funding, arguing to this Court that it should not take at face value the allegations contained within the pleading (which, incidentally, is contrary to established law)[48]. It defies logic, then, that Defendant CPS asks this Court to accept as true the conclusory and unsupported statements contained within the Affidavit of Headmaster Brent Johnson ("Johnson Affidavit") that was filed in support of Defendant CPS's Motion.

The Johnson Affidavit creates an issue of fact that eludes summary judgment at this stage. Plaintiffs have plead and presented admissible evidence that Defendant CPS has, in fact, received federal financial assistance.[49] The Johnson Affidavit avers that Defendant CPS has only received aid from the State of Maryland. These conflicting positions constitute a question of fact, as the conclusions set forth in the Johnson Affidavit are insufficient to disprove the evidence Plaintiffs have cited to in this Memorandum of Law. In situations such as this, where the non-moving party's

---

[48] Def. Memo. at 6.
[49] See Footnotes 1-15.

evidence contradicts the movant's, then the non-movant's evidence must be taken as true. *Big Apple BMW, Inc. v. BMW of N. Am., Inc.*, 974 F.2d 1358, 1363 (3d. Cir. 1992).

Further, the Johnson Affidavit is self-serving and must not be included in the record in support of Defendant CPS's Motion. A self-serving affidavit, without corroborating evidence, is insufficient to prevail on a motion for summary judgment, even when uncontroverted. *Stradley v. Lafourche Commuc'ns, Inc.,* 869 F. Supp 442, 445 (E.D.La.1994) ("[s]elf-serving affidavits ... have been held insufficient to sustain motions for summary judgment."); *State Farm Mut. Auto. Ins. Co. v. Philly Family Practice, Inc.*, 252 F.Supp.2d 718, 726 (E.D.Pa.2007) ("[S]elf-serving affidavit is an unreliable foundation to support his motion for summary judgment.") (*citing I.V. Servs. Of Am., Inc. v. Trs. Of Am. Consulting,* 136 F.3d 114, 122 (2d Cir.1998) ("[A] finder of fact need not have believed [the] self-serving affidavit.")); *Strum v. Ross,* 11 F.Supp.2d 942, 946 (S.D.Tex.1998) (the court denied summary judgment because the defendants "erroneously relie[d] exclusively on ... self-serving affidavits."); *Welch v. Liberty Machine Works, Inc*., 23 F.3d 1430 (8th Cir.1994) (overruled on other grounds) (holding that a self-serving affidavit "alone is insufficient" at summary judgment.). This is even more so when, as is the case here, there is conflicting testimony and documents offered by Plaintiffs.

Further, the Johnson Affidavit is inadmissible hearsay. There is no way for the Plaintiffs, or for this Court, to determine the manner in which the affiant arrived at the legal conclusion that Defendant CPS is not a recipient of federal financial assistance under Title IX. For example, the Johnson Affidavit did not contain, or reference by citation, any documents or evidence in the record to support the positions contained in the affidavit, nor would the affiant be able to testify as to the contents of the documents and evidence referenced without producing and authenticating them. *See, e.g., Evans v. Technologies Applications & Svc. Co*., 80 F.3d 954, 962 (4th Cir. 1996)

(applying Fed. R.Civ.P. 56(e)) (District court did not abuse its discretion in striking party's own self-serving affidavit without objective corroboration, and other statements that were found to be hearsay or conclusory); *Ballinger v. North Carolina Agr. Extension Servic*e, 815 F.2d 1001, 1004 (4th Cir.) (party may not rely on "conclusory" statements in summary judgment affidavit), cert. denied, 484 U.S. 897, 108 S. Ct. 232, 98 L. Ed. 2d 191 (1987); *Argo v. Blue Cross & Blue Shield of Kan., Inc.,* 452 F.3d 1193, 1199 (10th Cir., 2006) ("at summary judgment courts should disregard inadmissible hearsay statements contained in affidavits, as those statements could not be presented at trial in any form.").

The Johnson Affidavit is insufficient to settle the issues of material fact that exist on the issue of Defendant CPS's Title IX liability. Instead of approaching the legal question of whether or not CPS has received federal financial assistance on a direct or indirect basis, as is the established test under *Gebser* at its progeny, Defendant CPS seeks instead to offer unsubstantiated conclusions as if they were fact. 524 U.S. 274 (1998). The correct approach and analysis, as Plaintiffs have shown throughout this Memorandum, is to determine through the evidence whether Defendant CPS has received federal financial assistance thereby subjecting it to Title IX liability. For these reasons, this Court should strike the Johnson Affidavit from the record and decline to consider it as evidence in support of Defendant CPS's Motion.

## CONCLUSION

Based on the foregoing, Plaintiffs have established that Defendant CPS is a recipient of federal funding for purposes of establishing Title IX liability. Plaintiffs have established genuine issues of material fact with respect to all the necessary elements of the remaining claims concerning Title IX. As such, Defendant CPS's Motion to Dismiss and in the alternative Partial

Motion for Summary Judgment should be denied and Plaintiffs' Title IX claims should be allowed to proceed to a jury.

Dated: <u>January 21, 2022</u>                    Respectfully,


                                         <u>/s/ Christina Graziano</u>
                                         Christina Graziano *(admitted pro hac vice)*
                                         Justin Browne (Bar No. 29164)
                                         Brian Ketterer (*admitted pro hac vice*)
                                         Ketterer, Browne & Associates, LLC
                                         336 S. Main Street
                                         Bel Air, Maryland 21014
                                         Phone: (855) 522-5297
                                         Facsimile: (855) 334-5626
                                         Christina@KBAattorneys.com
                                         Justin@KBAattorneys.com
                                         Brian@KBAattorneys.com

                                         *Attorneys for Plaintiff*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 21st day of January, 2022, a copy of the foregoing

document was served via ECF on all counsel of record:

Gregg E. Viola, Esq.
Mark P. Johnson, Esq.
Eccleston and Wolf
7240 Parkway Drive, 4th Floor
Hanover, MD 21076
410-752-7474
viola@ewmd.com
johnson@ewmd.com
Counsel for Defendant Concordia Preparatory School

Brian S. Goodman, Esq.
Goodman & Donohue LLC
9199 Reisterstown Road
Suite 213 C
Owings Mills, MD 21117
443-824-0659
brian@goodmandonohue.com
Counsel for Defendant Lutheran Church Missouri Synod Southeast District


                                    _/s/ Christina Graziano_____
                                    Christina Graziano *(admitted pro hac vice*

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

**DONNA BUETTNER-HARTSOE, et al.**

     Plaintiffs

**v.**

**BALTIMORE LUTHERAN HIGH SCHOOL ASSOCIATION d/b/a CONCORDIA PREPARATORY SCHOOL, et al.**

     Defendants

**Case No.: 1:20-cv-03132-RDB**

## REPLY TO PLAINTIFFS' OPPOSITION TO DEFENDANT'S PARTIAL MOTION TO DISMISS OR IN THE ALTERNATIVE FOR SUMMARY JUDGMENT

Defendant Baltimore Lutheran High School Association d/b/a Concordia Preparatory School ("CPS"), by and through undersigned counsel, hereby submits this Reply to Plaintiffs' Opposition to Partial Motion to Dismiss or in the Alternative, for Summary Judgment as to Count I of the Plaintiffs' Amended Complaint, for violation of Title IX.

## SUMMARY

It is undisputed that for their claims asserted under Title IX, Plaintiffs have the burden of proving that Defendant CPS was a recipient of federal financial assistance. Defendant's Motion for Summary Judgment on that issue is premised upon the framework that the Supreme Court established in *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). "A party that does not bear the burden of persuasion may move for summary judgment 'by "showing"—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case.'" *Modrowski v. Pigatto*, 712 F.3d 1166, 1167 (7th Cir. 2013) (quoting *Celotex Corp.*, 477 U.S. at 325). "If, after an adequate opportunity for discovery, 'the non-movant does not come forward

with evidence that would reasonably permit the finder of fact to find in her favor on a material question, then the court *must* enter summary judgment against her.'" *Id.* (quoting *Waldridge v. Amer. Hoechst Corp.,* 24 F.3d 918, 920 (7th Circuit 1994) (emphasis in original)).

Plaintiffs agree with this standard as they frame the issue for the Court "to determine through the evidence whether Defendant CPS has received federal financial assistance thereby subjecting it to Title IX liability." *See* ECF 109 at 22. Confronted with Defendant's Motion asserting a lack of evidence of federal financial assistance, Plaintiffs however have not submitted competent evidence to defeat Defendant's Motion and summary judgment must be entered.

Plaintiffs' first argument is that Defendant receives federal financial assistance because they are tax exempt as a 501(c)(3) entity. However, Plaintiffs' argument relies on wholly inapposite cases including one in which the court expressly did not address the issue, a case involving a limited tax exemption to fraternal orders not applicable to CPS, and a case in which the defendant actually received direct federal grants. The cases that Plaintiffs do not cite, however, establish the rule that tax exempt status as a 501(c)(3) entity does not subject the entity to Title IX.

Plaintiffs' second argument is that the religious exemption under Title IX does not apply. Defendant has never argued that the religious exemption applies, and does not herein. Plaintiffs' argument is a red-herring.

Plaintiffs' third argument is that "CPS received federal financial assistance during the relevant timeframe." In making that argument, Plaintiffs contend that the relevant time period for considering when the school received federal financial assistance is "before, during, and after Plaintiffs' tenure at CPS, such that CPS was obligated to have followed the tenets of Title IX." The caselaw that Plaintiffs cite for that argument, however, is wholly inapposite as the decisions concern what facts are relevant to a Title IX claim, not whether a Title IX claim is viable before

the entity receives federal financial assistance. Title IX is spending clause legislation, meaning that CPS is only bound to follow Title IX after it makes the decision to accept federal financial assistance. It is thus axiomatic that before CPS accepts federal financial assistance, it is not bound by its requirements.

With regard to evidence of that federal financial assistance, Plaintiffs cite to a small business loan that Defendant received in 2020 and argue that Defendant submitted an application for the loan before April 8, 2020. However, that was long after Plaintiffs N.H. was a student at the school. Plaintiffs then argue that Defendant received federal aid in the form of grants for emergency repairs when the fieldhouse on CPS property collapsed and for aging building repairs. To support this argument, Plaintiffs rely on a single email from a member of Defendant's Board of Directors in which the individual suggests that Defendant "may well be" subject to Title IX. The critical defects with Plaintiffs' argument are that the email does not state when such federal aid was received so it cannot establish when Defendant received any such funds, and it is inadmissible hearsay not supported by the requirements of being under oath or based on personal knowledge. Moreover, the email is inaccurate, demonstrating the purpose of the requirement that evidence be submitted based upon personal knowledge. Hearsay email communications not shown to be based on the personal knowledge of the author cannot be used to defeat a motion for summary judgment. *Gomez-Gonzalez v. Rural Opportunities, Inc.*, 626 F.3d 654, 666 (1st Cir. 2010).

Plaintiffs also argue that Defendant received indirect federal funding from the State of Maryland Department of Education. Plaintiffs, however, have failed to provide any evidence that any funding that Defendant received from State sources was earmarked from Federal funds as required by Supreme Court precedent.

Finally, Plaintiffs argue that the affidavit of Brent Johnson, Headmaster at CPS, is inadmissible because it is conclusory and self-serving. This argument has no merit because the affidavit is sworn, on the basis of personal knowledge, and is in a form capable of being reduced to admissible evidence at trial. Moreover, as noted above, at this summary judgment stage it is Plaintiffs' burden to present competent admissible evidence to establish their claims. Regardless of Mr. Johnson's affidavit, Plaintiffs have not met their burden to prove CPS' receipt of federal financial assistance, and Defendant is entitled to partial summary judgment on the Title IX claim.

### ARGUMENT

**1.   Tax Exemption Under 501(c)(3) Does Not Equal Federal Financial Assistance**

Title IX is applicable to schools and educational programs receiving federal funds. Plaintiffs have the burden to prove whether the Defendant receives federal financial assistance to defeat Defendant's Motion for Summary Judgment.

Plaintiffs' first argument is that because CPS is tax exempt as a 501(c)(3) entity, CPS has received federal financial assistance and is bound by Title IX. In doing so, Plaintiffs rely on three cases, each of which is inapposite for different reasons. In *M.H.D. v. Westminster Schools,* 172 F.3d 797, 802 n.12 (11th Cir. 1999); the Eleventh Circuit clearly stated that they were not deciding whether 501(c)(3) tax exemption: "We therefore express no view on the question whether a federal tax exemption actually constitutes 'Federal financial assistance' under Title IX." Therefore, *M.H.D.* has no probative or precedential value whatsoever.

In the second case that Plaintiffs cite, *Fulani v. League of Women Voters Education Fund*, 684 F. Supp. 1185 (S.D.N.Y. 1988), the plaintiff sued, in part, the defendant League of Women Voters Education Fund on several bases. As the United States District Court for the Southern District of New York described "Fulani asserts that the League is required to be nonpartisan in its

activities by virtue of its tax-exempt status under section 501(c)(3) of the Code and that, as a recipient of federal funds, the League is prohibited from discriminating on the basis of race or sex pursuant to Title VI and Title IX."  684 F. Supp. at 1189.  The defendant's receipt of federal financial assistant was not litigated, however, because it was undisputed that the League receives direct grants from the Department of Energy and the Environmental Protection Agency.  *Id.* at 1192 (stating that "the League receives federal assistance indirectly through its tax exemption **and** directly through grants from the Department of Energy and the EPA") (emphasis added).  In other words, the Court's statement about tax exemption and federal financial assistance was not analyzed and was not necessary for the Title IX claim.

Lastly, Plaintiffs' citation to *McGlotten v. Connally*, 338 F. Supp. 448 (D.D.C. 1972), is misguided because that case did not involve a 501(c)(3) tax exemption, and the District Court for the District of Columbia concluded that not all tax exemptions create Title IX liability. That analysis, while not directly relevant to this case because the 501(c)(3) tax exemption was not discussed, is instructive and actually supports Defendant's argument. *McGlotten* was not an action for damages under Title IX. Instead, it was a class action seeking to enjoin the Secretary of the Treasury from granting tax benefits to fraternal and nonprofit organizations which exclude nonwhites from membership. *Id.* at 450. Part of the plaintiff's argument was that granting of federal tax benefits to organizations which exclude nonwhites from membership is a form of "federal financial assistance" in violation of Title VI. The Court concluded that assistance provided through the tax system can operate as federal financial assistance depending upon the particular provisions at issue. On the tax exemption issue, the Court addressed two different exemptions. First, the Court held that tax exemption provided to "nonprofit clubs" under Section 501(c)(7) does not require the clubs to comply with Title VI because that tax exemption for

nonprofit clubs "is part and parcel of defining appropriate subjects of taxation" and because the exemption is "available regardless of the nature of the particular club, [it] does not operate as a 'grant' of Federal funds." *Id.* at 457-59.  Conversely, the Court addressed tax exemptions provided to "fraternal orders" under Section 501(c)(8), which was "on different footing" because the tax exemption was "available only to particular groups, [and thus] it operates in fact as a subsidy in favor of the particular activities these groups are pursuing."  *Id.* at 460-62.  Because the tax exemption for fraternal orders was a subsidy in favor of the activities pursued by fraternal orders, the tax exemption was federal financial assistance rendered the fraternal orders subject to Title VI. *See Paralyzed Veterans of Am. v. Civil Aeronautics Bd.*, 752 F.2d 694, 708 (D.C. Cir. 1985) ("The three-judge court in *McGlotten* ruled that the tax exemption provided fraternal orders by section 501(c)(8) of the Internal Revenue Code, 'since it is available only to particular groups . . . operates in fact as a subsidy in favor of the particular activities these groups are pursuing. It thus falls within the coverage of the Civil Rights Act.'").

In this case, however, neither Section 501(c)(7) nor Section 501(c)(8) are applicable. Defendant has tax exempt status under Section 501(c)(3), for a charitable non-profit organization "designed to benefit the public good through charitable, religious, scientific, or educational purposes."  *St. Luke's Hosp. v. United States*, 494 F. Supp. 85, 89 (W.D. Mo. 1980).  Section 501(c)(3) tax exemption is not limited to certain organizations, or certain activities, but is a broad "tax exemption on churches and other organizations in recognition of the benefit society derives from the activities of these organizations." *Founding Church of Scientology v. United States*, 412 F.2d 1197, 1199 (9th Cir. 1969), *cert. denied*, 397 U.S. 1009 (1970).  *See also Summers v. Cherokee Children & Family Servs.*, 112 S.W.3d 486, 502 (Tenn. Ct. App. 2002) ("Such treatment is in recognition of the benefit to the public good resulting from the work of most nonprofit

organizations. Exemption from federal taxation and tax-deductibility of donations are benefits of classification as a § 501(c)(3) entity, but that classification is based upon essentially charitable purposes where the public good is served, not the private interest of any corporate insider."); *P.L.L. Scholarship Fund v. Commissioner*, 82 T.C. 196, 200 (1984) ("The privilege of tax-exempt status has been accorded by Congress to organizations dedicated to the public good."). Therefore, unlike the subsidy to the particular activities of the fraternal organizations noted in *McGlotten*, the tax exemption for Defendant CPS is wide-ranging, available regardless of the nature of the particular charitable activities of the school serving the public good, and not a subsidy in favor of Defendant.

Moreover, Plaintiffs make no mention of the numerous cases that have actually addressed whether Section 501(c)(3) tax exemption equates to "federal financial assistance." Even a cursory review of the case law reflects several decisions addressing that issue, all of which held that the 501(c)(3) tax exemption is not the same as "federal financial assistance." In *Johnny's Icehouse, Inc. v. Amateur Hockey Ass'n*, 134 F. Supp. 2d 965 (N.D. Ill. 2001), the Northern District of Illinois addressed the argument and held that the "contention simply does not withstand analysis." The Court first noted that the "comprehensive definition" of "federal financial assistance" in the Department of Education's regulation, 34 C.F.R. § 106.2(g), did not mention exemption from taxation, and that such assistance only includes direct transfers of money, property, or services:

> What is conspicuously absent from that laundry list is income tax exemption. Though to be sure the possession of such an exemption obviously makes the possessor the "recipient" of a higher net income than if it had to pay taxes, and presumably the beneficiary of more receipts because of the deductibility of its donors' contributions, those benefits--unlike those expressly listed in the Regulation--must be recognized as indirect rather than direct subsidies.
>
> In short, "federal financial assistance" encompasses only direct transfers of federal money, property or services from the government to a program. Exemption from taxation just does not equate to such direct transfers (*cf. Paralyzed Veterans*, 477 U.S. at 606-07, limiting the scope of Title IX to entities that actually receive federal

money, not to those that merely benefit economically from the federal programs that use the money).

134 F. Supp. 2d at 971-72. The Court continued and noted that equating tax exemption under Section 501(c)(3) with "federal financial assistance" would be inconsistent with the spending clause foundation for Title IX because an entity has a choice whether or not to accept an offer from the government to transfer money or property to support an educational program or activity, i.e., accept Federal funds and be subject to Title IX, or not:

> That is, when the government offers to transfer money or property to an entity to support an educational program or activity, the intended recipient has the choice whether or not to accept the assistance and the concomitant obligation not to discriminate on the basis of sex. While Congress may condition tax exempt status on an organization's conforming to the specific categories in Section 501(c)(3) (as discussed in *Bob Jones Univ. v. United States*, 461 U.S. 574, 585-92, 76 L. Ed. 2d 157, 103 S. Ct. 2017 (1983)), that was not the power that Congress invoked to subject entities to the nondiscrimination requirements of Title IX.

*Id.* In other words, while receipt of tax-exempt status confers an economic benefit, it is not the equivalent of a grant of money or property constituting federal financial assistance under Title IX.

Other courts addressing the issue have reached the same conclusion. *See, e.g., Stewart v. N.Y. Univ.*, 430 F. Supp. 1305, 1314 (S.D.N.Y. 1976) ("The Court of Appeals for the Second Circuit has held that the granting of tax deductions and exemptions 'creates only a minimal and remote involvement' by the government in the activities of the recipient, and the Court finds the Federal tax benefits granted to the Law School insufficient to support a claim under § 2000d or § 1681.") (internal citations omitted); *Zimmerman v. Poly Prep Country Day Sch.*, 888 F. Supp. 2d 317, 332 n.2 (E.D.N.Y. 2012) (holding that "tax-exempt status . . . does not constitute federal financial assistance within the meaning of Title IX"); *Russo v. Diocese of Greensburg*, Civil Action No. 09-1169, 2010 U.S. Dist. LEXIS 96338, at *9 (W.D. Pa. Sep. 15, 2010) (expressing doubt without necessarily deciding that "obtaining tax exempt status would transform a private,

parochial school into a recipient of Federal Financial Assistance for purposes of Title IX"). *See also Bachman v. Am. Soc'y of Clinical Pathologists*, 577 F. Supp. 1257 (D.N.J. 1983) (analogizing the Rehabilitation Act to Title IX, and noting that "in extending the coverage of Title IX to an entire educational institution, the courts have relied on the indirect benefits such institutions receive from federal grants and student loans and not on the tax exempt status of the schools themselves"). *Cf. NCAA v. Smith*, 525 U.S. 459, 470 (1999) (holding that the NCAA's receipt of dues payments from recipients of federal funds does not suffice to subject the NCAA to Title IX, and not addressing the fact that the NCAA is a 501(c)(3) entity).

Based upon the foregoing, it is clear that federal financial assistance contemplates a transfer of funds or property from the Federal government, and does not include tax exemption status under Section 501(c)(3).  If Congress had intended that all Section 501(c)(3) tax exempt entities must comply with Title IX, Congress could have easily included tax exemption as a category of federal financial assistance as defined in the statute and/or regulation. The fact that tax exemption is conspicuously absent from the list of what includes federal financial assistance is instructive, and evidence that Congress did not intend that all Section 501(c)(3) entities  would be subject to Title IX.  *See also* Exhibit 1, The Private Schools Nondiscrimination and Due Process Act of 1979, S.B. 995, *reprinted* in 1979 Cong. Rec. S8436 (daily ed. Apr. 24, 1979), stating in the "Declaration of Congressional Policy" that "various Acts of Congress which condition Federal financial assistance to grantees, such as Title VI of the Civil Rights Act of 1964 and Title IX of the Education Amendments of 1972, do not apply to organizations simply because they are tax-exempt").

**2. Plaintiffs Have Not Presented Competent Evidence of Federal Financial Assistance During Plaintiffs' Alleged Harassment at the School**

Plaintiffs' second argument is that "there is ample evidence that Defendant CPS received federal financial assistance on a consistent and ongoing basis starting years before Plaintiffs' allegations took place and continuing through to 2020."

As an initial matter, Plaintiffs argue that CPS' liability under Title IX is not restricted to the time period of receipt of federal financial assistance.  Plaintiffs argue that if CPS did not receive federal financial assistance until an SBA loan in 2020,[1] Title IX still applies retroactively and Plaintiffs are allowed to pursue their Title IX claim for harassment that occurred before 2020 when they were enrolled at the school.  There is no such support for that nonsensical argument.

Title IX is what is known as spending clause legislation, applicable to schools and educational programs that receive federal funds.  Title IX does not apply to all schools but "conditions an offer of federal funding on a promise by the recipient not to discriminate, in what amounts essentially to a contract between the government and the recipient of funds."  *Gebser v. Lago Vista Indep. Sch. Dist.*, 524 U.S. 274, 286 (1998).  Only "recipients" are bound by the statute. *Doe v. Meisels,* 2016 U.S. Dist. LEXIS 66740, *2 (E.D. N.Y. 2016). Because of the contractual nature of Title IX, it is axiomatic that a school cannot be liable under Title IX until the school makes the decision to accept federal funding in exchange for the promise not to discriminate. "[W[hen the government offers to transfer money or property to an entity to support an educational program or activity, the intended recipient has the choice whether or not to accept the assistance and the concomitant obligation not to discriminate on the basis of sex."  *Johnny's Icehouse, Inc.*, 134 F. Supp. 2d at 971-72.  Therefore, prior to the offer and acceptance of federal financial assistance, the school, such as CPS, cannot be liable under Title IX.  In this case, CPS' receipt of

---

[1]  The loan was obtained through the Paycheck Protection Program (PPP) loan established through the  Coronavirus Aid, Relief, and Economic Security Act (CARES Act).  *See* Ex. 2 to Pl. Opp. (Brent Johnson Vol. 2) at 394:8-16; Ex. 11 to Pl. Opp.

federal financial assistance in 2020 does not mean that CPS was bound by the requirements of Title IX during the preceding schools years (such as 2015-2016; 2016-2017; 2017-2018; 2018-2019; or 2019-2020 school years).

Plaintiffs' argument to the contrary is nonsensical and would render schools such as CPS subject to retroactive liability for former students who never attended the school during a time period when the school received federal financial assistance. The cases cited by Plaintiffs on Pages 11-13 of their Opposition are irrelevant to Defendant's argument because they do not address any issue relating to the timing of the receipt of federal financial assistance. Plaintiffs' argument is further contradicted by the guidance promulgated by the U.S. Small Business Administration for PPP loans, which states that "[a]ny legal obligations that you incur through your receipt of this loan are not permanent, and once the loan is paid or forgiven, those nondiscrimination obligations will no longer apply." *See* Exhibit 2, https://www.sba.gov/sites/default/files/2020-06/SBA%20Faith-Based%20FAQ%20Final-508.pdf. *See also Beverly R. v. Mt. Carmel Acad. of New Orleans, Inc.*, 528 F. Supp. 3d 451, 454 (E.D. La. 2021) ("Mt. Carmel received a Paycheck Protection Program loan from the United States Small Business Administration ('SBA'), which obligated it to comply with federal discrimination regulations *for the duration of the loan*.") (emphasis added). If the recipient's legal nondiscrimination obligations end when the loan is paid or forgiven, it is obvious that the recipient would not have such legal obligations before receipt of the loan.

Turning to Plaintiffs' claimed "ample evidence" of Defendant's receipt of federal financial assistance, Plaintiffs make three arguments. First, Plaintiffs argue that CPS obtained an SBA loan in 2020, and that "the application for the SBA loan had to have been submitted to the SBA prior to the April 8, 2020 date in order for the application to be processed and the funds to be released

by April 2020." *See* ECF 109 at 14. That argument is misguided for multiple reasons, not the least of which is that submitting an application for federal financial assistance is not "receipt" of federal financial assistance giving rise to the application of Title IX. *See NCAA*, 525 U.S. 459, 468 (1999) (stating that a "recipient" is an entity "to whom federal financial assistance is extended directly or through another recipient"). A school is not bound by Title IX until it is extended and receives that federal financial assistance, not when such assistance is requested by an application. Moreover, even if the submission of an application was receipt of financial assistance (which it is not), Plaintiffs cite no evidence in the record supporting the factual condition that the PPP loan was applied for during the time period in which Plaintiff N.H. was a student at the school. Instead, the evidence is that the loan was applied for in March or April 2020, long after Plaintiff N.H. stopped being a student at the school. *See* Ex. 2 to Pl. Opp. (Brent Johnson Vol. 2) at 394:8-16 ("We applied for the PPP loan in April – March or April of last year, the 2020."); Ex. 11 to Pl. Opp. Plaintiff N.H. stopped being a student at CPS in 2018, and she was not a student at the school in March or April 2020 when the PPP loan was applied for and received.

Second, Plaintiffs argue that CPS was a direct recipient of federal funding "for building repair, and emergency funds for a collapsed roof," citing an email sent by Ron Jaison, member of CPS' Board of Directors. The email, however, is not in a form capable of being reduced to admissible evidence at trial because Mr. Jaison has not, and has never, stated that he had personal knowledge regarding whether those funds were from the Federal government as opposed to a State or County government. It is well settled that in order to be considered in opposition to a motion for summary judgment, the evidence whether via interrogatory answers, deposition testimony, affidavit, or otherwise "must still be admissible under the Federal Rules of Evidence." *Solis v.*

*Prince George's Cty.*, 153 F. Supp. 2d 793, 799 (D. Md. 2001) (citing *Rohrbough v. Wyeth Labs.,*

*Inc.*, 916 F.2d 970, 973 (4th Cir. 1990)). As the Fourth Circuit has stated, when

> opposing a summary judgment motion, a party may rely on depositions, affidavits,
> admissions, and answers to interrogatories that would be admissible in evidence at
> trial. Consequently, answers to interrogatories used to "oppose a motion [for
> summary judgment] must be made on personal knowledge, set out facts that would
> be admissible in evidence, and show that the affiant or declarant is competent to
> testify on the matters stated." *The "personal knowledge requirement prevents*
> *statements in affidavits that are based, in part, upon information and belief—*
> *instead of only knowledge—from raising genuine issues of fact sufficient to defeat*
> *summary judgment*."

*Burwick v. Pilkerton*, 700 F. App'x 214, 216 (4th Cir. 2017) (emphasis added) (internal citations

omitted). *See also DiStiso v. Cook*, 691 F.3d 226, 230 (2d Cir. 2012) ("[W]here a party relies on

affidavits or deposition testimony to establish facts, the statements 'must be made on personal

knowledge, set out facts that would be admissible in evidence, and show that the affiant or

declarant is competent to testify on the matters stated.'"); *Vondriska v. Cugno*, 368 F. App'x 7, 9

(11th Cir. 2010) (providing that the deponent's testimony would be admissible on summary

judgment "to the extent that [it] was competent, on personal knowledge, and set out facts

admissible at trial").

       Mr. Jaison's email, without more, reflects nothing other than his speculation or belief about

CPS having received federal financial assistance. Mr. Jaison has not, and has never, stated that he

has personal knowledge of whether the school received federal funds relating to building repairs

and a roof collapse. Mr. Jaison was deposed, and never testified that he had personal knowledge

regarding the funding sources identified in his email. *See* Exhibit 3 (Ron Jasion) at 17-28. Without

any indication of personal knowledge, this Court cannot consider Mr. Jaison's email as competent

evidence to defeat summary judgment.

This conclusion is best buttressed by the fact that, as noted in Plaintiffs' Opposition, contents of the email from Mr. Jaison were false. The email stated in relevant part that the school "may well be [bound by Title IX] after receiving federal funding for the fieldhouse collapse, for aging building grants, and for textbook assistance." However, as Plaintiffs admitted, the "textbook funding referenced here is given through the State of Maryland with no influx of federal funding." *See* ECF 109 at 15 n.38. Moreover, Mr. Jaison's supposition that the school received federal funds relating to aging building repairs and a roof collapse was also incorrect, as CPS has investigated those issues and determined that funds were provided by the State of Maryland, and not the Federal government. *See* ECF 108-2; Ex. 2 to Pl. Opp. (Brent Johnson Vol. 2) at 390-393 ("We looked it up. The check was from the State of Maryland."); Ex. 4 to Pl. Opp. at No. 14 (identifying the Maryland State Department of Education as the government entity that provided CPS with the Aging Schools Grants). In other words, Mr. Jaison's conjecture and speculation absent personal knowledge that the school had received federal financial assistance in the past was false, and conclusory allegations, speculation, and unsubstantiated assertions are not evidence and are not enough to defeat a well-supported motion for summary judgment. *Shin v. Shalala*, 166 F.Supp.2d 373, 375 (D. Md. 2001). "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient" to defeat summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986).

Furthermore, even if Mr. Jaison's email was admissible, it does not specify or include any evidence about when CPS received the alleged federal financial assistance, and it is Plaintiffs' obligation to present evidence demonstrating the existence of an issue of material fact. "Once the movant has established the absence of any genuine issue of material fact, the opposing party has an obligation to present some type of evidence to the court demonstrating the existence of an issue

of fact." *Pension Benefit Guar. Corp. v. Beverley*, 404 F.3d 243, 246-47 (4th Cir. 2005). If the opposing party does not, the court must grant summary judgment. *Bouchat v. Baltimore Ravens Football Club, Inc.*, 346 F.3d 514, 525 (4th Cir. 2003); *Drewitt v. Pratt*, 999 F.2d 774, 778-79 (4th Cir. 1993). Without any evidence about when the alleged federal financial assistance noted in Mr. Jaison's email was received by CPS, there is no evidence to create a dispute of material fact.

Third, Plaintiffs argue that CPS received indirect federal assistance via the Maryland Department of Education. As set forth in Defendant's Motion, to establish that an entity receives federal assistance through an intermediary or indirectly, and thus constitutes a recipient, as opposed to an entity that only benefits economically from federal assistance and is not subject to Title IX, it is necessary to establish that the entity was provided "with federal funds earmarked for that purpose." *Sharer v. Oregon*, 581 F.3d 1176, 1181 (9th Cir., 2009) (quoting *NCAA*, 525 U.S. at 468). Stated otherwise, it is necessary to establish the source of funds to the Defendant; and in cases not involving direct funds from the federal government, that such other funds were originally derived from the federal government and earmarked for Defendant. *Lynn v. St. Anne Inst.*, 2006 U.S. Dist. LEXIS 18786, *37-38 (N.D. N.Y. 2006).

Plaintiffs take issue with the requirement that they must prove that the federal funds, indirectly provided to CPS, must be "earmarked" for the school. However, the "earmarked" requirement is settled law from the Supreme Court in *NCAA v. Smith*, 525 U.S. at 468 ("Unlike the **earmarked** student aid in *Grove City*, there is no allegation that NCAA members paid their dues with federal funds **earmarked** for that purpose. At most, the Association's receipt of dues demonstrates that it indirectly benefits from the federal assistance afforded its members. This showing, without more, is insufficient to trigger Title IX coverage.") (emphasis added).

In this case, Plaintiffs have cited no evidence capable of being reduced to admissible evidence at trial that CPS received federal financial assistance that was earmarked for Defendant. Plaintiffs specifically refer to the American Rescue Plan Elementary and Secondary School Emergency Relief plan, and state that "the U.S. Department of Education and U.S. Office of Innovation & Improvement each require state DOE's and governments to allocate financial resources for teacher certification funding and funding for health-department initiatives." *See* ECF 109 at 18-19.  To support that argument, Plaintiffs cite three websites from the U.S. Department of Education.  The websites, however, are inadmissible hearsay and none of the websites mention CPS or establish that any funding provided to CPS by the State of Maryland was originally received from the Federal government and earmarked for Defendant.

This case is completely different than the state department of education and/or athletic association cases cited on Page 18 of Plaintiffs' Opposition, in which the particular state department of education delegated operations of interscholastic athletics to a separate entity that was funded by schools that directly received federal financial assistance.  There is no evidence, because it is not true, that CPS operates an athletic conference or association, or receives athletic dues from other schools that receive federal financial assistance.

Although CPS received some governmental funding from the State of Maryland, that alone is insufficient upon which to base a Title IX claim.  Plaintiffs have not come forward and demonstrated that any State government funding received by CPS is in any way sufficient to trigger Title IX.  *See Lynn v. St. Anne Inst*., 2006 U.S. Dist. LEXIS 18786, *37-38 (N.D. N.Y. 2006) ("Assuming St. Anne receives monies from the state that were originally derived from the federal government, it can only be said that St. Anne benefits economically from federal assistance. There is no evidence that the federal funds were earmarked for St. Anne (or foster care). Accordingly,

St. Anne is not subject to Title IX.").  With the evidence that Defendant received government funding from the State of Maryland, it is Plaintiffs' obligation, and Plaintiffs have provided nothing other than their own conclusory allegation, that those state funds were from the Federal government earmarked for Defendant.  Even if such state funding was assumed to have originally been derived from the federal government (which it cannot), it could still only be said that CPS benefitted from federal assistance, which is insufficient to trigger Title IX.  Plaintiffs have failed to adduce the necessary factual support for their contention that CPS is a recipient of federal financial assistance, sufficient to render CPS subject to the requirements of Title IX.

### 3. Brent Johnson's Affidavit Complies with Rule 56, and Plaintiffs Have Not Produced Competent Evidence to Defeat Defendant's Motion

Plaintiffs' final argument is that Brent Johnson's affidavit as Headmaster of Defendant CPS is inadmissible at summary judgment because it is hearsay and self-serving.  Plaintiffs are incorrect and misstate the requirements under Rule 56.

"It is well established that unsworn, unauthenticated documents cannot be considered on a motion for summary judgment." *Orsi v. Kirkwood*, 999 F.2d 86, 92 (4th Cir. 1993). "Generally speaking, evidence must be admissible at trial in order to be considered on summary judgment." *Goguen ex rel. Estate of Goguen v. Textron, Inc.*. 234 F.R.D. 13, 16 (D. Mass. 2006); *Sook Yoon v. Sebelius*, Civil Action No. CBD-08-3173, 2010 U.S. Dist. LEXIS 116046, at *16 (D. Md. Nov. 1, 2010).  However, a significant exception to this rule is affidavits. Under Federal Rule of Civil Procedure 56(c)(4) affidavits, although not themselves admissible at trial, may be offered in support of, or opposition to, summary judgment if they set forth facts that would be admissible under the Federal Rules of Evidence.  *Id.*  Otherwise stated, hearsay affidavits are specifically allowed for purposes of summary judgment if they are "made on personal knowledge, set out facts

that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." *See Hamilton v. Mayor of Balt.*, 807 F. Supp. 2d 331, 352 (D. Md. 2011).

Mr. Johnson's affidavit as Headmaster of Defendant meets all requirements under the Federal Rules. The affidavit, by its express terms, is based upon personal knowledge given Mr. Johnson's role as Headmaster and his review of CPS files and documentation pertaining to CPS' receipt of governmental funding. Based upon that review, and within his personal knowledge as Headmaster, Mr. Johnson is competent to testify as to the contents of CPS records which indicate that from 2014 through February 29, 2020, CPS did not receive any direct Federal funding or financial assistance. Plaintiffs' argument that the affidavit is hearsay is irrelevant under the applicable Rule 56 legal standard.

Likewise, Plaintiffs' argument that the affidavit is self-serving is misguided because the cases cited by Plaintiffs in which affidavits were disregarded all involve affidavits setting forth subjective facts regarding interpretation of events or state of mind, as opposed to objective evidence about the source of school funding. *See Stradley v. Lafourche Commuc'ns, Inc.,* 869 F. Supp 442, 445 (E.D.La.1994) (affidavit describing basis to terminate employee); *State Farm Mut. Auto. Ins. Co. v. Philly Family Practice, Inc*., 525 F.Supp.2d 718, 726 (E.D.Pa.2007) (affidavit describing person's interpretation of contract); *I.V. Servs. Of Am., Inc. v. Trs. Of Am. Consulting,* 136 F.3d 114, 122 (2d Cir.1998) (same); *Welch v. Liberty Machine Works, Inc*., 23 F.3d 1403 (8th Cir.1994) (affidavit describing basis to terminate employee). In another case cited by Plaintiffs, the affidavit submitted at summary judgment contradicted deposition testimony from other witnesses, such that the decision to deny summary judgment because of a material issue of fact was easy. *Strum v. Ross,* 11 F.Supp.2d 942, 946 (S.D.Tex.1998).

In this case, there is no contradictory evidence.  In fact, although not required, Mr. Johnson's affidavit is consistent with his sworn deposition testimony as corporate representative of CPS that CPS has not received federal financial assistance.  *See* Ex. 2 to Pl. Opp. (Brent Johnson Vol. 2) at 390-393. By the same token, Mr. Johnson's affidavit is not required for Defendant's summary judgment motion.

While it is true that this Court must accept the non-moving party's evidence as true for purposes of summary judgment, Plaintiffs must provide competent evidence to defeat Defendant's summary judgment motion.  A "party cannot create a genuine dispute of material fact from your speculation or compilation of inferences." *Shin v. Shalala*, 166 F.Supp.2d 373, 375 (D. Md. 2001) (citations omitted). *See also Anderson v. Liberty Lobby LLC*, 477 U.S. 242, 247-48 (1986) ("By its very terms the standard provides that the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact.").  Plaintiffs had the burden to prove that the Defendant receive federal financial assistance, and Plaintiffs have not done so.  Without competent evidence that CPS is a recipient of federal financial assistance (because none exists), Title IX does not apply and Plaintiffs' Count I fails as a matter of law.

## CONCLUSION

For the reasons set forth herein, and CPS' Partial Motion to Dismiss or in the Alternative, for Summary Judgment, CPS requests that the Court grants its Motion, and dismiss Count I of the Amended Complaint for lack of subject matter jurisdiction, or in the alternative enter summary judgment on CPS' behalf with regard to Count I of Plaintiffs' Amended Complaint.

 Respectfully submitted,

/s/Gregg E. Viola
Gregg E. Viola (25737)
ECCLESTON & WOLF, P.C.
Baltimore-Washington Law Center
7240 Parkway Drive, 4th Floor
Hanover, MD 21076-1378
(410) 752-7474 (phone)
(410) 752-0611 (fax)
E-mail: viola@ewmd.com
*Attorney for Defendant*

/s/Mark P. Johnson
Mark P. Johnson (29091)
ECCLESTON & WOLF, P.C.
Baltimore-Washington Law Center
7240 Parkway Drive, 4th Floor
Hanover, MD 21076-1378
(410) 752-7474
(410) 752-0611 (fax)
E-mail: johnson@ewmd.com
*Attorney for Defendant*

/s/Eric M. Rigatuso
Eric M. Rigatuso (27605)
ECCLESTON & WOLF, P.C.
Baltimore-Washington Law Center
7240 Parkway Drive, 4th Floor
Hanover, MD 21076-1378
(410) 752-7474 (phone)
(410) 752-0611 (fax)
E-mail: rigatuso@ewmd.com
*Attorney for Defendant*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 4th day of February, 2022, copies of the foregoing were

served via the Court's ECF System to all counsel of record.

/s/Eric M. Rigatuso
Eric M. Rigatuso (Bar # 27605)

20

JA095

Pg: 100 of 610       Filed: 06/05/2023       Doc: 17       USCA4 Appeal: 23-1453

# EXHIBIT
# 1

Case 1:20-cv-03132-RDB   Document 116-1   Filed 02/04/22   Page 2 of 3

Filed: 06/05/2023      Pg: 101 of 610      Doc: 17      USCA4 Appeal: 23-1453

ties which have been subject to discrimination and other sanctions in our society.

It is too easy to lose sight of the fact that this issue involves the rights of two groups of minorities, one which is ethnic and the other religious in character. Both groups have suffered unequal treatment during the course of American history. Both groups have important constitutional rights which must be respected. The present difficulties with the IRS procedures point to the problems which arise when an administrative agency without authorization or guidance from Congress attempts to take it upon itself to resolve such sensitive issues.

Mr. President, it is the responsibility of Congress to examine the issues presented in this question. The legislative process is well suited to affording all interested parties a fair and open hearing. If new national policy is to be set on this matter, then it is the lawmaker, the Congress which should act.

#### THE PRIVATE SCHOOL NONDISCRIMINATION AND DUE PROCESS ACT OF 1979

The "Private School Non-Discrimination and Due Process Act of 1979" for the first time authorizes the IRS to deny the tax-exempt status of, and the deductibility of contributions to, a private school which racially discriminates as to students. It provides for the Secretary of the Treasury to bring declaratory action in the Federal courts to determine whether a particular private school racially discriminates.

The Congress has not yet legislated in either respect. The bill reestablishes the role of Congress in determining law in this area in a manner consistent with the Constitution, prior Federal statutes and case law.

Under pressure of litigation, the IRS has issued revenue procedures prohibiting racial discrimination as to students in tax-exempt private schools. These procedures are founded on a claim of "public policy" as determined by the IRS. They are not sensitive to the policies and programs of religious schools which limit or grant preferences and priorities, in admissions to students who are members of a particular religious organization. The bill draws upon the efforts of the IRS represented in various revenue rulings while establishing that the Congress is responsible for making policy decisions with respect to the Internal Revenue Code.

The definitions "private elementary or secondary school" and "a racially discriminatory policy as to students" as used in this bill are drawn from the IRS Revenue Procedures. The definitions also make explicit what is mandated by the Constitution, namely that admissions decisions of religious schools are not racially discriminatory if they limit or grant preferences or priorities to students who are a member of a particular religious organization.

The authority of the IRS for its present revenue ruling is suspect, having been upheld by one district court but rejected by another. The rationale for the authority of the IRS, which is based on "public policy" is suspect as a matter of law and open-ended in terms of bureaucrat-

ic discretion. The suggestion by some that the authority of the IRS should be based on the theory that indirect assistance through tax exemption and charitable deductions should be viewed as Federal financial assistance under title VI is contrary to the intent of Congress and is explicitly rejected by this legislation.

Under section 7428 of the current Internal Revenue Code, a tax-exempt organization has the right to seek a declaratory action against the IRS after exhaustion of administrative appeals. This is too late for private schools which are dependent, for their financial viability, on the assurance that contributions will be tax deductible. In addition, private schools are in a worse position than public schools which, under Title VI of the Civil Rights Act of 1964 are entitled to notice, hearing before an administrative law judge, and review by the Federal courts prior to fund termination.

This bill provides that allegations of racial discrimination as to students in a private school must be determined by a declaratory action suit brought by the Secretary of the Treasury in a Federal district court for the district in which the school is located. This assures elementary due process to a private school including adjudication by the constitutional branch of government well versed in determining on the basis of evidence whether an organization in fact discriminates.

The declaratory action requirement will also insure that the rights of religious schools which are threatened by allegations of racial discrimination will be determined by a Federal district court and not by an administrative agency which has no formal third party adjudicatory procedures and which under current practice now serves as legislator.

Finally, the bill does not require the Secretary of the Treasury to seek declaratory action if a private school has not adopted and published a nondiscrimination policy as to students or if the school has already been determined to discriminate in a Federal court action or that issue is before a Federal court at the time the bill becomes effective.

Mr. President, I ask unanimous consent that the Private School Non-Discrimination and Due Process Act of 1979 be printed in the RECORD at the conclusion of my remarks.

There being no objection, the bill was ordered to be printed in the RECORD, as follows:

#### S. 905

*Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled,*

SECTION 1. FINDINGS; DECLARATION OF CONGRESSIONAL POLICY.

(a) The Congress finds that—

(1) discrimination based on race in the public schools violates the Constitution and laws of Congress, including title VI of the Civil Rights Act of 1964, and the elimination of discrimination based on race in all educational opportunities is a fundamental national goal;

(2) the Supreme Court has held under the Civil Rights Act of 1866 that a private elementary school may not discriminate on

the basis of race in the admission of students, but the Congress has failed to provide guidance as to the tax-exempt status of such schools;

(3) revenue rulings and procedures adopted by the Internal Revenue Service which deny tax-exempt status to private schools that discriminate on the basis of race are not based on a specific statute but rest on broad grounds of fundamental public policy as determined by the Service;

(4) the financial viability of many private schools, including scholarship programs, rests on the assurance that contributions to the school are deductible under the Internal Revenue Code, and any action by the Internal Revenue Service affecting the tax-exempt status of a school threatens its existence;

(5) revenue rulings and procedures adopted by the Internal Revenue Service have not been sensitive to private schools which limit, prefer or grant priorities in admission to students which are members of religious organizations;

(6) many private schools operated by a particular religion or religious association form an integral part in carrying out the religious mission of the affiliated churches or associations in the free exercise of religion by their members;

(7) various Acts of Congress which condition Federal financial assistance to grantees, such as title VI of the Civil Rights Act of 1964 and title IX of the Education Amendments of 1972, do not apply to organizations simply because they are tax-exempt;

(8) the Congress has provided in title VI of the Civil Rights Act of 1964 that a public elementary and secondary school system is entitled to notice and a full evidentiary hearing on allegations of racial discrimination including the right to appeal an adverse decision to the Federal courts, prior to the termination of Federal funds; and

(9) neither the Congress nor the Internal Revenue Service has provided for impartial adjudication of allegations of racial discrimination prior to withdrawal of the advance notice of deductibility with respect to contributions to, and the determination of the tax-exempt status of, a private school.

(b) Therefore, the Congress determines that a private school which in fact racially discriminates as to students should not be entitled to tax-exempt status, and contributions to such schools should not be deductible under the Internal Revenue Code of 1954, and further determines that the Secretary of the Treasury should be required to bring a declaratory action in the Federal courts to adjudicate whether a private school in fact racially discriminates as to students prior to any action which affects the tax-exempt status of, or deductibility of contributions to, such school.

"SEC. 2. SHORT TITLE.

This Act may be cited as the "Private School Non-Discrimination and Due Process Act of 1979".

SEC. 3. DECLARATORY JUDGMENT PROCEDURE ESTABLISHED.

(a) IN GENERAL.—Subchapter A of chapter 76 of the Internal Revenue Code of 1954 (relating to civil actions by the United States) is amended by redesignating section 7408 as 7409, and by inserting after section 7407 the following new section:

"SEC. 7408. ACTION TO REVOKE OR DENY TAX-EXEMPT STATUS OF PRIVATE SCHOOL ON BASIS OF RACIAL DISCRIMINATION.

"(a) GENERAL RULE.—The Secretary may not—

"(1) revoke or change the qualification or classification of a private school as an organization described in section 501(c)(3) which is exempt from taxation under section 501(a),

"(2) deny, withhold approval of, the initial qualification or classification of a private school as such an organization, or

"(3) condition acceptance or approval of an application for qualification or classification of a private school as such an organization, or

"(4) revoke the advance assurance of deductibility issued to a private school,

on the grounds that the school discriminates on the basis of race as to students unless a court of the United States, in a civil action for a declaratory judgment brought by the Secretary in accordance with the provisions of this section, has found that the school has a racially discriminatory policy as to students.

"(b) PROCEDURE TO BE FOLLOWED BY THE SECRETARY.—Whenever the Secretary has reason to believe that a private school has a racially discriminatory policy as to students, the Secretary shall file a civil action for a declaratory judgment in the United States district court for the district in which the private school is located.

"(c) LIMITATIONS.—

"(1) Evidentiary standard.—No finding that a private school has a racially discriminatory policy as to students shall be made unless the Secretary, by a clear and convincing preponderance of the evidence, shows that the school has had a practice of deliberate and intentional racial discrimination in fact.

"(2) No adverse action until school has exhausted appeals.—In the case of a private school with respect to which a court has found under subsection (a) that it has a racially discriminatory policy as to students, the Secretary shall not take any action with respect to the initial qualification or continued qualification of the school as an organization described in section 501(c)(3) which is exempt from tax under section 501(a) or as an organization described in section 170(c)(2)(B) until the school has exhausted all appeals from the final order of the district court in the declaratory judgment action brought under this section.

"(d) RETENTION OF JURISDICTION; REINSTATEMENT OF STATUS.—The district court before which an action is brought under this section which resulted in the denial of initial qualification or revocation of qualification of a private school as an organization described in section 501(c)(3) which is exempt from tax under section 501(a), or as an organization described in section 170(c)(2)(B), shall retain jurisdiction of such case, and shall, upon a determination that such school—

"(1) has not had a racially discriminatory policy as to students for a period of not less than a full school year since such denial or revocation became final, and

"(2) does not have a racially discriminatory policy as to students,

shall issue an order to such effect and vitiate such denial or revocation. Such an order may be appealed by the Secretary, but, unless vacated, be binding on the Secretary with respect to such qualification.

"(e) Award of Cost and Fees to Prevailing School.—In any civil action brought under this section, the prevailing party, unless the prevailing party is the Secretary, may be awarded a judgment of costs and attorney's fees in such action.

"(f) DEFINITIONS.—For purposes of this section,—

"(1) Private school.—The term 'private school' means any privately-operated school which meets the requirements of State law relating to compulsory school attendance other than a school offering care or instruction for students solely below the first grade, nursery schools, schools for the blind or deaf, or schools operated solely for the handicapped or emotionally disturbed.

"(2) Racially Discriminatory Policy As To Students.—The term 'racially discriminatory policy as to students' means that a school does not admit students of all races to all the rights, privileges, programs, and activities generally accorded to or made available to students at that school, and that the school discriminates on the basis of race in administration of its educational policies, admissions policies, scholarship and loan programs, athletic programs, or other school-administered programs. Such term does not include an admissions policy of a school which limits, or grants preferences or priorities to, its students to members of a particular religious organization or belief and does not include any policy or program of a school which is limited to, or required of, members of a particular religious organization or belief.

"(g) Section to Apply Only to Schools With Publicly Announced Policy of Nondiscrimination.—Subsection (a) shall not apply with respect to any private school unless that school has adopted a policy of nondiscrimination on the basis of race as to students and has published, in such manner as the Secretary may require, public notice of that policy.".

(b) The table of sections for such subchapter is amended by striking out the last item and inserting in lieu thereof the following:

"Sec. 7408. Action to revoke or deny tax-exempt status of private school on basis of racial discrimination.

"Sec. 7409. Cross references.".

SEC. 4. EFFECTIVE DATE.

The amendments made by section 3 of this Act shall apply to actions of the Secretary of the Treasury taken with respect to the initial qualification or continuing qualification of an organization as an organization described in section 501(c)(3) of the Internal Revenue Code of 1954 which is exempt from taxation under section 501(a) of such Code, or which is described in section 170(c)(2)(B) of such Code, after the date of enactment of this Act.

By Mr. HELMS:

S. 996. A bill to amend the United Nations Participation Act of 1954 with respect to the enforceability of Executive orders which apply measures against Rhodesia; to the Committee on Foreign Relations.

ZIMBABWE-RHODESIA: IT IS TIME TO LIFT SANCTIONS

Mr. HELMS. Mr. President, it is time to lift all sanctions against Zimbabwe-Rhodesia.

All conditions of the Case-Javits amendment have been met; the transitional government time and again has agreed to meet with the Patriotic Front, with every good faith attempt to conduct an all-parties conference arrogantly rebuffed by the Patriotic Front and its allies.

Moreover, Mr. President, the most free and open election in the history of the continent of Africa has just been concluded—despite efforts to frustrate it—with a 63-percent turnout at the polls.

So, Mr. President, how can the United States now refuse to normalize relations with the new government of Zimbabwe-Rhodesia? What further excuse can be contrived as a basis for refusing to lift sanctions, and hold out the good-faith attempt by Zimbabwe-Rhodesia to set up a participatory democracy as an example

to be emulated by other nations in Africa and the Third World? If the U.S. foreign policy possesses even the barest element of fairness and good faith, we must now do what we pledged to do when the Case-Javits amendment passed the Senate.

As Senators will recall, the Case-Javits amendment was an amendment to my proposal to lift sanctions within a specified time. The Senate accepted the compromise proposal worked out by Senators CASE and JAVITS. I have cooperated in good faith since that time to make certain that the U.S. commitment clearly stated in the terms of Case-Javits would be met.

Those terms have been met, Mr. President. They have been met.

I am troubled that our State Department has not followed suit. Since Case-Javits was signed into law by the President, it should have been a good-faith guideline for executive branch actions dealing with Rhodesia. The State Department's record, and to say, falls short of good faith, let alone even a reasonable adherence to the commitment explicit in Case-Javits.

BACKGROUND OF CASE-JAVITS

On June 28, 1978, I offered an amendment to the foreign relations authorization bill. This amendment sought to lift sanctions against Rhodesia until the end of fiscal year 1979. While the amendment was successfully tabled, the vote, 48 to 42 disclosed a degree of support for lifting sanctions that could not be ignored.

Subsequent to that, I asked Prime Minister Ian Smith if Bishop Muzorewa would be willing to come to the United States to present the Rhodesian case to the Congress. Smith consulted with Muzorewa; Muzorewa agreed to come.

Muzorewa spoke eloquently about the hopes and aspirations of the majority of Rhodesians. He emphasized that Rhodesians wanted a peaceful transfer of power from white to majority rule—via the ballot box, not with violence. He urged Congress to lift sanctions, so that Rhodesians might have hope, and positive incentives to participate in the electoral process.

On July 26, 1978, I moved again to attempt to lift sanctions, this time until the end of the year—as a trial period to assess the transitional government's good faith in moving toward open and free elections. The Case-Javits substitute to my amendment was supported by 59 Senators. A vote on a measure offered by Senator DANFORTH as an amendment to Case-Javits (in substance the amendment that I originally had offered) was taken. The Danforth-Helms amendment received 42 votes, and Case-Javits prevailed.

It is interesting that in these two votes, a total of 84 Senators went on record as favoring the lifting of sanctions against Rhodesia in some form or another.

Mr. President, a clear, unequivocal signal was sent to the State Department by the Senate that day. Unfortunately, if we are to judge by the subsequent actions by officials of the executive branch in general, and the State Department

Case 1:20-cv-03132-RDB Document 116-1 Filed 02/04/22 Page 3 of 3

Filed: 06/05/2023 Pg: 102 of 610 Doc: 17 USCA4 Appeal: 23-1453

JA098

# EXHIBIT
# 2

USCA4 Appeal: 23-1453      Doc: 17      Filed: 06/05/2023      Pg: 103 of 610

**SBA** U.S. Small Business Administration

**Faith-Based Organizations**
FAQ

### FREQUENTLY ASKED QUESTIONS
### REGARDING PARTICIPATION OF FAITH-BASED ORGANIZATIONS
### IN THE PAYCHECK PROTECTION PROGRAM (PPP)
### AND THE ECONOMIC INJURY DISASTER LOAN PROGRAM (EIDL)

1. **Are faith-based organizations, including houses of worship, eligible to receive SBA loans under the PPP and EIDL programs?**

Yes, and we additionally clarify that faith-based organizations are eligible to receive SBA loans regardless of whether they provide secular social services. That is, no otherwise eligible organization will be disqualified from receiving a loan because of the religious nature, religious identity, or religious speech of the organization. The requirements in certain SBA regulations— 13 C.F.R. §§ 120.110(k) and 123.301(g)—impermissibly exclude some religious entities. Because those regulations bar the participation of a class of potential recipients based solely on their religious status, SBA will decline to enforce these subsections and will propose amendments to conform those regulations to the Constitution. Although 13 C.F.R. § 120.110(a) states that nonprofit entities are ineligible for SBA business loans (which includes the PPP program), the CARES Act explicitly makes nonprofit entities eligible for the PPP program and it does so without regard to whether nonprofit entities provide secular social services.

2. **Are there any limitations on how faith-based organizations can use the PPP and EIDL loan money they receive?**

Only the same limitations that apply to all other recipients of these loans (such as that loan forgiveness will cover non-payroll costs only to a maximum of 25% of the total loan to a recipient). The PPP and EIDL loan programs are neutral, generally applicable loan programs that provide support for nonprofit organizations without regard to whether they are religious or secular. The CARES Act has provided those program funds as part of the efforts to respond to the economic dislocation threatened by the COVID-19 public health emergency. Under these circumstances, the Establishment Clause does not place any additional restrictions on how faith-based organizations may use the loan proceeds received through either the PPP or the EIDL loan program. See, e.g., _Religious Restrictions on Capital Financing for Historically Black Colleges and Universities_, 43 Op. O.L.C. __, *7–15 (Aug. 15, 2019); _Authority of FEMA to Provide Disaster Assistance to Seattle Hebrew Academy_, 26 Op. O.L.C. 114, 122–32 (2002). In addition, the CARES Act does not impose unique burdens or limitations on faith-based

4/3/2020 11:25 PM

1 | P a g e

JA100

**SBA** U.S. Small Business
Administration

**Faith-Based Organizations**
FAQ

USCA4 Appeal: 23-1453   Doc: 17   Filed: 06/05/2023   Pg: 105 of 610

organizations.  In particular, loans under the program can be used to pay the salaries of ministers and other staff engaged in the religious mission of institutions.

3. **How will churches qualify if have not been informed of tax-exempt status by the IRS? Do organizations have to request and receive tax exempt status or just meet the requirements of 501(c)(3) status to be eligible?**

Churches (including temples, mosques, synagogues, and other houses of worship), integrated auxiliaries of churches, and conventions or associations of churches qualify for PPP and EIDL loans as long as they meet the requirements of Section 501(c)(3) of the Internal Revenue Code, and all other PPP and EIDL requirements.  Such organizations are not required to apply to the IRS to receive tax-exempt status. See 26 U.S.C. § 508(c)(1)(A).

4. **Will my organization be sacrificing its autonomy or its First Amendment or statutory rights if it requests and receives a loan?**

No. Receipt of a loan through any SBA program does not (1) limit the authority of religious organizations to define the standards, responsibilities, and duties of membership; (2) limit the freedom of religious organizations to select individuals to perform work connected to that organization's religious exercise; nor (3) constitute waiver of any rights under federal law, including rights protecting religious autonomy and exercise under the Religious Freedom Restoration Act of 1993 (RFRA), 42 U.S.C. § 2000b *et seq.*, Section 702 of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-1(a), or the First Amendment.

Simply put, a faith-based organization that receives a loan will retain its independence, autonomy, right of expression, religious character, and authority over its governance, and no faith-based organization will be excluded from receiving funding because leadership with, membership in, or employment by that organization is limited to persons who share its religious faith and practice.

5. **What legal requirements will be imposed on my organization as a result of our receipt of this Federal financial assistance?  Will those requirements cease to apply when the loan is either repaid in full or forgiven?**

Receipt of a loan through any SBA program constitutes Federal financial assistance and carries with it the application of certain nondiscrimination obligations.  Any legal obligations that you incur through your receipt of this loan are not permanent, and once the loan is paid or forgiven, those nondiscrimination obligations will no longer apply.

**SBA**  U.S. Small Business
Administration

**Faith-Based Organizations**
**FAQ**

Consistent with certain federal nondiscrimination laws, SBA regulations provide that the recipient may not discriminate on the basis of race, color, religion, sex, handicap, age, or national origin with regard to goods, services, or accommodations offered. 13 C.F.R. § 113.3(a). But SBA regulations also make clear that these nondiscrimination requirements do not limit a faith-based entity's autonomy with respect to membership or employment decisions connected to its religious exercise. 13 CFR § 113.3-1(h). And as discussed in Question 4, SBA recognizes the various protections for religious freedom enshrined in the Constitution and federal law that are not altered or waived by receipt of Federal financial assistance.

SBA therefore clarifies that its regulations apply with respect to goods, services, or accommodations offered generally to the public by recipients of these loans, but not to a faith-based organization's ministry activities within its own faith community. For example, SBA's regulations will require a faith-based organization that operates a restaurant or thrift store open to the public to serve the public without regard to the protected traits listed above. But SBA's regulations do not apply to limit a faith-based organization's ability to distribute food or clothing exclusively to its own members or co-religionists. Indeed, SBA will not apply its nondiscrimination regulations in a way that imposes substantial burdens on the religious exercise of faith-based loan recipients, such as by applying those regulations to the performance of church ordinances, sacraments, or religious practices, unless such application is the least restrictive means of furthering a compelling governmental interest. Congress enacted the CARES Act to afford swift and sweeping stopgap relief to Americans who might otherwise lose their jobs or businesses because of the economic hardships wrought by the response to the COVID-19 public health emergency, and SBA has a compelling interest in fulfilling that mandate to provide assistance broadly.

6. **Is my faith-based organization disqualified from any SBA loan programs because it is affiliated with other faith-based organizations, such as a local diocese?**

Not necessarily. Under SBA's regulations, an affiliation may arise among entities in various ways, including from common ownership, common management, or identity of interest. 13 C.F.R. §§ 121.103 and 121.301. These regulations are applicable to applicants for PPP loans. (They also apply to the EIDL program when determining certain loan terms, although aggregating the number of employees of affiliated organizations does not affect eligibility for EIDL loans.) Some faith-based organizations likely would qualify as "affiliated" with other entities under the applicable affiliation rules. Entities that are affiliated according to SBA's affiliation rules must add up their employee numbers in determining whether they have 500 or fewer employees.

But regulations must be applied consistent with constitutional and statutory religious freedom protections. If the connection between your organization and another entity that would constitute an affiliation is based on a religious teaching or belief or is otherwise a part of the

JA102

USCA4 Appeal: 23-1453      Doc: 17      Filed: 06/05/2023      Pg: 107 of 610

**SBA** U.S. Small Business Administration

**Faith-Based Organizations**
FAQ

exercise of religion, your organization qualifies for an exemption from the affiliation rules. For example, if your faith-based organization affiliates with another organization because of your organization's religious beliefs about church authority or internal constitution, or because the legal, financial, or other structural relationships between your organization and other organizations reflect an expression of such beliefs, your organization would qualify for the exemption. If, however, your faith-based organization is affiliated with other organizations solely for non-religious reasons, such as administrative convenience, then your organization would be subject to the affiliation rules. SBA will not assess, and will not permit participating lenders to assess, the reasonableness of the faith-based organization's good-faith determination that this exception applies.

7. **Does my faith-based organization need to apply for this exemption or include any documentation of its religious beliefs or practices to fall within this affiliation exemption?**

No specific process or detailed filing is necessary to claim the benefit of this exemption. If you believe that your organization qualifies for this exemption to the affiliation rules, you should submit with your loan application a separate sheet stating as much. That sheet may be identified as addendum A, and no further listing of the other organizations with which your organization is affiliated, or description of the relationship to those organizations, is required. You are not required to describe your religious beliefs.

A sample "Addendum A" is attached to this document, but you may choose to write your own. Your statement can be very simple.

8. **How do I know where my organization fits in SBA's size standards table? Should I use the table to determine whether my organization is a small business that is eligible to participate in the PPP program?**

SBA's size standards can be found at 13 CFR § 121.201. Under the CARES Act, a non-profit organization qualifies as small, and is eligible for assistance, if (1) it has no more than 500 employees or (2) the NAICS code associated with its primary industry has a higher employee-based size standard. Some industries—including "religious organizations"—are currently listed in the size standards table with a monetary cap on annual receipts rather than an employee-based size standards cap. For nonprofit organizations whose primary industry is listed with a monetary cap on annual receipts, the size standards table therefore cannot be used to determine eligibility for the PPP program. Faith-based nonprofit organizations that do not fall under a primary industry that is listed with an employee-based size standard must have 500 employees or fewer to be considered small.

4/3/2020 11:25 PM                                                                 4 | P a g e

**SBA** U.S. Small Business
Administration

**Faith-Based Organizations**
**FAQ**

**[Sample]**

**ADDENDUM A**

✓ The Applicant claims an exemption from all SBA affiliation rules applicable to Paycheck
Protection Program loan eligibility because the Applicant has made a reasonable, good
faith determination that the Applicant qualifies for a religious exemption under 13
C.F.R. 121.103(b)(10), which says that "[t]he relationship of a faith-based organization
to another organization is not considered an affiliation with the other organization . . .
if the relationship is based on a religious teaching or belief or otherwise constitutes a
part of the exercise of religion."

Pg: 108 of 610          Filed: 06/05/2023          Doc: 17          USCA4 Appeal: 23-1453

JA104

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| DONNA BUETTNER-HARTSOE, *et al.*, | * | |
| Plaintiffs, | * | Civil Action No. RDB-20-3132 |
| v. | * | |
| BALTIMORE LUTHERAN HIGH SCHOOL ASSOCIATION, *d/b/a/* CONCORDIA PREPARATORY SCHOOL, | * | |
| | * | |
| Defendant. | | |

\*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*

| | | |
|---|---|---|
| JENNIFER PULLEN, | * | |
| Plaintiff, | * | Civil Action No. RDB-20-3214 |
| v. | * | |
| BALTIMORE LUTHERAN HIGH SCHOOL ASSOCIATION, *d/b/a/* CONCORDIA PREPARATORY SCHOOL, | * | |
| | * | |
| Defendant. | | |

\*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*

| | | |
|---|---|---|
| ANDREA CONRAD, *et al.*, | * | |
| Plaintiffs, | * | Civil Action No. RDB-20-3229 |
| v. | * | |
| BALTIMORE LUTHERAN HIGH SCHOOL ASSOCIATION, *d/b/a/* CONCORDIA PREPARATORY SCHOOL, and LUTHERAN CHURCH-MISSOURI SYNOD, | * | |
| | * | |

SOUTHEASTERN DISTRICT,

    \*

    Defendants.

\*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*

ARIANA GOMEZ,

    \*

    Plaintiff,

    \*            Civil Action No. RDB-20-3267

BALTIMORE LUTHERAN HIGH
SCHOOL ASSOCIATION, *d/b/a/*
CONCORDIA PREPARATORY
SCHOOL, and LUTHERAN CHURCH-
MISSOURI SYNOD,
SOUTHEASTERN DISTRICT,

    \*

    \*

    \*

    \*

    Defendant.

\*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*

SELENA BARBER, *et al.,*

    \*

    Plaintiffs,

    \*            Civil Action No. RDB-21-0691

    v.

    \*

BALTIMORE LUTHERAN HIGH
SCHOOL ASSOCIATION, *d/b/a/*
CONCORDIA PREPARATORY
SCHOOL,

    \*

    \*

    \*

    Defendants.

\*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*

## **MEMORANDUM OPINION**

These five cases are brought by five different women, all former students of Concordia

Preparatory School ("CPS"), previously known as Baltimore Lutheran High School. All of the

women make similar allegations of sexual assault and verbal sexual harassment by male

students at the school dating back to 2016.  They allege that school officials failed to adequately

2

address their numerous complaints or take any meaningful action in response, thereby cultivating a hyper-sexualized culture at the school. In this series of cases, three minors, N.H., H.C., and A.G.—through their respective mothers, Donna Buettner-Hartsoe, Andrea Conrad, and Selena Barber—and two adults, Jennifer Pullen and Ariana Gomez (collectively, "Plaintiffs"), bring federal and state claims against Defendant Baltimore Lutheran High School Association, now doing business as Concordia Preparatory School, and Defendant Lutheran Church-Missouri Synod, Southeastern District ("LCMS").[1]

Presently pending before this Court are Defendant Concordia Preparatory School's Partial Motions to Dismiss, or in the Alternative, for Summary Judgment. (RDB-20-3132, ECF No. 108; RDB-20-3214, ECF No. 60; RDB-20-3229, ECF No. 75; RDB-20-3267, ECF No. 112; RDB-21-0691, ECF No. 37.)[2] These Motions relate to Plaintiffs' claims in Count I of their respective Amended Complaints under Title IX of the Education Amendments Act of 1972 ("Title IX"),[3] 20 U.S.C. § 1681, *et seq.* (RDB-20-3132, Am. Compl., ECF No. 69; RDB-20-3214, Am. Compl., ECF No. 53; RDB-20-3229, Am. Compl., ECF No. 24; RDB-20-3267, Am. Compl., ECF No. 26; RDB-21-0691, Am. Compl., ECF No. 29.) In these Motions, the Defendant contends that it is not subject to Title IX jurisdiction as it was not a direct recipient of federal financial assistance during the relevant time periods. This argument is without merit, as the tax-exempt status of the Defendant under 26 U.S.C. § 501(c)(3) constitutes federal financial assistance for the purposes of Title IX. The parties' submissions have been reviewed,

---

[1] On May 18, 2021, all of these cases were assigned to the undersigned Judge. Through its June 23, 2021 Order, this Court consolidated these cases for discovery and motions. (RDB-20-3132, ECF No. 65; RDB-20-3214, ECF No. 48; RDB-20-3229, ECF No. 61; RDB-20-3267, ECF No. 101; RDB-21-0691, ECF No. 17.)

[2] The Motions, Responses, and Replies, along with supporting exhibits, filed in all five cases are nearly identical.

[3] Title IX of the Education Amendments of Act of 1972 protects individuals from discrimination on the basis of sex in education programs or activities that receive federal financial assistance. 20 U.S.C. § 1681(a).

and no hearing is necessary. *See* Local Rule 105.6 (D. Md. 2021). For the reasons that follow, Defendant CPS's Motions, construed as Partial Motions for Summary Judgment, are DENIED.

## BACKGROUND

In a Memorandum Opinion dated June 23, 2021, this Court detailed Plaintiffs' factual allegations. (*E.g.*, RDB-21-0691, ECF No. 15 at 5-20.)[4] The presently pending Motions relate only to whether there is a genuine dispute of fact as to whether CPS received federal financial assistance and was subject to Title IX requirements at the times relevant to Plaintiffs' claims. Accordingly, this Court provides the following summary of facts necessary to resolve the Motions at issue.

Concordia Preparatory School, originally known as Baltimore Lutheran High School, is a religiously affiliated private school that is exempt from federal income taxes under Section 501(c)(3) of the Internal Revenue Code. (*E.g.*, RDB-21-0691, Financial Statements, ECF No. 39 *SEALED*.) Plaintiff N.H. attended CPS from Fall 2017 through Spring 2018. (RDB-20-3132, ECF No. 69 ¶¶ 11, 64, 84.) Plaintiff Pullen attended CPS from Fall 2014 through Spring 2019. (RDB-20-3214, ECF No. 53 ¶¶ 9, 68, 91.) Plaintiff H.C. attended CPS from Fall 2019 through Spring 2020. (RDB-20-3229, ECF No. 24 ¶¶ 11, 90, 114.) Plaintiff Gomez attended CPS from Fall 2017 through Spring 2019. (RDB-20-3267, ECF No. 26 ¶¶ 10, 72, 96.) Plaintiff A.G. attended CPS from Winter 2016 through May 2019. (RDB-21-0691, ECF No. 29 ¶¶ 11, 106, 117.)

---

[4] This same Memorandum Opinion was docketed in each of the five consolidated cases. (*See* RDB-20-3132, ECF No. 63; RDB-20-3214, ECF No. 46; RDB-20-3229, ECF No. 59; RDB-20-3267, ECF No. 99; RDB-21-0691, ECF No. 15.) In that Memorandum Opinion, this Court denied Defendant CPS's motions to dismiss the Title IX claims of Plaintiffs H.C., Gomez, and A.G. (*E.g.*, RDB-21-0691, ECF No. 15 at 32–36.)

From 2014 through 2020, CPS received funding from the State of Maryland in the form of grants to aging schools, textbook and technology grants, and a grant from the State of Maryland Field House Emergency Fund. (*E.g.*, RDB-21-0691, Def. Answers to Interrogs. 23–26, ECF No. 39-3 *SEALED*.)[5] CPS did not apply for federal funding until March or April 2020, when it applied for a Paycheck Protection Program ("PPP") loan from the United States Small Business Administration ("SBA"). (*E.g.*, RDB-21-0691, Johnson Tr. 394, ECF No. 39-1 *SEALED*.) This request was made in the face of the COVID-19 pandemic. (*E.g., id.*; RDB-21-0691, Def. Answers to Interrogs. 23–26, ECF No. 39-3 *SEALED*.) On April 8, 2020, CPS received a loan from the SBA in the amount of $483,400.00. (*E.g.*, RDB-21-0691, SBA Confirmation, ECF No. 39-10 *SEALED*.) That loan was forgiven as of November 10, 2020. (*E.g.*, RDB-21-0691, Def. Answers to Interrogs. 26, ECF No. 39-3 *SEALED*.)

## STANDARD OF REVIEW

CPS's Motions are styled as partial motions to dismiss under Fed. R. Civ. P. 12(b)(6) or, in the alternative, for summary judgment under Fed. R. Civ. P. 56. A motion styled in this manner implicates the court's discretion under Rule 12(d) of the Federal Rules of Civil Procedure. *See Kensington Vol. Fire Dept., Inc. v. Montgomery Cty.*, 788 F. Supp. 2d 431, 436-37 (D. Md. 2011). Ordinarily, a court "is not to consider matters outside the pleadings or resolve factual disputes when ruling on a motion to dismiss." *Bosiger v. U.S. Airways*, 510 F.3d 442, 450

---

[5] CPS also received state government funding in the form of: 5 Broadening Options & Opportunities for Students Today (BOOST) scholarships from the Maryland Department of Education in 2016; "Title II Preparing, Training, and Recruiting High-Quality Teachers, Principals, or Other School Leaders" grants from 2016 through 2020; payment for "Easement/Loss of Use – SHA Project Income" in 2018; a School Safety Grant from the Maryland Department of Education in 2020, and; Elementary and Secondary School Emergency Relief (ESSER) and Governor's Emergency Education Relief (GEER) grants through Baltimore County Public Schools in 2020. (RDB-21-0691, Def. Answers to Interrogs. 23–26, ECF No. 39-3 *SEALED*.)

(4th Cir. 2007). However, a court, in its discretion, may consider matters outside of the pleadings, pursuant to Rule 12(d). If the court does so, "the motion must be treated as one for summary judgment under Rule 56." Fed. R. Civ. P. 12(d). When the movant expressly captions its motion "in the alternative" as one for summary judgment, and submits matters outside the pleadings for the court's consideration, the parties are deemed to be on notice that conversion under Rule 12(d) may occur; the court "does not have an obligation to notify parties of the obvious." *Laughlin v. Metro. Wash. Airports Auth.*, 149 F.3d 253, 261 (4th Cir. 1998).

Under Rule 56 of the Federal Rules of Civil Procedure, a court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The same standard applies for a motion for partial summary judgment. *See Gill v. Rollins Protective Servs. Co.*, 773 F.2d 592, 595 (4th Cir. 1985). "A fact is material if it 'might affect the outcome of the suit under the governing law.'" *Libertarian Party of Va. v. Judd*, 718 F.3d 308, 313 (4th Cir. 2013) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). A genuine dispute over a material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248. In considering a motion for summary judgment, this Court must consider the facts and all reasonable inferences "in the light most favorable to the nonmoving party." *Libertarian Party of Va.*, 718 F.3d at 312; *see also Scott v. Harris*, 550 U.S. 372, 378 (2007). Additionally, this Court "must not weigh evidence or make credibility determinations." *Foster v. Univ. of Md.-Eastern Shore*, 787 F.3d 243, 248 (4th Cir. 2015) (citing *Mercantile Peninsula Bank v. French*, 499 F.3d 345, 352 (4th Cir. 2007)); *see also Jacobs v. N.C.*

*Admin. Off. of the Courts*, 780 F.3d 562, 569 (4th Cir. 2015) (explaining that a trial court may not make credibility determinations at the summary judgment stage).

This Court considers, and the parties rely upon, matters outside of the pleadings, including Plaintiffs' exhibits attached to their Responses to CPS's Motions. *See Miller v. Md. Dep't of Nat. Res.*, 813 Fed App'x 869, 873 (4th Cir. 2020) (concluding that a declaration attached to a response in opposition to a dispositive motion "is plainly outside the pleadings"). Because CPS styled its Motions as a partial motion to dismiss, or in the alternative, for summary judgment, CPS was on notice that the Court could treat the Motions as motions for summary judgment and rule on that basis. Accordingly, the Court will review CPS's Motions under the Rule 56(a) standard.

## ANALYSIS

CPS argues that it is entitled to summary judgment as to Plaintiffs' Title IX claims because there is no dispute that it was not a recipient of federal financial assistance during the relevant time periods. (*E.g.*, RDB-21-0691, CPS Mem. 4–8, ECF No. 37-1.) Plaintiffs argue CPS's tax-exempt status under 26 U.S.C. § 501(c)(3) represents federal financial assistance sufficient to subject the school to the requirements of Title IX. (*E.g.*, RDB 21-0691, Plaintiffs' Resp. 3–5, ECF No. 38.) The tax-exempt status of a private school subjects it to the same requirements of Title IX imposed on any educational institution. CPS cannot avail itself of federal tax exemption but not adhere to the mandates of Title IX.

Title IX of the Education Amendments Act of 1972 provides that "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity

receiving Federal financial assistance."[6] 20 U.S.C. § 1681(a). As the United States Court of

Appeals for the Fourth Circuit has held:

> To establish a Title IX claim based on student-on-student sexual harassment, a
> plaintiff must show that:
>
> > (1) they were a student at an educational institution receiving
> > federal funds;
> >
> > (2) they suffered sexual harassment that was so severe, pervasive,
> > and objectively offensive that it deprived them of equal access to
> > the educational opportunities or benefits provided by their
> > school;
> >
> > (3) the school, through an official who has authority to address
> > the alleged harassment and to institute corrective measures, had
> > actual notice or knowledge of the alleged harassment; and
> >
> > (4) the school acted with deliberate indifference to the alleged
> > harassment.

*Doe v. Fairfax Cty. Sch. Bd.*, 1 F.4th 257, 263–64 (4th Cir. 2021). Title IX's regulations clarify

that a "recipient" of federal funds is any entity or person "to whom Federal financial assistance

is extended directly or through another recipient and which operates an education program or

activity which receives such assistance." 34 C.F.R. § 106.2(i).

At issue in the presently pending motions is whether CPS, as a tax-exempt educational

institution, qualifies as an educational institution receiving federal funds. Under 26 U.S.C. §

501(c)(3), "[c]orporations, and any community chest, fund, or foundation, organized and

operated exclusively for . . . religious . . . or educational purposes" are exempt from federal

income taxation. Neither the Supreme Court nor the United States Court of Appeals for the

---

[6] The United States Supreme Court has held that Title IX is enforceable through an implied private right of
action. *See Cannon v. University of Chicago,* 441 U.S. 677, 717 (1979).

Fourth Circuit have directly addressed whether tax-exempt status under § 501(c)(3) constitutes federal financial assistance for purposes of Title IX. However, key decisions of both courts support this Court's conclusion that federal tax exemption qualifies as federal financial assistance under Title IX.

In a pair of opinions, the United States Supreme Court has considered when an entity qualifies as a recipient of federal financial assistance for the purposes of Title IX. In *Grove City Coll. v. Bell*, 465 U.S. 555 (1984), the Court held that "Title IX coverage is not foreclosed because federal funds are granted to [the school's] students rather than directly to one of the [school's] educational programs." 465 U.S. at 569–70. Notably, the Court determined that "[t]here is no basis in the statute for the view that only institutions that themselves apply for federal aid or receive checks directly from the federal government are subject to regulation [under Title IX]." *Id.* at 564. In *Nat'l Collegiate Athletic Ass'n v. Smith*, 525 U.S. 459 (1999), the Supreme Court held that "dues payments from recipients of federal funds" do not "suffice to subject [an entity] to suit under Title IX." 525 U.S. at 470. In so holding, the Court reasoned that "[e]ntities that receive federal assistance, whether directly or through an intermediary, are recipients within the meaning of Title IX; entities that only benefit economically from federal assistance are not." *Id.* at 468; *see also Jennings v. Univ. of N.C.*, 444 F.3d 255, 268 n.9 (4th Cir. 2006*), overruled on other grounds by* 482 F.3d 686 (4th Cir. 2007) (en banc). These opinions confirm that an institution still qualifies as a recipient of federal assistance under Title IX even if it did not apply for the aid or the aid is indirectly provided.

The Supreme Court has also considered the purpose and scope of tax exemptions. In *Regan v. Taxation with Representation*, 461 U.S. 540 (1983), the Supreme Court ruled that the

provision in 26 U.S.C. § 501(c)(3) prohibiting tax exempt status for organizations that seek to influence legislation does not violate the First Amendment. 461 U.S. at 550–51. In its analysis, the Court discussed the nature of tax exemptions and tax deductions and concluded that:

> Both tax exemptions and tax-deductibility are a form of subsidy that is administered through the tax system. A tax exemption has much the same effect as a cash grant to the organization of the amount of tax it would have to pay on its income . . . . Congress chose not to subsidize lobbying as extensively as it chose to subsidize other activities that non profit organizations undertake to promote the public welfare.

*Id.* at 544. The Supreme Court has therefore recognized § 501(c)(3) status as a form of Congressional subsidy and the equivalent of a cash grant.

Additionally, and equally as important, the Supreme Court has held that tax exempt institutions "must demonstrably serve and be in harmony with the public interest." *Bob Jones Univ. v. United States*, 461 U.S. 574, 592 (1983). Similarly, in *Green v. Connally*, 330 F. Supp. 1150 (D.D.C. 1971), the District Court for the District of Columbia held that schools that discriminate on the basis of race are not entitled to federal tax exemptions. 330 F. Supp. at 1156. The court recognized that there is a "well-established principle that the Congressional intent in providing tax deductions and exemptions is not construed to be applicable to activities that are either illegal or contrary to public policy." *Id.* at 1161. This Court believes the same principle applies to discrimination on the basis of sex. Indeed, the Supreme Court in *Cannon v. Univ. of Chicago*, 441 U.S. 667 (1979), noted that Title VI served as a "model" for Title IX and concluded that "Congress intended to create Title IX remedies comparable to those available under Title VI . . . ." 441 U.S. at 704.

Plaintiffs have noted Eleventh Circuit case law to support their position that CPS is subject to Title IX requirements due to its tax-exempt status. In *M.H.D. v. Westminster Sch.*,

172 F.3d 797 (11th Cir. 1999), the Eleventh Circuit concluded that the appellant's allegation that tax exempt qualifies as "federal financial assistance" under Title IX provisions was "neither immaterial nor wholly frivolous." 172 F.3d at 802 n.12.[7] Plaintiffs also observe that tax exempt organizations are subject to the requirements under Title VI of Civil Rights Act of 1964, 42 U.S.C. 2000d *et seq.*, and note that Title IX was modeled after Title VI. *See McGlotten v. Connally,* 338 F. Supp. 448, 461 (D.D.C.1972) (holding that "assistance provided through the tax system is within the scope of Title VI of the 1964 Civil Rights Act")*; Fulani v. League of Women Voters Educ. Fund,* 684 F. Supp. 1185, 1192 (S.D.N.Y.1988) (noting that an entity was subject to Title VI *and* Title IX enforcement because it "receive[d] federal assistance indirectly through its tax exemption and directly through grants" from federal agencies).[8]

CPS rejects Plaintiffs' argument that its tax-exempt status subjects it to the mandates of Title IX, relying primarily on *Johnny's Icehouse, Inc. v. Amateur Hockey Ass'n*, 134 F. Supp. 2d 965 (N.D. Ill. 2001). In *Johnny's Icehouse*, a women's hockey team contended that Amateur Hockey Association was subject to Title IX because its 501(c)(3) status qualified as a form of federal assistance. 134 F. Supp. 2d. at 966. The district court denied this argument, referring to the Title IX regulations that define "federal financial assistance" and observing that income tax exemptions are "conspicuously absent from that laundry list." *Id.* at 971 (citing 34 C.F.R.

---

[7] *See also Barrs v. S. Conference,* 734 F. Supp. 2d 1229, 1232 (N.D. Ala. 2010) (adopting the reasoning of *M.H.D.* and concluding that plaintiff's claim that a tax exemption constitutes federal financial assistance under Title IX "is not so wholly insubstantial and frivolous that subject matter jurisdiction is inappropriate").

[8] *See also Cannon.,* 441 U.S. at 694-95 ("Title IX was patterned after Title VI of the Civil Rights Act of 1964. Except for the substitution of the word 'sex' in Title IX to replace the words 'race, color, or national origin' in Title VI, the two statutes use identical language to describe the benefited class."); *Gebser v. Lago Vista Indep. Sch. Dist.,* 524 U.S. 274, 286 (1998) (noting that Title IX and Title VI "operate in the same manner").

JA115

§ 106.2(g)).[9] The court concluded that "'federal financial assistance' encompasses only direct transfers of federal money, property or services from the government to a program" and that "[e]xemption from taxation just does not equate to such direct transfers."[10] *Id.* at 972.

In light of the Supreme Court's holdings in *Regan*, *Grove City College*, *Smith*, and *Cannon*, as discussed *supra*, this Court holds that § 501(c)(3) tax exemption constitutes federal financial assistance for the purposes of Title IX. Enforcing the mandates of Title IX in schools with 501(c)(3) status aligns with and protects the principal objectives of Title IX: "to avoid the use of federal resources to support discriminatory practices" and "to provide individual citizens effective protection against those practices." *Cannon,* 441 U.S. at 704.

There is no dispute that CPS received federal financial assistance in the form of § 501(c)(3) income tax exemption in the years Plaintiffs or their daughters attended the school. (*E.g.*, RDB-21-0691, Financial Statements, ECF No. 39 *SEALED*.) Additionally, as to Plaintiff H.C., CPS's Motion is denied because there is no dispute that H.C. enrolled at CPS in Fall 2019 and remained a student there through at least Spring 2020. (RDB-20-3229, ECF No. 21 ¶¶ 11, 90, 114.) CPS applied for and received a PPP loan through the SBA between

---

[9] The Department of Education's Title IX regulations define "federal financial assistance" by enumerating the types of grants and aid that qualify "when authorized or extended under a law administered by the Department." 34 C.F.R. § 106.2(g). Neither party raises any argument as to whether § 501(c)(3) status qualifies as assistance administered by the Department of Education. *Id.* Moreover, this Court is not convinced that this regulation precludes a finding that § 501(c)(3) status qualifies as "federal financial assistance" in the Title IX context, given the statute's shared objectives with Title VI and the Supreme Court's conclusion that tax exemptions are a form of subsidy and the equivalent of a cash grant. *See Cannon*, 441 U.S. at 704; *Regan v. Taxation with Representation*, 461 U.S. 520, 550–51 (1983).

[10] In its Reply, CPS cites several other district court opinions that lend support for its position, but do not announce a holding in support of that position as clearly as the decision in *Johnny's Icehouse. See, e.g., Stewart v. N.Y. Univ.*, 430 F. Supp. 1305, 1314 (S.D.N.Y. 1976); *Zimmerman v. Poly Prep Country Day Sch.*, 888 F. Supp. 2d 317, 322 n.2 (E.D.N.Y. 2012); *Bachman v. Am. Soc'y of Clinical Pathologists*, 577 F. Supp. 1257 (D.N.J. 1983). (RDB-21-0691, ECF No. 45 at 8-9.)

March and April 2020, and that loan was forgiven as of November 10, 2020.[11] (*E..g*, RDB-20-3229, Johnson Tr. 394, ECF No. 77-1 *SEALED* ; SBA Award Confirmation, ECF No. 77-10 *SEALED*; Def. Answers to Interrogs. 26, ECF No. 77-3 *SEALED*.) CPS argues that all of the events giving rise to H.C.'s Title IX claim occurred before it accepted the SBA funding on April 8, 2020, but there is no evidence in the record supporting that claim. Accordingly, all of CPS's Motions are DENIED.

## CONCLUSION

For the reasons stated above, Defendant Concordia Preparatory School's Partial Motions for Summary Judgment as to the Title IX claims asserted in Count I of the Amended Complaints of Plaintiffs N.H., Pullen, H.C., Gomez, and A.G. (RDB-20-3132, ECF No. 108; RDB-20-3214, ECF No. 60; RDB-20-3229, ECF No. 75; RDB-20-3267, ECF No. 112; RDB-21-0691, ECF No. 37) are DENIED.

A separate Order follows.

Dated: July 21, 2022

_____/s/_____
Richard D. Bennett
United States District Judge

---

[11] The parties agree that on April 8, 2020, CPS received a loan from the SBA through the Paycheck Protection Program established by the Coronavirus Aid, Relief, and Economic Security ("CARES") Act. The parties also agree that this loan constitutes federal financial assistance for the purposes of Title IX. It is undisputed that Plaintiffs N.H., Pullen, Gomez, and A.G. had stopped attending CPS well before the school applied for and received the SBA loan. Pursuant to 13 C.F.R. 113.3(a), "recipients of financial assistance [from the SBA] may not: (a) Discriminate with regard to goods, services, or accommodations offered or provided by the aided business or other enterprise, whether or not operated for profit, because of race, color, religion, sex, handicap, or national origin of a person, or fail or refuse to accept a person on a nonsegregated basis as a patient, student, visitor, guest, customer, passenger, or patron." Once an SBA loan is forgiven, however, a recipient is no longer subject to "any legal obligations [it] incur[s] through [its] receipt of [the] loan." (RDB-20-3229, SBA Faith-Based Organizations FAQ 2, ECF No. 83-2.)

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| DONNA BUETTNER-HARTSOE, *et al.*, | * | |
| Plaintiffs, | * | Civil Action No. RDB-20-3132 |
| v. | * | |
| BALTIMORE LUTHERAN HIGH SCHOOL ASSOCIATION, *d/b/a/* CONCORDIA PREPARATORY SCHOOL, | * | |
| | * | |
| Defendant. | | |

\* \* \* \* \* \* \* \* \* \* \* \* \*

| | | |
|---|---|---|
| JENNIFER PULLEN, | * | |
| Plaintiff, | * | Civil Action No. RDB-20-3214 |
| v. | * | |
| BALTIMORE LUTHERAN HIGH SCHOOL ASSOCIATION, *d/b/a/* CONCORDIA PREPARATORY SCHOOL, | * | |
| | * | |
| Defendant. | | |

\* \* \* \* \* \* \* \* \* \* \* \* \*

| | | |
|---|---|---|
| ANDREA CONRAD, *et al.*, | * | |
| Plaintiffs, | * | Civil Action No. RDB-20-3229 |
| v. | * | |
| BALTIMORE LUTHERAN HIGH SCHOOL ASSOCIATION, *d/b/a/* CONCORDIA PREPARATORY SCHOOL, and LUTHERAN CHURCH-MISSOURI SYNOD, | * | |
| | * | |
| | * | |

JA118

SOUTHEASTERN DISTRICT,                 *

   Defendants.

\*      \*      \*      \*      \*      \*      \*      \*      \*      \*      \*      \*      \*

ARIANA GOMEZ,                          *

   Plaintiff,                          *              Civil Action No. RDB-20-3267

BALTIMORE LUTHERAN HIGH                *
SCHOOL ASSOCIATION, *d/b/a/*
CONCORDIA PREPARATORY                  *
SCHOOL, and LUTHERAN CHURCH-
MISSOURI SYNOD,                        *
SOUTHEASTERN DISTRICT,
                                       *
   Defendant.

\*      \*      \*      \*      \*      \*      \*      \*      \*      \*      \*      \*      \*

SELENA BARBER, *et al.*,               *

   Plaintiffs,                         *              Civil Action No. RDB-21-0691

   v.                                  *

BALTIMORE LUTHERAN HIGH                *
SCHOOL ASSOCIATION, *d/b/a/*
CONCORDIA PREPARATORY                  *
SCHOOL,
                                       *
   Defendants.

\*      \*      \*      \*      \*      \*      \*      \*      \*      \*      \*      \*      \*

## ORDER

   For the reasons stated in the accompanying Memorandum Opinion, it is hereby

**ORDERED** this 21st day of July, 2022, that:

     1. Defendant Concordia Preparatory School's Partial Motions to Dismiss, or in
       the Alternative, for Summary Judgment, (RDB-20-3132, ECF No. 108; RDB-
       20-3214, ECF No. 60; RDB-20-3229, ECF No. 75; RDB-20-3267, ECF No.
       112; RDB-21-0691, ECF No. 37), are construed as Partial Motions for Summary

Judgment, and as to the Title IX claims asserted in Count I of the Amended Complaints of Plaintiffs N.H., Pullen, H.C., Gomez, and A.G., are **DENIED**;

2. The Clerk shall transmit copies of this Order and the accompanying Memorandum Opinion to the parties.


_____/s/_____
Richard D. Bennett
United States District Judge

JA120

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
Baltimore Division

|  |  |
|---|---|
| **DONNA BUETTNER-HARTSOE, et al.**<br><br>    Plaintiffs<br><br>**v.**<br><br>**BALTIMORE LUTHERAN HIGH SCHOOL ASSOCIATION d/b/a CONCORDIA PREPARATORY SCHOOL, et al.**<br><br>    Defendants | **Case No.:  1:20-cv-03132-RDB** |

## MOTION FOR RECONSIDERATION, OR IN THE ALTERNATIVE, MOTION TO CERTIFY ORDER FOR INTERLOCUTORY APPEAL

Defendant Baltimore Lutheran High School Association d/b/a Concordia Preparatory School ("CPS"), by and through undersigned counsel, hereby moves this Honorable Court to reconsider the Court's Order of July 21, 2022, ECF No. 131, and the accompanying Memorandum Opinion, ECF No. 130, or in the alternative, to amend the Order and Memorandum Opinion to certify for interlocutory appeal the question of law whether tax exemption under 26 U.S.C. § 501(c)(3) constitutes receipt of federal financial assistance for purposes of Title IX of the Education Amendments Act of 1972.   Defendant hereby incorporates by reference the accompanying Memorandum of Law in support of Defendant's Motion, with the same effect as if it were fully restated herein.

Respectfully submitted,


/s/Gregg E. Viola                          /s/Mark P. Johnson
Gregg E. Viola (25737)                     Mark P. Johnson (29091)
ECCLESTON & WOLF, P.C.                      ECCLESTON & WOLF, P.C.
Baltimore-Washington Law Center            Baltimore-Washington Law Center
7240 Parkway Drive, 4th Floor              7240 Parkway Drive, 4th Floor
Hanover, MD 21076-1378                     Hanover, MD 21076-1378
(410) 752-7474 (phone)                     (410) 752-7474
(410) 752-0611 (fax)                       (410) 752-0611 (fax)
E-mail: viola@ewmd.com                     E-mail: johnson@ewmd.com
*Attorney for Defendant*                   *Attorney for Defendant*


/s/Eric M. Rigatuso
Eric M. Rigatuso (27605)
ECCLESTON & WOLF, P.C.
Baltimore-Washington Law Center
7240 Parkway Drive, 4th Floor
Hanover, MD 21076-1378
(410) 752-7474 (phone)
(410) 752-0611 (fax)
E-mail: rigatuso@ewmd.com
*Attorney for Defendant*

## **CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on this 4th of August, 2022, copies of the foregoing were served

via the Court's ECF System to all counsel of record.


                                    /s/Eric M. Rigatuso
                                    Eric M. Rigatuso (Bar # 27605)

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
Baltimore Division

|  |  |
|---|---|
| **DONNA BUETTNER-HARTSOE, et al.**<br><br>         Plaintiffs<br><br>**v.**<br><br>**BALTIMORE LUTHERAN HIGH SCHOOL ASSOCIATION d/b/a CONCORDIA PREPARATORY SCHOOL, et al.**<br><br>         Defendants | **Case No.:  1:20-cv-03132-RDB** |

## MEMORANDUM OF LA    IN SUPPORT OF MOTION FOR RECONSIDERATION, OR IN THE ALTERNATIVE, MOTION TO CERTIFY ORDER FOR INTERLOCUTORY APPEAL

Defendant Baltimore Lutheran High School Association d/b/a Concordia Preparatory School ("CPS"), by and through undersigned counsel, hereby moves this Honorable Court to reconsider the Court's Order of July 21, 2022, ECF No. 131 (the "Order"), and the accompanying Memorandum Opinion, ECF No. 130 (the "Memorandum Opinion"), or in the alternative, to amend the Order to certify for interlocutory appeal the question of law whether tax exemption under 26 U.S.C. § 501(c)(3) constitutes receipt of federal financial assistance for purposes of Title IX of the Education Amendments Act of 1972.

### TABLE OF CONTENTS

Background ............................................................................................................2

Argument ..............................................................................................................3

I.    Motion for Reconsideration .....................................................................3

II.   Motion for Certification of an Interlocutory Appeal ...........................17

A.  The Order Involves a Controlling Question of Law
Regarding Whether Title IX Applies to § 501(c)(3) Entities ...................19

B.  There Is a Substantial Ground for Difference of Opinion..........................24

C.  An Immediate Appeal of the Order Would Materially
Advance the Ultimate Termination of This Litigation
(and the Four Other Cases Against CPS)...................................................25

III.  Conclusion ........................................................................................28

## BACKGROUND

The facts underlying the instant Motion are undisputed.  Count I of Plaintiffs' Complaint alleges violation of Title IX, and to support that claim, Plaintiffs alleged in conclusory fashion that "During the relevant timeframe, Defendant CPS was a recipient of federal education funding within the meaning of Title IX."  ECF No. 69 at   86. However, like many of the allegations in the Complaint, discovery has not supported what Plaintiffs claim.[1]  Discovery revealed that during the time periods in which the Plaintiff student was enrolled at CPS, CPS did not receive any direct federal education funding, but that CPS was tax-exempt as a § 501(c)(3) entity.  On the basis of that tax exemption, the Court denied CPS' Partial Motion to Dismiss or in the Alternative for Summary Judgment on the Title IX claim, stating "this Court holds that § 501(c)(3) tax exemption constitutes federal financial assistance for the purposes of Title IX." ECF No. 130 at 12; ECF No. 131.

CPS requests the Court reconsider the Order on the basis of clear error because the Court's decision incorrectly concluded that a tax exemption, authorized and extended under a law administered by the Internal Revenue Service, constitutes federal financial assistance for purposes of Title IX.  The Court incorrectly analogized the definition of federal financial assistance with

---

[1] It is beyond the scope of this Motion to set forth each and every allegation in the Complaint of which there is no evidence or testimony in the record to support.  This will be addressed in Defendant's Motion for Summary Judgment.

JA124

general antidiscrimination public policy and the Internal Revenue Service's ability to revoke tax-exempt status to racially discriminatory schools that accordingly do not serve a charitable purpose.

In the alternative, pursuant to 28 U.S.C. § 1292(b), CPS seeks certification for an interlocutory appeal of the discrete legal issue whether tax exemption under § 501(c)(3) constitutes receipt of federal financial assistance for purposes of Title IX because the issue is a controlling question of law that will affect this case and other cases, not to mention the profound effect it will have on independent private schools and other § 501(c)(3) entities throughout the Fourth Circuit that will have to modify policies and procedures to comply with Title IX or give up tax-exempt status. Additionally, there is substantial grounds for difference of opinion given the split of authority in other circuits on this issue. Finally, the resolution of that question would materially advance the ultimate resolution of this litigation.

<div align="center">

**ARGUMENT**

</div>

## I.   MOTION FOR RECONSIDERATION

In *Cincinnati Ins. Co. v. Fish*, Civil Action No. RDB-19-3355, 2022 U.S. Dist. LEXIS 75666, at *2-3 (D. Md. Apr. 26, 2022), the Court recently expressed the standard of review applicable to a Motion for Reconsideration of an order that does not constitute a final judgment:

> Federal Rule of Civil Procedure 54(b) governs reconsideration of orders that do not constitute final judgments in a case. Rule 54(b) provides that "any order or other decision, however designated, that adjudicates fewer than all the claims or the rights and liabilities of fewer than all the parties . . . may be revised at any time before the entry of judgment adjudicating all the claims and all the parties' rights and liabilities." Fed. R. Civ. P. 54(b). The United States Court of Appeals for the Fourth Circuit has not enunciated the precise standard that should govern a motion for reconsideration of an interlocutory order under Rule 54(b). *Fayetteville Investors v. Commercial Builders, Inc.*, 936 F.2d 1462, 1472 (4th Cir. 1991). In *Fayettville*, the Fourth Circuit declined to "thoroughly express [its] views on the interplay of Rules 60, 59 and 54," but suggested that at least parts of the Rule 60(b) standard may be referenced by a district court in determining whether it should reconsider an interlocutory order. *Id.* at 1470. Thus, the court's analysis is guided by Rule 60(b) but is not bound by its strictures. *Am. Canoe Ass'n v. Murphy Farms, Inc.*, 326 F.3d

505, 514 (4th Cir. 2003) ("Motions for reconsideration of interlocutory orders are not subject to the strict standards applicable to motions for reconsideration of a final judgment.").

Under Rule 60(b), this Court has discretion to relieve plaintiff from a final order when any of the following can be shown: (1) mistake, inadvertence, surprise, or excusable neglect; (2) newly discovered evidence that, with reasonable diligence, could not have been discovered in time to move for a new trial under Rule 59(b); (3) fraud (whether previously called intrinsic or extrinsic), misrepresentation, or misconduct by an opposing party; (4) the judgment is void; (5) the judgment has been satisfied, released, or discharged; it is based on an earlier judgment that has been reversed or vacated; or applying it prospectively is no longer equitable; or (6) any other reason that justifies relief. Fed. R. Civ. P. 60(b). Motions for reconsideration are "an extraordinary remedy which should be used sparingly." *Pacific Ins. Co. v. Am. Nat. Fire Ins. Co*., 148 F.3d 396, 403 (4th Cir. 1998).

The Court continued by quoting from *Chae Bros., LLC v. Mayor & City Council of Balt*.,

Civil Action No. GLR-17-1657, 2019 U.S. Dist. LEXIS 34587, at *8 (D. Md. Mar. 5, 2019), and

stated:

"mere disagreement" with a court's ruling is not enough to justify granting a motion for reconsideration. *Lynn v. Monarch Recovery Mgmt.*, 953 F. Supp. 2d 612, 620 (D. Md. 2013) (quoting *Sanders v. Prince George's Pub. Sch. Sys.*, No. RWT 08cv501, 2011 U.S. Dist. LEXIS 107584, 2011 WL 4443441, at *1 (D. Md. Sept. 21, 2011)). Rather, to justify granting a motion for reconsideration on the basis of clear error, "the prior judgment cannot be 'just maybe or probably wrong; it must . . . strike the court as wrong with the force of a five-week-old, unrefrigerated dead fish.'" *Fontell v. Hassett*, 891 F.Supp.2d 739, 741 (D. Md. 2012) (alteration in original) (quoting *TFWS, Inc. v. Franchot*, 572 F.3d 186, 194 (4th Cir. 2009)). In other words, the Court's previous judgment must be "dead wrong." *Franchot*, 572 F.3d at 194 (quoting *Parts & Elec. Motors, Inc. v. Sterling Elec., Inc.*, 866 F.2d 228, 233 (7th Cir. 1988)).

Fish, 2022 U.S. Dist. LEXIS 75666, at *4.

This case, and the legal issue decided in the Court's Order, is ripe for application of the

extraordinary remedy of reconsideration because the Court's decision is dead wrong because CPS'

tax-exempt status does not constitute federal financial assistance authorized or extended under a

law administered by the Department of Education.  The Court's decision was based on CPS' status

as a § 501(c)(3) tax-exempt entity as the Court concluded that "[e]nforcing the mandates of Title

IX in schools with § 501(c)(3) status aligns with and protects the principal objectives of Title IX: 'to avoid the use of federal resources to support discriminatory practices' and 'to provide individual citizens effective protection against those practices.'" ECF No. 130 at 12.  That conclusion, however, over simplifies the legal issue by conflating overarching government policy with the application of a discrete legal issue and interpretation of a Department of Education regulation.

No party can dispute that it is in the best interests of the public to prevent discrimination based upon race, color, national origin, sex, gender, age, disability, sexual orientation, etc., and the Federal government has enacted laws protecting individuals from such discriminatory practices. *See, e.g.,* Title VII of the Civil Rights Act of 1964; Age Discrimination in Employment Act of 1967; The Americans With Disabilities Act of 1990; Equal Pay Act of 1963; The Civil Rights Act of 1991; Title IX of the Education Amendments of 1972.  That government interest, however, does not mean that all persons and entities are obligated and bound by the requirements and regulations of those Federal laws.  To that end, particular to this case Title IX only applies to an educational institution that receives "Federal financial assistance."  *Doe v. Fairfax Cty. Sch. Bd.*, 1 F.4th 257, 263-64 (4th Cir. 2021); 34 C.F.R. § 106.2(i).  That is, regardless of public policy, there must an element of federal financial assistance before an entity is bound by the requirements and regulations of Title IX.

Moreover, it is clear that not all government assistance or benefits constitute federal financial assistance for purposes of application of Title IX.  The Department of Education has enacted detailed and comprehensive regulations implementing Title IX including defining "Federal financial assistance" with a comprehensive list of government assistance "authorized or extended under a law administered by the Department [of Education]":

(b) Department means the Department of Education.

\* \* \*

(g) Federal financial assistance means any of the following, when authorized or extended under a law administered by the Department:
(1) A grant or loan of Federal financial assistance, including funds made available for:

(i) The acquisition, construction, renovation, restoration, or repair of a building or facility or any portion thereof; and
(ii) Scholarships, loans, grants, wages or other funds extended to any entity for payment to or on behalf of students admitted to that entity, or extended directly to such students for payment to that entity.

(2) A grant of Federal real or personal property or any interest therein, including surplus property, and the proceeds of the sale or transfer of such property, if the Federal share of the fair market value of the property is not, upon such sale or transfer, properly accounted for to the Federal Government.
(3) Provision of the services of Federal personnel.
(4) Sale or lease of Federal property or any interest therein at nominal consideration, or at consideration reduced for the purpose of assisting the recipient or in recognition of public interest to be served thereby, or permission to use Federal property or any interest therein without consideration.
(5) Any other contract, agreement, or arrangement which has as one of its purposes the provision of assistance to any education program or activity, except a contract of insurance or guaranty.

34 C.F.R. § 106.2(g).

Thus, only five types of government assistance qualify as federal financial assistance for purpose of application of Title IX, and that the assistance must be authorized or extended under a law administered by the Department of Education. The Court's Order was blatantly wrong because a tax exemption provided by the Internal Revenue Services (IRS) pursuant to 26 U.S.C. § 501(c)(3) does not fulfill either of those requirements.  First, a tax exemption provided by the IRS is not listed in the comprehensive regulatory definition of federal financial assistance.  The regulation defines federal financial assistance as "any of the following" and does not mention any tax benefits whatsoever.  The absence of tax benefits or tax exemption from the list of federal financial

assistance is conspicuous, reflecting a clear intent that tax exemptions do not constitute federal financial assistance.

Second, a § 501(c)(3) tax exemption is not a government benefit authorized or extended under a law administered by the Department of Education; it is authorized or extended under a law administered by the IRS. *See Bob Jones Univ. v. United States*, 461 U.S. 574, 596-99 (1983) (describing history of Congress delegating to the IRS the authority to administer and interpret the tax laws of the United States); *Regan v. Taxation with Representation*, 461 U.S. 540, 544 (1983) (cited on Page 10 of ECF No. 130 including for the proposition that "tax exemptions and tax-deductibility are a form of subsidy that is administered through the tax system," i.e., not through the Department of Education).

The types of government assistance detailed in the Title IX regulation involve the transfer of funds or something of value, i.e., a cash grant or loan, a grant of property, receipt of federal services, etc. *See Bachman v. Am. Soc'y of Clinical Pathologists*, 577 F. Supp. 1257, 1264 (D.N.J. 1983) (stating that under the Rehabilitation Act, "'assistance' connotes a transfer of government funds by way of subsidy, not merely an exemption from taxation"); *Johnny's Icehouse, Inc. v. Amateur Hockey Ass'n*, 134 F. Supp. 2d 965, 972 (N.D. Ill. 2001) ("In short, 'federal financial assistance' [under Title IX] encompasses only direct transfers of federal money, property or services from the government to a program.").

Because exemption from taxation is not a transfer of government money, property, or services, the Court relied upon an extraneous stray quote in *Regan v. Taxation with Representation*, 461 U.S. 540, 544 (1983), that "tax exemptions and tax-deductibility are a form of subsidy" and "has much the same effect as a cash grant to the organization." However, the issue in *Regan* was not the import or form of a tax exemption, and was not whether a tax exemption or tax benefit

constitutes federal financial assistance; the case did not involve Title IX or any spending clause

legislation. Instead, the issue was the constitutionality of a provision in § 501(c)(3) of the Internal

Revenue Code granting tax exemption to certain nonprofit organizations with "no substantial part

of the activities of which is carrying on propaganda, or otherwise attempting to influence

legislation." A nonprofit lobbying group challenged the constitutionality of that limitation on First

Amendment and equal protection grounds, and the Supreme Court upheld the provision because

Congress did not infringe on the rights of the nonprofit lobbying group when it chose to support

certain activities:

> Both tax exemptions and tax deductibility are a form of subsidy that is administered
> through the tax system. A tax exemption has much the same effect as a cash grant
> to the organization of the amount of tax it would have to pay on its income.
> Deductible contributions are similar to cash grants of the amount of a portion of the
> individual's contributions.  The system Congress has enacted provides this kind of
> subsidy to nonprofit civic welfare organizations generally, and an additional
> subsidy to those charitable organizations that do not engage in substantial lobbying.
> In short, Congress chose not to subsidize lobbying as extensively as it chose to
> subsidize other activities that nonprofit organizations undertake to promote the
> public welfare.

461 U.S. 540 at 544. The Supreme Court concluded its opinion, stating "the issue in these cases is

not whether TWR must be permitted to lobby, but whether Congress is required to provide it with

public money with which to lobby. For the reasons stated above, we hold that it is not." *Id.* at 551.

*Regan* absolutely did not hold, conclude or even address whether tax exemptions,

deductions or other tax benefits under the tax system are a form of federal financial assistance

under Title IX or other spending clause legislation, and the stray quotation utilized by the Court in

its decision was not even pertinent to the specifics of the Supreme Court's decision.  There is

absolutely nothing in the *Regan* decision that gives any indication that the Supreme Court intended

its use of the phrases "a form of subsidy" and "a cash grant" to have precedential value to the

present issue, or that the Supreme Court was equating tax benefits to federal financial assistance under spending clause legislation.

In fact, the Supreme Court's subsequent opinion in *NCAA v. Smith*, 525 U.S. 459 (1999), suggests the opposite. In *Smith*, the issue presented was whether the NCAA was the recipient of federal financial assistance to require compliance with Title IX when it received dues payments from its federally funded member schools, and the Supreme Court concluded that the NCAA was not.[2] The Supreme Court distinguished receipt of federal assistance either directly (such as via federal grant of money, property, or services) or through an intermediary (such as the receipt of federal grants of money given to students to pay for educational expenses), with the NCAA being an entity that "only benefited economically from federal assistance":

> Title IX coverage is not triggered when an entity merely benefits from federal funding. Thus, the regulation accords with the teaching of *Grove City* and *Paralyzed Veterans*: Entities that receive federal assistance, whether directly or through an intermediary, are recipients within the meaning of Title IX; entities that only benefit economically from federal assistance are not.

*Smith*, 525 U.S. at 468.

The fact that *Smith* was decided after the *Regan* decision is illustrative. In *Regan*, the Supreme Court remarked that tax exemptions and tax deductibility are benefits that are administered through the tax system, or otherwise stated, they are a form of federal assistance that provides an economic benefit to entities and individuals through the tax system. That is precisely the type of economic benefit described in *Smith* that the Supreme Court said was not federal financial assistance for purposes of Title IX.

---

[2] As a matter of public record, the NCAA is a § 501(c)(3) entity, but that did not stop the Supreme Court from concluding that a Title IX claim against it should be dismissed based upon the fact that the NCAA was not a recipient of federal financial assistance. If the NCAA's tax-exempt status constituted receipt of federal financial assistance, the *Smith* case would have been decided differently.

9

By way of further example, other federal benefits – but not transfers of federal money, property, or services – has not been classified as federal financial assistance in case law interpreting Title IX and other spending clause legislation. Licenses issued by federal agencies impart a valuable, monetary, benefit because they entitle the licensee to engage in a particular activity, but in *Community Television of Southern California. v. Gottfried*, 459 U.S. 498, 509-12 (1983), the Supreme Court noted that the Federal Communications Commission is not a funding agency and its issuance of television broadcasting licenses do not equal federal financial assistance for purposes of the Rehabilitation Act. *See also Herman v. United Bhd. of Carpenters*, 60 F.3d 1375, 1381-82 (9th Cir. 1995) (concluding that union certification by the National Labor Relations Board is not federal financial assistance under the Rehabilitation Act). In *Herman*, the Ninth Circuit also concluded that the federal financial assistance is not provided when the government establishes programs or regulations that support or establish guidelines for an entity's opinions. *Id. See also Rannels v. Hargrove*, 731 F. Supp. 1214, 1222-23 (E.D. Pa. 1990) (banking regulations and laws are not federal financial assistance under the Age Discrimination Act). Government programs owned and operated by the Federal government, which provide services to the public, are also not categorized as federal financial assistance. *See* 110 Cong. Rec. 13380 (1964) ("Activities wholly carried out by the United States with Federal funds, such as river and harbor improvements and other public works, defense installations, veteran's hospitals, mail service, etc. are not included in the list [of federally assisted programs]. Such activities, being wholly owned by, and operated by or for, the United States, cannot fairly be described as receiving Federal "assistance.").

With this clarity that 1) not all government assistance constitutes federal financial assistance, 2) that federal financial assistance entails receipt of federal money, property, or services, either directly or through an intermediary, and 3) that mere economic benefit provided

by the Federal government is not federal financial assistance, it is clear that a tax exemption for charitable entities under 26 U.S.C. § 501(c)(3) does not constitute receipt of federal financial assistance under Title IX or other spending legislation.  As stated in *Johnny's Icehouse, Inc.,* 134 F. Supp. 2d at 972, while Congress conditions tax-exempt status on an organization confirming to specific categories of charity, Congress did not and has never included within the Internal Revenue Code a condition whereby those tax-exempt entities are subject to the nondiscrimination requirements of Title IX. *See also* ECF No. 116-1 (The Private Schools Nondiscrimination and Due Process Act of 1979, S.B. 995, reprinted in 1979 Cong. Rec. S8436 (daily ed. Apr. 24, 1979), stating in the "Declaration of Congressional Policy" that "various Acts of Congress which condition Federal financial assistance to grantees, such as Title VI of the Civil Rights Act of 1964 and Title IX of the Education Amendments of 1972, do not apply to organizations simply because they are tax-exempt").

In addition to *Johnny's Icehouse*, prior court decisions from across the country have affirmed or at a minimum suggested that an entity's § 501(c)(3) status does not constitute federal financial assistance for purposes of Title IX or other spending statutes.  *See Zimmerman v. Poly Prep Country Day Sch.*, 888 F. Supp. 2d 317, 332 n.2 (E.D.N.Y. 2012) ("They further allege that Poly Prep enjoys tax-exempt status. Courts have held, however, that such status does not constitute federal financial assistance within the meaning of Title IX."); *Stewart v. N.Y. Univ.*, 430 F. Supp. 1305, 1314 (S.D.N.Y. 1976) ("The Court of Appeals for the Second Circuit has held that the granting of tax deductions and exemptions 'creates only a minimal and remote involvement' by the government in the activities of the recipient, and the Court finds the Federal tax benefits granted to the Law School insufficient to support a claim under § 2000d or § 1681.") (internal citations omitted); *Russo v. Diocese of Greensburg*, Civil Action No. 09-1169, 2010 U.S. Dist. LEXIS

96338, at *9 (W.D. Pa. Sep. 15, 2010) (expressing doubt without necessarily deciding that "obtaining tax exempt status would transform a private, parochial school into a recipient of Federal Financial Assistance for purposes of Title IX"); *McKeon v. Cent. Valley Cmty. Sports Found.*, 2019 U.S. Dist. LEXIS 221881, at *15 (E.D. Cal. Dec. 27, 2019) (tax credits are not federal financial assistance under Rehabilitation Act); *Merrifield v. Beaven/Inter-Am. Cos.*, 1991 U.S. Dist. LEXIS 12128, at *11 (N.D. Ill. Aug. 29, 1991) (tax-exempt status is not "federal financial assistance" under Rehabilitation Act); *Bachman v. Am. Soc'y of Clinical Pathologists*, 577 F. Supp. 1257, 1264 (D.N.J. 1983) (same).[3]

This case law is consistent with the way that that federal administrative agencies have operated for decades because the fact of the matter is that no federal agency has ever considered tax-exempt status as constituting federal financial assistance to require compliance with Title IX. For example, the United States Small Business Administration (SBA) was charged with administration of the Paycheck Protection Program (PPP) created in response to the COVID-19 pandemic. The Small Business Administration, like the Department of Education, has regulations including a prohibitions against discrimination on the basis of sex in any education program or activity receiving federal financial assistance. *See, e.g.*, 13 C.F.R. § 113.100, et. seq. The same regulations define "Federal financial assistance" in a manner that is substantively identical to the definition under the Department of Education regulation. *See* 13 C.F.R. § 113.105. Whether the

---

[3] In contrast to these decisions, the Court's reference to *M.H.D. v. Westminster Schools*,172 F.3d 797, 802 n.12 (11th Cir. 1999) for the proposition that "the Eleventh Circuit concluded that the appellant's allegation that tax exempt qualifies as 'federal financial assistance' under Title IX provision was 'neither immaterial nor wholly frivolous'" is wholly misguided. First, the issue in *M.H.D.* was whether the statute of limitations barred the appellant's claims, which has nothing to do with the issue presented in CPS' Motion. Second, Title IX and federal financial assistance was only mentioned in passing, and only with regard to whether the Federal court had subject matter jurisdiction. Third, the Eleventh Circuit in *M.H.D.* "express[ed] no view on the question whether a federal tax exemption actually constitutes 'Federal financial assistance' under Title IX." Thus, the reference to Title IX and federal financial assistance was not only dicta, it was dicta on a question not presented in CPS' Motion, and the Court did not even address the legal question in its dicta. *M.H.D.* has not meaningful impact on this case. The other District Court cases cited by the Court pre-dated the Supreme Court's decision in *Smith*.

receipt of a PPP loan constituted federal financial assistance was of particular concern to religious

based entities, many of whom are § 501(c)(3) entities, and accordingly, the SBA issued guidance

entitled "Frequently Asked Questions Regarding Participation of Faith-Based Organizations in

The Paycheck Protection Program (PPP) and The Economic Injury Disaster Loan Program

(EIDL)," which stated in relevant part:

> Receipt of a loan through any SBA program constitutes Federal financial assistance
> and carries with it the application of certain nondiscrimination obligations. Any
> legal obligations that you incur through your receipt of this loan are not permanent,
> and once the loan is paid or forgiven, those nondiscrimination obligations will no
> longer apply.

ECF No. 116-2.  That guidance, however, would be superfluous and irrelevant if those faith-based

organizations were already required to comply with those nondiscrimination obligations due to

their § 501(c)(3) tax status. That is, if the recipient's legal nondiscrimination obligations end when

the loan is paid or forgiven, it is obvious that the recipient would not have such legal obligations

before receipt of the loan based upon their § 501(c)(3) status.  This is strong evidence that Federal

agencies do not even view § 501(c)(3) status as the equivalent of federal financial assistance.

Moreover, in the context of Title VI, which is another spending clause statute, the

Department of Justice is charged with investigating certain complaints and as part of that

investigation, the Department has to first determine whether Title VI applies to the entity that is

the subject of the complaint.  Setting forth the standards for that determination, the Department of

Justice has published its Title VI Legal Manual which in part confirms that tax benefits are not

federal financial assistance "because they are not contractual in nature":

> Typical tax benefits, tax exemptions, tax deductions, and most tax credits are not
> considered federal financial assistance. Unlike grants, most typical tax benefits are
> not included in the statutory or regulatory definitions of federal financial assistance
> because they are not contractual in nature. *See, e.g.*, 42 U.S.C. § 2000d-1; 28 C.F.R.
> § 42.102(c); 31 C.F.R. § 28.105. Most courts that have considered the issue have
> concluded that typical tax benefits are not federal assistance.

*See* Exhibit 1 at 24.[4]  This analysis is supported by the Supreme Court's decision in United States *DOT v. Paralyzed Veterans of Am.*, 477 U.S. 597, 605-06 (1986), in which the Court stated that with spending clause legislation, "Congress enters into an arrangement in the nature of a contract with the recipients of the funds: the recipient's acceptance of the funds triggers coverage under the nondiscrimination provision."  *See also Soberal-Perez v. Heckler*, 717 F.2d 36, 41 (2d Cir. 1983) ("This emphasis upon the contractual nature of the receipt of federal moneys in exchange for a promise not to discriminate is still another reason to conclude that Title VI does not cover direct benefit programs since these programs do not entail any such contractual relationship"), *cert. denied*, 466 U.S. 929 (1984)).  Because the requirement is couched as a type of contractual obligation, Congress imposes the obligations of [the spending clause legislation] upon those who are in a position to accept or reject those obligations as a part of the decision whether or not to 'receive' federal funds."  *Paralyzed Veterans of Am*., 477 U.S. at 606.

In this case, CPS does not receive any transfers of federal money, property or services from the Federal government by means of its § 501(c)(3) tax-exempt status.  It is illogical and unreasonable to conclude that a business entity that has a tax exemption as a § 501(c)(3) charitable entity, or that takes a deduction on its federal tax return for contributions to charity, has chosen to accept federal financial assistance and must comply with the obligations of Title VI, Title IX and other spending legislation.

The Court, however, then relies on *Bob Jones University* for the principle that "tax exempt institutions 'must demonstrably serve and be in harmony with the public interest.'"  ECF No. 130 at 10.  The Court concluded that because CPS is a § 501(c)(3) tax-exempt entity, it must not engage in illegal or activities contrary to public policy, and because discrimination on the basis of sex is

---

[4] Also available at https://www.justice.gov/crt/book/file/1364106/download (last visited August 3, 2022).

both, CPS is bound by the requirements of Title IX.  The public policy against discrimination based on sex, however, does not mean that all tax-exempt entities must comply with Title IX; those are two separate and distinct issues.

The impetus for *Bob Jones University* was the IRS' issuance of Revenue Ruling 71-447 which stated that "[a] private school that does not have a racially nondiscriminatory policy as to students does not qualify for [a § 501(c)(3)] exemption."  Stated otherwise, the IRS Revenue Ruling was that a school could not have § 501(c)(3) status if it had a policy that discriminated based on race.  After issuance of the Revenue Ruling, the IRS revoked the tax-exempt status of two schools (Bob Jones University and Goldsboro Christian Schools).  Both schools challenged the IRS' decision but the Supreme Court rejected their arguments.  The Supreme Court concluded that the intent of the § 501(c)(3) tax exemption is that "an institution seeking tax-exempt status must serve a public purpose and not be contrary to established public policy" and must meet "certain common-law standards of charity."  *Id.* at 587.  "Congress sought to provide tax benefits to charitable organizations, to encourage the development of private institutions that serve a useful public purpose or supplement or take the place of public institutions of the same kind."  *Id.* at 588.  The Supreme Court then noted a "corollary of the public benefit principle" being that "the purpose of a charitable trust may not be illegal or violate established public policy."  *Id.* at 590.  Thus, the Supreme Court stated:

> History buttresses logic to make clear that, to warrant exemption under § 501(c)(3), an institution must fall within a category specified in that section and must demonstrably serve and be in harmony with the public interest. The institution's purpose must not be so at odds with the common community conscience as to undermine any public benefit that might otherwise be conferred.

*Id.* at 591-92.

To prevent the sway of public opinion from changing an organization's tax status, the Supreme Court further explained that the designation of what is and is not "public benefit and public policy are sensitive matters with serious implications for the institutions affected; a declaration that a given institution is not 'charitable' should be made only where there can be no doubt that the activity involved is contrary to a fundamental public policy." *Id.* at 592. The Supreme Court then concluded that "there can no longer be any doubt that racial discrimination in education violates deeply and widely accepted views of elementary justice," and affirmed the denial of tax-exempt status to the schools because "[i]t would be wholly incompatible with the concepts underlying tax exemption to grant the benefit of tax-exempt status to racially discriminatory educational entities, which 'exer[t] a pervasive influence on the entire educational process.'" *Id.* at 592-95.

*Bob Jones* University, however, absolutely did not hold, conclude or even address whether the § 501(c)(3) tax exemptions is a form of federal financial assistance. The Supreme Court never addressed the impact of the tax exemption under Title IX or other spending clause legislation. Instead, the Supreme Court's holding was that an organization's purpose must be charitable to obtain the tax exemption. Neither that holding, nor the rationale behind it, is present in this case because there is no allegations of any racially discriminatory admissions policies in this case. There is no allegation, and no facts in the record, that the purpose of CPS is discriminatory. Instead, the allegations are that CPS failed to adequately prevent and remedy student-on-student sexual harassment. As the Court noted, this case involves "allegations of sexual assault and verbal sexual harassment by male students at the school" "and allegations "that school officials failed to adequately address their numerous complaints or take any meaningful action in response." ECF No. 130 at 2-3. Incidents of alleged student-on-student harassment, and CPS' response thereto, is

wholly different than a school admissions policy that discriminates based upon race and was created, enacted, and enforced by those responsible for operating the school, such that the purpose of the school could be deemed to be discriminatory.  While the racially discriminatory admissions policies in *Bob Jones University* rendered the purposes of those educational institutions so at odds with public policy and "common community conscience" that those schools could not be considered to express the common law standards of charity, the same cannot be said for CPS.  If this were the law it would mean that every § 501(c)(3) entity would lose that tax status if it was accused and proven to have failed to prevent harassment, as distinct from having a policy that mandated discrimination. Unlike the schools at issue in *Bob Jones* University, where the discriminatory admission policy rendered the purpose of the school contrary to a fundamental public policy, the allegations that CPS failed to live up to its alleged duties to respond to and remediate incidents of student-on-student sexual harassment do not rise to the level to conclude that the purpose of the school is contrary to a fundamental public policy.

Of course, this is not to say that an entity exempt from taxation under § 501(c)(3) is permitted to discriminate on the basis of sex or ignore reports of incidents of sexual harassment; to the contrary, there are common law principles and claims to address those issues as demonstrated by the fact that Plaintiffs have pled various negligence theories under tort law.  The present legal issue, however, is whether a specific law, Title IX, applies to CPS based upon the school's § 501(c)(3) tax-exempt status.  Equating the analysis of that issue with whether sex discrimination is unlawful or against public policy was clear error by the Court and the decision must be reconsidered.

## II.    MOTION FOR CERTIFICATION OF AN INTERLOCUTORY APPEAL

In the alternative, CPS requests the Court to amend its Order and Memorandum Opinion of July 21, 2022, ECF Nos. 131 and 130, to state that the Order and Memorandum Opinion involve a controlling question of law regarding whether tax exemption under 26 U.S.C. § 501(c)(3) constitutes receipt of federal financial assistance for purposes of Title IX of the Education Amendments Act of 1972, as to which there is substantial ground for difference of opinion, and that an immediate appeal from the Order may materially advance the ultimate termination of the litigation.

"A district court's order denying a motion for summary judgment or denying a motion to dismiss is interlocutory and may be appealed only . . . if the district court certifies under 28 U.S.C. § 1292(b) that the order involves a controlling question of law as to which there is substantial ground for difference of opinion and that an immediate appeal from the order may materially advance the ultimate termination of the litigation." *Georgetown Coll. v. Madden*, 660 F.2d 91, 96-97 (4th Cir. 1981).

The decision to permit an interlocutory appeal under § 1292(b) is within the district court's discretion. *See Swint v. Chambers Cnty. Comm'n*, 514 U.S. 35, 47 (1995); 16 Charles Alan Wright, et al., *Federal Practice & Procedure* § 3929 (3d ed. 2017) (explaining that § 1292(b) "is not limited by its language to 'exceptional' cases," but rather is characterized by its flexibility). However, § 1292(b) provides that a district court "shall" certify its order for interlocutory appeal when the court determines that its order "involves a controlling question of law as to which there is substantial ground for difference of opinion and that an immediate appeal from the order may materially advance the ultimate termination of the litigation." 28 U.S.C. § 1292(b). *See also, e.g.,*); *Kennedy v. St. Joseph's Ministries, Inc.*, 657 F.3d 189, 195 (4th Cir. 2011). The use of the "shall" language in the statute means that when a district court determines that the statutory criteria are

present, it has a "duty. . . to allow an immediate appeal to be taken." *In re Trump*, 928 F.3d 360, 369 (4th Cir. 2019 (quoting *Ahrenholz v. Board of Trustees*, 219 F.3d 674, 677 (7th Cir. 2000)).

If the original order does not identify a question of law suitable for interlocutory appeal, it may be amended to include the requisite language. Fed. R. App. P. 5(a)(3) (calling for the district court to "amend its order, either on its own or in response to a party's motion, to include the required permission or statement"); *Halliburton Co. Benefits Comm. v. Graves*, 191 F. App'x 248, 251 (5th Cir. 2006) (per curiam) (advising parties seeking review of a partial summary judgment order to "move the district court to amend its order to include the 28 U.S.C. § 1292(b) certification language, pursuant to Fed. R. App. P. 5(a)(3)").

### A.    THE ORDER INVOLVES A CONTROLLING  UESTION OF LA  REGARDING  HETHER TITLE I   APPLIES TO   501(C)(3) ENTITIES

The first element under § 1292(b) is that the case present a controlling question of law.  A controlling question of law is defined by the Fourth Circuit as a "pure question of law" or "an abstract legal issue that the court of appeals can decide quickly and cleanly." *Int'l Refugee Assistance Project v. Trump*, 404 F. Supp. 3d 946, 950 (D. Md. 2019) (quoting *United States ex rel. Michaels v. Agape Senior Cmty., Inc.*, 848 F.3d 330, 340 (4th Cir. 2017) (quoting in turn *Mamani v. Berzain*, 825 F.3d 1304, 1312 (11th Cir. 2016)).  A pure question of law does not require the appellate court "to delve beyond the surface of the record in order to determine the facts." *Agape Senior Cmty, Inc.*, 848 F.3d at 341 (quoting *McFarlin v. Conseco Servs., LLC*, 381 F.3d 1251, 1259 (11th Cir. 2004)), but refers to "'a question of the meaning of a statutory or constitutional provision, regulation, or common law doctrine' – as opposed to 'whether the party opposing summary judgment had raised a genuine issue of material fact.'"  *Coal. For Equity & Excellence in Md. Higher Educ. v. Md. Higher Educ. Comm'n*, No. CCB-06-2773, 2015 U.S. Dist. LEXIS 83741, at *13 (D. Md. June 29, 2015) (quoting *Lynn v. Monarch Recovery Mgmt.*, 953 F.

Supp. 2d 612, 623 (D. Md. 2013) (quoting in turn *Clark Constr. Grp., Inc. v. Allglass Sys., Inc*., No. D  C-02-1590, 2005 U.S. Dist. LEXIS 5278, at *2 (D. Md. March 30, 2005)).

In order for the question of law to be "controlling," it does not have to resolve the action in its entirety; instead, a controlling question of law includes those that are dispositive in other respects such as whether a particular claim exists, whether a particular defense is available to defeat a claim, and questions relating to subject matter jurisdiction.  *See* 3 Moore's Manual – Federal Practice and Procedure § 27.04 (2022).  Certainly, "a 'controlling' question of law clearly includes every order that, 'if erroneous, would be reversible error on final appeal,'" but it also includes a question "'if interlocutory reversal might save time for the district court, and time and expense for the litigants.'" *Coal. For Equity & Excellence in Md. Higher Educ.*, 2015 U.S. Dist. LEXIS 83741, at *13 (quoting *Lynn*, 953 F. Supp. 2d at 623 (quoting in turn *Katz v. Carte Blanche Corp*., 496 F.2d 747, 755 (3d Cir.), *cert. denied*, 419 U.S. 885 (1974), and 16 Wright et al., Federal Practice & Procedure § 3930).

Otherwise stated, as the Third Circuit put it in *Katz*, a question is controlling if it is "serious to the conduct of the litigation, either practically or legally."  496 F.2d at 755 (citing Hearings Before Subcommittee No. 3 of the House Committee on the Judiciary on H.R. 6238, 85th Cong., 2d Sess., ser. 21 (1958) (legislative history); *In re Cement Antitrust Litig.*, 673 F.2d 1020, 1026 (9th Cir. 1982) ("[A]ll that must be shown in order for a question to be 'controlling' is that resolution of the issue on appeal could materially affect the outcome of litigation in the district court.").

In this case, it can hardly be disputed that whether Title IX applies to CPS because it is a tax-exempt § 501(c)(3) entity is a pure question of law on an abstract legal issue that can decided quickly and cleanly without delving into the factual record.  The only relevant fact is that CPS is

a tax-exempt § 501(c)(3) entity, and that fact is undisputed.  The legal issue of whether that tax exemption constitutes federal financial assistance for purposes of Title IX is a pure question of law or abstract legal issue that can be decided without any consideration of the factual record.

Additionally, the question of law is controlling because the Court's Order, if erroneous, would be reversible on appeal.  If tax-exempt status under § 501(c)(3) does not constitute receipt of federal financial assistance under Title IX, CPS is not required to comply with Title IX, and Plaintiffs cannot state a cause of action for violation of the statute.  Whether a party can pursue a legal claim as a matter of law is a quintessential example of a legal issue that could significantly and materially affect the conduct and outcome of the litigation.  *See, e.g., United States v. UPS Customhouse Brokerage, Inc.*, 30 C.I.T. 1612, 1618–1619 (Ct. Int'l Trade 2006) (question of whether certain damages were available under statute); *Bergeron v. Atl. Pac. Marine*, 899 F. Supp. 1544, 1550 (W.D. La. 1993) (question of whether a claim for punitive damages and/or loss of consortium was available to plaintiff and/or his wife).

Moreover, if the Fourth Circuit finds that a CPS has not received federal financial assistance as defined under Title IX, such that Title IX does not apply to the school, it could also significantly and materially affect the litigation because it would remove a significant part of Plaintiffs' case against CPS, including damages that are recoverable under Title IX but not under Plaintiffs' other tort theories.  Furthermore, the Court would lack original subject-matter jurisdiction over the litigation.  The cause of action under Title IX is the only claim that asserts a federal question over which the Court has subject matter jurisdiction; the remaining claims are based upon theories of negligence, premises liability, and tort liability under Maryland law under which the Court has supplemental jurisdiction.  Therefore, the resolution of the Title IX question of law could result in dismissal of Plaintiffs' Complaint for want of subject matter jurisdiction,

and jurisdictional questions impacting whether a court has subject matter jurisdiction to hear the case present a controlling question of law. *See, e.g., Klinghoffer v. S.N.C. Achille Lauro Ed Altri-Gestione Motonave Achille Lauro In Amministrazione Straordinaria*, 921 F.2d 21, 24 (2d Cir. 1990) ("[W]e have granted certification when the order involved issues of in personam and subject matter jurisdiction. *See, e.g., Leasco Data Processing Equip. Corp. v. Maxwell*, 468 F.2d 1326, 1330 (2d Cir. 1972)."); *Harris v. TJX Cos.*, 60 F. Supp. 2d 562, 565 (W.D. Va. 1999) (order denying motion to dismiss for lack of subject matter jurisdiction certified for interlocutory appeal); *Mizell v. Eli Lilly & Co.*, 526 F. Supp. 589, 597 (D.S.C. 1981) (certifying question of whether it was appropriate to dismiss third-party defendant for lack of subject matter jurisdiction); *Kenrose Mfg. Co. v. Fred Whitaker Co.*, 53 F.R.D. 491 (W.D. Va. 1971) (same).

Lastly, other courts have defined a controlling question of law as "one that substantially affects a large number of cases." *Shipping Corp. of India, Ltd. v. Am. Bureau of Shipping*, 752 F. Supp. 173, 175 (S.D.N.Y. 1990) ("On the issue of precedential value, plaintiff has made no showing that there are other cases in this Circuit involving the same issue. Rather, it appears to this court that the issue is somewhat unique.") (citing *Department of Economic Development v. Arthur Andersen & Co.*, 683 F. Supp. 1463, 1486-87 (S.D.N.Y. 1988); *Herold v. Braun*, 671 F. Supp. 936, 938 (E.D.N.Y. 1987); and *Abortion Rights Mobilization, Inc. v. Regan*, 552 F. Supp. 364, 366 (S.D.N.Y. 1982)). *See also In re Facebook, Inc.*, 986 F. Supp. 2d 524, 536 (S.D.N.Y. 2014) (stating that "[t]he impact an appeal will have on other cases need not be large, but it 'is a factor that [the court] may take into account'"); *Primavera Familienstifung v. Askin*, 139 F. Supp. 2d 567, 570 (S.D.N.Y. 2001).

The resolution of the issue presented for certification, whether tax exemption under 26 U.S.C. § 501(c)(3) constitutes receipt of federal financial assistance for purposes of Title IX, will

have a precedential impact on other ongoing and future cases where students will be able to pursue Title IX litigation against other independent private schools solely based upon the schools' § 501(c)(3) tax-exempt status, or such claims will be rejected as a matter of law.  Moreover, the question of law is controlling because its resolution on appeal will have a significant impact on implementation of processes and procedures in independent private schools across this jurisdiction.  Proof of the impact that appellate resolution of the legal issue presented will have even comes directly from Plaintiffs' liability expert in this case, Brett Sokolow, who published an article on JDSupra.com describing that the decision "will likely soon be sending shockwaves through private   -12 education, and religiously affiliated schools" and that "[a]n appeal would not be surprising":

> Judge Bennett's ruling on partial summary judgment against CPS will likely soon be **sending shockwaves** through private   -12 education, and religiously affiliated schools. Judge Bennett's decision did not address the larger question of whether this analysis might apply to all 501(c)(3) organizations with an educational component, but it has that potential implication.

*See* Exhibit 2 (emphasis added).[5]  If Plaintiffs' own expert described the Court's decision as "sending shockwaves" through the education community, it cannot seriously be disputed that this is a controlling legal question that should be addressed on appeal sooner rather than later.  Obtaining prompt and efficient appellate review of this discrete legal issue is important for the community of independent private schools in the Fourth Circuit because otherwise, these independent private schools will be kept in limbo regarding what obligations they have under Title IX while the five cases pending against CPS are litigated through trial likely into 2024.  Moreover, the impact of a decision equating § 501(c)(3) tax exemption with federal financial assistance could have profound impacts on all non-profit entities even outside of the context of education.

---

[5] Also available at https://www.jdsupra.com/legalnews/are-private-k-12-schools-subject-to-8012462 (last visited August 3, 2022).

The Supreme Court has stated that the preconditions for § 1292(b) review "are most likely to be satisfied when a privilege ruling involves a new legal question or is of special consequence, and district courts should not hesitate to certify an interlocutory appeal in such cases." *Mohawk Indus. v. Carpenter*, 558 U.S. 100, 110-11 (2009).  This is one of those cases.

### B. THERE IS A SUBSTANTIAL GROUND FOR DIFFERENCE OF OPINION

The second element under § 1292(b) is that the issue presents a substantial ground for difference of opinion. "An issue presents a substantial ground for difference of opinion if courts, as opposed to parties, disagree on a controlling legal issue." *Lynn*, 953 F. Supp. 2d at 624 (quoting *Randolph v. ADT Sec. Servs. Inc.*, 2012 U.S. Dist. LEXIS 10469, at *6 (D. Md. January 30, 2012)).

From the courts-perspective, a substantial ground for difference of opinion may exist where there is "a dearth of precedent within the controlling jurisdiction and conflicting decisions in other circuits," or "where a court's challenged decision conflicts with decisions of several other courts." *Coal. For Equity & Excellence in Md. Higher Educ.*, 2015 U.S. Dist. LEXIS 83741, at *16 (quoting *APCC Servs., Inc. v. Sprint Commc'ns Co.*, 297 F. Supp. 2d 90, 97-98 (D.D.C. 2003)). Courts also find substantial grounds for difference of opinion "if novel and difficult questions of first impression are presented." *Ekstrom v. Cong. Bank*, Civil Action No. ELH-20-1501, 2021 U.S. Dist. LEXIS 6628, at *6-7 (D. Md. Jan. 13, 2021) (quoting *Couch v. Telescope Inc.*, 611 F.3d 629, 633 (9th Cir. 2010)).

In this case, there can also be no dispute that there is a substantial ground for difference of opinion on whether tax exemption under 26 U.S.C. § 501(c)(3) constitutes receipt of federal financial assistance for purposes of Title IX.  Specifically, as the Court is aware, the issue presented is one of first impression in this Circuit and the Supreme Court has not addressed whether tax-exempt status under 26 U.S.C. § 501(c)(3) constitutes federal financial assistance for purposes of

Title IX.  ECF No. 130 at 8-9.  Additionally, there are now conflicting decisions in between courts in various circuits, as the Court held that § 501(c)(3) tax exemption constitutes federal financial assistance for purposes of Title IX, while the Northern District of Illinois reached the opposite conclusion in *Johnny's Icehouse, Inc.*  Other courts addressing the issue have expressed the same conclusion, or doubt that tax exemption equals federal financial assistance.  *See Zimmerman*, 888 F. Supp. 2d at 317; *Stewart*, 430 F. Supp. at 1314; *Russo*, Civil Action No. 09-1169, 2010 U.S. Dist. LEXIS 96338, at *9; *McKeon*, 2019 U.S. Dist. LEXIS 221881, at *15; *Merrifield*, 1991 U.S. Dist. LEXIS 12128, at *11; *Bachman*, 577 F. Supp. at 1264.  The Court rejected the rationale of those cases when it denied CPS' Partial Motion to Dismiss or in the Alternative for Summary Judgment, thus creating the very substantial grounds for difference of opinion warranting interlocutory appeal.  This case is the prototypical example of an issue on which there is substantial grounds for difference of opinion.

    **C.    AN IMMEDIATE APPEAL OF THE ORDER    OULD MATERIALLY ADVANCE THE ULTIMATE TERMINATION OF THIS LITIGATION (AND THE FOUR OTHER CASES AGAINST CPS)**

The third and final element under § 1292(b) is that an immediate appeal "may materially advance the ultimate termination of the litigation." *Fitch v. State*, No. PJM 18-2817, 2022 U.S. Dist. LEXIS 105412, at *18 (D. Md. June 9, 2022) (quoting *Hammons v. Univ. of Md. Med. Sys. Corp.*, Civil Action No. D  C 20-2088, 2021 U.S. Dist. LEXIS 205556, at *15 (D. Md. Oct. 25, 2021)) (citing *Lynn*, 953 F. Supp. 2d at 626).  This inquiry replicates much of the first prong of the § 1292(b) analysis. *Id.*; Wright, et al., *Federal Practice & Procedure* at § 3930

"In deciding whether certification will materially advance the ultimate termination of the litigation, 'a district court should consider whether an immediate appeal would: (1) eliminate the need for trial, (2) eliminate complex issues so as to simplify the trial, or (3) eliminate issues to

make discovery easier and less costly.'" *Ekstrom*, 2021 U.S. Dist. LEXIS 6628, at *8 (quoting *Goodman v. Archbishop Curley High School, Inc.*, 195 F. Supp. 3d 767, 773 (D. Md. 2016) (quoting in turn *Coal. For Equity & Excellence in Md. Higher Educ.*, 2015 U.S. Dist. LEXIS 83741, at *13)).

An immediate interlocutory appeal of the question of law whether tax exemption under 26 U.S.C. § 501(c)(3) constitutes receipt of federal financial assistance for purposes of Title IX may materially advance the ultimate termination of this case because if the Fourth Circuit concludes that the tax exemption is not federal financial assistance, it would eliminate the need for further proceedings relative to Title IX and the Court would lack original subject matter jurisdiction. Additionally, even if the Court elected to exercise supplemental jurisdiction, the litigation would be narrowed and proceed in a more efficient and streamlined manner, including narrowing the scope of potential relief available to Plaintiffs.   nowing the result of the appeal and what damages are recoverable based upon the claims asserted would undoubtably materially advance the termination of the case. *See New York v. Gutierrez*, 623 F. Supp. 2d 301, 317 (E.D.N.Y. 2009) ("Here, certification and reversal of the order allowing intervenor-plaintiffs to proceed against ASMFC would result in dismissal of all claims against ASMFC, eliminating the only non-federal defendant and all state law issues from the case. It would also substantially narrow the scope of potential relief available to plaintiffs."); *U.S. Philips Corp. v. Sears Roebuck & Co.*, Miscellaneous Docket No. 361, 1992 U.S. App. LEXIS 37824, at *5 (Fed. Cir. Dec. 10, 1992) ("[R]eviewing these interlocutory appeals will determine with finality which claims will proceed to trial and, thus, may materially advance the ultimate termination of the litigation."); *Associated Mills, Inc. v. Drake Hotel, Inc.*, 334 N.E.2d 746, 748 (Ill. App. 1975) (certifying question for appellate review because

"it will determine whether the defendant is exposed to liability in the amount of  87,122.80, as contended by plaintiff, or  250 or some lesser sum, as contended by defendant").

Moreover, this is one of five cases that present the same issue regarding whether CPS' tax-exempt status under 26 U.S.C. § 501(c)(3) constitutes federal financial assistance for purposes of Title IX.  It would be far more efficient to know the result of the appeal now and whether Title IX applies to CPS in the five cases based upon their tax exemption status, as opposed to trying five cases over many weeks and then appealing each of the cases to the Fourth Circuit.

Furthermore, not knowing the result of the appeal will also hamstring the parties and have an impact on any future settlement discussions.  As the Court is aware, recoverable damages on the Title IX claim differ from the recoverable damages under Maryland state law negligence and tort claims, and the parties need to know the result of the appeal to know the ceiling or range of recoverable damages to limit or frame future settlement discussions.  Conversely, going into settlement negotiations without knowing the result of the appeal would impair the parties' ability to reach a potential resolution and would protract the litigation because it would require the parties to litigate all five cases through trial and then appeal.  Thus, granting the interlocutory appeal, regardless of the eventual decision, would advance the termination of the litigation.  *See  Sterk v. Redbox Automated Retail, LLC*, 672 F.3d 535, 536 (7th Cir. 2012) (stating that "uncertainty" about whether a claim asserted was viable "may delay settlement (almost all class actions are settled rather than tried), and by doing so further protract the litigation. That is enough to satisfy the "may materially advance" clause of section 1292(b) . . . ."); *Scott v. Ruston La. Hosp. Co*., No. 16-0376, 2017 U.S. Dist. LEXIS 56138, at *15-16 (W.D. La. Apr. 12, 2017) ("The Court also finds that a decision on this issue may help to advance settlement, a factor that courts have found significant in permitting interlocutory appeals to proceed. . . . This is particularly true if this Court's decision

is affirmed, as it will set a ceiling for the amount of damages that Plaintiffs may recover at all and

limit settlement discussions to the range of damages available under the LMMA's damages caps.");

*Ka Kin Wong v. HSBC Bank USA (In re Lehman Bros. Holdings Inc.)*, 2011 U.S. Dist. LEXIS

124313, at *9 (S.D.N.Y. Oct. 26, 2011) ("Disrupting the settlement process, which narrows the

field of issues remaining before the Bankruptcy Court, is antithetical to advancing the termination

of the litigation."); *TEFFT v. A.C. & S., INC.*, No. C80-924M; No. C81-179M; No. C81-533M,

1983 U.S. Dist. LEXIS 17150, at *11 (W.D. Wash. May 6, 1983) ("knowing the viability of this

very important defense will affect settlement negotiations").

Moreover, an interlocutory appeal on the Title IX issue would not impede the progress of

the litigation because it would not stay trial proceedings or prevent the Court from resolving the

forthcoming Motion for Summary Judgment.  As noted above, based upon the extensive discovery

that has been conducted, many of the allegations in Plaintiffs' Complaint are not factually accurate

and/or there is no evidence to support the allegations.  CPS will raise those arguments in its Motion

for Summary Judgment, which can proceed while the Fourth Circuit Court of Appeals considers

the interlocutory appeal.

## CONCLUSION

The question presented above for interlocutory appeal meets that standard and is of special

consequence to five pending cases, not to mention the many private schools within this jurisdiction

and Circuit that are tax-exempt § 501(c)(3) entities.  As the Court's ruling on CPS' Partial Motion

to Dismiss or in the Alternative for Summary Judgment represents new law on an issue of first

impression in this Circuit, if the Order is not reconsidered, the Court should certify the issue for

immediate interlocutory appeal.

WHEREFORE, CPS respectfully requests that the Court reconsider the Order and accompanying Memorandum Opinion, or in the alternative, amend its Order and Memorandum Opinion to state that the Order and Memorandum Opinion involve a controlling question of law regarding whether tax exemption under 26 U.S.C. § 501(c)(3) constitutes receipt of federal financial assistance for purposes of Title IX of the Education Amendments Act of 1972, as to which there is substantial ground for difference of opinion, and that an immediate appeal from the Order and Memorandum Opinion may materially advance the ultimate termination of the litigation.

Respectfully submitted,

/s/Gregg E. Viola
Gregg E. Viola (25737)
ECCLESTON & WOLF, P.C.
Baltimore-Washington Law Center
7240 Parkway Drive, 4th Floor
Hanover, MD 21076-1378
(410) 752-7474 (phone)
(410) 752-0611 (fax)
E-mail: viola@ewmd.com
*Attorney for Defendant*

/s/Mark P. Johnson
Mark P. Johnson (29091)
ECCLESTON & WOLF, P.C.
Baltimore-Washington Law Center
7240 Parkway Drive, 4th Floor
Hanover, MD 21076-1378
(410) 752-7474
(410) 752-0611 (fax)
E-mail: johnson@ewmd.com
*Attorney for Defendant*

/s/Eric M. Rigatuso
Eric M. Rigatuso (27605)
ECCLESTON & WOLF, P.C.
Baltimore-Washington Law Center
7240 Parkway Drive, 4th Floor
Hanover, MD 21076-1378
(410) 752-7474 (phone)
(410) 752-0611 (fax)
E-mail: rigatuso@ewmd.com
*Attorney for Defendant*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 4th of August, 2022, copies of the foregoing were served

via the Court's ECF System to all counsel of record.

/s/Eric M. Rigatuso

Eric M. Rigatuso (Bar # 27605)

USCA4 Appeal: 23-1453    Doc: 17    Filed: 06/05/2023    Pg: 157 of 610

# TITLE VI LEGAL MANUAL



## CIVIL RIGHTS DIVISION

## U.S. DEPARTMENT OF JUSTICE



EXHIBIT
1

Pg: 158 of 610

Filed: 06/05/2023

Doc: 17

USCA4 Appeal: 23-1453

## ABOUT THIS DOCUMENT

The Civil Rights Division's *Title VI Legal Manual* provides an overview of Title VI legal principles.  This document is intended to be an abstract of Title VI principles and issues; it is not intended to provide a complete, comprehensive directory of all cases or issues related to Title VI.  For example, this manual does not address all issues associated with private enforcement.  In addition, although the manual includes cases interpreting both Title IX of the Education Amendments of 1972, as amended, 20 U.S.C. § 1681 et seq., and Section 504 of the Rehabilitation Act of 1973, as amended, 29 U.S.C. § 794, where their interpretation overlaps with Title VI, the manual should not be considered to be an overview of any statute other than Title VI.

The Civil Rights Division periodically issues policy guidance, directives, or other memoranda to federal agencies regarding statutes the Division enforces.  The manual discusses, as appropriate, current guidance documents and directives relating to Title VI.  Persons referring to the manual periodically should check the Division's websites (www.usdoj.gov/crt and www.lep.gov) for guidance documents and directives issued subsequent to the publication of the manual.  Comments on the manual, and suggestions as to future updates, including published and unpublished cases, may be addressed to:

> Federal Coordination and Compliance Section
> Civil Rights Division
> U.S. Department of Justice
> 950 Pennsylvania Avenue NW - NWB
> Washington, D.C. 20530
> Telephone and TDD (202) 307-2222
> FAX (202) 307-0595
> E-mail FCS.CRT@USDOJ.GOV

The Civil Rights Division issues the *Title VI Legal Manual* pursuant to its responsibility under Executive Order 12250, 28 C.F.R. pt. 41, app. A, to coordinate federal government compliance with the requirements of Title VI and other federal financial assistance statutes and to foster consistent and coordinated Title VI enforcement.  The manual is intended only to provide general assistance to interested persons and is not intended to, does not, and may not be relied upon to create any right or benefit, substantive or procedural, enforceable at law by a party against the United States.  Finally, because the law changes frequently, the Civil Rights Division cannot guarantee that all information is current.  Updates will be issued from time to time; please refer to the date issued for each chapter.

# TITLE VI LEGAL MANUAL

I.     Introduction

II.    Synopsis of Legislative History & Purpose

III.   Department of Justice Role Under Title VI

IV.    Interplay of Title VI with Other Laws

V.     Defining Title VI

VI.    Proving Discrimination- Intentional Discrimination

VII.   Proving Discrimination- Disparate Impact

VIII.  Proving Discrimination- Retaliation

IX.    Private Right of Action & Individual Relief Through Agency Action

X.     Employment Coverage

Pg: 159 of 610

Filed: 06/05/2023

Doc: 17

USCA4 Appeal: 23-1453

## I.   INTRODUCTION

In 1964, after years of intensive work on the part of civil rights advocates and their supporters in Congress, President Lyndon B. Johnson signed the landmark Civil Rights Act of 1964. Included among the Civil Rights Act's eleven titles is Title VI, codified at 42 U.S.C. § 2000d et seq. In 1963, President John F. Kennedy explained the need for Title VI: "Direct discrimination by Federal, State, or local governments is prohibited by the Constitution. But indirect discrimination, through the use of Federal funds, is just as invidious." Title VI directly addresses the then-common practice of denying certain persons access to federally funded services, programs, and activities based on their race, color, or national origin.



At the March on Washington for Jobs and Freedom, on August 28, 1963, a demonstrator carries a placard calling for the passage of Title VI, "*No U.S. Dough to Help Jim Crow Grow.*"

Specifically, Section 601 states the following:

> No person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance.

42 U.S.C. § 2000d.[1]

---

[1] The Title VI Legal Manual provides an overview of Title VI legal principles. This document is intended to be an abstract of the general principles and issues that concern federal agency enforcement; it is not intended to provide a complete, comprehensive directory of all cases or issues related to Title VI. For example, this Manual does not address all issues associated with private enforcement. In addition, although the Manual refers to cases interpreting

USCA4 Appeal: 23-1453      Doc: 17      Filed: 06/05/2023      Pg: 160 of 610

The Civil Rights Division of the U.S. Department of Justice (DOJ) is responsible for coordinating the Title VI implementation and enforcement efforts of federal agencies pursuant to Executive Order 12250, 28 C.F.R.pt. 41, app. A. As part of its coordination role, the Division periodically issues policy guidance, directives, or other memoranda to federal agencies regarding Title VI. The Title VI Legal Manual summarizes current DOJ guidance documents and directives relating to Title VI. Persons referring to the manual should check the Division's websites (www.justice.gov/crt and www.lep.gov) for guidance documents and directives issued subsequent to the publication of this document.

---

Title IX of the Education Amendments of 1972, as amended, 20 U.S.C. § 1681 et seq., and Section 504 of the Rehabilitation Act of 1973, as amended, 29 U.S.C. § 794, where their interpretation overlaps with Title VI, the Manual should not be considered to be an overview of any statute other than Title VI.

USCA4 Appeal: 23-1453      Doc: 17      Filed: 06/05/2023      Pg: 161 of 610

## II:   SYNOPSIS OF LEGISLATIVE HISTORY AND PURPOSE OF TITLE VI

The Civil Rights Act of 1964 was a product of the growing demand during the early 1960s for
the federal government to launch a nationwide offensive against racial discrimination. In calling
for its enactment, President John F. Kennedy stated:

> Simple justice requires that public funds, to which all taxpayers of all races
> contribute, not be spent in any fashion which encourages, entrenches, subsidizes,
> or results in racial discrimination. *Direct discrimination by Federal, State, or local*
> governments is prohibited by the Constitution. But indirect discrimination,
> through the use of Federal funds, is just as invidious; and it should not be
> necessary to resort to the courts to prevent each individual violation.

*See* H.R. Misc. Doc. No. 124, 88th Cong., 1st Sess. 3, 12 (1963).

Title VI was not the first attempt to ensure that the federal government not finance
discrimination based on race, color, or national origin. Beginning with Franklin Roosevelt,
presidents issued Executive Orders prohibiting racial discrimination in hiring. *See Cannon v.
Univ. of Chicago*, 441 U.S. 677, 720 & n.3 (1979) (White, J., dissenting).[1]  Various prior
Executive Orders prohibited racial discrimination in, for instance, the armed forces, employment
by federally funded construction contractors, and federally assisted housing.[2]  As Rep. Emanuel
Celler, Chairman of the House Judiciary Committee and floor manager for the Civil Rights Act
in the House of Representatives, noted:

> In general, it seems rather anomalous that the Federal Government should aid and
> abet discrimination based on race, color, or national origin by granting money and
> other kinds of financial aid. It seems rather shocking, moreover, that while we
> have on the one hand the 14th amendment, which is supposed to do away with
> discrimination since it provides for equal protection of the laws, on the other
> hand, we have the Federal Government aiding and abetting those who persist in
> practicing racial discrimination.
>
> It is for these reasons that we bring forth title VI. The enactment of title VI will
> serve to override specific provisions of law which contemplate Federal assistance
> to racially segregated institutions.

110 Cong. Rec. 2467 (1964) (*quoted in Regents of Univ. of Cal. v. Bakke*, 438 U.S. 265, 330-31
(1978) (opinion of Marshall, J.). Congress recognized the need for a statutory nondiscrimination

---

[1] *See also Cooper v. Aaron*, 358 U.S. 1 (1958); *Simkins v. Moses H. Cone Mem'l Hosp.*, 323 F.2d 959 (5th Cir.
1963).

[2] Exec. Order No. 9981, 13 Fed. Reg. 4313 (July 26, 1948) (equal opportunity in the armed services); Exec. Order
No. 10479, 18 Fed. Reg. 4899 (Aug. 13, 1953) (equal employment opportunity by government); Exec. Order No.
11063, 27 Fed. Reg. 11,527 (Nov. 20, 1962) (equal opportunity in housing), as amended by Exec. Order No. 12259,
3 C.F.R. § 307 (1981), *reprinted in* 42 U.S.C. § 3608.

Pg: 162 of 610      Filed: 06/05/2023      Doc: 17      USCA4 Appeal: 23-1453

provision to apply across-the-board "to make sure that the funds of the United States are not used to support racial discrimination." 110 Cong. Rec. 6544 (statement of Sen. Humphrey).

Senator Humphrey, the Senate manager of the Civil Rights Act of 1964, identified several reasons for the enactment of Title VI. *Id.* First, several federal financial assistance statutes, enacted prior to *Brown v. Bd. of Education*, 347 U.S. 483 (1954), expressly provided for federal grants to racially segregated institutions under the "separate but equal" doctrine that *Brown* overturned. Although *Brown* made the validity of these programs doubtful, the decision did not automatically invalidate these statutory provisions.

Second, Title VI would eliminate any doubts that some federal agencies may have had about their authority to prohibit discrimination in their programs.

Third, through Title VI, Congress would "insure the uniformity and permanence to the nondiscrimination policy" in all programs and activities involving federal financial assistance. 110 Cong. Rec. 6544 (1964). Title VI would eliminate the need for Congress to debate nondiscrimination amendments in each new piece of legislation authorizing federal financial assistance.[3] As stated by Representative Celler, "Title VI enables the Congress to consider the overall issue of racial discrimination separately from the issue of the desirability of particular Federal assistance programs. Its enactment would avoid for the future the occasion for further legislative maneuvers like the so-called Powell amendment." *Id.* at 2468.[4]

Fourth, the supporters of Title VI considered it an efficient alternative to ponderous, time-consuming, and uncertain litigation. Prior legal challenges demonstrated that litigation involving private discrimination proceeded slowly, and the adoption of Title VI was seen as an alternative to such an arduous route. *See* 110 Cong. Rec. 7054 (1964) (statement by Sen. Pastore).

Further, federal funds continued to subsidize racial discrimination. For example, Senator Pastore addressed how North Carolina hospitals received substantial federal monies for construction, that the hospitals discriminated against Blacks as patients and as medical staff, and that, in the absence of legislation, judicial action was the only means to end these discriminatory practices.

> That is why we need Title VI of the Civil Rights Act, H.R. 7152—to prevent such
> discrimination where Federal funds are involved.... Title VI is sound; it is
> morally right; it is legally right; it is constitutionally right.... What will it
> accomplish?  It will guarantee that the money collected by colorblind tax

---

[3] *See* 6 Op. O.L.C. 83, 93 (1982) ("The statutes [Title VI, Title IX, Section 504, and the Age Discrimination Act] ... [are] intended to apply to all programs or activities receiving federal financial assistance without being explicitly referenced in subsequent legislation.  They should therefore be considered applicable to all legislation authorizing federal financial assistance ... unless Congress evidences a contrary intent.")

[4] The "Powell amendment" refers to the effort of Representative Adam Clayton Powell to add nondiscrimination clauses to federal legislation.  *See* 110 Cong. Rec. 2465 (1964) (Statement by Rep. Powell).

> collectors will be distributed by Federal and State administrators who are equally
> colorblind. Let me say it again: The title has a simple purpose—to eliminate
> discrimination in Federally financed programs.

*Id.; see also Simkins v. Moses H. Cone Mem'l Hosp.*, 323 F.2d 959, 969 (4th Cir. 1963) (federal
provisions undertaking to authorize segregation by state-connected institutions are
unconstitutional).[5]

President Lyndon Johnson signed the Civil Rights Act of 1964 into law on July 2, 1964, after
more than a year of hearings, analyses, and debate. During the course of congressional
consideration, Title VI was one of the most debated provisions of the Act.

---

[5] At issue in *Simkins* was a provision of the Hill-Burton Act (Hospital Survey and Construction Act), 60 Stat. 1041
(1946), as amended, 42 U.S.C. § 291e(f), which "authorize[d] the construction of hospital facilities and the
promotion of hospital services with funds of the United States on a 'separate-but-equal' basis." *Simkins*, 323 F.2d at
961. The Act included a general nondiscrimination provision, but further stated that "'an exception shall be made in
cases where separate hospital facilities are provided for separate population groups, if the plan makes equitable
provision on the basis of need for facilities and services of like quality for each such group;....'" *Id.* at 969 (quoting
42 U.S.C. § 291e(f)).

USCA4 Appeal: 23-1453    Doc: 17    Filed: 06/05/2023    Pg: 164 of 610

Pg: 165 of 610        Filed: 06/05/2023        Doc: 17        USCA4 Appeal: 23-1453

### III:   DEPARTMENT OF JUSTICE ROLE UNDER TITLE VI

Title VI authorizes and directs federal departments and agencies that extend financial assistance to issue rules, regulations, or orders that effectuate the prohibition on discrimination on the basis of race, color, or national origin. Title VI assigns the Department of Justice (DOJ) two key government-wide roles: coordinator of federal agency implementation and enforcement, and legal representative of the United States.[1]

### A.   Ensuring Consistent and Effective Enforcement Across the Federal Government

Under Executive Order 12250, 28 C.F.R. pt. 41, app. A, the President tasked the Attorney General to "coordinate the implementation and enforcement by Executive agencies" of Title VI, Title IX, and Section 504. Executive Order 12250 further provided that the Attorney General coordinate

> any other provision of Federal statutory law which provides, in whole or in part, that no person in the United States shall, on the ground of race, color, national origin, handicap, religion, or sex, be excluded from participation in, be denied the benefits of, or be subject to discrimination under any program or activity receiving Federal financial assistance.

Exec. Order No. 12250 § 1-201. Accordingly, DOJ is charged with ensuring the consistent and effective implementation of Title VI across the federal government.

Initially, the Title VI coordination responsibility was assigned to a President's Council on Equal Opportunity, which was created by Executive Order 11197, 3 C.F.R. 1964-1965 Comp. 278 (Feb. 5, 1965). The Council was abolished after six months and the responsibility was reassigned to the Attorney General pursuant to Executive Order 11247. 3 C.F.R. 1964-1965 Comp. 348 (Sept. 24, 1965). Executive Order 11247 provided that the Attorney General was to assist federal departments and agencies in coordinating their Title VI enforcement activities and in adopting consistent, uniform policies, practices, and procedures. During this period, DOJ issued its "Guidelines for the Enforcement of Title VI, Civil Rights Act of 1964," 28 C.F.R. § 50.3, which are still in force today.

In 1974, the President signed Executive Order 11764, designed "to clarify and broaden the role of the Attorney General with respect to Title VI enforcement." Exec. Order No. 11764, 3A C.F.R. § 124 (1974 Comp.). The Order gave the Attorney General broad power to ensure the effective and coordinated enforcement of Title VI. In 1976 and pursuant to this Executive Order,

---

[1] The DOJ has a third role, of course: ensuring that its own recipients of funding abide by their Title VI (and other federal funding statute) obligations. This Manual chapter focuses on the Department's unique Title VI obligations.

DOJ promulgated its Coordination Regulations describing specific implementation, compliance, and enforcement obligations of federal funding agencies under Title VI. *See* 28 C.F.R. §§ 42.401-42.415.[2] Every agency that extends Title VI covered federal financial assistance is subject to the Coordination Regulations as well as Title VI guidelines and directives issued by DOJ.

On November 2, 1980, the President signed Executive Order 12250, which directed the Attorney General to oversee and coordinate the implementation and enforcement responsibilities of the federal agencies pursuant to Title VI. For the first time, and notwithstanding that no rules, regulations, or orders of general applicability "shall become effective unless and until approved by the President," 42 U.S.C. § 2000d-1, the President delegated approval power over regulations to the Attorney General. Exec. Order No. 12250, at § 1-1. This Executive Order further charges the Attorney General with specific Title VI oversight responsibilities, which, with the exception of the approval of agency regulations implementing Title VI and the issuance of coordinating regulations, the Attorney General has delegated to the Assistant Attorney General for Civil Rights:

- Review existing and proposed rules, regulations, and orders of general applicability of the Executive agencies in order to identify those that are inadequate, unclear, or unnecessarily inconsistent (§ 1-202);
- Develop specific standards and procedures for taking enforcement actions and for conducting investigations and compliance reviews (§ 1-203);
- Issue guidelines for establishing reasonable time limits on efforts to secure voluntary compliance, on the initiation of sanctions, and for referral to DOJ of enforcement where there is noncompliance (§ 1-204);
- Establish and implement a schedule for the review of the agencies' regulations that implement Title VI and related statutes (§ 1-205);
- Establish guidelines and standards for the development of consistent and effective recordkeeping and reporting requirements for Executive agencies; for the sharing and exchange of agency compliance records, findings, and supporting documentation; for the development of comprehensive employee training programs; and for the development of cooperative programs with state and local agencies, including sharing of information, deferring of enforcement activities, and providing technical assistance (§ 1-206);
- Initiate cooperative programs between and among agencies, including the development of sample memoranda of understanding, designed to improve the coordination of Title VI and related statutes (§ 1-207).

---

[2] These regulations were amended slightly after the signing of Executive Order 12250 in 1980 to identify correctly the applicable Executive Order, but in substance they have not been changed since being issued in 1976.

Pg: 166 of 610          Filed: 06/05/2023          Doc: 17          USCA4 Appeal: 23-1453

Under the Attorney General's delegation, the Civil Rights Division is responsible for reviewing and providing clearance of subregulatory guidance interpreting Title VI. While each federal agency extending federal financial assistance has primary responsibility for implementing Title VI with respect to its recipients, overall coordination in identifying legal and operational standards, and ensuring consistent application and enforcement, rests with DOJ's Civil Rights Division. The section within the Civil Rights Division that provides Title VI assistance and oversight to agency civil rights offices is the Federal Coordination and Compliance Section (FCS).

The Civil Rights Division employs a variety of strategies for meeting its coordination mandate, some of which are discussed in more detail below.

### 1.      Department of Justice Clearance Authority

Executive Order 12250 provides that the Attorney General must approve federal regulations that effectuate Title VI (and other civil rights statutes, including Title IX and Section 504). 42 U.S.C. § 2000d-1; Exec. Order No. 12250 at § 1-1. This includes the provisions of comprehensive regulations that govern, in part, a federal agency's Title VI implementation or enforcement. For example, if a federal agency drafts a rule governing administrative complaints, the rule is subject to DOJ clearance requirements to the extent it affects how Title VI may be enforced.

In addition, federal implementing directives (whether in the nature of regulations or implementing guidance) that agencies issue under any of the laws covered by Executive Order 12250 are "subject to the approval of the Attorney General, who may require that some or all of them be submitted for approval before taking effect." *Id.* § 1-402. These documents include regulations issued to effectuate statutes that "provide in whole or in part, that no person in the United States shall, on the ground of race, color, national origin, handicap, religion, or sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving federal financial assistance." *Id.* § 1-201(d). The authority to review such guidance documents has been delegated to the Assistant Attorney General for Civil Rights. 28 C.F.R. § 0.51(a) ("The Assistant Attorney General in charge of the Civil Rights Division shall, except as reserved herein, exercise the authority vested in and perform the functions assigned to the Attorney General by Executive Order 12250 ('Leadership and Coordination of Nondiscrimination Laws'")).

The DOJ clearance role is critical to its responsibility to ensure consistent and effective enforcement. Agencies should contact FCS early in the development of documents encompassed within the DOJ clearance requirements.

USCA4 Appeal: 23-1453      Doc: 17      Filed: 06/05/2023      Pg: 167 of 610

### 2.    Legal and Policy Guidance

DOJ develops formal and informal guidance regarding implementation of Title VI, including legal interpretations of the statute and regulations. DOJ, including the Civil Rights Division, has issued guidance in a range of formats, including notice-and-comment rulemaking; directives; frequently asked questions; tips and tools documents; promising practices documents; and correspondence to federal agencies, recipients, or beneficiaries. These documents generally are sent directly to interested stakeholders and also made available online. Because of DOJ's unique government-wide coordination function, such interpretations of Title VI are entitled to special deference from the courts. *See, e.g.*, *United States v. Maricopa Cty.*, 915 F. Supp. 2d 1073, 1080 (D. Ariz. 2012) (citing *Consol. Rail Corp. v. Darrone*, 465 U.S. 624, 634 (1984); *Andrus v. Sierra Club*, 442 U.S. 347, 357-58 (1979)).[3]

DOJ's legal guidance review function plays a particularly important role in ensuring consistency of legal interpretation across the federal government. For example, where two agencies have conflicting interpretations of what constitutes federal financial assistance under Title VI, DOJ's coordination role authorizes it to determine the final government-wide position on the matter.

### 3.    Legal Counsel and Technical Assistance

DOJ, through the Civil Rights Division's FCS, provides ongoing technical assistance, including legal and policy review, to federal funding agencies. On an almost daily basis, the FCS staff answers questions from staff working in other federal agencies. FCS also provides direct assistance to individual agencies, including legal or technical assistance on novel or complex investigations.

FCS also conducts periodic in-depth reviews of agency Title VI enforcement programs, including both Case Assistance Reviews (CAR) and Technical Assistance Reviews (TAR). Section 1-302 of Executive Order 12250 directs the Attorney General periodically to evaluate the implementation of the nondiscrimination provisions of the laws the Executive Order covers, including Title VI; advise the heads of the agencies concerned on the results of those

---

[3] Federal civil rights agency interpretations of their own Title VI regulations are entitled to "substantial deference" where they "reflect its 'fair and considered judgment on the matter in question.'" *Biediger v. Quinnipiac Univ.*, 691 F.3d 85, 96-97 (2d Cir. 2012) (affording deference to U.S. Department of Education policy guidance interpreting Title IX); *see also Thomas Jefferson Univ. v. Shalala*, 512 U.S. 504, 512 (1994) (agency's permissible interpretation of its own regulation normally "must be given controlling weight unless it is plainly erroneous or inconsistent with the regulation"); *T.E. v. Pine Bush Cent. Sch. Dist.*, No. 12-CV-2303 KMK, 2014 WL 5591066, at *18 (S.D.N.Y. Nov. 4, 2014) ("agency interpretations of ambiguities in an agency's own regulation merit 'substantial deference'"). Because multiple agencies provide federal financial assistance to a wide variety of recipients, many of which issue guidance and other similar documents, the coordination role delegated to the Civil Rights Division under 28 C.F.R. § 0.51(a) seeks to ensure consistent federal government interpretation of Title VI and other federal financial assistance statutes.

USCA4 Appeal: 23-1453      Doc: 17          Filed: 06/05/2023      Pg: 168 of 610

evaluations; and provide recommendations for needed improvement in implementation or enforcement. A Title VI CAR involves a holistic assessment of an agency's administrative case docket in order to identify the critical enforcement matters requiring legal assistance and potential preparation for judicial enforcement, identify and develop solutions to any recurring barriers to effective enforcement, and inform the development of DOJ's technical assistance and training programs. A Title VI TAR is a focused assessment of selected aspects, functions, or issues concerning an agency's Title VI implementation and enforcement. A TAR is designed to yield helpful and practical recommendations to strengthen and improve an agency's Title VI enforcement. FCS undertakes both types of reviews cooperatively with the agency.

### 4.    Coordination and Clearinghouse

When a complainant files a complaint either with multiple funding agencies that fund a particular recipient or a complaint that implicates multiple agencies, FCS sometimes coordinates the investigation. FCS's role may involve bringing together representatives from the various agencies to ensure that they approach and conduct their investigations in a consistent manner. In other instances, FCS may partner with an agency in an investigation. In addition, FCS has significant government-wide coordination responsibilities to act as a clearinghouse for review and referral of mail from the public; non-governmental organizations; federal, state, and local agencies; and others concerning civil rights matters. Agencies should contact FCS when they receive complaints as to which they do not have jurisdiction and do not know where the complaint should be forwarded.

DOJ also leads the Title VI Interagency Working Group, a forum for federal civil rights leadership, staff, and counsel to leverage resources, training, promising practices, and problem-solving opportunities with the goal of creating more effective and consistent Title VI enforcement programs across government.

### 5.    Oversight and Coordination

In implementing Executive Order 12250, DOJ periodically evaluates Title VI implementation as well as the implementation of the other nondiscrimination provisions of the laws that the Order covers. DOJ does this in a variety of ways, including requiring agencies that administer federal financial assistance to submit reports to FCS describing their past year's performance and upcoming plans to implement Title VI. DOJ also can request information on the major components of an agency's civil rights enforcement program, including budget and staffing for external civil rights activities, complaint investigations, pre-award and post-award compliance reviews, regulatory and policy development, outreach and technical assistance, and training. Pursuant to Executive Order 12250, Section 1-401, agencies must cooperate with any such requests. Information gathered in these reports plays an essential role in refining DOJ's coordination and compliance activities.

USCA4 Appeal: 23-1453      Doc: 17      Filed: 06/05/2023      Pg: 169 of 610

## B.    Judicial Enforcement of Title VI

DOJ also serves as the federal government's litigator. Title VI authorizes DOJ to enforce Title VI through the filing of civil actions. DOJ, on behalf of Executive agencies, may seek injunctive relief, specific performance, or other remedies when agencies have referred determinations of recipients' noncompliance to DOJ for judicial enforcement. DOJ may also file statements of interest and amicus briefs regarding Title VI issues in private litigation. Litigation is assigned to DOJ's Civil Rights Division. In addition, DOJ is responsible for representing agency officials should they be named as defendants in private Title VI litigation.

A 1965 guidance, now codified at 28 C.F.R. § 50.3, specified that court enforcement may be obtained through the following:

> (1) a suit to obtain specific enforcement of assurances, covenants running with federally provided property, statements of compliance, or desegregation plans filed pursuant to agency regulations; (2) a suit to enforce compliance with other titles of the 1964 Act, other Civil Rights Acts, or constitutional or statutory provisions requiring nondiscrimination; and (3) initiation of or intervention or other participation in, a suit for other relief designed to secure performance.

31 Fed. Reg. 5292, 5292 (Apr. 2, 1966).[4]  In subsequent regulations, agencies were directed, upon failure to obtain voluntary compliance from a noncomplying program or activity, to "initiate appropriate enforcement procedures" in accordance with the 1965 Title VI guidelines. 41 Fed. Reg. 52,669 (Dec. 1, 1976) (now codified at 28 C.F.R. § 42.411). In this regard, the Coordination Regulations direct agencies to advise DOJ if they are unable to achieve voluntary compliance and to request that DOJ assist in seeking resolution of the matter. *Id.* § 42.411(a). Agencies should submit Title VI and other civil rights matters for litigation if they cannot be resolved administratively (that is, when the agency determines that informal resolution or fund termination is not a viable solution). FCS provides assistance to agencies in making determinations of noncompliance, including providing pre-enforcement legal counsel when it appears it may be difficult to obtain a voluntary resolution.

---

[4] In the 1965 guidance, the Department identified three alternative measures that could be undertaken to secure compliance: (1) court enforcement, including "initiation of or intervention or other participation in, a suit for other relief designed to secure performance;" (2) administrative action; and (3) other efforts to induce voluntary compliance. *Id.*

Pg: 170 of 610       Filed: 06/05/2023       Doc: 17       USCA4 Appeal: 23-1453

IV:   INTERPLAY OF TITLE VI WITH TITLE IX, SECTION 504, THE FOURTEENTH
AMENDMENT, AND TITLE VII

Title VI prohibits discrimination based on race, color, or national origin in programs and activities receiving federal financial assistance. Specifically, Title VI provides as follows:

> No person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be *subjected to discrimination under any program or activity receiving Federal* financial assistance.

42 U.S.C. § 2000d. Title VI served as the model for several subsequently promulgated statutes that prohibit discrimination on other grounds in federally assisted programs or activities, including Title IX (sex discrimination in education programs) and Section 504 (disability discrimination). *See U.S. Dep't of Transp. v. Paralyzed Veterans of Am.*, 477 U.S. 597, 600 n.4 (1986); *Grove City Coll. v. Bell*, 465 U.S. 555, 566 (1984) (Title IX was patterned after Title VI); *Consol. Rail Corp. v. Darrone*, 465 U.S. 624 (1984) (Section 504 patterned after Titles VI and IX).[1] Accordingly, courts have "relied on case law interpreting Title VI as generally applicable to later statutes." *Paralyzed Veterans*, 477 U.S. at 600 n.4.

The three statutes do not treat all issues identically. For example, Title VI statutorily restricts claims of employment discrimination to instances where a "primary objective" of the financial assistance is to provide employment. 42 U.S.C. § 2000d-3. An employment discrimination claim against a recipient of federal financial assistance that otherwise might raise a Title VI issue must be brought under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e et seq., if a "primary objective" is not employment. No such restriction applies to Title IX or Section 504. *See N. Haven Bd. of Educ. v. Bell*, 456 U.S. 512, 530 (1982) ("[T]he legislative history thus corroborates our reading of the statutory language and verifies the Court of Appeals' conclusion that employment discrimination comes within the prohibition of Title IX."); *Bentley v. Cleveland Cty. Bd. of Comm'rs*, 41 F.3d 600 (10th Cir. 1994) (Section 504 claim alleging discriminatory termination of former employee).

Courts also have held that Title VI adopts or follows the Fourteenth Amendment's standard of proof for intentional discrimination, *see Regents of the Univ. of Cal. v. Bakke*, 438 U.S. 265, 412-18 (1978); and, generally, the Title VII standard of proof for disparate impact. *See Guardians Ass'n v. Civil Serv. Comm'n of City of New York*, 463 U.S. 582, 639 (1983); *Elston v. Talladega Cty. Bd. of Educ.*, 997 F.2d 1394, 1405 n.11, 1407 n.14 (11th Cir. 1993) (*see, infra*, Section V, ch. 1). Accordingly, cases under these constitutional and statutory provisions may shed light on the Title VI analysis in a given situation.

---

[1] In addition, Title II of the Americans with Disabilities Act of 1990, as amended, uses Title VI enforcement procedures through reference to the process noted in Section 504. 42 U.S.C. § 12131.

USCA4 Appeal: 23-1453      Doc: 17       Filed: 06/05/2023      Pg: 171 of 610

Finally, cases decided under Title VIII of the Civil Rights Act of 1968, the Fair Housing Act, 42 U.S.C. § 3601 et seq., may also be instructive regarding the disparate impact analysis under Title VI.

USCA4 Appeal: 23-1453      Doc: 17      Filed: 06/05/2023      Pg: 172 of 610

V:    DEFINING TITLE VI

## A.    Who Is Protected Under Title VI?

Title VI protects *everyone* who is "in the United States" (which is separately defined below).

> NO PERSON in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance.

Title VI states "no person" shall be subject to discrimination because of race, color, or national origin. It is well-settled that the word "person" includes citizens and noncitizens alike and that undocumented individuals in the United States are protected from discrimination on the basis of race, color, and national origin. The Supreme Court has addressed "person" in the context of challenges brought under the Fifth and Fourteenth Amendments. *See, e.g., Zadvydas v. Davis*, 533 U.S. 678, 693 (2001); *Plyler v. Doe*, 457 U.S. 202 (1982); *Mathews v. Diaz*, 426 U.S. 67 (1976). The Court has held that undocumented individuals are considered "persons" under the equal protection and due process clauses of the Fifth and Fourteenth Amendments. *Plyler*, 457 U.S. at 210–11; *Mathews*, 426 U.S. at 77.[1] These cases provide persuasive authority as to the scope of "persons" protected by Title VI because the Supreme Court has found that Title VI is limited by the Fifth and Fourteenth Amendments *See Guardians Ass'n v. Civil Serv. Comm.*, 463 U.S. 582, 589–90 (1983); *Regents of the Univ. of Cal. v. Bakke*, 438 U.S. 265, 287 (1978).[2]

Under Title VI, a private entity is also a "person" when it receives federal financial assistance from a recipient and may bring suit alleging discriminatory allocation of funds. Similarly, a private entity also is a "person" when it seeks to contract with a recipient.

Where a recipient receiving federal financial assistance enters the marketplace seeking to contract for goods or services, it cannot discriminate among entities seeking to do business with it. In *Jacobson v. Delta Airlines*, 742 F.2d 1202, 1209 (9th Cir. 1984), the court noted that a contractor, corporate or individual, may be deemed a "person" and covered by Title VI. *See, e.g., Hudson Valley Freedom Theater, Inc. v. Heimbach*, 671 F.2d 702, 705–06 (2d Cir. 1982) (holding that corporate plaintiffs had standing to pursue racial discrimination claims pursuant to Title VI); *Bogdan v. Housing Auth. of Winston-Salem*, No. 1:05CV00568. 2006 WL 3848693 *6 (M.D.N.C. Dec. 29, 2006) (finding that Title VI covered a contractor if he has a logical nexus to

---

[1] In *Espinoza v. Farah Mfg. Co.*, 414 U.S. 86 (1973), a Title VII case, the Court ruled that an employer's distinction between a citizen and noncitizen for employment purposes did not violate the prohibition against national origin discrimination. It also noted that because the employer did not discriminate among the citizens it did hire based on national origin, it did not violate Title VII. *Id.* at 93 n.5.
[2] Fifth and Fourteenth Amendment equal protection claims are coextensive and "indistinguishable from each other." *Adarand Constructors, Inc. v. Peña.* 515 U.S. 200, 217 (1995).

USCA4 Appeal: 23-1453   Doc: 17   Filed: 06/05/2023   Pg: 173 of 610

a federally funded program, as a beneficiary, applicant, or participant in the program); *Carnell Const. Corp. v. Danville Redev. and Hous. Auth.*, 745 F.3d 703, 715 (4th Cir. 2014) (Carnell has Title VI standing because its president and sole shareholder is African–American, it was eligible for consideration as a contractor on a federally funded public project, and it alleged that defendants discriminated against it based on race), *cert. denied*, 135 S. Ct. 357 (2014); *see also United States v. Harris Methodist Ft. Worth*, 970 F.2d 94, 97 (5th Cir. 1992) (holding that Title VI protected from discrimination private physicians who were neither beneficiaries nor employees of the hospital); *J.A. Croson Co. v. City of Richmond*, 488 U.S. 469 (1989) (corporate standing to sue for race discrimination under the Equal Protection Clause).

In contrast, an entity's receipt of a procurement contract with the federal government does not subject the contractor to coverage under Title VI. *See, e.g., Fredricks v. City of New York*, No. 12 CIV. 3734, 2013 WL 839584, at *5 (S.D.N.Y. Mar. 6, 2013); *Tolliver v. Xerox Corp.*, 918 F.2d 1052, 1060 (2d Cir. 1990) (receipt of Army procurement contracts does not render the company a "program or activity receiving federal financial assistance").

Once an entity receives federal financial assistance, jurisdiction under Title VI attaches and if the recipient's program includes selection of contractors to carry out its various functions, then Title VI covers that selection process. For example, if a state agency receives funds pursuant to a federal program to establish and operate homeless shelters and uses some of the federal money to hire a food service company to provide meals in the shelter, the food service contractor is a participant in the homeless shelter program. Title VI would operate not only to ensure nondiscrimination against homeless people—the ultimate beneficiaries—but would also require the recipient to select the food service contractor in a nondiscriminatory manner. An essential purpose of Title VI—to prevent discrimination—would be undermined if it were limited to ensuring that a homeless shelter was operated in a nondiscriminatory manner, while the process by which such a facility is constructed, supplied, and serviced were free of any such restraints.

A number of courts have held that cities, political subdivisions, and other state instrumentalities are not Title VI-defined "persons" and do not have Title VI standing to bring suit against the state. In *United States v. Alabama*, 791 F.2d 1450 (11th Cir. 1986), the United States, later joined by intervenors, Alabama State University (ASU), a majority-black institution, along with faculty, staff, students, and graduates of ASU, filed suit against the state of Alabama, state educational authorities, and all four-year state institutions of higher education, claiming that Alabama operated a dual system of segregated higher education. Based on the language of Title VI and a review of its legislative history, the court concluded that "[n]othing in Title VI or its legislative history suggests that Congress conceived of a state instrumentality as a 'person' with rights under this statute" and the court "decline[d] to infer such a right of action by judicial fiat." *Id.* at 1456–57. The court further stated there are other avenues of recourse to remedy Title VI violations, including a private right of action for individuals under Title VI and Title VI's

USCA4 Appeal: 23-1453      Doc: 17      Filed: 06/05/2023      Pg: 174 of 610

comprehensive scheme of administrative enforcement. *Id.* at 1456, (citing *Cannon v. Univ. of Chicago*, 441 U.S. 677, 696–97 (1978)). *See also Pocono Mountain Charter Sch. v. Pocono Mountain Sch. Dist.*, 442 F. App'x 681, 688 (3d Cir. 2011) (explaining that a charter school did not meet definition of "person"); *Dekalb Cty. Sch. Dist. v. Schrenko*, 109 F.3d 680, 689 (11th Cir. 1997) (noting that a state created political subdivision has no standing to bring a Title VI claim against the state). Nevertheless, this should not preclude entities such as a school district or other political subdivision from bringing a Title VI administrative complaint either on its own behalf or on behalf of its students or other constituents. It also would not preclude individual students or other constituents from bringing a private Title VI suit against the state recipient in appropriate cases. *See, e.g., Coalition for Equity & Excellence in Md. Higher Educ. v. Md. Higher Educ. Comm'n*, 977 F. Supp. 2d 507, 519–20 (D. Md. 2013).

## B.      Where Does Title VI Apply?

Title VI states that no person "in the United States" shall be discriminated against based on race, color, or national origin by an entity receiving federal financial assistance. The phrase "in the United States" is intended to be broadly inclusive. Agency Title VI regulations, including those of the Department of Justice (DOJ), define "recipients" or "United States" to encompass, inter alia, territories and possessions.[3]

> No person IN THE UNITED STATES shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance.

Although no court has addressed the scope of "United States" or the validity of regulations that extend coverage to territories and possessions, cases interpreting the Fifth and Fourteenth Amendments again provide guidance in this analysis. Title VI covers all areas under the sovereignty of the United States that fall within the combined jurisdiction of the Fifth and Fourteenth Amendments. By separate covenant, Title VI applies to the Trust Territories of the Pacific Islands, which includes the Commonwealth of the Northern Marianas Islands. *See Temengil v. Trust Territory of the Pac. Islands*, No. 81-0006, 1983 WL 30363, at *32 (D.N. Mar. I. Mar. 22, 1983), *rev'd in part, aff'd in part on other grounds*, 881 F.2d 647 (9th Cir. 1989); *see also Oden v. N. Marianas Coll.*, 440 F.3d 1085, 1088 (9th Cir. 2006) (applying Title IX analysis in a case from the Northern Marianas Islands).

Whether Title VI applies extraterritorially presents a separate question. It is a "longstanding principle of American law 'that legislation of Congress, unless a contrary intent appears, is meant to apply only within the territorial jurisdiction of the United States.'" *EEOC v. Arabian*

---

[3] Individual agency descriptions of "United States" can be found in the following regulations, *see,, e.g.,* 24 C.F.R. § 1.2(d) (HUD); 28 C.F.R. § 42.102(b) (DOJ); 29 C.F.R. § 31.2(j) (DOL); 38 C.F.R. § 18.13(d) (VA); 45 C.F.R. § 80.13(e) (HHS); and 49 C.F.R. § 21.23(f) (DOT).

Pg: 175 of 610     Filed: 06/05/2023     Doc: 17     USCA4 Appeal: 23-1453

*American Oil Co.*, 499 U.S. 244, 248 (1991) (quoting *Foley Bros., Inc. v. Filardo*, 336 U.S. 281, 285 (1949)). Title VI may apply to discriminatory conduct outside the United States in certain narrow circumstances, depending on how much control the recipient exercises over the overseas operation and how integral the overseas operation is to the recipient's program in the U.S.

To date, however, the only application of extraterritoriality appears in cases involving schools and study abroad programs. For example, a district court ruled that Title IX protects students who participate in study abroad programs through American universities. *King v. Bd. of Control of E. Mich. Univ.*, 221 F. Supp. 2d 783, 790–91 (E.D. Mich. 2002) (because study abroad programs have become an integral part of college education, equality of opportunity in study abroad programs is "unquestionably mandated by Title IX" and requires extraterritorial application of Title IX); *but see Phillips v. St. George's Univ.*, No. 07-CV-1555, 2007 WL 3407728, at *5 (E.D.N.Y. 2007) (Title IX does not apply where the plaintiff was attending a school in Grenada and alleged that she was harassed by a school employee in Grenada and that the school employees ignored her complaints in Grenada); and *Archut v. Ross Univ. Sch. of Veterinary Med.*, No. 10-1681, 2012 WL 5867148 (D.N.J. 2012) (Section 504 of the Rehabilitation Act does not apply to a foreign educational institution even if it is receiving federal financial aid and has a U.S. parent). Whether the rationale of these cases might be applicable to other matters remains to be determined.

## C.    Federal Financial Assistance

Title VI states that no program or activity receiving "Federal financial assistance" shall discriminate against individuals based on their race, color, or national origin. Section V.E presents a detailed discussion of "program or activity." The focus here is on what is and what is not federal financial assistance; why it is necessary to establish that a recipient is receiving federal financial assistance; and things to consider when conducting a Title VI investigation or review.

> No person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving FEDERAL FINANCIAL ASSISTANCE.

### 1.    What is Federal Financial Assistance?

The clearest example of federal financial assistance is the award or grant of money. An agency also might provide federal financial assistance in nonmonetary form; that is, "whatever thing of value is extended by the grant statute." *See United States Dep't of Transp. v. Paralyzed Veterans*, 477 U.S. 597, 607 n.11 (1986) ("Although the word 'financial' usually indicates 'money,' federal financial assistance may take nonmoney form," citing *Grove City Col. v. Bell*, 465 U.S.

USCA4 Appeal: 23-1453      Doc: 17      Filed: 06/05/2023      Pg: 176 of 610

Pg: 177 of 610          Filed: 06/05/2023          Doc: 17          USCA4 Appeal: 23-1453

555, 564–65 (1984)). As discussed below, federal financial assistance may include the use or rental of federal land or property at below market value, federal training, a loan of federal personnel, subsidies, and other arrangements with the intention of providing assistance. Federal financial assistance does not encompass contracts of guarantee or insurance, regulated programs, licenses, procurement contracts by the federal government at market value, or programs that provide direct benefits.[4] Note, however, that federal financial assistance is contractual in the sense that the recipient agrees to use the assistance in a manner consistent with the terms of the award and, in most instances, should have signed an assurance agreement binding it to comply with certain terms and conditions.

It is important to remember that the availability of remedies may depend on the timing of an entity's receipt of federal financial assistance. For example, while past funding alone may not support prospective relief such as an injunction, past funding may support a claim for backward-looking relief, such as back pay, restitution, or damages. *See Huber v. Howard Cty.*, 849 F. Supp. 407, 415 (D. Md. 1994) (Section 504 matter, finding that the recipient received federal financial assistance during the time of plaintiff's employment and discharge); *James v. Jones*, 148 F.R.D. 196, 201 (W.D. Ky. 1993) (state "does not presently receive [federal] funds, but … has appealed its suspension from the program and it maintains its hope of receiving future funds"). Moreover, the amount of federal financial assistance does not affect Title VI coverage. *See, e.g., K.H. v. Vincent Smith Sch.*, CV 06-0319(ERK) (JO), 2006 WL 845385, *11 (E.D.N.Y. Mar. 29, 2006) (court could find "no support in the law for the *de minimis* exception the [recipient] School advocates").[5]

Agency regulations use similar, if not identical, language to define Federal financial assistance:

    (1) Grants and loans of Federal funds,
    (2) The grant or donation of Federal property and interests in property,
    (3) The detail of Federal personnel,
    (4) The sale and lease of, and the permission to use (on other than a casual or transient basis), Federal property or any interest in such property without consideration or at a nominal consideration which is reduced for the purpose of assisting the recipient, or in recognition of the public interest to be served by such sale or lease to the recipient, and

---

[4] *See* Letter from Robert Kennedy, Attorney General, to Hon. John Sherman Cooper (April 29, 1964), *reprinted in* 110 Cong. Rec. 10075, 10076 (1964) ("Title VI does not apply to procurement contracts, or to other contracts which do not involve financial assistance by the United States.").

[5] One court ruled that the entity must receive more than de minimis federal assistance. *See Marshall v. Sisters of Holy Family Nazareth*, 399 F. Supp. 2d 597, 602–03 (E.D. Pa. 2005) (finding school's participation in a national school lunch program where only one student received a free lunch and the school received no proceeds from the sale did not constitute financial assistance). In our view, however, the sounder approach is that the amount of federal financial assistance is not relevant. Rather, what is important is whether the recipient receives federal assistance in some form or amount and thus becomes obliged to ensure that it acts in a nondiscriminatory manner.

(5) Any Federal agreement, arrangement, or other contract which has as one of its
purposes the provision of assistance.

28 C.F.R. § 42.102(c) (Department of Justice regulations).

### a.    Grants and loans of federal funds

The clearest example of Title VI-covered federal financial assistance is money provided through
federal grants, cooperative agreements, and loans. An entity may receive grant money directly
from an agency or indirectly through another entity. In either case, the direct recipient as well as
the secondary or subrecipient are considered to have received federal funds. In other instances,
the funding may be directed to the funding beneficiaries but another entity ultimately receives
the funding. For example, a college or university receives federal financial assistance indirectly
where it enrolls United States military veterans for whom the federal government provides
tuition payments. Although federal payments go directly to the veterans and indirectly to the
university, the university is receiving federal financial assistance that neither it nor the students
would have received but for students' enrollment and entitlement. *See Grove City Coll. v. Bell*,
465 U.S. 555, 564 (1984) (*superseded by statute on other grounds by* Civil Rights Restoration
Act of 1987, Pub. L. No. 100-259, 102 Stat. 28 (1988)); *Spann ex rel. Hopkins v. Word of Faith
Christian Ctr. Church*, 589 F. Supp. 2d 759, 767 (S.D. Miss. 2008) (state may be recipient of the
funds but it is not the ultimate recipient, serving as a conduit of funds earmarked for payment to
the child care provider).

### b.    Federal property

As set forth in the regulations, federal financial assistance may be in the form of a grant or
donation of land or use (rental) of federal property for the recipient at no or reduced cost. It also
could be in the form of other tangible goods. *See Marable v. Ala. Mental Health Bd.*, 297 F.
Supp. 291, 295–96 (M.D. Ala. 1969) (defendant received federal financial assistance in the form
of, among other things, surplus food commodities from the U.S. Department of Agriculture
through the Food Distribution Program and surplus property under the Federal Property and
Administrative Services Act of 1949; *Kamen v. Am. Tel. & Tel. Co.*, 791 F.2d 1006, 1013 (2d
Cir. 1986) (plaintiff made plausible claim that defendant "received federal financial assistance in
the form of services of federal personnel or the use of Government property in the form of
satellite launching facilities and technology or, perhaps, federal lands"); *Staley v. Nat'l Capital
Area Council, Boy Scouts of Am.*, No. RWT 10CV2768, 2011 WL 2416724, at *12 (D. Md. June
9, 2011) (discovery allowed to determine whether defendant received federal financial assistance
because it was allowed to use federal land at no cost for scouting activities). Ownership of land,
rental property, or other tangible goods is considered federal financial assistance if the recipient
does not pay or pays less than market value. Recipients typically sign assurance documents at the

USCA4 Appeal: 23-1453    Doc: 17    Filed: 06/05/2023    Pg: 178 of 610

Filed: 06/05/2023    Pg: 179 of 610

USCA4 Appeal: 23-1453    Doc: 17

time the assistance is conferred and agree that assistance is ongoing for as long as the land or property is being used for the original or a similar purpose to that for which the assistance was intended. *E.g.*, 28 C.F.R. § 42.105. Moreover, regulations bind the successors and transferees of this property as long as the original purpose or a similar objective is pursued. *Id.* Thus, if at the time of the alleged discriminatory act, the recipient uses the land or rents the property for the same or similar purpose, the recipient is receiving federal financial assistance, irrespective of when the land was granted or donated. For example:

- Sixteen years ago, the Department of Defense (DOD) donated land from a closed military base to a state as the location for a new prison. The prison has been built and currently houses 130 inmates. Black and Hispanic inmates complain that they tend to be in long-term segregation more often than white inmates, and allege racial discrimination by the prison administrators. Because the state still uses the DOD-donated land for its original (or similar) purpose, the state is still receiving federal financial assistance. *See* 32 C.F.R. § 195.6.

- A police department has a branch office located in a housing project built, subsidized, and operated with Department of Housing and Urban Development funds. The police department is not charged rent. The police department is receiving federal financial assistance and is subject to Title VI.

- A railroad company receives federal funds to rehabilitate railroad crossings the railroad company owns. The railroad benefits from receiving federal funds because federal money is being used to pay for repairs to the railroad's property that the railroad otherwise would have had to pay for itself. Because the railroad benefits from the federal funds through the upgrade to its own property, the railroad company is receiving federal financial assistance and is covered by Title VI. *See Moreno v. Consol. Rail Corp.*, 99 F.3d 782 (6th Cir. 1996) (Section 504 case). Note that a railroad that is paid under contract by the federal government to maintain federal property may not be covered under Title VI.

### c.   Detail of federal personnel

Under the Intergovernmental Personnel Act of 1970, federal agencies may allow a temporary assignment of personnel (also known as a detail) to state, local, and Indian tribal governments, institutions of higher education, federally funded research and development centers, and certain other organizations for work of mutual concern and benefit. *See* 5 U.S.C. § 3372. This detail of federal personnel to a state or other entity is considered federal financial assistance even if the entity reimburses the federal agency for some (but not all) of the detailed employee's federal salary. *See Paralyzed Veterans*, 477 U.S. at 612 n.14. For example, two research scientists from

the National Institute of Health are detailed to a research organization for two years to help research treatments for cancer. NIH pays for three-fourths of the salary of the two detailed employees, while the organization pays the remaining portion. The research organization is receiving federal financial assistance because the federal government is paying a portion of the salary of the detailed federal employees. The research organization is subject to Title VI.

### d.   Tax Benefits

Typical tax benefits—tax exemptions, tax deductions, and most tax credits—are not considered federal financial assistance. Unlike grants, most typical tax benefits are not included in the statutory or regulatory definitions of federal financial assistance because they are not contractual in nature. *See, e.g.,* 42 U.S.C. § 2000d-1; 28 C.F.R. § 42.102(c); 31 C.F.R. § 28.105. Most courts that have considered the issue have concluded that typical tax benefits are not federal assistance. *See, e.g., Paralyzed Veterans of Am. v. Civil Aeronautics Bd.*, 752 F.2d 694, 708–09 (D.C. Cir. 1985); *Johnny's Icehouse, Inca v. Amateur Hockey Ass'n of Ill., Inc.*, 134 F. Supp. 2d 965, 971–72 (N.D. Ill. 2001); *Chaplin v. Consol. Edison Co.*, 628 F. Supp. 143, 145–46 (S.D.N.Y. 1986).

However, while these cases suggest that typical tax benefits are not federal financial assistance, a few courts have found instances where a tax benefit would be considered federal financial assistance. *See McGlotten v. Connally*, 338 F. Supp. 448, 462 (D.D.C. 1972) (provision of a tax deduction for charitable contributions is a grant of federal financial assistance within the scope of the 1964 Civil Rights Act); *see also Fulani v. League of Women Voters Educ. Fund*, 684 F. Supp. 1185, 1192 (S.D.N.Y. 1988), *aff'd*, 882 F.2d 621 (2d Cir. 1989) (jurisdiction under Title VI and Title IX because "the League receives federal assistance indirectly through its tax exemption and directly through grants from the Department of Energy and the EPA."); *M.H.D. v. Westminster Sch.*, 172 F.3d 797, 802 n.12 (11th Cir. 1999) (although not deciding the issue, the court observed that "appellant's allegation that tax-exempt status constitutes 'Federal financial assistance' is neither immaterial nor wholly frivolous … [and that] appellant contends [that] a direct grant and a tax exemption should be treated the same; because a grant constitutes 'Federal financial assistance' under Title IX, tax-exempt status also should satisfy this element of the statute"). Other courts have ruled otherwise, however, stating that assistance requires the transfer of funds or something of value to a recipient. S*ee, e.g., Bachman v. Am. Soc. of Clinical Pathologists*, 577 F. Supp. 1257, 1264 (D.N.J. 1983); *Johnny's Ice House*, 134 F. Supp. 2d at 972.

### e.   Training

The regulations also state that federal financial assistance can be in the form of any federal agreement, arrangement, or other contract that has as one of its purposes the provision of assistance. A typical example is training conducted by federal personnel. For example, a city

USCA4 Appeal: 23-1453      Doc: 17      Filed: 06/05/2023      Pg: 180 of 610

police department sends several police officers to training at the FBI Academy at Quantico without cost to the city. The police department is considered to have received federal financial assistance. *See Delmonte v. Dep't of Bus. & Prof'l Regulation*, 877 F. Supp. 1563, 1566–67 (S.D. Fla. 1995) (training state officers received from DEA, FBI and DOT constituted receipt of federal financial assistance pursuant to Section 504 of the Rehabilitation Act of 1973).

### 2.    What Is Not Federal Financial Assistance

The receipt of some types of items of value in nonmonetary form may not constitute federal financial assistance.

#### a.    Licenses

Licenses impart a benefit because they entitle the licensee to engage in a particular activity, and they can be quite valuable. However, in *Community Television of Southern California. v. Gottfried*, 459 U.S. 498, 509–12 (1983), the Supreme Court noted that the Federal Communications Commission is not a funding agency and television broadcasting licenses do not constitute federal financial assistance. *Accord, Cal. Ass'n of the Physically Handicapped v. FCC*, 840 F.2d 88, 92–93 (D.C. Cir. 1988) (same). Similarly, the court ruled in *Herman v. United Bhd. of Carpenters*, 60 F.3d 1375, 1381–82 (9th Cir. 1995), that certification of a union by the National Labor Relations Board is akin to a license, and not federal financial assistance under Section 504.

#### b.    Statutory programs or regulations

Similarly, statutory programs or regulations that directly or indirectly support or establish guidelines for an entity's operations are not federal financial assistance. *Herman*, 60 F.3d at 1382 (neither labor regulations establishing apprenticeship programs nor Davis-Bacon Act wage protections are federal financial assistance.); *Steptoe v. Savings of Am.*, 800 F. Supp. 1542, 1548 (N.D. Ohio 1992) (mortgage lender subject to federal banking laws does not receive federal financial assistance); *Rannels v. Hargrove*, 731 F. Supp. 1214, 1222–23 (E.D. Pa. 1990) (federal bank regulations are not federal financial assistance under the Age Discrimination Act).

#### c.    Programs owned and operated by the federal government

Programs "owned and operated" by the federal government, such as the air traffic control system, generally do not constitute federal financial assistance to the beneficiaries of those programs where they cannot be categorized as recipients of that assistance. As stated by then-Deputy Attorney General Nicholas Katzenbach to chairman Emanuel Celler of the Committee on the Judiciary for the House of Representatives:

USCA4 Appeal: 23-1453      Doc: 17      Filed: 06/05/2023      Pg: 181 of 610

> Activities wholly carried out by the United States with Federal funds, such as river and harbor improvements and other public works, defense installations, veteran's hospitals, mail service, etc. are not included in the list [of federally assisted programs]. Such activities, being wholly owned by, and operated by or for, the United States, cannot fairly be described as receiving Federal "assistance." While they may result in general economic benefit to neighboring communities, such benefit is not considered to be financial assistance to a program or activity within the meaning of Title VI.

110 Cong. Rec. 13380 (1964). *See Paralyzed Veterans*, 477 U.S. at 612 ("[T]he air traffic control system is not 'federal financial assistance' at all. Rather, it is a federally-conducted program that has many beneficiaries but no recipients."); *Jacobson v. Delta Airlines*, 742 F.2d 1202, 1213 (9th Cir. 1984) (Congress put in place a mechanism to charge airlines for their share of the cost of air traffic control system; therefore, airlines were not recipients of federal financial assistance).

### d.   Guaranty and insurance contracts

Title VI specifically states that it does not apply to "Federal financial assistance … extended by way of a contract of insurance or guaranty." 42 U.S.C. § 2000d-1. In *United States v. Baylor University Medical Center*, 736 F.2d 1039, 1048 (5th Cir. 1984), for example, the court noted that the legislative history of Title VI makes it abundantly clear that Congress intended to exempt individual bank accounts in a bank with federally guaranteed deposits from Title VI. *See also Gallagher v. Croghan Colonial Bank*, 89 F.3d 275, 277 (6th Cir. 1996) (default insurance for bank's disbursement of federal student loans is a "contract of insurance," and excluded from Section 504 coverage of agency regulations); *Butler v. Capitol Fed. Sav.*, 904 F. Supp. 1230, 1233 (D. Kan. 1995) ("Title VI specifically exempts a contract of insurance from the definition of 'federal financial assistance.'").[6]

### e.   Procurement contracts

Like guaranty and insurance contracts, procurement contracts are also not considered federal financial assistance. *See* Letter from Robert Kennedy, Attorney General, to Hon. John Sherman Cooper (April 29, 1964), *reprinted in* 110 Cong. Rec. 10075, 10076 (1964) ("Title VI does not apply to procurement contracts, or to other contracts which do not involve financial assistance by the United States."); *Venkatraman v. REI Sys., Inc.*, 417 F.3d 418, 421 (4th Cir. 2005) (defendant's "status as a government contractor is irrelevant to Title VI liability [because Title VI] coverage turns on the receipt of "federal financial assistance", not the existence of a contractual relationship"); *LaBouve v. Boeing Co.*, 387 F. Supp. 2d 845, 854 (N.D. Ill. 2005)

---

[6] On the other hand, in *Moore v. Sun Bank*, 923 F.2d 1423, 1427 (11th Cir. 1991), the court ruled that loans guaranteed by the Small Business Administration constituted federal financial assistance because Section 504—as contrasted with Title VI—does not exclude contracts of insurance or guaranty from coverage.

Filed: 06/05/2023   Pg: 182 of 610   Doc: 17   USCA4 Appeal: 23-1453

(Department of Defense contract with a corporation for the procurement of a fighter aircraft did not constitute federal financial assistance); *Gallagher*, 89 F.3d at 277 (interest subsidies are akin to procurement contracts); *Cook v. Budget Rent-A-Car Corp.*, 502 F. Supp. 494, 496–97 (S.D.N.Y. 1980) (contracts involving goods or services purchased by the government at fair market value do not constitute "assistance" because the word connotes a transfer of funds at reduced consideration or as a subsidy).

### f.    Assistance to ultimate beneficiaries

Finally, Title VI does not apply to direct, unconditional assistance to ultimate beneficiaries, the intended class of private citizens receiving federal aid. For example, social security payments and veterans' pensions are not federal financial assistance. *Soberal-Perez v. Heckler*, 717 F.2d 36, 40 (2d Cir. 1983); *but see Bob Jones Univ. v. Johnson*, 396 F. Supp. 597, 602, n.16 (D.S.C. 1974) (distinguishing pensions from payments to veterans for educational purposes because payments for education require or are conditioned on the individual participating in a program or activity). During debate preceding passage of the Civil Rights Act, members of Congress responded to concerns about the scope of Title VI by explaining that Title VI would not apply to direct benefit programs: "The title does not provide for action against individuals receiving funds under federally assisted programs—for example, widows, children of veterans, homeowners, farmers, or elderly persons living on social security benefits." 110 Cong. Rec. 15866 (1964) (statement of Sen. Humphrey); *see* 100 Cong. Rec. 6544 (1963) (statement of Sen. Humphrey); *see also* 110 Cong. Rec. 1542 (1964) (statement of Rep. Lindsay); 110 Cong. Rec. 13700 (1964) (statement of Sen. Javits).

### 3.    Why Establish Federal Financial Assistance?

Under Title VI and similar statutes, a federal agency has jurisdiction over a recipient's conduct through the federal financial assistance that it gives to the recipient. Before an agency can undertake a complaint investigation, it first needs to establish that it has or is providing federal financial assistance to the recipient alleged to be engaging in discriminatory conduct. *See, e.g., Bachman v. Am. Soc. of Clinical Pathologists*, 577 F. Supp. 1257, 1261 (D.N.J. 1983) (defendant received funds during the period of alleged discrimination); *cf. Johnson v. Bd. of Educ. of Prince George's Cty.*, No. PJM 11-1195, 2014 WL 3778603, at *1 (D. Md. July 29, 2014) (court noted that "funds must be received during the relevant time period of the alleged discrimination for a cause of action to survive."); *Vanes v. Ind. Comm'n on Pub. Records*, No. 2:07-CV-00063 RLYWGH, 2008 WL 763374, at *4 (S.D. Ind. Mar. 20, 2008) (court stated that "the entity must be a recipient of federal financial assistance during the time of the alleged discriminatory conduct; otherwise, the entity cannot be liable under Section 504.").

The financial assistance does not have to relate to a program in which the complainant participates or seeks to participate or used for the complainant's benefit. Rather, an agency only

Filed: 06/05/2023    Pg: 183 of 610    Doc: 17    USCA4 Appeal: 23-1453

has to prove that the entity received federal financial assistance when the alleged discrimination occurred. *See Howe v. Hull*, 874 F. Supp. 779, 789 (N.D. Ohio 1994) ("Defendant cannot receive federal funds on the one hand, and on the other deny he is covered by the [federal Rehabilitation Act] simply because he received no federal funds for his involvement with [complainant]."); *see also Estate of Alcalde v. Deaton Specialty Hosp. Home, Inc.* 133 F. Supp. 2d 702, 708 (D. Md. 2001) (motion to dismiss denied in case where the court emphasized "the receipt of federal funds when determining liability under [Section 504 of the Rehabilitation Act]" where defendant claimed he was not subject to federal financial assistance requirements because he saw the patient in his office and not at the hospital and it was the hospital that entered into the grant with the federal agency).

An agency unable to establish that it provided federal financial assistance to an entity would not have the authority to conduct a complaint investigation or seek recourse under Title VI unless it is jointly investigating with another federal agency that provides the federal financial assistance, the unresolved complaint has been referred to DOJ for litigation, or DOJ is considering potential participation in a private Title VI case and needs to conduct some investigation to determine if such participation is appropriate. In the absence of these circumstances, the Title VI coordination regulations require the agency to "refer the complaint to another federal agency or advise the complainant." 28 C.F.R. § 42.408(b).[7]

### 4.   Determining Whether an Entity Receives Federal Financial Assistance

When trying to identify funding sources of a recipient who has allegedly engaged in discriminatory acts, agencies should:

- Seek information from program offices responsible for providing grants;
- Use a data request to ask the target of the investigation directly for the information;
- Contact possible primary recipients for assistance identifying pass-through funds;
- Conduct internet research (e.g., county board minutes);
- Contact funding component program staff for leads;
- Research entities on the USA Spending.gov website (includes data about recipients and sub-recipients of various types of contracts, grants, loans, and other possible federal financial assistance);

---

[7] The Civil Rights Division is able to file statements of interest in matters pending in U.S. District Courts, including on matters brought by private litigants involving recipients of funds from non-DOJ sources. For example, the Division filed a statement of interest in a case involving a recipient's obligation to provide language assistance to limited English proficient individuals seeking driver's licenses. *Faith Action for Cmty. Equity v. Hawaii Dep't. of Transp.*, 13-CV-00450 (D. Haw. filed Mar. 28, 2014) *available at* http://www.lep.gov/resources/DOJ_SOI_Hawaii.pdf (last visited Apr. 12, 2016).

- Contact other federal agencies to discuss possible coordination. Some agencies have accessible online databases. *E.g.*, https://taggs.hhs.gov/ (the TAGGS database is a central repository of grants awarded by the eleven HHS Operating Divisions); the DOJ, Office of Justice Programs has a public website that provides award information; similarly, the Community Oriented Policing Services website, a component within DOJ, also has grant information on line. Other agencies also post award information.

Finally, agency offices addressing Title VI complaints should confirm receipt of any federal financial assistance before concluding that the agency has jurisdiction.

**D.      What/Who Is a Recipient?**

In simple terms, a Title VI recipient is an entity that receives, directly or indirectly, financial assistance from a federal agency.

> No person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity RECEIVING Federal financial assistance.

**1.      Regulations**

A "recipient" is an entity or person that receives federal financial assistance. Under Title VI, it is the recipient who is barred from discriminating against persons because of race, color, or national origin with respect to the operation of covered programs or activities.

All agency Title VI regulations use a similar if not identical definition of "recipient," as follows:

> (f) The term *recipient* means any State, political subdivision of any State, or instrumentality of any State or political subdivision, any public or private agency, institution, or organization, or other entity, or any individual, in any State, to whom Federal financial assistance is extended, directly or through another recipient, including any successor, assign [sic], or transferee thereof, but such term does not include any ultimate beneficiary.

> (g) The term *primary recipient* means any recipient which is authorized or required to extend Federal financial assistance to another recipient for the purpose of carrying out a program.

28 C.F.R. §§ 42.102(f), (g) (Department of Justice regulations).

In plain language, the regulation provides:

USCA4 Appeal: 23-1453      Doc: 17      Filed: 06/05/2023      Pg: 185 of 610

- A recipient may be a public entity (e.g., a state, local or municipal agency), a private entity, or an individual;
- Title VI does not apply to the federal government;
- There may be more than one recipient in a program; that is, a primary recipient (e.g., state agency) that transfers or distributes assistance to a subrecipient (local entity) for distribution to an ultimate beneficiary;[8]
- A recipient also encompasses a successor, transferee, or assignee of the federal assistance (property or otherwise), under certain circumstances; and
- As discussed below, there is a distinction between a recipient and a beneficiary.

A recipient also may receive federal assistance either directly from the federal government or indirectly through a third party, who is not necessarily another recipient (e.g., schools are indirect recipients when they accept payments from students who directly receive federal financial aid).[9]

If a recipient distributes federal financial assistance to other entities, it must monitor Title VI compliance for subrecipients and implement procedures to receive and investigate complaints or other information indicating potential noncompliance. Federal agency regulations generally require that the primary recipient obtain compliance reports from its subrecipients and make efforts to ensure that subrecipients permit access to information. *See, e.g.*, 28 C.F.R. §§ 42.106(b), (c) (DOJ regulations). A recipient can be liable for failure to take steps to ensure the compliance of its subrecipients. *Cf. United States v. Maricopa Cty.*, 915 F. Supp. 2d 1073 (D. Ariz. 2012) (ruling that the county government is a proper Title VI defendant under principles of municipal liability).

2.      **Direct Recipient**

A direct recipient of federal financial assistance for Title VI purposes is an entity that accepts financial assistance from a federal agency and, therefore, becomes subject to the requirements of Title VI. Federal financial assistance can be monetary or non-monetary and includes federal grants, loans, or contracts (other than a contract for goods or services at fair market value or of insurance or guaranty). For example:

- City Police Department (CPD) applies for and receives a grant from DOJ for its community outreach programs. CPD is a recipient of federal financial assistance.

---

[8] An ultimate beneficiary usually does not receive a "distribution" of the federal money. Rather, the beneficiary enjoys the benefits of enrollment in the program.
[9] *See Grove City Coll. v. Bell*, 465 U.S. 555, 563 (1984) (student financial aid office received federal financial assistance in the form of loans to students provided for the purpose of paying for college); *see also Liberty Res., Inc. v. Philadelphia Hous. Auth.*, 528 F. Supp. 2d 553, 558 (E.D. Pa. 2007)
(public housing authority that receives federal financial assistance from HUD through a voucher program).

- CPD also received a grant for the purchase of bulletproof vests. CPD remains a recipient as long as it uses the vests purchased with grant funds.
- CPD is given excess military equipment from the Defense Department that it continues to use. CPD remains a recipient as long as it uses the equipment.
- Ten years ago, Smithtown University applied for and received federal grants, loans, and interest subsidies in excess of $7 million from the Department of Education. The University used this assistance to construct a law school. The University is a "recipient" through the present day because it used federal financial assistance during construction and it continues to use the building for its original (or similar) purpose.
- Airport operators voluntarily accept federal funds under a statutory program for airport construction and capital development. The airport operators are recipients subject to nondiscrimination provisions as long as they use the facilities constructed with federal funds for their original (or similar) purposes. *See Paralyzed Veterans*, 477 U.S. at 606–07.

The clearest means of identifying a "recipient" of federal financial assistance is to determine whether the entity has voluntarily entered into a relationship with the federal government and receives federal assistance under a condition or assurance of compliance with Title VI (and/or other nondiscrimination obligations). *Id.* at 605–06. ("By limiting coverage to recipients, Congress imposes the obligations of § 504 [and Title VI] upon those who are in a position to accept or reject those obligations as part of the decision whether or not to 'receive' federal funds."). As one court noted:

> By accepting the funds, one accepts the obligations that go along with it, namely, the obligation not to exclude from participation, deny benefits to, or subject to discrimination an otherwise qualified handicapped individual solely by reason of her handicap. Only by declining the federal financial assistance can one avoid this obligation.

*Chester v. Univ. of Wash.*, No. C11-5937, 2012 WL 3599351, at *4 (W.D. Wash. Aug. 21, 2012).

The acceptance of federal assistance triggers Title VI coverage and becomes formalized when a recipient signs an assurance: a contract whereby the recipient agrees to comply with the nondiscrimination provisions as a condition of receiving federal assistance.[10]  Even without a

---

[10] A recipient's written assurance and certification documents can provide an independent contractual basis for enforcement of nondiscrimination requirements. For example, the assurance document from the Office of Justice Programs, a Department of Justice component, states, inter alia, "[The Applicant] will comply, and all its contractors will comply, with the nondiscrimination requirements of the [Safe Streets Act, Title VI, Section 504, Title IX ….]." The United States may bring civil actions to enforce Title VI contractual assurances. *See* Department of Justice, *Guidelines for the Enforcement of Title VI, Civil Rights Act of 1964*, 28 C.F.R. § 50.3, pt. I.B.1 (listing various "[p]ossibilities of judicial enforcement," including suits to enforce contractual assurances).

Filed: 06/05/2023    Pg: 187 of 610

USCA4 Appeal: 23-1453    Doc: 17

written or signed assurance, however, acceptance of federal financial assistance triggers coverage under Title VI. *See Paralyzed Veterans*, 477 U.S. at 605 ("the recipient's acceptance of the funds triggers coverage under the nondiscrimination provision"). *See also Grove City Coll. v. Bell*, 465 U.S. 555, 560–61, 563 (1984) (finding that Grove City College was a recipient even though it refused to sign an assurance); *Guardians Ass'n v. Civil Serv. Comm'n*, 463 U.S. 582, 630 (1983) (Marshall, J., dissenting) (citing 3 R. Cappalli, *Federal Grants* § 19:20, at 57, and n.12 (1982) ("[W]ritten assurances are merely a formality because the statutory mandate applies and is enforceable apart from the text of any agreement.").

### 3.   Indirect Recipient

Finding that an entity directly receives federal financial assistance is usually the easiest way to identify a Title VI recipient. It is not, of course, the only way.[11]  A recipient may receive funds either directly or indirectly. *Grove City*, 465 U.S. at 564–65.[12]  In *Grove City*, the Supreme Court found the college was a "recipient" under Title IX because students paid for their educational expenses, in part, with federally subsidized loans. *Id.* at 569–70. The Court reasoned that colleges and universities were the intended recipients of the grant program because Congress created the grants to supplement the financial aid programs of institutions of higher education. *Id.* at 565–66. The *Grove City* Court concluded that Congress never intended to "elevat[e] form over substance by making the application of the nondiscrimination principle dependent on the manner in which a program or activity receives federal assistance." *Id.* at 564; *see also Bennett-Nelson v. Louisiana Bd. of Regents*, 431 F.3d 448, 452 (5th Cir. 2005) (finding that a university was a "recipient" under Section 504 because its students received federal work study assistance and grants); *Bob Jones Univ. v. Johnson*, 396 F. Supp. 597, 602 (D.S.C. 1974) ("payments are specifically tied to the beneficiary's participation in an educational program or activity," and go to the university "recipient"), *aff'd*, 529 F.2d 514 (4th Cir. 1975).[13]

Nevertheless, there are limits to the concept of an indirect recipient. As the Supreme Court explained in *Paralyzed Veterans*, an entity that merely enjoys indirectly the benefits of federal financial assistance is not an intended recipient: "While *Grove City* stands for the proposition that Title IX coverage extends to Congress' intended recipient, whether receiving the aid directly

---

[11] The remaining text of this section distinguishes various scenarios for recipients and beneficiaries. While captions are used to distinguish different circumstances, courts do not uniformly use the same phrase to explain the same funding pattern. Thus, a court may refer to an "indirect recipient" when the situation more closely fits the paradigm of "primary recipient/subrecipient."

[12] As noted in the Manual, the Supreme Court's analysis in *Grove City* of the scope of "program or activity" was reversed by the Civil Rights Restoration Act of 1987, Pub. L. No. 100-259, 102 Stat. 28 (1988). The Court's discussion of other principles, however, including direct and indirect recipients, remains undisturbed.

[13] Similarly, in *Spann v. Word of Faith Christian Center Church*, 589 F. Supp. 2d 759, 765–67 (S.D. Miss. 2008), the court found that a daycare center was a recipient of federal financial assistance because it accepted a federally funded voucher from a family to pay for part of the cost of child care. The court reasoned that the daycare center was an intended recipient because the funds were earmarked for a child care provider and the purpose of the subsidy was to "improve the quantity and quality of child care available to low income families." *Id.* at 767.

Filed: 06/05/2023    Pg: 188 of 610

Doc: 17

USCA4 Appeal: 23-1453

Filed: 06/05/2023    Pg: 189 of 610

Doc: 17

USCA4 Appeal: 23-1453

or indirectly, it does not stand for the proposition that federal coverage follows the aid past the recipient to those who merely benefit from the aid." *Paralyzed Veterans*, 477 U.S. at 607 (citing *Grove City*, 465 U.S. at 564).

Along these lines, the Supreme Court in *NCAA v. Smith*, 525 U.S. 459, 468–70 (1999), citing both *Grove City* and *Paralyzed Veterans*, ruled that the NCAA was not an indirect recipient of federal financial assistance under Title IX. The NCAA received dues from colleges and universities who were recipients of federal financial assistance, but the assistance to those institutions was not earmarked for the NCAA. *Id.* at 468. The court concluded that "[a]t most, the [NCAA's] receipt of dues demonstrates that it indirectly benefits from the federal assistance afforded its members." *Id.* But, the Court stated, "[t]his showing, without more, is insufficient to trigger Title IX coverage." *Id.*

The Court in *Smith* specifically did not address DOJ's argument that "when a recipient cedes controlling authority over a federally funded program to another entity, the controlling entity is covered by Title IX regardless whether it is itself a recipient." *Id.* at 469–70. The Eleventh Circuit found enough of a connection, however, in *Williams v. Board of Regents*, 477 F.3d 1282 (11th Cir. 2007). In this Title IX case, the court noted that the plaintiff "alleged that [the University of Georgia], a funding recipient, has ceded control over one of its programs, the athletic department, to [the University of Georgia Athletic Association] and provided extensive funding to UGAA." *Id.* at 1294. Based on this contention, the court ruled that to not extend Title IX coverage to the University in this case would allow "funding recipients to cede control over their programs to indirect funding recipient" but "avoid Title IX liability." *Id.* (citing *Cmtys. for Equity v. Mich. High Sch. Athletic Ass'n*, 80 F. Supp. 2d 729, 733–34 (W.D. Mich. 2000).

### 4.  Primary/Subrecipient Programs

Many programs have two or more recipients. The primary recipient directly receives the federal financial assistance. The primary recipient then distributes the federal assistance to a subrecipient to carry out a program. *See*, *e.g.*, 28 C.F.R. § 42.102(g). The primary recipient and all the subrecipients are covered by and must conform their actions to Title VI. For example:

- A state agency, such as the Department of Children and Family Services, receives a substantial portion of its funding from the federal government. The state agency, as the primary recipient or conduit, in turn, funds local social service organizations in part with its federal funds. The local agencies receive federal financial assistance, and thus are subject to Title VI. *See Graves v. Methodist Youth Servs., Inc.*, 624 F. Supp. 429 (N.D. Ill. 1985) (Section 504 case).[14]

---

[14] The *Graves* court described the local agency as an "indirect" recipient because the federal money flowed "through another recipient," and it compared this situation to Grove City College's indirect receipt of financial aid funds from

- A state subcontracts with a private company to operate a state institution for individuals with developmental disabilities. The state receives federal funding and uses those funds to pay the private company for its services. The state is the recipient of federal financial assistance and the private company is a subrecipient. As a subrecipient, the company must comply with any program-specific statutes through which it receives funding, as well as Title VI. *See, e.g., Brown v. Fletcher*, 624 F. Supp. 2d 593, 607 (E.D. Ky. 2008) (Section 504 case).

- Under the Older Americans Act, the Department of Health and Human Services gives funds to state agencies. Those agencies, in turn, distribute funds according to funding formulas to local agencies operating programs for elderly Americans. Title VI applies to the local agencies as subrecipients of federal financial assistance as well as to the state agencies that directly receive the funds. *See Chicago v. Lindley*, 66 F.3d 819 (7th Cir. 1995).

In many instances, a recipient receives funds with the purpose and expectation that it will distribute the funds to one or more sub-grantees or indirect recipients.[15] For example, in *Moreno v. Consolidated Rail Corp.*, 99 F.3d 782 (6th Cir. 1996) (en banc), the United States Department of Transportation provided funds to Michigan for use in upgrading railroad crossings. The state, in turn, provided these funds to Conrail. In finding that Conrail was a recipient of federal financial assistance, the court noted that "[i]t makes no difference, in our view, that the federal funds of which Conrail is the recipient come to it through the State of Michigan rather than being paid to it by the United States directly." *Id.* at 787. Similarly, in *Rogers v. Board of Education*, 859 F. Supp. 2d 742, 752 (D. Md. 2012), the court held that the county board of education received federal financial assistance because the State Department of Education received federal funds and, through its Department of Treasury, distributed funds to county boards of education. *Id.*

---

students. *Graves*, 624 F. Supp. at 433. Given that the funding was distributed to a state agency and a portion allocated to a local entity, the more accurate description is that of primary/subrecipient.

[15] The Title VI Coordination Regulations, codified at 28 C.F.R. § 42.401 et seq., are designed to provide agencies with a set of standards for use in developing and implementing a Title VI enforcement and compliance program. One provision addresses grants that go to a central state office with an expectation that the state will distribute the funds to subrecipients:

> Each state agency administering a continuing program which receives federal financial assistance shall be required to establish a Title VI compliance program for itself and other recipients which obtain federal assistance through it. The federal agencies shall require that such state compliance programs provide for the assignment of Title VI responsibilities to designated state personnel and comply with the minimum standards established in this subpart for federal agencies, including the maintenance of records necessary to permit federal officials to determine the Title VI compliance of the state agencies and the sub-recipient.

*Id.* § 42.410.

USCA4 Appeal: 23-1453      Doc: 17      Filed: 06/05/2023      Pg: 190 of 610

### 5.    Contractor and Agent

A recipient may not absolve itself of its Title VI obligations by hiring a contractor or agent to perform or deliver assistance to beneficiaries. Agency regulations consistently state that prohibitions against discriminatory conduct apply to a recipient, whether committed "directly or through contractual or other arrangements." *E.g.*, 28 C.F.R. §§ 42.104(b)(1), (2). For example:

- A recipient public housing authority contracts with a residential management company for the management and oversight of a public housing complex. Employees of the contractor reject prospective tenants based on their race, color, or national origin. The recipient is liable under Title VI for the contractor's actions as the contractor is performing a program function of the recipient. (For the reasons discussed below, the contractor may also be liable under Title VI).

- In addition, Title VI may cover a contractor that performs an essential function for the recipient, making the contractor itself a recipient. In *Frazier v. Bd. of Trustees.*, 765 F.2d 1278, 1290, *amended*, 777 F.2d 329 (5th Cir. 1985), a Section 504 case, the court noted that the defendant hospital contracted out core medical functions, for which it received federal financial assistance, to a contractor. The court ruled that this financial assistance to the hospital "would not have been [provided] at all were it not for [the contactor's] performance as a de facto subdivision of [the hospital]." *Frazier*, 765 F.2d at 1290; *but see Rose v. Cahee*, 727 F. Supp. 2d 728, 739 (E.D. Wis. 2010) (court declined to follow *Frazier*, limiting coverage of the funding assistance nondiscrimination cover the contractor of a recipient requirement to those entities receiving the funds directly and that "are in a position to choose whether to do so"). Of significance, core hospital functions were at issue in *Frazier*. Failure to extend Title VI protection in this case arguably would have permitted the hospital to contract out all of its federally funded functions and deprive the beneficiaries of protection under the Title VI and the other federal financial assistance statutes.[16] See also the discussion of indirect recipients, above.

---

[16] As the court noted in *Frazier*:

> It is this mutual benefit that distinguishes [the contractor's] womb-like financial situation from that of a private contractor with no material relationship to the recipient's receipt of federal funds. Unlike the hospital's privately contracted mower of lawns, sweeper of floors, or supplier of aspirin, [the contractor] contributes in a direct and tangible way to the hospital's claims for reimbursement under Medicare and Medicaid. That the federal check does not bear [the contractor's] name is no answer to the fact that the check would not have been written at all were it not for [the contractor's] performance as a de facto subdivision of [the hospital].

*Frazier*, 765 F.2d at 1290.

USCA4 Appeal: 23-1453    Doc: 17    Filed: 06/05/2023    Pg: 191 of 610

USCA4 Appeal: 23-1453      Doc: 17      Filed: 06/05/2023      Pg: 192 of 610

### 6.    Transferees and Assignees

When the federal government provides financial assistance related to real or personal property, such as by partially financing construction or renovations on a building, a "recipient" is defined more broadly. In such circumstances, successors, transferees, assignees, and contractors all may be recipients under Title VI. Agency regulations and assurances often include specific statements on the application of Title VI in situations involving real or personal property. For example, DOJ's regulations state:

> In the case where Federal financial assistance is to provide or is in the form of personal property, or real property or interest therein or structures thereon, such assurance shall obligate the recipient, or in the case of a subsequent transfer, the *transferee*, for the period during which the property is used for a purpose for which the Federal financial assistance is extended or for another purpose involving the provision of similar services or benefits …. The responsible Department official shall specify the form of the foregoing assurances, and the extent to which like assurances will be required of subgrantees, contractors, and subcontractors, transferees, successors in interest, and other participants.

28 C.F.R. § 42.105(a)(1) (emphasis added).

Furthermore, land that originally was acquired through a program receiving federal financial assistance must include a covenant binding on subsequent purchasers or transferees that requires nondiscrimination for as long as the land is used for the original or a similar purpose for which the federal assistance is extended. 28 C.F.R. § 42.105(a)(2).[17]

### 7.    Recipient v. Beneficiary

Finally, in analyzing whether an entity is a recipient, it is necessary to distinguish a recipient from a beneficiary: the former must comply with Title VI while the latter does not. *See Paralyzed Veterans*, 477 U.S. at 606–07.[18] An assistance program may have many beneficiaries, that is, individuals and entities that directly or indirectly receive an advantage through the operation of a federal program. Beneficiaries, however, do not enter into any formal contract or

---

[17] In contrast, in *Independent Housing Services of San Francisco v. Fillmore Center Associates*, 840 F. Supp. 1328, 1341 (N.D. Cal. 1993), the transfer of property at issue occurred before the effective date of HUD regulations stating that transferees or purchasers of real property are subject to Section 504. The San Francisco agency was a recipient of funds under a block grant to assemble and clear land for redevelopment. The purchaser of the land, who built housing units, was considered a beneficiary. *Id.*

[18] Most agency Title VI regulations state that the term recipient "does not include any ultimate beneficiary under the program." *See, e.g.*, 28 C.F.R. § 42.102(f) (DOJ).

agreement with the federal government where compliance with Title VI is a condition of receiving the assistance.[19]

> In almost any major federal program, Congress may intend to benefit a large class of persons, yet it may do so by funding—that is, extending federal financial assistance to—a limited class of recipients. Section 504, like Title IX in *Grove City*, draws the line of federal regulatory coverage between the recipient and the beneficiary.

*Id.* at 609–10.

In distinguishing between recipients and beneficiaries, courts have considered both the intent of Congress and a party's ability to accept or reject the federal financial assistance. *Alfano v. Bridgeport Airport Servs.*, 373 F. Supp. 2d 1, 5 (D. Conn. 2005) (citing *Paralyzed Veterans*, 477 U.S. at 605–06). In *Paralyzed Veterans*, the Court held that commercial airlines were beneficiaries of an airport improvement program, and not recipients under Section 504. *Id.* at 607.[20] The Court reasoned that the purpose of the program was to improve airports, not to give aid to individual airlines. *Id.* at 604–05. The Court rejected the argument that the airlines were indirect recipients because airport operators converted federal funds into runways and other property improvements for the airlines. *Id.* at 606–07. The Court noted that there was no evidence that the airlines were intended recipients of the aid or that the airport operators were mere conduits of the funds. *Id.* at 607 (citing *Grove City*, 465 U.S. at 564). The Court found that the airport operators were the recipients because they received federal funds, agreed to comply with civil rights statutes as a condition of the assistance, and could terminate their participation in the program at any time. *Id.* at 604–06 (citing *Grove City*, 465 U.S. at 565 n.13).

E.      **"Program or Activity"**

Title VI prohibits discrimination in "any program or activity," any part of which receives Federal financial assistance. *See* 42 U.S.C. §§ 2000d, 2000d-4(a). Interpretations of "program or

---

[19] For example, in *Cuffley v. Mickes*, 208 F.3d 702 (8th Cir. 2000), plaintiffs Knights of the Ku Klux Klan brought suit against the Missouri Highway and Transportation Commission for denying its application to participate in Missouri's Adopt-a-Highway program. Among the state's reasons for denying the application was that allowing the Klan to participate in the Adopt-a-Highway program would violate Title VI and would cause the state to lose its federal funding. The Eighth Circuit ruled that "Title VI clearly does not apply directly to prohibit the Klan's discriminatory membership criteria" and that the Klan is not a direct recipient of federal financial assistant through the Adopt-A-Highway program, but merely a beneficiary of the program. Therefore, the state's Title VI-based denial of the Klan's application was invalid. *Id.* at 710.

[20] In response to *Paralyzed Veterans*, Congress passed the Air Carrier Access Act (ACAA) in 1986, requiring that Department of Transportation regulations ensure that air carriers traveling within the United States do not discriminate against passengers based on disability.

Filed: 06/05/2023     Pg: 193 of 610        Doc: 17        USCA4 Appeal: 23-1453

activity" depend on whether one is analyzing the scope of Title VI's prohibitions or evaluating what part of the entity is subject to a potential fund termination or refusal. As described in greater detail elsewhere in the manual, "a recipient may be only a part of a larger entity. Title VI often covers, and prohibits discrimination in, the larger entity, rather than the smaller program that directly receives the funding." This section focuses on coverage.

> No person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any PROGRAM OR ACTIVITY receiving Federal financial assistance.

## 1.    Introduction

When enacted in 1964, Title VI did not include a definition of "program or activity." Congress had made its intentions clear, however: Title VI's prohibitions were meant to be applied institution-wide, and as broadly as necessary to eradicate discriminatory practices in programs that federal funds supported. 110 Cong. Rec. 6544 (statement of Sen. Humphrey); *see* S. Rep. No. 64, 100th Cong., 2d Sess. 5–7 (1988), *reprinted in* 1988 U.S.C.C.A.N. 3, 7–9. The courts, consistent with congressional intent, initially interpreted "program or activity" broadly to encompass the entire institution in question. For example, Title VI covered all of the services and activities of a university even where the sole federal assistance was federal financial aid to students. *See, e.g., Bob Jones Univ. v. Johnson*, 396 F. Supp. 597, 603 (D.S.C. 1974), *aff'd*, 529 F.2d 514 (4th Cir. 1975); S. Rep. No. 64 at 10, *reprinted in* 1988 U.S.C.C.A.N. at 12. In 1984, the Supreme Court in *Grove City College v. Bell*, 465 U.S. 555, 571 (1984), severely narrowed the interpretation of "program or activity." The Court ruled that Title IX's prohibitions against discrimination applied only to the specific office of an institution's operations that received the federal funding. Because the college received federal funds as a result of federal financial aid to students, the Court found that the "program or activity" was the college's financial aid program. *Id.* at 574.

In response to *Grove City*, Congress passed the Civil Rights Restoration Act of 1987, Pub. L. No. 100-259, 102 Stat. 28 (1988) (CRRA). The CRRA includes virtually identical amendments to broadly define "program or activity" (for coverage purposes) for the four cross-cutting civil rights statutes: Title VI, Title IX, Section 504, and the Age Discrimination Act.[21]  Congress

---

[21] The Age Discrimination Act of 1975, as amended, 42 U.S.C. § 6101 et seq. (ADA 1975), similar to Title VI, provides that "no person in the United States shall, on the basis of age, be excluded from participation, in be denied the benefits of, or be subjected to discrimination under, any program or activity receiving Federal financial assistance." *Id.* § 6102. The ADA 1975 does not include age limits; that is, there are neither minimum nor maximum age parameters that would limit coverage to young or old persons. The Act includes a provision giving the Department of Health and Human Services responsibility for issuing regulations addressing the Act, *id.* at § 6103, as well as other coordination and oversight responsibilities. Similar to the other federal financial assistance statutes,

USCA4 Appeal: 23-1453   Doc: 17         Filed: 06/05/2023         Pg: 195 of 610

determined that legislative action was "necessary to restore the prior consistent and long-standing executive branch interpretation and broad, institution-wide application of those laws as previously administered." CRRA § 2. Congress explained that it always had been its intent that Title VI and its progeny "be given the broadest possible interpretation" so that federal agencies may "assist in the struggle to eliminate discrimination from our society by ending federal subsidies of such discrimination." S. Rep. No. 64 at 7, *reprinted in* 1988 U.S.C.C.A.N. at 9; [22] *see also Fleming v. Yuma Reg'l Med. Ctr.*, 587 F.3d 938, 942 (9th Cir. 2009) (citing *Sharer v. Oregon*, 581 F.3d 1176, 1178 (9th Cir. 2009)) (the term "program or activity" should be viewed as expansive in meaning and application); *Salinas v. City of New Braunfels*, 557 F. Supp. 2d 771, 775 (W.D. Tex. 2006) (citing *Barden v. City of Sacramento*, 292 F.3d 1073, 1076 (9th Cir. 2002)) ("Courts have broadly construed the "services, programs, or activities" language in … the Rehabilitation Act to encompass "anything a public entity does.").[23]

With regard to public institutions or private institutions that serve a public purpose, the "program or activity" that Title VI covers encompasses the entire institution and not just the part of the institution that receives federal financial assistance. 42 U.S.C. § 2000d-4a. Moreover, the part of the program or activity that receives assistance can be, and often is, distinct from the part that engages in the allegedly discriminatory conduct. *See White v. Engler*, 188 F. Supp. 2d 730, 745–47 (E.D. Mich. 2001) (plaintiffs could pursue a Title VI claim against a scholarship program, even though the program operated without federal financial assistance, because it was part of a department that received federal funds); *D.J. Miller & Assocs. v. Ohio Dep't of Admin. Servs.*, 115 F. Supp. 2d 872, 878 (S.D. Ohio 2000) (granting a preliminary injunction under Title VI regarding alleged discrimination in a state contract where the contract was administered by a department that received federal funds).

In *Lucero v. Detroit Public Schs.*, 160 F. Supp. 2d 767, 785–86 (E.D. Mich. 2001), plaintiffs claimed that school officials violated Title VI when they relocated a largely minority elementary school to a site with alleged environmental toxins. The court held that it was irrelevant that the construction of the new school did not involve federal financial assistance because the term "program or activity" broadly encompassed the entire school district. *Id.* at 785. The court reasoned that the construction of the new school was "an operation of" or "part of" the larger

---

however, each grant making agencies are responsible for addressing allegations that their recipients have violated the Act.

[22] The Senate further stated that "[t]he purpose of the Civil Rights Restoration Act of 1987 is to reaffirm pre-*Grove City* judicial and executive branch interpretations and enforcement practices which provided for broad coverage of the anti-discrimination provisions of these civil rights statutes." *Id.*

[23] In 1999, the Third Circuit held that the CRRA's statutory definition of "program or activity" did not apply to the effects test created by Title VI regulations. *Cureton v. NCAA*, 198 F.3d 107 (3d Cir. 1999). The court reasoned that because the Title VI regulations in question had not been amended to reflect the CRRA's definition, the effects test only applied to specifically funded programs. In response to the decision, federal agencies amended their regulations to make clear that CRRA's broad definition of "program or activity" applies to claims brought under the effects test enunciated in regulations, as well as to intentional discrimination. *See, e.g.*, 34 C.F.R. §§ 100.13(g); 104.3(k); 106.2(h) (Dep't of Educ.); 45 C.F.R. §§ 80.13; 86.2; 91.4 (HHS).

school district. *Id.* Therefore, it was sufficient that the school district received federal funds for other purposes to extend Title VI coverage to the construction of the school in question. *Id.*

## 2.    State and Local Governments

The following instrumentalities of a state or local government may constitute a "program or activity" under Title VI:

> [A]ll of the operations of
> (A) a department, agency, special purpose district, or other instrumentality of a State or of a local government; or
> (B) the entity of such State or local government that distributes such assistance and each such department or agency (and each other State or local government entity) to which the assistance is extended, in the case of assistance to a State or local government;
> … any part of which is extended Federal financial assistance.

42 U.S.C. § 2000d-4a(1). The legislative history confirms Congress intended a broad application to state and local governments:

> [W]hen any part of a state or local government department or agency is extended federal financial assistance, the entire agency or department is covered. If a unit of a state or local government is extended federal aid and distributes such aid to another governmental entity, all of the operations of the entity which distributes the funds and all of the operations of the department or agency to which the funds are distributed are covered.

S. Rep. No. 100-64, at 16 (1988), *reprinted in* 1988 U.S.C.C.A.N. 18. As such, when an office or operation is part of a larger department or entity, the relevant "program or activity" is the larger entity.

In *Haybarger v. Lawrence Cty. Adult Probation & Parole*, 551 F.3d 193, 199–203 (3d Cir. 2008), the plaintiff alleged that Lawrence County Adult Probation and Parole Department (LCAPPD) engaged in unlawful employment discrimination practices that Section 504 prohibits. *Id.* at 196–97. While LCAPPD did not receive federal funds, "the Domestic Relations Section (DRS) of the Fifty–Third Judicial District did receive federal funds under Title IV–D of the Social Security Act." *Id.* at 197. The court explained that "although a particular function or operation might be the State's only link to federal funds … [Title VI] applies to 'all the operations' of the entity receiving federal funds." *Id.* at 200.[24]  Because the court found the DRS

---

[24] While federal law controls in determining whether an entity is a covered "program or activity" under Title VI, state or local law can inform the decision of whether a particular entity is independent or a subunit of another entity. *See Haybarger*, 551 F.3d at 200–01; *Sharer v. Oregon*, 581 F.3d 1176, 1178 (9th Cir. 2009).

USCA4 Appeal: 23-1453      Doc: 17      Filed: 06/05/2023      Pg: 197 of 610

to be a sub-unit of the Fifty–Third Judicial District, which is in turn part of Pennsylvania's Unified Judicial System, the DRS's receipt of federal funds effectuated a waiver of Eleventh Amendment immunity for not just the DRS, but for all subunits of the Fifty–Third Judicial District, including the LCAPPD. *Id.* at 202. The court concluded that the relevant "program or activity" was the entire Judicial District because the LCAPPD formed a part of the Judicial District. *Id.* at 202–03 (citing *Thomlison v. City of Omaha*, 63 F.3d 786 (8th Cir. 1995)).[25] *See also Huber v. Howard Cty.*, 849 F. Supp. 407, 415 (D. Md. 1994) ("if one part of a department receives federal financial assistance, the whole department is considered to receive federal assistance"). *aff'd* 56 F.3d 61 (4th Cir. 1995); *Starr v. Hawaii*, CV05-00665, 2007 WL 3254831 *3 (D. Haw. Nov. 2, 2007) (citing cases).

An entire state or local government generally is not considered a "program or activity" where the funding goes to an agency or department within the entity and not to the state or local government specifically.[26] *See Lovell v. Chandler*, 303 F.3d 1039, 1051 (9th Cir. 2002) ("The term 'program or activity' … does not encompass all the activities of the State. Instead, it only covers all the activities of the department or the agency receiving federal funds.");[27] *see also Schroeder v. City of Chicago*, 927 F.2d 957, 962 (7th Cir. 1991).[28]  The following examples illustrate this point:

- If federal health assistance is extended to a part of a state health department, the entire health department, including its components, would be covered in all of its operations.

---

[25] In *Thomlison*, the court stated, "Because the definition of program or activity covers all the operations of a department, here the Public Safety Department, and part of the Department received federal assistance, the entire Department is subject to the Rehabilitation Act." 63 F.3d at 789. In this case, the civil action involved the Fire Department, which was part of the Public Safety Department that also included the Police, and Communications Departments. Because the Police Department received federal financial assistance, the entire Public Safety Department was covered, including the Fire Department.

[26] At least one court, however, has held that an entire county was the "program or activity." *See Bentley v. Cleveland Cty. Bd. of Comm'rs*, 41 F.3d 600 (10th Cir. 1994) *See also Thorpe v. Borough of Jim Thorpe*, 2013 WL 1703572 *13–15 (M.D. Pa. 2013) (extended discussion of federal funding issues), *aff'd in part and rev'd in part on other grounds*, 770 F.3d 255 (3d Cir. 2014).

[27] In *Hodges by Hodges v. Pub. Bldg. Comm'n of Chicago*, 864 F. Supp. 1493, 1506 (N.D. Ill. 1994), the court framed the test as follows:

> In the post-CRRA era, whether or not an entity receives federal funds is no longer the *sine qua non* of a Title VI action. Consistent with the broad definition of "program or activity," courts have rejected such a formalistic approach in favor of examining the defendant's relationship to the entity receiving the federal funds.

[28] In *Schroeder*, the court stated:

> But the amendment was not, so far as we are able to determine—there are no cases on the question—intended to sweep in the whole state or local government, so that if two little crannies (the personnel and medical departments) of one city agency (the fire department) discriminate, the entire city government is in jeopardy of losing its federal financial assistance.

*Id.*

Filed: 06/05/2023     Pg: 198 of 610     Doc: 17     USCA4 Appeal: 23-1453

> However, the entire state government is not considered a covered program just because the health department receives federal financial assistance.
>
> - If the office of a mayor receives federal financial assistance and distributes it to departments or agencies, all of the operations of the mayor's office are covered along with the departments or agencies that actually receive the aid from the Mayor's office.
> - If a state receives funding that is designated for a particular state prison, the entire State Department of Corrections is considered the covered "program or activity" (but not, however, the entire state).

An entire state or local government may, however, be liable for Title VI violations if it is partially responsible for the discriminatory conduct, is contractually obligated to comply with Title VI, or has a responsibility to monitor subrecipients. In *United States v. City of Yonkers*, 880 F. Supp. 212, 232 (S.D.N.Y. 1995), *vacated and remanded on other grounds*, 96 F.3d 600 (2d Cir. 1996), the court rejected the state's argument that sovereign immunity applied because it is not a "program or activity." The court stated that, not only does the plain language of § 2000d-7 defeat the state's assertion, but also

> [N]othing in the legislative history of Title VI compels the conclusion that an entity must be a 'program' or 'activity' to be a Title VI defendant.... We therefore hold that the State of New York can be sued under Title VI as long as it, along with those of its agencies receiving federal financial assistance, is alleged to have been responsible for a Title VI violation.

*Id.* (note omitted).[29]  *See also N.Y. Urban League v. Metro. Transp. Auth.*, 905 F. Supp. 1266, 1273 (S.D.N.Y.), *vacated on other grounds*, 71 F.3d 1031 (2d Cir. 1995).

Further, when accepting federal financial assistance, state and local governments should be required to obligate themselves to comply with Title VI by a separate contract of assurance. Often times, this contractual arrangement is formalized when a state or local government signs an assurance agreement. *See, e.g.*, *United States v. Maricopa Cty.*, 2:10-cv-01878-LOA (D. Ariz. filed Sept. 13, 2010) (United States sues county government for Title VI violations, in part, because of its obligations under contractual assurances); *United States v. Maricopa Cty.*, 2:12-cv-00981-ROS (D. Ariz. filed May 10, 2012) (same). Even absent a written contract, the state or local government obligates itself to comply with Title VI if the entire governmental unit accepts federal financial assistance. *Cf. Paralyzed Veterans*, 477 U.S. at 605 (noting that "the recipient's

---

[29] Plaintiffs had alleged that the state, through its legislature, contributed to the alleged school segregation by passing laws that impeded desegregation efforts and providing limited financial assistance for such efforts. *Id.* at 232 n.25. It is unclear whether the plaintiffs introduced evidence in support of these allegations. In a subsequent opinion, the court did not address these facts and rejected plaintiffs' arguments that a state, solely by its failure to prevent alleged discrimination, could be held vicariously liable for a local agency's discriminatory acts under either an intent or discriminatory effect standard. *United States v. City of Yonkers*, 880 F. Supp. 591, 597–98 (S.D.N.Y. 1995), *vacated and remanded*, 96 F.3d 600 (2d Cir. 1996).

USCA4 Appeal: 23-1453      Doc: 17      Filed: 06/05/2023      Pg: 199 of 610

acceptance of the funds triggers [contractual] coverage under the nondiscrimination provision")
(citing *Soberal-Perez v. Heckler*, 717 F.2d 36, 41 (2d Cir. 1983)).

### 3.   Educational Institutions

In the educational context, Title VI provides that the following institutions constitute a "program
or activity":

> all of the operations of
> (2)(A) a college, university, or other postsecondary institution, or a public system
> of higher education: or
> (B) a local educational agency (as defined in Section 7801 of Title 20), system of
> vocational education, or other school system;
> … any part of which is extended Federal financial assistance.

42 U.S.C. § 2000d-4a(2) (emphasis added). Section 2(A) specifically overturns *Grove City* by
including all of the operations of a postsecondary institution when any part of that institution is
extended federal financial assistance.[30] *See Knight v. Alabama*, 787 F. Supp. 1030, 1364 (N.D.
Ala. 1991) (entire statewide university system constituted "program or activity," notwithstanding
limited autonomy of institutions and even though not all institutions received federal assistance),
*aff'd in part, rev'd in part, and vacated in part*, 14 F.3d 1534 (11th Cir. 1994).

Senate Report 64 provides several examples of the scope of an educational "program or
activity." Federal funding to one school subjects the entire school system to Title VI. S. Rep. No.
64 at 17, *reprinted in* 1988 U.S.C.C.A.N. at 19. Congress explained that the phrase "all of the
operations of" encompasses, but is not limited to, "traditional educational operations, faculty and
student housing, campus shuttle bus service, campus restaurants, the bookstore, and other
commercial activities." *Id*.

The courts have followed this broad interpretation by ruling that a local educational agency
includes school boards, their members, and agents of such boards. *Horner v. Kentucky High Sch.
Athletic Ass'n*, 43 F.3d 265, 272 (6th Cir. 1994) (Title IX case); *Rogers v. Bd. of Educ.*, 859 F.
Supp. 2d 742, 752 (D. Md. 2012); *Meyers ex rel. Meyers v. Bd. of Educ.*, 905 F. Supp. 1544 (D.
Utah 1995);[31] *see also Young ex rel. Young v. Montgomery Cty. Bd. of Educ.*, 922 F. Supp. 544
(M.D. Ala. 1996) (court addressed the merits of Title VI claims against the county board of
education without comment or question as to the propriety of such claims). In *Rogers*, for

---

[30] "Postsecondary institution is a generic term for any institution which offers education beyond the twelfth grade.
Examples of postsecondary institutions would include vocational, business and secretarial schools." S. Rep. No. 64
at 16, *reprinted in* 1988 U.S.C.C.A.N. at 18.
[31] The court in *Meyers* opined that the Department of Education's regulations have a narrower definition of
"program or activity" than is set forth in the statute. *Id*. at 1574 n.37. Nonetheless, the definition was broad enough
to encompass the program at issue in the case.

example, the court held that the county board of education received federal financial assistance
because the state's Department of Education received federal funds and, through its Department
of Treasury, distributed funds to county boards of education. *Rogers*, 869 F. Supp. 2d at 752. The
court concluded that the county board of education was a proper defendant under Title VI
because it fit the definition of a "local educational agency" under the statutory language for
covered programs or activities. *Id.* at 745 (citing 42 U.S.C. § 2000d-4a(2)(B)).

### 4.    Corporations and Private Entities

While the CRRA restored institution-wide definitions of a program or activity for public entities
or entities that serve a public purpose, it left in place a more narrow definition for private
entities. *See Boswell v. Skywest Airlines, Inc.*, 217 F. Supp. 2d 1212, 1216 (D. Utah 2002)
("[W]ith respect to private organizations such as [the defendant], the statutory definition of
'program or activity' was not expanded to the pre-*Grove City* institution-wide definition."), *aff'd*,
361 F.3d 1263 (10th Cir. 2004) (court did not address the definition of program or activity). The
scope of "program or activity" as it applies to a corporation or other private entity depends on the
operational purpose of the entity, the purpose of the funds, and the structure of the entity. Title
VI provides:

> For the purposes of this subchapter, the term "program or activity" and the term
> "program" mean all of the operations of
> (3)(A) an entire corporation, partnership, or other private organization, or an
> entire sole proprietorship--
> (i) if assistance is extended to such corporation, partnership, private organization,
> or sole proprietorship as a whole; or
> (ii) which is principally engaged in the business of providing education, health
> care, housing, social services, or parks and recreation; or
> (B) the entire plant or other comparable, geographically separate facility to which
> Federal financial assistance is extended, in the case of any other corporation,
> partnership, private organization, or sole proprietorship;
> … any part of which is extended Federal financial assistance.

42 U.S.C. § 2000d-4a(3).

When federal financial assistance broadly supports an entire private organization, all of its
operations are subject to Title VI. 42 U.S.C. § 2000d-4a(3)(A)(i). Funds are given to an entity
"as a whole" when such funds further the central or primary purpose of the entity, or the funds
are not for a specific, narrow purpose. For example, funds provided to ensure the continued
operation of a corporation such as by preventing bankruptcy, are assistance to the entity "as a
whole." S. Rep. No. 100-64 at 17, *reprinted in* 1988 U.S.C.C.A.N. at 19. By contrast, funds for a
specific purpose or funds that support one of several functions of the private entity are not
assistance to the recipient "as a whole." When the funding is narrowly tailored, Title VI covers

—

only the part of the recipient's operations that receives funds. The following are examples of funding for a specific purpose that does not apply to the entity "as a whole":

- An airline that receives Department of Transportation funds for certain rural routes. *Boswell*, 217 F. Supp. 2d at 1217–19.
- A company that receives funds for job training. S. Rep. No. 100-64 at 17, *reprinted in* 1988 U.S.C.C.A.N. at 19.
- A religious organization that receives a grant to enable it to extend assistance to refugees, which is just one of a number of activities of the organization. *Id.*

The notion that federal aid "frees up" funds for other purposes or the fungibility of money does not expand the application of Title VI beyond the principles described above. *Id.* at 17–18, *reprinted in* 1988 U.S.C.C.A.N. at 19–20.

When federal assistance is extended to a plant or any other comparable, geographically separate corporate facility or other private entity, Title VI covers only the operations of the specific plant or facility. 42 U.S.C. § 2000d-4a(3)(B). Congress gave the following example to illustrate this point: the federal government extended federal financial assistance to the Michigan State Department of Health, which in turn provided funding for first aid training to the General Motors Dearborn, Michigan plant. As a result, Title VI covers all Dearborn plant operations, as well as the State Department of Health that distributed the federal money. Title VI does not, however, cover other geographically separate General Motors facilities merely because of the assistance to the Dearborn plant. S. Rep. No. 100-64 at 18-19, *reprinted in* 1988 U.S.C.C.A.N. at 20–21.

The definition of "program or activity" is broader for private entities that engage in certain public works. For recipients "principally engaged" in the business of providing education, health care, housing, social services, or parks and recreation, the term "program or activity" has an institution-wide application. 42 U.S.C. § 2000d-4a(3)(A)(ii). In other words, Title VI covers the entire entity when any part of it receives federal financial assistance. For example, Nursewell Corporation owns and runs a chain of five nursing homes as its principal business. One of the five nursing homes receives federal financial assistance under the Older Americans Act. Because the corporation is principally engaged in the business of providing social services and housing for elderly persons, aid to one home will subject the entire corporation to the requirements of Title VI. *See* S. Rep. No. 64 at 18, *reprinted in* 1988 U.S.C.C.A.N. at 20; *see also* Mary Crossley, *Infected Judgment: Legal Responses to Physician Bias*, 48 Vill. L. Rev. 195, 265 (2003).

The terms "education, health care, housing, social service, or parks and recreation" should be construed broadly consistent with ordinary meaning. In an Eighth Circuit case, the court addressed the scope of "social services" and "education."

In terms of what businesses might qualify as providing education, the statute envisions that education is not limited to the sort of instruction received in a traditional school system. As noted above, formal educational systems are covered by a separate provision, § 794(b)(2). Section 794(b)(3)(A)(ii), then, covers the sort of education offered by stand-alone schools or by other private organizations seeking to train and develop individuals. As to what constitutes a social service, it is "an activity designed to promote social well-being" such as "organized philanthropic assistance of the sick, destitute, or unfortunate."

*Runnion ex rel. Runnion v. Girl Scouts of Greater Chicago & Nw. Ind.*, 786 F.3d 510, 527 (7th Cir. 2015) (citing *Doe v. Salvation Army*, 685 F.3d 564, 570 (6th Cir. 2012), quoting Merriam Webster's Collegiate Dictionary 1115 (10th Ed.1995)). In *Doe*, 685 F.3d at 571, the court noted that the notion of "'principally engaged' has been interpreted in other statutory contexts as referring to the primary activities of a business, excluding only incidental activities" (citing *Carrington v. Lawson's Milk Co.*, No. 86–3264, 1987 WL 36691, at *3 (6th Cir. Mar. 6, 1987) (unpublished opinion) (convenience store not "'principally engaged in selling food' for onsite consumption because service was 'incidental to some other business.'") (quoting *Newman v. Piggie Park Enters., Inc.*, 377 F.2d 433, 435–36 (4th Cir. 1967) (holding term "principally" does not require a specific percentage); *United States v. Baird*, 85 F.3d 450, 454 (9th Cir. 1996) (construing "principally engaged in selling food for consumption on the premises," as directed to "the issue of principal and peripheral uses"); *Fazzio Real Estate Co. v. Adams*, 396 F.2d 146, 150 (5th Cir. 1968) (it is "clear" that sales from refreshment counter constituting from eight to eleven percent of gross revenue were "not de minimus [sic] [and] that the operation of the refreshment counter was not an insignificant adjunct of the operation of bowling alley"; thus, refreshment counter was "principally engaged in sale of food for consumption on the premises").

Moreover, the statute requires that Title VI's anti-discrimination requirements apply institution-wide if, in the aggregate, the organization is principally engaged in the business of providing any of the services enumerated in the statute. In other words, the conjunction "or" does not mean that only one item on the list *by itself* must be a principal activity. Rather, Title VI covers all operations of a private recipient if it is principally engaged in providing these services alone or in combination. *Runnion*, 786 F.3d at 528 ("There is no reason to think Congress was laying out mutually exclusive conditions."). In sum, a covered "program or activity" under Title VI broadly applies to entire institutions, except when the institution in question is a private entity that does not serve a public purpose.

It is important to reiterate that even if a private institution does not fit into one of the broad categories of coverage, Title VI covers the recipient's facility that receives funds.

USCA4 Appeal: 23-1453     Doc: 17     Filed: 06/05/2023     Pg: 202 of 610

### 5.     Catch-All/Combinations of Entities

Finally, the term "program or activity" includes the operations of entities formed by any combination of the aforementioned entities. Title VI provides that a "program or activity" includes:

> [A]ll of the operations of
> (4) any other entity which is established by two or more of the entities described in paragraph (1) [instrumentalities of state or local government], (2) [educational institutions], or (3) [corporations or private entities]:
> … any part of which is extended Federal financial assistance.

42 U.S.C. § 2000d-4a(4) (emphasis added). This catch-all provision recognizes the complex nature of entities that serve a public purpose. For example, the provision ensures that "a multistate, regional transportation commission which received federal financial assistance would be covered in its entirety, like a state Transportation Department." Rep. No. 64 at 19, *reprinted in* 1988 U.S.C.C.A.N. at 21.

Unlike the limitations placed on private entities described above, this provision ensures that all of the operations of a partnership between public entities or between a public and private entity, such as a school and a private corporation, would be subject to Title VI. It is the public nature of these hybrid institutions that led Congress to expand Title VI coverage:

> [A]n entity which is established by two or more entities described in [paragraphs] (1), (2), or (3) is inevitably a public venture of some kind, i.e., either a government-private effort (1 and 3), a public education-business venture (2 and 3) or a wholly government effort (1 and 2). It cannot be a wholly private venture under which limited coverage is the general rule. The governmental or public character helps determine institution-wide coverage…. Even private corporations are covered in their entirety under (3) if they perform governmental functions. i.e., are "principally engaged in the business of providing education, health care, housing. social services, or parks and recreation."

*Id.* at 19–20. *reprinted in* 1988 U.S.C.C.A.N. at 21–22. While coverage under paragraph (4) applies to the hybrid entity; coverage of the separate entities that comprise the partnership or joint venture must be determined independently. *Id.* at 20, *reprinted in* 1988 U.S.C.C.A.N. at 22.

Pg: 203 of 610          Filed: 06/05/2023          Doc: 17          USCA4 Appeal: 23-1453

SECTION VI: PROVING DISCRIMINATION – INTENTIONAL DISCRIMINATION

A.      **Introduction**

B.      **Proving Intentional Discrimination**

    **1.   Direct Evidence of Discriminatory Motive**

       a.   Express classifications

       b.   Other forms of direct evidence

    **2.   The *Arlington Heights* Framework**

    **3.   The *McDonnell-Douglas* Framework**

C.      **Other Issues Affecting Title VI Cases Involving Intent**

    **1.   Proof of Systemic or Widespread Discrimination (Pattern or Practice)**

    **2.   Permissible Use of Race**

    **3.   Intentional Discrimination by a Third Party**

Pg: 204 of 610

Filed: 06/05/2023

Doc: 17

USCA4 Appeal: 23-1453

USCA4 Appeal: 23-1453      Doc: 17      Filed: 06/05/2023      Pg: 205 of 610

## A.   Introduction

Title VI prohibits discrimination based on "race, color, or national origin …under any program or activity receiving Federal financial assistance." 42 U.S.C. § 2000d. The purpose of Title VI is simple: to ensure that public funds are not spent in a way that encourages, subsidizes, or results in discrimination on these bases. Toward that end, Title VI bars intentional discrimination. *See Guardians Ass'n v. Civil Serv. Comm'n*, 463 U.S. 582, 607–08 (1983); *Alexander v. Choate*, 469 U.S. 287, 292–93 (1985). A Title VI discriminatory intent claim alleges that a recipient intentionally treated persons differently or otherwise knowingly caused them harm because of their race, color, or national origin. Agency regulations implementing Title VI also prohibit intentional discrimination based on race, color, or national origin, covering any disposition, service, financial aid, or other benefits provided under the recipient's program, the determination of the site or location of facilities, or other aspects of program operations. *See, e.g.,* 28 C.F.R. § 42.104(b) (Department of Justice regulations).

Private parties seeking judicial enforcement of Title VI's nondiscrimination protections must prove intentional discrimination. *Alexander v. Sandoval*, 532 U.S. 275, 280–81 (2001). Private parties may also file administrative complaints with federal agencies alleging that a recipient of the agency's federal financial assistance has engaged in intentional discrimination; the federal agency providing the assistance may investigate these complaints.[1]

This section provides an overview of the types of evidence necessary to prove intentional discrimination under Title VI. Much of the discussion in this section relies on judicial precedent developed in private plaintiffs' intent claims for damages, and therefore focuses on standards applied in that context. Those standards may not always apply to agency investigations, which often follow a non-adversarial model in which the agency collects all relevant evidence and then determines whether the evidence establishes discrimination. Under this model, agencies do not "shift the evidentiary burdens" between complainant and recipient when making findings. The burden-shifting framework may nevertheless serve as a useful paradigm for organizing and analyzing the evidence.

> **AGENCY PRACTICE TIP**
>
> Investigating agencies can look to case law for guidance on proving intentional discrimination, but are not bound by case law concerning burden shifting between plaintiff and defendant (that is, as between a complainant and a recipient). An agency need not use the same sequential process as courts, where a plaintiff first offers prima facie evidence and the defendant then offers rebuttal evidence. Rather, an agency has discretion to gather and evaluate all relevant evidence as part of its initial investigation, or may choose to make a preliminary prima facie finding then require recipients to articulate defenses.

---

[1] Unlike when seeking judicial enforcement, private parties may file administrative complaints under any theory of liability, including disparate impact. Section VII of the Title VI Legal Manual provides an analysis of the disparate impact theory.

**B.     Proving Intentional Discrimination**

Courts have developed a number of analytical frameworks for assessing intent claims. The elements of a Title VI intent claim derive from and are similar to the analysis of cases decided under the Fourteenth Amendment's Equal Protection Clause[2] and Title VII of the Civil Rights Act of 1964, as amended.[3] Because the Title VI statutory prohibition on discrimination is based on the Equal Protection Clause, the constitutional analysis of intentional discrimination should be applied under Title VI.[4] *See Grutter v. Bollinger*, 539 U.S. 306, 343–44 (2003) (citing *Regents of Univ. of Cal. v. Bakke*, 438 U.S. 265, 287 (1978) (opinion of Powell, J.) ("Title VI . . . proscribe[s] only those racial classifications that would violate the Equal Protection Clause or the Fifth Amendment.").

Generally, intentional discrimination occurs when the recipient acted, at least in part, because of the actual or perceived race, color, or national origin of the alleged victims of discriminatory treatment. *Doe ex rel. Doe v. Lower Merion Sch. Dist.*, 665 F.3d 524, 548 (3d Cir. 2011). While discriminatory intent need not be the only motive, a violation occurs when the evidence shows that the entity adopted a policy at issue "'because of,' not merely 'in spite of,'" its adverse effects upon an identifiable group." *Pers. Adm'r of Mass. v. Feeney*, 442 U.S. 256, 279 (1979). Some assume that the intentional use of race should be carefully scrutinized only when the intent is to harm a group or an individual defined by race, color, or national origin. That is not true: the Supreme Court in *City of Richmond v. J.A. Croson Co.*, 488 U.S. 469, 493 (1989), and *Adarand Constructors, Inc., v. Pena*, 515 U.S. 200, 226 (1995), established that any intentional use of race, whether for malicious or benign motives, is subject to the most careful judicial scrutiny.[5] Accordingly, the record need not contain evidence of "bad faith, ill will or any evil motive on the part of the [recipient]." *Williams v. City of Dothan*, 745 F.2d 1406, 1414 (11th Cir. 1984).

This section discusses a variety of methods of proof to consider when evaluating recipient behavior to determine whether it meets the legal standard for intentional discrimination. A method of proof—or analytical framework—is an established way of organizing the evidence in an investigation or lawsuit in order to show why that evidence amounts to intentional discrimination.

---

[2] U.S. Cons. amend. XIV, § 1.

[3] 42 U.S.C. § 2000e et seq.

[4] Note that the analyses under these civil rights laws are not always the same, particularly to the extent that the Equal Protection Clause affords different levels of protection to classifications based on sex and disability vs. race, color, and national origin.

[5] At times in this section "race" is used to refer to "race, color, and national origin." This shorthand is used merely for ease of discussion and should not be read as a limitation on the applicability of the principles discussed.

Pg: 206 of 610     Filed: 06/05/2023     Doc: 17     USCA4 Appeal: 23-1453

Those methods are as follows:

**Methods that focus on direct evidence**

- **Express classifications.** Express classifications are the clearest form of direct evidence of discriminatory intent. If a recipient explicitly conditions the receipt of benefits or services on the race, color, or national origin of the beneficiary, or directs adverse action to be taken based on race, color, or national origin, such a policy or practice constitutes an express classification. See Section B.1.a.

- **Comments or conduct by decision-makers as direct evidence of intent.** The direct method of proof typically involves a statement from a decision-maker that expresses a discriminatory motive. See Section B.1.b.

**Methods that focus on circumstantial evidence**

- **The *Arlington Heights* mosaic of factors.**[6] This method of proof, originally developed for Equal Protection Clause cases, uses a number of different types of circumstantial evidence that, taken collectively, can demonstrate that the recipient acted, at least in part, because of race, color, or national origin. This framework is most commonly applied in cases alleging discrimination against a group. Agencies can use this method for many different types of cases, but will find it particularly useful where the complaint is about the treatment of a group, not individuals, and the investigation reveals many different kinds of evidence. Agencies should be sure to consider this method where a complaint challenges an expressly neutral practice that has an effect on a larger class defined by race, color, or national origin. For instance, a complaint alleging that a state agency adopted a new policy with the purpose of reducing the number of minority participants could be investigated using this method. See Section B.2.

- **The *McDonnell-Douglas* framework.**[7] Plaintiffs use this framework, originally developed for Title VII employment cases, to show that a defendant treated similarly situated individuals differently because of race, color, or national origin. The framework is most commonly applied in cases alleging discrimination in individual instances. Agencies should consider using this method for investigations involving the selection of individuals, such as for program participation, benefits, or services, particularly where the recipient provides a nondiscriminatory explanation for its decision. This method is most likely to be helpful where the complaint is about one or a few individuals, and involves easily identifiable

---

[6] *Vill. of Arlington Heights v. Metro. Housing Dev. Corp.*, 429 U.S. 252, 266–68 (1977).

[7] The *McDonnell-Douglas* framework refers to *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).

USCA4 Appeal: 23-1453      Doc: 17      Filed: 06/05/2023      Pg: 208 of 610

similarly situated individuals not in the protected class. For instance, a complaint alleging that a state agency denied benefits to a family because of that family's national origin might be investigated using this method. See Section B.3.

More than one type of analysis may apply to facts disclosed in an investigation or trial to determine race-based intent. Agencies and plaintiffs can use them individually or together and may combine both direct and circumstantial evidence. Ultimately, the "totality of the relevant facts" will determine whether the recipient has engaged in intentional discrimination in violation of Title VI. *See Washington v. Davis*, 426 U.S. 229, 242 (1976) (discussing analysis of intentional discrimination generally).

Regardless of the method or methods of proof ultimately employed, the central question remains whether the recipient acted intentionally based on race, color, or national origin. In evaluating the totality of relevant facts, courts and federal funding agencies look to either direct or circumstantial evidence to establish whether a recipient engaged in intentional discrimination. Often, the available proof consists of a combination of these different kinds of evidence, and therefore more than one method of proof may be appropriate. The box below cross-references the major types of evidence with the related methods of proof discussed in this section.

---

### TYPES OF EVIDENCE

**Direct evidence.** Direct evidence often involves a statement from a decision-maker that expresses a discriminatory motive. Direct evidence can also include express or admitted classifications, in which a recipient explicitly distributes benefits or burdens based on race, color, or national origin. Other than instances where a recipient uses race expressly to achieve diversity or implement a race-based remedy for past discrimination, finding direct evidence is rare; most recipients are circumspect enough to avoid making overtly discriminatory statements. As a result, most Title VI litigation and administrative investigations focus on circumstantial evidence. See methods of proof discussed in Section B.1.

**Circumstantial evidence.** Circumstantial evidence, also known as indirect evidence, requires the fact finder to make an inference or presumption. *Hamilton v. Southland Christian Sch., Inc.*, 680 F.3d 1316, 1320 (11th Cir. 2012). "Circumstantial evidence can include suspicious timing, inappropriate remarks, and comparative evidence of systematically more favorable treatment toward similarly situated [individuals] not sharing the protected characteristic...." *Loyd v. Phillips Bros., Inc.*, 25 F.3d 518, 522 (7th Cir. 1994); *accord Troupe v. May Dep't Stores Co.*, 20 F.3d 734, 736 (7th Cir. 1994). See methods of proof discussed in Sections B.2 and B.3.

**Statistical evidence.** Statistical evidence can often be critical in a case where the exercise of race-based motive is alleged. A plaintiff or agency investigation can use

---

statistics in several ways to establish a claim of intentional discrimination. For example, statistics can be used show that an ostensibly race-neutral action actually causes a pattern of discrimination, a racially disproportionate impact, or foreseeably discriminatory results. While statistical evidence is not required to demonstrate intentional discrimination, plaintiffs often successfully use statistics to support, along with other types of evidence, a claim of intentional discrimination. See methods of proof discussed in Sections B.2 and C1.

Finally, it is important for agencies to remember that even if a recipient is found to have engaged in the intentional consideration of race, color, or national origin, this is not the end of the inquiry. Some uses of race are permissible. This is discussed more extensively beginning at page 30.

Title VI case law has traditionally borrowed jurisprudence from other civil rights laws with a similar structure and purpose.[8] The remainder of this section examines methods of proving intentional discrimination in greater detail, with reference to case law not only under Title VI and the Equal Protection Clause, but also under Title VII; Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681 et seq.; and Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 701, among other laws. Importantly, the analyses under these civil rights laws are not always the same, but this discussion identifies principles that are applicable to Title VI.

## 1.   Direct Evidence of Discriminatory Intent

Direct evidence of discriminatory intent is evidence that, "if believed, proves the fact [of discriminatory intent] without inference or presumption." *Coghlan v. Am. Seafoods Co.*, 413 F.3d 1090, 1095 (9th Cir. 2005) (citation omitted).

Occasionally, a recipient official admits to having considered race during the decisional process as a basis for its action. In other instances, a recipient explicitly conditions the receipt of benefits or services on the race, color, or national origin of the beneficiary, or explicitly directs action be taken based on race, color, or national origin. These kinds of requirements are often referred to as "express classifications," and are the clearest form of direct evidence.

Short of an express classification, other direct evidence of discrimination includes "any statement or document which shows on its face that an improper criterion served as the basis ... for [an] adverse ... action." *Fabela v. Socorro Indep. Sch. Dist.*, 329 F.3d 409, 415 (5th Cir. 2003). On the other hand, "remarks by non-decisionmakers or remarks unrelated to the decision

---

[8] *See, e.g., Gebser v. Lago Vista Indep. Sch. Dist.*, 524 U.S. 274, 286 (1998) ("[Title VI] is parallel to Title IX .... The two statutes operate in the same manner ...."); *Liese v. Indian River Cty. Hosp. Dist.*, 701 F.3d 334, 346 (11th Cir. 2012) ("Title IX, like the [Rehabilitation Act] was modeled after Title VI, and the text of all three acts [is] virtually identical ...."); *Darensburg v. Metro. Transp. Comm'n*, 636 F.3d 511, 519 (9th Cir. 2011) (looking to Title VII jurisprudence to analyze Title VI claims).

Filed: 06/05/2023   Pg: 209 of 610     Doc: 17     USCA4 Appeal: 23-1453

making process itself are not direct evidence of discrimination." *Standard v. A.B.E.L. Servs., Inc.*, 161 F.3d 1318, 1330 (11th Cir. 1998).

### a.  Express classifications

The Equal Protection Clause requires strict scrutiny of any government policy or practice that classifies individuals based on race, color, or national origin. *Parents Involved in Cmty. Schs. v. Seattle Sch. Dist. No. 1*, 551 U.S. 701, 720 (2007) ("[W]hen the government distributes burdens or benefits on the basis of individual racial classifications, that action is reviewed under strict scrutiny."); *Gratz v. Bollinger*, 539 U.S. 244, 270 (2003) (applying strict scrutiny to student admissions policies that considered race as a factor). Similarly, Title VI requires recipients to demonstrate that any intentional use of race, color, or national origin classification is "narrowly tailored" to achieve a "compelling" government interest. *Parents Involved*, 551 U.S. at 720.

A recipient's express or admitted use of a classification based on race, color, or national origin establishes intent without regard to the decision-makers' animus or ultimate objective. Such classifications demonstrate a discriminatory purpose as a matter of law. *See Miller v. Johnson*, 515 U.S. 900, 904–05 (1995); *see also Wittmer v. Peters*, 904 F. Supp. 845, 849–50 (C.D. Ill. 1995), *aff'd*, 87 F.3d 916 (7th Cir. 1996). "Put another way, direct evidence of intent is ˙supplied by the policy itself.'" *Hassan v. City of New York*, 804 F.3d. 277, 295 (3d Cir. 2015) (quoting *Massarsky v. Gen. Motors Corp.*, 706 F.2d 111, 128 (3d Cir.1983) (Sloviter, J., dissenting)). Where a plaintiff demonstrates, or an agency determines, that a challenged policy overtly and expressly singles out a protected group for disparate treatment, "a plaintiff need not prove the malice or discriminatory animus of a defendant …." *Bangerter v. Orem City Corp.*, 46 F.3d 1491, 1501 (10th Cir. 1995); *see also Ferrill v. Parker Grp., Inc.*, 168 F.3d 468, 473 n.7 (11th Cir. 1999) ("[I]ll will, enmity, or hostility are not prerequisites of intentional discrimination."). Rather, the focus is on the "explicit terms of the discrimination," *Int'l Union, United Auto. Aerospace & Agric. Implement Workers of Am. v. Johnson Controls, Inc.*, 499 U.S. 187, 199 (1991); that is, how the recipient's actions specifically deprived or otherwise adversely affected the individual or individuals of access to a federally funded program or benefit. Even benign motivations for racial classifications are presumptively invalid and trigger strict scrutiny in Equal Protection Clause and Title VI cases. *Adarand*, 515 U.S. at 223–24 (1995); *Grutter*, 539 U.S. at 326.

### b.  Other forms of direct evidence of intent

Even without a direct admission or express policy, a plaintiff may prove intentional discrimination with other forms of direct evidence demonstrating that the "decisionmakers placed substantial negative reliance on an illegitimate criterion in reaching their decision." *Price*

*Waterhouse v. Hopkins,* 490 U.S. 228, 277 (1989) (O'Connor, J., concurring);[9] *Venters v. City of Delphi,* 123 F.3d 956, 972 (7th Cir. 1997) (direct evidence includes "evidence which in and of itself suggests" that someone with managerial authority was "animated by an illegal ... criterion."). For example, a statement of an official involved in the decision stating that an ostensibly race-neutral action was taken in order to limit minority individuals' eligibility for a federally funded benefit or program is direct evidence of race-based intent. Even isolated comments may constitute direct evidence of discrimination if they are "contemporaneous with the [adverse action] or causally related to the [adverse action] decision making process." *Kennedy v. Schoenberg, Fisher & Newman, Ltd.,* 140 F.3d 716, 723 (7th Cir. 1998) (citations omitted).

This type of direct evidence of discriminatory intent does not require "a virtual admission of illegality." *Venters,* 123 F.3d at 973. For example, direct evidence need not take the form of an admission where the defendant states "I'm [taking this adverse action] because you're in a protected group." *Sheehan v. Donlen Corp.,* 173 F.3d 1039, 1044 (7th Cir. 1999); *see Venters,* 123 F.3d at 973. The court in *Venters* explained that "the evidence need not be this obvious to qualify as direct evidence." *Id.* And the Sheehan court explained why: because such a requirement "would cripple enforcement of the ... discrimination laws." *Sheehan,* 173 F.3d at 1044. The direct evidence of such remarks must, however, establish that race was an important factor motivating the challenged action. "Stray remarks," "derogatory comments," even those uttered by decision-makers, may not constitute direct evidence of discrimination if unrelated to the adverse decision. *Price Waterhouse,* 490 U.S. at 277 (O'Connor, J., concurring); *Fuentes v. Perskie,* 32 F.3d 759, 767 (3d Cir. 1994). Evidence of such remarks or comments is nevertheless important in an intent case, and can help to establish circumstantial or indirect evidence of intent. *Doe v. C.A.R.S. Prot. Plus, Inc.,* 527 F.3d 358, 368 (3d Cir. 2008); *Fitzgerald v. Action, Inc.,* 521 F.3d 867, 877 (8th Cir. 2008) (same); *see also Lounds v. Lincare, Inc.,* 812 F.3d 1208, 1224 (10th Cir. 2015) (citing Kerri Lynn Stone, *Taking in Strays: A Critique of the Stray Comment Doctrine in Employment Discrimination Law,* 77 Mo. L. Rev. 149, 177 (2012) ("[S]tray remarks can prove to be invaluable insights into biases at every level of consciousness that may be rife but invisible within the workplace.... [They] may bespeak a workplace culture in which certain language or sentiments are tolerated and perhaps encouraged or rewarded.")).

By way of illustration, in *Wilson v. Susquehanna Township Police Dep't,* 55 F.3d 126 (3d Cir. 1995), a Title VII case, a female plaintiff alleged that she was not promoted because of her sex. The plaintiff's evidence revealed a number of discriminatory occurrences, including the daily circulation of sexually explicit drawings, the posting of obscene notices (some referring to female employees by name), sexual conversations between officers and female employees, the

---

[9] *Price Waterhouse* has been superseded by statute in the employment discrimination context under Title VII, but as discussed below, its framework remains instructive when considering how to prove mixed motives cases in other civil rights contexts.

USCA4 Appeal: 23-1453      Doc: 17      Filed: 06/05/2023      Pg: 211 of 610

showing of an x-rated movie and graphic home videos in the station house, the Chief's regular discussion of sex lives and employees' anatomy, the Chief's bemused dismissal of the plaintiff's complaint about an indecent assault committed by an officer, and the Chief's comment that he did not promote the plaintiff because the town manager "wanted a man." *Id.* at 127–29. The court of appeals described that evidence as direct evidence of intentional sex discrimination, explaining that "[t]he record clearly goes beyond 'stray remarks' and evinces strong gender bias in the police department.... This evidence, which included 'conduct or statements by persons involved directly reflecting the discriminatory attitude,' ... constitutes 'direct evidence' of discriminatory animus." *Id.* at 130 (citations and quotations omitted).

In *In re Rodriguez*, 487 F.3d 1001, 1006–08 (6th Cir. 2007), a case originally brought under Michigan's Civil Rights Act, which borrows legal standards from federal civil rights laws including Title VII,[10] the court found that a Hispanic employee was not selected for promotion based on a manager's impression about the applicant's "language" and "how he speaks." This evidence, the court held, was direct evidence of discrimination. Stating that "the [EEOC] recognizes linguistic discrimination as national origin discrimination" and that "discrimination based on manner of speaking can be national origin discrimination," the court found that the plaintiff's "Hispanic speech pattern and accent" played a motivating part in the manager's decision to deny the plaintiff a promotion. *Id.* at 1008–09; *accord*, *Diaz v. Jiten Hotel Mgmt., Inc.*, 762 F. Supp. 2d 319, 337 (D. Mass. 2011) ("racially, sexually, or ageist offensive language is necessarily prejudicial, precisely because it is highly probative").

A clean "direct evidence" case—where direct evidence alone establishes that discrimination was the sole reason for an adverse decision—is rare. *Price Waterhouse*, 490 U.S. at 271 ("[D]irect evidence of intentional discrimination is hard to come by.") (O'Connor, J., concurring). After all, decision-makers seldom will admit that they based decisions on race or ethnic origin, or used either as a criterion. *See, e.g., SECSYS, LLC v. Vigil*, 666 F.3d 678, 686 (10th Cir. 2012).

### 2.   The *Arlington Heights* Framework

Many cases of intentional discrimination are not proven by a single type of evidence. Rather, many different kinds of evidence—direct and circumstantial, statistical and anecdotal—are relevant to the showing of intent and should be assessed on a cumulative basis.

---

[10] *See* Michigan Elliott-Larsen Civil Rights Act, MCL 37.2101 *et seq.* (2016); *Jackson v. Quanex Corp.*, 191 F.3d 647 (6th Cir.1999)(When an employer is liable under the Michigan Civil Rights Act, it would also be liable under Title VII).

Filed: 06/05/2023     Pg: 212 of 610          Doc: 17          USCA4 Appeal: 23-1453

*Arlington Heights,* 429 U.S. at 266–68, and its progeny set forth a variety of factors probative of intent to discriminate.[11] Under this method of proving intent, the court or investigating agency analyzes whether discriminatory purpose motivated a recipient's actions by examining factors such as statistics demonstrating a "clear pattern unexplainable on grounds other than" discriminatory ones; "[T]he historical background of the decision"; "[T]he specific sequence of events leading up to the challenged decision"; the defendant's departures from its normal procedures or substantive conclusions, and the relevant "legislative or administrative history." *Faith Action for Cmty. Equity v. Hawai'i,* No. CIV. 13-00450 SOM, 2015 WL 751134, at *7 (D. Haw. Feb. 23, 2015) (Title VI case citing *Pac. Shores Props., LLC v. City of Newport Beach,* 730 F.3d 1142, 1158–59 (9th Cir. 2013)); *see also Sylvia Dev. Corp. v. Calvert Cty.,* 48 F.3d 810, 819 (4th Cir. 1995) (adding to the *Arlington Heights* factors evidence of a "consistent pattern" of actions of decision-makers that have a much greater harm on minorities than on non-minorities). When a recipient applies different procedural processes or substantive standards to requests of minorities and non-minorities, the use of such different processes or standards, when a non-minority receives more favorable treatment, may raise an inference of discriminatory intent. "These factors are non-exhaustive." *Pac. Shores Props.,* 730 F.3d at 1159.

---

**AGENCY PRACTICE TIP**

Agencies can use the *Arlington Heights* framework for many different types of cases, but will find it particularly useful where the complaint is about the treatment of a group, not individuals, and the investigation reveals many different kinds of evidence. Agencies should be sure to consider this method where a complaint challenges an expressly neutral policy or practice that has an effect on a larger class defined by race, color, or national origin. For instance, an agency could use this method when investigating a complaint alleging that a state agency adopted a new policy with the purpose of reducing the number of minority participants.

---

In court and agency investigations, evaluation of these factors "demands a sensitive inquiry into such circumstantial and direct evidence of intent as may be available." *Arlington Heights,* 429 U.S. at 266. Moreover, when a plaintiff relies on the *Arlington Heights* method to establish intent, "the plaintiff need provide very little such evidence ... to raise a genuine issue of fact ...; any indication of discriminatory motive ... may suffice to raise a question that can only be resolved by a fact-finder." *Pac. Shores Props.,* 730 F.3d at 1159 (citations omitted).

---

[11] Though the *Arlington Heights* test was developed to detect discriminatory intent in the context of a Fourteenth Amendment Equal Protection claim, the test also applies to claims of intentional discrimination under some federal statutes, including Title VI. *See Pac. Shores Props.,* 730 F.3d at 1158 n.21; *see also Gallagher v. Magner,* 619 F.3d 823, 833 (8th Cir. 2010) (Fair Housing Act case applying the *Arlington Heights* factors); *Hallmark Developers, Inc. v. Fulton Cty.,* 466 F.3d 1276, 1283–84 (11th Cir. 2006) (same); *Tsombanidis v. W. Haven Fire Dep't,* 352 F.3d 565, 579–80 (2d Cir. 2003) (same in Fair Housing Act and Americans with Disabilities Act contexts).

Filed: 06/05/2023   Pg: 213 of 610

Doc: 17

USCA4 Appeal: 23-1453

| FACTORS/CIRCUMSTANTIAL EVIDENCE PROBATIVE OF INTENT |
|---|
| • Statistics demonstrating a clear pattern of discriminatory effect; |
| • The historical background of the decision and other decisions on comparable matters; |
| • The sequence of events leading up to the decision, as compared to other decisions on comparable matters; |
| • Departures from normal procedures or substantive conclusions; |
| • Relevant legislative or administrative history; and |
| • Consistent pattern of actions of decision-makers that impose much greater harm on minorities than on non-minorities. |

Critically, *Arlington Heights* directs courts and agencies to engage in a cumulative assessment of the evidence. By way of illustration, in *North Carolina State Conference of NAACP v. McCrory*, No. 1:13CV658, 2016 WL 1650774, at *5 (M.D.N.C. Apr. 25, 2016), plaintiffs challenged provisions of a North Carolina election law, alleging that discriminatory intent to disenfranchise African-American voters motivated the legislature in violation of the Fourteenth and Fifteenth Amendments and the Voting Rights Act. The Fourth Circuit agreed. *N.C. State Conf. of NAACP v. McCrory*, 831 F.3d 204 (4th Cir. 2016). The district court's error in holding otherwise, the Fourth Circuit explained, "resulted from the court's consideration of each piece of evidence in a vacuum, rather than engaging in the totality of the circumstances analysis required by *Arlington Heights*." *Id.* at 233. The district court "missed the forest in carefully surveying the many trees." *Id.* at 214. Instead, agencies evaluating possible intentional discrimination by recipients must conduct a cumulative assessment of all the available evidence.

This case also illustrates the kinds of evidence relevant to each of the *Arlington Heights* factors described above:

- **Historical background of the decision.** First, the court considered the historical background in the state generally and related to voting in particular, identifying "North Carolina's history of race discrimination and recent patterns of official discrimination, combined with the racial polarization of politics in the state" as particularly relevant. *Id.* at 223. Against this background of historical discrimination in the state, the court found "the record is replete with evidence of instances since the 1980s in which the North Carolina legislature has attempted to dilute the voting rights of African Americans" and

USCA4 Appeal: 23-1453    Doc: 17    Filed: 06/05/2023    Pg: 214 of 610

Pg: 215 of 610

Filed: 06/05/2023    Doc: 17

USCA4 Appeal: 23-1453

pointed to the numerous instances of "Department of Justice and federal court determinations have determined that the North Carolina General Assembly acted with discriminatory intent …." *Id.* The court found these examples revealed "a series of official actions taken for invidious purposes," and held that the district court "erred in minimizing these facts." *Id.* (citing *Arlington Heights*, 429 U.S. at 267).

- **Sequence of events leading to the decision.** Next, the court turned to an examination of the sequence of events leading to the legislature's passage of the challenged provisions, finding these events "devastating" to the defense. *N.C. State Conf. of NAACP*, 831 F.3d at 227. The court found that the undisputed sequence of events—"the General Assembly's eagerness to … rush through the legislative process the most restrictive voting law North Carolina has seen since the era of Jim Crow—bespeaks a certain purpose …. Although this factor, as with the other Arlington Heights factors, is not dispositive on its own, it provides another compelling piece of the puzzle of the General Assembly's motivation." *Id.* at 229.

- **Legislative history leading to the decision.** As instructed by *Arlington Heights*, the court also considered the sequence of events described above from the perspective of "legislative history" because such evidence "may be highly relevant, especially where there are contemporaneous statements by members of the decisionmaking body, minutes of its meetings, or reports." *Id.* (citing *Arlington Heights*, 429 U.S. at 268). The record revealed that the General Assembly requested a report on voting patterns, and that data established that African Americans in North Carolina disproportionately used early voting, same-day registration, and out-of-precinct voting. *N.C. State Conf. of NAACP*, 831 F.3d at 230. The court held that "relying on this data, the General Assembly enacted legislation restricting all—and only—practices disproportionately used by African Americans …. [W]e cannot ignore the choices the General Assembly made with this data in hand." *Id.*

- **Impact.** The first *Arlington Heights* factor, statistics demonstrating a clear pattern of discriminatory effect, acknowledges that disparate impact evidence can be probative of discriminatory intent. *Arlington Heights*, 429 U.S. at 266 (discussing the importance of the impact of the official action, including "whether it bears more heavily on one race than another"). Here, the court analyzed the available impact data and held that the same data showing that African Americans disproportionately used each of the voting mechanisms removed by the new provisions also established "sufficient disproportionate impact" for an *Arlington Heights* analysis. *N.C. State Conf. of NAACP*, 831 F.3d at 231.

The court conducted a cumulative assessment of this evidence:

> [T]he totality of the circumstances—North Carolina's history of voting
> discrimination; the surge in African American voting; the legislature's knowledge
> that African Americans voting translated into support for one party; and the swift
> elimination of the tools African Americans had used to vote and imposition of a
> new barrier at the first opportunity to do so—cumulatively and unmistakably
> reveal that the General Assembly used [the new law] to entrench itself.

*Id* at 233. Accordingly, when viewed collectively, the evidence in the record established
intentional discrimination based on race. *Id.*

Finally, it is important to understand that under the *Arlington Heights* framework, evidence
identifying similarly situated comparators is helpful but not required. In this regard, the
relationship between the *Arlington Heights* framework and the *McDonnell-Douglas* framework
is sometimes misunderstood. As discussed more extensively below in Section B.3., the
*McDonnell-Douglas* method of proof requires a showing that the recipient treated one or a few
similarly situated individuals differently because of race, color, or national origin. However,
plaintiffs alleging intentional discrimination under civil rights statutes "need not demonstrate the
existence of a similarly situated entity who or which was treated better than the plaintiff in order
to prevail." *Pac. Shores Props.*, 730 F.3d at 1158-59 (explaining that a plaintiff need not rely on
the *McDonnell-Douglas* approach to intentional discrimination but may instead produce
circumstantial evidence of intentional discrimination using the *Arlington Heights* method).
*McDonnell Douglas* "is not a straightjacket requiring the plaintiff to demonstrate that such
similarly situated entities exist" but is just *one* way to prove intentional discrimination. *Id*. at
1159.

**Impact evidence.** In many cases, including many litigated under *Arlington Heights*, evidence
will show that an ostensibly race-neutral practice has had a much more harmful effect on
minorities than on non-minorities. *Arlington Heights* instructs courts and agencies to consider
"the impact of the official action" including whether "it bears more heavily on one race than
another." 429 U.S. at 266 (citations and quotations omitted). Accordingly, the discriminatory
impact of a facially neutral policy or practice (frequently, but not always, demonstrated through
the use of statistics) can be used as part of the evidentiary showing in an intentional
discrimination case. *See Melendres v. Arpaio*, 989 F. Supp. 2d 822, 902 (D. Ariz. 2013)
(awarding injunctive relief to Title VI plaintiffs and finding that plaintiffs demonstrated "racially
disparate results" and "additional indicia of discriminatory intent") (citing *Feeney*, 442 U.S. at
272); *see also Arlington Heights*, 429 U.S. at 264–66; *Conn. Concerning Cmty. Improvement v.
City of Modesto*, 583 F.3d 690 (9th Cir. 2009) (Title VI and equal protection case finding that
statistical evidence was sufficient to create inference of intent where race-neutral precondition to
receiving municipal services served to exclude Latino-majority neighborhoods)).

In only rare instances will a showing of disparate impact by itself support a showing of discriminatory intent—for example, where racially variant results cannot be explained on other grounds, such as in cases of a dramatic mismatch between jury representation and the composition of a surrounding community. *Castaneda v. Partida*, 430 U.S. 482, 495–96 (1977). In most instances, however, "impact alone is not determinative, and the Court must look to other evidence." *Arlington Heights*, 429 U.S. at 266, 267–68 (enumerating factors that indicate evidence of intent) (footnotes omitted).

When attempting to rely on impact evidence in an intent case, the plaintiff must, as an initial matter, precisely identify the "facially neutral policy or practice" at the heart of the discrimination claim. (The Title VI Legal Manual's disparate impact section discusses this requirement in detail.) In addition, in *Arlington Heights*, the selection of a similarly situated comparator group is a key feature of cases where plaintiffs proffer impact evidence. By its nature, "disparate impact" evidence involves showing a disparity. Plaintiff must show that the extent of harm the policy or practice causes minorities and non-minorities is different. The level or degree of impact that a plaintiff alleging discriminatory intent must show depends on a variety of factors, including the strength of the impact evidence and the strength of other indicators of intent under *Arlington Heights*. But, as one court noted, "[i]t would be improper to posit a quantitative threshold above which statistical evidence of disparate racial impact is sufficient as a matter of law to infer discriminatory intent, and below which it is insufficient as a matter of law." *Gay v. Waiters' & Dairy Lunchmen's Union, Local No. 30*, 694 F.2d 531, 551 (9th Cir. 1982). Because disparate impact is not the only factor in an *Arlington Heights* case, "showing disproportionate impact, even if not overwhelming impact, suffices to establish one of the circumstances evidencing discriminatory intent." *N. Carolina State Conference of NAACP*, 831 F.3d at 231.

In addition, impact evidence most often involves the presentation of statistical evidence. *Thomas v. Washington Cty. Sch. Bd.*, 915 F.2d 922, 926 (4th Cir. 1990). However, statistical evidence, while extremely beneficial, is not a necessity in impact cases. *Id*. Indeed, a series of "discrete episodes" negatively affecting minorities can raise a plausible inference of discriminatory impact. *McCoy v. Canterbury*, No. 3:10-0368, 2010 WL 5343298, at *5 (S.D.W. Va. Dec. 20, 2010), *aff'd*, 428 Fed. App'x 247 (4th Cir. 2011). Accordingly, non-statistical evidence of harm to minorities and non-minorities that is significantly different will be relevant evidence in an *Arlington Heights* case.

Moreover, statistics alone will seldom prove discriminatory intent. There may be cases where statistics establish "a clear pattern, unexplainable on grounds other than race," "but such cases are rare." *Arlington Heights*, 429 U.S. at 266, No matter how "devastating or reliable" the statistics appear to be, *Ward v. Westland Plastics, Inc.*, 651 F.2d 1266, 1270 (9th Cir. 1980) (per curiam), they must reveal that some "invidious discriminatory purpose" is causing the disparate

USCA4 Appeal: 23-1453      Doc: 17      Filed: 06/05/2023      Pg: 218 of 610

outcomes. *Arlington Heights*, 429 U.S. at 266; *see also Feeney*, 442 U.S. at 279 (plaintiff must show that the rule was promulgated or reaffirmed "'because of,' not merely 'in spite of,' its adverse impact on" persons in the plaintiff's class); *Horner v. Ky. High Sch. Athletic Ass'n*, 43 F.3d 265, 276 (6th Cir. 1994) (citing *Feeney*). As such, and in most instances, "the question whether the facts proved are sufficient to permit a legal inference of discriminatory intent cannot properly be reduced into a mere battle of statistics." *Gay*, 694 F.2d at 552.[12] Absent a "stark" pattern, then, discriminatory intent requires more than discriminatory impact. *Arlington Heights*, 429 U.S. at 266.

**Recipient's awareness of the impact.** Also consistent with the *Arlington Heights* factors is an inquiry into whether the discriminatory impact of the challenged action was foreseeable:

> [A]ctions having foreseeable and anticipated disparate impact are relevant evidence to prove the ultimate fact, forbidden purpose.... [T]he foreseeable effects standard [may be] utilized as one of the several kinds of proofs from which an inference of segregative intent may be properly drawn.... Adherence to a particular policy or practice, with full knowledge of the predictable effects of such adherence ... is one factor among many others which may be considered by a court in determining whether an inference of segregative intent should be drawn.

*Columbus Bd. of Educ. v. Penick*, 443 U.S. 449, 464–65 (1979); *see United States v. Brown*, 561 F.3d 420, 433 (5th Cir. 2009). Foreseeability is a common feature of Title VI and equal protection claims, and allegations that properly package foreseeability together with factors such as impact and history of defendant's actions, have succeeded.[13] *See, e.g.*, *N.C. State Conf. of NAACP*, 831 F.3d at 223; *Dowdell v. City of Apopka*, 698 F.2d 1181, 1186 (11th Cir. 1983) (discussing "obviously foreseeable" outcome of the town's decision to spend nearly all of its revenue-sharing monies on the white community, at the expense of communities of color); *United States v. Bannister*, 786 F. Supp. 2d 617, 665–66 (E.D.N.Y. 2010) (expressing support for using discriminatory impact, foreseeable consequences, and historical background to demonstrate intent in enacting mandatory minimums for crack cocaine, but determining that court could not find intentional discrimination where Second Circuit already made finding on the specific issue under consideration).

---

[12] For a detailed case analysis of statistical evidence, circumstantial evidence, the strength of each, and the cumulative picture of intent presented by both types of evidence together in the Title VII context, *see Gay*, 694 F.2d at 555–56.

[13] Similarly, an agency may be able to use impact evidence under the deliberate indifference framework, originally developed to analyze hostile environment harassment claims, to show that the recipient knew a federally protected right was substantially likely to be violated and failed to act despite that knowledge. This approach is closely related to the *Arlington Heights* framework. As in the cases discussed in this section, foreseeability or knowledge of harm is a key feature of this method of proof. *See infra* section C.3.

Pg: 219 of 610        Filed: 06/05/2023        Doc: 17        USCA4 Appeal: 23-1453

Additional examples of successful outcomes where impact and foreseeable consequences combine with other *Arlington Heights* factors, such as history of state action, include the following:

- Spanish-speaking food stamp beneficiaries alleged that state agencies administering the state food stamp program continued a policy of failing to ensure bilingual services for food stamp applicants who were limited English proficient. The plaintiffs alleged that the defendants continued this policy while knowing that Spanish-speaking applicants and beneficiaries were being harmed as a consequence. The court found that such knowledge was sufficient to state a Title VI claim that the defendants purposefully acted based on national origin, finding that "disparate impact, history of the state action, and foreseeability and knowledge of the discriminatory onus placed upon the complainants" is the type of circumstantial evidence upon which a case of intentional discrimination is often based. *Almendares v. Palmer*, 284 F. Supp. 2d 799, 806 (N.D. Ohio 2003) (citations omitted)

- A facially neutral NCAA rule (Proposition 16) raising the minimum academic requirements for incoming college athletes to qualify for athletic scholarships and compete in college sports applied to all incoming college athletes but had a statistically greater adverse impact on black athletes. The NCAA was aware that the impact of the proposed rule would reduce the number of black athletes qualifying for athletic scholarships, and adopted the rule specifically to promote higher academic standards among black athletes. The court held that plaintiffs had stated a claim of purposeful discrimination under Title VI. *Pryor v. NCAA*, 288 F.3d 548, 562 (3d Cir. 2002). *Pryor* directly addressed the *Arlington Heights* standards for intentional discrimination, concluding that the plaintiffs met the intent test where the NCAA had actual notice and knowledge of the impact on black athletes, and affirmatively considered that impact in reaching its decision to adopt Proposition 16.[14]

- Plaintiffs claimed intentional discrimination based partly on the defendant's knowledge of the impact that placement of a cement grinding facility would have on the minority community, together with allegations regarding historical practices and a specific sequence of events leading to the placement decision. The court found that the plaintiffs "not only showed that the operation of the cement grinding facility would have a disparate impact upon the predominantly minority community … but also that the [defendant] was well-aware of the potential disproportionate and discriminatory burden

---

[14] The *Pryor* court partially distinguished *Feeney*, 442 U.S. at 256, in which the Court refused to find that a Massachusetts veterans' preference statute deprived women of equal protection of the laws. It noted that the NCAA had actual notice and knowledge of the impact on the minority students, while the Court in *Feeney* could only *infer* that the "legislature almost certainly was aware" that the law benefiting veterans would disadvantage women. *Pryor*, 288 F.3d at 564.

placed upon that community and failed to take measures to assuage that burden." The
court further determined that the plaintiffs had stated a claim of intentional discrimination
under Title VI, sufficient to survive the defendant's motion to dismiss. The court set forth
that "the controlling decisions of the Supreme Court and the Third Circuit make it clear
that a case of intentional discrimination is often based upon the type of circumstantial
evidence which the … Plaintiffs allege …., namely, disparate impact, history of the state
action, and foreseeability and knowledge of the discriminatory onus placed upon the
complainants." *S. Camden*, 254 F. Supp. at 496–97 (citing *Arlington Heights*, 429 U.S. at
267; *Penick*, 443 U.S. at 465 (1979); *Pryor*, 288 F.3d at 563).[15]

3.     **The *McDonnell-Douglas* Framework**

Another common way to prove intentional discrimination is to establish that a recipient treated
similarly situated individuals differently because of race, color, or national origin.

1) **Step 1—The prima facie case**

Plaintiff must first prove a prima facie case of discrimination by a preponderance of the
evidence. To establish a prima facie case of intentional discrimination under Title VI using the
*McDonnell-Douglas* framework from Title VII, a plaintiff typically shows that he or she is a
member of a particular protected group, was eligible for the recipient's program, activity or
service, and was not accepted into that program or otherwise treated in an adverse manner, and
that an individual who was similarly situated with respect to qualifications, but was not in the
plaintiff's protected group was given better treatment. *See, e.g., Brewer v. Bd. of Trs. of Univ. of
Ill.*, 479 F.3d 908, 921 (7th Cir. 2007) (Title VI case where court found that plaintiff's case "falls
apart because of a failure to locate a similarly situated individual").[16]

---

[15] In a subsequent proceeding, the court granted summary judgment for the defendants on the issue of intentional
discrimination under Title VI by noting that "assuming, *arguendo,* that Plaintiffs are correct that '[t]he disparate
impact of [issuing the permit to the defendant] was clearly [foreseeable]' to [the defendants], Pls.' Opp. at 71, such a
foreseeable impact is of no aid to Plaintiffs at this juncture because it, alone, is insufficient to establish a
constitutional violation." *S. Camden Citizens in Action v. N.J. Dep't of Envtl. Prot.*, No. Civ. A. 01-702 (FLW),
2006 WL 1097498 at *36 (D.N.J. Mar. 31, 2006) (citing *Penick*, 443 U.S. at 465). In so ruling, the court found
insufficient evidence of *Arlington Heights* factors alleged at the motion to dismiss stage, such as a history of
discrimination on the part of the defendant. *S. Camden*, 2006 WL 1097498 at *26–28. The court determined that, in
the absence of the other *Arlington Heights* factors raised at the motion to dismiss stage, foreseeable impact alone is
insufficient to demonstrate intent. *Penick* has cautioned that "disparate impact and foreseeable consequences,
without more, do not establish a constitutional violation." *Penick*, 443 U.S. at 464. *See also Dayton Bd. of Educ. v.
Brinkman*, 443 U.S. 526, 536 n.9 (1979) (foreseeable adverse impact may be relevant evidence in proving purposeful
discrimination, but foreseeability by itself has not been held to make out a case of purposeful discrimination).

[16] The elements of a prima facie case are the same under both Title VI and VII. *Paul v. Theda Med. Ctr., Inc.*, 465
F.3d 790, 794 (7th Cir. 2006); *Fuller v. Rayburn*, 161 F.3d 516, 518 (8th Cir. 1998).

USCA4 Appeal: 23-1453     Doc: 17     Filed: 06/05/2023     Pg: 220 of 610

Filed: 06/05/2023    Pg: 221 of 610

Doc: 17

USCA4 Appeal: 23-1453

---

**AGENCY PRACTICE TIP**

Agencies can use the *McDonnell-Douglas* framework for investigations involving the selection of individuals, such as for program participation, benefits, or services, particularly where the recipient provides a nondiscriminatory explanation for its decision. This method is most likely to be helpful where the complaint is about one or a few individuals, and involves easily identifiable similarly situated individuals not in the protected class. For instance, a complaint alleging that a state agency denied benefits to a family because of that family's national origin might be investigated using this method.

---

With respect to what constitutes adverse action or "harm," there are "no bright-line rules," *Wanamaker v. Columbian Rope Co.*, 108 F.3d 462, 466 (2d Cir. 1997), so courts and agencies must make that determination in each case. As such, whether conduct rises to the level of "adverse action" is a fact-specific inquiry. The harm need not be physical in nature, or even the type of harm that would permit an award of compensatory damages. For example, the Supreme Court has held that intentional racial segregation is a harm in and of itself. *See Brown v. Bd. of Educ.*, 347 U.S. 483 (1954). Similarly, the stigma that intentional discrimination may cause is a cognizable harm. *See generally Johnson v. California*, 543 U.S. 499, 507 (2005) ("racial classifications 'threaten to stigmatize individuals by reason of their membership in a racial group'") (quoting *Shaw v. Reno*, 509 U.S. 630, 643 (1993)). The provision of fewer or inferior services or benefits to a person or class of persons will satisfy the adversity requirement, but adversity can be established even without the loss of specific services or benefits; threatened or imminent harm can satisfy the adverse action requirement.

Moreover, Title VI's broad nondiscrimination mandate means that investigating agencies generally should take an inclusive approach to determining legally sufficient harms. Title VI's plain language supports this approach. The statute states that no person shall on the ground of race, color, or national origin "be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 42 U.S.C. § 2000d. Agency regulations further state that recipients may not administer their programs or activities in a manner that "den[ies] any individual *any disposition, service, financial aid, or benefit* provided under the program," 28 C.F.R. § 42.104(b)(1)(i) (DOJ) (emphasis added), or "restrict[s] an individual *in any way* in the enjoyment of any advantage or privilege enjoyed by others receiving any disposition, service, financial aid, or benefit under the program," *Id.* § 42.104(b)(1)(iv) (emphasis added). This language is best read to encompass a broad range of "adverse actions" that may be caused by a recipient's administration of its program.[17]

---

[17] The DOJ regulations quoted here are similar to those of other agencies.

USCA4 Appeal: 23-1453      Doc: 17      Filed: 06/05/2023      Pg: 222 of 610

For a more detailed discussion of case law addressing the harms cognizable under Title VI, see Section VII, Section C.1.b., which discusses the threshold showing of adversity required under the disparate impact standard.

### 2) Step 2 – The defendant must articulate a legitimate non-discriminatory reason

If the plaintiff establishes a prima facie case, the burden in court shifts to the defendant to articulate some legitimate, nondiscriminatory reason for the challenged action. *EEOC v. Boeing Co.*, 577 F.3d 1044, 1049 (9th Cir. 2009). The defendant's explanation of its legitimate reasons must be clear and reasonably specific; not all proffered reasons would be legally sufficient to rebut a prima facie case. *See Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 254–55, 258 (1981). For example, in the employment context, a defendant may not merely state that the employment decision was based on the hiring of the "best qualified" applicant, but must provide specifics regarding that applicant's qualifications, such as seniority, length of service in the same position, personal characteristics, general education, or experience in comparable work, and must demonstrate why that person's qualifications were considered superior to those of the plaintiff. *See Steger v. Gen. Elec. Co.*, 318 F.3d 1066, 1075–76 (11th Cir. 2003).

### 3) Step 3 – The plaintiff must demonstrate pretext

If the defendant meets the Step 2 burden, the burden shifts back to the plaintiff to demonstrate that the proffered reason is false—that is, that the nondiscriminatory reason(s) the defendant gives for its actions are not the true reasons and are actually a pretext for the exercise of prohibited discriminatory intent. *Brooks v. Cty. Comm'n of Jefferson Cty.*, 446 F.3d 1160, 1162–63 (11th Cir. 2006) (addressing a Title VII race discrimination claim). A plaintiff can show pretext by pointing to "weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions" in the defendant's proffered legitimate reasons for its action, such that a reasonable fact finder could rationally find them unworthy of credence. *Id.* at 1163 (quoting *Jackson v. Ala. State Tenure Comm'n*, 405 F.3d 1276, 1289 (11th Cir. 2005)); *Mickelson v. N.Y. Life Ins. Co.*, 460 F.3d 1304, 1315 (10th Cir. 2006). Plaintiffs can, for example, present evidence that the defendant's stated reasons for taking the adverse action were false; the defendant acted contrary to a written policy setting forth the action the defendant should have taken under the circumstances; or the defendant acted contrary to an unwritten policy or practice when making the decision. *See Plotke v. White*, 405 F.3d 1092, 1102 (10th Cir. 2005). A plaintiff may also show pretext through evidence that the "employer's proffered non-discriminatory reasons [were] either a *post hoc* fabrication or otherwise did not actually motivate the employment action ...." *Fuentes*, 32 F.3d at 764.

---

**AGENCY PRACTICE TIP**

As mentioned previously, certain procedural aspects of the methods of proof developed in the litigation context do not transfer to the administrative context. Here, the *McDonnell-Douglas* burden-shifting test that applies in litigation to determine whether an institution has engaged in intentional discrimination does not necessarily apply in the context of agency enforcement activities prior to administrative litigation. An agency is free to collect and analyze the evidence described in the steps below as part of its initial investigation, or may choose to make a preliminary prima facie finding and require the recipient to articulate its defense as a next step.

---

The Supreme Court has cautioned that the four *McDonnell-Douglas* elements are not "an inflexible formulation." *Teamsters*, 431 U.S. at 358. Further, as previously noted, agency Title VI investigations generally follow a non-adversarial model that does not involved burden-shifting. Nevertheless the *McDonnell-Douglas* framework may be useful for complaint investigations, particularly where the investigation uncovers evidence of similarly situated comparators who were treated differently or better. The example below, from joint DOJ and Department of Education guidance, illustrates how the *McDonnell-Douglas* framework would inform an administrative investigation.[18]

---

**ILLUSTRATION: MCDONNELL DOUGLAS FRAMEWORK APPLIED TO INVESTIGATION OF ALLEGED DISCRIMINATORY SCHOOL DISCIPLINE**

**Complaint.** Plaintiff alleged discrimination after a school imposed different disciplinary sanctions on two students in the sixth grade—a non-Hispanic student and a Hispanic student—who engaged in a fight. Both students had similar disciplinary histories, having each previously received after-school detention for minor infractions. The Hispanic student received a three-day out-of-school suspension for the student's involvement in the fight, while the non-Hispanic student received a two-day out-of-school suspension for the same misconduct, raising a concern that the students were treated differently based on race.

Based on these facts and circumstances, the Departments of Education and Justice would make an initial determination that the students were **similarly situated**, as they were involved in the same incident and have similar discipline records. If the school provided evidence of facts and circumstances surrounding the incident that would constitute a **legitimate, nondiscriminatory reason** for the different treatment, such as evidence that it disciplined the Hispanic student more severely because the student instigated the fight and directly threatened school officials who tried to break up the fight, then these facts and circumstances might constitute a nondiscriminatory reason for the different treatment. If

---

[18] Dep't of Justice and Dep't of Educ., "Dear Colleague" Letter on the Nondiscriminatory Administration of School Discipline (Jan. 8, 2014), *available at* http://www2.ed.gov/about/offices/list/ocr/letters/colleague-201401-title-vi.html.

Filed: 06/05/2023     Pg: 223 of 610       Doc: 17       USCA4 Appeal: 23-1453

USCA4 Appeal: 23-1453    Doc: 17    Filed: 06/05/2023    Pg: 224 of 610

> the school failed to provide a legitimate nondiscriminatory reason for imposing a different sanction on either student, the Departments could find that the school had violated Title VI.
>
> If, however, the school did provide a legitimate, nondiscriminatory reason for the different sanction, the Departments would probe further to determine whether the reason given for the enhanced sanction was an accurate statement of the reasons for different treatment of the two students, or constituted a **pretext for racial discrimination**. In making this determination, the Departments would request and consider information such as witness statements, codes of conduct, and student disciplinary records. The Departments would then evaluate, among other things, whether the school conformed to its written policies; whether the Hispanic student did, in fact, instigate the fight; and whether the school had previously imposed a higher sanction on non-Hispanic students who had instigated fights.

## C.    Other Issues Affecting Title VI Cases Involving Possible Intentional Discrimination

### 1.    Proof of Systemic or Wide-Spread Discrimination (Pattern or Practice Discrimination)

Principles similar to those discussed above may be used to establish that a recipient engaged in widespread discrimination in violation of Title VI. In these cases, one means of proving intentional discrimination is through circumstantial evidence showing a statistical disparity that affects a large number of individuals. Agencies investigating complaints alleging widespread discrimination may find useful guidance in Title VII case law that discusses "pattern or practice" discrimination. The phrase "pattern or practice" can be used to describe a systemic violation of Title VI, regardless of the method of proof employed. Although statistical evidence is usually used to establish a pattern or practice of intentional discrimination, it is not required to establish wide-spread or systemic discrimination. This section focuses on the use of statistical evidence of disparity to establish a pattern showing different treatment based on race, color, or national origin.

In *International Brotherhood of Teamsters v. United States*, 431 U.S. 324 (1977), a case brought under the "pattern or practice" provision of Title VII, the Court stated that "statistics showing racial or ethnic imbalance are probative … because such imbalance is often a telltale sign of purposeful discrimination." *Id.* at 339 n.20. Accordingly, statistical evidence of a sufficiently "gross disparity" between the affected population and the general population may establish an inference of intentional discrimination. *Hazelwood Sch. Dist. v. United States*, 433 U.S. 299, 307–08 (1977) ("Where gross statistical disparities can be shown, they alone may in a proper case constitute *prima facie* proof of a pattern or practice of discrimination.").

As previously noted, the term "pattern or practice" can be used broadly to refer to systemic discrimination. The term "pattern or practice" also refers to a technical claim type authorized by various civil rights statutes. These statutes use the term to define the authority of the Attorney General or private parties to bring certain claims in court. *See, e.g.,* Title VII, 42 U.S.C. § 2000e-

USCA4 Appeal: 23-1453      Doc: 17      Filed: 06/05/2023      Pg: 225 of 610

6(a); The Violent Crime Control and Law Enforcement Act of 1994, 42 U.S.C. § 14141(b); The Omnibus Crime Control and Safe Streets Act of 1968, 42 U.S.C. § 3789d(c)(3). A Title VII pattern or practice case, for example, will demonstrate that an employer is taking action that causes the same kind of harm to a great number of individuals. In *Teamsters,* the employer used job transfer policies that punished individuals, primarily minorities, who tried to transfer from less desirable jobs to more desirable ones. The "pattern or practice" that was challenged harmed many minorities in precisely the same manner. While Title VI does not expressly include a "pattern or practice" claim, principles developed in these contexts and discussed below can nevertheless inform the investigation and analysis of Title VI claims. *See, e.g., Melendres v. Arpaio,* 695 F.3d 990 (9th Cir. 2012) (class action alleging pattern or practice of racial profiling by law enforcement agency in violation of Title VI and the Fourth and Fourteenth Amendments); Dep't of Justice, Investigation of Los Angeles County Sheriff's Department Stations in Antelope Valley (June 28, 2013) (Title VI pattern or practice violation).[19]

For Title VI, that kind of widespread or broad discriminatory practice is often viewed or described as a claim of "systemic discrimination"—a practice that harms a large number of minority individuals in the same manner. For example, were a written test used to determine eligibility for a federally funded benefit or program, and the test resulted in a much higher percentage of minorities than non-minorities being determined ineligible for the benefit or access to the program, that might present a case of systemic discrimination. The method of proof used in pattern or practice cases under other statutes can be applied to these kinds of Title VI cases.

To prove such systemic discrimination using this method in a Title VI case, the plaintiff must show that discrimination was the recipient's standard operating procedure; that is, the plaintiff must "prove more than the mere occurrence of isolated or accidental or sporadic discriminatory acts." *EEOC v. Joe's Stone Crab, Inc.,* 220 F.3d 1263, 1286–87 (11th Cir. 2000) (quoting *Teamsters,* 431 U.S. at 336 (internal quotation marks omitted)). Rather, the plaintiff must establish by a preponderance of the evidence that discrimination is the company's "regular rather than unusual practice." *Joe's Stone Crab,* 220 F.3d at 1287 (quoting *Teamsters,* 431 U.S. at 336). A plaintiff in a pattern or practice case can prove that discrimination was the defendant's "standard operating procedure" by, among other things, presenting statistical evidence of similarly situated individuals not in the protected class who were treated better than those in the protected class. *Craik v. Minn. State Univ. Bd.,* 731 F.2d 465, 470 (8th Cir. 1984).

In a case alleging such pervasive or systemic discrimination, the plaintiff need not initially show discrimination against any particular person; rather the critical showing at the prima facie stage is one of a pervasive policy of intentional discrimination affecting many individuals. *See Teamsters,* 431 U.S. at 360; *Chin v. Port Auth. of N.Y. & N.J.,* 685 F.3d 135, 147 (2d Cir. 2012)

---

[19] The report of investigation is located on the following website: http://www.justice.gov/crt/special-litigation-section-cases-and-matters (search "Antelope"; last visited Sept. 15, 2016).

USCA4 Appeal: 23-1453      Doc: 17          Filed: 06/05/2023      Pg: 226 of 610

(noting that in such cases "the government need not demonstrate specific losses to specific individuals to establish that injunctive relief is appropriate"). Once the plaintiff has established a prima facie case, the defendant can rebut it by either demonstrating that the plaintiff based his or her statistical calculations on faulty data, flawed computations, or improper methodologies, or by introducing alternative statistical evidence. *Teamsters*, 431 U.S. at 360 & n.46. As in other disparate treatment cases, the ultimate burden of persuasion rests with the plaintiff. *Id.* at 362 n.50 (citing *McDonnell-Douglas*, 411 U.S. at 804–06). If the defendant fails to rebut the inference that arises from the plaintiff's prima facie case, the court can conclude "that a violation has occurred." *Id.* at 361.

---

**AGENCY PRACTICE TIP**

As emphasized above in the *McDonnell-Douglas* discussion, certain procedural aspects of methods of proof developed in the litigation context do not transfer to the administrative context. Here, the Title VII burden-shifting test for formal "pattern or practice" claims that applies in litigation to determine whether an institution has engaged in intentional discrimination does not necessarily apply in the context of agency enforcement activities prior to litigation. An agency is free to collect and analyze all the evidence described in this section as part of its initial investigation, or may choose to make a preliminary prima facie finding and require the recipient to articulate its defense as a next step.

---

As previously stated, statistics typically are used to help establish that a pattern of discrimination based on race, color, or national origin was the recipient's "standard operating procedure." *Teamsters*, 431 U.S. at 336; *Hazelwood*, 433 U.S. at 307. Statistics showing racial or ethnic imbalance are probative in pattern or practice cases because a clear and significant imbalance based on race or ethnicity is often an indication of purposeful discrimination. *Teamsters*, 431 U.S. at 339 n.20; *Lujan v. Franklin Cty. Bd. of Educ.*, 766 F.2d 917, 929 (6th Cir. 1985). In these cases, most often, statistics are "coupled with anecdotal evidence of the … intent to treat the protected class unequally." *Mozee v. Am. Commercial Marine Serv. Co.*, 940 F.2d 1036, 1051 (7th Cir. 1991).[20] Statistical evidence can sometimes serve by itself to establish a prima facie case in the pattern or practice context, in lieu of comparative evidence pertaining to each class member. *Teamsters*, 431 U.S. at 336; *Hazelwood*, 433 U.S. at 307–08 ("Where gross statistical disparities can be shown, they alone may in a proper case constitute prima facie proof of a

---

[20] Note that "the absence of statistical evidence [will not] invariably prove fatal in every pattern or practice case. [In employment cases,] [w]here the overall number of employees is small, anecdotal evidence may suffice." *In re W. Dist. Xerox Litig.*, 850 F. Supp. 1079, 1084 (W.D.N.Y. 1994); *accord*, *Pitre v. Western Elec. Co.*, 843 F.2d 1262, 1268 (10th Cir. 1988); *Haskell v. Kaman Corp.*, 743 F.2d 113, 119 (2d Cir. 1984). Conversely, in certain cases, "a plaintiff's statistical evidence alone might constitute a prima facie case." *Coates v. Johnson & Johnson*, 756 F.2d 524, 532 n.6 (7th Cir. 1985) (citing *Segar v. Smith*, 738 F.2d 1249, 1278 (D.C. Cir. 1984)). "Neither statistical nor anecdotal evidence is automatically entitled to reverence to the exclusion of the other." *Id.* at 533. However, "[w]hen one type of evidence is missing altogether, the other must be correspondingly stronger for plaintiffs to meet their burden." *In re W. Dist. Xerox Litig.*, 850 F. Supp. at 1085. *Compare Chisholm v. USPS*, 665 F.2d 482, 495 (4th Cir. 1981) (twenty class plaintiffs was sufficient to support the statistical evidence) *with Ste. Marie v. E. R.R. Ass'n*, 650 F.2d 395, 406 (2d Cir. 1981) (seven discriminatory acts coupled with problematic statistical evidence were insufficient to support finding pattern or practice discrimination).

USCA4 Appeal: 23-1453   Doc: 17   Filed: 06/05/2023   Pg: 227 of 610

pattern or practice of discrimination.") As one court explained, "strong statistics may prove a case on their own, while shaky statistics may be insufficient unless accompanied by additional evidence." *EEOC v. O & G Spring & Wire Forms Specialty Co.*, 38 F.3d 872, 876 (7th Cir. 1994) (citing *Teamsters*, 431 U.S. at 340).

While there is no "rigid mathematical formula" for determining whether a disparity is significant, *Watson v. Fort Worth Bank & Trust*, 487 U.S. 977, 994–95 (1988), courts have adopted various tests to aid them in making this determination. For example, some courts have looked to whether the disparity is statistically significant. *Hazelwood*, 433 U.S. at 308 n.14 (an inference of discrimination will generally arise where "'the difference between the expected value and the observed number is greater than two or three standard deviations'") (quoting *Castaneda*, 430 U.S. at 496 n.17).[21] Other courts have looked at whether the disparity is both statistically and practically significant. *See Thomas v. Metroflight, Inc.*, 814 F.2d 1506, 1510 n.4 (10th Cir. 1987) (suggesting that courts may require, in addition to statistical significance, that the observed disparity be substantial). Still other courts have recognized the usefulness of multiple regression analyses, a statistical tool for understanding the relationship between two or more variables where there are several possible explanations for a given outcome, which, in turn, aids in isolating the most relevant variable and determining its effect on the outcome. *See, e.g.,* *Bazemore v. Friday*, 478 U.S. 385, 400 (1986) (observing the usefulness of multiple regression analysis, even one that did not include all measurable variables).

Here are a few cases in which systemic discrimination was proved:

- Latino motorists were deprived of constitutional rights as a result of being detained by a law enforcement agency conducting "saturation patrols" or "sweeps" targeting Latinos suspected of being illegally present in the country. Law enforcement deputies engaged in a pattern of racially profiling Latinos for vehicle stops. *Melendres*, 695 F.3d at 998 (addressing Title VI and equal protection claims).

- The deliberate and systematic exclusion of women from food server positions based on sexual stereotypes associating a "fine-dining ambience" with all–male food service may amount to a pattern or practice. While the court ultimately remanded the case because of conflicting witness testimony and conclusions drawn by the lower court, the decision set forth certain guideposts regarding the kind of evidence that may prove helpful to establish that discrimination was the defendant's "standard operating procedure." For

---

[21] However, "[t]here is no minimum statistical threshold" mandating that plaintiff has demonstrated a violation. *Waisome v. Port Auth. of N.Y. & N.J.*, 948 F.2d 1370, 1376 (2d Cir. 1991); *accord Chin v. Port Auth. of N.Y. & N.J.*, 685 F.3d 135, 153 (2d Cir. 2012). Courts should take a "'case-by-case approach' in judging the significance or substantiality of disparities, one that considers not only statistics but also all the surrounding facts and circumstances." *Waisome*, 948 F.3d at 1376; *Chin*, 685 F.3d at 153 (quoting *Waisome*).

SECTION VI                          DOJ TITLE VI LEGAL MANUAL                                    25

example, the court noted the testimony of several witnesses who described the defendant's active discouragement of women applying for employment. The court explained that a plaintiff may establish systemic discrimination "'through a combination of strong statistical evidence of disparate impact coupled with anecdotal evidence of the employer's intent to treat the protected class unequally.' [Further,] direct evidence of an intent to discriminate' may be used to establish a pattern or practice claim." *Joe's Stone Crab Inc.*, 220 F.3d at 1285, 1287 (Title VII case) (citing *Mozee*, 940 F.2d at 1051, and *Lujan*, 766 F.2d at 929 n.15).

- Defendant's motion for partial summary judgment was denied where the EEOC argued that the defendant's "standard operating procedure—its regular rather than unusual practice"—was to ignore most (if not all) of its female employees' complaints that they were individually, or as a group, being subjected to a sexually hostile and abusive environment. The alleged offensive conduct included unwelcome sexual advances, demands for sexual favors, and other offensive verbal and physical conduct of a sexual nature. The court held that the employer was aware of this possible sexual harassment and its failure to act indicated that it tolerated individual acts of sexual harassment. *EEOC v. Mitsubishi Motor Mfg. of Am.*, 990 F. Supp. 1059, 1069 (C.D. Ill. 1998) (Title VII case).

## 2.    Permissible Use of Race

It is critical for agencies to be aware that the exercise of a race-based motive does not mean that the recipient's actions automatically violate Title VI. The Supreme Court has held that strict judicial scrutiny applies to a governmental entity's intentional use of race, a standard that applies through Title VI to any recipient of Title VI funds. The Court has also held that strict scrutiny does not automatically invalidate the use of race; race may be used when the government has a compelling interest supporting its use, and that use is narrowly tailored to support the stated compelling interest. *Parents Involved in Cmty. Schs. v. Seattle Sch. Dist. No. 1*, 551 U.S. 701, 720 (2007).

Moreover, agency Title VI implementing regulations recognize circumstances under which recipients' consideration of race may be permissible. First, when "administering a program regarding which the recipient has previously discriminated against persons on the ground of race, color, or national origin, the recipient must take affirmative action to overcome the effects of prior discrimination." 28 C.F.R. 42.104(b)(6)(1) (DOJ regulations). Second, "[e]ven in the absence of such prior discrimination, a recipient in administering a program may take affirmative action to overcome the effects of conditions which resulted in limiting participation by persons of a particular race, color, or national origin." 28 C.F.R. 42.104(b)(6)(2) (DOJ regulations).

USCA4 Appeal: 23-1453      Doc: 17      Filed: 06/05/2023      Pg: 229 of 610

Compelling governmental interests, thus far, have included remedying the effects of past discrimination, *United States v. Paradise*, 480 U.S. 149, 161 (1987), and achieving the benefits of diversity in higher education, *Grutter v. Bollinger*, 539 U.S. 303, 333 (2003), and law enforcement, *Wittmer v. Peters*, 87 F.3d 916, 920 (7th Cir. 1996). In addition, a recipient has more latitude to pursue one of these goals through actions that do not award benefits based solely on an individual's race, color, or national origin. *See Parents Involved in Cmty. Sch. v. Seattle Sch. Dist. No. 1*, 551 U.S. 701 (2007) (distinguishing between race conscious mechanisms to achieve diversity in public schools, such as strategic site selection of new schools, and approaches that treat specific individuals differently based on race); *see also Doe ex rel. Doe v. Lower Merion Sch. Dist.*, 665 F.3d 524, 545–46 (3d Cir. 2011) (facially race neutral plan that involved assignment of students based on where they live did not trigger strict scrutiny).

Classifications of individuals based on race, color, or national origin cannot avoid strict scrutiny merely because the recipient asserts a very important interest, such as a public safety justification. "The gravity of the threat alone cannot be dispositive of questions concerning what means law enforcement officers may employ to pursue a given purpose." *City of Indianapolis v. Edmond*, 531 U.S. 32, 42 (2000). "No matter how tempting it might be to do otherwise, [courts] must apply the same rigorous standards even where national security is at stake." *Hassan v. City of New York*, 804 F.3d 277, 306 (3d Cir. 2015). In *Hassan*, the Third Circuit reversed the lower court, ruling that plaintiffs had alleged a viable claim of intentional discrimination where the New York Police Department followed a facially discriminatory policy in surveilling Muslim individuals and businesses in New York and New Jersey, and that this can amount to "direct evidence of intent." *Id.* at 295; *see also Johnson v. California*, 543 U.S. 499, 505–06 (2005) (racial classifications for penological purposes, such as controlling gang activity in prison, subject to strict scrutiny); *United States v. Brignoni-Ponce*, 422 U.S. 873, 885–87 (1975) (law enforcement need "does not justify stopping all Mexican-Americans to ask if they are aliens").

Once a compelling interest is established, a recipient must still demonstrate that it has satisfied narrow tailoring; in other words, that it is using race in the most limited manner that will still allow it to accomplish its compelling interest. *Parents Involved*, 551 U.S. at 720. "Even in the limited circumstance when drawing racial distinctions is permissible to further [an important or] compelling state interest, [the recipient] is still 'constrained in how it may pursue that end.'" *Grutter*, 539 U.S. at 333 (quoting *Shaw v. Hunt*, 517 U.S. 899, 908 (1996)). Strict scrutiny requires that the decision-maker "ultimately be satisfied that no workable race-neutral alternatives would" further the compelling interest "'about as well and at tolerable administrative expense.'" *Fisher v. Univ. of Tex.*, 133 S. Ct. 2411, 2420 (2013) (quoting *Wygant v. Jackson Bd. of Ed.*, 476 U.S. 267, 280 n.6 (1986)). In addition, the relationship between the stated justification and the discriminatory classification must "be substantiated by objective evidence." *Patrolmen's Benevolent Ass'n of New York v. City of New York*, 310 F.3d 43, 53 (2d Cir. 2002). "[M]ere speculation or conjecture is insufficient," *id.*, as are appeals to "'common sense' which

Pg: 230 of 610          Filed: 06/05/2023          Doc: 17          USCA4 Appeal: 23-1453

might be inflected by stereotypes," *Reynolds v. City of Chicago,* 296 F.3d 524, 526 (7th Cir. 2002).

By way of illustration, in some instances police departments have used race or national origin to direct law enforcement activities, and have attempted to justify their conduct by noting that specific individuals from that race or national origin group engaged in illegal activity. Courts consistently reject this kind of stereotyping when examining expressly discriminatory law enforcement policies. *See, e.g., Whren v. United States,* 517 U.S. 806, 813 ("the Constitution prohibits selective enforcement of the law based on considerations such as race"). One court, in ruling that a police department's policy of focusing on Hispanic persons in immigration enforcement was discriminatory, held "there is no legitimate basis for considering a person's race in forming a belief that he or she is more likely to engage in a criminal violation and the requisite 'exact connection between justification and classification' … is lacking." *Melendres,* 989 F. Supp. 2d at 901 (quoting *Gratz v. Bollinger,* 539 U.S. 244, 270 (2003)); *see also Floyd v. City of New York,* 959 F. Supp. 2d 540, 587 (S.D.N.Y. 2013) (rejecting the City's suggestion that law-abiding members of some racial groups have a greater tendency to appear suspicious than members of other racial groups, ruling that a "stop and frisk" program was racially discriminatory).

Similarly, in *Hassan,* an Equal Protection Clause case involving an express religious classification, the Third Circuit held that the NYPD's blanket monitoring of the Muslim community after the September 11 attacks failed strict scrutiny because the surveillance program was not narrowly tailored. The Third Circuit compared the City's public safety justification to the infamous *Korematsu* case, in which the Supreme Court uncritically accepted the government's national security justification for overt discrimination, leading to the wartime imprisonment of American citizens of Japanese ancestry based solely on national origin.[22] The *Hassan* court stated:

> We have learned from experience that it is often where the asserted interest appears most compelling that we must be most vigilant in protecting constitutional rights. "[H]istory teaches that grave threats to liberty often come in times of urgency, when constitutional rights seem too extravagant to endure." *Skinner v. Ry. Labor Execs.' Ass'n,* 489 U.S. 602, 635 (1989) (Marshall, J., dissenting); *see also Grutter,* 539 U.S. at 351 (Scalia, J., concurring in part and dissenting in part) ("The lesson of *Korematsu* is that national security constitutes a 'pressing public necessity,' though the government's use of [a suspect classification] to advance that objective must be [appropriately] tailored."); *Skinner,* 489 U.S. at 635 (Marshall, J. dissenting) ("The World War II relocation-camp cases and the Red scare and McCarthy-era internal subversion cases are only the most extreme reminders that when we allow fundamental freedoms to be

---
[22] *Korematsu v. United States,* 324 U.S. 885 (1944).

USCA4 Appeal: 23-1453        Doc: 17        Filed: 06/05/2023        Pg: 231 of 610

sacrificed in the name of real or perceived exigency, we invariably come to regret it." (citations omitted)).

*Hassan*, 804 F.3d at 306–07.

Obviously, when to determine that a recipient's consideration of race is permissible is complex, and is not extensively discussed here. Guidance documents from the Departments of Justice and Education review applicable legal principles and set out detailed considerations for educational institutions. *See* Dep't of Educ. and Dep't of Justice, "Dear Colleague" Letter on the U.S. Supreme Court ruling in *Schuette v. Coalition to Defend Affirmative Action* (May 6, 2014); Dep't of Educ. and Dep't of Justice, "Dear Colleague" Letter and Guidance Documents on the Voluntary use of Race (Dec. 2, 2011). These also may be useful in understanding how and when recipients may consider race in other contexts. Federal investigating agencies are encouraged to review applicable guidance documents and case law, and to consult their legal counsel or the Civil Rights Division for assistance applying applicable legal principles to specific situations. The Department of Education's Office for Civil Rights is also available to provide assistance about the use of race in the educational context.

### 3.    Intentional Discrimination by a Third Party

Hostile environment harassment is another form of intentional discrimination prohibited by Title VI not discussed here extensively. When the recipient does not create the hostile environment, but a third party, who neither speaks for nor represents the recipient, is responsible, the hostile environment framework focuses on the recipient's obligation to respond adequately to the third party's discriminatory conduct. Both courts and federal agencies have addressed this circumstance in the context of hostile environment discrimination in schools.

A recipient violates Title VI if (1) a third party (e.g., a fellow student) harasses a program participant or beneficiary based on race, color, or national origin and the harassing conduct is sufficiently serious to deny or limit the individual's ability to participate in or benefit from the program or activity (i.e., the harassment creates a hostile environment); (2) the recipient knew or reasonably should have known about the alleged harassment, i.e., actual or constructive notice; and (3) the recipient fails to take prompt and effective steps reasonably calculated to end the harassment, eliminate the hostile environment, prevent its recurrence, and address its effects, as appropriate. A recipient is liable under Title VI for its own conduct when it fails to take adequate steps to address discriminatory harassment. [23]

---

[23] Dep't of Educ. Off. for Civ. Rts., "Dear Colleague" Letter: Harassment and Bullying, (Oct. 26, 2010), *available at* http:// www2.ed.gov/about/offices/list/ocr/letters/colleague-201010.pdf; *see also* Dep't of Educ. Complaint Resolution Letter, *Richmond Heights School District (OH)*, No. 15-11-1134 (May 11, 2012); *Revised Sexual Harassment Guidance: Harassment of Students by School Employees*, Other Students, or Third Parties, 66 Fed. Reg. 5512–01 (Jan. 19, 2001).

Liability in private suits for monetary damages involving student-on-student harassment lies "only where the funding recipient acts with deliberate indifference to known acts of harassment in its programs or activities." *Davis v. Monroe Cty. Sch. Bd.*, 526 U.S. 629, 633 (1999). Often, but not always, termed "deliberate indifference" cases, the standard of proof has been most commonly applied to harassment claims, particularly sex- and race-based claims. However, courts have recognized the standard in cases involving other forms of discriminatory conduct. *See, e.g., Blunt v. Lower Merion School District,* 767 F.3d 247, 271–73 (3d Cir. 2014) (plaintiffs may establish a school district's liability under Title VI for racially motivated student assignments through a deliberate indifference theory).

Similarly, a private plaintiff or investigating agency may be able to use evidence that a recipient knew or should have known about a third party's intentionally discriminatory conduct and failed to act despite that knowledge.

Pg: 232 of 610      Filed: 06/05/2023      Doc: 17      USCA4 Appeal: 23-1453

### SECTION VII: PROVING DISCRIMINATION – DISPARATE IMPACT

**A.**    **Introduction**

**B.**    **Sandoval and the Critical Role of the Federal Funding Agencies**

**C.**    **Proving a Violation of the Disparate Impact Standard**

    **1.**  **Establishing an Adverse Disparate Impact**

        a.   Identifying the facially neutral policy or practice

        b.   *Establishing adversity/harm*

        c.   Establishing disparity

            i.    Identifying the protected class

            ii.   Determining the need for statistical evidence

            iii.  Relevant comparator population

                (a)   Comparator groups that include the total group to which the policy was applied

                (b)   Comparator evidence that is not coextensive with the population subject to the policy

            iv.   Determining the significance of the disparity

        d.   Establishing causation

        e.   Agency approaches to defining adverse disparate impact

    **2.**  **The Recipient's Substantial Legitimate Justification**

        a.   Is the proffered justification legitimate, integral to the recipient's institutional mission, and  important?

            i.    Legitimate

            ii.   Integral

            iii.  Important

        b.   Does the challenged policy or practice bear a demonstrable relationship to the recipient's stated objective?

        c.   Special considerations: site selection or facility closure

    **3.**  **Less Discriminatory Alternatives**

        a.   Evidentiary burdens

        b.   Specificity of evidence of alternatives and  relationship to the recipient's mission

**D.**    **Agency Data Collection Authority and Measuring Disparate Impact**

USCA4 Appeal: 23-1453      Doc: 17         Filed: 06/05/2023      Pg: 233 of 610

Filed: 06/05/2023    Pg: 234 of 610

Doc: 17

USCA4 Appeal: 23-1453

## A.    Introduction

Section VI discusses intentional discrimination or disparate treatment as one type of Title VI claim. Another type of Title VI violation is based on agency Title VI implementing regulations and is known as the disparate impact or discriminatory effects standard. While a discriminatory impact or effect may also be evidence of intentional discrimination or disparate treatment, this section discusses disparate impact as a cause of action independent of any intent.

The disparate impact regulations seek to ensure that programs accepting federal money are not administered in a way that perpetuates the repercussions of past discrimination. As the Supreme Court has explained, even benignly-motivated policies that appear neutral on their face may be traceable to the nation's long history of invidious race discrimination in employment, education, housing, and many other areas. *See Griggs v. Duke Power Co.*, 401 U.S. 424, 430–31 (1971); *City of Rome v. United States*, 446 U.S. 156, 176–77 (1980); *Gaston Cty. v. United States*, 395 U.S. 285, 297 (1969). The disparate impact regulations ensure "that public funds, to which all taxpayers of all races contribute, not be spent in any fashion which encourages, entrenches, subsidizes, or results in racial discrimination." H.R. Misc. Doc. No. 124, 88th Cong., 1st Sess. 3, 12 (1963). The Supreme Court explained in *Griggs*, 401 U.S. at 429–30, that under Title VII, which was enacted at the same time as Title VI, "practices, procedures, or tests neutral on their face, and even neutral in terms of intent, cannot be maintained if they operate to 'freeze' the status quo of prior discriminatory employment practices." *Id.* at 430; *see also Texas Dep't of Hous. & Cmty. Affairs v. Inclusive Communities*, 135 S. Ct. 2507, 2521 (2015) (noting that "[r]ecognition of disparate impact claims is consistent with the [Fair Housing Act's] central purpose" as it "was enacted to eradicate discriminatory practices within a sector of our Nation's economy") (citations omitted). The regulations task agencies to take a close look at neutral policies that disparately exclude minorities from benefits or services, or inflict a disproportionate share of harm on them.

A growing body of social psychological research has also reaffirmed the need for legal tools that address disparate impact. This research demonstrates that implicit bias against people of color remains a widespread problem.[1] Such bias can result in discrimination that federal agencies can prevent and address through enforcement of their disparate impact regulations. Because

---

[1] *See, e.g.*, Anthony G. Greenwald et al., *Measuring Individual Differences in Implicit Cognition: The Implicit Association Test*, 74 J. Personality & Soc. Psychol. 1464 (1998) (showing that majority of white experiment participants more frequently associate white faces rather than African American faces with "pleasant" factors); Anthony G. Greenwald & Linda Hamilton Krieger, *Implicit Bias: Scientific Foundations*, 94 Cal. L. Rev. 945, 954–59 (2006); *see also* Nilanjana Dasgupta, *Implicit Ingroup Favoritism, Outgroup Favoritism, and Their Behavioral Manifestations*, 17 Soc. Just. Res. 143 (2004); Gary Blasi, *Advocacy Against the Stereotype: Lessons from Cognitive Social Psychology*, 49 UCLA L. Rev. 1241 (2002); Jerry Kang, *Trojan Horses of Race*, 118 Harv. L. Rev. 1489 (2005); Christine Jolls & Cass R. Sunstein, *The Law of Implicit Bias*, 94 Cal. L. Rev. 969 (2006); Samuel R. Bagenstos, *The Structural Turn and the Limits of Antidiscrimination Law*, 94 Cal. L. Rev. 1, 5–9 (2006).

Pg: 235 of 610    Filed: 06/05/2023    Doc: 17    USCA4 Appeal: 23-1453

individual motives may be difficult to prove directly, Congress has frequently permitted proof of only discriminatory impact as a means of overcoming discriminatory practices. The Supreme Court has, therefore, recognized that disparate impact liability under various civil rights laws, "permits plaintiffs to counteract unconscious prejudices and disguised animus that escape easy classification as disparate treatment." *Id.* at 2522.

In a disparate impact case, the investigation focuses on the consequences of the recipient's practices, rather than the recipient's intent. *Lau v. Nichols*, 414 U.S. 563, 568 (1974). As explained throughout this Section, "a plaintiff bringing a disparate-impact claim challenges practices that have a 'disproportionately adverse effect on minorities' and are otherwise unjustified by a legitimate rationale." *Inclusive Communities*, 135 S. Ct. at 2513 (quoting *Ricci v. DeStefano*, 557 U.S. 557, 577 (2009).[2]

Twenty-six federal funding agencies have Title VI regulations that include provisions addressing the disparate impact or discriminatory effects standard.[3]

| AGENCY TITLE VI DISPARATE IMPACT REGULATIONS |
|---|
| A recipient, in determining the type of disposition, services, financial aid, benefits, or facilities which will be provided under any such program, or the class of individuals to whom, or the situations in which, such will be provided under any such program, or the class of individuals to be afforded an opportunity to participate in any such program, may not, directly or through contractual or other arrangements, utilize criteria or methods of administration *which have the effect* of subjecting individuals to discrimination because of their race, color, or national origin, or have the effect of defeating or substantially impairing accomplishment of the objectives of the program as respects individuals of a particular race, color, or national origin. |
| *See, e.g.*, 28 C.F.R. § 42.104(b)(2) (emphasis added)(DOJ regulations). |

---

[2] *Lau* was a Title VI case; as noted, *Inclusive Communities* involved the Fair Housing Act, 42 U.S.C. § 3601 et seq. Cases decided under Title VII or the Fair Housing Act may be instructive. Investigating agencies may find Fair Housing Act case law particularly instructive where the employment context does not present ready analogues. For instance, courts applying the Fair Housing Act frequently examine the impact borne in particular geographic areas, such as neighborhoods, towns, or counties, whereas Title VII cases more frequently involve comparisons between various groups of applicants and employees. Finally, investigating agencies might find helpful guidance from cases decided under an intent theory, but which evaluate statistical evidence of the disparate impact of a policy or practice, including Equal Protection Clause case law. Accordingly, this section will discuss disparate impact discrimination with reference to case law not only under Title VI, but also under these other laws.

[3] *See* 7 C.F.R. § 15.3(b)(2)–(3) (USDA); 22 C.F.R. § 209.4(b)(2)–(3) (Agency for Int'l Dev.); 15 C.F.R. § 8.4(b)(2)–(3) (Dep't of Commerce); 45 C.F.R. § 1203.4(b)(2) (Corp. for Nat'l &– Cmty. Serv.); 32 C.F.R. § 195.4(b)(2) (DOD); 34 C.F.R. § 100.3(b)(2)–(3) (Dep't of Educ.); 10 C.F.R. § 1040.13(c)–(d) (Dep't of Energy); 40 C.F.R. § 7.35(b)–(c) (EPA); 41 C.F.R. § 101–6.204–2(a)(2)–(3) (GSA); 45 C.F.R. § 80.3(b)(2)–(3) (HHS); 6 C.F.R. § 21.5(b)(2)–(3) (DHS); 24 C.F.R. § 1.4(b)(2)(i)–(3) (HUD); 43 C.F.R. § 17.3(b)(2)–(3) (Dep't of the Interior); 28 C.F.R. § 42.104(b)(2)–(3)(DOJ); 29 C.F.R. § 31.3(b)(2)–(3) (DOL); 14 C.F.R. § 1250.103–2(b) (NASA); 45 C.F.R. § 1110.3(b)(2)–(3) (Nat'l Found. on the Arts &– Humanities); 45 C.F.R. § 611.3(b)(2)–(3) (NSF); 10 C.F.R. § 4.12(b)–(c) (NRC); 5 C.F.R. § 900.404(b)(2) (OPM); 22 C.F.R. § 141.3(b)(2) (Dep't of State); 18 C.F.R. § 1302.4(b)(2)–(3) (TVA); 49 C.F.R. § 21.5(b)(2)–(3) (DOT); 31 C.F.R. § 22.4(b)(2) (Dep't of Treasury); 38 C.F.R. § 18.3(b)(2)–(3) (VA); 18 C.F.R. § 705.4(b)(2) (Water Resources Council).

Pg: 236 of 610      Filed: 06/05/2023      Doc: 17      USCA4 Appeal: 23-1453

> In determining the site or location of facilities, a recipient or applicant may not make selections with the purpose *or effect* of excluding individuals from, denying them the benefits of, or otherwise subjecting them to discrimination under any program to which this subpart applies, on the ground of race, color, or national origin; or with the purpose *or effect* of substantially impairing the accomplishment of the objectives of the Act or this subpart.
>
> *See*, *e.g.*, 28 C.F.R. § 42.104(b)(3) (emphasis added)(DOJ regulation).

The Supreme Court has repeatedly held that Title VI regulations validly prohibit practices having a discriminatory effect on protected groups. even if the actions or practices are not intentionally discriminatory. *Guardians Ass'n v. Civil Serv. Comm'n,* 463 U.S. 582, 643 (1983) (Stevens, J., dissenting) (citing *Lau,* 414 U.S. at 568, 571 (Stewart, J., concurring) and *Fullilove v. Klutznick,* 448 U.S. 448, 479 (1980) (opinion of Burger, C.J.)); *Alexander v. Choate,* 469 U.S. 287, 293 (1985)). Funding agencies require that entities receiving federal financial assistance enter into standard agreements or provide assurances that the recipient will comply with the funding agency's implementing regulations under Title VI. *See, e.g.,* 28 C.F.R. § 42.105 (DOJ) (requiring applications for federal financial assistance to be accompanied by an assurance of compliance with Title VI implementing regulations); *see also United States v. Marion Cty Sch. Dist.,* 625 F.2d 607, 609, 612–13 (5th Cir. 1980) (confirming legitimacy of assurance requirement); *Guardians,* 463 U.S. at 642 n.13 (Stevens, J., dissenting) (quoting from HUD assurance).[4]

The basic analytical framework for applying the disparate impact standard has remained unchanged for decades; how to prove a violation of the disparate impact standard is discussed below.

**B.      *Sandoval* and the Critical Role of the Federal Funding Agencies**

Federal funding agencies play a vital role in enforcing the prohibition on disparate impact discrimination through complaint investigations, compliance reviews, and guidance on how to comply with Title VI. In 1994, the Attorney General directed the "Heads of Departments and Agencies" to "ensure that the disparate impact provisions in your regulations are fully utilized so that all persons may enjoy equally the benefits of federally financed programs."[5] The memorandum stated that agency enforcement "is an essential component of an effective civil

---

[4] The Department of Justice issued its discriminatory effect regulation in 1966. 31 Fed Reg. 10,265 (July 29, 1966). Congress, fully aware of this administrative interpretation, has never altered it. *Guardians Ass'n v. Civil Serv. Comm'n,* 463 U.S. 582, 620–21 (1983) (Marshall, J., dissenting) (noting, among other things, that Congress has enacted ten additional statutes modeled on Title VI "none of which define discrimination to require proof of intent" and that "Congress has not acted to correct any misinterpretation of its objectives despite its continuing concern with the subject matter").

[5] Memorandum from the Assistant Attorney General to heads of Departments and Agencies that Provide Federal Financial Assistance (Jul. 14, 1994), *available at* http://www.justice.gov/ag/attorney-general-july-14-1994-memorandum-use-disparate-impact-standard-administrative-regulations.

rights compliance program.… Frequently, discrimination results from policies and practices that are neutral on their face but have the *effect* of discriminating[.] Those policies and practices must be eliminated unless they are shown to be necessary to the program's operation and there is no less discriminatory alternative." *Id.* (emphasis added).

The agencies' critical role only increased after the Supreme Court's 2001 decision in *Alexander v. Sandoval*, 532 U.S. 275 (2001). Before *Sandoval*, it was believed that individuals could file civil actions relying on the Title VI disparate impact standard. In *Sandoval*, however, the Supreme Court held that *individuals* did not have a right of action to enforce the Title VI disparate impact regulations in federal court. *Id.* at 293. Following *Sandoval*, the Civil Rights Division issued a memorandum on October 26, 2001, for "Heads of Departments and Agencies, General Counsels and Civil Rights Directors" that clarified and reaffirmed federal government enforcement of the disparate impact regulations. The memorandum explained that although *Sandoval* foreclosed private judicial enforcement of Title VI the regulations remained valid and funding agencies retained
their authority and responsibility to enforce them.[6] Nor does *Sandoval* affect the disparate impact provisions of other laws, such as Title VII or the Fair Housing Act. The agencies' Title VI disparate impact regulations continue to be a vital administrative enforcement mechanism.

**Complaint investigations and compliance reviews.** In addition to the administrative complaint process, federal funding agencies are authorized to initiate affirmative compliance reviews as a mechanism for ensuring recipient compliance. Federal funding agencies should prioritize vigorous enforcement of their Title VI disparate impact provisions both through investigation of complaints and through compliance reviews.

**Agency guidance.** Funding agencies buttress their enforcement role by providing informal and formal guidance clarifying and applying their Title VI disparate impact regulations. The Supreme Court has stated that agencies have a great deal of discretion in establishing discriminatory impact standards: "Title VI had delegated to the agencies in the first instance the complex determination of what sorts of disparate impact upon minorities constituted sufficiently significant social problems, and were readily enough remediable, to warrant altering the practices of the federal grantees that had produced those impacts." *Choate*, 469 U.S. at 293–94; *see also Sandoval*, 532 U.S. at 306 (Stevens, J., dissenting). And lower courts have consistently recognized and deferred to agency interpretations of the disparate impact standard. *See, e.g., United States v. Maricopa Cty*, 915 F. Supp. 2d 1073, 1080 (D. Ariz. 2012) (citing *Auer v. Robbins*, 519 U.S. 452, 461 (1997)) (agency interpretation of its own regulations "controlling unless plainly erroneous or inconsistent with the regulations"); *S. Camden Citizens in Action v.*

---

[6] Memorandum from the Assistant Attorney General to the Heads of Departmental Agencies, General Counsels, and Civil Rights Directors (Oct. 26, 2001) *available at* http://www.justice.gov/crt/about/cor/lep/Oct26Memorandum.php); *see Sandoval*, 532 U.S. at 281 (assuming for purposes of deciding the case "that regulations promulgated under § 602 of Title VI may validly proscribe activities that have a disparate impact on racial groups ….").

USCA4 Appeal: 23-1453      Doc: 17       Filed: 06/05/2023      Pg: 237 of 610

USCA4 Appeal: 23-1453      Doc: 17      Filed: 06/05/2023      Pg: 238 of 610

*N.J. Dep't of Envtl. Prot.*, 145 F. Supp. 2d 446, 496 (D.N.J. 2001) (reviewing Environmental Protection Agency regulations, guidance, and administrative decisions in analyzing claim brought under EPA's disparate impact provision); *opinion modified and supplemented*, 145 F. Supp. 2d 505 (D.N.J.), *rev'd on other grounds*, 274 F.3d 771 (3d Cir. 2001).

## C.    Proving a Violation of the Disparate Impact Standard

Understanding the process for establishing Title VI noncompliance in disparate impact cases is crucial in assessing an allegation or matter and determining how an agency conducts its investigation. Courts have developed analytical frameworks to assess disparate impact claims in litigation that inform agencies' investigative processes. In some instances, agencies have issued guidance documents articulating a process for determining compliance in particular types of disparate impact cases.

The elements of a Title VI disparate impact claim are similar to the analysis of cases decided under Title VII. *N.Y. Urban League, Inc. v. New York*, 71 F.3d 1031, 1036 (2d Cir. 1995).[7] Cases decided under the Fair Housing Act, 42 U.S.C. § 3601 et seq., also often employ disparate impact analyses. and HUD's Fair Housing Act implementing regulations, 24 C.F.R. § 100.500, adopt a formulation of the disparate impact standard that is substantially similar to the Title VI and Title VII standard.

Courts have adopted a three-part test to determine whether a recipient's policy or practice violates the Title VI disparate impact regulations. First, does the adverse effect of the policy or practice disproportionately affect members of a group identified by race, color, or national origin? Some courts refer to this first inquiry as the "prima facie" showing. If so, can the recipient demonstrate the existence of a substantial legitimate justification for the policy or practice? *N.Y. Urban League*, 71 F.3d at 1036. A violation is still established if the record shows the justification offered by the recipient was pretextual. *See Elston v. Talladega Cty. Bd. of Educ.*, 997 F.2d 1394, 1407 (11th Cir. 1993) (citing *Georgia State Conf. v. Georgia*, 775 F.2d 1403, 1417 (11th Cir. 1985)). Finally, is there an alternative that would achieve the same legitimate objective but with less of a discriminatory effect? If such an alternative is available to the recipient, even if the recipient establishes a justification, the policy or practice will still violate disparate impact regulations.

---

[7] The test has been codified in Title VII at 42 U.S.C. § 2000e–2(k).

Filed: 06/05/2023    Pg: 239 of 610        Doc: 17        USCA4 Appeal: 23-1453

---

**TITLE VI DISPARATE IMPACT VIOLATION**

1) **Disparate impact.** Does the adverse effect of the policy or practice fall disproportionately on a race, color, or national origin group? See Section C.1.

2) **Justification.** If so, does the record establish a substantial legitimate justification for the policy or practice? See Section C.2.

3) **Less discriminatory alternative.** Is there an alternative that would achieve the same legitimate objective but with less of a discriminatory effect? See Section C.3.

---

In administrative investigations, this court-developed burden shifting framework serves as a useful paradigm for organizing the evidence. Agency investigations, however, often follow a non-adversarial model in which the agency collects all relevant evidence then determines whether the evidence establishes discrimination. Under this model, agencies often do not shift the burdens between complainant and recipient when making findings. For agencies using this method, the following sections serve as a resource for conducting an investigation and developing an administrative enforcement action where appropriate.

---

**AGENCY PRACTICE TIP**

Agencies need not address each element in rank order because lack of evidence of any one of these elements results in a "no violation" finding and concludes the analysis. However, in many cases understanding the nature of the harm is an important first step to evaluating its impact on a protected class. The sections below provide additional insight into the potential benefits of proceeding in a particular order through the investigation and analysis.

---

The example below, adapted from Department of Education guidance, illustrates how the three-part test would inform an administrative investigation of a Title VI complaint alleging that a school discipline policy violates the disparate impact regulation.[8]

---

[8] Dep't of Educ., Dear Colleague Letter on the Nondiscriminatory Administration of School Discipline (Jan. 8, 2014), *available at* http://www2.ed.gov/about/offices/list/ocr/letters/colleague–201401–title–vi.html.

Pg: 240 of 610      Filed: 06/05/2023      Doc: 17      USCA4 Appeal: 23-1453

---

**ILLUSTRATION: DISPARATE IMPACT INVESTIGATION OF SCHOOL DISCIPLINE POLICY**

A middle school has a "zero tolerance" tardiness policy. Students who are more than five minutes tardy to class are always referred to the principal's office at a particular school, where they are required to remain for the rest of the class period regardless of their reason for being tardy. The school also imposes an automatic one-day suspension when a student is recorded as being tardy five times in the same semester. Additional tardiness results in longer suspensions and a meeting with a truancy officer. The evidence shows Asian-American students are **disproportionately** losing instruction time under the school's "zero tolerance" tardiness policy, as a result of both office referrals and suspensions for repeated tardiness.



An investigation further reveals that white and Hispanic students are more likely to live within walking distance of the school, while Asian-American students are more likely to live farther away and in an area cut off by an interstate highway that prevents them from walking to school. The majority of Asian-American students are thus required to take public transportation. These students take the first public bus traveling in the direction of their school every morning. Even though they arrive at the bus stop in time to take the first bus available in the morning, they often are not dropped off at school until after school has begun.

As **justification** for the "zero tolerance" tardiness policy, the school articulates the goals of reducing disruption caused by tardiness, encouraging good attendance, and promoting a climate where school rules are respected, all of which the federal funding agency accepts as important educational goals. The agency would then assess the fit between the stated goals and the means employed by the school—including whether the policy is reasonably likely to reduce tardiness for these students under these circumstances.

Assuming there was such a fit, the agency would then probe further to determine the availability of **alternatives** that would also achieve the important educational goals while reducing the adverse effect on Asian-American students (e.g., aligning class schedules and bus schedules, or excusing students whose tardiness is the result of bus delays). If the agency determines that a school's articulated goal can be met through alternative policies that eliminate or have less of an adverse racial impact, the agency would find the school in **violation** of Title VI and require that the school implement those alternatives.

Pg: 241 of 610        Filed: 06/05/2023        Doc: 17        USCA4 Appeal: 23-1453

### 1.    Establishing an Adverse Disparate Impact

The first step in analyzing any disparate impact case is determining whether the recipient's criteria or method of administering its programs or activities *adversely* and *disparately* affect members of a protected class. In some cases federal agencies proceed directly to preliminary findings after this step. To establish an adverse disparate impact, the investigating agency must (1) identify the specific policy or practice at issue; (2) establish adversity/harm; (3) establish significant disparity;[1] and (4) establish causation. *See N.Y.C. Envtl. Justice All. v. Giuliani*, 214 F.3d 65, 69  (2d Cir. 2000) (plaintiffs must "allege a causal connection between a facially neutral policy and a disproportionate and adverse impact on minorities.").

| ELEMENTS TO ESTABLISH ADVERSE DISPARATE IMPACT UNDER TITLE VI |
| --- |
| 1)  Identify the specific **policy or practice** at issue; see Section C.3.a.<br>2)  Establish **adversity/harm**; see Section C.3.b.<br>3)  Establish **disparity**; see Section C.3.c.<br>4)  Establish **causation**; see Section C.3.d. |

#### a.   Identifying the facially neutral policy or practice

Accurate disparate impact analyses begin with identifying the policy or practice that allegedly caused the disparate harm. *Inclusive Communities*, 135 S. Ct. at 2523 ("a disparate-impact claim that relies on a statistical disparity must fail if the plaintiff cannot point to a defendant's policy or policies causing that disparity"). Although plaintiffs' claims succeed or fail based on whether they have established adversity/harm, significant disparity, and causation, identifying the policy at issue  informs the evaluation of the evidence put forth at these three stages.

When analyzing disparate impact claims, investigating agencies must accurately and completely define the policy or practice at issue. In some cases, the agency will have to broaden its inquiry beyond the specific complaint allegations in order to conduct this analysis. Courts, however, provide little guidance to agencies in how to separate discrete parts of a recipient's evaluation process. Identifying the relevant parts of any policy or practice is a fact-specific inquiry.

| AGENCY PRACTICE TIP |
| --- |
| While an investigating agency must initially identify the full policy or practice at issue, this does not mean the agency must investigate every application of that practice. For example, in statewide or large–scale investigations, agencies may develop evidentiary sampling methods probative of the merits of such complaints. Sampling methods are discussed further in the disparity section below. |

---

[1] If statistics are used to establish disparity, they must establish statistically significant disparity, as discussed below in section C.3.c.

One method to discern whether the legally relevant policy or practice is broader than the action identified by the complainant involves identifying the negative effect that the challenged action has on the protected group. For example, in *New York City Environmental Justice Alliance*, the court rejected a challenge to New York City's decision to scale back a community garden program benefitting minority neighborhoods. Although the precise action challenged was the City's closing or selling of community gardens, the plaintiffs identified the negative effect of the action as the reduction of the amount of open space/green space available to minority community districts. 214 F.3d at 71. The court saw the issue as the City's overall policy about green spaces, not its decision to sell or close community gardens. So viewed, the City would not violate Title VI unless the overall open space/green space policy disadvantaged predominantly minority neighborhoods significantly more than predominantly white neighborhoods. The plaintiffs' statistics only included calculations that compared available space from community gardens, parks, and playgrounds, and excluded space from regional parks available to the community districts. *Id.*

The court noted that this exclusion meant that they could not actually evaluate the City's overall green space policy: "[T]he plaintiffs fail to explain how 'open space' statistics excluding regional parks adjacent to minority communities—some of the most important open spaces in the City— are meaningful in determining whether, as they assert, there is a disparate impact in minority communities as a whole resulting from the City's sale of garden lots." *Id.* at 71 n.5.

Similarly, in *Greater New Orleans Fair Housing Action Center v. HUD*, 639 F.3d 1078 (D.C. Cir. 2011), the court rejected a challenge to one part of HUD's formula for awarding hurricane relief grants. The plaintiffs alleged that under HUD's formula, African Americans had less access to rebuilding programs after hurricanes Katrina and Rita. *Id.* at 1079. The court held that while that one part of the formula, viewed in isolation from the rest, may have had an adverse impact on African Americans, other parts of the formula may have disproportionately benefitted African Americans. *Id.* at 1086. Thus, the court looked at the Katrina/Rita grant process as a whole. *Id.* The court also rejected plaintiffs' evidence that was limited to a single parish because HUD applied the formula in a much broader geographic area. *Id.*

The *Greater New Orleans* court's focus on the geographic area where the impact occurred provides a related method to ascertain the policy or practice. Specifically, agencies should identify the area where the negative effects occur even if that area is larger than the area that is the focus of the complainant's allegation. For example, in *Coalition of Bedford-Stuyvesant Block Ass'n v. Cuomo*, 651 F. Supp. 1202, 1206 (E.D.N.Y. 1987), the plaintiffs claimed the City of New York located shelters for homeless persons in a manner that had the effect of concentrating all but one of the City-owned homeless shelters in Brooklyn's minority communities in violation of, inter alia, the Fourteenth Amendment. The court, however, considered all of the sites City-wide, and not in Brooklyn, because the relevant policy and practice was the City's siting of shelters generally, not just in one portion of its jurisdiction. *Id.* at 1209. The court rejected plaintiff's data because it only covered the impact in Brooklyn. *Id.*

USCA4 Appeal: 23-1453    Doc: 17    Filed: 06/05/2023    Pg: 243 of 610

---

**AGENCY PRACTICE TIP**

Agencies should inquire about the challenged action's negative effect—looking at who is impacted and where the impact occurs—in order to identify the legally relevant policy or practice. Agencies should remember that the answer to this question may also come from the disparity/discriminatory effect analysis discussed below.

---

The importance of avoiding examination of only a portion of the legally relevant policy or practice does not mean that an agency must always examine the entirety of what a recipient does. Where plaintiffs allege discrimination in access or opportunities instead of in outcomes, a policy or portion of that policy can have a discriminatory effect on a protected class even where another policy or portion of that policy has a countervailing effect. As the Supreme Court has stated in the employment context, because a certain group ultimately gets hired or promoted at the same rate as another overall does not preclude claims that some aspect of the hiring or promotion process has a disparate impact on them. *See Connecticut v. Teal*, 457 U.S. 440, 451–52 (1982); *accord Clady v. Cty. of Los Angeles*, 770 F.2d 1421, 1429 (9th Cir. 1985). The *Teal* Court made clear that Title VII ensures equal *opportunities* for individuals, not just equal *outcomes* for groups. 457 U.S. at 451. In *Teal*, the defendant imposed a written examination for promotion candidates that excluded a much greater number of African Americans. It then employed affirmative action with respect to those who did pass to ensure that it promoted a proportionate number of African American candidates. *See id.* at 443–44. The Court held that those whom the test excluded from consideration were entitled to challenge the discriminatory procedure under Title VII, notwithstanding the absence of racial disparity in the "bottom-line," i.e., the final award of promotions. *Id.* at 451, 456.

The *Teal* holding has been applied in Fair Housing Act cases relating to access to nondiscriminatory housing, *Betsey v. Turtle Creek Assoc.*, 736 F.2d 983, 987 (4th Cir. 1984) ("'Bottom-line' considerations of the number and percentage of minorities in the rest of the complex or community are 'of little comfort' to those minority families evicted from Building Three"), and Title VI disparate impact cases relating to access to schools or school programs. *See, e.g., Cureton v. NCAA,* 37 F. Supp. 2d 687, 704–05 (E.D. Pa. 1999) (rejecting NCAA's "bottom-line" defense that pointed to graduation rates in disparate impact case involving initial eligibility standards), *rev'd on other grounds*, 198 F.3d 107 (3d Cir. 1999); *Elston*, 997 F.2d at 1418–20 (finding the increase in the racial identifiability of black-majority school as a result of school transfer practices sufficient to constitute a disparate impact, even if overall racial balances had not changed in either the county or county school system, because the success of desegregation is measured on a school-by-school basis).

USCA4 Appeal: 23-1453      Doc: 17      Filed: 06/05/2023      Pg: 244 of 610

Finally, the importance of identifying a specific practice does not necessarily mean that practice must be affirmatively undertaken; sometimes the relevant policy or practice could be the failure to do something, or even the failure to have a policy. In other words, *inaction* can exert a disproportionate adverse effect. Language access cases provide an example. The failure to have a coherent language assistance policy, or to train employees on providing assistance, can prevent individuals who are limited English proficient from benefiting from the recipient's program. Where a recipient does not implement any language assistance policy but instead leaves these individual employees untrained and uninformed to do what they will, the result may be that these employees will often fail to provide appropriate assistance. *See, e.g., Maricopa Cty.,* 915 F. Supp. 2d at 1079 (disparate impact violation based on national origin properly alleged where recipient "failed to develop and implement policies and practices to ensure [limited English proficient] Latino inmates have equal access to jail services" and discriminatory conduct of detention officers was facilitated by "broad, unfettered discretion and lack of training and oversight" resulting in denial of access to important services). Similarly, where law enforcement agencies fail to train their officers, a failure to properly assist persons who are limited English proficient often follows. *See, e.g., U.S. v. Town of E. Haven,* No. 3:12–cv–1652, 2012 WL 5869974, ¶ 43 (D. Conn. filed Nov. 20, 2012).

### b.  Establishing adversity/harm

Once the investigating agency has accurately identified the policy or practice, it must evaluate whether the policy or practice "harms" a particular group of people enough to be actionable. This element is sometimes referred to as "adversity of the impact."[9] The investigating agency must determine whether the alleged consequences are sufficiently adverse or harmful. *See Bryan v. Koch,* 627 F.2d 612, 617 (2d Cir. 1980). Adversity exists if a fact specific inquiry determines that the nature, size, or likelihood of the impact is sufficient to make it an actionable harm. This discussion will use the terms "adversity" and "harm" interchangeably.

Most cases applying the Title VI disparate impact standard do not explicitly address adversity as a separate element. Rather, courts frequently assume that the impacts alleged were sufficiently adverse, impliedly recognizing a wide range of harms, including physical, economic, social, cultural, and psychological. In many administrative investigations, particularly those involving the denial of services or benefits, investigating agencies, too, will be able easily to conclude the harm alleged is legally sufficient.

The expansive language of Title VI and its implementing regulations support this approach: the statute states that no person shall on the ground of race, color, or national origin "be excluded

---

[9] *E.g., S. Camden Citizens in Action v. N.J. Dep't of Envtl. Prot.,* 145 F. Supp. 2d 446, 487 *opinion modified and supplemented,* 145 F. Supp. 2d 505 (D.N.J.) (discussing the methods used to "evaluate the 'adversity' of the impact" and considering whether the impacts at issue were "sufficiently adverse" to establish a prima facie case), *rev'd on other grounds,* 274 F.3d 771 (3d Cir. 2001).

from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 42 U.S.C. § 2000d. In implementing this provision, agency regulations further state that recipients may not administer their programs or activities in a manner which "den[ies] any individual *any disposition, service, financial aid, or benefit* provided under the program." 28 C.F.R. § 42.104(b)(1)(i) (DOJ) (emphasis added), or "restrict[s] an individual *in any way* in the enjoyment of any advantage or privilege enjoyed by others receiving any disposition, service, financial aid, or benefit under the program." *Id.* § 42.104(b)(1)(iv) (emphasis added). Agency disparate impact regulations do not define discriminatory "effects" but simply state that recipients may not "utilize criteria or methods of administration which have the effect of subjecting individuals to discrimination because of their race, color, or national origin ...." *Id.* § 42.104(b)(2).[10]

---

**AGENCY PRACTICE TIP**

While establishing adversity in most cases presents a low bar, investigating agencies nevertheless should employ a broad definition of adversity/harm, and gather any and all evidence of adversity/harm or risk of adversity/harm, including anecdotal evidence from complaining witnesses. Even though such additional evidence may not be required as a legal matter, it provides important context for the decision–maker. Such evidence also informs development of the appropriate remedy in the case of noncompliance.

---

**Fewer or inferior services or benefits.** Courts have frequently identified Title VI adversity/harm where recipients' policies or practices result in fewer services or benefits, or inferior service or benefits. In this type of case, the recipient denies the plaintiff something deemed desirable. For example, in *Larry P. v. Riles,* 793 F.2d 969 (9th Cir. 1986), the court held that improper placement in special education classes had a "definite adverse effect" because such "classes are dead-end classes which de-emphasize academic skills and stigmatize children improperly placed in them." *Id.* at 983; *see also Elston,* 997 F.2d at 1412 (holding that stigmatization of black children and the risk of closure of a school in a black community, among other things, "might well constitute a disparate impact"). While these cases often arise in the education context, many different types of inferior services and benefits will satisfy the adversity requirement. *See, e.g., Meek v. Martinez,* 724 F. Supp. 888, 906 (S.D. Fla. 1987) (minority seniors harmed when receiving less financial aid for community services than non-minority peers); *Campaign for Fiscal Equity, Inc. v. New York,* 86 N.Y.2d 307, 323–24, 655 N.E.2d 661, 631 N.Y.S.2d 565 (1995) (adversity properly alleged where minority students received less state financial aid as a group and per pupil than their nonminority peers); *Sandoval v. Hagan,* 197 F.3d 484, 508 (11th Cir. 1999) (lack of drivers' licenses adversely affects individuals in the form of lost economic opportunities, social services, and other quality of life pursuits), *rev'd on other grounds sub nom. Alexander v. Sandoval,* 532 U.S. 275 (2001); *Maricopa Cty.,* 915 F. Supp. 2d at 1081 (adversity properly alleged where limited English proficient Latino inmates had

---

[10] The DOJ regulations quoted here are similar to those of other agencies.

Pg: 245 of 610        Filed: 06/05/2023        Doc: 17        USCA4 Appeal: 23-1453

diminished access to jail services such as sanitary needs, food, clothing, legal information, and religious services).

**Distribution of burdens, negative effects.** Recipient practices also can harm protected class members even without the loss of specific services or benefits. In this type of case, the recipient distributes burdens, or something seen as undesirable. For example, in *Coalition of Concerned Citizens Against I-670 v. Damian,* 608 F. Supp. 110, 127 (S.D. Ohio 1984), the court held that disruptions and other impacts of planned highway construction would negatively affect minority residents living in the area under construction. In another case, a court found that plaintiffs established sufficient potential harm to their health resulting from the recipient's issuance of air pollution permits for a cement processing facility, noting that the operation of the facility would "adversely affect [the plaintiffs'] health to a degree that meets the standard of 'adversity' under Title VI." *S. Camden Citizens in Action v. N.J. Dep't of Envtl. Prot.,* 145 F. Supp. 2d 446, 490, *opinion modified and supplemented,* (D.N.J.), *rev'd on other grounds,* 274 F.3d 771 (3d Cir. 2001). The court granted a preliminary injunction and the air permits were vacated. *Id.* at 505; *see also Darensburg v. Metro. Transp. Comm.,* 636 F.3d 511, 520–22 (9th Cir. 2011), (finding that while plaintiffs had not established a prima facie case, a transit expansion plan could result in disproportionate harm to minorities); *Maricopa Cty.,* 915 F. Supp. 2d at 1079 (plaintiff properly stated a disparate impact claim where Latinos, as compared with non-Latinos, were far more likely to be stopped by officers).

**Threatened or imminent harm.** These cases and others also illustrate that threatened or imminent harm may satisfy the adversity requirement.[11] *See, e.g., NAACP v. Med. Ctr., Inc.,* 657 F.2d 1322, 1332–38 (3d Cir. 1981) (en banc) (examining a disparate impact claim under Title VI concerning the future impact of a planned medical center relocation); *Damian,* 608 F. Supp. at 127 (examining a disparate impact claim brought under Title VI concerning the future impact of a planned highway expansion). Notably, the Environmental Protection Agency has determined that based on a technical analysis, a showing of *potential* health effects, depending on their nature and severity (e.g., cancer risk), provides an adequate basis for a finding of adversity under EPA's disparate impact regulation. EPA Investigative Report, *For Title VI Admin. Complaint File No. 16R-99-R9,* at 26–28 (Aug. 25, 2011);[12] EPA Draft Revised Guidance for Investigating Title VI Administrative Complaints Challenging Permits (Draft Revised Investigation Guidance), 65 Fed. Reg. 39,650, 39,679–81 (June 27, 2000).

**Mix of costs and benefits, effects that are difficult to quantify.** In some cases, recipient actions provide a mix of costs and benefits, or the alleged harm may be difficult to quantify.

---

[11] Of course, the challenged policy must be ripe for review by the investigating agency. Where the recipient has not yet adopted the policy because, for instance, several potential options are under consideration, it may be premature to analyze a challenge to that potential policy.

[12] EPA Investigative Report for Title VI Admin. Complaint File No. 16R-99-R9 (Aug. 25, 2011), *available at* http://www.epa.gov/ocr/TitleVIcases/ir-082511.pdf.

Pg: 246 of 610          Filed: 06/05/2023          Doc: 17          USCA4 Appeal: 23-1453

USCA4 Appeal: 23-1453     Doc: 17     Filed: 06/05/2023     Pg: 247 of 610

These factors may increase the complexity of the adversity/harm analysis. For example, hospital relocations and closures are often challenged on the grounds that they will force residents of predominantly minority neighborhoods to travel greater distances for service, without an attempt to demonstrate that this would cause a hardship or that the quality of service and care would be diminished. In *Bryan*, 627 F.2d at 617, the court addressed a challenge to the closure of a hospital that served a 98% minority population, compared with a 66% minority population in the surrounding city's hospital system. Based on these statistics, the court easily found the closure would affect the minority population disproportionately (this step of the analysis—disparity—is discussed in C.1.c. below). Less easy was "whether the impact of this disparity is sufficiently adverse to create a prima facie Title VI violation …." *Id.* The court pointed out that the great majority of patients would be provided satisfactory care in nearby municipal and voluntary hospitals, and only a small number of emergency room patients "would suffer adverse consequences if the nearest emergency room treatment available were at even slightly more distant locations." *Id.* Ultimately, the court proceeded with the subsequent steps of the impact analysis instead of stopping the analysis based on the weakness of the adversity/harm evidence.

Similarly, in a school closing case, the plaintiffs alleged that the closure and student transfers resulted in a discriminatory effect on Hispanic students by depriving them of the high quality education previously provided. The court found there was no adversity/harm, and thus declined to analyze disparity, because (1) the new schools had comparable facilities, (2) there was no evidence that the new schools would be overcrowded, (3) special education programs would continue at the new schools, and (4) the new schools had similarly high percentages of at-risk and minority students. *Villanueva v. Carere*, 85 F.3d 481, 487 (10th Cir. 1996).[13]

Determining the sufficiency of harm can be a fact-intensive and complicated inquiry, particularly where recipient actions provide both costs and benefits, or where the alleged harm can be difficult to quantify. In *NAACP v. Medical Center*, the court noted that it was a close call whether impacts were sufficiently adverse/harmful. Here, the court questioned (without deciding) the plaintiffs' contention that a hospital's relocation from the inner city to an outlying suburban location caused sufficient harm absent proof that the need to travel a few extra miles inflicted significant harm on patients. At trial, the district court considered whether relocation would result in a slight increase in travel time, a modest decrease in the ability of inner city residents to visit patients at the new suburban site, the possibility that a few high risk patients might miss appointments, and the rare chance that treatment would be inadequate. It then determined these to be such unlikely effects that they failed to establish a prima facie case, particularly when weighed against the numerous benefits of the relocation. *NAACP v. Wilmington Med. Ctr.*, 491 F. Supp. 290, 337 (D. Del. 1980). Although the Third Circuit

[13] The factors listed in *Villanueva* are not intended to be exclusive. There are multiple other potentially relevant factors that affect whether a school closing may violate Title VI. Some of the relevant factors, for example, are noted in the Department of Education's "Dear Colleague" letter on resource comparability. *See* http://www2.ed.gov/about/offices/list/ocr/letters/colleague-resourcecomp-201410.pdf.

USCA4 Appeal: 23-1453    Doc: 17    Filed: 06/05/2023    Pg: 248 of 610

affirmed without deciding this particular issue, a concurrence addressed the issue directly, finding the countervailing benefits accruing to minority patients a determinative consideration:

> [T]hese specific findings are part of a larger mosaic: the trial court's overarching finding that the level of care for all population groups will improve as a result of the benefits that greater consolidation, better-trained residents and upgraded facilities will confer. Measured against [agency] regulations which define Title VI *violations as actions which have* "*the effect of defeating or substantially impairing* accomplishment of the objective of the program as respect (sic) individuals of a particular race, color, or national origin," 45 C.F.R. § 80.3(b)(2) (emphasis added), these de minimis impacts simply do not pass muster.

*Med. Ctr.*, 657 F.2d at 1340 (Adams, J., concurring); *see also United States v. Bexar Cty.*, 484 F. Supp. 855, 859 (W.D. Tex. 1980) (finding the increased quality of care at a new medical center "much more than offset and outweigh" possible transportation problems created by relocation).

In both *Medical Center* and *Bexar*, the recipients had taken actions to mitigate the impacts on minorities, and both holdings recognized these efforts as important considerations. In *Medical Center*, the recipient had entered into an agreement with the Department of Health, Education & Welfare (predecessor to the Department of Health and Human Services), obligating it to "designate an ombudsman to receive and act upon complaints of discrimination, to adopt a system of inpatient utilization control, to prevent either [of the two hospitals in the parent system] from becoming racially identifiable," and to set aside nearly three million dollars for the renovation of the existing facility. *Med. Ctr.*, 657 F.2d at 1331–32. In *Bexar*, the hospital understood the new travel burden and had taken steps to alleviate problems by providing mini-bus service. *Bexar*, 484 F. Supp. at 860. It is possible that the court may have ruled differently but for these ameliorative measures.

---

**AGENCY PRACTICE TIP**

Investigating agencies should consider the sufficiency of the adversity/harm and carefully consider whether benefits to the affected group offset or outweigh the harms to that group. Agencies should remember that recipients may be able to ensure compliance with Title VI by mitigating any adverse harm that may affect the protected group. Informal resolution efforts often involve identification of mitigation efforts which, if applied, would result in compliance with Title VI by reducing or eliminating adversity/harm.

---

### c.  Establishing disparity

An investigating agency's disparity analysis must answer the question that is the essence of a violation of agency disparate impact regulations: Is a disproportionate *share* of the adversity/harm borne based on race, color, or national origin? If so, a disparity is established.

USCA4 Appeal: 23-1453      Doc: 17      Filed: 06/05/2023      Pg: 249 of 610

To establish a disparity, an investigating agency must use an "appropriate measure." *N.Y.C. Envtl. Justice All.*, 214 F.3d at 70 (citation omitted). A typical disparity measure involves a comparison between the proportion of persons in the protected class who are adversely affected by the challenged practice and the proportion of persons not in the protected class who are adversely affected. *Tsombanidis v. W. Haven Fire Dep't*, 352 F.3d 565, 576–77 (2d Cir. 2003). A disparity is established if the challenged practice adversely affects a significantly higher proportion of protected class members than non-protected class members. *Id.*

---

**AGENCY PRACTICE TIP**

There is no one-size-fits-all measure for disparity. Investigating agencies must tailor their methodology to the circumstances in each case in order to ensure an accurate measurement. For example, under the Fair Housing Act, HUD noted that deciding whether "a particular practice results in a discriminatory effect is a fact–specific inquiry" and that because there are "numerous and varied practices and wide variety of private and governmental entities covered by the Act, it would be impossible to specify in the rule the showing that would be required to demonstrate a discriminatory effect in each of these contexts." Implementation of the Fair Housing Act's Disparate Impact Standard, 78 Fed. Reg. 11,460, 11,468, (Feb. 15, 2013). Where recurring case types have sufficient commonalities, however, agencies can consider crafting guidelines for measuring and defining adverse disparate impact in their recipients' programs. Where such guidelines apply, the investigating agency should, of course, use the methodologies developed for specific matters.

---

When beginning a disparity analysis, an investigating agency should take two initial steps. First, the agency should identify the protected class. Second, the agency must evaluate whether statistical evidence is available and necessary to evaluate the claim. Next, the agency takes the third and fourth steps, which are the most critical components of the disparity analysis. In the third step, the agency should evaluate on what population the adverse disparate impact must be shown. This highly fact-specific inquiry involves accurately identifying the adversely affected population as well as determining the legally relevant population base from which to draw a comparison population. Finally, the agency must determine whether the disparity shown is sufficiently large to impose legal liability (sometimes termed "practical significance").

i.    Identifying the Protected Class

Typically, the relevant protected class will be evident from the complaint because it alleges harm to a specific group (e.g., "Latinos" or "Blacks"). Other times, however, the complaint may broadly allege harm to "minorities" or to several specific groups collectively, or funding agencies may wish to conduct compliance reviews addressing impacts on such groups in the aggregate. Agencies may conduct disparity analyses in which multiple protected groups are aggregated. Such aggregation is commonplace and presumptively accepted by the courts. *See, e.g.*, *Wards Cove Packing Co. v. Atonio*, 490 U.S. 642, 650–55 (1989) (conducting a close critique of the statistics used to compare "white" and "nonwhite" workers and indicating that to

prove disparate impact, one must provide statistics of probative value comparing "white" and "nonwhite" individuals under Title VII); *Darensburg*, 636 F.3d at 520–21 (critiquing the district court's statistical methodology comparing effects on "minorities" and "non-minorities" generally under Title VI while raising no complaint with the aggregate statistics used). Many cases accept statistics aggregating "Blacks" and "Hispanics." *E.g.*, *N.Y.C. Transit Auth. v. Beazer*, 440 U.S. 568, 584–85 (1979); *Biondo v. City of Chicago*, 382 F.3d 680, 682–83 (7th Cir. 2004); *Cox v. City of Chicago*, 868 F.2d 217, 220 (7th Cir. 1989); *Huntington Branch, NAACP v. Town of Huntington*, 844 F.2d 926, 929 (2d Cir. 1988), *aff'd in part*, 488 U.S. 15 (1988).

On the other hand, agencies should avoid aggregation where two groups are not similarly situated and aggregation may hide disproportionate effects on one of the groups. *See Rich v. Martin Marietta Corp.*, 522 F.2d 333, 346 (10th Cir. 1975) (aggregating group statistics as between "blacks, women and Chicanos and [Asians] and American Indians" was inappropriate because the practice "rendered the statistics useless, particularly in view of the fact that the [Asians] especially were heavily represented in the upper echelon of the labor force").

---

**AGENCY PRACTICE TIP**

If the recipient's policy or practice exerts an adverse/harmful effect on more than one protected group, agencies may aggregate protected groups unless the groups are not similarly situated.

---

ii.    Determining the Need for Statistical Evidence

Often a disparity can be quantified using statistical evidence. *See Darensburg*, 636 F.3d at 519 (explaining that appropriate statistical evidence can provide a "reliable indicator of a disparate impact" (citing *New York Urban League*, 71 F.3d at 1038)). And the majority of contemporary disparate impact claims involve comparative evidence based on statistical analysis. It is important to remember, however, that even where statistical evidence is available, circumstantial evidence can be a critical supplement. As the Supreme Court has cautioned, the usefulness of statistics "depends on all of the surrounding facts and circumstances." *Int'l Bhd. of Teamsters v. United States*, 431 U.S. 324, 340 (1977).

While statistical evidence is often necessary, in some cases statistical evidence may not be needed. *Thomas v. Washington Cty. Sch. Bd.*, 915 F.2d 922, 926 (4th Cir. 1990) ("although disparate impact cases usually focus on statistics, they are neither the exclusive nor a necessary means of proof") (citation omitted). The requisite unfair share of harm can also be shown by evidence of impact on specific individuals. *See, e.g.*, *McCoy v. Canterbury*, No. 3:10–0368, 2010 WL 5343298, at *5 (S.D.W. Va. Dec. 20, 2010) (a "series of discrete episodes" of the challenged practice can "raise a plausible inference that it has a discriminatory impact on minorities"), *aff'd*, 428 Fed. App'x 247 (4th Cir. 2011); *Mitchell v. Bd. of Trustees*, 599 F.2d 582, 585–86 (4th Cir.

USCA4 Appeal: 23-1453      Doc: 17      Filed: 06/05/2023      Pg: 250 of 610

1979) (affirming district court's finding of disparate impact "on the basis of the few specific applications of the policy proven, such inferences of likely other applications as these instances could rationally support, and judicial notice of the world as it is and as it is known in common experience to be").

The disparate effect of a recipient's policy or practice is sometimes so obvious or predictable that comparative statistics are simply unnecessary to draw the requisite connection between the policy and harm to a Title VI protected group. For instance, certain recipient language policies have the self-apparent effect of excluding individuals based on their national origin. *See Lau v. Nichols*, 414 U.S. 563, 568 (1974) (finding national origin discrimination without reliance on statistical evidence because instruction takes place only in English and therefore "[i]t seems obvious that the Chinese-speaking minority receive fewer benefits than the English-speaking majority"); *see also Mitchell*, 599 F.2d at 585–86 (upholding district court finding that "a policy that arguably would not renew the contract of any teacher who for any reason could not commit at contract renewal time to a full year's uninterrupted service, but that singled out pregnancy alone for compelled disclosure, would necessarily impact disproportionately upon women").

---

**AGENCY PRACTICE TIP**

Agencies should not immediately dismiss a claim if statistics are not provided or available. Instead, agencies should ask if the requisite unfair share of harm can also be shown by evidence of impact on specific individuals or if the discriminatory effect of a recipient's policy or practice is inherently obvious or predictable.

---

       iii.    Relevant comparator population

If an agency uses statistical evidence, it must determine the particular proportion of protected persons and non-protected persons adversely affected. To do this, the agency must "take into account the correct population base and its racial makeup." *Darensburg*, 636 F.3d at 520. This step in a statistical analysis of disparate impact, therefore, is to identify the base population from which to draw comparative evidence, because the challenged policy must be shown to have a discriminatory effect *within the population or area it affects. See, e.g., Hallmark Developers, Inc. v. Fulton Cty.*, 466 F.3d 1276, 1286 (11th Cir. 2006). In other words, the legally relevant "population base" for a statistical measure of adverse disparate impact is all persons the policy or practice affects or who could possibly be affected by some change in (or the elimination of) the policy or practice. Normally, this means "persons subject to the challenged … practice." *Carpenter v. Boeing Co.*, 456 F.3d 1183, 1196 (10th Cir. 2006). As stated in a Fair Housing Act case, *Housing Investors, Inc. v. City of Clanton*, 68 F. Supp. 2d 1287, 1299 (M.D. Ala. 1999), "the starting point is always the subset of the population that is affected by the disputed decision."

Filed: 06/05/2023     Pg: 251 of 610     Doc: 17     USCA4 Appeal: 23-1453

As these cases show, because the ultimate question is whether the policy has a discriminatory effect within the population it affects, statistical evidence ideally should be based on comparison groups that include, but do not extend beyond, "the total group to which the policy was applied." *Betsey v. Turtle Creek Assoc.*, 736 F.2d 983, 987 (4th Cir. 1984). Part (a) of this section, below, discusses comparison groups that include the total group to which the policy applies.

Of course, the ideal evidence, i.e., statistical proof that covers the relevant population, is not always available. Investigating agencies may find that additional issues arise in attempting to analyze disparate impact within the affected population or area using statistical evidence that is not always a perfect fit. As discussed in part (b), sometimes the sources of available data may describe only a population smaller or larger than the population actually subject to the challenged policy. Other times, comparison groups are simply unavailable because the disparate effects of the policy or practice cannot be isolated or the policy or practice has a uniform, or near uniform, adverse effect on a predominantly minority population or area. Section (b) provides some additional guidance on methods that may be available to address these complications.

> (a)   Comparator groups that include the total group to which the policy was applied

Determining the population to which the challenged policy is applied or area the policy actually affected can present a challenging, fact-intensive element of proof. In certain types of cases involving whole areas, like cities, counties, or states, the investigating agency may use general population data where everyone in that population may be affected. Investigating agencies may find this method more efficient than other options because general population data are often readily available at little or no cost through existing sources. For example, in *Angelita C. v. California Department of Pesticides Regulation*, No. 16R–99–R9, an EPA administrative case, complainants alleged that the use of a particular pesticide caused adverse health risks borne disproportionately by Latino school children. EPA correctly measured disparity within the population base of all students enrolled in California public schools because all school children "could potentially have been affected" by the use of that pesticide, depending on proximity of the school to the farm using the pesticide and meteorological conditions. EPA Office of Civil Rights, *Investigative Report for Title VI Admin. Complaint File No. 16R–99–R9* at 32 (Aug. 25, 2011).[14]

Similarly, in a Fair Housing Act (FHA) disparate impact claim that challenged the effect of a generally applicable zoning ordinance or other local law, the court determined that the legally relevant population base was everyone who lived in the city where the allegedly discriminatory fire code applied. *Tsombanidis v. W. Haven Fire Dep't*, 352 F.3d 565, 577 (2d Cir. 2003) (fire code used to bar group home for recovering alcoholics and drug addicts violated FHA and Title II of the Americans with Disabilities Act of 1990, 42 U.S.C. §§ 12131–12165).

---

[14] The report is available here: http://www.epa.gov/civilrights/TitleVIcases/ir-082511.pdf.

By contrast, in an FHA disparate impact claim that challenge a more focused policy or practice, the court rejected an attempt to use generalized population data. *Betsey*, 736 F.2d at 987–88. In *Betsey*, plaintiffs challenged an apartment complex's institution of a no-children policy in one of its buildings, resulting in the evictions of many African-American residents. *Id.* at 985–86. The court held that the only relevant question was the policy's effect on African-American tenants of that building; it was irrelevant that the policy had little disparate impact on African-American residents community-wide, because the policy did not apply so broadly. *Id.* at 987–88. Because the percentage of minority residents receiving eviction notices was far higher than that of non-minority residents receiving eviction notices, a showing of disparate impact was "self-evident." *Id.* at 988.

The history of Title VII disparate impact claims also suggests that agencies must be very cautious in the use of jurisdiction-wide population statistics. While courts sometimes allowed plaintiffs in early cases to use the population of the surrounding area as the population base for determining whether an employer's hiring practices had an adverse disparate impact on a protected class, *see, e.g.*, *Griggs*, 401 U.S. at 430, it is now clear that the legally relevant population base is the actual applicant pool or qualified applicant pool. *See, e.g.*, *Paige v. California*, 291 F.3d 1141, 1145 (9th Cir. 2002) ("In evaluating the impact of a particular process, we must compare the group that 'enters' the process with the group that emerges from it."); *Stout v. Potter*, 276 F.3d 1118, 1123 (9th Cir. 2002) ("Generally, the appropriate population is the applicant pool or relevant labor market from which the positions at issue are filled.") (citing *Wards Cove Packing Co.*, 490 U.S. at 650–51; *Hazelwood Sch. Dist. v. United States*, 433 U.S. 299, 308 (1977)).

Although Title VI matters are less frequently the subject of litigation than housing or employment cases, the test for determining the relevant population base from which to measure disparity in a Title VI case is the same. In *Larry P. v. Riles*, 793 F.2d 969 (9th Cir. 1984), for example, plaintiffs claimed that California used an IQ test to place children in non-academic track classes, resulting in an adverse impact on black children. The relevant population base was all school children who took the test. The court concluded that plaintiffs made out a prima facie case by showing that "black children as a whole scored ten points lower than white children on the tests, and that the percentage of black children in [non-academic-track] classes was much higher than for whites." *Id.* at 982–83. Similarly, in *Bryan v. Koch*, 627 F.2d 612, 617 (2d Cir. 1980), where plaintiffs alleged that closing a city hospital serving a 98% minority population violated Title VI, the court determined that the relevant population base was "the patients served by the City's municipal hospital system." *Id.* Because the general population was 66% minority—significantly less than the 98% minority population served by the hospital slated for closing—sufficient racial disparity was established. *Id.*

---

**AGENCY PRACTICE TIP**

When, and only when, an agency can reasonably conclude that everyone in the jurisdiction is potentially affected, investigating agencies can rely on Title VII and FHA disparate impact cases to support using an entire jurisdiction as the relevant population base.

---

        (b)     Comparator evidence that is not coextensive with the population subject to the policy

While the better practice is to analyze the population actually subject to the challenged policy, courts have recognized that evidence may not be available to measure this directly. For example, if the claim includes an allegation that a particular policy or practice created a pool where a particular group's numbers were low precisely because the policy discouraged that group from applying, then plaintiffs must use some means to accurately estimate what the population makeup would have been without that policy or practice. *See, e.g., Dothard v. Rawlinson*, 433 U.S. 321, 330 (1977) (noting that "[t]here is no requirement … that a statistical showing of disproportionate impact must always be based on analysis of the characteristics of actual applicants" in part because "[t]he application process might itself not adequately reflect the actual potential applicant pool, since otherwise qualified people might be discouraged from applying because of a self-recognized inability to meet the very standards challenged as being discriminatory").

In some cases, agencies facing this limitation may use evidentiary samples that are not coextensive with the population subject to the policy as long as those samples are representative of that population. For example, job applicants who actually take an allegedly discriminatory test, and whose pass rates can be compared for racially disparate results, represent only a portion of the affected population, which includes all potential job applicants. *See* Elaine W. Shoben, *Differential Pass-Fail Rates in Employment Testing: Statistical Proof Under Title VII*, 91 Harv. L. Rev. 793, 794 (1978); *Frazier v. Consol. Rail Corp.*, 851 F.2d 1447, 1452 (D.C. Cir. 1988). That does not mean pass rates are without evidentiary value; it just means decision-makers must attempt to use that information to determine the discriminatory effect the test would have on individuals in the relevant geographic area who could have taken the test.

Courts, in fact, routinely reject evidence when the sample is not sufficiently probative. In *Smith v. Xerox Corp.* 196 F.3d 358 (2d Cir. 1999) (overruled on other grounds by *Meacham v. Knolls Atomic Lab.*, 461 F.3d 134 (2d Cir. 2006)), for example, the court considered the process each Xerox work unit used when deciding which workers to lay off. Plaintiffs, alleging age discrimination company-wide, presented statistics showing the relative retention rates of older and younger workers only within their particular units. The court found this evidence inadequate, as it demonstrated only a varying level of disparity in those particular units and not that such an effect pertained to the company as a whole. *Id.* at 369–70. It concluded that "isolating a few

USCA4 Appeal: 23-1453    Doc: 17    Filed: 06/05/2023    Pg: 254 of 610

work-groups and analyzing the effect of [the company's policy] on each work-group is misleading at best" when the challenge is to the effect the policy causes company-wide. *Id.* at 370. Similarly, in *Darensburg*, plaintiffs attempted to challenge the impact of a portion of a transit system's expansion policy by presenting evidence regarding the impact on a particular group of minority bus riders.[15] The court concluded that the expansion policy affected *all* transit users and held that it must therefore analyze the impact of the plan on *all* minority transit users, not just minority bus riders. 636 F.3d at 520.

Other times, the available evidence is of a pool that is *broader* than those affected by the challenged policy. This evidence, too, can be useful as long as that broader pool is representative of the affected population. *See, e.g., EEOC v. Joint Apprenticeship Comm. of Joint Indus. Bd. of Elec. Indus.*, 186 F.3d 110, 119 (2d Cir. 1999) (using general population data, in addition to other statistical methods, to estimate the qualified labor pool). For example, in a challenge to a company's requirement that job applicants have high school diplomas or pass standardized tests, the Supreme Court accepted evidence of racial disparity in high school graduation rates statewide and in standardized test pass rates nationally. *Griggs*, 401 U.S. at 430 n.6. Similarly, in *Dothard*, 433 U.S. at 330, the Court accepted nationwide evidence of how many women met challenged height and weight requirements. In both cases, there was no reason to think that local conditions varied significantly from the broader ones.

In contrast, courts may reject evidence of racial disparity gleaned from broad statistics where there is a reason to question whether those statistics are representative of the affected population. For example, in *Johnson v. Uncle Ben's, Inc.*, 965 F.2d 1363, 1369 (5th Cir. 1992), the court rejected national statistics about education levels by race in a challenge to a company's promotion policy because those statistics were not necessarily representative of workers already working for the company and seeking promotion. Similarly, in *Fletcher v. Berkowitz Oliver Williams Shaw & Eisenbrandt*, 537 F. Supp. 2d 1028, 1030 (W.D. Mo. 2008), in a challenge to an employer's consideration of plaintiff's prior sexual assault conviction, the court rejected as immaterial the argument that African Americans were overrepresented in the larger pool of people with felony convictions. The court stated that the general felony data said nothing about the representation of African Americans among those with sexual assault convictions, which was the reason the employer terminated this employee.

---

[15] The *Darensburg* complaint was brought under state law (California Government Code §11135), which contains language comparable to Title VI and provides explicitly for a private right of action. The court analyzed the prima facie case under Title VI and Title VII standards.

USCA4 Appeal: 23-1453    Doc: 17    Filed: 06/05/2023    Pg: 255 of 610

---

**AGENCY PRACTICE TIP**

Use of general population data can simplify an agency's disparate impact analysis where local demographic data about the population actually subjected to a challenged policy is simply not available. Part D discusses the critical role of agency data collection authority to meaningful disparate impact analyses. But agencies should use generalized data with caution: some showing must be made that evidence drawn from a national pool, or from another sample that is not coextensive with the population affected, is sufficiently and closely representative of the affected population.

---

iv.      Determining the significance of the disparity

Once the relevant adversely affected and comparator populations are determined, investigating agencies must determine whether the disparity is large enough to matter, i.e., is it sufficiently significant to establish a legal violation. The magnitude of the disparity necessary may be difficult to define in some cases, but guidance can be drawn both from judicial consideration of this question and from federal agency guidelines. In many cases, courts have shied away from drawing clear lines. *See Clady v. Cty. of Los Angeles*, 770 F.2d 1421, 1428–29 (9th Cir. 1985); *accord Smith v. Xerox Corp.*, 196 F.3d at 366 ("[T]he substantiality of a disparity is judged on a case-by-case basis."); *Groves*, 776 F. Supp. at 1526 ("There is no rigid mathematical threshold that must be met to demonstrate a sufficiently adverse impact."). Some disparities are so self-evidently significant, however, that courts have seen no need to explain their reasoning beyond presentation of the statistical evidence. *See, e.g., Betsey*, 736 F.2d at 988 (building policy resulted in 54.3% of non-white tenant households receiving eviction notices, compared with 14.1% of white households); *Charleston Hous. Auth. v. U.S. Dep't of Agric.*, 419 F.3d 729, 734 (8th Cir. 2005) (disparate impact caused by planned demolition of public housing units where 46 of the 47 families occupying units were African-American).

Conversely, courts are comfortable rejecting particularly small disparities, or those based on very small sample sizes, without explaining the mathematical basis for their conclusions. For example, one court found insufficient evidence of disparate impact based on sex where women were six of the thirty-eight applicants and received two of the fifteen interviews. As the court observed, if just one more female applicant had received an interview, women actually would have had a higher percentage of interviews granted. *Stout*, 276 F.3d at 1123 & n.2. Another court found insufficient disparate impact where "the pass rate for black applicants … was 93% that of white applicants," without opining on what might be a sufficient showing. *Moore v. Southwestern Bell Tele. Co.*, 593 F.2d 607, 608 (5th Cir. 1979) (per curiam). Importantly, plaintiffs have succeeded in establishing disparate impact, even with very small sample sizes, in cases where statistics were not necessary because the disparate effect was obvious or predictable. This approach is discussed above in subsection ii.

Pg: 256 of 610        Filed: 06/05/2023      Doc: 17        USCA4 Appeal: 23-1453

Enforcement agencies have developed guidelines to help identify sufficiently significant disparities in frequently recurring contexts. In employment discrimination cases, where the members of one race or other protected class are selected at four-fifths (or less) the rate of another (80% or less), the EEOC, DOJ, and the Department of Labor have adopted this formula for use in identifying evidence of disparate impact.[16] Some courts have adopted this four-fifths cutoff as a rule of thumb when determining whether the amount of differential impact is sufficient. *See, e.g., Clady*, 770 F.2d at 1429 (finding that written exam for employment adversely affected Hispanics because they passed at less than four-fifths the rate of white applicants).

However, not every type of disparity lends itself to the use of the four-fifths rule, even with respect to employment decisions. Federal guidelines in employment cases clarify that the four-fifths (80%) rule is not dispositive and smaller differences in selection rates may nevertheless constitute adverse impact. 28 C.F.R. § 50.14(4)(D). Some courts have found a prima facie case where the disparity fell just short of four-fifths but the causation analysis (discussed below) was statistically significant (meaning the disparity is less likely due to chance) and, in the court's view, of practical import. *See, e.g., Groves*, 776 F. Supp. at 1527–28 (disparate impact established where defendant's evidence revealed black candidates met testing requirement at 82.3% the rate of white candidates, slightly above the 80% mark, but the causation analysis was "overwhelming[ly] statistically significant, showing that "the test itself, and not merely random sampling, has caused the disproportionate exclusion of blacks"); *Hill v. Metro. Atlanta Rapid Transit Auth.*, 591 F. Supp. 125, 129 (N.D. Ga. 1984) (acknowledging that disparate impact could still be established where minorities' selection rate was 81.55% that of white candidates), *rev'd in part on other grounds*, 841 F.2d 1533 (11th Cir. 1988).

As noted above, in addition to the four-fifths (80%) rule, courts have considered statistical significance—the difference between the expected and observed rates in terms of standard deviations—with a difference of two or three standard deviations to be statistically significant (Hazelwood test). Similarly, the "Shoben formula" recognizes a "Z-value" measuring the difference in the groups' success rates greater than 1.96 standard deviations to be statistically significant. *Groves*, 776 F. Supp. at 1526–28, citing *Richardson v. Lamar Cty. Bd. of Educ.*, 729 F. Supp. 806, 816 (M.D. Ala. 1989).

Some agencies have suggested guidelines for disparity that may be considered significant. Following the focus in *Groves* on overwhelming statistical significance (part of the causation analysis), the Department of Education's Office for Civil Rights has issued guidance in the context of high stakes testing indicating that, in general, a test has a disproportionate adverse impact if a statistical analysis shows a significant difference from the expected random

---

[16] Uniform Guidelines for Employee Selection Procedures. *See* 29 C.F.R. pt. 1607 (EEOC); 28 C.F.R. § 50.14 (DOJ); and 29 C.F.R. ch. 60–3 (DOL).

USCA4 Appeal: 23-1453      Doc: 17      Filed: 06/05/2023      Pg: 257 of 610

distribution of test scores and pointing out that different courts have used different methods for determining disparate impact. U.S. Department of Education, Office of Civil Rights, *The Use of Tests as Part of High-Stakes Decision-Making for Students: A Resource Guide for Educators and Policy-Makers* (December 2000). [17] *See also* EPA Investigation Guidance, 65 Fed. Reg. at 39,682 ("[W]here credible measures of [disparity] are at least a factor of 2 times higher in the affected population, OCR would generally expect to find disparate impact under Title VI ….").

Some agencies may use other methods of evaluating disparity. Some disparity measures, for example, may consider differences in the magnitude of adversity/harm (e.g., level of exposure or risk). Agency guidelines may evaluate both the demographic disparity and the differences in the magnitude of the impacts. For example, EPA's Title VI investigations guidance established a sliding scale that takes into account the degree of demographic disparity and the differences of degree in the health impact measure (e.g., rates of cancer risks). *Id.* ("[W]here a large disparity exists in terms of impact and a relatively slight disparity exists with regard to demographics (or vice versa), EPA will ordinarily attempt to balance these factors, taking into account the particular circumstances of the case."). While this does not provide a uniform standard for determining whether any individual matter has a discriminatory effect, it makes clear that the agency regards these two factors— degree of health impact and degree of demographic disparity—as important components of the analysis.

The Federal Transit Administration's approach to disparate impact analysis, like EPA's, recognizes the need for flexibility in determining whether there is disparity and considers differences in degree related to adversity/harm. Certain recipients are required to adopt a disparate impact policy that establishes "a threshold for determining when adverse effects of service changes are borne disproportionately by minority populations." FTA Title VI Circular at Chap. IV–13.[18] The threshold should define "statistically significant disparity and may be presented as a statistical percentage of impacts borne by minority populations compared to impacts borne by non- minority populations." *Id.*

### d. Establishing causation

The final element of adverse disparate impact is causation. Even if the evidence establishes an adverse effect that is borne disproportionately by members of a protected group, this question remains: did the recipient *actually cause* that effect? As the court held in *Flores v. Arizona*, 48 F. Supp. 2d 937, 952 (D. Ariz. 1999), "[p]laintiff's duty to show that the practice has disproportionate effect requires plaintiff to demonstrate a causal link between the practice and the disparate impact identified." To establish a violation of its disparate impact provision, an

---

[17] Available at https://www2.ed.gov/offices/OCR/archives/pdf/TestingResource.pdf.
[18] The Circular is available at http://www.fta.dot.gov/legislation_law/12349_14792.html (last visited Nov. 18, 2016).

Pg: 258 of 610    Filed: 06/05/2023    Doc: 17    USCA4 Appeal: 23-1453

USCA4 Appeal: 23-1453    Doc: 17    Filed: 06/05/2023    Pg: 259 of 610

investigating agency must determine that the impact is causally linked to a recipient's policy or practice. *See Elston v. Talladega Cty. Bd. of Educ.*, 997 F.2d 1394, 1415 (11th Cir. 1993) (citations omitted) (plaintiff cannot make out a prima facie disparate impact claim if the evidence tends to show that even had the defendant not engaged in the challenged practice, the same disparate impact would nonetheless have existed).

Causation is frequently shown with statistics. To establish causation, the investigating agency may identify "statistical evidence of a kind and degree sufficient to show that the practice in question has *caused* the exclusion of [a particular group] because of their membership in a protected group." *Rose v. Wells Fargo & Co.*, 902 F.2d 1417, 1424 (9th Cir. 1990) (emphasis added) (citing *Watson Watson v. Fort Worth Bank & Trust*, 487 U.S. 977, 994 (1988). The statistical disparities must be sufficiently significant that they "raise … an inference of causation." *Id.* As should already be clear, this method of proving causation is linked to the statistical proof of disparity discussed above; i.e., the same comparative population evidence is typically used to prove both causation and disparity. While the previous section looked at whether the magnitude of the disparity is large enough to matter, this analysis allows agencies to be sufficiently certain (at the specified statistical level) that the disparity is not caused by chance. In other words, is the difference statistically significant?

As discussed above, statisticians have their own established definitions of statistical significance that federal agencies can readily import in their analyses. *See, e.g.*, 28 C.F.R. § 50.14(4)(D). Federal regulations generally define statistical significance, consistent with the term's typical use in social sciences and other statistical inquiry, as a demonstration that the disparity has "a probability of no more than one (1) in twenty (20) to have occurred by chance." *Id.* § 50.14(14)(B)(5); *see also Castaneda v. Partida*, 430 U.S. 482, 496 n.17 (1977); *Alexander v. Louisiana*, 405 U.S. 625, 630 & n.9 (1972); *Watson*, 487 U.S. at 995 (O'Connor, J., plurality opinion) ("statistical disparities must be sufficiently substantial that they raise … an inference of causation"). However, as discussed above there are multiple tests for statistical significance that allow for different confidence intervals (e.g. the Hazelwood test allows for statistical significance at 2-3 standard deviations from the expected rates and the Shoben formula allows 1.96 standard deviations). *See Groves*, 776 F. Supp. at 1526–28.

Regardless of the statistical significance measure used, the Supreme Court has emphasized the importance of "a robust causality requirement" in ensuring entities are not "held liable for racial disparities they did not create." *Inclusive Communities*, 135 S. Ct. at 2523 (citing *Wards Cove*, 490 U.S. at 653). Investigating agencies must carefully evaluate the causal connection between the challenged policy and any adverse disparate impacts identified. Yet, it is important to remember that the causation element is not a fault-based inquiry; the proper analysis is not about whether there are actual differences among applicants or beneficiaries of different races or why those differences exist. Rather, the sole question at this phase of the case should be whether the

recipient's policy in fact affects people of different races disproportionately. Causation is established where the evidence establishes that the recipient's policy or practice operates in this manner; there is no need for understanding why the policy results in the disparity at this step of the inquiry.

- Where a requirement that applicants have high school diplomas disproportionately excludes African Americans from the hiring process, it does not matter that the recipient is not at fault for African Americans not having high school diplomas at the same rate as whites. The causation inquiry does not involve consideration of whether societal factors external to the hiring process caused the disparate high school diploma rates. *Griggs*, 401 U.S. at 430–31.

- Where the denial of language assistance excludes individuals from meaningful access to the recipient's program based on national origin, it does not matter that the recipient did not cause students to lack English proficiency. The causation inquiry does not involve consideration of factors external to the education process that caused children not to know English. *Lau*, 414 U.S. at 568.

- Where an I.Q. test results in a disproportionate representation of African American children in special education classes, the overrepresentation cannot be "explained away" by external societal factors such as poor nutrition and poor medical care related to lower socioeconomic status. *Larry P.*, 793 F.2d at 983.

Other types of Title VI cases may involve a different type of causation analysis—one that explores the concrete proof connecting the recipient's practice to the alleged harms. For example, environmental justice cases often involve allegations that a recipient's action or inaction causes harm or that the recipient's permitting of a third party facility causes the harm. In these cases, establishing causation may involve scientific or other quantifiable proof that the challenged practice actually caused the alleged adverse impacts. This may involve proof connecting a specific facility to a specific adverse impact, such as harmful health effects, odor, noise, decrease in property values, etc. When such proof is not obtainable, the statistical tests discussed above will suffice.

For example, in complaint investigations alleging adverse impacts from the operation of recipient-permitted facilities, EPA has explained that the facts and circumstances of each complaint will determine whether a likely causal link exists. EPA recognizes a number of forms and types of evidence that could establish causation, including scientific proof of a direct link, prediction of potentially significant exposures and risks resulting from stressors created by the permitted activities or other sources, and other complex methodologies. EPA Investigations Guidance, 65 Fed. Reg. at 39,679. For an example of a causation analysis involving the risk of

Pg: 260 of 610      Filed: 06/05/2023      Doc: 17      USCA4 Appeal: 23-1453

exposure to a pesticide, see EPA's investigatory report in *Angelita C. v. California Department of Pesticides Regulation*, No. 16R–99–R9. EPA Office of Civil Rights, *Investigative Report for Title VI Administrative Complaint File No. 16R–99–R9* at 32–33 (Aug. 25, 2011).[19]

### c.  Agency approaches to defining adverse disparate impact

As mentioned previously, federal funding agencies responsible for Title VI enforcement sometimes engage in rulemaking, issue formal guidance documents, and informal guidance such as letters to inform recipients of the types of adverse disparate impact (discriminatory effects) they must try to avoid. In the following illustrative examples of agency approaches to defining adverse disparate impact in specific applications, agencies have identified specific impacts prohibited by Title VI; identified factors they will consider in making such determinations on a case by case basis; and required (or recommended) that their recipients establish formal definitions.

- The Department of Transportation's Federal Transit Administration, which funds state and local transportation agencies, requires recipients to "define and analyze adverse effects related to major changes in transit service." FTA Circular 4702.1B, Title VI Requirements and Guidelines for Federal Transit Recipients, Chap. IV-13 (Oct. 1, 2012).[20] As part of FTA's requirement that recipients submit a multi-element "Title VI Program," recipients must adopt their own definitions of adversity, subject to DOT approval and subject to the requirement that the effect be "measured by the change between the existing and proposed service levels that would be deemed significant." *Id.* FTA provides additional guidance and examples of the types of service changes that could have an adverse effect, such as elimination of a transit route, rerouting an existing route, and increases in travel time.

- The Department of Justice, which provides funding to state court systems, has determined that court policies failing to provide appropriate language assistance to limited English proficient individuals in all types of proceedings and court-managed services, are adverse under DOJ's disparate impact regulation. DOJ made this determination after considering both the importance of the issues at stake in criminal and civil matters and the critical need for accurate communications. Accordingly, a prima facie violation is established where a court's language services policy or practice causes these types of harms. *See* Language Access Guidance Letter to State Chief Justices and State Court Administrators from the Assistant Attorney General (August 16, 2010).[21]

---

[19] The report is available at https://perma.cc/KP2X-JXFQ (last visited Nov. 18, 2016).
[20] The Circular is available at http://www.fta.dot.gov/documents/FTA_Title_VI_FINAL.pdf.
[21] This letter is available at https://perma.cc/5S4E-L8J6.

USCA4 Appeal: 23-1453      Doc: 17      Filed: 06/05/2023      Pg: 262 of 610

- The Departments of Education and Justice have determined that certain student enrollment practices may chill or discourage student participation or exclude students based on their parents' or guardians' actual or perceived citizenship or immigration status, and that such an effect is adverse under agency Title VI disparate impact regulations. The Departments noted that school district must not prevent students from enrolling based either on their own citizenship or that of their parents: "[D]istricts may not request information with the purpose or result of denying access to public schools on the basis of race, color, or national origin. Dep't of Educ. and Dep't of Justice, Dear Colleague Letter on the Rights of All Children to Enroll in Public Schools 2 (May 8, 2014).[22]

- The Environmental Protection Agency, which provides funding to state environmental permitting agencies, has determined that where recipients issue pollution emission permits to facilities that may cause negative effects, these adverse effects could be sufficiently significant to establish adversity. Where agencies have not established specific benchmarks, EPA has provided guidance on the factors that agencies should consider in analyzing adversity. EPA observed that "no single analysis or definition of adverse disparate impact is possible due to the differing nature of impacts (e.g., cancer risk, acute health effects, odors) and the various environmental media (e.g., air, water) that may be involved." Rather, it said that it would "use environmental laws, regulations, policy and science as touchstones for determining thresholds for what is adverse." EPA Investigations Guidance, 65 Fed. Reg. at 39,654, 39,698.

### 2.   The Recipient's Substantial Legitimate Justification

If the evidence establishes a prima facie case of adverse disparate impact, as discussed in the preceding sections, courts then determine whether the recipient has articulated a "substantial legitimate justification" for the challenged policy or practice. *Georgia State Conf. v. Georgia*, 775 F.2d 1403, 1417 (11th Cir. 1985). The justification inquiry is an important and appropriate means of ensuring recipients have "leeway to state and explain the valid interests served by their policies." *Inclusive Communities*, 135 S. Ct. at 2522.

> **AGENCY PRACTICE TIP**
>
> The sequential process that courts use, where a complainant offers prima facie evidence and the defendant offers a rebuttal or a "substantial legitimate justification" need not be how an agency conducts its investigation. Rather, an agency has discretion to gather and evaluate evidence of "substantial legitimate justification" as part of its initial investigation, or to make a preliminary finding and require recipients to articulate their defenses as a next step. For example, EPA Title VI guidance recognizes the "recipient may offer its justification following its receipt of the notice of complaint, or after a preliminary finding of non–compliance with Title VI or EPA's implementing regulations." EPA Draft Revised Investigations Guidance, 65 Fed. Reg. at 39,683.

---

[22] The letter is available at http://www.justice.gov/crt/about/edu/documents/plylerletter.pdf.

DOJ TITLE VI LEGAL MANUAL

In contrast to intentional discrimination cases, where recipients can offer legitimate non-discriminatory reasons for the challenged actions, a justification in a disparate impact case that merely dispels inferences of illegitimate *intent* is inadequate. "Substantial legitimate justification" in a disparate impact case is similar to the Title VII concept of "business necessity," which requires an employer to show that the policy or practice in question is demonstrably related to a significant, legitimate employment goal. *Griggs*, 401 U.S. 433–36; *Wards Cove*, 490 U.S. at 659. After the plaintiff establishes a prima facie case of disparate impact, the defendant can attempt to show that the challenged practice "serves, in a significant way, the legitimate employment goals of the employer." *Id.* Importantly, the concept of "business necessity" does not transfer exactly to the Title VI context because Title VI covers a broader scope of recipient practices. *See Inclusive Communities*, 135 S. Ct. at 2522–24 (recognizing the limitations on extension of the business necessity concept to Fair Housing Act cases).

Thus, while it is well-established that *unjustified* disparate impact violates agency Title VI regulations, the precise nature of the justification inquiry in Title VI cases is somewhat less clear in application. As discussed in more detail below, courts and agencies have articulated a number of different formulations to describe what constitutes a justification legally sufficient to permit an adverse disparate impact. In all of these formulations, this analysis requires a delicate balancing of recipients' interests in implementing their policies with the substantial public interest in preventing discrimination. Because Title VI covers a vast array of federally funded programs, each with a different institutional mission, this highly fact-specific inquiry must be made carefully case by case.

Although determining a substantial legitimate justification is a fact-specific inquiry, Title VI case law and agency guidance set forth general requirements. For example, courts have required that the recipient show that the challenged policy was "*necessary* to meeting a goal that was *legitimate, important, and integral to the [recipient's] institutional mission*" in order to establish a "substantial legitimate justification." *Elston*, 997 F.2d at 1413 (emphasis added). Courts have evaluated whether the policy was "necessary" by requiring that the justification bear a "manifest demonstrable relationship" to the challenged policy. *Georgia State Conf.*, 775 F.2d. at 1418 (11th Cir. 1985).

| SUBSTANTIAL LEGITIMATE JUSTIFICATION |
|---|
| Was the challenged policy necessary to meeting a goal that was legitimate, important, and integral to the recipient's institutional mission? |
| Does the justification bear a manifest demonstrable relationship to the challenged policy? |

USCA4 Appeal: 23-1453      Doc: 17            Filed: 06/05/2023      Pg: 264 of 610

Agency guidelines or regulations implementing Title VI incorporate similar formulations. *See, e.g.*, EPA Investigations Guidance, 65 Fed. Reg. at 39,654 ("Determining what constitutes an acceptable justification will necessarily be based on the facts of the case. Generally, the recipient would attempt to show that the challenged activity is reasonably necessary to meet a goal that is legitimate, important, and integral to the recipient's institutional mission."); Fair Housing Act Regulations, 24 C.F.R. § 100.500(b)(1), (c)(2) (under the second step of the disparate impact burden shifting analysis, the defendant must prove that the proposed action is "necessary to achieve one or more substantial, legitimate. nondiscriminatory interests" of the defendant).

As is clear, this inquiry is fact-specific; this section does not present an exhaustive list of factors, but rather some of the considerations that may guide an investigating agency's analysis.

---

**AGENCY PRACTICE TIP**

Agencies provide guidance concerning types of justifications they expect to consider when investigating particular case types. *See, e.g.*, HUD Office of General Counsel Guidance on Application of the Fair Housing Act Standards to the Use of Criminal Records by Providers of Housing and Real Estate–Related Transactions (April 4, 2016), *available at* https://perma.cc/A49W-XJNC (resident safety and protecting property may be both substantial and legitimate, but housing providers must be able to prove that policies making housing decisions based on criminal history actually assist in protecting resident safety and/or property); EPA Draft Revised Investigations Guidance, 65 Fed. Reg. at 39,683 (explaining that when evaluating justifications for discriminatory environmental permitting decisions, EPA "expects to consider provision of public health or environmental benefits (e.g., waste water treatment plant) to the affected population from the permitting action to be an acceptable justification because such benefits are generally legitimate, important, and integral to the recipient's mission"); DOJ Language Guidance Letter to State Courts, (Aug. 16, 2010), *available at* http://www.lep.gov/final_courts_ltr_081610.pdf (explaining how cost justifications will be evaluated in the language access context).

Federal funding agencies are uniquely qualified to provide such guidance because of their expert knowledge of their funded programs. Courts normally defer to agency guidance in evaluating specific types of disparate impact. *See, e.g., S. Camden Citizens in Action*, 145 F. Supp. 2d 446, 496 (D.N.J. 2001) ("In the absence of guiding legal precedent on the question of what constitutes a 'substantial legitimate justification' or a 'legitimate nondiscriminatory reason' in the context of this case, I shall look to EPA regulations and practice."). As in all aspects of Title VI investigation, agencies should consider not only the recipient's perspective, but also the views of the affected community in assessing whether benefits to the community outweigh the policy's disproportionate adverse effects. *See, e.g.*, EPA Investigations Guidance, 65 Fed. Reg. at 39,683.

---

### a.  Is the proffered justification legitimate, integral to the recipient's institutional mission, and important?

Agencies should first inquire whether the recipient offers a justification that is legitimate, integral to the recipient's institutional mission, and important. *Elston*, 997 F.2d at 1413.

i.  Legitimate

Recipients frequently articulate rationales that appear to be legitimate on their face. These rationales can be objective: for example, showing that the recipient considered multiple alternatives and selected the least damaging/most beneficial path. *See, e.g., New York City Envtl. Justice All. v. Giuliani*, 214 F.3d 65, 72 (2d Cir. 2000); *see also Inclusive Communities*, 135 S. Ct. at 2523 (noting that "[z]oning officials … must often make decisions based on a mix of factors, both objective (such as cost and traffic patterns) and, at least to some extent, subjective (such as preserving historic architecture)" and that "these factors contribute to a community's quality of life and are legitimate concerns for housing authorities.")

Where, however, a federally funded entity insists on implementing a policy despite its adverse disparate impacts, the investigating agency must scrutinize the recipient's rationale to determine whether the evidence adequately supports it. A violation is established if the investigating agency finds that the evidence does not support the entity's justification, and therefore is not legitimate. *See Elston*, 997 F. 2d at 1407. Federal Transit Administration guidance explains this critical point: "[I]f evidence undermines the legitimacy of the [recipient's] asserted justification—that is, that the justification is not supported by demonstrable evidence—the disparate effects will violate Title VI, as the lack of factual support will indicate that there is not a substantial legitimate justification for the disparate effects." FTA Title VI Circular, at ch. IV–16.

Court decisions show that agencies should be particularly skeptical of "subjective rationales" and should thoroughly investigate and analyze the facts to determine whether these rationales are supported by sufficient evidence. *See, e.g., Sandoval v. Hagan*, 197 F.3d 484, 490–91 (11th Cir. 1999), *rev'd on other grounds sub nom. Alexander v. Sandoval*, 532 U.S. 275 (2001). In *Sandoval*, the Eleventh Circuit affirmed the district court's determination that none of the facts supported the recipient state agency's rationale for limiting driver's license examinations only to people who spoke English. *Id.* The state agency offered several justifications for the English-only rule: highway safety concerns, exam administration difficulties, exam integrity, and budgetary constraints. *Id.* The district court found that the recipient had produced no evidence at trial that non-English speakers posed a greater driving safety risk than English speakers; the recipient had undermined its own safety argument by recognizing valid licenses from non-English speakers of other locales; making test accommodations for illiterate, deaf, and disabled drivers; and having previously offered the examination in fourteen languages without administrative difficulty. The court further noted that cost had not been a real factor in making the decision to administer the examination only in English and that the recipient could afford the costs of language assistance in light of its $50 million dollar budget. *Id.* Affirming the district court, the Eleventh Circuit ruled that the state agency's rationales constituted a pretext for the policy despite its established disparate impact on national origin minorities. *Id.*

USCA4 Appeal: 23-1453    Doc: 17    Filed: 06/05/2023    Pg: 265 of 610

The justification analysis used in Fair Housing Act disparate impact cases can also provide
guidance for Title VI investigating agencies. The justification "must be supported by evidence
and may not be hypothetical or speculative." 24 C.F.R. §§ 100.500(c)(2), 100.500(b)(2); *see,
e.g., Gashi v. Grubb & Ellis Prop. Mgmt. Servs., Inc.*, 801 F. Supp. 2d 12, 16 (D. Conn. 2011)
(explaining that where the "defendant presents objective evidence to support his assertions, the
court is less wary of subjective explanations") (citing *Soules v. HUD*, 967 F.2d 817, 822 (2d Cir.
1992)). The *Gashi* court found that the evidence did not support a housing authority's
justifications for its discriminatory occupancy limitation. The defendant argued that the local fire
code mandated the challenged occupancy requirements and that "building infrastructure
concerns" necessitated the policy. The court concluded, however, that the fire code defendants
cited actually was not binding because it represented only national guidelines, and the defendants
had no documentation to support their vague assertions regarding infrastructure concerns. *Id.* at
17–18. *See also Charleston Housing Authority v. U.S. Dep't of Agriculture*, 419 F.3d 729, 741
(8th Cir. 2005) (rejecting as unsupported by the evidence defendant housing authority's claim
that demolition of public housing units occupied almost entirely by African Americans was
justified by a desire for low-income housing density reduction, need to eliminate a housing
design that contributed to the concentration of crime and drug use, and lack of funding for
necessary improvements).

It is important for investigating agencies to evaluate the veracity of any cost-based justifications
the recipient puts forward. A monetary justification for a policy or practice (or lack thereof) will
often fail because of a lack of evidence. *See, e.g., Sandoval v. Hagan*, 7 F. Supp. 2d 1234, 1312
(M.D. Ala. 1998) (finding defendant's cost argument unsupported by the evidence because
translation services at issue could be obtained by alternative cost-effective means); *aff'd*, 197
F.3d 484 (11th Cir. 1999) *rev'd sub nom. Alexander v. Sandoval*, 532 U.S. 275 (2001);
*Charleston Hous. Auth.*, 419 F.3d at 742; Department of Justice, Civil Rights Division,
Complaint No. 171–54M–8, *Letter to N.C. Courts from Assistant Attorney General* (March 8,
2012) at 15–16 (rejecting the recipient's cost justification in part because it had access to new
funds, none of which increased language access services in the courts; the cost of providing
services was a small fraction of its operating budget; and it prevented courts from providing
interpreters even when there would be no financial cost to do so);[23] *but see NAACP v.
Wilmington Med. Ctr., Inc.*, 491 F. Supp. 290, 342 (1980) (crediting defendant's evidence that
the costs associated with avoiding relocation of medical center from an urban to suburban
location would require borrowing well beyond defendant's budget).

Finally, a recipient cannot simply contend that it followed other applicable rules governing site
selection or permit approvals to establish a legitimate justification. *See S. Camden Citizens in
Action*, 145 F. Supp. 2d at 496 (rejecting defendant's argument that the challenged facility's

---

[23] Letter from Assistant Attorney General to Director of North Carolina Administrative Office of the Courts (Mar. 8,
2012), *available at* https://perma.cc/69Q6-NALT.

USCA4 Appeal: 23-1453     Doc: 17     Filed: 06/05/2023     Pg: 266 of 610

USCA4 Appeal: 23-1453      Doc: 17      Filed: 06/05/2023      Pg: 267 of 610

compliance with the National Ambient Air Quality Standard constitutes a substantial, legitimate justification for its permitting decision). Mere compliance with rules unrelated to civil rights prohibitions does not legitimize a justification that would otherwise be insufficient under Title VI to justify adverse disparate impacts. In most instances, determining compliance with other rules or requirements involves reasoning based exclusively on those rules and "does not include considerations required by Title VI." *Id.* at 496.

### ii.  Integral

Federal funding agencies should also consider the type of recipient in evaluating the adequacy of the recipient's proffered justification. Different types of institutions obviously have different interests. What is central to the mission of one type of recipient may be merely tangential to, or even contrary to, the central mission of another. *See Wilmington Med. Ctr.*, 491 F. Supp. at 316 (acknowledging that Title VI could be applied to a wide range of entities and to an equally diverse range of decisions and, therefore, the nature of the justification required might vary from case to case). For instance, crime reduction may be part of a law enforcement agency's integral institutional mission, but may be only minimally or even unrelated to the mission of other types of public entities.

### iii.  Important

The investigating agency's evaluation of the importance of a recipient's stated justification involves weighing the reason for implementing the challenged policy or practice against the harm it causes. *See NAACP v Med. Ctr., Inc.*, 657 F.2d 1322, 1350 (3d Cir. 1981) (en banc) ("The content of the rebuttal or justification evidence cannot be determined in the abstract. It must be related to the precise impacts suggested by the plaintiffs' evidence."); *see also Gashi*, 801 F. Supp. 2d at 16 (citing *Huntington Branch, NAACP v. Town of Huntington*, 844 F.2d 929, 937 (2d Cir. 1988), *aff'd*, 488 U.S. 15 (1988) ("After the defendant presents a legitimate justification, the court must weigh the defendant's justification against the degree of adverse effect shown by the plaintiff."). Courts have also recognized that the degree of adverse impact that a challenged policy or practice causes can affect the sufficiency of the recipient's justification. *See, e.g., Clady v. Cty. of Los Angeles*, 770 F.2d 1421, 1432 (9th Cir. 1985) ("As a general principle, the greater the test's adverse impact, the higher the correlation which will be required."). Generally, the more serious, significant, or widespread the adverse disparate impacts the challenged policy causes, the more difficult it will be for the recipient to establish a sufficient reason for implementing the policy.

USCA4 Appeal: 23-1453      Doc: 17      Filed: 06/05/2023      Pg: 268 of 610

b. **Does the challenged policy bear a demonstrable relationship to the recipient's stated objective?**

Even if the recipient points to a legitimate, important goal that is integral to its institutional mission, the discriminatory policy or practice must also bear a demonstrable relationship to that goal. *Georgia State Conf.*, 775 F.2d. at 1418. If it does not, implementation of that policy or practice violates Title VI. Accordingly, the investigating agency must take a hard look at the connection between the challenged policy or practice and the recipient's stated objective.

For example, in *Leaders for Equality and Action in Dayton* (*LEAD*) *v. City of Beavercreek*, the Federal Highway Administration (FHWA) found that the City Council's refusal to approve the construction of three bus stops caused unjustified disparate impact by denying minority residents public transit access to a shopping mall, a large medical center, jobs, and other essential services in Beavercreek. FHWA Office of Civil Rights, Letter from Associate Administrator for Civil Rights, DOT #2012–0020, at 15–16 (June 26, 2013). The City attempted to justify its decision by arguing, among other things, that installation of police call boxes and "state of the art" video surveillance would be necessary to protect the public and reduce the risk of crime at the stops. *Id.* at 12. FHWA acknowledged the City had a legitimate, important goal to ensure public safety, but found the record contained insufficient evidence to show the lack of call boxes and video surveillance at other comparable stops presented a public safety risk. *Id.* In other words, the City did not establish that the action taken bore a demonstrable relationship to the stated goal. Moreover, the City offered no evidence that security and public safety were serious issues at comparable bus stops. *Id.* The FHWA concluded that the City failed to prove the necessary connection between the legitimate justification—public safety—and the challenged practice—the refusal to approve the construction of the three bus stops based on the asserted necessity to install police call boxes and video surveillance equipment.

c. **Special considerations: site selection or facility closure**

Many Title VI cases involve challenges to site selection decisions, such as the locations selected for construction of highways or facilities that will have negative consequences for the surrounding community. Site selection cases can also involve challenges to the closure or relocation of desirable facilities, such as schools or hospitals. In such cases, courts have tended to merge the initial justification analysis with the final step of the disparate impact burden shifting framework, i.e., consideration of less discriminatory alternatives. That step is discussed in detail in Section 3 below. In determining the sufficiency of the recipient's proffered reasons for the discriminatory siting or closure decision, courts consider not only whether the construction or closure was necessary to begin with but also whether the recipient can justify selection of the *particular site* over alternatives. *See, e.g., Coalition of Concerned Citizens Against I-670 v. Damian*, 608 F. Supp. 110, 127 (S.D. Ohio 1984). These cases show that consideration of less

discriminatory alternatives is often linked to the "substantial legitimate justification" analysis, and agencies therefore should carefully consider recipients' site selection process, including alternatives, when analyzing justification.

For example, in *Damian*, the court found that plaintiffs made a prima facie showing that recipients' decision to build a new freeway would have a discriminatory effect because the freeway would travel through predominately minority neighborhoods, the majority of people displaced by the construction were racial minorities, and the disruptions and other negative impacts caused by the construction and eventual highway operation would fall disproportionately on those minority neighborhoods. *Id.* Nonetheless, the court further found that the recipients had met their burden of justifying the location of the interstate because the major alternative location would have had a substantially greater impact on minorities, and the recipients had selected the final freeway location "so as to minimize impacts upon minority neighborhoods," avoiding most of the neighborhoods that were 90% racial minorities. *Id.* Critically, it was not enough to show that a new freeway was needed; rather, the court demanded that the recipient justify the specific location selected. *See also Bryan*, 627 F.2d at 617–18 (where public officials made a choice to close one of 17 municipal hospitals, it was "the choice of this particular hospital that must be justified").

### 3.    Less Discriminatory Alternatives

If a substantial legitimate justification for the recipient's discriminatory policy or practice is identified, the investigating agency must also determine whether there are alternative practices that may be comparably effective with less disparate impact. Title VI requires recipients to implement a "less discriminatory alternative" if it is feasible and meets their legitimate objectives. *Elston*, 997 F.2d at 1407, 1413; *Georgia State Conf.*, 775 F.2d at 1417. This is a critical—and sometimes overlooked—stage of the investigation. Even if the recipient demonstrates a substantial legitimate justification, the challenged policy will nevertheless violate Title VI if the evidence establishes an alternative that meets this test.

Courts have been willing to thoroughly analyze alternatives, particularly where the recipient had considered and rejected them and thus the record was already developed. *See, e.g., Damian*, 608 F. Supp. 119–20 (conducting a thorough review of alternative sites for highway or other methods, such as light rail or public transportation). Where Title VI plaintiffs challenged broad institutional decisions, however, courts were sometimes reluctant to conduct a searching analysis of alternatives. *See, e.g., Bryan*, 627 F.2d at 619 ("We are skeptical of the capacity and appropriateness of courts to conduct such broad inquiries concerning alternative ways to carry out municipal functions. Once a court is drawn into such a complex inquiry, it will inevitably be assessing the wisdom of competing political and economic alternatives.").

Federal funding agencies, on the other hand, are subject matter experts charged with specific Title VI enforcement duties. As a result, they are well-equipped to analyze alternatives thoroughly and they should evaluate carefully potential less discriminatory alternatives. This section discusses (a) who bears the responsibility to establish less discriminatory alternatives, (b) how evidence of less discriminatory alternatives must be specific, (c) how proposed alternatives must meet the recipient's objectives, and (d) how less discriminatory alternatives may be of a different type than the challenged policy and can be achieved through mitigation measures.

**a. Evidentiary burdens**

In disparate impact lawsuits, once the defendant establishes a substantial legitimate justification, the burden shifts back to the plaintiff to identify less discriminatory alternatives to the challenged policy or practice. *Powell v. Ridge*, 189 F.3d 387, 394 (3d Cir. 1999) (citing *Georgia State Conf.*, 775 F.2d at 1417). In other words, the defendant is not obligated to prove that there were no such alternatives, and the burden of persuasion remains with the plaintiff to prove that there were. *But cf. Damian*, 608 F. Supp. at 128 (recognizing "there would be some question whether defendants were required by federal law to consider alternatives with less disparate impact" under Title VI).

In contrast, in agency Title VI administrative investigations, the evidentiary burden, as previously explained, rests with the investigating agency rather than with the complainant. EPA guidance explains this important distinction:

> The investigation of Title VI administrative complaints by [EPA] does not involve an adversarial process, as in litigation, between the complainant and the recipient. Rather, it should be viewed as EPA investigating allegations that EPA financial assistance is being used improperly. Consequently, the complainants do not have the burden of proving that their allegations are true and *are not obligated to offer less discriminatory alternatives*. Instead, EPA has the responsibility to determine whether a violation exists and, where appropriate, to uncover less discriminatory alternatives. Nonetheless, EPA encourages complainants to provide whatever relevant information they may have.

EPA Investigations Guidance, 65 Fed. Reg. at 39,696 (emphasis added). Moreover, Title VI regulations require the recipient to provide the investigating agency with the data and information necessary to make this determination.

USCA4 Appeal: 23-1453      Doc: 17      Filed: 06/05/2023      Pg: 271 of 610

---

**AGENCY PRACTICE TIP**

Although agencies bear the burden of evaluating less discriminatory alternatives, agencies sometimes impose additional requirements on recipients to consider alternatives before taking action. These requirements can affect the legal framework by requiring recipients to develop the evidentiary record related to alternatives as a matter of course, before and regardless of whether an administrative complaint is even filed. Such requirements recognize that the recipient is in the best position to complete this task, having the best understanding of its goals, and far more ready access to the information necessary to identify alternatives and conduct a meaningful analysis. *See Med. Ctr.*, 657 F.2d at 1355 (Gibbons, J., concurring and dissenting). Courts have recognized that agencies have authority to impose additional obligations. *See, e.g., Damian*, 608 F. Supp. at 128.

---

Many agencies have established additional requirements related to less discriminatory alternatives, under both Title VI and other authorities. For example, the Federal Transit Administration requires certain recipients to consider alternatives before implementing key decisions. A recipient's failure to do so, and to gather sufficient data to establish it has selected the least discriminatory alternative, is a procedural violation of agency regulatory requirements, and may put the recipient at risk of a substantive violation as well. *See* FTA Title VI Circular, Chap IV–16. FTA explains the requirement to examine alternatives as follows:

> Examining Alternatives. If the transit provider determines that a proposed service change will have a disparate impact, the transit provider shall analyze the alternatives … to determine whether alternatives exist that would serve the same legitimate objectives but with less of a disparate effect on the basis of race, color, or national origin. The existence of such an alternative method of accomplishing the transit provider's substantial and legitimate interests demonstrates that the disparate effects can be avoided by adoption of the alternative methods without harming such interests.… At that point, the transit provider must revisit the service changes and make adjustments that will eliminate unnecessary disparate effects on populations defined by race, color, or national origin. Where disparate impacts are identified, the transit provider shall provide a meaningful opportunity for public comment on any proposed mitigation measures, including the less discriminatory alternatives that may be available.

*Id.*

In some cases, a recipient is responsible for assisting in the development of a record of alternatives because it is involved in a project covered by the National Environmental Policy Act (NEPA), 42 U.S.C. § 4321 et seq. This record may contain evidence that is also relevant and useful in determining compliance with Title VI. For example, recipients of funding from the Federal Highway Administration may be responsible for assisting in the development of the record of alternatives that the FHWA reviews in the NEPA process and related investigations. The FHWA follows the federal-government wide regulations implementing the procedural

USCA4 Appeal: 23-1453    Doc: 17    Filed: 06/05/2023    Pg: 272 of 610

provisions of NEPA issued by the Council on Environmental Quality (CEQ) (40 C.F.R. parts 1500–1508) and has supplemented these procedures to take into account its programs. The CEQ regulations require a rigorous assessment of all reasonable alternatives. *See* 40 C.F.R. § 1502.14(a) (explaining that environmental impact statements under NEPA require the entity to "[r]igorously explore and objectively evaluate all reasonable alternatives"). The FHWA regulations require applicants to use early coordination to identify alternatives to the proposed action. *See* 23 C.F.R. §§ 771.119(b), 771.123(b)–(c), and 771.125(a)(1).

### b. Specificity of evidence of alternatives and relationship to the recipient's mission

Investigating agencies should thoroughly review the evidence regarding potential alternatives. Plaintiffs in private litigation often fail to establish "less discriminatory alternatives" because their evidence of alternatives is not sufficiently specific. *See, e.g., N.Y.C. Envtl. Justice All.*, 214 F.3d at 72 (in challenge to decision to sell community gardens in order to build new housing and foster urban renewal, plaintiffs suggested other vacant lots but presented no evidence that the defendant owned the lots or that they were suitable for housing); *Damian*, 608 F. Supp. at 128 (alternative "indirect" route for challenged highway was too speculative, there was no indication of specific route, economic cost, or social or environmental impacts); *Lucero v. Detroit Pub. Sch.*, 160 F. Supp. 2d 767, 797 (E.D. Mich. 2001) (in challenge to school siting decision, plaintiffs argued that an alternate site would have been more appropriate, but failed to identify another viable site). Before finding a Title VI violation due to the availability of a "less discriminatory alternative," agencies should determine that the evidence is sufficient and concrete, and not speculative.

Plaintiffs' claims have also failed, notwithstanding an adverse impact, because plaintiffs could not identify an alternative that satisfies all of the defendants' needs. *See, e.g., Elston*, 997 F.2d at 1413 (the only alternative identified did not provide sufficient land to accommodate defendants' needs); *Damian*, 608 F. Supp. 120 (alternative sites for highway or other transportation options, such as light rail, public transportation, etc., were insufficient to meet the traffic demands served by added highway); *African Am. Legal Def. Fund, Inc. v. New York State Dep't of Educ.*, 8 F. Supp. 2d 330, 338 (S.D.N.Y. 1998) (in challenge to public school funding formula, plaintiff's proposed alternative formula based on enrollment instead of attendance was legally insufficient because it failed to meet the objectives served by the existing formula); *but see Meek v. Martinez*, 724 F. Supp. 888, 906 (S.D. Fla. 1987) (in challenge to state formula for distributing funds under the Older Americans Act, plaintiff demonstrated that less discriminatory alternatives to the current formula were readily available and could be feasibly implemented).

In *Goshen Road Environmental Action Team v. U.S. Dep't of Agriculture*, 176 F.3d 475, 1999 WL 187264 (4th Cir. 1999) (unpublished opinion), the court concluded that the alternatives plaintiffs presented for the siting of a wastewater treatment facility were unsuitable. *Id.* at *3.

The recipient successfully argued that two alternative sites were poor choices because of the risk raw sewage could be released into a major river if the infrastructure in either location were to deteriorate. Other sites were unsuitable because of the poor quality of the soil. Of the two remaining potential sites, engineers selected the existing site because it required slightly less land, had better soil quality, its road frontage provided better access, and it was further from the town. *Id.* The court concluded the plaintiff had adduced "no scientific evidence of its own supporting its claim that other equally effective sites existed." *Id.*

Similarly, in *Darensburg v. Metropolitan Transportation Commission*, 611 F. Supp. 2d. 994, 1060 (N.D. Cal. 2009), the district court held that plaintiffs did not show that the alternatives proposed would be "equally effective while causing less racial disparity." In this challenge to a metropolitan planning organization's complex scheme for allocating funding to various transit projects, plaintiff proposed a number of alternative funding allocation methods. The court took each proposal in turn, holding that plaintiffs failed to adduce sufficient evidence of their plans' effectiveness. *Id.* at 1060–61. For instance, plaintiffs' expert argued the recipient could first use federal funds for operations because it cannot collect interest on those funds, then use the remaining funds, which can earn interest, to pay for longer term projects. The court rejected this alternative because the plaintiff failed to show that the amount of interest that could be earned would be large enough to meet the recipient's needs. *Id.* at 1060.

Importantly, alternatives need not be merely substitutes of the same type as the challenged practice, but may include practices or policies of a different manner or that include other actions by the defendant that ameliorate the disparate impact. *See id.* at 998–1000, 1060–61. For example, in *Medical Center*, plaintiffs challenged the recipient's intention to close some city hospitals and build the primary medical facility in the suburbs, farther away from a predominantly minority community. *Med. Ctr.*, 657 F.2d at 1325. Assuming a discriminatory effect resulted from the new location, the court upheld the action because the recipient considered and rejected various alternatives for legitimate reasons, noting that the alternative locations would not meet the recipient's needs. The court also noted that the recipient had agreed to provide a shuttle service between the several hospitals for patients, visitors, and employees to lessen any hardship on people who needed to use the suburban facility. *Id.* at 1331–32, 1337.

Similarly, in the context of environmental permitting complaints, the use of "practical mitigation measures associated with the permitting action could be considered as less discriminatory alternatives, including, in some cases, modifying permit conditions to lessen or eliminate the demonstrated adverse disparate impact." EPA Investigations Guidance, 65 Fed. Reg. at 39,683.

USCA4 Appeal: 23-1453      Doc: 17      Filed: 06/05/2023      Pg: 273 of 610

Pg: 274 of 610          Filed: 06/05/2023          Doc: 17          USCA4 Appeal: 23-1453

---

**AGENCY PRACTICE TIP**

These cases and guidelines show that "less discriminatory alternatives" may take the form of mitigation measures to be applied to the original challenged practice. Accordingly, investigating agencies should ensure that they consider not only alternative policies and practices when evaluating "less discriminatory alternatives," but also the measures the recipient could implement in order to lessen the harm that the challenged practice causes. Informal resolution efforts often involve identification of mitigation efforts which, if applied, would result in compliance with Title VI through implementation of a less discriminatory alternative.

---

## D.   Agency Data Collection Authority and Measuring Disparate Impact

In many disparate impact cases, particularly those in which federal guidelines have not already established the types of impacts that are per se unlawful, demographic data will be important to the investigating agency's analysis. *See Darensburg*, 636 F.3d at 522 (attributing plaintiffs' loss to the lack of precise data necessary to determine the extent to which a project harmed minorities to a greater extent than regional-level statistics may have suggested).

Title VI regulations provide agencies with a clear mandate to collect the data necessary to ensure compliance with their Title VI disparate impact regulations. The Department of Justice Title VI coordination regulation states that "[e]xcept as determined to be inappropriate … federal agencies … shall in regard to each assisted program provide for the collection of data and information from applicants for and recipients of federal assistance sufficient to permit effective enforcement of Title VI." 28 C.F.R. § 42.406(a). The coordination regulation then gives various examples of the types of data that agencies generally should require recipients to submit, including the racial and ethnic composition of the eligible population, the racial and ethnic impact of the location of facilities connected with the program, and any relocation involved in the program. *Id.* § 42.406(b). The coordination regulation also contemplates that agencies will collect "demographic maps, [and] the racial composition of affected neighborhoods or census data" where they are necessary to understand the considerations above, but "only to the extent that it is readily available or can be compiled with reasonable effort." *Id.* § 42.406(c).

Consistent with these provisions, all agency Title VI implementing regulations specifically require that recipients collect and provide access to information that is necessary to determine compliance.[24] The applicable provision typically appears under the heading "compliance reports," and mandates the following:

---

[24] These accountability requirements are not unique to federal financial assistance from DOJ but rather are a universal feature of the grant–making system. Every agency that has promulgated Title VI regulations includes similar or identical accountability requirements. *See* 7 C.F.R. § 15.5(b) (USDA); 22 C.F.R. § 209.6(b) (USAID); 15 C.F.R. § 8.7(b) (Dep't of Commerce); 45 C.F.R. § 1203.6(b) (Corp. for Nat'l and Community Serv.); 32 C.F.R. § 195.7(b) (DOD); 34 C.F.R. § 100.6(b) (Dep't of Educ.); 10 C.F.R. §1040.89–3 (Dep't of Energy); 40 C.F.R. §

> Each recipient shall keep such records and submit to the responsible Department official or his designee timely, complete, and accurate compliance reports at such times, and in such form and containing such information, as the responsible Department official or his designee may determine to be necessary to … ascertain whether the recipient has complied or is complying with this subpart.

*See, e.g., id.* § 42.106(b) (DOJ). This provision also requires the primary recipient to obtain from its subrecipients, and have available for agency review, such compliance reports "as may be necessary to enable the primary recipient to carry out its obligations." *Id.*

These regulations permit agencies to exercise broad discretion in determining what sources of information "may be pertinent" to ascertain compliance with Title VI. Although rarely a litigated issue because the vast majority of recipients cooperate with agency data requests, in *United States v. El Camino Community College District,* 600 F.2d 1258, 1260 (9th Cir. 1979), the Ninth Circuit held that "[i]n exercising its investigatory powers" under Title VI, a federal agency "must have substantial latitude in scrutinizing policies and practices of the institution" for possible discrimination.

Moreover, these provisions are not limited to evidence gathered during a formal complaint investigation or compliance review but also allow for agency data collection during monitoring efforts. That is, agencies need not suspect discrimination in order to collect relevant demographic data but may do so to monitor or evaluate compliance. Courts have recognized that routine monitoring is a form of enforcement, *Gillis v. U.S. Dep't of Health and Human Servs.,* 759 F.2d 565, 575 (6th Cir. 1985), and that agencies have broad discretion in selecting the data they need to fulfill the congressional mandate to enforce Title VI through monitoring. *Madison-Hughes v. Shalala,* 80 F.3d 1121, 1126 (6th Cir. 1996) (noting that "enforcement decisions involve a complicated balancing of a number of factors which are peculiarly within the agency's expertise, and the agency is far better equipped than the courts to deal with the many variables involved in the proper ordering of its priorities.") (citing *Heckler v. Chaney,* 470 U.S. 821, 830–31 (1985)).

**Agency approaches to data collection.** Under the authorities described above, many agencies collect data that is helpful in ensuring Title VI compliance. For example, the Federal Transit Administration requires its grant recipients that serve areas with populations over 200,000 to collect and analyze racial and ethnic data showing the extent to which members of minority groups are beneficiaries of programs receiving federal financial assistance, including the

---

7.85 (EPA); 41 C.F.R. § 101–6.29–3 (GSA); 45 C.F.R. § 80.6(b) (HHS); 6 C.F.R. § 21.9 (DHS); 24 C.F.R. § 1.6(b) (HUD); 43 C.F.R. § 17.5(b) (Dep't of the Interior); 29 C.F.R. § 31.5(b) (DOL); 14 C.F.R. § 1250.105(b) (NASA); 45 C.F.R. § 1110.6 (Nat'l Found. on the Arts and Humanities); 45 C.F.R. § 611.6(b) (NSF); 10 C.F.R. § 4.33 (NRC); 5 C.F.R. § 900.406 (OPM); 13 C.F.R. § 112.9(b) (SBA); 22 C.F.R. § 141.5(b) (Dep't of State); 18 C.F.R. § 1302.6(b) (TVA); 49 C.F.R. § 21.9(b) (DOT); 38 C.F.R. § 18.6(b) (VA); 18 C.F.R. § 705.6(b) (Water Resources Council).

USCA4 Appeal: 23-1453      Doc: 17      Filed: 06/05/2023      Pg: 275 of 610

USCA4 Appeal: 23-1453        Doc: 17        Filed: 06/05/2023        Pg: 276 of 610

preparation of demographic and service profile maps and charts. FTA Circular 4702.1B, Title VI Requirements and Guidelines for Federal Transit Recipients, ch. IV–7 (August 28, 2012). In addition, FTA requires these recipients to analyze all major service changes to determine their effects on low income and minority communities. *Id.* Ch. IV–13. These requirements place the responsibility on recipients to analyze their actions, and to collect the data FTA would require in order to check its recipients' analyses. Similarly, Department of Labor regulations mandate that recipients maintain information required for assessing compliance with the nondiscrimination and equal opportunity provisions of the Workforce Innovation and Opportunity Act. 29 C.F.R. §§ 38.41-38.43. The "system and format in which the records and data are kept must be designed to allow … statistical or other quantifiable data analyses to verify the recipient's compliance … ." *Id.* § 38.41(b)(1). The Department of Education maintains extensive reporting requirements to ensure that public school districts and elementary and secondary schools are meeting their civil rights obligations. Dep't of Educ., *About the Civil Rights Data Collection (CRDC).*[25]

---

**AGENCY PRACTICE TIP**

The ready availability of demographic data assists agencies in prioritizing complaint investigations, selecting recipients for compliance reviews, and conducting targeted outreach. Agencies should use this authority to ensure effective enforcement of their disparate impact regulations. Where a recipient does not fully cooperate with an agency's request for information, and compliance cannot be achieved voluntarily, the agency may refer the matter to the Department of Justice for judicial enforcement. Agencies should consider establishing additional requirements for certain recipients to provide information routinely to assist in monitoring compliance with the Title VI disparate impact regulations.

Such data give recipients themselves a better understanding of the impact of their actions and decisions on protected groups, including the ability to conduct self–assessments of their own compliance with Title VI. For example, in the context of health disparities, HHS has urged its recipients to consider strategies to collect and use racial and ethnic data to help eliminate disparities. Letter from Thomas E. Perez, Director, HHS Office for Civil Rights & David Satcher, Surgeon General, to various recipients (Jan. 19, 2001) (explaining ways in which health care providers can analyze race and ethnicity data to ensure provision of services to minorities, identify differences in the quality of care among various geographic, cultural, and ethnic groups, provide culturally and linguistically appropriate services, and alert recipients to potential Title VI issues). Letter from Dir., Office for Civil Rights, Dep't Health and Human Servs. and Assistant Sec'y for Health and Surgeon Gen. to President, American Diabetes Assoc. (Jan. 19, 2001) (on file with Dep't of Justice, Civil Rights Div.).

---

[25] Dep't of Educ., *About the Civil Rights Data Collection, available at* http://www2.ed.gov/about/offices/list/ocr/data.html. Data collected by the CRDC are available at http://ocrdata.ed.gov.

## SECTION VIII: PROVING DISCRIMINATION - RETALIATION

### A.    Introduction

It is well-settled that Title VI supports retaliation claims. *See, e.g., Peters v. Jenney*, 327 F.3d 307, 318 (4th Cir. 2003); *Chandamuri v. Georgetown Univ.*, 274 F. Supp. 2d 71, 83 (D.D.C. 2003); *Gutierrez v. Wash. Dep't of Soc. & Health Servs.*, CV-04-3004-RHW, 2005 WL 2346956, at *5 (E.D. Wash. Sept. 26, 2005). When a person reasonably believes that he or she has been the victim of discrimination that Title VI or other federal law prohibits, or has witnessed another person being discriminated against, that person should be able to report the alleged discrimination without fear of retaliation or fear that doing so will further jeopardize accessing benefits or services. Similarly, a person should be free to access the services, programs, and activities that federal financial assistance supports without fear that a recipient might discriminate against him or her merely for seeking access.

The Supreme Court has defined retaliation as an intentional act in response to a protected action. *Jackson v. Birmingham Bd. of Educ.*, 544 U.S. 167, 173-74 (2005). Citing *Jackson*, the court in *Gutierrez* underscored the intentional nature of a retaliation complaint: "Retaliation is, by definition, an intentional act. It is a form of "discrimination" because the complainant is being subjected to differential treatment." *Gutierrez*, 2005 WL 2346956, at *5. The complained of matter need not be a complaint; it can be any lawful conduct that an individual engages in connected with a protected right. "The very concept of retaliation is that the retaliating party takes action against the party retaliated against after, and because of, some action of the latter." *Fed. Mar. Bd. v. Isbrandtsen Co.*, 356 U.S. 481, 514 (1958). It carries with it the notion of "getting even." *See id.* As noted in a 2011 law review article:

> Retaliation is a deliberate action used to send a clear message that complaining is unwelcome and risky. It is employed to instill fear in others who might consider making a complaint in the future. Those with cause for complaining are frequently among the most vulnerable in an institution. Once they complain, they are labeled "troublemakers." Retaliation, and the fear of retaliation, becomes a potent weapon used to maintain the power structure within the institution.

Ivan E. Bodensteiner, *The Risk of Complaining—Retaliation*, 38 J.C. & U.L. 1, 1 (2011).

This chapter on retaliation provides an overview of the legal authority for a private party to bring a retaliation claim under Title VI to an agency or in court, addresses who has standing to bring a retaliation complaint, and identifies what an agency should look for when assessing the merits of a retaliation allegation.

USCA4 Appeal: 23-1453    Doc: 17    Filed: 06/05/2023    Pg: 277 of 610

Pg: 278 of 610    Filed: 06/05/2023    Doc: 17    USCA4 Appeal: 23-1453

## B.    Legal Authority

Title VI does not include an express provision prohibiting retaliation.[1] Nonetheless, courts, including the Supreme Court, have held that various anti-discrimination statutes contain an implied cause of action for retaliation based on the general prohibition against intentional discrimination. *See, e.g., Jackson*, 544 U.S. at 173 ("Retaliation against a person because that person has complained of sex discrimination is another form of intentional sex discrimination encompassed by Title IX's private cause of action"). A statute that prohibits intentional discrimination implicitly prohibits acts of retaliation for complaints about or opposition to discrimination. *See Sullivan v. Little Hunting Park, Inc.*, 396 U.S. 229, 237 (1969) (a prohibition on racial discrimination includes an implicit prohibition on retaliation against those who oppose the discrimination); *CBOCS West, Inc. v. Humphries*, 553 U.S. 442, 451 (2008) (a race discrimination statute encompasses retaliation actions as Congress and long line of precedent intended); *Gomez-Perez v. Potter*, 553 U.S. 474, 479 (2008) (ADEA federal-sector provision that prohibits age discrimination implicitly covers claims of retaliation for filing an age discrimination complaint); *Peters*, 327 F.3d at 318-19 (prohibition against retaliation is implicit in the text of Section 601 of Title VI).

In *Jackson*, the Court explained how retaliation constitutes intentional discrimination:

> Retaliation against a person because that person has complained of sex discrimination is another form of intentional sex discrimination. Retaliation is, by definition, an intentional act. It is a form of "discrimination" because the complainant is being subjected to differential treatment. Moreover, retaliation is discrimination "based on sex" because it is an intentional response to the nature of the complaint: an allegation of sex discrimination. We conclude that when a funding recipient retaliates against a person *because* he complains of sex discrimination, this constitutes intentional "discrimination" "based on sex," in violation of Title IX.

*Jackson*, 544 U.S. at 173-74 (citations omitted). The Court also noted that the language in the statute itself supplies sufficient notice to a recipient that it cannot retaliate against those who complain of discrimination. *Id.* at 183.

For Title VI, as discussed elsewhere in this manual, Section 601 prohibits discrimination based on race, color, or national origin, while Section 602 authorizes and directs federal departments

---

[1] By comparison, *see* Fair Labor Standards Act of 1938, 29 U.S.C. § 215(a)(3); Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-3(a); the Age Discrimination in Employment Act of 1967, 29 U.S.C. § 623(d); the Americans with Disabilities Act of 1990, 42 U.S.C. §§ 12203(a)-(b); the Family and Medical Leave Act of 1993, 29 U.S.C. § 2615; the National Labor Relations Act, 29 U.S.C. § 158(a)(4); and the Equal Pay Act, 29 U.S.C. § 215(a)(3).

Pg: 279 of 610          Filed: 06/05/2023          Doc: 17          USCA4 Appeal: 23-1453

and agencies that extend financial assistance to issue rules, regulations, or orders to effectuate Section 601. Under this authority, most federal grant-making agencies have included an anti-retaliation provision in their Title VI regulations.[2] The DOJ regulation provides the following:

> No recipient or other person shall intimidate, threaten, coerce, or discriminate against any individual for the purpose of interfering with any right or privilege secured by [Title VI], or because he has made a complaint, testified, assisted, or participated in any manner in an investigation, proceeding or hearing under this *subpart.*

28 C.F.R. § 42.107(e); *see also Johnson v. Galen Health Insts., Inc.*, 267 F. Supp. 2d 679, 695 (W.D. Ky. 2003) (Title IX anti-retaliation provision cuts to the core of [its] ban on intentional discrimination and is covered by that section's existing cause of action).

Retaliatory behavior needs to be barred irrespective of whether the underlying claim is based on intent or disparate impact. Although one Court of Appeals has found that a private plaintiff cannot pursue a retaliation claim in court based on his or her opposition to alleged disparate impact discrimination, Title VI does not grant recipients a license to threaten individuals or prevent them from bringing disparate impact complaints to the government, which has the ability to pursue disparate impact claims in court and in the administrative process.[3]

---

[2] Other federal funding agencies' regulations also bar retaliation. *See* 5 C.F.R. § 900.407(e) (Office of Personnel Mgmt.); 6 C.F.R. § 21.11(e) (Dep't of Homeland Sec.); 7 C.F.R. § 15.7 (Dep't of Agric.); 10 C.F.R. § 1040.104(d) (Dep't of Energy); 10 C.F.R. § 4.45 (Nuclear Regulatory Comm'n); 13 C.F.R. § 112.10(f) (Small Bus. Admin.); 14 C.F.R. § 1250.106(e) (NASA); 15 C.F.R. § 8.9(a) (Dep't of Commerce); 18 C.F.R. § 1302.7(d) (Tenn. Valley Auth.); 18 C.F.R. § 705.7(e) (Water Resources Council); 22 C.F.R. § 141.6(e) (Dep't of State); 22 C.F.R. § 209.7(e) (Agency for Int'l Dev. ); 24 C.F.R. § 1.7(e) (Dep't of Hous. & Urban Dev.); 29 C.F.R. § 31.7(e) (Dep't of Labor); 32 C.F.R. § 195.8(e) (Dep't of Defense); 34 C.F.R. § 100.7(e) (Dep't of Educ.); 38 C.F.R. § 18.7(e) Dep't of Veterans Affairs); 40 C.F.R. § 7.100 (Envtl. Prot. Agency); 41 C.F.R. § 101-6.210-5 (Gen. Servs. Admin.); 43 C.F.R. § 17.6(e) (Dep't of the Interior); 45 C.F.R. § 80.7(e) (Dep't of Health & Human Servs.); 45 C.F.R. § 1110.7(e) (Nat'l Found. on the Arts & Humanities); 45 C.F.R. § 1203.7(e) (Corp. for Nat'l & Cmty. Serv.); 45 C.F.R. § 611.7(e) (Nat'l Science Found.); 45 C.F.R. § 80.7(e) (Dep't of Health & Human Servs.); 49 C.F.R. § 21.11(e) (Dep't of Transp.). In addition, assurance documents from some agencies include a non-retaliation provision.

[3] In *Peters*, the court limited the viability of a private suit for retaliation claim when the underlying allegation addresses unlawful disparate impact. According to *Peters*, a private individual cannot bring a retaliation claim under Title VI based on an underlying complaint of disparate impact. 327 F.3d at 319. DOJ disagrees. A recipient violates Title VI if it retaliates against a private individual who opposes a discriminatory action or participates in a matter alleging discrimination whether the underlying matter concerns intentional discrimination or disparate impact. As noted above, retaliation is a form of intentional discrimination, which Title VI clearly covers. *See Jackson*, 544 U.S. at 173-74 ("Retaliation is, by definition, an intentional act."). If a recipient intentionally takes an adverse action against an individual because he or she alleged that it violated Title VI, it should not matter whether the alleged violation raises an intent or disparate impact claim, particularly within the administrative setting. *Cf. id. at* 544 U.S. at 180 ("Reporting incidents of discrimination is integral to Title IX enforcement and would be discouraged if retaliation against those who report went unpunished. Indeed, if retaliation were not prohibited, Title IX's enforcement scheme would unravel.").

USCA4 Appeal: 23-1453      Doc: 17      Filed: 06/05/2023      Pg: 280 of 610

Moreover, and as discussed elsewhere in this manual, some courts have found that in certain circumstances, evidence of a disparate impact can also be evidence of intentional discrimination. *See Garcia ex rel. Garcia v. Bd. of Educ. of Albuquerque Pub. Schs.*, 436 F. Supp. 2d 1181, 1192 (D.N.M. 2006). The line between an intent and impact case is not always clear, particularly before the facts are gathered through discovery or an administrative investigation. In such cases, it may be impossible for an individual complainant to know, at the point of his or her complaint, whether a particular discriminatory effect is the result of a neutral policy or practice or was intentional. It is therefore entirely impractical to limit the retaliation protection to underlying intent claims.

It is well-settled that neither an agency nor a court need find that the underlying conduct about which the individual complained is discriminatory in order for the retaliation protection to attach. *Wyatt v. City of Boston*, 35 F.3d 13, 15 (1st Cir. 1994) ("[T]here is nothing [in the wording of the participation clause] requiring that the charges be valid, nor even an implied requirement that they be reasonable."); *accord Ray v. Ropes & Gray LLP*, 961 F. Supp. 2d 344, 358 (D. Mass. 2013) (quoting *Wyatt*), aff'd, 799 F.3d 99 (1st Cir. 2015); *Slagle v. Cty. of Clarion*, 435 F.3d 262, 268 (3d Cir. 2006); *Brower v. Runyon*, 178 F.3d 1002, 1006 (8th Cir. 1999) ("The underlying charge need not be meritorious for related activity to be protected under the participation clause.") (citing *Filipovic v. K & R Express Sys., Inc.,* 176 F.3d 390, 398 (7th Cir. 1999)).

Even if a private plaintiff could not file suit for retaliation for challenging disparate impact discrimination, a federal agency receiving a retaliation complaint would, nonetheless, have jurisdiction to pursue the retaliation claim.

1.    **Who May File a Retaliation Claim**

A retaliation complaint can be filed by the individual who was the target of the recipient's original allegedly discriminatory acts; a person whom the recipient has adversely treated for speaking out against the recipient's allegedly discriminatory acts directed toward a member or members of a protected class; a person who participated in an investigation of alleged discrimination or in the complaint process itself. Title VI does not require that the retaliation victim also be the victim of the discrimination included in the original complaint or a member of the protected class. For example, the Supreme Court has held that an employer violated Title VII when it fired the fiancé of an employee who filed a sex discrimination complaint. *Thompson v. N. Am. Stainless*, 562 U.S. 170, 177 (2011). In finding that the plaintiff was an "aggrieved" party, the Court ruled that he fell within the "zone of interests" that the anti-retaliation provision intended to protect. *See also Jackson*, 544 U.S. at 179 (male coach who was retaliated against for complaining about sex discrimination against girl's team had standing to sue for retaliation under Title IX although he was not the victim of the discrimination that was the subject of his original complaints); *Sullivan*, 396 U.S. at 237 (white person who was retaliated against for advocating

for the rights of a black person had standing to sue for retaliation); *Peters*, 327 F.3d at 316 (citing and quoting *Sullivan)*; *Reinhardt v. Albuquerque Pub. Sch. Bd.*, 595 F.3d 1126, 1132 (10th Cir. 2010) (teacher advocated for student in Section 504 matter); *Kimmel v. Gallaudet Univ.* 639 F. Supp. 2d 34, 43 (D.D.C. 2009) ("advocacy on behalf of minority students is a protected activity sufficient to support a retaliation claim"). Retaliation protections thus are extended to those who oppose discrimination against others because otherwise individuals who witness discrimination might be reluctant to speak out against it.[4]

### 2.   What Are the Elements of a Retaliation Claim?

If an investigative agency receives a claim of retaliation, the agency should consider whether the evidence establishes the court-developed elements of the claim. Under Title VI, the evidence must show that (1) an individual engaged in protected activity of which the recipient was aware; (2) the recipient took a significantly adverse action against the individual; and (3) a causal connection exists between the individual's protected activity and the recipient's adverse action. *See Peters*, 327 F.3d at 320; *Emeldi v. Univ. of Oregon*, 673 F.3d 1218, 1223 (9th Cir. 2012); *Palmer v. Penfield Cent. Sch. Dist.*, 918 F. Supp. 2d 192, 199 (W.D.N.Y. 2013); *Kimmel*, 639 F. Supp. 2d at 43; *Hickey v. Myers*, 852 F. Supp. 2d 257, 268 (N.D.N.Y. 2012); *Chandamuri*, 274 F. Supp. 2d at 84.

For there to be "protected activity," the evidence must show that a person *opposed* a recipient's actions that the person reasonably and in good faith believed violated Title VI or *participated* in a matter that reasonably or in good faith alleged a violation. *Peters*, 327 F.3d at 320-21; *Bigge v. Albertsons, Inc.*, 894 F.2d 1497, 1503 (11th Cir. 1990); *Kimmel*, 639 F. Supp. 2d at 43. Opposition or complaints can be oral or written. *Kasten v. Saint-Gobain Performance Plastics Corp.*, 131 S. Ct. 1325, 1336 (2011) (Congress intended anti-retaliation provisions to protect both oral and written complaints). The evidence does not have to establish that the underlying act violated Title VI, only that the complainant reasonably and in good faith believed that the acts were discriminatory. *See Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 69-70 (2006); *Peters,* 327 F.3d at 321; *Manoharan v. Columbia Univ. Coll. of Physicians & Surgeons*, 842 F.2d 590, 593 (2d Cir. 1988) ("plaintiff must demonstrate a 'good faith, reasonable belief that the underlying challenged actions of the employer violated the law.'").

For a Title VI retaliation claim, an adverse action is an action that would deter a reasonable person from bringing or supporting a charge of discrimination. *See, e.g., Jackson*, 544 U.S. at 179 (giving coach negative evaluations and firing him as a coach was sufficient evidence of

---

[4] In *Crawford v. Metropolitan Government of Nashville & Davidson County*, 555 U.S. 271, 277-78 (2009), the Court ruled that anti-retaliation protection also extends to an employee cooperating with an internal employer investigation of a discrimination complaint: "[N]othing in the statute requires a freakish rule protecting an employee who reports discrimination on her own initiative but not one who reports the same discrimination in the same words when her boss asks a question."

Pg: 281 of 610          Filed: 06/05/2023          Doc: 17          USCA4 Appeal: 23-1453

adverse action); *Burlington*, 548 U.S. at 68, 70 (reassigning employee to a less desirable job and suspending her for 37 days without pay after she complained about work conditions constitutes adverse action); *Palmer*, 918 F. Supp. 2d at 199 (denial of tenure constitutes adverse action). The evidence must show that the actions the recipient took against the complainant were more than trivial harms, minor annoyances, or petty slights. *Burlington*, 548 U.S. at 68; *Morales v. N.Y. Dep't of Labor*, 865 F. Supp. 2d 220, 256 (N.D.N.Y. 2012) (plaintiff alleged only "petty slights"), *aff'd*, 530 Fed. App'x 13 (2d Cir. 2013). An agency should decide what constitutes an adverse action case-by-case, taking into consideration contextual factors or specific circumstances. *See Burlington*, 548 U.S. at 69; *Gupta v. Fla. Bd. of Regents*, 212 F.3d 571, 587 (11th Cir. 2000).

Lastly, the evidence must show that the protected activity was the likely reason for the recipient's adverse action. The focus here is on determining whether there is a causal connection between the complainant's protected activity and the recipient's alleged adverse action.

A complainant or agency could establish retaliation under one of two methods. Under the first, the direct method of proof, complainants must "offer evidence that [they] engaged in a statutorily protected activity, that the defendants subjected [them] to an adverse employment action, and that a causal connection exists between the two events." *Gates v. Caterpillar, Inc.*, 513 F.3d 680, 686 (7th Cir. 2008) (citing *Treadwell v. Office of Ill. Sec'y of State*, 455 F.3d 778, 781 (7th Cir. 2006)). Under this evidence method, a plaintiff must present evidence of discriminatory intent that does not require support from inferences.

The second method, indirect proof, involves use of circumstantial evidence that the individual's protected activity led to an alleged adverse action, either wholly or in part, in response to the individual's protected conduct. Temporal proximity between the complainant's protected activity and the recipient's adverse actions often is relevant to a determination of causation. *See, e.g., Loudermilk v. Best Pallet Co.*, 636 F.3d 312, 315 (7th Cir. 2011) ("an adverse action [that] comes so close on the heels of a protected act that an inference of causation is sensible"); *Krouse v. Am. Sterilizer Co.*, 126 F.3d 494, 503 (3d Cir. 1997) ("the timing of the alleged retaliatory action must be 'unusually suggestive' of retaliatory motive before a causal link will be inferred."); *Palmer*, 918 F. Supp. 2d at 199 (allegation that denial of tenure "swiftly followed" complaint about discrimination supported claim of retaliation). There is no bright line rule, however; "the answer depends on context," *Loudermilk*, 636 F.3d at 315; and temporal proximity is not dispositive. *See, e.g., Robinson v. Southeastern Pa. Transp. Auth.*, 982 F.2d 892, 894 (3d Cir. 1993) ("mere passage of time is not legally conclusive proof against retaliation."). "When temporal proximity between protected activity and allegedly retaliatory conduct is missing, courts may look to the intervening period for other evidence of retaliatory animus." *Krouse*, 126 F.3d at 503-04.

Pg: 282 of 610          Filed: 06/05/2023          Doc: 17          USCA4 Appeal: 23-1453

### 3.    Third-party retaliation

Finally, under certain circumstances, Title VI's prohibition on retaliation extends to third parties, which may include lower-level recipient employees, program beneficiaries or participants, organizations with a relationship to the recipient such as contractors, and others. Agency Title VI regulations provide that "[n]o recipient or *other* person" may retaliate. *See, e.g.*, 28 C.F.R. § 42.107(e) (Department of Justice); 34 C.F.R. § 100.7(e) (Department of Education) (emphasis added). Recipients have two key obligations related to third party retaliation: first, to protect individuals from potential retaliation, recipients are obligated to keep the identity of complainants confidential except to the extent necessary to carry out the purposes of the Title VI regulations, including conducting investigations, hearings, or judicial proceedings; and second, recipients must investigate and respond when a third party engages in retaliatory conduct that Title VI prohibits. As with other types of third party conduct, such as harassment, the extent of the recipient's obligation is tied to the level of control it has over the bad actor and the environment in which the bad acts occurred. *See Davis v. Monroe Cty. Bd. of Educ.*, 526 U.S. 629, 644 (1999). Agencies should make this determination case-by-case. For example, universities are required to investigate and respond adequately to retaliatory conduct by their students. *See, e.g.*, Departments of Education and Justice letter resolving DOJ Case No. DJ 169-44-9, OCR Case No. 10126001 (May 9, 2013).[5]

---

[5] The letter is available here: https://perma.cc/2GAC-Y3YK.

Pg: 283 of 610    Filed: 06/05/2023    Doc: 17    USCA4 Appeal: 23-1453

## IX.   PRIVATE RIGHTS OF ACTION AND INDIVIDUAL RELIEF THROUGH AGENCY ACTION

### A.   Private Right of Action

The Supreme Court has established "an implied private right of action" under Title VI, leaving it "beyond dispute that private individuals may sue" to address allegations of intentional discrimination. *Barnes v. Gorman*, 536 U.S. 181, 185 (2002) (quoting *Alexander v. Sandoval*, 532 U.S. 275, 280 (2001)). The Court previously has stated that it had "no doubt that Congress … understood Title VI as authorizing an implied private cause of action for victims of illegal discrimination." *Cannon v. Univ. of Chicago*, 441 U.S. 677, 703 (1979) (holding that an individual has a private right of action under Title IX). In *Sandoval*, 532 U.S. at 284-85, the Supreme Court explained that the private right of action under Title VI exists only under Section 601, for cases of intentional discrimination. The Court held that individuals do not have a private right of action to enforce the discriminatory effects regulations implementing Section 602, because "[n]either as originally enacted nor as later amended does Title VI display an intent to create a freestanding private right of action to enforce regulations promulgated under § 602." *Id.* at 293.

In *Sandoval*, the Court posited that if Congress intended for Section 602 to be enforced through a private cause of action, it would have to create an express individual right under that Section. *Id.* at 286-87. Looking at Title VI's explicit language, the Court ruled that Section 601 only prohibits intentional discrimination, and the "authorizing portion of § 602 reveals no congressional intent to create a private right of action." *Id.* at 289.[1] Section 602, unlike Section 601, is focused on regulating the funded entity, not providing rights to individuals. *Id.* The Supreme Court held that "[s]tatutes that focus on the person regulated rather than the individuals protected create 'no implication of an intent to confer rights on a particular class of persons.'" *Id.* (quoting *California v. Sierra Club*, 451 U.S. 287, 294 (1981)). As a result, "*Sandoval* held that private parties may not invoke Title VI regulations to obtain redress for disparate-impact discrimination because Title VI itself prohibits only intentional discrimination." *Jackson v. Birmingham Bd. of Educ.*, 544 U.S. 167, 178 (2005).[2]

---

[1] The *Sandoval* Court stated:

> Whereas § 601 decrees that "[n]o person ... shall ... be subjected to discrimination," 42 U.S.C. § 2000d, the text of § 602 provides that "[e]ach Federal department and agency ... is authorized and directed to effectuate the provisions of [§ 601]," 42 U.S.C. § 2000d-1. Far from displaying congressional intent to create new rights, § 602 limits agencies to "effectuat[ing]" rights already created by § 601. And the focus of § 602 is twice removed from the individuals who will ultimately benefit from Title VI's protection.

*Sandoval*, 532 U.S. at 288-89.

[2] Following the Court's *Sandoval* decision, the Civil Rights Division made clear that federal agencies retained the right to address and remedy disparate impact discrimination. *See* Civil Rights Division, *Memorandum for Heads of Departments and Agencies General Counsels and Civil Rights Directors, Executive Order 13166 (Improving Access*

Pg: 284 of 610    Filed: 06/05/2023    Doc: 17    USCA4 Appeal: 23-1453

USCA4 Appeal: 23-1453      Doc: 17      Filed: 06/05/2023      Pg: 285 of 610

The Supreme Court's *Sandoval* decision left open the question whether an individual may bring an action under 42 U.S.C. § 1983 to enforce Section 602 regulations. *Sandoval,* 532 U.S. at 300–01 (Stevens, J., dissenting). A year later, the Supreme Court answered this question in a case brought under Section 1983 to enforce the Family Educational Rights and Privacy Act (FERPA), finding that there is no private cause of action via Section 1983. *Gonzaga Univ. v. Doe,* 536 U.S. 273, 290 (2002). The issue before the Court was whether a plaintiff could bring an action under Section 1983 to enforce FERPA, even though FERPA created no private right of action. *Id.* The Supreme Court explained that there is no private right of action: "We have held that '[t]he question whether Congress … intended to create a private right of action [is] definitively answered in the negative' where a statute by its terms grants no private rights to any identifiable class." *Id.* at 283-84 (citing *Touche Ross & Co. v. Redington,* 442 U.S. 560, 576 (1979)). Following *Sandoval* and *Gonzaga,* a majority of circuits have held that where a statute does not confer a private enforceable right, regulations promulgated under the statute cannot create a private right of action.[3] Therefore, the regulations promulgated under Section 602 are unenforceable via a private action under Section 1983.

The private right of action under Section 601 for intentional discrimination cannot be brought against individuals except in their official capacity. *Wood v. Yordy,* 753 F.3d 899, 903, 904 (9th Cir. 2014) (finding, consistent with the 3rd, 4th, 7th, and 10th Circuits, that Spending Clause statutes do "not authorize suits against a person in anything other than an official or governmental capacity"); *see also Price ex rel. Price v. La. Dep't of Educ.,* 329 F. App'x 559, 561 (5th Cir. 2009) ("[O]nly public and private entities can be held liable under Title VI."); *Shotz v. City of Plantation,* 344 F.3d 1161, 1171 (11th Cir. 2003) ("It is beyond question … that individuals are not liable under Title VI") (footnote omitted); *Mwabira-Simera v. Howard Univ.,* 692 F. Supp. 2d 65, 70 (D.D.C. 2010) ("[N]one of the individual defendants is subject to suit under [Title VI]").

Generally, Title VI does not provide a cause of action for private plaintiffs to sue the federal government directly or to address an allegation that the government has failed to perform its Title VI responsibilities.[4] *See Maloney v. Soc. Sec. Admin.,* 517 F.3d 70, 75-76 (2d Cir. 2008) (concluding "that, as with Title VI, the Age Discrimination Act does not apply to a federal agency implementing a federal program"); *Jersey Heights Neighborhood Ass'n v. Glendening,*

---

*to Services for Persons with Limited English Proficiency),* (Oct. 26, 2001),
http://www.justice.gov/crt/about/cor/lep/Oct26Memorandum.php (last visited Apr. 12, 2016).
[3] *See, e.g., Caswell v. City of Detroit Hous. Comm'n,* 418 F.3d 615, 618-20 (6th Cir. 2005) (Section 1983); *Three Rivers Ctr. for Indep. Living v. Hous. Auth. of City of Pittsburgh,* 382 F.3d 412, 423-25 (3d Cir. 2004) (Section 1983 and Section 504); *Save Our Valley v. Sound Transit,* 335 F.3d 932, 936-39 (9th Cir. 2003) (Section 1983).
[4] There may be other causes of action available to private plaintiffs seeking to challenge a federal agency's administration of its responsibilities under Title VI, such as the Administrative Procedures Act. This section addresses only claims brought under Title VI.

174 F.3d 180, 191 (4th Cir. 1999) (Title VI does not provide a cause of action against the United States); *Wash. Legal Found. v. Alexander*, 984 F.2d 483, 487-88 (D.C. Cir. 1993); *Women's Equity Action League v. Cavazos*, 906 F.2d 742, 750 (D.C. Cir. 1990) [hereinafter *WEAL II*]; *Cottrell v. Vilsack*, 915 F. Supp. 2d 81, 91 (D.D.C.) (finding a nondiscrimination provision in a federal funding statute does not apply to programs "that are conducted directly by a federal agency ...."), *aff'd.* 2013 WL 4711683 (D.C. Cir. 2013), *cert. denied*, 134 S. Ct. 1553 (2014).

In *Jersey Heights*, African-American landowners filed suit against the U.S. Department of Transportation, among others, claiming that it abdicated its duties under Section 602 by not terminating funding to a recipient not in compliance with Title VI. *Jersey Heights*, 174 F.3d at 191. The Fourth Circuit found that Title VI provides two avenues of recourse to address discrimination: private right of action against recipients and petition or complaint to the federal funding agency to secure voluntary compliance by its recipients. *Id.* After reviewing Title VI's legislative history, the court concluded that Congress did not intend for aggrieved parties "to circumvent that very administrative scheme through direct litigation against federal agencies." *Id.*

Similarly, the court in *WEAL II* ruled that, absent congressional authorization, individuals do not have a private right of action under Title VI, Title IX, or Section 504 against the federal government for failing to enforce those statutes against its funding recipients.[5] *WEAL II*, 906 F.2d at 748-50.

## 1. Injunctive Relief[6]

The most common form of relief sought and obtained through a Title VI private right of action is an injunction ordering a recipient to do or to stop doing something. *See, e.g., Sandoval*, 532 U.S. at 279 ("[P]rivate individuals may sue to enforce § 601 of Title VI and obtain both injunctive relief and damages.").[7] To obtain a permanent injunction, the moving party must demonstrate:

---

[5] The *WEAL II* decision brought to a close the twenty-year history of litigation that began in 1970 alleging that the Department of Health, Education, and Welfare failed adequately to enforce Title VI. *See Adams v. Richardson*, 356 F. Supp. 92 (D.D.C. 1973).

[6] The availability of remedies may depend on the timing of an entity's receipt of federal financial assistance. Past funding alone may not support prospective relief such as an injunction, but it may support a claim for backward-looking relief, such as back pay, restitution, or damages. *See Huber v. Howard Cty.*, 849 F. Supp. 407, 415 (D. Md. 1994) (Section 504 matter, finding that the recipient received federal financial assistance during the time of plaintiff's employment and discharge); *James v. Jones*, 148 F.R.D. 196, 201 (W.D. Ky. 1993) (state "does not presently receive [federal] funds, but ... has appealed its suspension from the program and it maintains its hope of receiving future funds").

[7] Not all monetary relief is automatically treated as compensatory or punitive in nature by the courts. In some instances monetary relief is equitable in nature and therefore may not require proof of intentional discrimination. *See Albemarle Paper Co. v. Moody*, 422 U.S. 405, 415-18 (1975).

Filed: 06/05/2023    Pg: 286 of 610        Doc: 17        USCA4 Appeal: 23-1453

Pg: 287 of 610        Filed: 06/05/2023        Doc: 17        USCA4 Appeal: 23-1453

> (1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction.

*eBay Inc. v. MercExchange, L.L. C.,* 547 U.S. 388, 391 (2010); *see also Entergy Nuclear Vermont Yankee, LLC v. Shumlin,* 733 F.3d 393, 422-23 (2d Cir. 2013).

The factors for a preliminary injunction vary by circuit, but are similar to those considered for a permanent injunction. *See Winter v. Natural Res. Def. Council, Inc.,* 555 U.S. 7, 20 (2008) (moving party must show "he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in its favor, and that an injunction is in the public interest"); *Centro Tepeyac v. Montgomery Cty.,* 722 F.3d 184, 188 (4th Cir. 2013); *Melendres v. Arpaio,* 695 F.3d 990, 1000 (9th Cir. 2012); *In re Navy Chaplaincy,* 697 F.3d 1171, 1178 (D.C. Cir. 2012); *EEOC v. KarenKim, Inc.,* 698 F.3d 92, 100 (2d Cir. 2012).

## 2. Monetary Damages for Intentional Discrimination[8]

The law is well-settled that private individuals may obtain monetary damages for claims of intentional discrimination under Section 601 of Title VI. *Blunt v. Lower Merion Sch. Dist.,* 767 F.3d 247, 272 (3d Cir. 2014); *Yakin v. Univ. of Ill.,* 508 F. Supp. 848, 852 (N.D. Ill. 1981), *aff'd,* 760 F.2d 270 (7th Cir. 1985).

Throughout its opinion in *Franklin v. Gwinnett County Public Schools,* 503 U.S. 60 (1992), a case brought under Title IX, the Supreme Court broadly referred to the relief being sanctioned as "monetary damages" or "monetary awards." *Id.* at 74-76. Although the Court did not define these terms, it specifically rejected limiting Title IX plaintiffs to monetary relief that is equitable in nature, such as backpay. *See id.* at 75-76. In these circumstances, a recipient of federal funds is "subject to suit for compensatory damages," *Barnes v. Gorman,* 536 U.S. 181, 186–87 (2002), which traditionally includes damages for both pecuniary and nonpecuniary injuries.[9]

---

[8] As discussed in Section VIII, retaliation is a form of intentional discrimination. A person proving retaliation thus would be entitled to compensatory damages on the same basis as a person alleging a violation involving one of the specifically identified bases.

[9] Section 903 of the Restatement (Second) of Torts (1979) defines "compensatory damages" as "the damages awarded to a person as compensation, indemnity or restitution for harm sustained." *See also Pro-Pac, Inc. v. WOW Logistics Co.,* 721 F.3d 781, 788 (7th Cir. 2013) (quoting Section 903). 'Non-pecuniary' compensatory damages include "compensation for bodily harm and emotional distress …." Restatement (Second) of Torts §§ 905-906; *Barati v. Metro-N. R.R.,* 939 F. Supp. 2d 143, 151 (D. Conn. 2013) (quoting Sections 904–906). Section 904 states that damages for nonpecuniary harm include damages for bodily harm and emotional distress. *See generally id.,* §§ 901-932.

Pg: 288 of 610          Filed: 06/05/2023          Doc: 17          USCA4 Appeal: 23-1453

Similarly, in *Barnes*, the Supreme Court has held that individuals may obtain monetary damages from recipients for claims of intentional discrimination under Title IX. *Barnes*, 536 U.S. at 186-87 (citing *Franklin v. Gwinett*, 503 U.S. 60, 74-75 (1990));[10] *Sandoval*, 532 U.S. at 282-83 ("In *Guardians*, the Court held that private individuals could not recover compensatory damages under Title VI except for intentional discrimination.") (citing *Guardians Ass'n v. Civil Serv. Comm'n*, 463 U.S. 582, 611 n.5 (1983) (Powell, J., concurring in judgment)); *Consol. Rail Corp. v. Darrone*, 465 U.S. 624, 630-31 (1984).

Courts applying *Barnes* and *Franklin* generally have interpreted these decisions to permit the award of the full range of compensatory damages, including damages for emotional distress, as available remedies under Spending Clause legislation. *Sheely v. MRI Radiology Network, P.A.*, 505 F.3d 1173, 1198-1204 (11th Cir. 2007) (discussing *Barnes* and *Franklin* and concluding that emotional damages are a form of compensatory damages available for intentional discrimination claims); *Tyler v. City of Manhattan*, 118 F.3d 1400, 1409-14 (10th Cir. 1997) (collecting cases, analyzing *Franklin*, and concluding that compensatory damages, including emotional distress, are appropriate remedies); *Doe v. District of Columbia*, 796 F. Supp. 559, 571 (D.D.C. 1992) (finding compensatory damages are available under Section 504); *Dawn L. v. Greater Johnstown Sch. Dist.*, 586 F. Supp. 2d 332, 383-84 (W.D. Pa. 2008) (concluding emotional distress damages are available under Title IX); *see also DeLeo v. City of Stamford*, 919 F. Supp. 70 (D. Conn. 1995) (citing cases equating monetary damages with compensatory damages).

Punitive damages are not an available remedy. In *Barnes*, 536 U.S. at 189, the Court explained:

> When a federal-funds recipient violates conditions of Spending Clause legislation, the wrong done is the failure to provide what the contractual obligation requires; and that wrong is "made good" when the recipient *compensates* the Federal Government or a third-party beneficiary (as in this case) for the loss caused by that failure.

The Court also stated that recipients generally are not on notice that they may be subject to a recovery of punitive damages and, more significantly, likely would not seek or agree to receiving federal financial assistance if punitive damages were available. *Id.* at 188 ("Not only is it doubtful that funding recipients would have agreed to exposure to such unorthodox and indeterminate liability; it is doubtful whether they would even have *accepted the funding* if punitive damages liability was a required condition.") (emphasis in original); *see also Moreno v. Consol. Rail Corp.*, 99 F.3d 782, 790-92 (6th Cir. 1996) (collecting cases).

---

[10] The Court stated, "absent clear direction to the contrary by Congress, the federal courts have the power to award any appropriate relief in a cognizable cause of action brought pursuant to a federal statute." *Franklin*, 503 U.S. at 70-71.

### 3.  Availability of Individual Monetary Damages through Agency Action

Compensatory damages are also an available remedy in agency administrative compliance activities. However, compensatory damages are generally unavailable for claims based solely on an agency's disparate impact regulations. *Sandoval,* 532 U.S. at 282–83; *Barnes*, 536 U.S. at 187. The Supreme Court has stated, "where discrimination is unintentional, 'it is surely not obvious that the grantee was aware that it was administering the program in violation of the [condition].'" *Gebser v. Lago Vista Indep. Sch. Dist.*, 524 U.S. 274, 287 (1998) (quoting *Guardians,* 463 U.S. at 598). In *Franklin*, the Court explained, "[t]he point of not permitting monetary damages for an unintentional violation is that the receiving entity of federal funds lacks notice that it will be liable for a monetary award." *Franklin*, 503 U.S. at 74 (citing *Pennhurst State Sch. and Hosp. v. Halderman*, 451 US 1, 17 (1981)); *See also Davis*, 526 U.S. at 640; *Guardians*, 463 U.S. at 598.[11]

### 4.  No Administrative Exhaustion Requirement

There is no requirement that a plaintiff exhaust administrative remedies prior to bringing a private Title VI civil action. *See Fitzgerald v. Barnstable Sch. Comm.*, 555 U.S. 246, 255 (2009) ("Title IX has no administrative exhaustion requirement.... Plaintiffs can file directly in court under its implied private right of action and can obtain the full range of remedies."); *Cannon*, 441 U.S. at 706-07 n.41 ("[W]e are not persuaded that individual suits are inappropriate in advance of exhaustion of administrative remedies.").[12] Though *Fitzgerald* and *Cannon* addressed Title IX, courts have applied the same analysis to Title VI and Section 504 claims and held that litigants need not exhaust administrative remedies prior to bringing a Title VI claim in federal court. *See, e.g., Wade v. Knoxville Util. Bd.*, 259 F.3d 452, 460 (6th Cir. 2001) ("[P]laintiff was not required to exhaust administrative remedies before bringing a Title VI claim ...."). First, "nothing in the language of [ ] Title VI requires administrative exhaustion." *Freed v. Consol.*

---

[11] *See also Loeffler v. Staten Island Univ. Hosp.*, 582 F.3d 268, 275 (2d Cir. 2009) (Section 504 permits "all remedies available under Title VI of the Civil Rights Act of 1964, including monetary damages. However, monetary damages are recoverable only upon a showing of an *intentional* violation.") (citation omitted); *Horner v. Ky. High Sch. Athletic Ass'n*, 206 F.3d 685, 690 (6th Cir. 2000) (requiring proof of intentional discrimination to obtain monetary damages under Title IX where facially neutral policy is challenged because of its disparate impact); *Davoll v. Webb*, 194 F.3d 1116, 1142 (10th Cir. 1999) ("[S]tatutes enacted by Congress pursuant to its spending power should not expose funding recipients to compensatory damages liability for unintentional violations."); *Ferguson v. City of Phoenix*, 157 F.3d 668, 674 (9th Cir. 1998) (compensatory damages are not available under Section 504 absent a showing of discriminatory intent); *Wood v. President & Trustees of Spring Hill Coll.*, 978 F.2d 1214, 1219-20 (11th Cir. 1992) (compensatory damages are not available absent proof of intent under Section 504); *Carter v. Orleans Parish Pub. Schs.*, 725 F.2d 261, 264 (5th Cir. 1984) (finding compensatory damages are not available for unintentional violations of the Rehabilitation Act).

[12] *See also Parker v. Franklin Cty. Cmty. Sch. Corp.*, 667 F.3d 910, 919 (7th Cir. 2012) (finding Title IX claimants "need not exhaust administrative remedies before bringing suit directly in court"); *Brennan v. King*, 139 F.3d 258, 268 n.12 (1st Cir. 1998) ("[Section 504] derives its procedural requirements from Title VI, which does not have an exhaustion requirement."); *Kling v. Los Angeles County*, 633 F.2d 876, 879 (9th Cir. 1980) (concluding "the exhaustion of Title IX administrative remedies is not required before one files a private action").

Filed: 06/05/2023    Pg: 289 of 610    Doc: 17    USCA4 Appeal: 23-1453

Filed: 06/05/2023      Pg: 290 of 610

Doc: 17

USCA4 Appeal: 23-1453

*Rail Corp.*, 201 F.3d 188, 194 (3d Cir. 2000). Second, as the Court noted in *Cannon*, "[t]he award of individual relief to a private litigant who has prosecuted her own suit is not only sensible but is also fully consistent with—and in some cases even necessary to—the orderly enforcement of the statute." *Cannon*, 441 U.S. at 705-06.

## B.    States Do Not Have Eleventh Amendment Immunity under Title VI

The Eleventh Amendment reflects a broad principle of sovereign immunity.[13] Since 1890, the Supreme Court consistently has held that this Amendment protects a state from being sued in federal court without the state's consent. *See Seminole Tribe of Fla. v. Florida*, 517 U.S. 44, 54 n.7 (1996) (citing cases). However, federal courts have jurisdiction over a state if the state has either waived its immunity or Congress has abrogated unequivocally a state's immunity pursuant to valid powers. *See id.* at 68. Congress has unequivocally done so with respect to Title VI and related statutes.

In 1986, Congress enacted 42 U.S.C. § 2000d-7 as part of the Rehabilitation Act Amendments of 1986, Pub. L. No. 99-506, Tit. X, § 1003, 100 Stat. 1845 (1986), to abrogate states' immunity from suit for violations of Section 504, Title VI, Title IX, the Age Discrimination Act, and similar nondiscrimination statutes. *See Sossamon v. Texas*, 131 S. Ct. 1651, 1662 (2011); *Sandoval*, 532 U.S. at 280; *Lane v. Peña*, 518 U.S. 187, 199 (1996). Section 2000d-7(a) states:

> (1) A State shall not be immune under the Eleventh Amendment of the Constitution of the United States from suit in Federal court for a violation of … title VI of the Civil Rights Act of 1964, … or the provisions of any other Federal statute prohibiting discrimination by recipients of Federal financial assistance.
>
> (2) In a suit against a State for a violation of a statute referred to in paragraph (1), remedies (including remedies both at law and in equity) are available for such a violation to the same extent as such remedies are available for such a violation in the suit against any public or private entity other than a State.

42 U.S.C. § 2000d-7 (internal citations omitted). Section 2000d-7 is an unambiguous abrogation that gives states express notice that a condition for receiving federal funds is the requirement that they consent to suit in federal court for alleged violations of Title VI and the other statutes enumerated. *Sossamon*, 131 S. Ct. at 1662.

---

[13] U.S. Const. Amend. XI states: "The judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or subjects of any Foreign State." *See Hans v. Louisiana*, 134 U.S. 1 (1890).

## X:    EMPLOYMENT COVERAGE

### A.    Scope of Coverage

Title VI prohibits recipients, most of which are employers, from discriminating based on race, color, and national origin. Congress, however, did not intend Title VI to be the primary federal vehicle to prohibit employment discrimination.[1] It does forbid recipients from discriminating in employment in certain situations. Specifically, if "a primary objective" of the federal financial assistance to a recipient is to provide employment, then the recipient's employment practices are subject to Title VI. 42 U.S.C. § 2000d-3. In addition, a recipient's employment practices also are subject to Title VI where those practices negatively affect the delivery of services to ultimate beneficiaries.

An illustration of the Title VI "primary objective" analysis is as follows: If a recipient builds a temporary shelter with funds designed to provide assistance to dislocated individuals, the employment practices of the recipient with respect to the construction of the facility would not be subject to Title VI. However, if the recipient builds the same facility with funds received through a public works program whose primary objective is to generate employment, the employment practices would be subject to Title VI. In the former case, the program's benefit was to provide shelter to dislocated individuals, while in the latter, the benefit was the employment of individuals to build the facility.

One important factor in determining the reach of the employment provision of Title VI is the clear congressional intent that Title VI not "impinge" on Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e et seq. *Johnson v. Transp. Agency,* 480 U.S. 616, 628 n.6 (1987). Title VII prohibits employment discrimination based on race, color, national origin, religion, and sex. Title VII covers employers with 15 or more employees. To sustain a Title VI claim of employment discrimination under the exception for "a primary objective," the plaintiff has a specific threshold requirement: not only must the plaintiff establish that the recipient receives federal financial assistance, but also that a "primary objective" of the federal funding is to provide employment. *Middlebrooks v. Godwin Corp.,* 722 F. Supp. 2d 82, 91-92 (D.D.C. 2010); *Reynolds v. School Dist. No. 1, Denver,* 69 F.3d 1523, 1531 (10th Cir. 1995) (motion to

---

[1] Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e to 2000e-17, is the primary vehicle that Congress established to address employment discrimination. Under Title VII, employers with 15 or more employees are prohibited from discriminating based on race, color, national origin, religion, and sex. When Congress enacted Title VI, it made clear its limited reach with respect to employment:

> Nothing contained in [Title VI] shall be construed to authorize action under [Title VI] by any department or agency with respect to any employment practice of any employer, employment agency, or labor organization except where a primary objective of the Federal financial assistance is to provide employment.

42 U.S.C. § 2000d-3.

USCA4 Appeal: 23-1453    Doc: 17    Filed: 06/05/2023    Pg: 291 of 610

dismiss granted where plaintiff failed to show that a primary purpose of federal assistance was to provide employment); *Ass'n Against Discrimination in Emp't v. City of Bridgeport*, 647 F.2d 256, 276 (2d Cir. 1981) (plaintiff failed to prove all elements of employment discrimination claim because of lack of evidence of primary purpose of federal funds); *Bass v. Bd. of Cty. Comm'rs*, 38 F. Supp. 2d 1001, 1009 (M.D. Fla. 1999) (summary judgment against plaintiff because of lack of evidence of primary purpose of federal funds); *Thornton v. Nat'l R.R. Passenger Corp.*, 16 F. Supp. 2d 5, 7 (D.D.C. 1998) (complaint dismissed because funding transportation was the primary objective of funding, not employment). In *Reynolds*, the plaintiff's assertion that federal funds paid, in part, the salary of an employee was insufficient, because the plaintiff did not show that a primary objective of the federal funds was employment rather than general funding of school programs. *Id.* at 1532.[2]

By contrast, in *Rogers v. Board of Education*, 859 F. Supp. 2d 742, 744 (D. Md. 2012), the court noted that Maryland public schools "received more than $1 billion through the American Recovery and Reinvestment Act of 2009 (ARRA), Pub. L. No. 111–5, 123 Stat. 115, and that the [defendant public school system] received such funds 'for the express purpose of creating jobs and maintaining existing ones.'" The court observed that "[t]he statute is clear that this objective need not be exclusive [and that] providing employment need only be *a* primary goal ...." *Rogers*, 859 F. Supp. 2d at 751. Although the defendant conceded that it received ARRA and other funds that targeted employment, the school board argued that it did not use these funds for employment. The court denied the defendant's motion for summary judgment on this issue because it determined that the issue was in dispute.[3]

Further, where a recipient's employment discrimination has a secondary effect on the ability of beneficiaries to participate meaningfully in and/or receive the benefits of a federally assisted program in a nondiscriminatory manner, those employment practices are within the purview of Title VI.[4] Agency regulations specifically address this principle in identical or similar language:

---

[2] Cases involving staff privileges at hospitals have led to some apparent inconsistency. As one commenter noted,

> Courts have not been uniform in their handling of staff privileging cases brought under Title VI .... The cases turn on the question of whether a physician is an intended beneficiary of Title VI protections. Where courts find there is no nexus between the allegedly discriminatory practice and the use of federal funds, physician claims have failed .... This "primary objective" exception makes the distinction between employee and non-employee physicians in staff privileging cases important. If physicians are employees of the health care defendant, then there is no colorable Title VI discrimination claim. However, where physicians are independent contractors, a Title VI claim may survive.

Dayna Bowen Matthew, *A New Strategy To Combat Racial Inequality in American Health Care Delivery*, 9 DePaul J. Health Care L. 793, 815-16 (2005).

[3] Subsequently, the court dismissed the plaintiff's harassment complaint, finding that she failed to show that she was the victim of severe or pervasive offending conduct. *Rogers v. Bd. of Educ.*, No. 8:11–CV–01194–PJM (D. Md. July 27, 2012), *aff'd,* 508 Fed.App'x 258 (4th Cir. 2013).

[4] This is oftentimes referred to as the "infection theory."

Pg: 293 of 610       Filed: 06/05/2023       Doc: 17       USCA4 Appeal: 23-1453

> In regard to Federal financial assistance which does not have providing
> employment as a primary objective, the provisions of paragraph (c)(1)
> [prohibitions where objective is employment] apply to the employment practices
> of the recipient if discrimination on the grounds of race, color, or national origin
> in such employment practices tends, on the grounds of race, color, or national
> origin, to exclude persons from participation in, to deny them the benefits of or to
> subject them to discrimination under the program receiving Federal financial
> assistance. In any such case, the provisions of paragraph (c)(1) of this Section
> shall apply to the extent necessary to assure equality of opportunity to and
> nondiscriminatory treatment of beneficiaries.

28 C.F.R. § 42.104(c)(2) (DOJ); *see also* 15 C.F.R. § 8.4(c)(2) (Dep't of Commerce); 34 C.F.R. § 100.3(c)(3) (Dep't of Education). In this situation, there is a causal nexus between employment discrimination and discrimination against beneficiaries; that is, the employment discrimination infects the beneficiaries' entitlement of the recipient's services, programs, and activities. *United States v. Jefferson Cty. Bd. of Educ.*, 372 F.2d 836, 883 (5th Cir. 1966) ("faculty integration is essential to student desegregation"); *Ahern v. Bd. of Educ.*, 133 F.3d 975, 983-84 (7th Cir. 1998) (applying infection theory to public school plan for assignment of principals); *Caulfield v. Bd. of Educ.*, 486 F. Supp. 862, 876 (E.D.N.Y. 1979) (characterization of infection theory where employment practices affect beneficiaries, i.e., students); *Marable v. Ala. Mental Health Bd.*, 297 F. Supp. 291, 297 (M.D. Ala. 1969) (patients of state mental health system have standing to challenge segregated employment practices which affect delivery of services to patients.).

Section 2000d-3 only limits Title VI's employment coverage. It does not exempt a recipient's employment practices from other applicable federal statutes, executive orders, or regulations. *United States ex rel. Clark v. Frazer*, 297 F. Supp. 319, 322 (M.D. Ala. 1968); *see also Contractors Ass'n of E. Pa. v. Sec'y of Labor*, 442 F.2d 159, 173 (3d Cir. 1971). Furthermore, a recipient's compliance with state and local merit systems for employment may not necessarily constitute compliance with Title VI. *See, e.g.*, 28 C.F.R. § 42.409.

**B.     Regulatory Referral of Employment Complaints to EEOC**

In 1983, DOJ and the Equal Employment Opportunity Commission published "Procedures for Complaints of Employment Discrimination Filed Against Recipients of Federal Financial Assistance." 28 C.F.R. §§ 42.601 – 42.613 (DOJ); 29 C.F.R. §§ 1691.1 – 1691.13 (EEOC) (often referred to as the Title VI/VII rule). The purpose of the regulation is simple: to reduce "duplicative investigations by various Federal agencies of similar complaints of employment discrimination against an employer."

48 Fed. Reg. 3570, 3670 (1983).[5] The regulation further noted that by placing the primary responsibility for addressing employment discrimination with the EEOC, "agencies will be able to focus their efforts on possible instances of systemic employment discrimination or discrimination in the provision of services to beneficiaries of Federally assisted programs." *Id.*

In summary, and as a general rule, the procedures provide that a federal agency receiving a complaint of employment discrimination against a recipient covered by both Title VI (and/or other grant-related prohibitions against discrimination) and Title VII may (and generally does) refer the complaint to the EEOC for investigation and conciliation. *Id.* §§ 42.605(d), 42.609.[6] If the EEOC finds discrimination and is unable to resolve the complaint, the rule calls for the funding agency to evaluate the matter, with "due weight to EEOC's determination that reasonable cause exists," and to take appropriate enforcement action. *Id.* § 42.610. Where a complaint alleges a pattern or practice of discrimination and there is dual coverage, agencies have the option of keeping the complaint rather than referring it.[7]

---

[5] As of the date of this Manual, the EEOC has indicated that it intends to review and revise the joint regulation. The EEOC has not yet issued a Notice of Proposed Rulemaking on this matter but has included it in the Unified Agenda. *See* OMB/OIRA Unified Agenda, https://www.reginfo.gov/public/do/eAgendaViewRule?pubId=201604&RIN=3046-AA93 (last visited Oct. 14, 2016).

[6] If the complaint only alleges a violation of Title VII and not Title VI, the matter should be transferred to the EEOC. In addition, the regulation exempts from its application Executive Order 11246, which the Department of Labor's Office of Federal Contracts Compliance Programs enforces. Similarly, the nondiscrimination provisions in the Omnibus Crime Control and Safe Streets Act, as amended, and the Juvenile Justice and Delinquency Prevention Act are not limited as to coverage of employment discrimination. *See* 28 C.F.R. § 42.601.

[7] For example, the Office for Civil Rights (OCR) at the Department of Education generally does not refer such complaints to the EEOC if OCR has jurisdiction and the complaint alleges a pattern or practice of employment discrimination or the complaint also alleges discrimination in other practices of the recipient. *See* OCR Case Processing Manual, Article VI, Section 601 (Special Intake Procedures), (c) Title VI and Title IX Employment Complaints.

USCA4 Appeal: 23-1453        Doc: 17        Filed: 06/05/2023        Pg: 294 of 610

Case 1:20-cv-03152-RDB  Document 132-3  Filed 08/04/22  Page 1 of 3

July 27, 2022

# Are Private K-12 Schools Subject to Title IX and Title VI by Virtue of Their Federal Tax-Exempt Status?

Brett Sokolow

TNG Consulting

 + Follow   Contact


Strategic Risk
Management Solutions

*Buettner-Hartsoe v. Balt. Lutheran High Sch. Ass'n*, Case 1:20-cv-03214-RDB (D. Md. July 21, 2022).

Are private K-12 schools subject to Title IX if they don't directly accept federal funds? According to Senior Federal District Judge Richard D. Bennett (a Republican, appointed by George Bush), the answer is a resounding yes, even if the school is religiously affiliated. If a school claims tax-exempt status under 26 USC § 501(c)(3), this federal tax exemption qualifies as federal financial assistance under Title IX. An appeal would not be surprising, given that this is really a case of first impression, at least as to this direct question.

## Background

Five different women, all former students at Concordia Preparatory School ("CPS"), previously known as Baltimore Lutheran High School, made similar allegations of sexual assault and verbal sexual harassment by male students at the school dating back to 2016. They allege that school officials failed to adequately address their numerous complaints or take any meaningful action in response, thereby cultivating a hyper-sexualized culture at the school.

The issue before the court in this motion was whether CPS received federal financial assistance and was thus subject to Title IX at the relevant time periods in the women's claims. As a religiously affiliated private school that is exempt from federal income taxes under 26 USC § 501(c)(3), CPS "contends that it is not subject to Title IX jurisdiction as it was not a direct recipient of federal financial assistance during the relevant time periods." The "plaintiffs argue CPS's tax-exempt status under 26 U.S.C. § 501(c)(3) represents federal financial assistance sufficient to subject the school to the requirements of Title IX."

EXHIBIT
2

## Analysis and Findings

Judge Bennett's ruling on partial summary judgment against CPS will likely soon be sending shockwaves through private K-12 education, and religiously affiliated schools. Judge Bennett's decision did not address the larger question of whether this analysis might apply to all 501(c)(3) organizations with an educational component, but it has that potential implication.

In his opinion, Judge Bennett stated, "The tax-exempt status of a private school subjects it to the same requirements of Title IX imposed on any educational institution. CPS cannot avail itself of federal tax exemption but not adhere to the mandates of Title IX." Citing the Supreme Court's decision in *Regan v. Taxation with Representation*, Bennett extended the Court's analysis in that case to Title IX, quoting that "[b]oth tax exemptions and tax-deductibility are a form of subsidy that is administered through the tax system. A tax exemption has much the same effect as a cash grant to the organization of the amount of tax it would have to pay on its income . . ."

Judge Bennett considered the analogue of Title VI in his decision, "[T]ax exempt organizations are subject to the requirements under Title VI of Civil Rights Act of 1964, 42 U.S.C. 2000d et seq.," and noted that Title IX was modeled after Title VI. The court pointed to *McGlotten v. Connally*, holding that "assistance provided through the tax system is within the scope of Title VI of the 1964 Civil Rights Act," and to *Fulani v. League of Women Voters Educ. Fund*, which noted that the League was subject to Title VI and Title IX enforcement because it "receive[d] federal assistance indirectly through its tax exemption and directly through grants" from federal agencies.

*Fulani* may provide some basis for the answer to the question posed above, about whether this decision could have wider implications for other non-profit organizations that are not schools, though the court in *Fulani* made a conclusory assumption of Title IX's applicability without any analysis.

We will keep readers apprised as the *CPS* case continues to wind its way through the federal courts.

*Full disclosure: The author is serving as an expert witness on behalf of the plaintiffs in this case.



## LATEST POSTS

- A Rose By Any Other Name – Are You Making This Common Title IX Mistake?

Pg: 296 of 610    Filed: 06/05/2023    Doc: 17    USCA4 Appeal: 23-1453

JA292

- **[Certification Course] Title IX Hearing Officer and Decision-Maker - October 17th - 18th, Lake Buena Vista, FL**

- **[Certification Course] DEI Practitioner One: Foundations - October 17th - 18th, Lake Buena Vista, FL**

- **Are Private K-12 Schools Subject to Title IX and Title VI by Virtue of Their Federal Tax-Exempt Status?**

- **[Training Course] NPRiMer: Preparing Your K-12 School or District for the 2023 Title IX Regulations – Training and Certification Course - October 16th, Lake Buena Vista, FL**

See more ⌐

WRITTEN BY:

TNG Consulting

+ Follow

Brett Sokolow                                            + Follow

PUBLISHED IN:

Private Schools                                          + Follow

Sexual Assault                                          + Follow

Sexual Harassment                                      + Follow

Title IX                                                + Follow

Education                                              + Follow

TNG CONSULTING ON:

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| DONNA BUETTNER-HARTSOE, *et al.*, | * | |
| Plaintiffs, | * | Civil Action No. RDB-20-3132 |
| v. | * | |
| BALTIMORE LUTHERAN HIGH SCHOOL ASSOCIATION, *d/b/a/* CONCORDIA PREPARATORY SCHOOL, | * * * | |
| Defendant. | | |

\*       \*       \*       \*       \*       \*       \*       \*       \*       \*       \*       \*       \*

| | | |
|---|---|---|
| JENNIFER PULLEN, | * | |
| Plaintiff, | * | Civil Action No. RDB-20-3214 |
| v. | * | |
| BALTIMORE LUTHERAN HIGH SCHOOL ASSOCIATION, *d/b/a/* CONCORDIA PREPARATORY SCHOOL, | * * * | |
| Defendant. | | |

\*       \*       \*       \*       \*       \*       \*       \*       \*       \*       \*       \*       \*

| | | |
|---|---|---|
| ANDREA CONRAD, *et al.*, | * | |
| Plaintiffs, | * | Civil Action No. RDB-20-3229 |
| v. | * | |
| BALTIMORE LUTHERAN HIGH SCHOOL ASSOCIATION, *d/b/a/* CONCORDIA PREPARATORY SCHOOL, and LUTHERAN CHURCH-MISSOURI SYNOD, | * * * | |

SOUTHEASTERN DISTRICT,

       *

    Defendants.

\*      \*      \*      \*      \*      \*      \*      \*      \*      \*      \*      \*      \*

ARIANA GOMEZ,                               *

    Plaintiff,                              *               Civil Action No. RDB-20-3267

BALTIMORE LUTHERAN HIGH        *
SCHOOL ASSOCIATION, *d/b/a/*
CONCORDIA PREPARATORY            *
SCHOOL, and LUTHERAN CHURCH-
MISSOURI SYNOD,                             *
SOUTHEASTERN DISTRICT,
                                 *

    Defendant.

\*      \*      \*      \*      \*      \*      \*      \*      \*      \*      \*      \*      \*

SELENA BARBER, *et al.,*                    *

    Plaintiffs,                             *               Civil Action No. RDB-21-0691

    v.                                      *

BALTIMORE LUTHERAN HIGH        *
SCHOOL ASSOCIATION, *d/b/a/*
CONCORDIA PREPARATORY            *
SCHOOL,
                                 *

    Defendants.

\*      \*      \*      \*      \*      \*      \*      \*      \*      \*      \*      \*      \*

## ORDER

    A hearing on the pending Motion for Reconsideration (ECF#132) has been scheduled for:

**September 1, 2022 at 2:00 p.m. in Courtroom 5D**

Date: 8/08/2022                     __/s/_____
                                        Richard D. Bennett
                                        United States District Judge

JA295

UNITED STATES DISTRICT COURT
DISTRICT OF MARYLAND
Northern Division

| | | |
|---|---|---|
| **DONNA BUETTNER-HARTSOE, et al.** | * | |
| *Plaintiffs,* | * | |
| v. | * | **Case No.: 1:20-cv-03132-RDB** |
| **BALTIMORE LUTHERAN HIGH SCHOOL ASSOCIATION d/b/a CONCORDIA PREPARATORY SCHOOL** | * | |
| | * | |
| | * | |
| *Defendant.* | * | |

\* \* \* \* \* \* \* \* \* \* \* \*

| | | |
|---|---|---|
| **JENNIFER PULLEN** | * | |
| *Plaintiff,* | * | |
| v. | * | **Case No.: 1:20-cv-03214-RDB** |
| **BALTIMORE LUTHERAN HIGH SCHOOL ASSOCIATION d/b/a CONCORDIA PREPARATORY SCHOOL** | * | |
| | * | |
| | * | |
| *Defendant.* | * | |

\* \* \* \* \* \* \* \* \* \* \* \*

| | | |
|---|---|---|
| **ANDREA CONRAD, et al.** | * | |
| *Plaintiffs,* | * | |
| v. | * | **Case No.: 1:20-cv-03229-RDB** |
| **BALTIMORE LUTHERAN HIGH SCHOOL ASSOCIATION d/b/a CONCORDIA PREPARATORY SCHOOL, et al.** | * | |
| | * | |
| | * | |
| *Defendants.* | | |

\* \* \* \* \* \* \* \* \* \* \* \*

| | | |
|---|---|---|
| **ARIANA GOMEZ** | * | |
| *Plaintiff,* | * | |
| v. | * | **Case No.: 1:20-cv-03267-RDB** |
| **BALTIMORE LUTHERAN HIGH SCHOOL ASSOCIATION d/b/a CONCORDIA PREPARATORY SCHOOL, et al.** | * | |
| | * | |
| | * | |
| *Defendant.* | * | |

\*       \*       \*       \*       \*       \*       \*       \*       \*       \*       \*       \*

| | | |
|---|---|---|
| **SELENA BARBER, et al.** | * | |
| *Plaintiffs,* | * | |
| v. | * | **Case No.: 1:21-cv-00691-RDB** |
| **BALTIMORE LUTHERAN HIGH SCHOOL ASSOCIATION d/b/a CONCORDIA PREPARATORY SCHOOL** | * | |
| | * | |
| *Defendant.* | * | |

\*       \*       \*       \*       \*       \*       \*       \*       \*       \*       \*       \*

## PLAINTIFFS' OPPOSITION TO DEFENDANT BALTIMORE LUTHERAN HIGH SCHOOL ASSOCIATION'S MOTION TO RECONSIDER AND MOTION TO CERTIFY ORDER FOR INTERLOCUTORY APPEAL

**Ketterer, Browne & Associates**

Justin Browne (Bar No. 29164)
Christina Graziano *(admitted pro hac vice)*
Brian Ketterer *(admitted pro hac vice)*
Ketterer, Browne & Associates, LLC
336 S. Main Street
Bel Air, Maryland 21014
Phone: (855) 522-5297
Facsimile: (855) 334-5626
Justin@KBAattorneys.com
Christina@KBAattorneys.com
Brian@KBAattorneys.com
*Attorneys for Plaintiffs*

## **TABLE OF CONTENTS**

PRELIMINARY STATEMENT ……………………………………………………...11

STANDARD OF REVIEW ……………………………………………………...11

ARGUMENT ……………………………………………………………....……13

I.    This Court should Deny Defendant CPS's Motion for Reconsideration because its §
501(c)(3) Tax Exempt Status Constitutes "Federal Financial Assistance" Under Title IX and
as such, no Clear Error was Made………………………………………………………14

    A.    It is Well-Established Law that a Tax Exemption under § 501(c)(3) Constitutes
Federal Financial Assistance under Title VI and Title IX …………………….…..14

        1.    Supreme Court and Federal Circuit Court Precedent on this Issue is Clear
………………………………………………………………………..14

        2.    Defendant CPS's Argument that a § 501(c)(3) Tax-Exemption is Not the
Type of "Government Assistance" or Economic Benefit Contemplated by
Title IX Plainly Fails……………………………………………………16

        3.    Imposing the Mandates of Title IX on Tax-Exempt Schools is Consistent
with the Objectives of Title IX and Other Anti-Discrimination Statutes..23

    B.    The Court Already Considered Defendant CPS's Argument – and the Case Law
it Cites in Support - that its Tax-Exempt Status is Insufficient to Trigger Title
IX's Mandates………………………………………………………………..25

    C.    Defendant CPS's Disagreement with this Court's Careful Consideration of
Title IX Implications for a Tax-Exempt, Private School like CPS Does Not
Warrant Reconsideration of a Court Order…………………………………..26

    D.    Defendant CPS's Receipt of Paycheck Protection Program (PPP) Loans
Triggered Title IX Mandates During the Timeframe Relevant to H.C.'s Claims
………………………………………………………………………………..26

    E.    This Court Needn't Make a Sweeping Declaration with Respect to ALL §
501(c)(3) Tax-Exempt Entities……………………………………………………29

II.   This Court should Deny Defendant CPS's Motion for Interlocutory Appeal where CPS
Failed to Meet the Applicable Standard because the Issue at Hand is Not a Controlling
Question of Law to Which there is a Substantial Ground for Difference of Opinion, Nor
would an Appeal Materially Advance the Termination of the Instant Litigation…………30

    A.    Defendant CPS's Disagreement with the Court's Ruling Provides No Basis for
Certification of an Extraordinary Interlocutory Appeal………………………..32

1.  The Court's Order Contains No Controlling Question of Law
    Regarding Whether Title IX Applies to § 501(c)(3) Entities………..33

B.  There is Not a Sufficiently Substantial Ground for Difference of Opinion….36

C.  Defendant CPS's Argument that an Interlocutory Appeal would Materially
    Advance this Litigation Fails………………………………………………..38

CONCLUSION ……………………………………………………………………....…40

CERTIFICATE OF SERVICE………………………………………………………...41

## <u>TABLE OF AUTHORITIES</u>

**CASES**:

*Ahrenholz v. Bd. of Trs. of Univ. of Ill*
219 F.3d 674, 677 (7th Cir. 2000)………………………………….……………34

*Awah v. Mansfield Kaseman Health Clinic*
2021 WL 6197415 (D. Md. Dec. 30, 2021)…………………………….……….…...27

*Beck v. Commc'ns Workers of Am.*
468 F. Supp. 93, 95- 96 (D. Md. 1979)…………………………………….…………30

*Bob Jones University v. United States*
461 U.S. 574 (1983)…………………………………………………………………...16,17

*Brooks v. Circuit City Stores*
No. DKC–95–3296, 1997 WL 679899, at *1 (D.Md. Sept.16, 1997) (citing *In re Flor*, 79 F.3d 281, 284 (2d
Cir.1996))……………………………………………………………………...……………37

*Butler v. DirectSAT USA, LLC*
307 F.R.D. at 453…………………………………………………………..………31,35

*Butler v. DirectSAT USA, LLC*
307 F.R.D. 445, 452 (D. Md. 2015)…………………………………………………...34

*Cannon v. University of Chicago*
441 U.S. 677, 717 (1979)……………………………………………...14, 16, 23,25,38

*Carbotrade v. Bureau Veritas,*
1993 WL 60567 (S.D.N.Y. March 2, 1993)……………………………………..37

*Carlson v. Bos. Sci. Corp.*
856 F.3d 320, 325 (4th Cir. 2017)……………………………………...……………12

*David v. Alphin*
No. 07–cv–11–RJC–DLH, 2009 WL 3633889, at *4 (W.D.N.C. Oct.30, 2009)………………..37

*E.H. v. Valley Christian Academy*
2022 WL 2953681 at *7 (C.D. Cal. July 25, 2022)……………………………………...23, 27

*Fannin v. CSX Transp*., Inc.,
No. 88-8120, 1989 WL 42583, at *5 (4th Cir. Apr. 26, 1989) (unpublished opinion)……….31, 24

*Fannin v. CSX Transp., Inc.*
873 F.2d 1438, 1989 WL 42583, at *5 (4th Cir.1989)…………………………………………33,39

*Fernandez v. Bruno Northfleet, Inc.*
2021 WL 4851378 (S.D. Fla. Oct 18, 2021)……………………………………………….…27

*Flor v. BOT Fin. Corp. (In re Flor)*
79 F.3d 281, 284 (2d Cir. 1996)……………………………………………………...36, 37

*Fulani v. League of Women Voters Educ. Fund*
684 F. Supp. 1185, 1192 (S.D.N.Y.1988)……………………………………………………24

*Garber v. Office of the Comm'r of Baseball*
120 F. Supp. 3d 334, 337 (S.D.N.Y. 2014) (citation omitted)…………………………………...31

*Gebser v. Lago Vista Indep. Sch. Dist.*
524 U.S. 274, 286 (1998) ……………………………………………………………….24

*Goodman v. Archbishop Curley High Sch., Inc.*
195 F. Supp. 3d 767, 774 (D. Md. 2016)……………………………………………….…..36

*Grove City Coll. v. Bell*
465 U.S. 555, 564(1984)……………………………………………………………15, 25, 38

*Hall v. Greystar Mgmt. Servs.*
*L.P.*, 193 F. Supp. 3d 522, 525 (D. Md. 2016)……………………………………………..31

*HeiTech Servs., Inc. v. Rowe*
GJH-17-1319, 2017 WL 4838750, at *2 (D. Md. Oct. 24, 2017)……………………………..31

*Husbands v. Financial Management Solutions, LLC*
No. GJH-20-3618, 2021 WL 4339436, at *8 (D. Md. Sept. 23, 2021)………………………….27

*Joe Doe One, et al., v. CVS Pharmacy, Inc., et al.*
No. 18-cv-01031-EMC, 2022 WL 3139516 (N.D. Cal.) (Aug. 5, 2022)………………………..24

*Johnny's Icehouse, Inc. v. Amateur Hockey Ass'n*
134 F. Supp. 2d 965 (N.D. Ill. 2001)……………………………………………………...23, 25

*Johnson v. Cent. Collections*
No. ELH-19-2821, 2020 WL 2306452, at *5 (D. Md. May 8, 2020)…………………………31

*Karanik, et al. v. Cape Fear Academy, et al*.
Case No. 7:21-cv-169-D (E.D.N.C. June 17, 2022)……………………………………………27

*Keena v. Groupon, Inc*.
886 F.3d 360, 362-63 (4th Cir. 2018); *cf.* 28 U.S.C. § 1292(b)…………………………………31

*Kelly v. Johns Hopkins Univ.*
2018 WL 4211296, at *2 (D. Md. Aug. 13, 2018)………………………………………………26

*Kennedy v. Villa St. Catherine, Inc*.
No. 09-3021, 2010 WL 9009364, at *2 (D. Md. June 16, 2010)………………………………...36

*Kennedy v. St. Joseph's Ministries, Inc*.
657 F.3d 189, 195 (4th Cir. 2011)…………………………………………………………………33

*LaFleur v. Dollar Tree Stores, Inc*.
No. 2:12–CI–00363, 2014 WL 2121721, at *2 (E.D.Va. May 20, 2014)………………………35

*Lawley v. Northam*
No. ELH-10-1074, 2013 WL 4524288, at *1 (D. Md. Aug. 23, 2013),,,,…………….……13, 26

*Lizarbe v. Rondon*, No. 07-1809
2009 WL 2487083, at *3 (D. Md. Aug. 12, 2009)………………………………………………36

*Lynn v. Monarch Recovery Mgmt*.
953 F. Supp. 2d 612, 620 (D. Md. 2013)………………………………………...…….12, 33

*McGlotten v. Connally*
338 F. Supp. 448, 461 (D.D.C.1972)…………………………………………………...24, 30

*M.H.D. v. Westminster Schools*
172 F.3d 797 (11th Cir.1999)………………………………………………………………15

*Mohawk Indus., Inc. v. Carpenter*
130 S. Ct. 599, 605 (2009)…………………………………………………………………32

*Moffett v. Computer Sci. Corp*………………………………………………………...33
No. 05-1547, 2010 WL 348701, at *2 (D. Md. Jan. 22, 2010)

*Myles v. Laffitte*
881 F.2d 125, 127 (4th Cir. 1989)………………………………………………………13,31

*Nat'l Collegiate Athletic Ass'n v. Smith (multiple pages)*
525 U.S. 459 (1999)…………………………………………………………..…15, 17

*NCAA v. Smith*
525 U.S. at 470……………………………………………………………17, 18, 22

*N.J. Dep't of Treas. v. Fuld*
2009 WL 2905432, at *2 (D.N.J. Sept.8, 2009)…………………………………………39

*North Carolina v. W.R. Peele, Sr. Trust*
889 F.Supp. 849, 852
(E.D.N.C.1995)…………………………………………………………………………30, 37

*North Carolina ex rel. Howes v. W.R. Peele, Sr. Trust*
889 F.Supp. 849, 853 (E.D.N.C.1995)…………………………………………………..35

*Palandjian v. Pahlavi*
782 F.2d 313, 314 (1st Cir. 1986)…………………………………………………..34

*Potter v. Potter*
199 F.R.D. 550, 553 (D. Md. 2001)…………………………………………………12

*Randolph v. ADT Sec. Servs., Inc.*
2012 WL 273722, at *6 (D. Md. Jan. 30, 2012)……………………………………32

*Randolph v. ADT Sec. Servs., Inc.*
No. 09-1790, 2012 WL 273722, at *6 (D. Md. Jan. 30, 2012)…………………………..36

*Regan v. Taxation with Representation*
461 U.S. 520, 550–51 (1983)……………………………………………15, 16, 25,38

*Springfield Hosp., Inc. v. Guzman*
28 F.4th 403, 409–10 (2d Cir. 2022)………………………………………………29

*State of N.C. ex rel. Howes v. W.R. Peele, Sr. Trust*
889 F.Supp. 849, 852 (E.D.N.C.1995)…………………………………………35, 37

*TFWS, Inc. v. Franchot*
572 F.3d 186, 194 (4th Cir. 2009)…………………………………………………13

*U.S. Tobacco Coop. Inc. v. Big. S. Wholesale of Va., LLC*
899 F.3d 236, 256-57 (4th Cir. 2018)………………………………………………12

*United States v. Under Seal*
835 F.3d 706, 716 (4th Cir. 2017)…………………………………………………30

*United States v. Lawrence*
201 F.3d 536, 537 (4th Cir. 2000)…………………………………………………30

*Wade v. Corr. Ofc. Christopher Cavins*
No. PWG-17-3693, 2019 WL 2410969………………………………………………12, 13

*White v. Nix*
43 F.3d 374, 378 (8th Cir. 1994)………………………………………………………...36

*In re Air Cargo, Inc.*, CCB-080587, 2008 WL 2415039, at *3 (D. Md. June 11, 2008)………...31

*In re Swann Ltd. Partnership*, 128 B.R. 138, 140–41 (D.Md.1991)……………………………39

*In re Text Messaging Antitrust Litig.*, 630 F.3d 622, 626 (7th Cir.2010)………………………..34

*Sinclair Broad. Grp. Ec. Litig.*, 473 F. Supp. 3d 529, 535 (D. Md. 2020)………………………12

**STATUTES**:

13 C.F.R. § 113.100………………………………………………………………………...27

13 C.F.R. § 113.105……………………………………………………………………………28

26 U.S.C. § 501(c)(3)………………………………………………………….passim

28 U.S.C. § 1292(b)……………………………………………………………...13, 31, 37

42 U.S.C. § 18116(a)……………………………………………………………………24

42 U.S.C.A. § 1981 *et seq*……………………………………………………………………...27

29 U.S.C.A. § 701………………………………………………………………………27

34 C.F.R. § 106.2(g)(1) ……………………………………………………………………27

Title VI of the Civil Rights Act of 1964 (42 U.S.C. 2000d et seq.)……………………………24

Title VI and Section 504 of the Rehabilitation Act……………………………………………...27

Title IX of the Education Amendments of 1972 (20 U.S.C. 1681 et seq.), the Age Discrimination
Act of 1975 (42 U.S.C. 6101 et seq.), or section 794 of title 29…………………………………24

**FEDERAL RULES OF CIVIL PROCEDURE**:

Federal Rule of Civil Procedure 54(b)……………………………………………………...11

Federal Rule of Civil Procedure 59(e)……………………………………………………...12

Federal Rule of Civil Procedure 60(b) ………………………………………………….....12

**OTHER AUTHORITIES**:

Rev. Rul. 71-447, 1971-2 CB 230……………………………………………………………….16

16 CHARLES A. WRIGHT, ET AL., FED. PRAC. & PROC. § 3930, at 157 (1977)………….37

Plaintiffs Donna Buettner-Hartsoe and N.H., a minor, Arianna Gomez, Jenna Pullen, Selena Barber and A.G., a minor, and Andrea Conrad and H.C., a minor ("Plaintiffs") file this Memorandum of Law in Opposition to Defendant Baltimore Lutheran High School Association d/b/a Concordia Preparatory School's ("Defendant CPS") Motion to Reconsider and/or Motion to Certify an Order for Interlocutory Appeal (Docket No. 134) and in support thereof state as follows:

## PRELIMINARY STATEMENT

Before this Court is Defendant CPS's Motion for Reconsideration and/or Motion to Certify an Order for Interlocutory Appeal filed on the heels of this Court's Order denying Defendant CPS's prior Motion to Dismiss and/or Motion for Partial Summary judgment on Plaintiffs' Title IX claim (RDB-20-3132, ECF No. 108; RDB-20-3214, ECF No. 60; RDB-20-3229, ECF No. 75; RDB-20-3267, ECF No. 112; RDB-21-0691, ECF No. 37.). In its Memorandum Order, this Court held that Defendant CPS's tax-exempt status under 26 U.S.C. § 501(c)(3) ("501(c)(3)" constitutes federal financial assistance for the purposes of Title IX (RBD-20-03132, ECF No. 130)).

Defendant CPS now asks for yet another bite at the same apple, arguing for reversal of this Court's Order or for interlocutory appeal on this issue, despite not offering any new information or case law, and without meeting the heavy burden for interlocutory appeal in this Circuit (Docket No. 134). In accordance with this Court's Memorandum Order denying Defendant CPS's prior Motion to Dismiss, Defendant CPS's tax-exempt status under § 501(c)(3) subjects the institution to liability under Title IX and Defendant CPS's Motion for Reconsideration and/or Interlocutory Appeal must be denied.

## LEGAL STANDARD

The bounds of a district court's discretionary review under Federal Rule of Civil Procedure 54(b), which governs motions for reconsideration of orders that do not constitute final judgments

in a case, "[are] not limitless." *Carlson v. Bos. Sci. Corp.,* 856 F.3d 320, 325 (4th Cir. 2017). The Fourth Circuit has not yet articulated a precise standard governing a motion for reconsideration of an interlocutory order: while the standards articulated in Rules 59(e) and 60(b) are not binding in an analysis of Rule 54(b) motions, Courts in this circuit frequently look to these standards for guidance in considering such motions. *See Wade v. Corr. Ofc. Christopher Cavins,* No. PWG-17-3693, 2019 WL 2410969, at *1–2 (D. Md. June 7, 2019). The Fourth Circuit has explained that review under Rule 54(b) is "cabined . . . by treating interlocutory rulings as law of the case." *Carlson* at 325 (citations omitted). Accordingly, a court may revise an interlocutory order under the same circumstances in which it may depart from the law of the case – *i.e.*, (1) different evidence is discovered during the litigation; (2) a change in applicable law; or (3) clear error causing manifest injustice. *Id.*

This discretion is also "subject to the caveat that where litigants have once battled for the court's decision, they should neither be required, nor without good reason permitted, to battle for it again." *In re Sinclair Broad. Grp. Ec. Litig.*, 473 F. Supp. 3d 529, 535 (D. Md. 2020) (citing *U.S. Tobacco Coop. Inc. v. Big. S. Wholesale of Va., LLC*, 899 F.3d 236, 256-57 (4th Cir. 2018)). In other words, a reconsideration motion is "not the proper place to relitigate a case after the court has ruled against a party, as mere disagreement with a court's rulings will not support granting such a request." *Id*. (quoting *Lynn v. Monarch Recovery Mgmt*., 953 F. Supp. 2d 612, 620 (D. Md. 2013)). Were it otherwise, "there would be no conclusion to motions practice, each motion becoming nothing more than the latest installment in a potentially endless serial that would exhaust the resources of the parties and the court." *Potter v. Potter*, 199 F.R.D. 550, 553 (D. Md. 2001).

In evaluating a Rule 54(b) motion for a "clear error of law causing manifest injustice," "'mere disagreement' with a court's ruling is not enough to justify granting a motion for reconsideration." *Wade*, 2019 WL 2410969, at *4 (quoting *Lynn*, 953 F. Supp. 2d at 620). Rather, to justify granting reconsideration on the basis of clear error, "the prior judgment cannot be 'just maybe or probably wrong; it must . . . strike the court as wrong with the force of a five week-old, unrefrigerated dead fish.'" *Id*. (quoting *Fontell*, 891 F. Supp. 2d at 741). Indeed, as the Fourth Circuit has explained it, the prior judgment must be "dead wrong." *Id*. (quoting *TFWS, Inc. v. Franchot*, 572 F.3d 186, 194 (4th Cir. 2009)). Importantly, a "'factually supported and legally justified' decision does not constitute clear error." *Id*. (quoting *Lawley v. Northam*, No. ELH-10-1074, 2013 WL 4524288, at *1 (D. Md. Aug. 23, 2013)).

In the alternative, Defendant CPS seeks a certification for interlocutory appeal pursuant to 28 U.S.C. § 1292(b). The Fourth Circuit has made clear that Section 1292(b) "should be used sparingly and . . . its requirements must be strictly construed." *Myles v. Laffitte*, 881 F.2d 125, 127 (4th Cir. 1989). Certification is only appropriate where an appeal involves a controlling issue of law as to which there is substantial ground for disagreement among the courts and immediate appeal may materially advance the ultimate termination of the litigation. 28 U.S.C. § 1292(b). Defendant CPS fails to meet this strict test.

## ARGUMENT

Defendant CPS presents two arguments for reconsideration and for certification of an interlocutory appeal: First, that the Court erred by concluding that CPS's § 501(c)(3) tax-exempt status is "federal financial assistance" for purposes of Title IX; and second, that the Court's Order involves a controlling question of law, with substantial grounds for difference of opinion, such that interlocutory appeal is warranted. Neither of these arguments warrants reconsideration or

certification for interlocutory appeal because they simply rehash arguments the Court has already carefully considered and rejected. Defendant CPS has presented no new facts or law since its last reply that would alter in any way this Court's prior decision as contained in its June 21, 2022 Order.

I.    **This Court should Deny Defendant CPS's Motion for Reconsideration because its § 501(c)(3) Tax Exempt Status Constitutes "Federal Financial Assistance" Under Title IX and as such, no Clear Error was Made**

In its Motion for Reconsideration, Defendant CPS argues that this Court's prior Order exhibits "clear error because the Court's decision incorrectly concluded that a tax exemption, authorized and extended under a law administered by the Internal Revenue Service, constitutes federal financial assistance for purposes of Title IX." (Mot. at 2-3.) First, Defendant already argued this in its Reply. Defendant may not like the Court's reception to its argument, but that is not a basis for the relief sought. Second, this argument plainly fails.

The Court correctly analogized the definition of federal financial assistance with antidiscrimination public policy from both Title VI and Title IX. Moreover, the case law and facts establish that Defendant CPS cannot avail itself of the benefits of federal tax exemption but avoid the costs by not adhering to Title IX's mandates. Thus, this Court's Order must be upheld.

a.    **It is Well-Established Law that a Tax Exemption under § 501(c)(3) Constitutes Federal Financial Assistance under Title VI and Title IX**

1.    **Supreme Court and Federal Circuit Court Precedent on this Issue is Clear**

As this Court made clear in its Memorandum Order, and consistent with Supreme Court precedent on this issue, § 501(c)(3) tax exemption constitutes federal financial assistance for the purposes of Title IX. *See Cannon v. University of Chicago*, 441 U.S. 677, 717 (1979) (Schools with tax-exempt status should be held to the mandates of Title IX "to avoid the use of federal

resources to support discriminatory practices"); *Regan v. Taxation with Representation,* 461 U.S. 520, 550–51 (1983) ("A tax exemption has much the same effect as a cash grant to the organization"); *Grove City Coll. v. Bell,* 465 U.S. 555, 564(1984) ( "[t]here is no basis in the statute for the view that only institutions that themselves apply for federal aid or receive checks directly from the federal government are subject to regulation [under Title IX]"); *Nat'l Collegiate Athletic Ass'n v. Smith*, 525 U.S. 459, 461 (1999) ("[E]ntities that receive federal assistance, whether directly or through an intermediary, are recipients within the meaning of Title IX"). On this basis alone, the Court should deny Defendant CPS's Motion.

Other Circuit courts have reached this same conclusion, as illustrated in the Eleventh Circuit decision in *M.H.D. v. Westminster Schools*, 172 F.3d 797 (11th Cir.1999). In *Westminster,* the Georgia district court found that a private high school's tax-exempt status constituted federal financial assistance to render it subject to Title IX. *Id.* The facts presented by Defendant CPS are the same as those presented in *Westminster*: that this tax-exempt status was the sole form of federal financial assistance the defendant school received. *Id.* at 801. The *Westminster* court found that "exemption from federal taxes produces the same result as a direct federal grant— Westminster possesses funds that otherwise would belong to the Government." *Id.* at fn 12. Thus, the Court found in agreement with the plaintiff's argument that it logically follows that "a direct grant and a tax exemption should be treated the same; because a grant constitutes 'Federal financial assistance' under Title IX, tax-exempt status also should satisfy this element of the statute." *Id.*

Tellingly, Defendant CPS does not cite to a single Supreme Court or Circuit court case to support their argument that tax-exempt status does not constitute "federal financial assistance" under Title IX. Indeed, it is well-settled that § 501(c)(3) status confers upon the beneficiary of said status the mandates and requirements of Title IX and other spending clause statutes. This is of

course true in other contexts. *See, e.g., Cannon*, 441 U.S. at 704 (tax exemptions are a form of subsidy and the equivalent of a cash grant in Title VI context); *Regan,* 461 U.S. T 550-551 (1983) (Recognizing, in first amendment context, that § 501(c)(3) is a form of Congressional subsidy and the equivalent of a cash grant.). As such, this Court must deny Defendant CPS's Motion.

### 2. Defendant CPS's Argument that a § 501(c)(3) Tax-Exemption is Not the Type of "Government Assistance" or Economic Benefit Contemplated by Title IX Plainly Fails

Defendant CPS argues that a § 501(c)(3) tax exemption is not a government benefit authorized or extended under a law administered by the Department of Education, and that because it is authorized or extended under a law administered by the IRS, it is not "federal financial assistance" for purposes of Title IX. (Mot. at 7.) Defendant CPS's reliance on *Bob Jones University v. United States,* 461 U.S. 574 (1983) in support of this position is misguided.

The Court in *Bob Jones* held that racially discriminatory private schools could not qualify for recognition of tax-exempt status as organizations described in § 501(c)(3). *Id.* In so holding, the Court affirmed the interpretation of § 501(c)(3) announced in 1970 and again in 1971 in Rev. Rul. 71-447, 1971-2 CB 230. The Court held that such schools violate a fundamental public policy and cannot be viewed as conferring a public benefit within the meaning of common-law standards of charity and the Congressional intent underlying § 501(c)(3). *Bob Jones*, 461 U.S. at 595, 596.

Defendant CPS argues that because the *Bob Jones* court "never addressed the impact of the tax exemption under Title IX or other spending clause legislation", this Court's ruling "equating the analysis of that issue with whether sex discrimination is unlawful or against public policy was clear error by the Court." (Mot. at 16-17.) This argument misses the point of the *Bob Jones* decision and its relevance to the issues raised in Defendant CPS's Motions.

The Court in *Bob Jones* made clear that if a private school qualifies for tax-exempt status under § 501(c)(3), it has implicitly adopted a policy of nondiscrimination as to its students. *Id.* at 579. The Court reasoned that Congress could constitutionally force private schools like Bob Jones University to make the choice between receipt of tax benefits and following religious beliefs. *Id.* at 604. The Court did not require – or even consider – whether Bob Jones University received any other type of financial aid from the government, which Defendant CPS argues is necessary to trigger the mandates of anti-discrimination statutes, such as "a cash grant or loan, a grant of property, receipt of federal services, etc." (Mot. at 7). To wit, by holding the university to the express tenets of the antidiscrimination statutes *simply because the school availed itself of § 501(c)(3) tax-exempt status*, the *Bob Jones* court found that tax-exempt status granted by the IRS is a form of "federal financial assistance" sufficient for purposes of requiring compliance with nondiscrimination law. *Id.* at 574-575. The Court simply called out the hypocrisy of schools like Bob Jones University wanting to have it both ways.

Similarly, Defendant CPS's reliance on *Nat'l Collegiate Athletic Ass'n v. Smith*, 525 U.S. 459 (1999) in support of its argument that its tax-exempt status is solely economic in nature, and therefore insufficient federal assistance for purposes of Title IX liability, is misplaced. In *NCAA v. Smith,* the Supreme Court held that "dues payments from recipients of federal funds" do not "suffice to subject [an entity] to suit under Title IX." 525 U.S. at 470. In so holding, the Court reasoned that "[e]ntities that receive federal assistance, whether directly or through an intermediary, are recipients within the meaning of Title IX; entities that only benefit economically from federal assistance are not." *Id.* at 468. Defendant CPS argues that its tax-exemption is purely economic in nature and that it does not use its § 501(c)(3) status for any other purpose (Mot. at 9-10). Defendant CPS argues that this kind of economic benefit is substantially dissimilar from the

kind of financial assistance contemplated under Title IX, which consists of monies given to schools from the federal government for spending on educational practices and student scholarships, among other endeavors. (Mot. at 6, 9-11.) This application of *NCAA v. Smith* misses the mark.

Unlike in *NCAA v. Smith*, Defendant CPS uses its tax-exempt status as both a shield and a sword. Put more directly, it is simply untrue that Defendant CPS receives *only an economic break from the IRS* when it avails itself of tax-exempt status, and that Defendant CPS receives no other benefit ancillary to this status. (*See* Mot. at 9-10.) On the contrary, Defendant CPS actively uses its non-profit, tax-exempt status for benefits beyond economic breaks from the IRS, including to attract and solicit donations from private entities, such as alumni, for direct use for its educational programs and auxiliary services (such as classrooms, sports fields, and the like). An example: Defendant CPS's "Renew and Rejoice" institutional advancement campaign expressly calls for tax-deductible donations that would fund endeavors like renovated sports facilities and improved performing arts and classroom spaces. Defendant CPS's own development webpage makes clear this special benefit, as the first of its "Frequently Asked Questions"[1]:

> **Q: Is my gift tax deductible?**
> A: Yes
>
> **Q: Can I designate my gift?**
> A: Yes. You may designate your gift for the Capital Campaign or the Annual Fund. Our greatest need is for unrestricted gifts, but you may direct your gift to any area encompassed by the Capital Campaign or the Annual Fund.

In addition, Defendant CPS's "Planned Giving" site[2] extols the many ways in which donors can enjoy tax deductions in exchange for their gifts and donations to Concordia Preparatory

---

[1] Concordia Preparatory School: Ways to Give, (August 15, 2022), https://concordiaprepschool.org/development/ways-to-give/
[2] Concordia Preparatory School: Planned Giving, (August 15, 2022), https://concordiaprepschool.org/development/planned-giving/

School: the site explains how planned gifts such as bequests in wills, life income plans, charitable gift annuities, charitable remainder trusts, retained life estates, charitable lead trusts, and life insurance policies can confer upon the donor a "deductible for federal estate tax purposes". To wit, this webpage contains detailed tax deduction information for each and every category of planned giving listed. Clearly, Defendant CPS wants its potential donors to know that the school's tax-exempt status under § 501(c)(3) carries a benefit to their tax bill as well. This in turn also attracts talent to the school - people not only donate, but they volunteer their time, join boards, coach, and otherwise support the school and its mission all because it is a "nonprofit" organization, a § 501(c)(3) organization. Indeed, some individuals and groups will *only* work with nonprofit groups.

Other examples of this type of solicitation and the ways in which Defendant CPS uses and benefits from these tax-deductible donations include:

- In the November 2018 issue of "Crossroads"[3], a newsletter sent to alumni and friends of Concordia Preparatory School, CPS Headmaster Brent Johnson informs readers that "We began the day with our Fall Open House for Prospective families--attendance was outstanding. At noon, we welcomed many alumni to campus for a dedication ceremony for the renovated areas that are part of Phase One of the 'Renew and Rejoice' campaign." Johnson similarly encourages readers to attend and donate to an upcoming CPS theater production, noting that a portion of funds raised would go toward the "Renew and Rejoice" campaign and the renovation of the CPS Black Box Theatre. Again, CPS is going beyond the economic benefit conferred by the IRS.

- In the December 2018 issue of "Crossroads"[4], Johnson reminds readers to donate to the Annual Fund Campaign, stating that "Gifts to the Annual Fund provide immediate assistance to the school's operating budget and provides financial aid to our students." Again, in addition to the economic benefits beyond the IRS, CPS derives a substantial benefit – being able to attract students CPS and to build its image and prestige through its sports program and otherwise. CPS often touts its

---

[3] Concordia Preparatory School: Crossroads November 2018, (August 15, 2022), https://myemail.constantcontact.com/Concordia-Prep-Crossroads.html?soid=1128530034465&aid=jfRR_NtbOz8

[4] Concordia Preparatory School: Crossroads December 2018, (August 15, 2022), https://myemail.constantcontact.com/Concordia-Prep-Crossroads.html?soid=1128530034465&aid=NsrPadqd5lc

students' successes to attract teachers and students in its marketing materials like newsletters and its admissions websites.[5]

- In the March 2019 issue of "Crossroads"[6], Johnson again calls for donations to the "Renew and Rejoice" campaign, informing donors that "phase one is complete! Both the Upper School and Middle School bathrooms have been renovated. The Upper School chemistry lab and Middle School science room were both renovated and refurbished. The cafeteria renovations are almost complete. Please stop by to witness the transformations on our campus and learn more about what is to come. Phase Two of the campaign is in full swing. Next up is the renovations to the Black Box Theatre, parking lot, and turf field. These updates will take place this summer. We are still in need of funding for these projects. A video that outlines the Black Box Theatre campaign is included below. Please consider making a donation." Here again, CPS is using this benefit to grow and build its community, inviting people to the campus to connect.

- In the Summer 2019 issue of "Crossroads"[7], Johnson provides further update on the status of the "Renew and Rejoice" fundraising campaign, reminding potential donors: "If you have not had an opportunity to donate to the campaign or have donated but would like to support the final phase, please contact me or Director of Advancement, Mrs. Gloria Murphy. We need one last push to make it to the finish line." In that same mailer, Defendant CPS uses "non-profit US postage" designations directly above its promotion of fall Homecoming events. Again, CPS is building its community and supporting attendance at events, which enhances the school's reputation, the students' and faculty's experience, and which in turn it also used for retention and marketing purposes.

- In the September 2019 issue of "Crossroads"[8], Johnson lays out the third phase of the "Renew and Rejoice" campaign: "Over the summer months, we continued to improve the campus through the Renew and Rejoice campaign. The turf field was replaced and the entire Saints Athletic Field area received a makeover. The Press Box was renovated, a new sound system was installed, landscaping, fences, and

---

[5] Concordia Preparatory School: Concordia Prep Fast Facts, (August 15, 2022), https://concordiaprepschool.org/admissions/concordia-prep-fast-facts/; Concordia Preparatory School: Testimonials, (August 15, 2022), https://concordiaprepschool.org/admissions/testimonials/

[6] Concordia Preparatory School: Crossroads March 2019, (August 15, 2022), https://myemail.constantcontact.com/Concordia-Prep-Crossroads.html?soid=1128530034465&aid=r0RmqPOA-EI

[7] Concordia Preparatory School: Crossroads Summer 2019, (August 15, 2022), https://concordiaprepschool.org/wp-content/uploads/2019/08/CPS-Crossroads-Summer-2019.pdf

[8] Concordia Preparatory School: Crossroads September 2019, (August 15, 2022), https://myemail.constantcontact.com/Concordia-Prep-Crossroads.html?soid=1128530034465&aid=VSRsAt82BAc

walkways were all improved. We are in the process of finishing the renovations to the Giguere room—formerly the STAR suite with new furniture and a dedicated testing area. The Black Box Theater renovation is now scheduled to be completed in time for the fall Theatre Department production of Secondary Cause of Murder, November 1-3. The final phase of the Renew and Rejoice campaign is kicking off this fall with renovations to the LAC including new locker rooms, bathrooms, and sound system. We still need your support to finish this project. Please contact Director of Advancement, Mrs. Gloria Murphy or myself to learn how you get involved." Again, Johnson asks for donations after spelling out how the tax-deductible donations will be used. CPS is also benefiting from its enhanced offerings, attendee/participant experience, and reputation.

- In the March 2021 issue of "Crossroads"[9], Johnson invites alumni and friends of CPS to attend a "a Virtual Bid for Kids Gala. This is our biggest fundraiser of the year and we need your support. The special appeal this year will raise money to finish the Renew and Rejoice cafeteria project and enable CPS to begin a hot lunch program." Here we see more of the same – vast benefits that extend far beyond the mere acceptance of tax-exempt status and include non-economic benefits.

Additionally, Defendant CPS offers alumni and friends the chance to personally engrave a brick outside of the school in exchange for a tax-deductible donation through it's "Brick Engraving Program"[10].

Further, Defendant CPS enjoys a litany of benefits inherent to its status as a § 501(c)(3) tax-exempt entity that go far beyond a simple tax break. Like many § 501(c)(3) entities, Defendant CPS enjoys a number of benefits because of its tax-exempt status, including:

- Exemption from Federal income tax;

- Tax-deductible contributions;

- Possible exemption from state income, sales, and employment taxes;

- Reduced postal rates;

---

[9] Concordia Preparatory School: Crossroads March 2021, (August 15, 2022), https://myemail.constantcontact.com/Concordia-Prep-Crossroads.html?soid=1128530034465&aid=iJxwAoWHcuM

[10] Concordia Preparatory School: Brick Engraving Program Order Form, (August 15, 2022), https://concordiaprepschool.org/wp-content/uploads/2018/04/renewandrejoice-brickcampaign.pdf

- Exemption from Federal unemployment tax; and

- Tax-exempt financing[11].

Other benefits of § 501(c)(3) status include the credibility afforded non-profit organizations to the public and other entities; limited liability protection for directors and founders against personal liability for the activities of the nonprofit; the ability to offer donors tax deductions when they make charitable gifts to the organization; and eligibility for grants on federal, state, and local levels, as many funders require § 501(c)(3) status as a requirement to apply for a grant.[12] Additionally, CPS is able to attract students, faculty, and staff by virtue of having this status, and in this case, CPS did so as a matter of course. CPS is able to enhance its on-campus experience, bring in talented people to attend or work at the school, and to improve its reputation.

In sum, Defendant CPS is not merely the recipient of an economic benefit when it avails itself of § 501(c)(3) tax-exemption with the IRS; it uses this status as a means to attract and obtain donations and funding, to attract people to its community, and to enhance the experience of its community, which it uses for the express purpose of providing educational opportunities and improving the school's facilities. This is wholly inapposite to the economic situation laid out in *NCAA v. Smith.* To wit, Defendant CPS's argument that it is "illogical and unreasonable" to subject CPS to Title IX implications because it is a tax-exempt entity, one that does not receive "transfers of federal money, property or services from the federal government" is unavailing. (Mot. at 14.)

---

[11] *See* IRS Course: Tax Basics for Tax-Exempt Organizations, (August 15, 2022), www.501c3.org

[12] *See* IRS Charitable Organization Exemption Requirements, (August 15, 2022), https://www.irs.gov/charities-non-profits/charitable-organizations/exemption-requirements-501c3-organizations; Primary benefits of a 501c3 corporation, (August 15, 2022), https://www.nonprofitlegalcenter.com/non-profit-resources/primary-benefits-501c3-corporation/

Put simply, Defendant CPS receives a § 501(c)(3) tax-exemption, which the Supreme Court has held constitutes "federal financial assistance" for purposes of Title VI and Title IX mandates. It is simply untrue in fact and contrary to established precedent for Defendant CPS to argue that because it does not cash a check written by the federal government it is somehow not in receipt of federal financial assistance. This Court's prior Order on this issue is soundly decided.

### 3. Imposing the Mandates of Title IX on Tax-Exempt Schools is Consistent with the Objectives of Title IX and Other Anti-Discrimination Statutes

Indeed, imposing the requirements of Title IX in schools with § 501(c)(3) status is congruent with the principal objectives of Title IX: "to avoid the use of federal resources to support discriminatory practices" and "to provide individual citizens effective protection against those practices." *Cannon*, 441 U.S. at 704. This reasoning is consistent with a holding reached in the Central District of California on July 25, 2022, mere days after the Court entered its Memorandum Order. In *E.H. v. Valley Christian Academy*, 2022 WL 2953681 at *7 (C.D. Cal. July 25, 2022), the district court considered and rejected the defendant school's arguments that, under *Johnny's Icehouse* and similar arguments posited by Defendant CPS, it could not be deemed to have received federal financial assistance for purposes of Title IX simply because of its status as a tax-exempt entity. *Id.* The district court held that the school's tax-exempt status confers a federal financial benefit that obligates compliance with Title IX. *Id.* at *7.

Categorizing tax-exempt status as a form of "federal financial assistance" covered by Title IX is consistent with how tax-exemption is treated in other avenues, including other anti-discrimination statutory constructs such as Title VI of Civil Rights Act of 1964, 42 U.S.C. 2000d *et seq.* ("Title VI"), to which Title IX was closely modeled. *See Cannon*., 441 U.S. at 694-95 ("Title IX was patterned after Title VI... Except for the substitution of the word 'sex' in Title IX

to replace the words 'race, color, or national origin' in Title VI, the two statutes use identical language to describe the benefited class."); *McGlotten v. Connally*, 338 F. Supp. 448, 461 (D.D.C.1972) (holding that "assistance provided through the tax system is within the scope of Title VI"); *Fulani v. League of Women Voters Educ. Fund*, 684 F. Supp. 1185, 1192 (S.D.N.Y.1988) (noting that an entity was subject to Title VI and Title IX because it "receive[d] federal assistance indirectly through its tax exemption"); *Gebser v. Lago Vista Indep. Sch. Dist.*, 524 U.S. 274, 286 (1998) (Title IX and Title VI "operate in the same manner").

In *Joe Doe One, et al., v. CVS Pharmacy, Inc., et al.,* No. 18-cv-01031-EMC, 2022 WL 3139516 (N.D. Cal.) (Aug. 5, 2022), a district court decision reached just weeks after the entry of this Court's Memorandum Order, the Court discussed the mandates of Section 1557 (the nondiscrimination provision of the Affordable Care Act (ACA)), which states that "[a]n individual shall not, on the ground prohibited under Title VI of the Civil Rights Act of 1964 (42 U.S.C. 2000d et seq.), Title IX of the Education Amendments of 1972 ( 20 U.S.C. 1681 et seq.), the Age Discrimination Act of 1975 (42 U.S.C. 6101 et seq.), or section 794 of title 29, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under, any health program or activity, any part of which is receiving federal financial assistance." *Id.* at *1 (citing 42 U.S.C. § 18116(a)). In its discussion of whether the defendant pharmacy was in fact a recipient of federal financial assistance, the *Doe* court denied defendant's motion to dismiss, holding that an entity is deemed to have received federal funding where the entity receives "credits, subsidies, or contracts of insurance" from the federal government, consistent with "the federal funding cases under the Rehabilitation Act and Title IX". *Id.* at *12.  Surely, a tax break is a form of a "credit" from the federal government. And moreover, unlike other § 501(c)(3) tax-exempt entities, Defendant CPS goes beyond merely accepting a tax break and proactively uses its status as a tax-

exempt entity as a direct marketing and fundraising tool for its institutional advancement endeavors.

Here, consistent with the rulings in the analogous cases involving other spending clause statutes, this Court properly held that Defendant CPS's receipt of a § 501(c)(3) tax exemption is precisely the kind of credit or subsidy from the government sufficient to trigger Title IX implications. Accordingly, Defendant CPS's Motion for Reconsider on this issue must be denied.

### b. The Court Already Considered Defendant CPS's Argument – and the Case Law it Cites in Support - that its Tax-Exempt Status is Insufficient to Trigger Title IX's Mandates

In its Motion to Dismiss and supporting Memorandum of Law, Defendant CPS cites to *Johnny's Icehouse, Inc. v. Amateur Hockey Ass'n*, 134 F. Supp. 2d 965 (N.D. Ill. 2001) in support of the contention that because income tax exemptions are absent" from the "laundry list" of financial assistance that the district court held were sufficient to trigger Title IX liability. (Mot. At 11-12.) Defendant CPS raises the exact same arguments, with reliance on *Johnny's Icehouse,* in the instant motion; Defendant CPS offers no new fact or law in support of its position. (Mot. at 11, 25.) This is now the second time Defendant CPS has brought this case to the attention of the Court, only for the Court to reject it as controlling law.

This Court outright rejected Defendant CPS's argument and said that its reliance on the district court's opinion in *Johnny's Icehouse* in its Memorandum Order was unavailing, stating that "[i]n light of the Supreme Court's holdings in *Regan, Grove City College, Smith,* and *Cannon*, as discussed supra, this Court holds that § 501(c)(3) tax exemption constitutes federal financial assistance for the purposes of Title IX." (Mem. Order at 12.) Despite this, Defendant CPS reargues the very principles espoused in the *Johnny's Icehouse* decision, offering this argument for the second time as if it were freshly brought before this Court. (Mot. at 11, 25.) Defendant CPS offers

no District of Maryland or Fourth Circuit law, in its initial Motion to Dismiss or in the pending

Motion for Reconsideration, to support its position.

The instant Motion is therefore little more than an attempt for a third bite at the apple

despite this Court having ruled, multiple times now, against Defendant CPS's motions for

judgment on the pleadings and motions to dismiss Plaintiffs' Title IX claims.

**c.  Defendant CPS's Disagreement with this Court's Careful Consideration of Title IX Implications for a Tax-Exempt, Private School like CPS Does Not Warrant Reconsideration of a Court Order**

Defendant CPS asks the Court to reconsider its prior ruling concerning Plaintiffs' assertion

that Defendant CPS's tax-exempt status is federal financial aid under Title IX. (Mot. at 30.) But

Defendant CPS does not (and cannot) argue that the Court failed to consider controlling law, or

that in the weeks since the Order was entered, new law has come to light that would materially

alter the Court's reasoning in Defendant CPS's favor (and instead, tellingly, it is Plaintiffs who

have additional, persuasive authority from the period in between the entry of this Court's

Memorandum Order and the filing of Defendant CPS's Motion that further supports Plaintiffs'

positions). Rather, Defendant CPS simply disagrees with the outcome of the Court's application

the law to the facts. Once again, a disagreement with the Court's analysis does not trigger

reconsideration. *See Kelly v. Johns Hopkins Univ*., 2018 WL 4211296, at *2 (D. Md. Aug. 13,

2018) ("[A] factually supported and legally justified decision does not constitute clear error.")

(quoting *Lawley v. Northam*, 2013 WL 4524288, at *1 (D. Md. Aug. 23, 2013)). There is no error

afoot here, only Defendant CPS's dissatisfaction at having lost on this issue multiple times.

**d.  Defendant CPS's Receipt of Paycheck Protection Program (PPP) Loans Triggered Title IX Mandates During the Timeframe Relevant to H.C.'s Claims**

District courts have held that Paycheck Protection Program (PPP) loans administered by

the Small Business Association (SBA) of the federal government constitute federal financial

assistance under anti-discrimination statutes Title VI and Section 504 of the Rehabilitation Act as well as Title IX. *See* 42 U.S.C.A. § 1981 *et seq.*; 29 U.S.C.A. § 701 *et seq. See, e.g., Karanik, et al. v. Cape Fear Academy, et al.*, Case No. 7:21-cv-169-D (E.D.N.C. June 17, 2022), in which a district court in North Carolina held that "[a] PPP loan is 'federal financial assistance' subject to Title IX because it is '[a] grant or loan of Federal financial assistance.'" *Id.* (citing 34 C.F.R. § 106.2(g)(1); *E.H. v. Valley Christian Academy*, 2022 WL 2953681 at *7 (C.D. Cal. July 25, 2022)(holding that school's receipt of a PPP loan constituted receipt of federal financial assistance for purposes of Title IX implications).

This is consistent with holdings reached in other cases involving anti-discrimination statutes and the receipt of PPP loans. *See Awah v. Mansfield Kaseman Health Clinic,* 2021 WL 6197415 (D. Md. Dec. 30, 2021) (denying motion to dismiss Title VI claims against entity Defendant that received PPP loan); *Fernandez v. Bruno Northfleet, Inc.,* 2021 WL 4851378 (S.D. Fla. Oct 18, 2021) ("Any doubts as to whether the federal funding Defendant received qualifies as 'federal financial assistance' for purposes of Rehabilitation Act coverage are better addressed after discovery... At the Motion to Dismiss stage, however, Plaintiff has sufficiently alleged facts to support its Rehabilitation Act claim"); *Husbands v. Financial Management Solutions, LLC,* No. GJH-20-3618, 2021 WL 4339436, at *8 (D. Md. Sept. 23, 2021) (finding allegations that a defendant was the recipient of federal financial assistance sufficient to state a claim for relief under the Rehabilitation Act despite defendant's urging that it only received funds in the form of PPP loans disbursed under the CARES Act). It is similarly undisputed that the SBA itself has incorporated Title IX into its Regulations. *See* 13 C.F.R. § 113.100. Similarly, Defendant CPS is certainly an "Education institution" under those same SBA Regulations. 13 C.F.R. § 113.105 ("a

preschool, a private elementary or secondary school . . . .”). The SBA Regulations adopting Title IX made clear that any “loan of financial assistance” constitutes “Federal financial assistance.” *Id.*

In the context of its own receipt of a PPP loan, Defendant CPS argues that there is “strong evidence” that Federal agencies do not view § 501(c)(3) status as the equivalent of federal financial assistance. (Mot. at 13.) In support of this argument, Defendant CPS cites to “Frequently Asked Questions Regarding Participation of Faith-Based Organizations in The Paycheck Protection Program (PPP) and The Economic Injury Disaster Loan Program (EIDL),” which state in part that once a PPP loan is paid off or forgiven, the recipient’s nondiscrimination obligations cease. *Id.* This argument defies logic: the specific “Frequently Asked Questions” cited by Defendant CPS make absolutely no reference to tax-exempt status as being connected to the receipt of the loan, nor is a PPP loan in any way connected with § 501(c)(3) tax-exemption. To wit: an entity could have received a PPP loan without being a tax-exempt entity; one has nothing to do with the other.

Defendant CPS attempts to conflate the two issues – PPP loan forgiveness and § 501(c)(3) tax exemption – in an effort to convince the Court that its obligation to comply with nondiscrimination statutes, including Title IX, ceased at the time that its PPP loan was forgiven regardless of its status as a tax-exempt entity. (Mot. at 13-14.) (This does not comport with the factual record, as articulated in this Court’s Memorandum Order, which found that Plaintiff H.C., who was a student at CPS through at least Spring 2020, was enrolled during the timeframe in which CPS was the recipient of a PPP loan; Defendant CPS’s obligations to H.C. under Title IX are not impacted by the fact that Defendant CPS repaid its loan (Order at 12-13)). The express language of this “Frequently Asked Question” is overly broad and provides no mechanism or description delineating what precise obligations are extinguished and what remains enforceable. For example, as Defendant CPS readily admits, compliance with Federal nondiscrimination

28

statutes is clearly not excused just because a PPP loan has been forgiven. (Mot. at 13.) Despite Defendant CPS's contention that it would be "superfluous and irrelevant if…faith-based organizations were already required to comply with those nondiscrimination obligations due to their § 501(c)(3) tax status", Courts are not so quick to let borrowers off the proverbial hook merely because they repaid their debts to the federal government. *See, e.g., Springfield Hosp., Inc. v. Guzman* 28 F.4th 403, 409–10 (2d Cir. 2022)(holding that "the mere existence of a forgiveness option does not turn the PPP into a grant of free money").

Further, as the Court pointed out in its Memorandum Order, Defendant CPS's PPP loan was forgiven in November 2020, months after the sexual assault of H.C. took place. (Mem. Order at 12-13.) There are simply no facts in evidence to support Defendant CPS's contention that it did not receive federal financial assistance in the form of a PPP loan in the timeframe relevant to H.C.'s claims. *Id.* Defendant CPS's argument as to its PPP loan forgiveness is unavailing and should be disregarded.

### e. This Court Needn't Make a Sweeping Declaration with Respect to ALL § 501(c)(3) Tax-Exempt Entities

Defendant CPS makes much out of the idea that the Court's Memorandum Order has the potential to disrupt the status quo for all private K-12 institutions in the jurisdictional reach of this Court and this Circuit. (Mot. at 23-24.) There is no need for such an alarmist response. Even if this Court is disinclined to uphold a ruling that states that *all* entities enjoying the benefits of § 501(c)(3) tax-exemption are deemed to be in receipt of "federal financial assistance" for purposes of Title IX (or other spending clause statutes), it can easily distinguish between § 501(c)(3) entities that solely enjoy the tax break inherent to their non-profit status and entities like Defendant CPS, who use their tax-exempt status as a means to self-promote, advertise, and fundraise, as discussed earlier in this Memorandum.

Defendant CPS has clearly benefitted from its tax-exempt status and uses this status as a proactive means to solicit and obtain outside sources of funding. Where "the plain purpose" of Title IX "is clearly to eliminate discrimination in programs or activities benefitting from federal financial assistance", "[d]istinctions as to the method of distribution of federal funds" or their "equivalent seems beside the point". *McGlotten*, 338 F. Supp. at 461. Defendant CPS's words inside the courtroom – that its tax-exempt status is purely an economic benefit – do not match up with the facts as proven by their own website. (Mot. at 9.) Unlike other nonprofit, tax-exempt entities, Defendant CPS is unique in that it uses its tax-exemption as a tool for its own gain, far beyond the mere acceptance of a tax break. This distinction is an important one, and allows this Court to avoid a broad, sweeping ruling that applies to all tax-exempt entities.

II.    **This Court should Deny Defendant CPS's Motion for Interlocutory Appeal where CPS Failed to Meet the Applicable Standard because the Issue at Hand is Not a Controlling Question of Law to Which there is a Substantial Ground for Difference of Opinion, Nor would an Appeal Materially Advance the Termination of the Instant Litigation**

This Court should not certify its ruling for interlocutory appeal because Defendant CPS also fails to meet its burden to justify a departure from the longstanding rule against this extraordinary relief. "Section 1292(b) [which provides] a narrow exception to the longstanding rule against piecemeal appeals, is limited to exceptional cases." *Beck v. Commc'ns Workers of Am.*, 468 F. Supp. 93, 95- 96 (D. Md. 1979). Tellingly, interlocutory appeals are generally disfavored in the Fourth Circuit. *United States v. Under Seal*, 835 F.3d 706, 716 (4th Cir. 2017) (quoting *United States v. Lawrence*, 201 F.3d 536, 537 (4th Cir. 2000)).

The procedural requirements of § 1292(b) are to be strictly construed and applied. *Myles v. Laffitte*, 881 F.2d 125, 127 (4th Cir.1989). To determine whether an order should be certified for interlocutory appeal, courts apply the multi-part test established by the language of § 1292(b).

First, courts must determine whether there is a "controlling question of law as to which there is a substantial ground for difference of opinion." *North Carolina v. W.R. Peele, Sr. Trust,* 889 F.Supp. 849, 852 (E.D.N.C.1995) (holding that "the interlocutory appeal mechanism was not intended to be used in ordinary suits and was not designed "to provide early review of difficult rulings in hard cases"). Next, courts must inquire as to whether an interlocutory appeal would "materially advance the ultimate termination of the litigation." *Id*; *see also Johnson v. Cent. Collections*, No. ELH-19-2821, 2020 WL 2306452, at *5 (D. Md. May 8, 2020) (quoting *HeiTech Servs., Inc. v. Rowe,* GJH-17-1319, 2017 WL 4838750, at *2 (D. Md. Oct. 24, 2017)); *Keena v. Groupon, Inc*., 886 F.3d 360, 362-63 (4th Cir. 2018); *cf.* 28 U.S.C. § 1292(b) (same elements required for leave to file interlocutory appeal of district court order).

Each and every factor must be met before leave shall be granted. *Johnson*, 2020 WL 2306452, at *2 (citing *In re Air Cargo, Inc*., CCB-080587, 2008 WL 2415039, at *3 (D. Md. June 11, 2008)). While all three elements must be present for the district court to grant certification, *Butler v. DirectSAT USA, LLC*, 307 F.R.D. 445, 452 (D. Md. 2015), "'even when the elements of Section 1292(b) are satisfied, the district court retains "unfettered discretion" to deny certification,'" *Garber v. Office of the Comm'r of Baseball*, 120 F. Supp. 3d 334, 337 (S.D.N.Y. 2014) (citation omitted); accord *Hall v. Greystar Mgmt. Servs., L.P*., 193 F. Supp. 3d 522, 525 (D. Md. 2016). In essence, interlocutory review should be reserved for "a narrow question of pure law whose resolution will be completely dispositive of the litigation." *Fannin v. CSX Transp*., Inc., No. 88-8120, 1989 WL 42583, at *5 (4th Cir. Apr. 26, 1989) (unpublished opinion).

Indeed, section 1292(b) is not a fast-forward button for impatient parties, to be pressed when all else fails. Defendant CPS will have ample opportunity to appeal adverse rulings on the merits in due course, and as of right, at the end of the case. *See Mohawk Indus., Inc. v. Carpenter*,

31

JA326

130 S. Ct. 599, 605 (2009) (emphasizing the "general rule that a party is entitled to a single appeal, to be deferred until final judgment has been entered") (internal quotation marks omitted). For reasons stated below, the factors required for interlocutory appeal are not met here, and Defendant CPS's Motion should accordingly be denied.

### a. Defendant CPS's Disagreement with the Court's Ruling Provides No Basis for Certification of an Extraordinary Interlocutory Appeal

Defendant CPS's disagreement with this Court's ruling is inadequate to establish that the Court's order involves a "controlling question of law as to which there is a substantial ground for difference of opinion." *Id*. "The mere presence of a disputed issue that is a question of first impression, standing alone, is insufficient to demonstrate a substantial ground for difference of opinion." *Lynn,* 953 F. Supp. 2d at 624 (D. Md. 2013). For if mere disagreement were sufficient, "every contested decision would be appropriate for immediate interlocutory appeal," which would make this extraordinary relief the norm rather than the exception. *Id*. at 626. Instead, "[a]n issue presents a substantial ground for difference of opinion if courts, as opposed to parties, disagree on a controlling legal issue." *Id*. at 624 (quoting *Randolph v. ADT Sec. Servs., Inc*., 2012 WL 273722, at *6 (D. Md. Jan. 30, 2012)).

Here, Defendant CPS identifies no disagreement among Fourth Circuit or District of Maryland courts – let alone any *substantial* disagreement – warranting this unusual remedy. It is also noteworthy that in its Motion, Defendant CPS states multiple times that the Court got this issue flatly wrong (Mot. at 4, 6). Yet, the relief they seek – an interlocutory appeal – requires that the issue be one where "a substantial ground for difference of opinion exists". (See *Lynn*, supra). This begs the question to Defendant CPS: which one is it? It seems that Defendant CPS is unwilling to "pick a lane": either the issue is so straightforward that the Court's error is plainly obvious, or its one where differing opinions can and do exist such that appeal to the Fourth Circuit is

appropriate. Defendant CPS seems to try and argue both points, which is both illogical and insufficient to warrant the relief it seeks in this particular context.

### 1. The Court's Order Contains No Controlling Question of Law Regarding Whether Title IX Applies to § 501(c)(3) Entities

A "controlling question of law" is an issue that would, decided differently, terminate, or substantially alter the suit. *See, e.g., Kennedy v. St. Joseph's Ministries, Inc.*, 657 F.3d 189, 195 (4th Cir. 2011) (issue is a controlling question where the appellate court's "resolution of it terminates the case"); *Moffett v. Computer Sci. Corp.*, No. 05-1547, 2010 WL 348701, at *2 (D. Md. Jan. 22, 2010)("[C]ontrolling questions . . . determine whether there should be any future proceedings at all with respect to Plaintiffs' claims."). For purposes of the § 1292(b) analysis, a "controlling question of law" is a question directed to the "meaning of a statutory or constitutional provision, regulation, or common law doctrine," as opposed to a question heavily freighted with the need for factual assessment. *Id*. at 452 (quoting *Lynn v. Monarch Recovery Mgmt., Inc.*, 953 F.Supp.2d 612, 623 (D.Md.2013)); cf. *Fannin v. CSX Transp., Inc.*, 873 F.2d 1438, 1989 WL 42583, at *5 (4th Cir.1989) (unpublished table decision) ("Certainly the kind of question best adapted to discretionary interlocutory review is a narrow question of pure law whose resolution will be *completely dispositive of the litigation*, either as a legal or practical matter, whichever way it goes.")(emphasis added)).

The question of whether a § 501(c)(3) exempt entity has received federal financial assistance by virtue of its tax break for purposes of imputing Title IX requirements is not a "controlling question of law" within the meaning of section 1292(b). As this Court has explained, "the kind of question best adapted to discretionary interlocutory review is a narrow question of *pure law*". *Fannin*, 1989 WL 42583 at *5 (emphasis added); *see also Kennedy v. St. Joseph's Ministries, Inc*., 657 F.3d 189, 195 (4th Cir. 2011) (finding the "controlling question of law"

criterion met since the Court was "faced with a pure question of law"). Questions requiring this Court to apply case-specific facts do not qualify. *See Ahrenholz v. Bd. of Trs. of Univ. of Ill.*, 219 F.3d 674, 677 (7th Cir. 2000) ("The idea was that if a case turned on a pure question of law, something the court of appeals could decide quickly and cleanly without having to study the record, the court should be enabled to do so without having to wait till the end of the case.").

Here, the facts inextricably matter to the Court's ruling on whether tax-exempt status is sufficient to trigger the requirements of Title IX. In reaching its decision, the Court considered and weighed the facts and evidentiary record relating to Defendant CPS's financial standing. (Mem. Order at 12, citing RDB-21-0691, Financial Statements, ECF No. 39 *SEALED*). Where this Court necessarily had to make factual determinations in order to reach a decision on the legal question presented, the issue for appeal is not purely legal in nature; thus, [s]Such 'questions of law' have usually been thought not the kind of 'controlling' question proper for interlocutory review under § 1292(b) [,]" because they "inflict[ ] upon courts of appeals an unaccustomed and illsuited role as factfinders." *Lynn* at 623; see also *In re Text Messaging Antitrust Litig.*, 630 F.3d 622, 626 (7th Cir.2010) ("[A] pure question of law [is] something the court of appeals could decide quickly and cleanly without having to study the record[.]").

Similarly, "[t]he mere fact that its resolution at this time may save pre-trial and trial effort and expense is not determinative; that of course can be said of any interlocutory appeal." *Id*. (citing *Palandjian v. Pahlavi*, 782 F.2d 313, 314 (1st Cir. 1986)). Even a reversal by this Court could merely result in a remand of this case for further proceedings on the remainder of Plaintiffs' claims against Defendant CPS. Questions like this are not "controlling" because "litigation will 'necessarily continue regardless of how [these procedural] questions [are] decided.'" *Butler v. DirectSAT USA, LLC*, 307 F.R.D. at 453; citing *LaFleur v. Dollar Tree Stores, Inc*., No. 2:12–CI–

00363, 2014 WL 2121721, at *2 (E.D.Va. May 20, 2014) (quoting *North Carolina ex rel. Howes v. W.R. Peele, Sr. Trust*, 889 F.Supp. 849, 853 (E.D.N.C.1995)(Questions are not "controlling" because "litigation will 'necessarily continue regardless of how [these procedural] questions [are] decided.'"). This Court's ruling on Plaintiffs' Title IX claims thus does not contain a section 1292(b) "controlling question of law."

Defendant CPS further argues that "the question of law [as to whether tax-exemption constitutes federal financial assistance under Title IX] is controlling because its resolution on appeal will have a significant impact on implementation of processes and procedures in independent private schools across this jurisdiction." (Mot. at 23.) The facts underlying Defendant CPS's § 501(c)(3) status and its use of this tax-exemption as a proactive tool are unique to this particular school; it may not be the case that each and every independent, private school in the Fourth Circuit is impacted by this Court's decision; either way, Defendant CPS's argument that some schools may have to change their policies and procedures to align with Title IX is not sufficient to justify reconsideration or interlocutory appeal. Indeed, the Court's decision in its Memorandum Order – and the attendant wake-up call that it gave to Maryland and middle states private and independent schools that tax-exemption may constitute a form of federal financial assistance for purposes of Title IX – is not sufficient grounds to certify an appeal.

For the reasons stated herein, Defendant CPS has failed to satisfy even the first prong of the test for interlocutory appeal.

### b. There is Not a Sufficiently Substantial Ground for Difference of Opinion

Even if Defendant CPS's argument could be construed as a controlling legal question, there is no substantial ground for difference of opinion as to whether this statutory safe harbor applies here. That the question of whether tax-exempt status constitutes federal financial assistance for

purposes of Title IX has been decided by the Supreme Court, despite lower court rulings that parse out exceptions to the rule (See Mem. Order at 12-13). This falls short of the necessary section-1292(b) showing. *See, e.g.*, *Flor v. BOT Fin. Corp. (In re Flor),* 79 F.3d 281, 284 (2d Cir. 1996) (warning that "the mere presence of a disputed issue that is a question of first impression, standing alone, is insufficient to demonstrate a substantial ground for difference of opinion"); *White v. Nix,* 43 F.3d 374, 378 (8th Cir. 1994) (noting that a "dearth of cases" doesn't count).

A question is one "to which there is a substantial ground for a difference of opinion" when there is "'substantial doubt' that the district court's order was correct." *Goodman v. Archbishop Curley High Sch., Inc*., 195 F. Supp. 3d 767, 774 (D. Md. 2016) (quoting *Kennedy v. Villa St. Catherine, Inc.,* No. 09-3021, 2010 WL 9009364, at *2 (D. Md. June 16, 2010)). A litigant's own disappointment or disagreement with the outcome of an order does not rise to the level of substantial doubt. *See Lizarbe v. Rondon*, No. 07-1809, 2009 WL 2487083, at *3 (D. Md. Aug. 12, 2009). Rather, as a general matter, "'[a]n issue presents a substantial ground for difference of opinion if courts, as opposed to parties, disagree on a controlling legal issue.'" *Goodman*, 195 F. Supp. 3d at 774 (quoting *Randolph v. ADT Sec. Servs., Inc*., No. 09-1790, 2012 WL 273722, at *6 (D. Md. Jan. 30, 2012)); *see also In re Nichols,* No. 14-0625, 2014 WL 4094340, at *3 (D. Md. Aug. 15, 2014) ("In other words, for interlocutory appeals, it matters not whether the lower court simply got the law wrong, but whether courts themselves disagree as to what the law is." (citation omitted)).

Here, Defendant CPS cites only district court cases from other circuits in support of its arguments that to § 501(c)(3) status does not constitute receipt of federal financial assistance for purposes of imputing Title IX's requirements. Plaintiffs, in their Memorandum of Law in Support of their Opposition to Defendant CPS's Motion to Dismiss and/or Motion for Partial Summary

Judgment (Dkt. 109), along with this Court in its Memorandum Order, present Supreme Court and Eleventh Circuit precedent that deal squarely with this exact issue (Mem. Order at 12-13). Simply put, there is no substantial ground for difference of opinion at play here; the pertinent courts have reached consensus.

Similarly, that this issue is one of first impression within the Fourth Circuit is insufficient to meet the test for interlocutory appeal. It is true that "[c]ases of first impression do not necessarily create 'a substantial ground for difference of opinion.'" *Brooks v. Circuit City Stores,* No. DKC–95–3296, 1997 WL 679899, at *1 (D.Md. Sept.16, 1997) (citing *In re Flor*, 79 F.3d 281, 284 (2d Cir.1996)); *see also David v. Alphin*, No. 07–cv–11–RJC–DLH, 2009 WL 3633889, at *4 (W.D.N.C. Oct.30, 2009) (same); *State of N .C. ex rel. Howes v. W.R. Peele, Sr. Trust*, 889 F.Supp. 849, 852 (E.D.N.C.1995) ("District courts have not been bashful about refusing to find substantial reason to question a ruling of law, even in matters of first impression.'") (quoting 16 CHARLES A. WRIGHT, ET AL., FED. PRAC. & PROC. § 3930, at 157 (1977)); *Carbotrade v. Bureau Veritas,* 1993 WL 60567 (S.D.N.Y. March 2, 1993) at *1 (stating that the fact that the issue is one of first impression "does not, without more, suffice to present a 'substantial ground for difference of opinion'"; noting that "[t]he legislative history of 28 U.S.C. § 1292(b) indicates that the statutory prerequisite of "substantial ground for difference of opinion" is satisfied only when there is " 'substantial doubt" that the district court's order was correct'").

Of import, and as discussed throughout this Memorandum and in the Court's Memorandum Order, the Supreme Court and our sister circuits have ruled on this exact legal issue. (Mem. Order at 12-13.) The facts of this case, together with the precedent set by the Courts in *Regan, Grove City College, Smith,* and *Cannon,* as discussed supra, do not present the sort of unique situation where interlocutory appeal is warranted. Since Defendant CPS has presented no reason to find that

this Court's Order is a more novel or difficult question beyond the Court's purview, the Court should decline to find that it demands interlocutory appeal.

### c. Defendant CPS's Argument that an Interlocutory Appeal would Materially Advance this Litigation Fails

Nor does Defendant CPS credibly show that an interlocutory appeal would materially advance this litigation. *See* § 1292(b). As to this factor, Defendant CPS simply claims that an interlocutory appeal will allow this litigation to conclude more expeditiously.[13] (Mot. at 18.) To the contrary, an interlocutory appeal premised on bare disagreement with the Court's rulings, where there is no pressing, substantial disagreement of the courts, would only needlessly drag out the resolution of this litigation. In determining whether certification would materially advance the ultimate termination of the litigation, courts consider whether an immediate appeal would: "(1) eliminate the need for trial, (2) eliminate complex issues so as to simplify the trial, or (3) eliminate issues to make discovery easier and less costly." *Lynn*, 953 F. Supp. 2d at 626. None of these factors are implicated here. Courts have denied similar requests for interlocutory appeal. *See, e.g., id.* (movant's claim that an interlocutory appeal would simply "speed up the litigation" was insufficient to establish that an immediate appeal would materially advance the litigation). Indeed, the "potential for avoiding court costs in the event of later appellate reversal is true of nearly every district court order, and the 'mere fact' that an interlocutory appeal 'at this time may save pre-trial and trial effort and expense is not determinative; that of course can be said of any interlocutory appeal.'" *Fannin*, 873 F.2d at 1438.

It is simply not the case here that an appellate court's decision in favor of Defendant CPS's position will lead to an absolute terminus of the five consolidated cases currently pending against

---

Defendant CPS. (Mot. 25-26.) As Defendant CPS concedes, even if the Title IX count were dismissed, this Court could extend supplemental jurisdiction over the cases and allow the litigations to proceed in federal court. *Id*. To wit, H.C.'s Title IX claim survives even if the Court were to overturn its prior Order concerning tax-exemption. *Id.* The remaining counts of Plaintiffs' Amended Complaints remain viable against Defendant CPS and have survived multiple rounds of dispositive motions practice.

Typically, this test is only met when the moving party can show that *all counts, indeed the entire litigation*, would be disposed of by a contrary ruling on the contested legal issue. *See Fannin* at *5; *See also In re Swann Ltd. Partnership*, 128 B.R. 138, 140–41 (D.Md.1991) (Interlocutory appeal does not promote termination of litigation if decision on issue would result in case being transferred to a venue "where a judge unfamiliar with the litigation would have to start from scratch. Such delay is not in keeping with the requirement that an interlocutory appeal be accepted only if it will help terminate or shorten litigation and keep expenses down."); *N.J. Dep't of Treas. v. Fuld*, 2009 WL 2905432, at *2 (D.N.J. Sept.8, 2009) (Third element necessary for interlocutory appeal may be satisfied only when movant can show that summary judgment should have been granted on all counts, and litigation will end, without need for a trial and the associated costs and time commitments). Plaintiffs' claims against Defendant CPS do not rise and fall on the Title IX claim, and the litigation will continue even if the Title IX count were to be dismissed. Indeed, there would not be much of a cognizable difference between the case presented to the jury here with or without Title IX. As such, Defendant CPS has not met the requirements of the third element for interlocutory appeal.

**CONCLUSION**

Based on the foregoing, Defendant CPS's Motion for Reconsideration and/or Motion to Certify an Order for Interlocutory Appeal should be denied.


Dated: <u>August 22, 2022</u>                    Respectfully,


                                         */s/ Christina Graziano*
                                         Justin Browne (Bar No. 29164)
                                         Christina Graziano *(admitted pro hac vice)*
                                         Brian Ketterer (*admitted pro hac vice)*
                                         Ketterer, Browne & Associates, LLC
                                         336 S. Main Street
                                         Bel Air, Maryland 21014
                                         Phone: (855) 522-5297
                                         Facsimile: (855) 334-5626
                                         Christina@KBAattorneys.com
                                         Justin@KBAattorneys.com
                                         Brian@KBAattorneys.com

                                         *Attorneys for Plaintiffs*

### CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 22nd day of August, 2022, a copy of the foregoing

document was served via ECF on all counsel of record:

Gregg E. Viola, Esq.
Mark P. Johnson, Esq.
Eccleston and Wolf
7240 Parkway Drive, 4th Floor
Hanover, MD 21076
410-752-7474
viola@ewmd.com
johnson@ewmd.com
Counsel for Defendant Concordia Preparatory School

Brian S. Goodman, Esq.
Goodman & Donohue LLC
9199 Reisterstown Road
Suite 213 C
Owings Mills, MD 21117
443-824-0659
brian@goodmandonohue.com
Counsel for Defendant Lutheran Church Missouri Synod Southeast District


*/s/ Christina Graziano*
Christina Graziano, Esq.

**UNITED STATES DISTRICT COURT**
**DISTRICT OF MARYLAND**
Northern Division

| | | |
|---|---|---|
| **DONNA BUETTNER-HARTSOE,** *et al.* | * | |
| *Plaintiffs,* | * | |
| v. | * | **Case No.: 1:20-cv-03132-RDB** |
| **BALTIMORE LUTHERAN HIGH** | * | |
| **SCHOOL ASSOCIATION d/b/a** | | |
| **CONCORDIA PREPARATORY** | * | |
| **SCHOOL,** *et al.* | | |
| | * | |
| *Defendants.* | | |
| *     *     *     *     *     * | *     *     *     *     *     * | |
| **JENNIFER PULLEN** | * | |
| *Plaintiff,* | * | |
| v. | * | **Case No.: 1:20-cv-03214-RDB** |
| **BALTIMORE LUTHERAN HIGH** | * | |
| **SCHOOL ASSOCIATION d/b/a** | | |
| **CONCORDIA PREPARATORY** | * | |
| **SCHOOL,** *et al.* | | |
| | * | |
| *Defendants.* | | |
| *     *     *     *     *     * | *     *     *     *     *     * | |
| **ANDREA CONRAD,** *et al.* | * | |
| *Plaintiffs,* | * | |
| v. | * | **Case No.: 1:20-cv-03229-RDB** |
| **BALTIMORE LUTHERAN HIGH** | * | |
| **SCHOOL ASSOCIATION d/b/a** | | |
| **CONCORDIA PREPARATORY** | * | |
| **SCHOOL,** *et al.* | | |
| | * | |
| *Defendants.* | | |
| *     *     *     *     *     * | *     *     *     *     *     * | |

ARIANNA GOMEZ                          *

     *Plaintiff,*               *

     **v.**                     *          **Case No.: 1:20-cv-03267-RDB**

**BALTIMORE LUTHERAN HIGH**            *
**SCHOOL ASSOCIATION d/b/a**
**CONCORDIA PREPARATORY**              *
**SCHOOL,** *et al.*
                           *

     *Defendants.*

\*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*

**SELENA BARBER,** *et al.*              *

     *Plaintiffs,*              *

     **v.**                     *          **Case No.: 1:21-cv-00691-RDB**

**BALTIMORE LUTHERAN HIGH**            *
**SCHOOL ASSOCIATION d/b/a**
**CONCORDIA PREPARATORY**              *
**SCHOOL,** *et al.*
                           *

     *Defendants.*

\*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*

## REPLY TO PLAINTIFFS' OPPOSITION TO MOTION FOR RECONSIDERATION, OR IN THE ALTERNATIVE, MOTION TO CERTIFY ORDER FOR INTERLOCUTORY APPEAL

       Defendant Baltimore Lutheran High School Association d/b/a Concordia Preparatory

School ("CPS"), by and through undersigned counsel, hereby submits this Reply to Plaintiffs'

Opposition to CPS' Motion seeking this Honorable Court to reconsider the Court's Order of July

21, 2022  and the accompanying Memorandum Opinion,[1] or in the alternative, to amend the Order

---

[1] *See* ECF 57-58 in Case No.: 1:21-cv-00691-RDB; ECF 132-133 in Case No.: 1:20-cv-03267-RDB; ECF 96-97 in Case No.: 1:20-cv-03229-RDB; ECF 80-81 in Case No.: 1:20-cv-03214-RDB; ECF 130-131 in Case No.: 1:20-cv-03132-RDB.

to certify for interlocutory appeal the question of law whether tax exemption under § 501(c)(3) constitutes receipt of federal financial assistance for purposes of Title IX.

## SUMMARY OF REPLY

Just like many of the allegations in the Complaint that have not been borne out in discovery, Plaintiffs' Opposition to CPS' Motion contains material overstatements and inapplicable broad generalizations, and the strength of Plaintiffs' position, or lack thereof, is demonstrated by these efforts to repeat blatantly false, and irrelevant, arguments.

First, on at least seven occasions in their Opposition Plaintiffs argue that "the Supreme Court and our sister circuits have ruled on this exact legal issue" such that it is "well settled" that entities that are tax-exempt under 26 U.S.C. § 501(c)(3) are required to comply with Title IX because tax-exempt status constitutes receipt of federal financial assistance. *See, e.g.,* Pls. Opp. at 14, 15, 23, 36, 37. This is simply false, as the Supreme Court has never reached that conclusion or addressed this issue in any case, let alone the six Supreme Court cases cited by Plaintiffs.

Second, Plaintiffs devote more than five pages of their Opposition, and makes repeated arguments in several sections, that tax-exempt status under § 501(c)(3) is receipt of federal financial assistance for CPS because the school "uses this status as a means to attract and obtain donations and funding, to attach people to its community, and to enhance the experience of its community." *See* Pls. Opp. at 18-23. Plaintiffs, however, cite to no case law from any court trial or appellate level supporting this distinction. Plaintiffs' argument is wholly illogical and irrational given the IRS publication of guidance (which is cited by Plaintiffs) that entities with tax-exempt status under § 501(c)(3) enjoy benefits including tax-deductible contributions. Under Plaintiffs' theory, if a tax-exempt entity wishes to not receive federal financial assistance for purposes of Title IX, the entity must refuse to tell potential donors that contributions are tax-deductible,

although the same guidance is available and published by an agency of the Federal government. This is nonsensical and not supported by any case law or regulatory guidance.

As explained in CPS' Motion, and not addressed in Plaintiffs' Opposition, the critical error in the Court's Order and Memorandum Opinion is that the decision is inconsistent with the whole notion that the scope of Title IX is contractual in nature as reflected in the repeated and recent Supreme Court precedent. In other words, because responsibility for Title IX is couched as a contractual obligation after receipt of federal financial assistance, it must be clear and unambiguous that an entity has made a voluntary and conscious decision to accept federal financial assistance in exchange for agreeing to comply with anti-discrimination requirements in Title IX. Without that, Title IX cannot apply to CPS.

Moreover, Plaintiffs talk out of both sides of their mouths by arguing that an interlocutory appeal is not warranted because the legal issue is not controlling and there is not substantial grounds for difference of opinion on the legal issue presented (because of the non-existent Supreme Court precedent noted above), while admitting that the Court's decision in these five cases was an "attendant wake-up call . . . to Maryland and middle states private and independent schools." Plaintiffs cannot have it both ways. If the Court's decision was a "wake-up call," similar to what Plaintiffs' own expert has stated ("Judge Bennett's ruling on partial summary judgment against CPS will likely soon be sending shockwaves through private K-12 education, and religiously affiliated schools."),[2] it necessarily could not be clear and unambiguous that an entity has made a voluntary and conscious decision to accept federal financial assistance and agree to comply with Title IX by accepting tax exempt status. This also proves that the legal issue is

---

[2] *See* ECF 59-3 in Case No.: 1:21-cv-00691-RDB; ECF 134-3 in Case No.: 1:20-cv-03267-RDB; ECF 98-3 in Case No.: 1:20-cv-03229-RDB; ECF 82-3 in Case No.: 1:20-cv-03214-RDB; ECF 132-3 in Case No.: 1:20-cv-03132-RDB.

controlling and there is substantial grounds for a difference of opinion warranting this issue to be

decided by the Fourth Circuit on an immediate interlocutory basis.

## ARGUMENT

**1. Defendant Is Not Subject To Title IX Because Congress Did Not "Unambiguously" Condition That Defendant's Federal Tax Exemption Constituted The Receipt Of Federal Financial Assistance, Such That Defendant Would "Clearly Understand" And Be "On Notice" That Acceptance Of The Exemption Carried With It An Obligation To Adhere To Title IX.**

Plaintiffs' Opposition fails to address the critical argument in CPS' Motion – the Court's

Order and Memorandum Opinion are inconsistent with the whole notion that the scope of Title IX

is contractual in nature as reflected in the most recent Supreme Court precedent.

In *Cummings v. Premier Rehab Keller, P.L.L.C.*, 142 S. Ct. 1562, *reh'g denied*, 142 S. Ct.

2853 (2022), the United States Supreme Court addressed whether emotional distress damages were

available in a disability discrimination case brought under Spending Clause statutes the

Rehabilitation Act of 1973 and the Patient Protection and Affordable Care Act. The Supreme

Court's decision and more importantly its rationale implicated all four statutes, including Title IX,

that prohibit recipients of federal financial assistance from discriminating based upon certain

protecting grounds because "the Rehabilitation Act and the Affordable Care Act . . . each expressly

incorporates the rights and remedies provided under Title VI." *Id.* at 1568-69.

The Supreme Court began its analysis by observing that Spending Clause legislation like

Title IX operates, "in what amounts essentially to a contract between the Government and the

recipient of the funds." The Supreme Court explained that, "Unlike ordinary legislation, which

'imposes congressional policy' on regulated parties 'involuntarily,' Spending Clause legislation

operates based on consent: 'in return for federal funds, the [recipients] agree to comply with

federally imposed conditions." *Id.* at 1570 (quoting *Pennhurst State School and Hospital v.*

*Halderman*, 451 U.S. 1, 16 (1981)).  The Supreme Court further explained that, "For that reason, the 'legitimacy of Congress' power' to enact Spending Clause legislation rests not on its sovereign authority to enact binding laws, but on 'whether the [recipient] voluntarily and knowingly accepts the terms of th[at] contract.'" *Cummings*, 142 S. Ct. at 1570 (quoting *Barnes v. Gorman*, 536 U.S. 181, 186 (2002) (quoting in turn *Pennhurst State School and Hospital v. Halderman*, 451 U.S. 1, 17 (1981)).

The Court recognized the obvious proposition that, "Recipients cannot 'knowingly accept' the deal with the Federal Government unless they 'would clearly understand . . . the obligations' that would come along with doing so."  *Cummings*, 142 S. Ct. at 1570 (quoting *Arlington Central Sch. Dist. Bd. of Ed. v. Murphy*, 548 U.S. 291, 296 (2006)).  The Supreme Court noted that it therefore construes "the reach of Spending Clause conditions with an eye toward 'ensuring that the receiving entity of federal funds [had] notice that it will be liable.'" *Cummings*, 142 S. Ct. at 1570 (quoting *Gebser v. Lago Vista Independent School Dist.*, 524 U.S. 274, 287 (1998)).

The Court continued by noting that, "when considering whether to accept federal funds, a prospective recipient would surely wonder not only what rules it must follow. . . ." *Cummings*, 142 S. Ct. at 1570.  The Supreme Court expounded that a recipient of federal funding must be "*on notice* that, by accepting federal funding, it exposes itself to liability of that nature." *Id.* (quoting *Barnes*, 536 U.S. at 188 (emphasis in original)). The Court concluded, "Accordingly, if Congress intends to impose a condition on the grant of federal moneys, ***it must do so unambiguously***,'" and only if it had been done unambiguously such that, "we be confident that the recipient 'exercise[d its] choice knowingly, cognizant of the consequences of [its] participation" in the federal program." *Cummings*, 142 S. Ct. at 1570 (quoting *Pennhurst*, 451 U.S. at 17)) (emphasis added).

In *Cummings*, it was undisputed that the defendant received federal financial assistance because it was a rehabilitation center that accepted Medicare. The Court held that emotional distress damages are not recoverable under Spending Clause statutes because recipients of federal funding would not be on notice of the recoverability of such damages given those damages are not specified in the statute or generally recoverable under contract law. *Cummings*, 142 S. Ct. at 1570-1576. Thus, the recovery of emotional distress damages in the Spending Clause statutes was not unambiguously set forth in the law that the defendant knowingly accepted, and it could not be said that the defendant clearly understood that such damages were recoverable. *Id.* Of note, when the Supreme Court examined what constituted being unambiguously set forth in the law, it recognized that, "No dive through the treatises, 50-state survey, or speculative drawing of analogies is required." *Id.* at 1573.

However, the clear application of *Cummings* to the instant case is that the current Supreme Court, except for a single Justice, held that for Spending Clause legislation like Title IX to be applicable to any given defendant, its application must be unambiguous under the law, such that the defendant would clearly understand, and knowingly accept, its obligations. It would be absurd to suggest that a recipient of federal funds did not have notice of available damages, but that the same analysis did not apply to whether an entity was subject to the statute at all. In other words, the *Cummings* opinion makes clear that for a § 501(c)(3) tax exemption to constitute federal financial assistance for statutes such as Title IX to apply, Congress must have unambiguously conditioned the extension of that tax exemption on the application of Title IX, such that an entity such as CPS in the instant case would "clearly understand" and been "on notice" that its tax exemption was conditioned upon its adherence to Title IX.

In that regard, the *Cummings* opinion make clear that this Court's earlier ruling was dead wrong. It cannot be credibly argued that it is clear and unambiguous that a § 501(c)(3) entity's tax-exempt status constitutes federal financial assistance to put those entities on notice that they clearly understood and were knowingly accepting the consequences of that status. The statute itself does not define or explain what constitutes federal financial assistance, and the applicable regulations that interpret the statute do not include tax exempt status within the definition of federal financial assistance.[3] Thus, far from making it unambiguous that tax-exempt status constitutes receipt of federal financial assistance to put a recipient on notice that it is subject to Title IX, the failure to include tax-exempt status in the regulations plainly indicates that tax exemptions do not constitute federal financial assistance.

The United States District Court for the Northern District of Illinois's ruling in *Johnny's Icehouse, Inc. v. Amateur Hockey Ass'n*, 134 F. Supp.2d 965, 971-72 (2001), is entirely consistent with the Supreme Court's ruling and contractual analogy in *Cummings*, in that the *Johnny's*

---

[3] The Department of Education's regulations implementing Title IX defining "Federal financial assistance":

   (b) Department means the Department of Education.

<div align="center">* * *</div>

   (g) Federal financial assistance means any of the following, when authorized or extended under a law administered by the Department:
      (1) A grant or loan of Federal financial assistance, including funds made available for:
         (i) The acquisition, construction, renovation, restoration, or repair of a building or facility or any portion thereof; and
         (ii) Scholarships, loans, grants, wages or other funds extended to any entity for payment to or on behalf of students admitted to that entity, or extended directly to such students for payment to that entity.
      (2) A grant of Federal real or personal property or any interest therein, including surplus property, and the proceeds of the sale or transfer of such property, if the Federal share of the fair market value of the property is not, upon such sale or transfer, properly accounted for to the Federal Government.
      (3) Provision of the services of Federal personnel.
      (4) Sale or lease of Federal property or any interest therein at nominal consideration, or at consideration reduced for the purpose of assisting the recipient or in recognition of public interest to be served thereby, or permission to use Federal property or any interest therein without consideration.
      (5) Any other contract, agreement, or arrangement which has as one of its purposes the provision of assistance to any education program or activity, except a contract of insurance or guaranty.

34 C.F.R. § 106.2(g). The Department of Treasury's Title IX regulations are identical. *See* 31 C.F.R. § 28.105.

*Icehouse* court found that only affirmative transfers of money, property, or services constituted federal financial assistance, whereas tax exemptions did not, in part because with Spending Clause legislation the intended recipient knows that it is accepting the affirmative benefit of money, property, or services in exchange for an obligation to adhere to legislation such as Title IX.

Conversely, the contractual analogy set forth in *Cummings* is absent from the handful of cases that represent the minority view that tax-exempt status constitutes federal financial assistance. The analysis, in dicta, of the issue in *McGlotten v. Connally*, 338 F. Supp. 448 (D.D.C. 1972), which predated *Cummings* by over 50 years, is entirely inconsistent with *Cummings*, and reveals the unreliability of that decision. Specifically, the *McGlotten* court recognized that the applicable regulations of Title VI did not include tax exemptions in the definition of federal financial assistance. *Id.* at 461. The Court also recognized that there was no discussion in the "massive legislative history" of the 1964 Civil Rights Act to suggest that tax exemptions constituted federal financial assistance. *Id.* Nevertheless, the Court said that, "[d]istinctions as to the method of distribution of federal funds or their equivalent seem beside the point," and relied on the "plain purpose" of the statute to eliminate discrimination to suggest that tax exemptions constituted federal financial assistance. *Id.* There is no discussion of the contractual analogy and it would be hard to suggest that it was unambiguous that tax exemptions constituted federal financial assistance to put the defendant in that case on notice. Given the *Cummings* decision, and the lack of analysis in *McGlotten*, that case has little or no precedential value.

Similarly, in *E.H. v. Valley Christian Academy*, 2022 U.S. Dist. LEXIS 132893 (C.D. Cal. July 25, 2022), the court, without even acknowledging the regulations, said that there was no controlling precedent and there was no "strong legislative history" that tax-exempt status was not federal financial assistance, and found that "tax-exempt status confers a federal financial benefit

that obligates compliance with Title IX." This holding is entirely inconsistent with *Cummings*, which required unambiguous authority such that the recipient knowingly and voluntarily accepts the obligations of Title IX.

In *Fulani v. League of Women Voters Educ. Fund*, 684 F. Supp. 1185, 1192 (S.D.N.Y. 1988), there is no discussion whatsoever of why a tax exemption met the definition of federal financial assistance, and the determination was wholly immaterial and irrelevant given that the defendant in that case received federal grants from the Department of Energy and the Environmental Protection Agency.

In *M.H.D. v. Westminster Schools*, 172 F.3d 797 (11th Cir. 1999), the court did not hold that tax-exempt status constituted federal financial assistance; in dicta, in a footnote, it indicated that the argument "was neither immaterial nor wholly frivolous" such that the Court had subject matter jurisdiction. 172 F.3d at 802, n. 12. To the extent that the *M.H.D.* court recognized that it was not bad faith to argue that tax-exempt status constituted federal financial assistance, there was no discussion or recognition of the contractual analogy in *Cummings*, and the court was only addressing a jurisdictional issue in a preliminary motion unlike the procedural posture here.

Based upon the current Supreme Court analysis in *Cummings*, how could a school like CPS have knowingly and voluntarily agreed to be subject to Title IX by the mere fact of its non-profit status? It could not, and it has had zero notice that it would be liable for the consequences. Non-profit charitable entities predate the modern tax code, which the Supreme Court acknowledged in *Bob Jones University v. United States*, 461 U.S. 574, 588 (1983), when it stated that "Tax exemptions for certain institutions thought beneficial to the social order of the country as a whole, or to a particular community, are deeply rooted in our history, as in that of England" and noted that "special privileges . . . have long been extended to charitable trusts." That, however, does

not mean that an entity that is charitable and promotes the public good, such that it qualifies for § 501(c)(3) tax exemption, has received federal financial assistance.  In *Stewart v. N.Y. Univ.*, 430 F. Supp. 1305, 1314 (S.D.N.Y. 1976), the District Court noted that tax exemption "'creates only a minimal and remote involvement' by the government in the activities of the recipient," and thus is not sufficient to support a claim under Title IX.  Unlike an affirmative transfer of money, property or services, where the recipient can make the decision whether to accept federal funds or services and the accompanying "strings attached," tax exemption reflects minimal and remote government involvement such that it cannot reasonably be said that accepting tax exemption amounts to contractual acceptance of anti-discrimination requirements under statutes such as Title IX.

To that end, the *amici curiae* briefs submitted to the Court are instructive in that they relate that the Court's Memorandum Opinion and Order "creates grave uncertainty and anxiety for [The Association of Independent Maryland Schools, Inc.] member schools – 100 of which are in this state – about their legal obligations" because "Under the Court's decision, schools would abruptly find themselves subject to the burdens but not the benefits of federal funding."  *See* ECF 134-1 in Case No. 1:20-cv-03132-RBD at 10.  Additionally, the National Association of Independent Schools, the National Business Officers Association, the Association of Independent Schools of Greater Washington, the Southern Association of Independent Schools, the Virginia Association of Independent Schools, the North Carolina Association of Independent Schools, and the Palmetto Association of Independent Schools *amici curiae* brief, which was also supported by fifty-four (54) other nonprofit organizations and represented the vast majority of the private school community including approximately 30,500 private schools, expressly stated that "[t]he independent school community has relied on the regulations and precedent cited above and has not instituted the substantial, prescriptive measures required to comply with Title IX": "For many

years, independent schools throughout the country have relied on federal regulations and a consensus among education lawyers and other professionals that, by foregoing federal funds, they would not be burdened with the requirements of Title IX and a host of other federal statutes that mandate strict and cumbersome regulatory infrastructures." *See* ECF 136-1 in Case No. 1:20-cv-03132-RBD at 2, 4, 13-14. Plaintiffs even acknowledge this when they argue that the Court's Order and Memorandum Opinion were an "attendant wake-up call . . . to Maryland and middle states private and independent schools that tax-exemption may constitute a form of federal financial assistance for purposes of Title IX." *See* Pls. Opp. at 35.

The record is wholly devoid of evidence that it is clear and unambiguous that a § 501(c)(3) entity's tax-exempt status constitutes federal financial assistance to put those entities on notice that they clearly understood and were knowingly accepting the anti-discrimination requirements of Title IX. The Court's conclusion that CPS knowingly and voluntarily agreed to abide by Title IX via its § 501(c)(3) tax-exempt status was patently incorrect and should be reconsidered.

## 2. Plaintiffs' Argument That CPS Has Used Its Tax-Exempt Status As A Tool For Its Own Gain Is Irrelevant.

Plaintiffs also devote numerous pages to refer to CPS newsletters to student families and alumni while arguing that CPS' tax-exempt status under § 501(c)(3) is receipt of federal financial assistance because the school "uses this status as a means to attract and obtain donations and funding, to attract people to its community, and to enhance the experience of its community." *See* Pls. Opp. at 18-23. Plaintiffs, however, cite to no case law from any court, trial or appellate level, supporting this distinction. As discussed above, the question is not how CPS, or any other non-profit charitable entity, uses its § 501(c)(3) tax-exempt status, but whether CPS accepted § 501(c)(3) tax-exempt status knowingly and voluntarily in exchange for compliance with Title IX.

Plaintiffs' argument is also wholly illogical and irrational given the IRS publication of guidance (which is cited by Plaintiffs) that entities with tax-exempt status under § 501(c)(3) enjoy benefits including tax-deductible contributions and reduced postal rates. Under Plaintiffs' theory, if a tax-exempt entity wishes to not receive federal financial assistance for purposes of Title IX, the entity must refuse to tell potential donors that contributions are tax-deductible although the same guidance is available and published by an agency of the Federal government. Moreover, under Plaintiffs' theory, a tax-exempt entity must divert funds away from furthering the goals and initiatives of the entity's charitable endeavors and pay full postal rates for mailings through the United States Postal Service. This is nonsensical and not supported by any case law or regulation.

3. **If Reconsideration Is Not Granted, An Immediate Interlocutory Appeal Is Warranted In Light Of The Impact Of The Court's Decision, As Well As Other Decisions On The Title IX Issue.**

If reconsideration is not granted, an immediate interlocutory appeal is warranted. On this issue, there is no dispute as to the applicable standard. "A district court's order denying a motion for summary judgment or denying a motion to dismiss is interlocutory and may be appealed only . . . if the district court certifies under 28 U.S.C. § 1292(b) that the order involves a controlling question of law as to which there is substantial ground for difference of opinion and that an immediate appeal from the order may materially advance the ultimate termination of the litigation." *Georgetown Coll. v. Madden*, 660 F.2d 91, 96-97 (4th Cir. 1981). Plaintiffs argue in their Opposition that none of those elements exist.

First, Plaintiffs argue that whether Title IX applies to CPS is not a controlling question of law because it is not a question of pure law because the Court's Memorandum Opinion cited evidence relating to CPS' financial standing. What Plaintiffs omit, however, is that the evidence was only relevant to establish that CPS is a § 501(c)(3) tax-exempt entity, a factual issue that is

not disputed. Therefore, the question for immediate interlocutory appeal is "an abstract legal issue that the court of appeals can decide quickly and cleanly." *Int'l Refugee Assistance Project v. Trump*, 404 F. Supp. 3d 946, 950 (D. Md. 2019) (quoting *United States ex rel. Michaels v. Agape Senior Cmty., Inc.*, 848 F.3d 330, 340 (4th Cir. 2017) (quoting in turn *Mamani v. Berzain*, 825 F.3d 1304, 1312 (11th Cir. 2016)).

Plaintiffs also argue that whether Title IX applies to CPS based upon its tax-exempt status is not a controlling question of law because it would not impact the proceedings on Plaintiffs' other state-law negligence claims against CPS. While that is true, Plaintiffs gloss over the accepted principle that a controlling question of law exists when it would, if decided differently, substantially alert the lawsuit. In other words, to be controlling the question of law does not have to resolve the suit entirely, but includes questions that are dispositive in other respects such as whether a particular claim exists, whether a particular defense is available to defeat a claim, and questions relating to subject matter jurisdiction. *See* 3 Moore's Manual – Federal Practice and Procedure § 27.04 (2022). As the Court has held previously, a controlling question of law includes a question "'if interlocutory reversal might save time for the district court, and time and expense for the litigants.'" *Coal. For Equity & Excellence in Md. Higher Educ. v. Md. Higher Educ. Comm'n*, No. CCB-06-2773, 2015 U.S. Dist. LEXIS 83741, at *13 (D. Md. June 29, 2015) (quoting 16 Wright et al., Federal Practice & Procedure § 3930).

It cannot be disputed that whether Title IX applies to CPS in these five cases based upon its tax-exempt status (or that the statute only applies to CPS between April 8, 2020 when CPS applied for a PPP loan from the Federal government and received the loan, and November 10, 2020 when the loan was forgiven) is a critical and decisive issue for liability. The question of whether CPS was required to abide by Title IX during all of Plaintiffs' years at the school is of

critical importance to what liability and damages evidence can be presented at trial.  It is also of

critical importance to private independent schools across the county as demonstrated by the *amici*

*curiae* briefs submitted to the Court.

  Second, Plaintiffs argue that there is not a substantial ground for difference of opinion

because the issue has been decided by the Supreme Court.  This is simply false, as the Supreme

Court has never reached that conclusion or addressed this issue in any case, let alone the six

Supreme Court cases cited by Plaintiffs. *See Cannon v. University of Chicago*, 441 U.S. 677 (1979)

(issue was whether Title IX authorized a private cause of action); *Regan v. Taxation with

Representation*, 461 U.S. 520 (1983) (as discussed at length in CPS' Motion, issue was the

constitutionality of a provision in § 501(c)(3) pertaining to lobbying organizations); *Grove City

Coll. v. Bell*, 465 U.S. 555 (1984) (issue was whether institution was a "recipient" of federal

financial assistance as a result of student tuition payments); *Gebser*, 524 U.S. at 274 (issue was

standard of actual notice and deliberate indifference under Title IX); *Nat'l Collegiate Athletic

Ass'n v. Smith*, 525 U.S. 459 (1999) (issue was whether institution was a "recipient" of federal

financial assistance by receiving dues payments from member schools).

  None of those cases addressed or considered the issue presented here regarding whether §

501(c)(3) tax exempt status constitutes federal financial assistance, a conclusion that is supported

by the fact that the Court's Memorandum Opinion stated on pages 8-9 that "Neither the Supreme

Court nor the United States Court of Appeals for the Fourth Circuit have directly addressed

whether tax-exempt status under § 501(c)(3) constitutes federal financial assistance for purposes

of Title IX."  Plaintiffs' repeated argument that the issue presented has been decided by the

Supreme Court is blatantly incorrect.

Instead, "[a]n issue presents a substantial ground for difference of opinion if courts, as opposed to parties, disagree on a controlling legal issue." *Lynn v. Monarch Recovery Mgmt.*, 953 F. Supp. 2d 612, 620 (D. Md. 2013) (quoting *Randolph v. ADT Sec. Servs. Inc.*, 2012 U.S. Dist. LEXIS 10469, at *6 (D. Md. January 30, 2012)).

To establish that element, the *Johnny's Icehouse* decision represents the majority view of courts on this issue. *See, e.g., Zimmerman v. Poly Prep Country Day Sch.*, 888 F. Supp. 2d 317, 332 (E.D.N.Y. 2012) (holding that tax-exempt status "does not constitute Federal financial assistance within the meaning of Title IX"); *Merrifield v. Beaven/Inter-Am. Companies, Inc.,* No. 89 C 8436, 1991 WL 171376, at *3 (N.D. Ill. Aug. 30, 1991) ("The term 'assistance' [under the Rehabilitation Act] connotes transfer of government funds by way of subsidy, not merely exemption from taxation."); *Martin v. Delaware L. Sch. of Widener Univ.*, 625 F. Supp. 1288, 1302 n.13 (D. Del. 1985), *aff'd*, 884 F.2d 1384 (3d Cir. 1989) ("'Assistance' [under the Rehabilitation Act] connotes the transfer of government funds by way of subsidy, not merely exemption from taxation."); *Bachman v. Am. Soc. of Clinical Pathologists*, 577 F. Supp. 1257, 1265 (D.N.J. 1983) (holding that plaintiff's tax-exempt status did not constitute "Federal financial assistance" for purposes of the Rehabilitation Act); *Stewart v. New York Univ.*, 430 F. Supp. 1305, 1314 (S.D.N.Y. 1976) (holding that various tax deductions and exemptions afforded law school by federal law did not constitute "Federal financial assistance" for purposes of Title VI.).   Other courts, while not directly ruling on the issue, have expressed skepticism that tax-exempt status qualifies as federal financial assistance.  *See, e.g., Russo v. Diocese of Greensburg*, No. CIV.A09-1169, 2010 WL 3656579, at *3 (W.D. Pa. Sept. 15, 2010) ( "expressing doubt" that tax-exempt status qualified as "Federal financial assistance" for purposes of Title IX and the Rehabilitation Act); *Graham v. Tennessee Secondary Sch. Athletic Ass'n*, No. 1:95-CV-044, 1995 WL 115890,

at *17 n.4 (E.D. Tenn. Feb. 20, 1995) (noting that it was not basing its holding that the defendant was subject to Title VI on the association's tax-exempt status qualifying as "Federal financial assistance," because that is a minority view).

Conversely, there are three judicial opinions, aside from the Order and Memorandum Opinion, holding that tax exemptions do constitute federal financial assistance for purposes of a Spending Clause legislation. *See Valley Christian Acad*., No. 221CV07574MEMFGJSX, 2022 WL 2953681, at *7; *Fulani*, 684 F. Supp. at 1192–93; *McGlotten*, 338 F. Supp. at 461.[4] While none of the cases that have actually decided that § 501(c)(3) tax-exempt status requires compliance with Title IX have performed any detailed analysis and consideration of the issue, there are clearly conflicting decisions between judges in courts in various circuits, meaning there is substantial grounds for difference of opinion.

Lastly, Plaintiffs argue that an immediate interlocutory appeal would not materially advance the ultimate termination of the litigation because it would not terminate Plaintiffs' other state-law negligence claims against CPS. Plaintiffs, however, again give short shrift to the actual applicable legal standard because as the Court has repeatedly held, when "deciding whether certification will materially advance the ultimate termination of the litigation, 'a district court should consider whether an immediate appeal would: (1) eliminate the need for trial, (2) **eliminate complex issues so as to simplify the trial, or** (3) eliminate issues to make discovery easier and less costly.'" *Ekstrom v. Cong. Bank*, Civil Action No. ELH-20-1501, 2021 U.S. Dist. LEXIS 6628, at *8 (D. Md. Jan. 13, 2021) (quoting *Goodman v. Archbishop Curley High School, Inc.*,

---

[4] Plaintiffs also cite to a recent decision in *Doe v. CVS Pharmacy, Inc*., No. 18-cv-01031-EMC, 2022 U.S. Dist. LEXIS 139684, at *20 (N.D. Cal. Aug. 5, 2022), but like the Supreme Court cases noted above, the decision did not involve or address tax-exempt status or federal financial assistance. In that case, the issue was whether, under the Affordable Care Act, the plaintiff had to prove that CVS Pharmacy, Inc. had received federal financial assistance as a result of its operations, or whether such proof could come by the operations of CVS subsidiaries.

195 F. Supp. 3d 767, 773 (D. Md. 2016) (quoting in turn *Coal. For Equity & Excellence in Md. Higher Educ.*, 2015 U.S. Dist. LEXIS 83741, at *13)) (emphasis added).  While Plaintiffs focus on the first potential reason that an interlocutory appeal would materially advance the ultimate termination of the litigation, Plaintiffs ignore the second upon which CPS' Motion is based.

An immediate interlocutory appeal of the question of law whether tax exemption under § 501(c)(3) constitutes receipt of federal financial assistance for purposes of Title IX may materially advance the ultimate termination of this case because if the Fourth Circuit concludes that the tax exemption is not federal financial assistance, it would eliminate the need for further proceedings relative to Title IX.  The parties would eliminate the complex issues regarding Title IX in four of the five pending cases, and substantially limit the issue in the fifth case (*Conrad*) because of the limited time period during which CPS accepted federal financial assistance while Conrad was a student at the school.  The parties would avoid trial on Title IX issues and all attendant preparation including motion *in limine* practice, drafting of jury instructions and *voir dire* on Title IX, and certain witness preparation

Plaintiffs also ignore Defendant's argument that going into settlement negotiations without knowing the result of the appeal would impair the parties' ability to reach a potential resolution and would protract the litigation because it would require the parties to litigate all five cases through trial and then appeal.  This has been held to be sufficient to establish the third element for an immediate interlocutory appeal, and Plaintiffs did not dispute that it is present.  *See  Sterk v. Redbox Automated Retail, LLC*, 672 F.3d 535, 536 (7th Cir. 2012); *Scott v. Ruston La. Hosp. Co.*, No. 16-0376, 2017 U.S. Dist. LEXIS 56138, at *15-16 (W.D. La. Apr. 12, 2017); *In re Lehman Bros. Holdings Inc.*, 2011 U.S. Dist. LEXIS 124313, at *9 (S.D.N.Y. Oct. 26, 2011); *TEFFT v.*

*A.C. & S., INC.*, No. C80-924M; No. C81-179M; No. C81-533M, 1983 U.S. Dist. LEXIS 17150, at *11 (W.D. Wash. May 6, 1983).

Moreover, it cannot be lost that this is one of five cases that present the same issue. Therefore, CPS is not seeking an interlocutory appeal to decide a minor issue that affects a single case; this is a significant issue that impacts five pending cases.  It would be far more efficient to know the result of the appeal now and whether Title IX applies to CPS in the five cases based upon their tax exemption status, as opposed to trying five cases over many weeks and then appealing each of the cases to the Fourth Circuit.  Furthermore, as demonstrated by the *amici curiae* briefs, there is a general recognition that the issue should be decided quickly to avoid or shorten what the *amici curiae* briefs describe as "a period of disruptive uncertainty around the law in the nonprofit community," *see* ECF 136-1 in Case No. 1:20-cv-03132-RBD at 3, involving "grave uncertainty and anxiety" for many independent private schools about their legal obligations under Title IX.  *See* ECF 134-1 in Case No. 1:20-cv-03132-RBD at 10.  The question presented above for interlocutory appeal meets that standard and is of special consequence to five pending cases, not to mention the many private schools within this jurisdiction and Circuit that are tax-exempt § 501(c)(3) entities.  As the Court's ruling on CPS' Partial Motion to Dismiss or in the Alternative for Summary Judgment represents new law on an issue of first impression in this Circuit, if the Order is not reconsidered, the Court should certify the issue for immediate interlocutory appeal.

WHEREFORE, CPS respectfully requests that the Court reconsider the Order and accompanying Memorandum Opinion, or in the alternative, amend its Order and Memorandum Opinion to state that the Order and Memorandum Opinion involve a controlling question of law regarding whether tax exemption under 26 U.S.C. § 501(c)(3) constitutes receipt of federal financial assistance for purposes of Title IX of the Education Amendments Act of 1972, as to

which there is substantial ground for difference of opinion, and that an immediate appeal from the Order and Memorandum Opinion may materially advance the ultimate termination of the litigation.

Respectfully submitted,

/s/Gregg E. Viola                              /s/Mark P. Johnson
Gregg E. Viola (25737)                         Mark P. Johnson (29091)
ECCLESTON & WOLF, P.C.                          ECCLESTON & WOLF, P.C.
Baltimore-Washington Law Center                Baltimore-Washington Law Center
7240 Parkway Drive, 4th Floor                  7240 Parkway Drive, 4th Floor
Hanover, MD 21076-1378                          Hanover, MD 21076-1378
(410) 752-7474 (phone)                         (410) 752-7474
(410) 752-0611 (fax)                           (410) 752-0611 (fax)
E-mail: viola@ewmd.com                         E-mail: johnson@ewmd.com
*Attorney for  Defendant*                      *Attorney for Defendant*

/s/Eric M. Rigatuso
Eric M. Rigatuso (27605)
ECCLESTON & WOLF, P.C.
Baltimore-Washington Law Center
7240 Parkway Drive, 4th Floor
Hanover, MD 21076-1378
(410) 752-7474 (phone)
(410) 752-0611 (fax)
E-mail: rigatuso@ewmd.com
*Attorney for  Defendant*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 26th of August, 2022, copies of the foregoing were served via the Court's ECF System to all counsel of record.

/s/Eric M. Rigatuso
Eric M. Rigatuso (Bar # 27605)

```
 1                IN THE UNITED STATES DISTRICT COURT
                   FOR THE DISTRICT OF MARYLAND
 2                        NORTHERN DIVISION

 3   DONNA BUETTNER-HARTSOE, et al. )
          Plaintiff,               )
 4        vs.                      )CIVIL ACTION NOS.
     BALTIMORE LUTHERAN HIGH SCHOOL )20-3132, 20-3214, 20-3229,
 5   ASSOCIATION, d/b/a CONCORDIA   )20-3267, 21-691-RDB
     PREPARATORY SCHOOL,           )
 6        Defendants.              )
     _____)
 7                                  Baltimore, Maryland
                                    September 1 , 2022
 8                                  1:57 p.m.

 9            THE ABOVE-ENTITLED MATTER CAME ON FOR
                       MOTIONS HEARING
10            BEFORE THE HONORABLE RICHARD D. BENNETT

11                 A P P E A R A N C E S

12   On Behalf of the Plaintiff:

13        BRIAN KETTERER, ESQUIRE
          CHRISTINA GRAZIANO, ESQUIRE
14        JUSTIN A. BROWNE, ESQUIRE

15   On Behalf of the Defendant:

16        GREGG E. VIOLA, ESQUIRE
          BRIAN S. GOODMAN, ESQUIRE
17        GEOFFREY H. GENTH, ESQUIRE
          EVAN T. SHEA, ESQUIRE
18        WILLIAM KING, ESQUIRE

19   Also Present:
          MEGAN MATTHEWS, ESQUIRE
20        CONSTANCE BAKER, ESQUIRE
          CAROLINE BELESON, LAW CLERK
21

22        (Computer-aided transcription of stenotype notes)

23                        Reported by:
                     Ronda J. Thomas, RMR, CRR
24                   Federal Official Reporter
                 101 W. Lombard Street, 4th Floor
25                   Baltimore, Maryland 21201
```

```
1   (1:57 p.m.)
2           THE COURT:  Good afternoon, everyone.  This is calling
3   the case of Buettner-Hartsoe, et al. v. Baltimore Lutheran High
4   School, Civil Numbers 20-3132, 20-3214, 20-3229, 20-3267,
5   21-691-RDB with consolidated cases.  The lead case being
6   Buettner-Hartsoe, if I'm pronouncing those names correctly, et
7   al. v. Baltimore Lutheran High School Association, which is the
8   predecessor of Concordia Prep School Academy.  We are here on a
9   Motion for Reconsideration as well as a Motion for
10  Interlocutory Appeal.
11          I would note, first of all, that the standing orders of
12  this Court provide that masks are to be worn in all public
13  areas of the courthouse, with the exception of the courtroom if
14  in the discretion of the presiding judge the participants have
15  been adequately vaccinated.
16          I have been fully vaccinated and boosted and tested
17  negative within the last two weeks, I guess, so I have my mask
18  pulled down.  So as we proceed, I'll first inquire of the
19  vaccination status of the parties.
20          Counsel, it doesn't mean you have to pull your mask down,
21  you're encouraged to do so because it's a little bit easier for
22  Ms. Thomas, the court reporter, but I'll inquire as to that.
23          So on behalf of the Plaintiffs here, if counsel would
24  identify themselves for the record.
25          MS. GRAZIANO:  Good afternoon, Your Honor.  Christina
```

1  Graziano for the Plaintiffs, and I am in fact vaccinated and
2  boosted.
3          **THE COURT:**  Ms. Graziano, nice to see you.  Welcome.
4  Nice to see you.
5          **MS. GRAZIANO:**  Nice to see you.
6          **MR. KETTERER:**  Good afternoon, Your Honor.  Brian
7  Ketterer on behalf of the Plaintiffs.  I'm also vaccinated.
8          **THE COURT:**  Yes, Mr. Ketterer, nice to see you.
9          **MR. KETTERER:**  Nice to see you too.
10          **MR. BROWNE:**  Good afternoon, Judge Bennett.  I'm
11  Justin Browne, and I'm vaccinated.
12          **THE COURT:**  Yes, nice to see all three of you.  You
13  can pull your mask down while speaking, you don't have to.
14      Mr. Browne, you can certainly come and sit at the trial
15  table if you'd like.  You're a matter of counsel of record.
16  Nice to have you.
17      On behalf of the Defendants?  First of all, the Defendants
18  Baltimore Lutheran High School Association doing business as
19  Concordia Preparatory School.
20          **MR. VIOLA:**  Good afternoon, Your Honor.  Gregg Viola
21  on behalf of Baltimore Lutheran High school.  I am vaccinated.
22          **MR. GOODMAN:**  Good afternoon, Your Honor.  Brian
23  Goodman on behalf of Codefendant Lutheran Church-Missouri
24  Synod, Southeastern District.  I have been vaccinated and
25  boosted.

1          **THE COURT:**  Yes, Mr. Goodman.  Nice to see you as
2    well.  It's been a long tile.
3          **MR. GOODMAN:**  It has been.
4          **THE COURT:**  I'm going to take my mask fully off then.
5    So with that, you all may be seated for a minute.
6          Let me just go over where we are on this.  This dispute
7    involves five consolidated cases brought by five different
8    women, all former students of Concordia Preparatory School,
9    once known as the Baltimore Lutheran High School.
10         And all five women have alleged that Concordia failed to
11   take meaningful action to address a wealth of complaints of
12   sexual assault and verbal sexual harassment.
13         Title XI of the Education Amendment Act of 1972 confers
14   federal jurisdiction over institutions that are a recipient of
15   federal funds.  And the issue here is whether organizations
16   with 501(c)(3) tax exempt status qualify as recipients of
17   federal funds for purposes of Title XI.
18         On July 21st of this year, I issued an opinion denying the
19   partial Motion for Summary Judgment as to Count 1 of the
20   operative Amended Complaint in the lead case in this case, and
21   essentially they're identical complaints in all of the cases.
22         I would first note that with respect to the Plaintiffs in
23   this matter, there are three minor Plaintiffs.  The minor
24   Plaintiff by the initials H.C. through -- I'm sorry, N.H.,
25   first of all, through her mother, Donna Buettner-Hartsoe.  If

1   I'm pronouncing the name correctly.  And then the minor

2   Plaintiff H.C. through her mother Andrea Conrad.  And then the

3   minor Plaintiff A.G. through her mother Selena Barber.

4       And then we have two other Plaintiffs who are adults and

5   do not choose to go through any other persons.  They're adults

6   and they've come forward.  And that is Jennifer Pullen and

7   Ariana Gomez.  They are the other five Plaintiffs.

8       Are any of the Plaintiffs here in the courtroom today,

9   Ms. Graziano?

10          **MS. GRAZIANO:**  No, Your Honor.  I would also point out

11  as a factual verification, at the time that the

12  Buettner-Hartsoe complaint was filed, N.H. -- or, yeah, excuse

13  me, N.H. was a minor.  She has now reached the age of majority.

14  So I just point that out.

15          **THE COURT:**  All right.  She's still proceeding as N.H.

16  through her mother, Donna Buettner-Hartsoe, though, correct?

17          **MS. GRAZIANO:**  That's correct.

18          **THE COURT:**  That's fine.  She's entitled to do that,

19  I'm just trying to clarify.

20      And there's an operative Amended Complaint, which is

21  pretty much identical in all five of these cases.  And this

22  case is the lead case for purposes of filing.  And essentially,

23  there are four counts to the complaint.

24      There's a Count 1 alleging the violation of 20 U.S.C. §

25  1681, that being Title XI of the Education Amendment Act of

1   1972.

2       And then Count 2 is negligent supervision and retention.

3       Count 3 alleges negligence.

4       Count 4 alleges intentional infliction of emotional

5   distress.

6       I believe all of the complaints or the amended complaints

7   all allege the same four counts if I'm not mistaken; is that

8   correct?

9           **MS. GRAZIANO:**  That is correct, Your Honor.

10          **THE COURT:**  Correct from your point of view,

11  Mr. Goodman as well and Mr. Viola?

12          **MR. VIOLA:**  Yes, Your Honor.

13          **MR. GOODMAN:**  Your Honor, yes.  I note for the record

14  my client is only named in Counts 2 and 3 and not in Counts 1

15  and 4.

16          **THE COURT:**  I was about to ask that, Mr. Goodman.

17  Your client was not affected by -- well, I should not say was

18  not affected by -- your client is Lutheran Church

19  Missouri-Synod, Southeastern District, correct?

20          **MR. GOODMAN:**  That is correct.  We are not a named

21  Defendant in Title XI.  We were a named Defendant in Count 4

22  but we were dismissed.

23          **THE COURT:**  Let me make a note of that.

24          **MR. GOODMAN:**  Thank you, Your Honor.

25          **THE COURT:**  So with respect to the Motion for

1  Consideration, reconsideration of my ruling, your client had

2  not moved in that fashion anyway under Count 1, correct?

3       **MR. GOODMAN:**  No, I didn't think I had any standing to

4  do so because we're not a named Defendant.

5       **THE COURT:**  That's right.  I'm just verifying that

6  you're here and I'm going to be hearing from Mr. Viola on these

7  arguments.

8       **MR. GOODMAN:**  Thankfully I'm sure Your Honor will be

9  glad to hear I have nothing to say about today's motion.

10       **THE COURT:**  That's quite all right.

11      We had amicus briefs filed in this case.  And just so the

12  record is clear, amicus briefs that are in the lead case

13  20-3132.  An amicus brief was filed on behalf of the

14  Association of Independent Maryland and D.C. schools, better

15  know as AIMS, I believe, in the community.  And that was filed

16  by the law firm of Kramon & Graham, Geoffrey Genth and Steven

17  Klepper are listed as counsel on that matter.

18       Are either Mr. Genth or Mr. Klepper here?

19       **MR. GENTH:**  Yes, Your Honor.

20       **THE COURT:**  You're certainly welcome, if you want to

21  try to sit up here in the row up here.  I'm going to grant the

22  motion.  I've permitted the amicus briefs to be filed.  That's

23  fine.  Technically it's a pending motion and leave to file the

24  amicus brief is being granted.

25       So Paper Number 134, I'll include in an order, is granted

1  for the reasons set forth in the record.  And welcome to you.

2      If you would like to come up and sit in the front row in

3  the back at least behind counsel table there are some empty

4  chairs there.  You are welcome to come up.

5          MR. GENTH:  Thank you, Your Honor.

6          THE COURT:  And Mr. Klepper is not here; is that

7  correct?

8          MR. GENTH:  That's correct.

9          THE COURT:  Nice to see you.  There's also an amicus

10  brief filed, Paper Number 136 filed on August the 11th by the

11  National Association of Independent Schools that Mr. Evan Shea

12  of the law firm of Venable has been listed as counsel of

13  record.

14      Is Mr. Shea here?

15          MR. SHEA:  Yes, Your Honor.

16          THE COURT:  Mr. Shea, nice to see you.

17          MR. SHEA:  Nice to see you.

18          THE COURT:  You're welcome to come forward and come up

19  and sit in the back here.  You're welcome to come.

20          MR. SHEA:  Thank you, Your Honor.  I'll point out that

21  Mr. William King from Venable --

22          THE COURT:  Yes, Mr. King, nice to see you.  I

23  recognize you from years past.  The record will reflect that

24  Mr. King is a former law clerk of mine, which means it only got

25  easier for him after his career commenced.

1    (Laughter.)

2        **MR. SHEA:**  And, Your Honor, Ms. Megan Matthews is the

3    general counsel for the National Association.

4        **THE COURT:**  Yes.  I'm sorry?

5        **MR. SHEA:**  She's not counsel of record.

6        **THE COURT:**  All three of you may come up and sit

7    behind the defense table.  We'll be glad to have you.  Come on

8    up.  Come on up.

9        **MR. GENTH:**  Your Honor, general counsel for the

10   Association of Independent Maryland Schools, Constance Baker,

11   Esquire is also here.  Would it be acceptable if she came up as

12   well?

13       **THE COURT:**  Well, if it is the Constance Baker,

14   Esquire, then certainly she's welcome to come up.

15       Ms. Baker, nice to see you again.  It's been a long time.

16   Come on up.  It's certainly nice to have you here.

17       I will inquire of any of you that want to speak.  Have you

18   all been fully vaccinated?

19       (All Counsel - "Yes, Your Honor.")

20       **THE COURT:**  That's a uniform "yes."  And, Ms. Baker,

21   I'm sure she's been vaccinated, she's always been very

22   cautious.  Nice to see you, Ms. Baker.  Just come on up.

23       Have I overlooked anyone here that is counsel of record or

24   amicus filing?  Well, thank you very much.  You all may be

25   seated here.

1        Let me just note, if I can, that the -- what I propose to
2   do is we're first going to deal with a Motion for
3   Reconsideration.  And then after that we'll deal with the
4   Motion for Interlocutory Appeal.

5        Any objection from the point of view of the Plaintiffs on
6   that?

7            **MS. GRAZIANO:**  No objection, Your Honor.

8            **THE COURT:**  From the defense, any objection,
9   Mr. Viola?

10           **MR. VIOLA:**  No, Your Honor.

11           **THE COURT:**  So we will proceed in that fashion.  And
12  I'll hear argument first on the Motion for Reconsideration and
13  then I will indicate essentially what my ruling will be today
14  on both of these.  And then I'll follow up with a written
15  opinion.  Do my best to get it filed tomorrow on this matter.

16       Just starting off in terms of the matter of the Motion for
17  Reconsideration.  Essentially, that'll be guided by Rule 60(b)
18  of the Federal Rules of Civil Procedure, in terms of the
19  Court's analysis.

20       Just so the record is clear, as a matter of public record
21  here, to establish a Title XI claim based on student sexual
22  harassment, Plaintiff must show, one, that they were a student
23  at an educational association, institution receiving federal
24  funds.  And that's the key phrase here as to that.

25       And then two, that they suffered sexual harassment that

were so severe, pervasive, and objectively offensive that it
deprived them of equal access to the educational opportunities
or benefits provided by their school.

Three, the school, through an official who has the
authority to address the alleged harassment and to institute
corrective measures, had actual notice or knowledge of the
alleged harassment.

And four, the school acted with deliberate indifference to
the alleged harassment.  That's been summarized within the last
year -- or actually last year by the Fourth Circuit, United
States Court of Appeals for the Fourth Circuit in *Doe v.*
*Fairfax County School Board* at 1 F.4th 257, an opinion in 2001
and actually an opinion to which I made reference in my written
opinion.

So the analysis here is in terms of a Motion for
Reconsideration is, I think, the Court is guided -- essentially
the Fourth Circuit, there's been some variance in some of the
cases as to whether the Court turns to Rule 54(b) or Rule 60(b)
of the Federal Rules of Civil Procedure.  Rule 60(b), I think,
guides this Court's analysis.  The fourth Circuit, I think, has
so indicated previously, and I have made reference to that,
actually in an opinion last year in *Cincinnati Insurance*
*Company v. Fish* where that is the rule that guides this Court's
analysis as to a Motion for Reconsideration.

So with that, Mr. Viola -- am I pronouncing your name

1  correctly?

2         MR. VIOLA:  Viola, that's correct.

3         THE COURT:  I will be glad to hear from you.  You can

4  speak at the table or use the podium.  Whatever you are more

5  comfortable with.

6         MR. VIOLA:  I'm happy to speak at the table.

7         THE COURT:  That's fine.

8         MR. VIOLA:  Your Honor, the reason respectfully that

9  the Court was wrong in its original opinion was because Title

10 XI is spending clause legislation and spending clause

11 legislation is different than other legislation.  In *Cummings*

12 *v. Premiere Rehab*, the Supreme Court just spoke on this issue

13 just about four months ago, and it went through the history and

14 discussed why spending clause legislation is different than

15 other legislation.  They observe that other legislation imposes

16 a duty on a class of people.

17      But spending clause legislation is in essence a contract.

18 It's in essence a contract between the Government and recipient

19 of federal funds in which the recipient of federal funds

20 agrees, in exchange for accepting some benefit, that it

21 undertakes certain duties, including being subject to statutes

22 such as Title XI, so it's in essence a different animal.

23      And in *Cummings*, the Supreme Court said that in order for

24 an entity that receives federal funds to be bound by Title XI

25 it had to, quote, "knowingly accept," unquote, and clearly

1   understand the obligations, so in essence it acts as a

2   contract.

3       A recipient has to know by accepting whatever constitutes

4   federal funds they're undertaking these obligations.  The

5   Supreme Court described it as having notice, the recipient has

6   to have notice that they're undertaking these obligations.

7       The way that the Supreme Court said that that is done

8   would be if it is unambiguous in the statute that for our

9   purposes tax exemptions constitute a receipt of federal funds.

10      One of the other things that I think is important for the

11  Court to keep in mind is the *Cummings* court also said, it

12  basically has to be plainly obvious from the statute that

13  receipt of federal funds -- I'm sorry -- tax exemption

14  constitutes receipt of federal funds.

15      One of the things it said, they're not requiring a dive

16  through treatises, 50 state surveys, or speculative drawing of

17  analogies.  Basically what they're saying it has to be clear

18  from the statue.

19      And respectfully, I think that's why the Court's original

20  opinion was wrong in that it's hard to say that it's

21  unambiguous on the face of statute, and the law that tax

22  exemptions constitutes receipt of federal funds.  And the first

23  place to look are the regulations.

24      And the regulations, whether they're from the Department

25  of Education or Department of the Treasury, are all basically

 1  the same.  And they have what has been described as a

 2  comprehensive list or a laundry list of things that constitute

 3  the receipt of federal funds.  They all have two things in

 4  common:  Number one, they all constitute affirmative receipt of

 5  benefits, affirmative receipt of money or property or

 6  services --

 7          THE COURT:  What was the date of the Supreme Court

 8  opinion in *Cummings*, by the way?  I'm sorry.

 9          MR. VIOLA:  I want to say, Your Honor, it was

10  April 28, 2022.  I'm not positive.  I know 2022, April of 2022.

11  I want to say it's April 28, but I'm not positive of that.  It

12  is cited, I believe, in our -- at least in our reply.

13          THE COURT:  I guess my point is it was definitely not

14  cited in the paper you filed on August the 4th.

15          MR. VIOLA:  Honestly, I don't believe it was, Your

16  Honor.

17          THE COURT:  I'm pretty sure it was not.

18          MR. VIOLA:  That may be --

19          THE COURT:  So if I missed something, if it was

20  April 28th, you missed it on August 24th as well because you

21  didn't cite that opinion in here.

22          MR. VIOLA:  I believe you're correct, Your Honor.

23          THE COURT:  Okay.  All right.

24          MR. VIOLA:  But *Cummings* is controlling law, and I

25  think it's instructive in this case.

```
 1            THE COURT:  What page is it cited in your reply?  I'm
 2   sorry.
 3            MR. VIOLA:  Court's indulgence, Your Honor.
 4            THE COURT:  I have it right here, I see it.  I see it
 5   in the reply brief filed last week.
 6            MR. VIOLA:  That's correct, Your Honor.
 7            THE COURT:  Actually the reply brief filed last
 8   Friday.
 9            MR. VIOLA:  Correct.  It starts on Page 5 and the
10   discretion of Cummings continues through at least page--
11            THE COURT:  So I'm clear, that case involves the
12   Rehabilitation Act and it had to do with emotional distress
13   damages.  It's not a Title XI case, correct?
14            MR. VIOLA:  No, it's not.
15            THE COURT:  I'm just trying to make sure I'm clear on
16   that because you seem pretty emphatic Cummings is controlling.
17            MR. VIOLA:  Understood.
18            THE COURT:  I'm looking at it.  You filed it last
19   Friday, this is Wednesday.  And I don't see that it necessarily
20   justifies your position that Cummings is clearly controlling.
21   I understand your argument.  But Cummings didn't say a word
22   about Title XI.
23            MR. VIOLA:  Agreed.
24            THE COURT:  Okay.
25            MR. VIOLA:  I'm not suggesting that it did --
```

1          **THE COURT:**  I got the impression that it did, so I'm

2     feeling a little bit better than I did a few minutes ago.  I

3     was, like, how did I miss that?

4          **MR. VIOLA:**  So let me talk to Your Honor why I think

5     it is controlling.

6          **THE COURT:**  Okay.

7          **MR. VIOLA:**  It's talks about spending clause

8     legislation and Rehabilitation Act as well as Title XI, and

9     there's no doubt that obviously Title XI is spending clause

10    legislation.

11         So I think the analysis that the Supreme Court used in

12    *Cummings* is applicable to other spending clause legislation

13    cases like Title XI.  And in essence, what they're saying is

14    the recipient has to know and affirmatively in essence accept

15    that -- in exchange for their receipt of federal funds, they

16    are undertaking these duties.

17         And, like I said, I think that's the problem with the

18    Court's opinion and why the Court's opinion is wrong because it

19    doesn't recognize that spending clause legislation cases like

20    Title XI, like this case, require that contract analogy that is

21    discussed in *Cummings*.

22         And that's why I think *Cummings* is instructive in this.

23    And *Cummings* doesn't state anything new.  There's nothing new

24    in *Cummings* of what I'm talking about.  It starts with, I think

25    it's *Pennhurst*, a case, like, maybe 1982 that starts this

1   analysis.

2        And that's why I'm saying I think the construct that

3   spending clause legislation is different is controlling in this

4   case and is the reason that, respectfully, I think the Court's

5   original opinion was wrong.  Because if you accept that then

6   the -- for something to be --

7            **THE COURT:**  Essentially, your argument is that

8   spending clause legislation is akin to a contract?

9            **MR. VIOLA:**  That's what it says in *Cummings*.

10           **THE COURT:**  Okay.  Right.  And you're correct.  I

11  mean, I read the case that you cited earlier in terms of the

12  paralyzed veterans case I think in 1986 and some others.  I

13  understand what your argument is.

14           **MR. VIOLA:**  Right, right.  I think that's controlling

15  in this case because it's hard to say that the Title XI statute

16  unambiguously says that tax exempt status is the receipt of

17  federal funds.  I think the opposite is true.  If you look at

18  the regulations, the regulations specifically do not include

19  tax exemptions when they list what has been described as

20  comprehensive or laundry list of things that constitute receipt

21  of federal funds.

22       So any entity, like Concordia Prep, would not be on notice

23  using the language of *Cummings* that they would be bound by

24  Title XI.  And I think that that's also borne out in the way

25  that people or entities have treated tax exempt status.

1    And it's clear, at least from my review of the record,

2  that 501(c)(3) status are under the impression that that

3  constitutes receipt of federal funds for the application of

4  Title XI.  Even Plaintiff's expert in this case wrote an

5  article after Your Honor issued an opinion, which said, this

6  ruling -- I think the word used was sent "shockwaves" through

7  the independent school community.  And inherent in that is a

8  recognition that previously no such schools believed that the

9  tax exempt status constituted receipt of federal funds

10  subjecting schools, like Concordia Prep, to Title XI.

11    Also, we cited in our papers in the frequently asked

12  questions of the Paycheck Protection Program there was -- one

13  of the questions that they -- the Small Business Administration

14  anticipated getting was, well, I'm a tax exempt entity, if I

15  accept PPP loans, does this now subject me to Title XI and

16  spending clause legislation?

17    And again, inherent in that is the assumption that those

18  entities that were tax exempt 501(c)(3) status entities were

19  not subject to Title XI.  We also cited the Title VI manual for

20  the Department of Justice that said that it's not.

21    THE COURT:  It's interesting by the way that you

22  mentioned the Payment Protection Program in the face of the

23  COVID because of one of the Plaintiffs here, H.C., the minor

24  Plaintiff through her mother, Andrea Conrad, attended the

25  school from the fall of 2019 to the spring of 2020.  And

1  apparently the record reflects that from March to April of 2020

2  that Payment Protection Plan funds were received from the Small

3  Business Administration.

4      Is that not correct?

5          MR. VIOLA:  I think your dates are inaccurate, Your

6  Honor.  You said March to April, I think you meant April --

7          THE COURT:  I meant March/April of 2020.

8          MR. VIOLA:  I'm sorry, received in March, I think it

9  was April, but I'm not positive, yes.  Generally you're

10  correct.

11         THE COURT:  So that is totally apart from your

12  argument as to the matter of tax exempt status under 501(c)(3).

13  But one of the five Plaintiffs here apparently attended a

14  school during the period of time when there were funds directly

15  received, correct?

16         MR. VIOLA:  Well, to parse out the distinction, we've

17  not moved for reconsideration on that particular issue.  We've

18  just moved for reconsideration on whether tax exempt status

19  constitutes the receipt of federal funds.  This is I think

20  beyond the scope of the Motion for Reconsideration, but the

21  allegations, our position is, what happened to H.C. all

22  occurred in the fall of 2019.

23         THE COURT:  You mean in terms of the alleged events?

24         MR. VIOLA:  Exactly.  Because the other thing, too, is

25  that there was nothing -- no facts giving rise to any of the

1    claims, Title XI or otherwise, after March of 2020.  Kind of
2    makes sense because they were all at Concordia Prep.  Like,
3    other schools were remote at that time.

4         **THE COURT:**  Does your Motion for Certification for
5    Preliminary Injunctive Relief for the Interlocutory Appeal,
6    does that also relate -- does that not include H.C. or not?

7         **MR. VIOLA:**  It does include H.C., but it includes H.C.
8    for the proposition as to whether tax exempt status constitutes
9    federal financial assistance.

10        Because what we intend to do, there's no secret to anybody
11   in this room, is to say that it's factually different.  Even if
12   the PPP loan program -- and I'm not conceding that that PPP
13   loans do constitute receipt of federal funds.  But even if they
14   do, I think it's irrelevant in H.C.'s case because of the
15   factual basis of it.  But we don't have to -- we purposely
16   didn't move on that to just not muddy up the analysis and make
17   it a very clean issue of law that does tax exempt status
18   constitute the receipt of federal funds.  And that goes a
19   little bit to the second issue of the potential interlocutory
20   appeal.  So it is a pure question of law and includes no
21   question of fact.

22        So that's just -- just cleaning that up.  Trying to
23   clarify for you, if that makes sense, Your Honor.

24        So based on that, it's hard, under the state of the law,
25   to reach a conclusion that unambiguously indicates that tax

1   exempt status is federal financial assistance.

2        In fact, the regulations would draw any reasonable entity

3   to the opposite conclusion.  And I think it's borne out by the

4   fact that almost all entities that are established in the

5   record, that are 501(c)(3) entities, reach the conclusion that

6   they were not subject to spending clause legislation like Title

7   XI.

8        So that reaches the inescapable conclusion that those

9   entities weren't on notice of it.  And there was no basis for

10  them to be on notice of it because there's nothing in the law

11  that would cause them to believe that.

12       And like I said before, the *Cummings* case says you don't

13  have to do this exhaustive review of the law to figure that

14  out.  It has to be -- it has to be plain and obvious from the

15  statute and the law that tax exempt status is federal financial

16  assistance and that's simply not the case here.

17       And when you look at it through that construct, and you go

18  back and you look at the cases that go either side, if you look

19  at the *Johnny's Icehouse* case, they talk about spend spending

20  clause legislation.  And part of the --

21            THE COURT:  That's the 2001 case in the Northern

22  District of Illinois, correct?

23            MR. VIOLA:  Right.  And if you look at that opinion,

24  Your Honor, the Court expressly says, in essence, the

25  regulations that define what is federal financial assistance

1  don't include tax exemptions, and they all include affirmative

2  benefits.

3      And then that also reached the step of saying it also is

4  consistent with the foundation of spending clause legislation,

5  what I'm talking about here.  That it's the contract that Your

6  Honor talked about.  In essence, there's got to be some

7  agreement that they're accepting -- the entity is accepting the

8  money, the federal funds, in exchange for the agreement to be

9  obligated to spending clause legislation, whether it's the

10 Rehabilitation Act, whether it's Title VI, whether it's Title

11 XI.  Respectfully, I don't think it makes a difference.  That's

12 why *Johnny's Icehouse* is the correctly decided case.  And it's

13 also the reason why *McGlotten* is incorrectly decided.

14     I think *McGlotten* is a Title VI case.  They kind of all

15 run together at some point.

16     But *McGlotten*, basically they recognize --

17          **THE COURT:**  You're referring to the case in District

18 of Columbia 1972?

19          **MR. VIOLA:**  Correct, Your Honor.  They recognize that

20 there's nothing in the statute to suggest a tax exempt status

21 constitutes the receipt of federal funds.  There's nothing in

22 the legislative history.  There's nothing in the regulations.

23     So under what I would think the *Cummings* court would

24 analyze the issue, they would say, well, that makes it clear

25 that it's not unambiguous that tax exempt status constitutes --

1          **THE COURT:**  What was the basis, Mr. Viola, for example

2    the Eleventh Circuit clearly doesn't go your way in the *M.H.D.*

3    *v. Westminster School* cases.

4          **MR. VIOLA:**  I respectfully disagree with Your Honor.

5    That case -- they don't reach the issue.  What they say is the

6    argument is not frivolous.

7          **THE COURT:**  The argument is not what?

8          **MR. VIOLA:**  Is not frivolous.  And it's in a footnote.

9    And they say the argument is not frivolous.  That's hardly a

10   ringing endorsement.  They did that in talking about the

11   subject matter jurisdiction.  But they didn't analyze the

12   issue.  They didn't get in-depth.  They essentially said that

13   if you make an argument like that it doesn't give rise to Rule

14   11 sanctions.

15       I think that a fair reading of that case is not -- I

16   respectfully think it does not stand for the proposition that

17   tax exempt status constitutes a receipt of federal funds.

18          **THE COURT:**  Are there any cases you think that agree

19   with me?

20          **MR. VIOLA:**  I would think that the *McGlotten* case is

21   consistent with your opinion.  It's a Title VI case, but I

22   think it's incorrectly decided.

23          **THE COURT:**  Well, I mean, I do note that there's

24   authority.  Just so the record is clear, you make it sound as

25   if my case is unheard of, and you haven't acknowledged any case

 1   that agrees with me.  I guess I have to ask you if I missed

 2   something.

 3       If it's your position that my opinion is a total outlier,

 4   then just explain to me how the Central District of California

 5   last month, as well as the Eastern District of North Carolina

 6   in June, essentially came to the same conclusions?  But if you

 7   think that they're totally different than my case, please

 8   indicate to me why.

 9           MR. VIOLA:  In terms of the California case, Your

10   Honor, that case involved the PPP loan and the court reached

11   the conclusion that PPP loan did constitute receipt of federal

12   financial assistance.

13       So it wasn't a pure analysis of whether tax exempt status

14   is -- constitutes receipt of federal financial assistance.  And

15   the other, I forget the name of the case you're talking about

16   in California.

17       There's no analysis beyond, it just relies on *McGlotten*.

18   So it just parrots *McGlotten*.  And I think that because it

19   doesn't have any recognition of the contractual analogy, the

20   contractual basis of spending --

21           THE COURT:  Well, *McGlotten*, Mr. Viola, I notice there

22   are two words you haven't mentioned here, and that's public

23   policy.

24           MR. VIOLA:  Right.

25           THE COURT:  And *McGlotten* has spoke to public policy

1   in terms of rejecting an argument to narrow an analysis in

2   terms of a spending clause in a manner that is inconsistent

3   with its purpose, which the purpose being to eliminate

4   discrimination in programs or activities.

5       What is the public policy of Title XI, Mr. Viola?

6       MR. VIOLA:  Well, the public policy is to eliminate

7   disparate treatment between the sexes.

8       THE COURT:  Right.

9       MR. VIOLA:  But that's part of the reason *McGlotten* is

10  incorrectly decided.  It ignores the fact that this is spending

11  clause legislation.  *McGlotten* is not heavily cited in a lot of

12  cases.  And a lot of cases decided after it, including *Johnny's*

13  *Icehouse*, go the other way.

14      And *Johnny's Icehouse* is a better-decided decision.  And

15  frankly, *Johnny's Icehouse* is consistent with *Cummings v.*

16  *Premier Rehab*, and *McGlotten* isn't.  Because *McGlotten* doesn't

17  recognize the contractual relationship between a recipient of

18  funds and the Government.  Again, *McGlotten* is decided one way

19  but it's incorrectly decided.

20      THE COURT:  I understand.

21      MR. VIOLA:  Because that's why *Johnny's Icehouse* is a

22  better-decided case.  And there are other cases, *Stewart*,

23  *Bachman*, those all recognize spending clause legislation.  And

24  those are decided consistent with how, I think, this Supreme

25  Court would analyze the issue.  And I think they would analyze

1  it consistent with the cases that are the majority of the

2  cases.  The majority holds that tax exempt status is not the

3  receipt of federal financial assistance.

4         **THE COURT:**  Again, just so we're clear, in terms of

5  the spending clause legislation argument.

6         **MR. VIOLA:**  Well, I think both in terms --

7         **THE COURT:**  No, I'm trying to make sure, you're pretty

8  emphatic about your argument, Mr. Viola, and I'm trying to make

9  sure the record is clear.  You're referring to a lot of cases

10  with respect to the spending clause legislation, including

11  *Cummings* which you just cited five days ago.  But there's

12  not -- there are not so many overwhelming cases on this Title

13  XI question.

14         **MR. VIOLA:**  I don't mean to suggest that there are.

15         **THE COURT:**  I'm trying to make sure we're clear on

16  that, okay.  You're citing these various cases and it keeps

17  coming back to spending clause legislation.

18       The record will reflect that the many cases you're citing

19  have to do with the spending clause legislation.  And I

20  understand what your document is with respect to specific

21  funding.  I do not believe the record reflects, nor has your

22  briefing reflected, that this is so abundantly clear when it

23  comes to Title XI legislation.

24         **MR. VIOLA:**  Well, *Johnny's Icehouse* is Title XI.

25         **THE COURT:**  Clearly it does.  And *Johnny's Icehouse*

1  was decided in 2001.  I believe the case that you take issue

2  with, the *McGlotten* case, was decided in 1972.  I'm not

3  saying -- it's abundantly clear to me that there's a variance

4  of arguments on this.  But this is not -- this, you know, to

5  imply that spending clause legislation, all these cases are so

6  abundantly clear that you just automatically factor them into

7  Title XI, and that's why we're having the hearing because I'm

8  trying to have you explain to me why it's so abundantly clear

9  that I'm wrong?

10          MR. VIOLA:  Well, to me, that's the common theme is --

11          THE COURT:  I understand.  I want you to address

12  public policy then.  I want you to address public policy.

13  Because public policy has been interwoven in *Regan v. Taxation*

14  *with Representation* by the Supreme Court in 1983.  The *Bob*

15  *Jones University* case in 1983 addressed the public policy

16  matters as to discrimination.  It did not speak to the mandates

17  of Title XI, but it did speak as to a matter of public policy.

18          MR. VIOLA:  But those weren't -- I don't mean to

19  interrupt you and be disrespectful.

20          THE COURT:  Then don't.  Then don't.

21          MR. VIOLA:  Sorry.

22          THE COURT:  But in terms of public policy, I think you

23  need to address the matter of public policy because the

24  position that you're taking here is that the matter of the

25  phrase "receiving federal funds" that was addressed by the

1   Fourth Circuit in *Doe v. Fairfax County school Board* last year,

2   that the spending clause legislation cases make it abundantly

3   clear that there has to be this specificity.

4        And Title XI is dealing with specifically, of the four

5   criteria as noted by the Fourth Circuit, is specifically

6   dealing with suffering sexual harassment that's so severe,

7   pervasive, and objectively offensive that it deprived them of

8   equal access to the educational opportunities or benefits

9   provided by their school.

10       You would acknowledge I'm sure, Mr. Viola, or perhaps you

11  would not, that the allegations in this case certainly allege

12  fairly severe sexual harassment.  That's what's in these cases,

13  is it not?

14           **MR. VIOLA:**  I agree that that's what's alleged.

15           **THE COURT:**  All right.  So the point is that your view

16  is that any public policy considerations don't in any way

17  support a broader analysis, that receiving federal funds is

18  interpreted strictly within the spending clause legislation

19  cases that you've cited?

20           **MR. VIOLA:**  The cases that you cited, Your Honor, in

21  terms of the public policy, *Bob Jones* and *Regan*, they're not

22  spending clause legislation cases.  Bob Jones is an IRS

23  regulation which basically said, we don't think that entities

24  that have a racially discriminatory admissions practice deserve

25  501(c)(3) status.

1      So that's why I'm saying I don't think public policy

2    analysis -- and respectfully I also think it's part of the

3    reason that the Court was incorrect in its opinion in relying

4    on the public policy analysis.  Because the case that the Court

5    relied upon is not a spending clause legislation case.  It's

6    something that's completely different, and so I think that

7    that's not the proper analysis in this particular case.

8           **THE COURT:**  Okay.  I understand.  I understand.

9    Overwhelming, I understand your argument.  And how is it

10   different from your original argument?  How is what we're

11   arguing here different from your original submissions?  It's

12   pretty axiomatic that filing for Motions of Reconsideration is

13   not just to regurgitate a prior argument.

14      So under factors under Rule 60(b) there is six predicate

15   factors as to that:  It's a mistake, inadvertence, surprise,

16   inexcusable neglect, newly discovered evidence, fraud,

17   misrepresentation, the judgment is void, the judgment has been

18   satisfied, or any other reason justifying relief.

19      I guess except for the *Cummings* case that you're now

20   citing that was decided in April, exactly what is the change in

21   the landscape here from my ruling made a month ago?

22           **MR. VIOLA:**  Well, the *Cummings* case is not one that

23   was available during the original briefing.

24           **THE COURT:**  I thought you said the *Cummings* case was

25   decided in April?

1    **MR. VIOLA:**  Well, I mean the original briefing, when

2   we first briefed the original motions, I think it was in

3   January.

4    **THE COURT:**  All right.  So your point on that is that

5   that case is a change in the law essentially that would justify

6   reconsideration?

7    **MR. VIOLA:**  I don't think it changes the law.

8    **THE COURT:**  Okay.

9    **MR. VIOLA:**  I think it clarifies the law.  But also

10   one of the basis for Motion of Reconsideration that we cited in

11   the papers was that the Court -- the phrase that's used is

12   "dead wrong."  We would take the position that the Court was

13   dead wrong.  Respectfully, of course.

14    **THE COURT:**  Mr. Viola, I've said on more than one

15   occasion, the best preparation for this job up here is I was

16   the quarterback of a losing high school football team.

17    We're laughing here.

18    So I have a pretty thick hide.  So I'm trying to

19   understand what your argument is.  I know you strongly disagree

20   with it.  I know you have great faith in the spending clause

21   legislation.  I know it doesn't apply automatically to Title

22   XI, although you argue that it does.

23    But I'm trying to get a handle on what is the great change

24   here that I would justify my just changing my opinion.

25   Obviously you disagreed with it.  You don't just file Motions

1  for Reconsideration because you don't like opinions.  You file

2  it because there's a basis for it.

3      MR. VIOLA:  Right.  We take the position, Your Honor,

4  that the original opinion was dead wrong.

5      THE COURT:  I understand.  That doesn't give rise to

6  reconsideration.  There's got to be some other basis.

7      MR. VIOLA:  Well, my understanding of the law is that

8  if it is dead wrong that it does give rise to Motion for

9  Reconsideration.

10      THE COURT:  In fairness to you, I don't see Rule 60(b)

11  or Rule 54(b) says it's dead wrong.  I gather the argument is

12  is that it's a mistake, I guess, or inadvertence.  Right?

13      MR. VIOLA:  Correct, Your Honor.  And also I'd like to

14  point out, the *Cummings* case clarifies the issue and it speaks

15  to what the current -- basically the -- almost the identical

16  construct of the current Supreme Court views spending clause

17  legislation cases.

18      THE COURT:  To extent do the spending clause -- and

19  I'm really asking you because I'm not sure.  To what extent do

20  the spending clause limitation cases deal with matters of

21  important public policy?

22      MR. VIOLA:  Again --

23      THE COURT:  In the area of discrimination or whatever.

24  Just tell me which ones.

25      MR. VIOLA:  All the spending clause legislation is

1   important.  But again, I get back to I don't think that the

2   public policy is the analysis in this particular case as to

3   whether tax exempt status constitutes federal financial

4   assistance.

5           THE COURT:  So I'm clear, with respect to the minor

6   Plaintiff H.C., your argument, in addition to the matter of the

7   501(c)(3) status not being federal funding, is also that with

8   respect to the specific allegations that were raised, and the

9   matter of the complaint itself -- one second here -- that as to

10  that, H.C. was -- apparently the Payment Protection Plan

11  funding under COVID was in March to April of 2020 -- or she

12  was -- that's when the funding was received apparently.  And

13  your argument is that while H.C. was a student there, it was

14  from the fall of 2019 to the spring of 2020, and the alleged

15  specific actions that are specified all occurred in the fall of

16  2019 and didn't occur in 2020.  So that's a factual argument,

17  is it not?

18          MR. VIOLA:  Again, as I mentioned before, Your Honor,

19  we didn't -- we didn't raise that issue.  The only issue that

20  we took reconsideration on is whether tax exempt status

21  constitutes federal financial assistance.

22          THE COURT:  Okay.

23          MR. VIOLA:  We purposely did not take issue with

24  anything with regard to Paycheck Protection Program.

25          THE COURT:  Well then, so with respect to that, there

1    would not be, in your view, any reconsideration nor any

2    interlocutory appeal then as to H.C.;  Is that correct?

3         **MR. VIOLA:**  I think that it would be with regard to

4    whether the tax exempt status constitutes receipt of federal

5    financial assistance.  And then we can, you know, depending on

6    how that is ruled upon, we can make a determination later as to

7    whether there's a factual basis as to whether there's an

8    additional reason that potentially H.C. --

9         **THE COURT:**  You mean a factual dispute about when the

10   acts occurred as to H.C.?

11        **MR. VIOLA:**  I'm not sure.

12        **THE COURT:**  You mean a factual dispute as to when the

13   actions took place?

14        **MR. VIOLA:**  Yes, yes.

15        **THE COURT:**  How is that not in the province of the

16   jury?  How is that a matter of law?

17        **MR. VIOLA:**  I'm not suggesting it is a matter of the

18   law.

19        **THE COURT:**  Then as to the minor Plaintiff H.C.,

20   regardless of my ruling with respect to 501(c)(3) status

21   constituting receipt of federal funds, with respect to the

22   minor Plaintiff H.C. attending the school from the fall of 2019

23   to spring of 2020, in light of the receipt of Payment Plan

24   Protection funds from the school in the spring of 2020, it

25   would be a factual question, would it not, as to whether or not

1  Count 1 could proceed before the jury?

2       **MR. VIOLA:**  Yes, unless there's no factual basis that

3  anything took place in the spring, which I think is what the

4  record reflects.  I'm not suggesting the record is before you

5  now, but I think that's ultimately what's going to be borne

6  out.

7       **THE COURT:**  This could be important, you know, in

8  terms of the matter of supplemental jurisdiction for this

9  Court.  And it also is a factor in terms of whether or not

10 there should be an interlocutory appeal.

11      So I don't think it's a minor matter, Mr. Viola.  If the

12 allegations are what they are, and she was a student, if your

13 theory is, well, the actual alleged violations had to occur in

14 the spring of March 2020, around the time that the Payment Plan

15 Protection money was received or there's not a receipt of

16 federal funds.  The nature of these allegations have to do with

17 negligent supervision and retention in Count 2.  Count 4,

18 intentional infliction of emotional distress.  Count 3,

19 negligence, and the fact patterns that outlie all that.

20      And as to Count 1, a violation of Title XI in terms of it

21 may be a factual question that would have to be submitted in

22 terms of whether or not there was inactivity or malfeasance on

23 the part of the school in the aftermath of complaints by the

24 minor Plaintiff H.C.

25      So I'm giving you an opportunity to address that because

1  that may be important in terms of whether or not this Court --

2  even if the Fourth Circuit were to disagree with me and reverse

3  me on Title XI, whether or not there would be supplemental

4  jurisdiction with respect to -- certainly as to the -- as to

5  those causes of action as to H.C.

6      I'm asking how would that be handled?

7      **MR. VIOLA:**  Well, I don't think -- unless I'm missing

8  something, that is not relevant to -- it's only relevant to the

9  determination of Title XI in --

10     **THE COURT:**  Well, what I'm trying to ask you, I'm

11 obviously not asking the question properly because I'm not

12 getting an answer -- I apologize.

13     **MR. VIOLA:**  I'm not trying to --

14     **THE COURT:**  What I'm saying to you is you're also here

15 seeking the matter of -- the granting of an interlocutory

16 appeal on this.

17     **MR. VIOLA:**  Right.

18     **THE COURT:**  That is purely a matter of law.  And I

19 guess my question to you is how is it purely a matter of law as

20 to 501(c)(3) status as to the minor Plaintiff H.C., when I've

21 already noted in my opinion that -- with respect to my opinion

22 of July 21st I specifically noted that as to the Plaintiff H.C.

23 I denied your motion for partial summary judgment, apart from

24 the matter of the 501(c)(3) analysis, because there's no

25 dispute as to her enrollment period.  And that the school

```
1   applied for and received a PPP loan through the Small Business
2   Administration and that loan was forgiven, ultimately, as of
3   November 20 -- I'm sorry, November 10 of 2020.
4        So my point to you is, how does the -- how does the claim
5   of the minor Plaintiff H.C. not survive regardless of -- in
6   terms of going to a jury regardless of the 501(c)(3) analysis?
7             MR. VIOLA:  Well, I think I said before, what I was
8   trying to say, maybe I didn't say it.  It would in terms of the
9   factual issue as to whether that overlapped for the --
10            THE COURT:  Yeah.
11            MR. VIOLA:  -- for Title XI.
12            THE COURT:  So the Title XI case would stay alive as
13  to her and would have to go to the jury.
14            MR. VIOLA:  For the time being, I guess --
15            THE COURT:  You say "for the time being," for what
16  time being?
17            MR. VIOLA:  We've got motion for summary judgment
18  coming up.
19            THE COURT:  I understand.
20            MR. VIOLA:  I guess where I'm getting hung up is I
21  think that the record is ultimately going to be borne out that
22  there's nothing in the record to suggest that during the time
23  that CPS had received the PPP loan, that there's any
24  allegations giving rise to any of H.C.'s complaint, whether
25  it's Title XI or otherwise.
```

1          **THE COURT:**  I'm not going to go rule ahead of time on

2     this, but how does it not, in terms of inactions or

3     malfeasance, to take no steps, to not deal with a situation

4     that's been presented?  How does that not -- I'm having a hard

5     time understanding, Mr. Viola, how you frame this strictly in

6     the context of when the alleged sexual acts in the locker room,

7     for example, took place.  And unless the school was receiving

8     federal funds on that day, that if the school received funds

9     five or four months later that that doesn't constitute

10    receiving federal funds -- when the nature of this complaint is

11    not just a specific day, but the inaction of a school during a

12    time period?

13         **MR. VIOLA:**  Respectfully, Your Honor, I think where

14    we're getting hung up is going to be ultimately on an

15    examination of the factual record.  H.C. was not -- there was

16    nothing in the locker room with H.C., I think you're talking

17    about the N.H. case.  But that was an incident that happened

18    off campus in the fall of 2019.  And I think that the record is

19    going to reflect that there wasn't a lack of inaction.  That

20    the school dealt with it and there was no issues that H.C. had

21    beyond the fall of 2019.  That's why we're getting hung up on

22    this back and forth.

23         I'm not trying to be difficult.  What I'm saying is I

24    think we have a pure question of law on just the issue of

25    whether tax exempt status constitutes federal financial

1  assistance.  And I agree with you that the issue with H.C.,

2  that has to be dealt with later and make a determination as to

3  whether this is a factual dispute or not.

4      I don't think that's ultimately going to be borne out.

5  You may disagree with me.

6      **THE COURT:**  I understand.  I'm asking the question for

7  a reason.  There's an issue that floats here in terms of

8  supplemental jurisdiction.

9      **MR. VIOLA:**  I understand.

10     **THE COURT:**  Essentially, what you're seeking is to

11 have these cases be dismissed and then issues with having --

12 then these Plaintiffs have to refile in state court.  This is

13 not a removal and remand.  They were not filed in state court

14 to begin with.  They were filed here.

15     The issue here is a matter of dismissing these cases or

16 granting summary judgment on Title XI and then the issue of

17 whether or not this Court would have any basis for supplemental

18 jurisdiction, essentially.

19     **MR. VIOLA:**  I understand.

20     **THE COURT:**  Thank you, Mr. Viola.  I apologize if I

21 was a little bit aggressive on my questions.  But I have these

22 hearings -- I really was going to try to deal with this in a

23 phone call on the record.  The record will reflect that counsel

24 were pretty serious they wanted a hearing, so that's why we've

25 got a hearing.

1          **MR. VIOLA:**  I would have preferred to do it in person

2    anyway.  I'm thick-skinned, Your Honor.

3          **THE COURT:**  That's fine.  I'm glad to have you all

4    here.  I ask questions.  That's why we're here.  Thank you very

5    much.  And I'll give you time to respond in a minute.

6          **MR. VIOLA:**  All right.

7          **THE COURT:**  With that, Ms. Graziano, Mr. Ketterer,

8    whoever would like to address this you can stand at the table

9    or the podium or whatever you would like.

10          **MS. GRAZIANO:**  I'll stand at the table.

11          **THE COURT:**  That's fine.  Just pull the microphone a

12    little closer to you.  There you go.  That's fine.  Thank you.

13          **MS. GRAZIANO:**  Sure, Your Honor.  Thank you for

14    allowing me to be heard.  I'll attempt to be brief because I

15    think Your Honor actually addressed a great deal of my argument

16    and your comments to my brother counsel.  But really, why we're

17    here on this issue for a Motion for Reconsideration isn't to

18    rehash the merits.  Although I'm happy to do that to the extent

19    that it pleases Your Honor.

20          But we're to determine, as you rightly pointed out under

21    Rule 60, is this clear error or is there some new issue or new

22    fact or new law to support overturning your previous order?

23    And that's just not in play here.

24          And I think Your Honor very aptly noted that *Cummings* was

25    decided on April 22nd, 2022.  It was completely absent from my

1  brother's moving papers in moving to reconsidering.  And so
2  this idea that we're going to come time and time again before
3  Your Honor out of dissatisfaction with the outcome of a Motion
4  to Dismiss and Motion for Partial Summary Judgment, flies in
5  the face of what the standard is for a motion to reconsider.

6      I would further say to Your Honor, you know, if we're
7  talking about instead of bootstrapping new arguments, which I
8  would claim that the Defendant is doing, if we want to look at
9  cases that have been decided or orders that have been issued
10 after Your Honor's order was entered in July, you hit the nail
11 on the head.  The *E.H. v. Valley Christian Academy* order which
12 came down in the Central District of California July 25th, just
13 four days after your order, I think, is really illustrative.

14     And I'll point out that my brother says that this
15 particular Order did not deal with or consider tax exempt
16 status, which is false.  That case did not just concern a PPP
17 loan, though it did.  The Court in its holding -- and I have a
18 copy of this Order should Your Honor wish to see it.

19        **THE COURT:**  I've read it.  They didn't cite my case
20 slightly earlier, I note that, but they did rule the same way I
21 did.

22        **MS. GRAZIANO:**  It ruled the exact same way, Your
23 Honor.  In fact, the Court ended its treatment of the issue by
24 saying "Accordingly, the Court holds that Valley Christian's
25 tax exempt status confers a federal financial benefit that

obligates compliance with Title XI."

So I'm glad that Your Honor is familiar with it.  So I just wanted to point out the clarification that this Order was issued, not just with respect to the PPP loan but also to that school status.

Again, Your Honor, you're quite right that the facts of that case are almost identical in terms of allegations, and almost identical in that order to the arguments that were raised by the Defendant in this courtroom today, and also the cases that were relied upon.

I'm sure Your Honor recalls reading in the E.H. Order that the *Johnny's Icehouse* case was cited left, right, up and down, just as it has been by my brother.  And again, we're hearing the same cases over and over, the same arguments over and over and that's a merit-based argument.

And I think Your Honor was quite right earlier in saying dissatisfaction or upset or whatever you want to describe it as with a ruling doesn't give rise to the level of error that warrants a Motion for Reconsideration.

And I also just want to point out, since my brother did spend such a great deal of time speaking about the *Cummings* case, that case is about damages only, about how spending clause legislation is a contract, as my brother rightly noted.

But the Court was talking about what damages are available when there's a contract with the Government part and parcel to

1  that spending clause.  And said that because it's contractual

2  in nature, the only damages that are available then are

3  contractual damages, so not emotional distress damages.

4      So it's a little bit of a stretch to say then that the

5  *Cummings* case can be applied to this issue en masse, when it's

6  really very, very narrow.  And I don't think it all changes the

7  thought process or the analysis that this Court underwent in

8  reaching its order.

9      But I will also say this, Your Honor, and I think that you

10  really hit this in the Order that you issued.  We're not just

11  talking about tax exception, right?  We're talking about

12  501(c)(3) status, which in and of itself is a contract with the

13  Government.

14      You've got these nonprofit organizations coming forward

15  and saying "Look, in exchange for the benefit that we confer,

16  the good that we give to society, in exchange we want this

17  panoply," or we're going to take advantage of this panoply of

18  benefits, including tax exemption.

19      But it's far beyond that.  It is clearly and truly a

20  contract.  I think we see that even when we look at some of the

21  other Title VI cases that Your Honor cited.  They might not be

22  exactly factually on point talking about Title XI, although we

23  know from Supreme Court precedent that Title XI is of course

24  modeled after Title VI.

25      But we have the *Regan* case going back to the '80s telling

1  us that a grant is the same thing as -- and a subsidy is the

2  same thing as a cash gift from the Government, right.  So if we

3  agree that the 501(c)(3) status is a contract with the

4  Government, which is the equivalent of a grant, and we look

5  at -- my brother made much discussion of the C.F.R.s and the

6  regulations, 34 C.F.R. 106.2, the definitions for Title XI of

7  what constitutes federal financial assistance, number one, is a

8  grant or a loan.  So all we have to do, again, is look to *Regan*

9  which tells us that a grant is the same thing as a gift of cash

10 from the Government.

11      So any way we slice it, Your Honor, a 501(c)(3) entity is

12 keeping money that would otherwise belong to the government and

13 in that fashion is a direct recipient of federal financial

14 assistance.

15      So I really don't think it's so convoluted.  I really

16 don't think these bootstrapped arguments, some of which should

17 have been and for whatever reason weren't part of my brother's

18 original moving papers, they're extraneous.  They're not

19 persuasive.  They're not authoritative.

20      When we look at the Supreme Court precedent on the issue

21 of when an entity is a recipient of federal financial aid and

22 then what constitutes federal financial aid, as I said borne

23 out by the *Regan* case, also borne out by *Grove City* and *NCAA*,

24 coupled with as you pointed out the authority from the Eleventh

25 Circuit.  Whether or not, you know, a footnote wasn't enough

1  for my brother counsel, it's certainly enough for the Court in

2  its Order.

3       Then we look at some lower court decisions like the *Fulani*

4  case, as well as the *McGlotten* case, which I disagree with my

5  brother, I think that was soundly decided.  We clearly see that

6  assistance provided through the tax system is within the scope

7  of Title VI.  As we know from the Supreme Court, Title XI is a

8  mirror of Title VI.  It's unambiguous.

9       So this idea that schools like Concordia Prep, schools

10  like the Defendant who do have that 501(c)(3) status, were just

11  utterly in the dark, and it was so unambiguous, and they

12  weren't on notice that they were going to be held to the

13  mandates and requirements of Title XI is just unavailing.

14  Because it's clear when you look at the precedent that they

15  were given this grant.  They were given this money, basically,

16  from the Government and as such are on the hook for -- for

17  Title XI.

18       And I would just point out again, I know I mentioned to

19  Your Honor that we're talking about 501(c)(3) status as opposed

20  to just tax exemption.  This is not this broad-based policy.  I

21  didn't read Your Honor's opinion, and I certainly tried to make

22  this point in our opposition to my brother's motion.  We're

23  not -- I don't think that the Court's Order does this and we're

24  not certainly asking for some broad-based proclamation that

25  every school that gets a tax exemption is subject to Title XI.

1          We're here today talking about one Defendant, their

2    conduct, their status as a 501(c)(3) entity, and how they used

3    that conduct and benefited financially from that status in a

4    manner that places them under the auspices of Title XI.

5          So this idea, and my brother mentioned it, and I know it's

6    in his papers and we've got, you know, fine counsel here today

7    from various entities nationwide, this idea that this issue

8    affects such a great many schools and it's going to be so

9    onerous for schools to come into compliance with Title XI is,

10   frankly, unavailing.  And it's not a reason for this Court to

11   reconsider a sound --

12          **THE COURT:**  Let me make sure if I understand your

13   argument in that regard, is that the specific criteria of Title

14   XI, that's at issue here, is the matter of -- as was noted by

15   the Fourth Circuit in the *Doe v. Fairfax County* case -- is the

16   matter of the sexual harassment that being so severe, pervasive

17   and objectively offensive.  And so an official who has the

18   authority to address the alleged harassment, and the school

19   acting with deliberate indifference, all of those factors have

20   been listed by the Fourth Circuit last year.  And I'm trying to

21   understand your point about the limit of noting that 501(c)(3)

22   status may constitute receiving federal funds is in the context

23   of this type of sexual harassment section.

24          Is that what your argument is?

25          In fairness to the Defendants, I'm trying to inquire in

1   terms of the breadth of it.  I understand the reaction of --

2   and I understand the amicus briefs that have been filed in

3   terms of the breadth of it in that the 501(c)(3) status is not

4   just merely important to private schools, some would say it's

5   the very core of the existence of private schools.  And there's

6   more than a few private schools who would be severely

7   jeopardized, their very existence would be jeopardized if they

8   didn't have 501(c)(3) status.

9       I wouldn't want to be in charge of fundraising for a

10  private school if 501(c)(3) status was taken away.  And indeed,

11  it's pretty clear that most people realize that all the

12  fundraising, the financial status of schools is very dependent

13  upon the donations of alumni and very dependent upon 501(c)(3)

14  status.  I certainly understand the amicus briefs that were

15  filed by local and national independent school organizations.

16           **MS. GRAZIANO:**  As do I, Your Honor.

17           **THE COURT:**  I will note for the record I was fully

18  aware of that when I issued the opinion.

19           **MS. GRAZIANO:**  Of course, Your Honor.  And I will say

20  this, I'm going to ask the Court in the moment if I can include

21  my brother counsel.

22           **THE COURT:**  Sure.

23           **MS. GRAZIANO:**  Very appreciative of that.  If I can

24  say before I turn to him, Your Honor, that's certainly not lost

25  on me.  I know Your Honor at one time was a board member of a

1  private school in Maryland.  I'm a board member of a private
2  college.  So I completely understand the implications for
3  institutions.
4      My point is merely there's a difference between 501(c)(3)
5  status, which is something that's solicited, that's a position
6  that's applied for and granted in exchange for -- there's a
7  consideration there, like a contract, versus a mere tax
8  exemption.
9          THE COURT:  That's fine.  I'll be glad to hear from
10 Mr. Ketterer, that's fine.  And anyone else who wants to
11 respond.  Mr. Viola will have a chance to respond or
12 Mr. Goodman.  And for that matter, any of the amicus counsel.
13 I'm more than welcome to have any of them respond.  I
14 understand what the implications of this are.
15         MR. KETTERER:  Your Honor, just briefly.  I don't want
16 to have two people arguing.
17         THE COURT:  That's all right.  I can waive that local
18 rule if I want.  This is important.  I'm more than willing to
19 have an input of anybody that wants to speak.
20         MR. KETTERER:  Very good, Your Honor.  I appreciate
21 that.  What I would say directly to you is this, 501(c)(3)
22 status is not what's under the microscope or under implication.
23 This idea there's a public policy concern, which Your Honor has
24 consistently in both its original Order and here today has
25 voiced concerns about the concerns that Title XI sort of

1  implicates and is trying to protect, that's really what the
2  case is about.  It's about protection of young women.
3          THE COURT:  At private schools.
4          MR. KETTERER:  In private schools.  The question is is
5  that how is it that Concordia Prep School used its 501(c)(3)
6  status?  Right.  So we can say, well, tax exemption is one of
7  the benefits of 501(c)(3) but that is not the only benefit of
8  501(c)(3) status.  There are other benefits, both financial and
9  non-financial benefits that are implicit within that contract
10 or that contractual relationship with the Government.  So
11 that's number one.

12         Number two, how did Concordia use it?  If you go to the
13 Concordia website today, what you see is a panoply of a whole
14 section of fundraising efforts.  And those fundraising efforts
15 do this, they specifically target and utilize the contracted
16 benefit they got from the government, 501(c)(3) status, in
17 order to raise money, to use that money in a way that is
18 specifically directed to the very things that Title XI
19 specifies and enumerates are covered within that particular
20 statute.

21         So the frame of this is always tax exemption, tax
22 exemption, tax exemption.  And, there are 501(c)(3) entities
23 that use it, maybe as just a tax exempt status.  They take the
24 benefit.  That's a question -- and I believe that there's more
25 than adequate case law, the weight of the evidence more than

1  supports that being considered federal financial assistance.

2       But in this case, Your Honor, in Concordia Prep School's

3  case, in the manner in which they use it, they use it in a way

4  that is for further financial gain.  They take that federal

5  benefit and they explode it in another manner.  And that is a

6  benefit that directly benefits their pocketbook.

7       Money that would otherwise wind up in the Government's

8  pocket for many individuals, many companies, many corporations,

9  where does it land?  It lands with CPS as an express grant of

10 the relationship and the contractual nature.  So even assuming

11 defense counsel's argument, the contractual nature of that

12 relationship specifically lines CPS's pockets.  I don't know

13 about any of the other associations.  And I don't know about

14 any other private schools.  And I don't know exactly what they

15 do or do not do.  But what I do know is what Concordia Prep

16 does in its public view and how it is they use that 501(c)(3)

17 status.

18      Thank you, Your Honor.

19      **THE COURT:**  Thank you very much.  Thank you all very

20 much.

21      **MS. GRAZIANO:**  Thank you, Your Honor.

22      **THE COURT:**  Thank you.  Mr. Viola, I'll be glad to

23 hear from you in response.

24      **MR. VIOLA:**  Sure.  The Court's ruling was pretty clear

25 as to the tax exempt status constituted federal financial

```
1   assistance.  I'm not sure how we're trying to parse this out
2   now.
3            THE COURT:  In the context of an educational
4   institution.
5            MR. VIOLA:  Right, but how it differs somehow if they
6   use it for fundraising or not, as the Court aptly pointed out,
7   I think you said you wouldn't want to be any fundraiser for any
8   tax exempt institution -- or didn't want to be any sort of tax
9   exempt institution that didn't use it for fundraising.  I mean,
10  they're trying to draw a distinction without a difference.
11  Either the Court makes the ruling that tax exempt status
12  constitutes federal financial assistance and we can do
13  whatever, appeal or not.
14       I don't see how they're parsing out particular exceptions
15  involving CPS.  And I'm happy to ask amicus counsel if they
16  disagree with that.
17           THE COURT:  Sure.
18           MR. VIOLA:  The only other thing I want to talk
19  about --
20           THE COURT:  In fairness to you, I think that's very
21  apt.  I certainly read the implications when I issued the
22  opinion.  That in the context of Title XI, in terms of an
23  education institution, in context of Title XI and sexual
24  harassment that in terms of those mandates that are very
25  specific, that the 501(c)(3) status constitutes receiving
```

1    federal funds and not necessarily abiding by your argument with
2    respect to the spending clause legislation because, so the
3    record is clear, that there's broad public policy with respect
4    to Title XI.  And we're not just talking about Government
5    contracts and spending clause legislations and apportionments
6    from acts of Congress, we're talking about significant,
7    significant changes in 1972 that were important to literally
8    all women in the United States and all young women in schools.
9    There's no doubt about that.  In terms of the revolution and
10   the development of women sports in college.  Suddenly young
11   women are getting recruited to colleges for sports, not just
12   young men.  And in terms of the implications as to all these
13   mandates of Title XI, including sexual harassment.

14       So that I think that you're right in terms of -- you can't
15   really parse this down and make it limited.  I understand the
16   breadth of it.

17       The breadth of it is is that a young woman in Towson High
18   School doesn't have greater protection from sexual harassment
19   than does a young woman at Concordia Prep for the specific
20   reason, well, we get our money straight from the state or the
21   feds and we don't.  That's the point of it.  Let's make sure
22   it's abundantly clear on the record.

23       As far as I'm concerned they're trying to parse this into
24   spending clause legislation and shoehorning it in, in terms of
25   the narrowness of these doctrines, with no disrespect,

1   Mr. Viola, that's not what we're talking about here.  There's
2   no way you can limit Title XI in that fashion.  That
3   legislation was passed 50 years ago with earth-shaking results
4   across society.  Without question.
5       And I fully understand the import of my opinion in that
6   regard.  And I don't think you can parse that down.  It's Title
7   XI and young women and the protections and the benefits they
8   receive.  And what I want to ask you, I'm trying to understand
9   why this is so onerous because you've avoided public policy.
10  You cannot avoid public policy in this analysis, with all due
11  respect.  And there's very likelihood I'm going to let you all
12  go down to Richmond.  I want to make sure you understand so the
13  record is clear, you just can't ignore public policy and say:
14  Well, here we're going to shoehorn this in.  This is spending
15  clause limitation and here's this case on this law and this
16  case on this law.
17      And that's why I emphasize that you have a very definite
18  dearth of Title XI cases.  There is not an overwhelming
19  authority.  There is many cases that go my way as go your way.
20      *Johnny's Icehouse* is a case you've cited a lot today in
21  your opinion.  You needed to because there aren't that many
22  cases specifically on Title XI, despite your effort to try to
23  shoehorn them in the spending clause limitation.
24      But I think in fairness to you, I need you to explain to
25  me why is this so onerous?  There's some suggestion in terms of

1   implementing regulations that, for example, I saw somewhere in

2   the papers in terms of having a designated official that has to

3   deal with these kinds of issues, apparently which is the case

4   under Title XI.

5       Explain to me how that is so onerous for Concordia Prep to

6   have the same kind of person assigned to these matters as

7   Towson High School?

8       And anybody -- and I would be glad to hear from those who

9   filed amicus briefs.  I really want to be educated on this and

10  it's good for the record.

11      Mr. Shea, nice to see you here.

12          MR. SHEA:  Your Honor, it's a pleasure to see you, as

13  always.

14          THE COURT:  I mean, seriously, where is this so

15  onerous to a private school?  Where is this great burden that's

16  placed upon a private school?  And tell me where is this huge

17  matter of just sort of pushing public policy aside and looking

18  at the spending clause limitation figure?

19          MR. SHEA:  Your Honor, that's precisely why we

20  submitted our amicus brief is to show that the implications of

21  both the onerousness and the other implications of this kind of

22  compliance.

23      And to quibble, I would say this is, from our perspective,

24  this is not about protecting women.  This is about how women

25  are protected in these schools.  And the point is, Title XI is,

1   frankly, designed for large school systems and universities.

2   And to answer your precise question about how onerous it is,

3   Title XI's implementing regulations require not one designated

4   Title XI coordinator, but they require three specific people.

5   They require a Title XI coordinator.  They require someone to

6   investigate the --

7              THE COURT:  The allegation.

8              MR. SHEA:  -- the allegation, and someone to

9   adjudicate it.  And the three of them have to be different

10  people.  Not only do they have to be three different people,

11  they have to be trained on very complicated concepts of law.

12  Privilege, they have to apply privilege rules.  These are all

13  in the regulations, Your Honor, we cited them --

14             THE COURT:  Yes, I saw it.

15             MR. SHEA:  They have to apply privilege, they have to

16  not consider privileged material.  They have to consider

17  relevance.  They have to only consider what is legally

18  relevant.  They have to analyze what is sexual harassment claim

19  under the legal definition of sexual harassment and dismiss any

20  claim that's not -- that doesn't meet the claim of sexual

21  harassment.

22        And they have to -- I can go through this ad nauseam, but

23  it amounts to what is essentially a quasi-legal, quasi-

24  judicial proceeding.

25        And our clients are institutions that in some cases have

1    80 students.  We have one member that has 10 faculty members.

2    For them to designate three different of those 10 faculty

3    members to fill these positions and comply and be trained on

4    them and implement these very complicated and specific

5    procedures is just not something they're equipped to do.

6       And it's not that they're not capable and able to protect

7    women from sexual harassment complaints.  They do so every day,

8    very, very effectively.  But they have procedures and policies

9    in place that are tailored to both their size and their

10    mission.

11       So you have schools that, frankly, every day make the

12    difficult decision not to accept federal funds, actually accept

13    money, knowing that it could mean the difference between them

14    failing or not.  There are maybe schools that didn't take

15    Payment Protection Plan money knowing that they could fail and

16    they could have to close.  But they knew -- not that they

17    didn't want to protect women, but they knew that these very

18    specific prescriptive requirements are just not something that

19    they're ever going to be able to accomplish.

20       We cite in our brief Johns Hopkins University, which

21    obviously is a totally different animal, but they have an

22    entire division of their university.  Fifteen employees, seven

23    of whom are full time investigators, I might be getting the

24    numbers wrong, and 11 of whom are lawyers.  They have a whole

25    division.  And all they do, the whole division, all they do is

```
 1  implement the procedures that are required by Title XI that are
 2  very specific and change all the time from administration to
 3  administration that if they don't comply with they're in
 4  violation of Title XI.
 5      To go back to where I started, this is not about whether
 6  or not to extend more rigorous and greater protection to women.
 7  This is about how that should be implemented and what's the
 8  most appropriate way, given the institution that you're talking
 9  about.  And for a small school with 80 students and 10 faculty
10  member --
11          THE COURT:  Mr. Shea, you and I both know that's the
12  rare example.
13          MR. SHEA:  Well, Your Honor, just to give some numbers
14  to that --
15          THE COURT:  I'm sorry, Mr. Viola, do you want to say
16  something?
17          MR. VIOLA:  Concordia Prep, I believe their enrollment
18  was 104 students over seven grades.
19          THE COURT:  Seven grades, yes.  Okay.
20          MR. SHEA:  Your Honor, the National Association of
21  Independent Schools, which is one of the seven independent
22  schools we represent, 12 percent of their members have under
23  100 students.  So it's not the rare case.  It's a large number
24  of --
25          THE COURT:  Let me ask you this, I don't mean to
```

1  interrupt, because we can spend a lot of time on this, but I'm

2  really interested.  I'm familiar with those three people that

3  are required.  I'm very familiar with it.

4          **MR. SHEA:**  Understood, Your Honor.

5          **THE COURT:**  And you have one person that investigates

6  the allegation.  You have one person who sets the policy and

7  tries to make sure everyone is aware of it.  You have another

8  person who investigates the claim.  And you have a third person

9  who acts essentially as the judge and determines if it's up or

10 down, in terms of whether they find there was or was not, if

11 there was some violation of school policy.

12     It's very similar to school honor boards and private

13 schools have school honor boards, public schools have school

14 honor boards.

15     And I must tell you, just so the record is clear for

16 purposes of the Fourth Circuit record, I don't find how onerous

17 that is for three faculty members to perform that role.  I

18 really don't.  And I think -- I must tell you, in all candor,

19 while I understand the reaction of the private schools

20 associations, I also suggest, if this goes down to Richmond as

21 quickly as perhaps I think I'll let it go, we need to reflect

22 quickly upon the matter of public policy, the matter of

23 implementation of public policy, the importance of public

24 policy, and the implication that public high school students

25 have certain mechanisms that they can undertake and are certain

1  sanctions.  But the private schools, not so much.  Just don't

2  worry, they'll do the right thing --

3       I'll be there and finish in a minute, Ms. Graziano.

4       -- but they'll do the right thing.  But they don't fall

5  within the ambit of it.

6       You and I both know -- I have the benefit of knowing a lot

7  of the lawyers in this room, some of whom have also been the

8  benefit of the private school system, you and I both know that

9  the pandemic was nothing to private schools compared to what it

10 would be if they didn't have 501(c)(3) status.  Ms. Graziano

11 has aptly noted the emphasis on that that.

12      I mean, I can't imagine, when I served on the board of a

13 private school in this area if you suddenly had 501(c)(3)

14 status jeopardized, first of all you can't get the foundation

15 money.  Do you agree with that, Mr. Shea?

16           **MR. SHEA:**  Yes, Your Honor.

17           **THE COURT:**  You don't get a dime of foundation money.

18 All these foundations, AS Abell Foundation, all these

19 foundations, not a penny can go to a school that doesn't have a

20 501(c)(3) status.

21      Alumni are asked to give money and they're told:  Well,

22 you may or may not be able to deduct it.

23      501(c)(3) status is at the very core of private schools.

24 It is not just a minor matter.

25      And to understand -- I just absolutely, so the record is

1  abundantly clear in terms of Mr. Viola's very intense and very

2  good argument, I do not see that Title XI can be shoehorned

3  into the spending clause legislation like some of these cases

4  because it's an enormously significant piece of legislation and

5  had a major impact on American society.

6      And we all know that when that law was passed we had

7  nowhere near the issue of lifting up the issue of sexual

8  harassment.  We all know that it's been shocking to all of us

9  over the last 15 or 20 years in terms of these allegations

10  coming forward now.

11      But that's part of what Title XI did in my view.

12      And the notion that it's so particularly onerous, and I

13  have read your briefs, and I have no difficulty with you all

14  participating in this litigation, and I think you should have,

15  and I agree with it, but I'm not going to back off from how

16  significant the opinion is.

17      I recognize how significant the opinion is.  Ms. Graziano

18  is not quite correct to say:  Well, I'm going to narrow this

19  here.

20      I'm not narrowing it at all.

21      As far as I'm concerned, 501(c)(3) status to any private

22  school is receipt of federal funds in the context of Title XI

23  legislation when it comes to Title XI claim based on

24  student-on-student sexual harassment.  That that falls within

25  that, and they must abide by it.

1        And the notion that it's particularly onerous as to these

2  three people that appointed -- you've correctly summarized the

3  three people.  I don't find that to be very onerous.  It is not

4  a Johns Hopkins University system with house counsel.  And

5  you're right, many of these major universities have extensive

6  offices.  That's, you know, it is what it is.

7        But I just think that we're sort of treading through new

8  ground here.  And in fairness to AIMS, the Association of

9  Independent Maryland Schools, as well as to the national

10 organizations, I didn't just jump on this opinion.  If you

11 note, these motions for these five cases were pending for a

12 while.  And I did reflect upon them and the opinion might have

13 been short, but I think it was to the point.

14       Anything else you want to add on this, Mr. Shea?

15       **MR. SHEA:**  No, Your Honor.  Only just to reiterate

16 that under no way, shape or form are my clients or their

17 members in any way against all the great things that Title XI

18 has accomplished or all the things of the goals it is designed

19 to achieve.  Again, what we are taking issue with is that it's

20 designed for all entities everywhere.  And not just --

21       **THE COURT:**  All private school entities anywhere is

22 your point.

23       **MR. SHEA:**  Well, all schools everywhere, Your Honor.

24       **THE COURT:**  Right.  All private schools everywhere

25 because it's clearly applicable to public schools.  They all

1    get federal funding.  Is there any dispute about that?  Is

2    there a public school in the United States that doesn't get

3    some sort of federal funding?

4            MR. SHEA:  No, Your Honor.

5            THE COURT:  All right.  That's it in a nutshell.  That

6    might be the most important thing we've established today.

7        Literally, there's not one public high school in the

8    country that does not receive federal funding to place them

9    under the same mandates as we're now dealing with here in this

10   case, correct?

11           MR. SHEA:  Correct, Your Honor.  Although they are

12   different sizes and complexity.

13           THE COURT:  Different size, whatever, it could be a

14   very small -- not just a huge, urban public high school.  It

15   could be a very small public high school in a rural area of the

16   United States.  If it's a public high school, they're going to

17   get federal funding of some sort, correct?

18           MR. SHEA:  True, Your Honor.  Although the state

19   machinery, even if it's in a small, rural area they have

20   systems that are larger than 100-student private schools.

21           THE COURT:  Well, in fairness to you, just to continue

22   with that, the reality is -- again we're a little bit off on

23   terms of any of us having expertise on this -- but I'm fairly

24   certain that in rural areas of public high schools you may have

25   certain administrators that cover more than one school.

1        **MR. SHEA:**  Yes, Your Honor.

2        **THE COURT:**  And I think that's probably the case so

3   that you have in a rural area of the United States you have

4   someone who is an investigator who may be an investigator for

5   more than just one high school and probably also you agree with

6   that.

7        **MR. SHEA:**  Absolutely, Your Honor.

8        **THE COURT:**  And the point is, there would be also

9   another investigator, another person who would then preside and

10  they may preside at more than one high school.  So I'm not

11  suggesting that there aren't ramifications for even smaller

12  schools, and I hear you.  But that's the way it is.  That's my

13  view of it.

14       **MR. SHEA:**  Thank you, Your Honor.

15       **THE COURT:**  Thank you very much, Mr. Shea.  And thank

16  you for the quality of your briefing.  And thank you to your

17  group that's here from Venable.  Thank you very much.

18       And Mr. Genth, do you want to be heard on this?

19       **MR. GENTH:**  Your Honor, very briefly.

20       **THE COURT:**  Sure.

21       **MR. GENTH:**  Geoffrey Genth for the Association of

22  Maryland Independent Schools, Your Honor.

23       I represented AIMS only since Your Honor's July opinion.

24  I have had the privilege and the pleasure to be outside general

25  counsel for a number of independent Maryland schools starting

1  25 years ago, Your Honor.

2      Title XI was passed 50 years ago.  Congress did not intend

3  Title XI to cover independent schools.  The Executive Branch

4  for the education department has never understood Title XI to

5  cover independent schools.

6      Independent schools, with the exception of the PPP blip

7  that began two and a half years ago, never understood since

8  1972 that they were subject to Title XI.

9      There's been a consensus, therefore, that Title XI doesn't

10  apply to independent schools merely on account of tax exempt

11  status.  It could be that Congress didn't understand what its

12  enactment meant in that the education department has been

13  getting it wrong.  That could be.  And it could be that the

14  independent schools have been getting it wrong by not

15  understanding that they've been subject to Title XI since it

16  was enacted in 1972.

17      I respectfully submit that there's another possibility,

18  and that is that the congressional intent and the executive

19  interpretation of that intent has at all times been correct in

20  that independent schools are independent of a lot of government

21  regulation, including Title XI.  And there's a good reason for

22  that, Your Honor, in terms of public policy.

23      It's okay for Congress to have these sort of contractual

24  spending arrangements if they have highway funds for whatever,

25  and say:  Here's the *quid pro quo*, we'll give you the highway

1    money, you've got to the bring the speed limit down to 55.

2        It's a great public policy, I believe, in favor of lower

3    speed limits.

4        But that doesn't mean there's a contract between every

5    independent school and the federal government with regard to

6    Title XI.  It's never been understood to me that way.

7            THE COURT:  Let me ask you something, how do you react

8    to parallel definitions under Title VI and antidiscrimination

9    public policy as contained under Title VI?

10           MR. GENTH:  Well, Your Honor, my partner, Steve

11   Klepper, drafted our brief, but I think that's the *Bob Jones*

12   case, Your Honor.

13           THE COURT:  Yes.

14           MR. GENTH:  There would have been no reason to do that

15   analysis if Title XI by itself --

16           THE COURT:  My question to you, correct me if I'm

17   wrong, certainly Title VI and the antidiscrimination public

18   policy contained in Title VI has been incorporated to apply to

19   private institutions, has it not?

20           MR. GENTH:  Not on account of their tax exempt status,

21   Your Honor.  I don't believe so, no.  That's -- I think that's

22   the *Bob Jones* case.  And I think Mr. Klepper got it right in

23   the briefing and saying the very premise of all these cases --

24   and you're right, Your Honor, there are not a ton of cases out

25   there.  There are some things that are just so understood.

1    It's hard to find cases that decide that a cat is not a

2  canine because there's not a lot of people arguing about like.

3       What I'd like to report based on my experience, as outside

4  general counsel for independent schools, is that this is

5  changing the universe, if it changes this way.  It's not for

6  the better.

7       Mr. Shea, whose arguments I think are 100 percent on

8  point, has got it right.  This is hugely onerous.  That school

9  with 10 students -- excuse me, 10 faculty members -- they're a

10 client of mine.  Ten faculty members.  Only 10.  It's basically

11 a one-room schoolhouse.

12      And it's not just about appointing three people.  You've

13 got to train them.  And then, you know what, if you get the

14 procedures wrong, you get sued for that.  There are major

15 universities throughout this country, Your Honor, they can't

16 get it right.

17      And then every four years somebody else comes into the

18 White House and you have a new Department of Education and they

19 switch the Title XI regulations.  And then you deal with that.

20      What we deal with now -- I was on the phone with a client

21 very recently -- transgender.  Huge battleground.  And it goes

22 back and forth like a ping-pong ball between the political

23 parties.  The independent schools are doing their jobs, they're

24 protecting young women.

25      And what they don't need, this government overlay 50 years

after the enactment of the statute to come into play.  There
are causes of action here that exist and could be brought if
they're valid under applicable state law.  But respectfully --

          **THE COURT:**  Ah, that's the key point there, Mr. Genth.
That's the key point.  Under state law.  No federal
jurisdiction.

          **MR. GENTH:**  That's correct.  That's the way it's been
for 50 years.  And respectfully, if Congress didn't intend
Title XI to apply to independent schools, and I respectfully
submit it didn't, certainly didn't understand it.  Respectfully
to the Court, the whole world outside the legal area in these
cases going back and forth, no one understands or has thought
that Title XI applies to independent schools.  And it could be
that they've all just got it wrong.

     But I submit there's the other possibility, which is that
the Department of Education, which is in charge of all this --
I mean, through all the Democratic administrations, and I guess
Republican administrations too, they have wanted to do good
things and reform the world in this area.  It never occurred to
any of them that tax exempt status meant recipient to Title XI.

     And I'll respectfully submit it wasn't because they
weren't intelligent enough to realize that, it was because
that's the law.  This is spending legislation.  And there is a
very good public policy argument for not having quasi-judicial
proceedings in a tiny school that may be K through 5, K through

1   6.  These schools address these issues every way -- every day.

2   And they should be allowed the flexibility as independent

3   schools, independent of the government, to fulfill their

4   missions.

5       Independent schools are filled with some of the most

6   idealistic and good-doing people.  And they should be allowed

7   in the setting outside of the government to pursue their

8   missions.

9       So that's, you know, and, Your Honor is absolutely

10  correct.  If you're in for a penny, you're in for a pound.

11  Ms. Graziano cannot say:  Oh, it's just this little -- it's the

12  whole thing.  It's all those officers.  It's all the --

13           THE COURT:  Well, the issue here is in terms of the

14  sexual harassment prohibitions under Title XI.  That's what's

15  involved here in terms of specifically the section that deals

16  with student-on-student sexual harassment.  And the criteria as

17  summarized by it Fourth Circuit recently of those four criteria

18  that they were a student at an educational institution

19  receiving federal funds.  And the phrase that we're dealing

20  with is "receiving federal funds."  What does that phrase mean?

21  Does it have to be a direct grant or do they receive federal

22  funds from the point of view of tax deductibility contributions

23  to the school.  That's precisely what's before us.

24           MR. GENTH:  Well, Your Honor, I don't understand the

25  limiting principle.  If you're tax exempt status, it means you

1   receive federal funds for purposes of Title XI.  Maybe I'm
2   misunderstanding the Court's question, but doesn't that mean
3   that all Title XI apply?

4           THE COURT:  Like many things, Mr. Genth, I can't
5   project exactly how the litigation proceeds in terms of the
6   interpretations of these phrases.

7           MR. GENTH:  But, I mean, if Title XI applies to
8   independent schools on the basis of tax exemption, it's not
9   just some of Title XI, it's all of Title XI.  And we have
10  quasi- judicial proceedings because of something that happened
11  on the playground with two eight year olds.  And what I would
12  say --

13          THE COURT:  I guess you don't have much faith in
14  courts throwing out those kind of cases.

15          MR. GENTH:  Well, I --

16          THE COURT:  Are you suggesting that we have three
17  years of litigation over that?  And I mean, in all candor,
18  Mr. Genth, there's a remarkable lack of faith in a judicial
19  system here.  Do you really think a judge is going to have an
20  eight year old can make a complaint and have a frivolous
21  lawsuit be filed and not just bounce it out of court?

22          MR. GENTH:  Your Honor, I have utter faith in the
23  judicial system.  And I had a great privilege of, as you know,
24  serving with Judge Harvey.  I forget if he was in this
25  courtroom.  I have a great faith in the judicial system.

1        What I have less faith in, as outside counsel for schools,

2   is that every parent is sane, well-balanced, and always going

3   to only advance responsible arguments.  And it is a huge -- if

4   the Court wants to know what the burden is, to deal with a

5   quasi-judicial process and a parent saying, my eight year old

6   was teased because of her pigtails -- and I know this sounds

7   ridiculous -- but it is ridiculous -- it's not hard for me to

8   conjure this up.  In my representation of school I deal with

9   these things.

10       **THE COURT:**  There's no reason to conjecture.  How

11  often does that occur in public schools?  Tell me the -- cite

12  to me the litigation that has arisen in public schools across

13  the United States.  And there's an agreement, so the record is

14  clear for the Fourth Circuit, every public school in the United

15  States is exposed to the onerous task that you say is too

16  onerous for private schools.

17       Please explain to me and tell me, and maybe I can have you

18  document it.  I want you to document how many frivolous

19  lawsuits over pigtails and eight year olds in a lower school

20  have been filed in the United States.

21       **MR. GENTH:**  Your Honor, I have not done that research.

22       **THE COURT:**  I'm sure you haven't.  I'm sure you

23  haven't.

24       **MR. GENTH:**  I could, Your Honor.

25       **THE COURT:**  No, with all do respect, Mr. Genth, I'm

1  not going to go have you waste time or your client waste time

2  or money on it.

3      I respectfully suggest, I respectfully suggest that there

4  has not been this wave of litigation over eight year olds

5  throughout the United States based upon these provisions of

6  Title XI.  Clearly the record is perfectly clear here, we're

7  talking about private schools and public schools.  There is no

8  question that every argument about how onerous it is, how

9  difficult it is, that in terms of specific funding legislation

10  all public schools are subjected to this.

11      And I must tell you, I know of no -- well, actually the

12  proof in the pudding is this, you know what it is, we can watch

13  television -- and I've entertained as you may know many

14  international delegations.  They are, like, shocked at what

15  they see on the TV screens, the lawyers hawking their wares.

16  Every one of them.  Europe, Asia, they just stare in disbelief.

17  And they watch lawyers hawking their wares.  And I explain to

18  them that lawyers are allowed to do this.

19      I will tell you, I have not seen a lot of ads for lawyers

20  that talk about if you think your child is being mistreated at

21  the school, and there's been a frivolous this or that, or your

22  child is wearing pigtails, your child has been bullied, please

23  call this telephone number.  I haven't seen that on the TV

24  screens.  That's a pretty accurate measure of what does or does

25  not happen because if there was a market for it, I guarantee we

1   would see a lawyer advertising on television.

2        **MR. GENTH:**  I would submit to you that not every legal

3   problem and legal headache makes its way into a lawsuit.

4        **THE COURT:**  What I'm trying to say is you're posturing

5   that there's this potential wave of litigation that this is so

6   earth-shaking, my opinion and the opinion in California are so

7   earth-shaking.  And Mr. Viola wasn't particularly persuaded by

8   the Eleventh Circuit's opinion back in 1989, which I think goes

9   the way of my opinion.

10       There's no question there's a division of authority on

11   this.  And that's why it's important to build a record for the

12   Fourth Circuit.

13       But my point is, the notion that this is catastrophic,

14   catastrophic to private schools, I don't see where it's been so

15   catastrophic to public schools.  And I would challenge you

16   all -- I'm sure you can find a case somewhere.  But the notion

17   that this has been so catastrophic and onerous and crippling,

18   it doesn't seem to have been that catastrophic to the public

19   schools in the area.

20       **MR. GENTH:**  Well if Your Honor would like, with

21   permission, I would ask my firm to present some legal authority

22   or legal research we could.  What I would submit, though, is

23   this, that sort of fact-finding, that's what Congress does when

24   it enacts things.  That's what the Department of Education can

25   do.  But this imposition on the basis of tax exemption on

1  independent schools of Title XI compliance, it is -- it's

2  effectively an amendment, I would suggest, respectfully, to

3  Title XI 99, 50 years after it was passed.

4      Because Title XI was spending legislation and it talks

5  about receiving government aid.

6          **THE COURT:**  Right.

7          **MR. GENTH:**  So that's the gist of the question.

8          **THE COURT:**  Sure.  We all understand what the legal

9  issue is.  Thank you, Mr. Genth.  Thank you very much.

10 Certainly goes without saying, thank you for what you've done

11 for the private schools which you represent.  And I understand

12 the seriousness of it.

13     The simple fact of the matter we've been regurgitating

14 over issues that well represented, as I suggested to Mr. Viola

15 earlier in his argument, there's really no new ground here.

16 There's one case that has been said, a *Cummings* case, cited in

17 a brief filed five days ago having to do with the spending,

18 essentially the issue as to the spending clause legislation.

19 Doesn't relate to Title XI at all.  But that has been cited.

20     And the criteria here with respect to Motions for

21 Reconsideration under an analysis, essentially, under Rule

22 60(b), essentially the analysis is Rule 54(b) in terms of

23 reconsidering any decision of the Court and may be revised at

24 any time before the entry of final judgment.  But motions for

25 reconsideration of interlocutory orders are not subject to

1    those strict standards.

2        And the Fourth Circuit has suggested that rule 60(b)

3    standard guides the District Court's analysis.  And that goes

4    back to the Fourth Circuit opinion in *Fayetteville Investors*

5    936 F.3d. 1462, a Fourth Circuit opinion in 1991.

6        So as I've previously noted in some of my other opinions,

7    the analysis here is under Rule 60(b) and 60(b) provides

8    extraordinary relief and should only be invoked under

9    exceptional circumstances, as this Court has often held going

10   back to Judge Nickerson, an opinion in 2010:  To support a

11   motion under Rule 60(b), the moving party must demonstrate

12   timeliness, a meritorious defense, a lack of unfair prejudice

13   to the opposing party, and exceptional circumstances.  And the

14   threshold requirements are met if the moving party under 60(b)

15   establishes one of the six predicates, any one of them, mistake

16   or inadvertence.

17       I understand Mr. Viola has very strong and well-presented

18   arguments that I'm dead wrong.  I don't see the phrase "dead

19   wrong" anywhere in the rule, but I understand what his argument

20   is.  I don't happen to think that I'm dead wrong.  But that's

21   my job to make decisions and then the Fourth Circuit will

22   review what I've decided.

23       Newly discovered evidence.  There's no newly discovered

24   evidence here since my opinion.

25       Fraud or misrepresentation or other misconduct isn't an

1  issue here.

2      The judgment is void or there's a judgment that has been

3  satisfied or any other reason justifying relief.

4      The simple fact of the matter is that Plaintiffs face a

5  high bar to succeed on a Motion for Reconsideration.  And a

6  mere disagreement with the Court's ruling is not enough to

7  justify a Motion for Reconsideration as this Court has

8  previously held under the *Lynn v. Monarch Recovery*, 953 F.Supp.

9  2d 612, an opinion of this Court in 2013.

10     And indeed one of my colleagues has noted that -- I

11 forget -- I should note which one because it's lovely language,

12 it's not mine, I'm fairly certain -- is that:  The prior

13 judgment cannot bid me, quote, "just maybe or probably wrong,"

14 and Mr. Viola, it doesn't mention dead wrong there -- but we're

15 laughing here.  It says "maybe or probably wrong."

16     But then it says "It must strike the court as wrong with

17 the force of a five-week-old unrefrigerated dead fish."  And

18 that is the language of one of my colleagues at 891 F.Supp. 2d

19 739, an opinion in 2012.

20     I'm glad Mr. Viola is laughing with me here.  We have to

21 find out who wrote that because I have to tell him along with

22 the dead fish it's being dead wrong I guess is the point.

23     Yes, Mr. Viola?

24         **MR. VIOLA:**  I'm not trying to be disrespectful, Your

25 Honor.

1          **THE COURT:**  I know you're not.  I'm teasing you.  And

2    laughing with you.  No problem.  There it didn't say they have

3    to be dead wrong.  It has to be so obvious that it smells like

4    a dead fish.

5          **MR. VIOLA:**  I think there is a case that says dead

6    wrong too.  Don't quote me.

7          (Laughter.)

8          **THE COURT:**  I'm glad you're laughing with me on this.

9          The point is that this bar, that bar, has not been met.

10   I'll do a quick opinion on this.  If I don't get it out

11   tomorrow we'll get it out by Tuesday because it's a long Labor

12   Day weekend.  And Ms. Beleson is just now with me.  It's her

13   first week, and I'm not going to have her work through the

14   first weekend that she works for me.  You don't have to worry

15   about that.  We'll file it on Tuesday.

16         I think, if we've got time here, maybe we could take a --

17         Ronda, how you doing?  Do you want a quick break?

18              **THE COURT REPORTER:**  I'm okay, Your Honor.

19         **THE COURT:**  I'd like to go into the matter of the

20   interlocutory appeal because the District Court's Order denying

21   a Motion for Summary Judgment or denying a Motion to Dismiss is

22   interlocutory and may be appealed only if the District Court

23   certifies it under 28 U.S.C. § 1292(b).  That the Order

24   involves a controlling question of law as to there is

25   substantial ground for difference of opinion, and that an

```
1   immediate appeal from the Order may materially advance the
2   ultimate determination of the litigation.  And two, the Court
3   of Appeals permits such an appeal.  They're really the
4   standards here.
5        As to that, the Defendants have requested -- the motion is
6   essentially one for reconsideration of my ruling or an
7   interlocutory appeal in the alternative.  I'm certainly willing
8   to entertain that.
9        So with that, Mr. Viola, if you would like to address it
10  I'll be glad to hear from you on this.  Or Mr. Goodman.
11            MR. GOODMAN:  Your Honor, on this point I would like
12  to be heard.
13            THE COURT:  I'll be glad to hear from you.
14            MR. GOODMAN:  I'll be brief, but I'll let Mr. Viola go
15  first.
16            THE COURT:  All right.  Go ahead.
17            MR. VIOLA:  Your Honor, this is addressed
18  significantly in our brief.  I don't have too much else to add
19  here.
20        Again, I think the controlling issue of law, we talked
21  about why this is a controlling legal question, and you talked
22  about it as well, does tax exempt status constitute federal
23  financial assistance.
24            THE COURT:  Pretty precise issue.
25            MR. VIOLA:  Exactly.  Pure question of law.  And then
```

1    you also touched on which one is correct.  But I think we can
2    agree that there are cases that go both ways so it meets the
3    second criteria.  And then the third criteria --
4              THE COURT:  We didn't agree on that earlier -- I'm
5    laughing -- but we do agree on it now.  There are cases that go
6    both ways.
7              MR. VIOLA:  We agree to disagree as to who is right.
8         (Laughter.)
9              THE COURT:  We're laughing.  But that's the point,
10   there's definitely the California case that says it goes my
11   way.  The Johnny's Ice whatever from 2001 doesn't.  I think the
12   Eleventh Circuit goes my way.  There's no Fourth Circuit
13   authority.
14             MR. VIOLA:  I'll throw *Stewart* and *Bachman* in,
15   whatever.
16             THE COURT:  That's right.
17             MR. VIOLA:  But I think we agree that there's a
18   difference of opinion of the law, not of the facts.  And then
19   also that it would terminate the advance determination of
20   litigation.  And Your Honor spoke about this before in terms of
21   potential jurisdictional issues if the appeal is ultimately
22   granted, the Title XI is out of the case and the appeal is
23   ultimately -- Your Honor is ultimately reversed.
24        So I think all of those things that the requirements for
25   the certification for interlocutory appeal have been met.  And

1    one of the other issues, too, is that we've talked at length

2    about the independent schools that are here today being

3    represented.  It also has a profound impact on those schools as

4    well.

5            **THE COURT:**  Yes.

6            **MR. VIOLA:**  Whether we agree the propriety of it or

7    otherwise, I think there seems to be ample evidence in the

8    record that they've been operating under the assumption that

9    tax exempt status doesn't constitute federal financial

10   assistance and Title XI doesn't apply.  So they're entitled

11   respectfully to guidance as soon possible on that, so they can

12   make whatever decision is appropriate.  Included with that is

13   Concordia Prep.

14       So unless the Court has any questions on that?

15           **THE COURT:**  No, thank you very much, Mr. Viola.  With

16   that, Ms. Graziano or Mr. Ketterer, I'd be glad to hear from

17   you.

18       Oh, I'm sorry.  Mr. Goodman, I overlooked you.

19           **MR. GOODMAN:**  I will be very brief.

20           **THE COURT:**  By the way, Mr. Goodman, I would be remiss

21   if I didn't know note I'm really not sure if the -- is it the

22   Victorian Theater at Gilman School is it called Good Vic?

23           **MR. GOODMAN:**  It's the Young Victorian Theater.

24           **THE COURT:**  The Young Victorian Theater.  I'll take

25   judicial notice of the fact that Mr. Goodman has been the

1   backbone of the Young Victorian Theater at the Gilman School

2   here in Baltimore for decades.  He started at a very young age.

3   I'm not going to inquire about the contributions that have been

4   made to the Young Victorian Theater.  And I don't know that my

5   ruling affects the Young Victorian Theater because it's an

6   adjunct of the Gilman School.  But if you think that it may

7   then tell me if you're worried about that.

8        MR. GOODMAN:  Since you brought it up, we were an

9   adjunct at Gilman School for 17 years, and in 1988 we went

10  independent, in 1989 we garnered 501(c)(3) status which we

11  have.

12       THE COURT:  Good.

13       MR. GOODMAN:  And we do receive state funding.  So all

14  these issues are relevant for my little theater.

15       THE COURT:  But you're not an educational institution

16  and you're not subject to Title XI.

17       MR. GOODMAN:  I guess not.

18       THE COURT:  You may not be, I guess not.

19       MR. GOODMAN:  I know we're 501(c)(3).  But anyway,

20  thank you for your nice words.

21       THE COURT:  That's quite all right.

22       MR. GOODMAN:  It's pretty amazing.

23       The only thing I wanted to say on this issue is -- and I

24  don't want to speak inappropriately at this hearing about the

25  substance -- but this lawsuit as -- we didn't have anything to

1    do -- we're not in the Title XI count, and we didn't brief

2    that.

3        But if an interlocutory appeal is going to essentially put

4    this case on hold for however long it takes for the Fourth

5    Circuit to rule, this case has been hanging over my client's

6    head like the Sword of Damocles since it was filed.  Next week

7    summary judgments are due.  We're going to be filing summary

8    judgments.  I think all the parties are filing summary

9    judgments.  They feel very strongly that they should not be in

10   this suit.  I don't want to argue the merits at this point.

11       But if -- on behalf of the Synod we would not want to see

12   this case, itself, delayed where it's just going to be sitting

13   around while the other two parties go to the Fourth Circuit to

14   argue this Title XI motion in a count we're not even involved

15   in.  So we would not want to see an interlocutory appeal

16   granted.

17           THE COURT:  I understand.  I'm not sure how we would

18   be able to do that, quite frankly.  I understand.

19           MR. GOODMAN:  I know that.  But I just wanted to make

20   my record.

21           THE COURT:  I understand.  There really won't be a

22   whole lot.  I mean, I understand it's like the Sword of

23   Damocles.  Count 2 negligent supervision and retention and

24   Count 3 negligence as to your client, but there isn't going to

25   be anything happening.  I mean, the cases would essentially be

1  stayed pending an interlocutory appeal.  And there's certainly

2  nothing for you to do other than just wait.  It's not like it's

3  going to -- I'm not for a minute ignoring your issue in terms

4  of it hanging over your client's head.  But there's no cost to

5  your client.  There's nothing for your client to do but wait

6  for the rulings.

7      **MR. GOODMAN:**  Right.  There's no legal cost, but,

8  trust me, I'm dealing with a client -- there's a significant --

9  even though it's the Synod, which is the equivalent of the

10 archdiocese, there's a big emotional cost to them.

11     **THE COURT:**  Sure.

12     **MR. GOODMAN:**  They've spent a tremendous amount of

13 time and money defending what they believe to be is something

14 they shouldn't even be in.  And if I have to tell them now:

15 Well you know what, they're going to the Fourth Circuit on the

16 Title XI issue and it's going to be stayed for a year and a

17 half.  They're going to be very upset.

18     And I gather there's not a way that you can keep our --

19     **THE COURT:**  I don't think so.  I don't think so.  It

20 doesn't occur to me that quickly.

21     With that Ms. Graziano or Mr. Ketterer, I'll be glad to

22 hear from you.

23     **MS. GRAZIANO:**  Thank you, Your Honor.

24     **THE COURT:**  We've talked about the legal issue and

25 that cuts a different way for your client when it comes to the

1   matter of interlocutory appeal, but I'll be glad to hear from

2   you.

3       **MS. GRAZIANO:**  Sure.  I'll try to be brief, Your

4   Honor, as well.

5       You know, I think, again when we talked about the Motion

6   for Reconsideration, I started by saying "Why are we here,

7   right?"  Why are we here talking about a Motion for

8   Interlocutory Appeal when we know quite well in the Fourth

9   Circuit the tendency or the favor of the circuit is to appeal

10  everything all at once.  Especially when it's not an issue that

11  will dismiss an entire litigation outright.

12      So while I'll be the first person to agree with Your Honor

13  about the importance of this decision, which I believe you

14  arrived at quite soundly, it's not one that rises to this level

15  of immediacy that it needs to be sent up on interlocutory

16  appeal now.  It is absolutely an issue that can be appealed at

17  the termination of this litigation post trial.

18      And I think one of the things that's really important

19  about this, Your Honor, you brought up the *Butler* case, that

20  case says in black and white:  The questions are not

21  controlling if litigation will proceed regardless of how that

22  question is decided.

23      And while obviously this discussion has been very robust,

24  and there's a very profound public policy interest in, quite

25  frankly, your opinion being upheld, it is not the case that

1   these five cases rise and fall on the Title XI claim.  As Your

2   Honor aptly noted earlier, they will proceed on their other

3   state law counts.

4            THE COURT:  Well, they may or may not.  I don't know

5   that's a given, Ms. Graziano.  If there is no Title XI claim

6   then the matter of whether or not this Court exercises

7   supplemental jurisdiction is within the discretion of the

8   Court.  And I would -- give me one second here.

9        The matter of supplemental jurisdiction, it certainly may

10  be there with respect to H.C.'s claim, depending upon certain

11  factual predicates.  But in terms of four of these five

12  Plaintiffs, in terms of being in federal court, if the Fourth

13  Circuit reverses my opinion and finds that 501(c)(3) status

14  does not amount to federal funding under the applicable sexual

15  harassment section of Title XI, the matter of my continuing to

16  exercise supplemental jurisdiction over those four cases,

17  perhaps five, certainly those four cases, specifically the

18  cases involving N.H., A.G. and Jennifer Pullen and Ariana Gomez

19  may not proceed.  It would be a summary judgment entered in

20  terms of -- or dismissal of some sort.

21       I mean, just in terms of how it would play out.  There's

22  no jurisdiction of this Court.  May not be.

23            MS. GRAZIANO:  I'm sorry, Your Honor.  You hit the

24  nail on the head, it would be the Court's discretion if given

25  how advanced these cases are, as my brother alluded we're on

1   the eve of summary judgment motions.  It's not for me to say

2   whether this Court would or wouldn't exercise supplemental

3   jurisdiction.

4       I will just point out, as Your Honor mentioned, the H.C.

5   case is a case that's a little bit different than the other

6   four --

7               **THE COURT:**  Yes.

8               **MS. GRAZIANO:**  -- with the PPP issue.  There's

9   certainly a difference between the parties in terms of our

10  understanding of the facts, in terms of the timeline and import

11  of relevance incidents and kind of the prelude that led up to

12  the assault of that Plaintiff that is relevant for the factual

13  timeline.

14      So I would just submit to Your Honor that even if the

15  Fourth Circuit is to reverse Your Honor on the issue of the

16  501(c)(3) status, the Conrad case remains viable because of the

17  receipt of the PPP loan.

18      So if there's a summary judgment motion or some other

19  mechanism that would remove -- if it's a factual determination

20  for a later date, that's not something that's going to be

21  impacted by this interlocutory appeal.

22      So it's not the case that sending this issue up on

23  interlocutory appeal and having the Fourth Circuit reverse Your

24  Honor just automatically cleanly gets rid of all these cases.

25      One, there's one case that's exempt from that ruling.  And

1   two, Your Honor could still elect to retain those cases.  So

2   that is an issue that muddies up that first criteria.

3       You know, we've discussed of course the differences of

4   opinion.  I would just say again to Your Honor, that the

5   Supreme Court precedent is quite clear.  And I think it's very

6   articulately laid out in Your Honor's order, that the

7   differences of opinions are inferential mostly in the *Johnny's*

8   *Icehouse* case, which Your Honor already considered and

9   rejected.

10      And then thirdly, and perhaps most importantly, deciding

11  this issue now doesn't advance determination of this

12  litigation.  We would still need a trial.  Again, totally

13  understanding what Your Honor said about supplemental

14  jurisdiction in four of the five cases or all five cases

15  winding up in state court, but again that's not an automatic.

16  There is a likelihood or at least a chance that one or all five

17  of those cases could remain in federal court.

18      It doesn't eliminate complex issues in the sense, not to

19  dismiss the importance of Title XI, but say we do proceed to

20  trial before Your Honor in this court, we're presenting the

21  same negligence evidence.  We're presenting the same liability

22  evidence.  The question of damages is not altered by whether or

23  not Title XI stays in this case.  You know how I know that,

24  Your Honor*?  Cummings*.  The case that my brother cited.

25      So it's not such that we can't have this case move

1    forward.  We're so close to the end.  We're at dispositive

2    motion -- summary judgment motions.  It doesn't impede the

3    parties' ability to talk settlement.  It doesn't impede the

4    parties' ability to move forward with the cases.  There's no

5    good reason why this issue can't be decided on appeal later.

6    There's just no reason for this immediate pause.  As you said,

7    it could be -- my brother, Mr. Goodman, said it could be

8    months, if not years, that this is on hold.  There's no reason

9    that this has to happen now and can't happen later.

10          And frankly, the impact or the import of a waiting period

11   on these other institutions is not for the Court's decision

12   today.  Yes, it's a factor, but it's not determinative on the

13   factors enumerated by the Fourth Circuit on when an

14   interlocutory appeal is appropriate.

15          And frankly, a delay prejudices the Plaintiffs and other

16   similarly-situated individuals who are left without recourse in

17   private schools when they suffer sexual assault and sexual

18   discrimination.  I think that limbo period is more of greater

19   import than the impact on private schools that have ample

20   resources and funding and monies to put towards bringing their

21   policies and procedures within the purview of Title XI.

22          So with that, I thank Your Honor and I'm happy to answer

23   any questions you have.

24          **THE COURT:**  No, thank you very much, Ms. Graziano.

25   Anybody want to be heard on that further?  Mr. Shea?

1      I guess I do have a question for you, Ms. Graziano. What

2  is a private school in Maryland to do with respect to the

3  matter of awaiting a trial in this case and a verdict and

4  waiting in terms of processes they must follow?  What are the

5  implications of that?

6          MS. GRAZIANO:  Sure.  I'm glad you asked this, Your

7  Honor.  I think this speaks to what my esteemed colleagues in

8  their amicus briefs and in their comments today alluded to.

9  Certainly it is a period of limbo, for lack of a better word.

10 But I would submit to Your Honor -- and this is going to come

11 out at trial --

12         THE COURT:  It's not limbo *per se* in terms of if an

13 interlocutory appeal is granted, I stay the case.  It doesn't

14 have any binding effect upon the private schools until the

15 Fourth Circuit rules; isn't that correct?

16         MS. GRAZIANO:  That is correct, Your Honor.

17         THE COURT:  Does defense counsel agree with that?

18 Ms. Baker is here.  She's an expert in this area of the

19 lawsuit.  She's from the national association, I believe,

20 Ms. Baker, for the National Association of Independent Schools;

21 is that right?

22         MS. BAKER:  Your Honor, I'm general counsel for the

23 Association of Independent Maryland and DC School --

24         THE COURT:  All right.  That's fine.  My point is

25 this, if there's a stay and it's appealed to the Fourth

```
 1  Circuit, there's no binding obligation on the part of any
 2  private schools.  My view is to do anything [sic] until the
 3  Fourth Circuit rules, isn't that where we would be from your
 4  point of view?
 5          MS. GRAZIANO:  Yes and no, Your Honor.
 6          THE COURT:  Is that correct, Mr. Shea, from your point
 7  of view?
 8          MR. SHEA:  Your Honor, it also depends on what is
 9  controlling authority and what's persuasive.  But more or less
10  that's correct, Your Honor.
11          THE COURT:  I know that it would make everyone
12  nervous.
13          MR. SHEA:  Right.
14          THE COURT:  But --
15          MR. SHEA:  -- the Fourth Circuit have been --
16          THE COURT:  It reminds me of the old joke that federal
17  judges tell themselves:  What's the difference between God and
18  a federal judge?  God doesn't think he's a federal judge.
19      We're laughing here.
20      My point is that my ruling -- I understand the
21  implications.  I certainly understood the depth of Mr. Genth's
22  concerns.  My point is I have no difficulty, from the point of
23  view of the importance of this of having a stay, there's other
24  issues aside, and letting the Fourth Circuit determine it.
25  Until then there's no earth-shaking event that takes place with
```

1  respect to any of the private schools.  They're free to

2  continue as they do so.  It's an open issue waiting for court

3  resolution.  That's something that I think is important here.

4      This case has been going on for a while, Ms. Graziano.  I

5  don't know how quickly the Fourth Circuit would get to it.  I

6  believe they would get to it quite quickly down there.

7      **MS. GRAZIANO:**  If I understand my brother correctly, I

8  don't think he's representing that private schools or

9  independent schools believe that they're bound to your ruling

10 today.

11     **THE COURT:**  Well, they may or may not.

12     (Laughter.)

13     **THE COURT:**  I think they have a much higher comfort

14 level, Mr. Graziano, if I enter a stay -- and they're all

15 nodding in agreement with me -- if I enter a stay and grant the

16 interlocutory appeal and then it goes down to the United States

17 Court of Appeals for the Fourth Circuit in Richmond.  And I can

18 even note that one of my esteemed colleagues from my old law

19 firm that is in this area of the law, she's back there nodding

20 her head as well.

21     The point is, I don't for a minute ignore the importance

22 of this decision.  And I certainly can understand why everyone

23 would like it to have -- as opposed to another pair of eyes,

24 certainly three pairs of eyes with three judges and maybe even

25 the *en banc* Fourth Circuit.  I don't know.  The point is I have

1  no difficulty with that.

2      Although I'm sensitive to Mr. Goodman's client and trying

3  to get it resolved, and I'm sensitive to the situation of these

4  five young women.  You filed the lawsuit, you know, and came

5  into this court under federal question jurisdiction.

6          MS. GRAZIANO:  Yes, sir.

7          THE COURT:  And under federal question jurisdiction

8  under 1331 this is a federal question jurisdiction, that's why

9  you're here is because of Title XI.  You chose in this venue,

10 which is fine.  You have every right to do so, but it raised

11 issues that we need to address.

12         MS. GRAZIANO:  Of course, let me just say by way of

13 conclusion one other thing, Your Honor, that bears on the

14 discussion that you had with other of my brothers' counsel

15 regarding the onerousness or why is this so important?  Why is

16 one of the considerations that Your Honor has, sending this up

17 so that it can be decided for the sake of clarity for these

18 schools.  The standard for negligence or the standard for how

19 schools, even ones who don't receive federal funding, should be

20 conducting investigations into alleged sexual assaults,

21 incidences of sexual harassment, bullying, no matter how

22 trivial folks want to characterize the instances as being, that

23 standard is informed by Title XI.  Our expert is going to come

24 to this trial and say that.

25     So this idea that schools are going to have to completely

1  revamp their policies and procedures.  Yeah, they're going to

2  have to designate some faculty members or some staff to perform

3  those enumerated rules, but they should be almost in lockstep

4  with Title XI anyway just by the standard of care.

5      I think Your Honor really hit the nail on the head with

6  some of your earlier comments, which is that the onerousness to

7  a school with 10 faculty members, that's not who we litigate

8  for, right, we're not litigating for the exception.  We're not

9  litigating for the 10 percent school that's so small to have

10 that be impactful.  I would also just raise these are schools

11 that charge tuition.  These are schools that have multiple

12 athletic directors and brand new turf fields and all of these

13 fancy things.  No disrespect of private schools.  I'm a product

14 of a private university.  As I said I'm on the board of the

15 university.  My son goes to private school here in Baltimore.

16 I have the utmost respect.

17     But the fact is they have the funds for those outputs.

18 They have the funds to pay these fine lawyers to show up here

19 today, but what's reprehensible to me, Your Honor, is to then

20 come in this courtroom to say:  Whoa, whoa, whoa, it's really

21 going to be onerous for us to not know how to act for the next

22 year and a half.  They have money for all of the expenditures

23 but they won't spend money on training their staff, and faculty

24 and making sure that these kids are protected.

25     When the policies and procedures are left up to

1  interpretation, we end up with the situation that quite frankly

2  brought us to this courtroom today, Your Honor.  So I think

3  again, let's keep our eyes on the public policy consideration

4  which is protecting these children, regardless if they go to

5  private school or public school.

6          And with that, I thank Your Honor.

7          **THE COURT:**  Thank you, Ms. Graziano.  I will tell you

8  that I think that there was reference earlier by your side of

9  my having been on the board of one of the private schools.  I

10 actually then made reference to it later in these proceedings.

11 I think you might be surprised at the extent to which schools

12 are all that flush with money.  There's a lot of different

13 issues that come up.  I don't really think that's an issue.

14         I'm certainly going to grant the interlocutory appeal in

15 this matter on this issue.  It's an important issue.  And we'll

16 get this opinion out on Tuesday or Wednesday of next week.

17         The record will reflect that I will be issuing a stay

18 order and permitting the filing of an interlocutory appeal on

19 this precise issue to go down to the United States Court of

20 Appeals for the Fourth Circuit.  And I think that's the safest,

21 fairest way to do it.  And I recognize the implications of my

22 decision, and I recognize the split in authority.  I don't

23 agree necessary that I'm out there alone on this.  There are

24 certainly cases, including the Eleventh Circuit, that go my

25 way.  But this is a very important issue, and I understand the

```
1    implications of it.  And certainly the parties are free to go
2    down to the Fourth Circuit to appeal this.  And I think it
3    should be fine.
4        With that, I want to thank you all for very thorough
5    arguments and particularly, Mr. Viola, if I was tough on you to
6    start I apologize.  As Mr. King, my former law clerk, will tell
7    you I enjoy these hearings.  I enjoy the give and take but
8    you're entitled to know what I'm thinking and usually most
9    lawyers like that.  So I let them know what I'm thinking in
10   trying to flush it out.  We put it all out here on the table
11   and we really, I think, made a lot of progress.
12       Hopefully we built a good record for the Fourth Circuit
13   here and the Fourth Circuit is going to have to address this.
14   There is very serious policy considerations that are involved
15   and that's where we are.
16       Unless there's anything further, thank you all very much.
17   It was nice having you all here.
18           MR. GOODMAN:  I have one last question.  I assume that
19   the summary judgment motions due next Friday is out?
20           THE COURT:  They're done.  Everything is just going to
21   stop.  Everything is going to stop.  This case stopping.  It's
22   a stay.  The case is stayed and then we'll stop.  And this is
23   an important matter in terms of -- there's a lot of things that
24   have to be resolved here and to deal with this in a vacuum
25   would be very difficult.
```

1     And quite frankly, I don't think it's in your client's

2   interest, Ms. Graziano, long-term for that.  I think it's

3   probably better that we get this clarified.

4     So it's been nice having you all here.  And I enjoyed it.

5          **MR. GOODMAN:**  Thank you, Your Honor.

6          **THE COURT:**  Mr. Goodman, I gather that the Young Vic

7   theater is finished for the summer.

8          **MR. GOODMAN:**  Thank God, yes.  It's exhausting.  I'm

9   not as young as I used to be.

10          **THE COURT:**  Some of the people here will tell you

11   that's true for me, particularly in the last week.

12     With that, this Court stands adjourned for the day.

13     (All Counsel - "Thank you, Your Honor.")

14     (Hearing concluded at 4:10 p.m.)

15

16

17

18

19

20

21

22

23

24

25

1   CERTIFICATE OF OFFICIAL REPORTER

2

3

4       I, Ronda J. Thomas, Registered Merit Reporter, Certified

5   Realtime Reporter, in and for the United States District Court

6   for the District of Maryland, do hereby certify, pursuant to 28

7   U.S.C. § 753, that the foregoing is a true and correct

8   transcript of the stenographically-reported proceedings held in

9   the above-entitled matter and the transcript page format is in

10  conformance with the regulations of the Judicial Conference of

11  the United States.

12

13                  Dated this 10th day of September 2022.

14

15  _____

16              Ronda J. Thomas, RMR, CRR
                Federal Official Reporter

17

18

19

20

21

22

23

24

25

BUETTNER-HARTSOE, et al. v.
BALTIMORE LUTHERAN HIGH SCHOOL, et al.

MOTIONS HEARING - 9/1/2022

**MR. BROWNE: [1]** 3/10
**MR. GENTH: [19]** 7/19
8/5 8/8 9/9 62/19 62/21
64/10 64/14 66/24 66/7
67/24 68/7 68/15 68/22
69/21 69/24 71/2 71/20
72/7
**MR. GOODMAN: [22]**
3/22 4/3 6/13 6/20 6/24
7/3 7/8 76/11 76/14
78/19 78/23 79/8 79/13
79/17 79/19 79/22 80/19
81/7 81/12 93/18 94/5
94/8
**MR. KETTERER: [5]**
3/6 3/9 47/15 47/20 48/4
**MR. SHEA: [24]** 8/15
8/17 8/20 9/2 9/5 53/12
53/19 54/8 54/15 56/13
56/20 57/4 58/16 60/15
60/23 61/4 61/11 61/18
62/1 62/7 62/14 88/8
88/13 88/15
**MR. VIOLA: [86]** 3/20
6/12 10/10 12/2 12/6
12/8 14/9 14/15 14/18
14/22 14/24 15/3 15/6
15/9 15/14 15/17 15/23
15/25 16/4 16/7 17/9
17/14 19/5 19/8 19/16
19/24 20/7 21/23 22/19
23/4 23/8 23/20 24/9
24/24 25/6 25/9 25/21
26/6 26/14 26/24 27/10
27/18 27/21 28/14 28/20
29/22 30/1 30/7 30/9
31/3 31/7 31/13 31/22
31/25 32/18 32/23 33/3
33/11 33/14 33/17 34/2
35/7 35/13 35/17 36/7
36/11 36/14 36/17 36/20
37/13 38/9 38/19 39/1
39/6 49/24 50/5 50/18
56/17 74/24 75/5 76/17
76/25 77/7 77/14 77/17
78/6
**MS. BAKER: [1]** 87/22
**MS. GRAZIANO: [23]**
2/25 3/5 5/10 5/17 6/9
10/7 39/10 39/13 40/22
46/16 46/19 46/23 49/21
81/23 82/3 83/23 84/8
87/6 87/16 88/5 89/7
90/6 90/12
**THE COURT: [181]**

**'**

**'80s [1]** 42/25

**1**

**10 [8]** 36/3 55/1 55/2
56/9 65/9 65/9 65/10
91/7

**10 percent [1]** 91/9
**100 [1]** 56/23
**100 percent [1]** 65/7
**100-student [1]** 61/20
**101 [1]** 1/24
**104 [1]** 56/18
**106.2 [1]** 43/6
**10th [1]** 95/12
**11 [2]** 23/14 55/24
**11th [1]** 8/10
**12 percent [1]** 56/22
**1292 [1]** 75/23
**1331 [1]** 90/8
**134 [1]** 7/25
**136 [1]** 8/10
**1462 [1]** 73/5
**15 [1]** 59/9
**1681 [1]** 5/25
**17 [1]** 79/9
**1972 [7]** 4/13 6/1 22/18
27/2 51/7 63/8 63/16
**1982 [1]** 16/25
**1983 [2]** 27/14 27/15
**1986 [1]** 17/12
**1988 [1]** 79/9
**1989 [2]** 71/8 79/10
**1991 [1]** 73/5
**1:57 [2]** 1/8 2/1

**2**

**20 [3]** 5/24 36/3 59/9
**20-3132 [3]** 1/4 2/4 7/13
**20-3214 [2]** 1/4 2/4
**20-3229 [2]** 1/4 2/4
**20-3267 [2]** 1/5 2/4
**2001 [4]** 11/12 21/21
27/1 77/11
**2010 [1]** 73/10
**2012 [1]** 74/19
**2013 [1]** 74/9
**2019 [7]** 18/25 19/22
32/14 32/16 33/22 37/18
37/21
**2020 [11]** 18/25 19/1
19/7 20/1 32/11 32/14
32/16 33/23 33/24 34/14
36/3
**2022 [6]** 1/7 14/10 14/10
14/10 39/25 95/12
**21-691-RDB [2]** 1/5 2/5
**21201 [1]** 1/25
**21st [2]** 4/18 35/22
**22nd [1]** 39/25
**24th [1]** 14/20
**25 [1]** 63/1
**257 [1]** 11/12
**25th [1]** 40/12
**28 [4]** 14/10 14/11 75/23
95/6
**28th [1]** 14/20
**2d [2]** 74/9 74/18

**3**

**3132 [3]** 1/4 2/4 7/13

**3214 [2]** 1/4 2/4
**3229 [2]** 1/4 2/4
**3267 [2]** 1/5 2/4
**34 [1]** 43/6

**4**

**4:10 [1]** 94/14
**4th [2]** 1/24 14/14

**5**

**50 [6]** 13/16 52/3 63/2
65/25 66/8 72/3
**501 [40]** 4/16 18/2 18/18
19/12 21/5 28/25 32/7
33/20 35/20 35/24 36/6
42/12 43/3 43/11 44/10
44/19 45/2 45/21 46/3
46/8 46/10 46/13 47/4
47/21 48/5 48/7 48/8
48/16 48/22 49/16 50/25
58/10 58/13 58/20 58/23
59/21 79/10 79/19 83/13
84/16
**54 [3]** 11/18 31/11 72/22
**55 [1]** 64/1

**6**

**60 [12]** 10/17 11/18
11/19 29/14 31/10 39/21
72/22 73/2 73/7 73/7
73/11 73/14
**612 [1]** 74/9

**7**

**739 [1]** 74/19
**753 [1]** 95/7

**8**

**80 [2]** 55/1 56/9
**891 [1]** 74/18

**9**

**936 [1]** 73/5
**953 [1]** 74/8
**99 [1]** 72/3

**A**

**A.G [2]** 5/3 83/18
**Abell [1]** 58/18
**abide [1]** 59/25
**abiding [1]** 51/1
**ability [2]** 86/3 86/4
**able [4]** 55/6 55/19
58/22 80/18
**about [62]** 6/16 7/9
12/13 15/22 16/7 16/24
21/19 22/5 22/6 23/10
24/15 26/8 33/9 37/17
40/7 41/21 41/22 41/22
41/24 42/11 42/17 42/25
44/19 45/1 45/21 47/25
48/2 48/2 49/13 49/13
50/19 51/4 51/6 51/9
52/1 53/24 53/24 54/2
56/5 56/7 56/9 61/1 65/2

65/12 70/7 70/8 70/20
72/5 75/15 76/21 76/22
77/20 78/2 79/3 79/7
79/24 81/24 82/5 82/7
82/13 82/19 85/13
**above [2]** 1/9 95/9
**above-entitled [2]** 1/9
95/9
**absent [1]** 39/25
**absolutely [4]** 58/25
62/7 67/9 82/16
**abundantly [7]** 26/22
27/3 27/6 27/8 28/2
51/22 59/1
**Academy [2]** 2/8 40/11
**accept [6]** 12/25 16/14
17/5 18/15 55/12 55/12
**acceptable [1]** 9/11
**accepting [4]** 12/20 13/3
22/7 22/7
**access [2]** 11/2 28/8
**accomplish [1]** 55/19
**accomplished [1]** 60/18
**Accordingly [1]** 40/24
**account [2]** 63/10 64/20
**accurate [1]** 70/24
**achieve [1]** 60/19
**acknowledge [1]** 28/10
**acknowledged [1]**
23/25
**across [2]** 52/4 69/12
**act [6]** 4/13 5/25 15/12
16/8 22/10 91/21
**acted [1]** 11/8
**acting [1]** 45/19
**action [1]** 1/4 4/11 35/5
66/2
**actions [2]** 32/15 33/13
**activities [1]** 25/4
**acts [5]** 13/1 33/10 37/6
51/6 57/9
**actual [2]** 11/6 34/13
**actually [8]** 11/10 11/13
11/22 15/7 39/15 55/12
70/11 92/10
**ad [1]** 54/22
**add [2]** 60/14 76/18
**addition [1]** 32/6
**additional [1]** 33/8
**address [12]** 4/11 11/5
27/11 27/12 27/23 34/25
39/8 45/18 67/1 76/9
90/11 93/13
**addressed [4]** 27/15
27/25 39/15 76/17
**adequate [1]** 48/25
**adequately [1]** 2/15
**adjourned [1]** 94/12
**adjudicate [1]** 54/9
**adjunct [2]** 79/6 79/9
**administration [5]** 18/13
19/3 36/2 56/2 56/3
**administrations [2]**
66/17 66/18

**administrators [1]**
61/25
**admissions [1]** 28/24
**ads [1]** 70/19
**adults [2]** 5/4 5/5
**advance [4]** 69/3 76/1
77/19 85/11
**advanced [1]** 83/25
**advantage [1]** 42/17
**advertising [1]** 71/1
**affected [2]** 6/17 6/18
**affects [2]** 45/8 79/5
**affirmative [3]** 14/4 14/5
22/1
**affirmatively [1]** 16/14
**after [10]** 8/25 10/3 18/5
20/1 25/12 40/10 40/13
42/24 66/1 72/3
**aftermath [1]** 34/23
**afternoon [6]** 2/2 2/25
3/6 3/10 3/20 3/22
**again [20]** 9/15 18/17
25/18 26/4 31/22 32/1
32/18 40/2 41/6 41/13
43/8 44/18 60/19 61/22
76/20 82/5 85/4 85/12
85/15 92/3
**against [1]** 60/17
**age [2]** 5/13 79/2
**aggressive [1]** 38/21
**ago [9]** 12/13 16/2 26/11
29/21 52/3 63/1 63/2
63/7 72/17
**agree [16]** 23/18 28/14
38/1 43/3 58/15 59/15
62/5 77/2 77/4 77/5 77/7
77/17 78/6 82/12 87/17
92/23
**Agreed [1]** 15/23
**agreement [4]** 22/7 22/8
69/13 89/15
**agrees [2]** 12/20 24/1
**Ah [1]** 66/4
**ahead [2]** 37/1 76/16
**aid [3]** 43/21 43/22 72/5
**aided [1]** 1/22
**AIMS [3]** 7/15 60/8
62/23
**akin [1]** 17/8
**al [3]** 1/3 2/3 2/7
**alive [1]** 36/12
**all [103]**
**allegation [3]** 54/7 54/8
57/6
**allegations [8]** 19/21
28/11 32/8 34/12 34/16
36/24 41/7 59/9
**allege [2]** 6/7 28/11
**alleged [11]** 4/10 11/5
11/7 11/9 19/23 28/14
32/14 34/13 37/6 45/18
90/20
**alleges [2]** 6/3 6/4
**alleging [1]** 5/24

BUETTNER-HARTSOE, et al. v.
BALTIMORE LUTHERAN HIGH SCHOOL, et al.

MOTIONS HEARING - 9/1/2022

**A**

**allowed [3]** 67/2 67/6 70/18
**allowing [1]** 39/14
**alluded [2]** 83/25 87/8
**almost [5]** 21/4 31/15 41/7 41/8 91/3
**alone [1]** 92/23
**along [1]** 74/21
**already [2]** 35/21 85/8
**also [33]** 1/19 3/7 5/10 8/9 9/11 13/11 17/24 18/11 18/19 20/6 22/3 22/3 22/13 29/2 30/9 31/13 32/7 34/9 35/14 41/4 41/9 41/20 42/9 43/23 57/20 58/7 62/5 62/8 77/1 77/19 78/3 88/8 91/10
**altered [1]** 85/22
**alternative [1]** 76/7
**although [6]** 30/22 39/18 42/22 61/11 61/18 90/2
**alumni [2]** 46/13 58/21
**always [4]** 9/21 48/21 53/13 69/2
**am [3]** 3/1 3/21 11/25
**amazing [1]** 79/22
**ambit [1]** 58/5
**amended [3]** 4/20 5/20 6/6
**amendment [3]** 4/13 5/25 72/2
**American [1]** 59/5
**amicus [14]** 7/11 7/12 7/13 7/22 7/24 8/9 9/24 46/2 46/14 47/12 50/15 53/9 53/20 87/8
**amount [2]** 81/12 83/14
**amounts [1]** 54/23
**ample [2]** 78/7 86/19
**analogies [1]** 13/17
**analogy [2]** 16/20 24/19
**analysis [24]** 10/19 11/15 11/20 11/24 16/11 17/1 20/16 24/13 24/17 25/1 28/17 29/2 29/4 29/7 32/2 35/24 36/6 42/7 52/10 64/15 72/21 72/22 73/3 73/7
**analyze [2]** 22/24 23/11 25/25 25/25 54/18
**Andrea [2]** 5/2 18/24
**animal [2]** 12/22 55/21
**another [6]** 49/5 57/7 62/9 62/9 63/17 89/23
**answer [3]** 35/12 54/2 86/22
**anticipated [1]** 18/14
**antidiscrimination [2]** 64/8 64/17
**any [43]** 5/5 5/8 7/3 9/17 10/5 10/8 17/22 19/25

21/2 23/18 23/25 24/19 28/16 28/16 29/18 33/1 33/1 36/23 36/24 38/17 43/11 47/12 47/13 49/13 49/14 50/7 50/7 50/8 54/19 59/21 60/17 61/1 61/23 66/20 72/23 72/24 73/15 74/3 78/14 86/23 87/14 88/1 89/1
**anybody [4]** 20/10 47/19 53/8 86/25
**anyone [2]** 9/23 47/10
**anything [8]** 16/23 32/24 34/3 60/14 79/25 80/25 88/2 93/16
**anyway [4]** 7/2 39/2 79/19 91/4
**anywhere [1]** 60/21 73/19
**apart [2]** 19/11 35/23
**apologize [3]** 35/12 38/20 93/6
**apparently [5]** 19/1 19/13 32/10 32/12 53/3
**appeal [31]** 2/10 10/4 20/5 20/20 33/2 34/10 35/16 50/13 75/20 76/1 76/3 76/7 77/21 77/22 77/25 80/3 80/15 81/1 82/1 82/8 82/9 82/16 84/21 84/23 86/5 86/14 87/13 89/16 92/14 92/18 93/2
**appealed [3]** 75/22 82/16 87/25
**Appeals [4]** 11/11 76/3 89/17 92/20
**applicable [4]** 16/12 60/25 66/3 83/14
**application [1]** 18/3
**applied [3]** 36/1 42/5 47/6
**applies [2]** 66/13 68/7
**apply [8]** 30/21 54/12 54/15 63/10 64/18 66/9 68/3 78/10
**appointed [1]** 60/2
**appointing [1]** 65/12
**apportionments [1]** 51/5
**appreciate [1]** 47/20
**appreciative [1]** 46/23
**appropriate [3]** 56/8 78/12 86/14
**April [13]** 14/10 14/10 14/11 14/20 19/1 19/6 19/6 19/7 19/9 19/20 29/25 32/11 39/25
**April 22nd [1]** 39/25
**April 28 [2]** 14/10 14/11
**April 28th [1]** 14/20
**apt [1]** 50/21
**aptly [4]** 39/24 50/6 58/11 83/2

**archdiocese [1]** 81/10
**are [102]**
**area [10]** 31/23 58/13 61/15 61/19 62/3 66/11 66/19 71/19 87/18 89/19
**areas [2]** 2/13 61/24
**aren't [2]** 52/21 62/11
**argue [3]** 30/22 80/10 80/14
**arguing [3]** 29/11 47/16 65/2
**argument [31]** 10/12 15/21 17/7 17/13 19/12 23/6 23/7 23/9 23/13 25/1 26/5 26/8 29/9 29/10 29/13 30/19 31/11 32/6 32/13 32/16 39/15 41/15 45/13 45/24 49/11 51/1 59/2 66/24 70/8 72/15 73/19
**arguments [10]** 7/7 27/4 40/7 41/8 41/14 43/16 65/7 69/3 73/18 93/5
**Ariana [2]** 5/7 83/18
**arisen [1]** 69/12
**around [2]** 34/14 80/13
**arrangements [1]** 63/24
**arrived [1]** 82/14
**article [1]** 18/5
**articulately [1]** 85/6
**as [130]**
**Asia [1]** 70/16
**aside [2]** 53/17 88/24
**ask [10]** 6/16 24/1 35/10 39/4 46/20 50/15 52/8 56/25 64/7 71/21
**asked [3]** 18/11 58/21 87/6
**asking [5]** 31/19 35/6 35/11 38/6 44/24
**assault [3]** 4/12 84/12 86/17
**assaults [1]** 90/20
**assigned [1]** 53/6
**assistance [19]** 20/9 21/1 21/16 21/25 24/12 24/14 26/3 32/4 32/21 33/5 38/1 43/7 43/14 44/6 49/1 50/1 50/12 76/23 78/10
**association [14]** 1/5 2/7 3/18 7/14 8/11 9/3 9/10 10/23 56/20 60/8 62/21 87/19 87/20 87/23
**associations [2]** 49/13 57/20
**assume [1]** 93/18
**assuming [1]** 49/10
**assumption [2]** 18/17 78/8
**athletic [1]** 91/12
**attempt [1]** 39/14
**attended [2]** 18/24 19/13

**attending [1]** 33/22
**August [3]** 8/10 14/14 14/20
**August 24th [1]** 14/20
**auspices [1]** 45/4
**authoritative [1]** 43/19
**authority [10]** 11/5 23/24 43/24 45/18 52/19 71/10 71/21 77/13 88/9 92/22
**automatic [1]** 85/15
**automatically [3]** 27/6 30/21 84/24
**available [3]** 29/23 41/24 42/2
**avoid [1]** 52/10
**avoided [1]** 52/9
**awaiting [1]** 87/3
**aware [2]** 46/18 57/7
**away [1]** 46/10
**axiomatic [1]** 29/12

**B**

**Bachman [2]** 25/23 77/14
**back [11]** 8/3 8/19 21/18 26/17 32/1 37/22 42/25 56/5 59/15 65/22 66/12 71/8 73/4 73/10 89/19
**backbone [1]** 79/1
**BAKER [8]** 1/20 9/10 9/13 9/15 9/20 9/22 87/18 87/20
**balanced [1]** 69/2
**ball [1]** 65/22
**BALTIMORE [10]** 1/4 1/7 1/25 2/3 2/7 3/18 3/21 4/9 79/2 91/15
**banc [1]** 89/25
**bar [3]** 74/5 75/9 75/9
**Barber [1]** 5/3
**based [8]** 10/21 20/24 41/15 44/20 44/24 59/23 65/3 70/5
**basically [8]** 13/12 13/17 13/25 22/16 28/23 31/15 44/15 65/10
**basis [12]** 20/15 21/9 23/1 24/20 30/10 31/2 31/6 33/7 34/2 38/17 68/8 71/25
**battleground [1]** 65/21
**be [141]**
**bears [1]** 90/13
**because [50]** 2/21 7/4 12/9 14/20 15/16 16/18 17/5 17/15 18/23 19/24 20/2 20/10 20/14 21/10 24/18 25/16 25/21 27/7 27/13 27/23 29/4 31/1 31/2 31/19 34/25 35/11 35/24 39/14 42/1 44/14 51/2 52/9 52/21 57/1 59/4 60/25 65/2 66/21

66/22 68/10 69/6 70/25 72/4 74/11 74/21 75/11 75/20 79/5 84/16 90/9
**been [57]** 2/15 2/16 3/24 4/2 4/3 8/12 9/15 9/18 9/21 9/21 11/9 11/17 14/1 17/19 27/13 29/17 37/4 40/9 40/9 41/13 43/17 45/20 46/2 58/7 59/8 60/13 63/9 63/12 63/14 63/15 63/19 64/6 64/14 64/18 66/7 69/20 70/4 70/21 70/22 71/14 71/17 71/18 72/13 72/16 72/19 74/2 75/9 77/25 78/8 78/25 79/3 80/5 82/23 88/15 89/4 92/9 94/4
**before [12]** 1/10 21/12 32/18 34/1 34/4 36/7 40/2 46/24 67/23 72/24 77/20 85/20
**began [1]** 63/7
**begin [1]** 38/14
**behalf [9]** 1/12 1/15 2/23 3/7 3/17 3/21 3/23 7/13 80/11
**behind [2]** 8/3 9/7
**being [17]** 2/5 5/25 7/24 12/21 25/3 32/7 36/14 36/15 36/16 45/16 49/1 70/20 74/22 78/2 82/25 83/12 90/22
**BELESON [2]** 1/20 75/12
**believe [17]** 6/6 7/15 14/12 14/15 14/22 21/11 26/21 27/1 48/24 56/17 64/2 64/21 81/13 82/13 87/19 89/6 89/9
**believed [1]** 18/8
**belong [1]** 43/12
**benefit [10]** 12/20 40/25 42/15 48/7 48/16 48/24 49/5 49/6 58/6 58/8
**benefited [1]** 45/3
**benefits [10]** 11/3 14/5 22/2 28/8 42/18 48/7 48/8 48/9 49/6 52/7
**BENNETT [2]** 1/10 3/10
**best [2]** 10/15 30/15
**better [7]** 7/14 16/2 25/14 25/22 65/6 87/9 94/3
**better-decided [2]** 25/14 25/22
**between [9]** 12/18 25/7 25/17 47/4 55/13 64/4 65/22 84/9 88/17
**beyond [4]** 19/20 24/17 37/21 42/19
**bid [1]** 74/13
**big [1]** 81/10
**binding [2]** 87/14 88/1

BUETTNER-HARTSOE, et al. v.
BALTIMORE LUTHERAN HIGH SCHOOL, et al.

**B**

**bit [7]** 2/21 16/2 20/19
38/21 42/4 61/22 84/5
**black [1]** 82/20
**blip [1]** 63/6
**board [7]** 11/12 28/1
46/25 47/1 58/12 91/14
92/9
**boards [3]** 57/12 57/13
57/14
**Bob [5]** 27/14 28/21
28/22 64/11 64/22
**boosted [3]** 2/16 3/2
3/25
**bootstrapped [1]** 43/16
**bootstrapping [1]** 40/7
**borne [7]** 17/24 21/3
34/5 36/21 38/4 43/22
43/23
**both [11]** 10/14 26/6
47/24 48/8 53/21 55/9
56/11 58/6 58/8 77/2
77/6
**bounce [1]** 68/21
**bound [3]** 12/24 17/23
89/9
**Branch [1]** 63/3
**brand [1]** 91/12
**breadth [4]** 46/1 46/3
51/16 51/17
**break [1]** 75/17
**BRIAN [4]** 1/13 1/16 3/6
3/22
**brief [15]** 7/13 7/24 8/10
15/5 15/7 39/14 53/20
55/20 64/11 72/17 76/14
76/18 78/19 80/1 82/3
**briefed [1]** 30/2
**briefing [5]** 26/22 29/23
30/1 62/16 64/23
**briefly [2]** 47/15 62/19
**briefs [8]** 7/11 7/12 7/22
46/2 46/14 53/9 59/13
87/8
**bring [1]** 64/1
**bringing [1]** 86/20
**broad [3]** 44/20 44/24
51/3
**broad-based [2]** 44/20
44/24
**broader [1]** 28/17
**brother [14]** 39/16 40/14
41/13 41/20 41/23 43/5
44/1 44/5 45/5 46/21
83/25 85/24 86/7 89/7
**brother's [3]** 40/1 43/17
44/22
**brothers' [1]** 90/14
**brought [5]** 4/7 66/2
79/8 82/19 92/2
**BROWNE [3]** 1/14 3/11
3/14
**BUETTNER [6]** 1/3 2/3
2/6 4/25 5/12 5/16

**BUETTNER-HARTSOE**
**[6]** 1/3 2/3 2/6 4/25 5/12
5/16
**build [1]** 71/11
**built [1]** 93/12
**bullied [1]** 70/22
**bullying [1]** 90/21
**burden [2]** 53/15 69/4
**business [4]** 3/18 18/13
19/3 36/1
**Butler [1]** 82/19

**C**

**C.F.R [1]** 43/6
**C.F.R.s [1]** 43/5
**California [6]** 24/4 24/9
24/16 40/12 71/6 77/10
**call [2]** 38/23 70/23
**called [1]** 78/22
**calling [1]** 2/2
**came [5]** 1/9 9/11 24/6
40/12 90/4
**campus [1]** 37/18
**can [32]** 3/13 3/14 10/1
12/3 33/5 33/6 39/8 42/5
46/20 46/23 47/17 48/6
50/12 52/2 52/6 54/22
57/1 57/25 58/19 59/2
68/20 69/17 70/12 71/16
71/24 77/1 78/11 81/18
82/16 89/17 89/22 90/17
91/11
**can't [9]** 51/14 52/13
58/12 58/14 65/15 68/4
85/25 86/5 86/9
**candor [2]** 57/18 68/17
**canine [1]** 65/2
**cannot [3]** 52/10 67/11
74/13
**capable [1]** 55/6
**care [1]** 91/4
**career [1]** 8/25
**Carolina [1]** 24/5
**CAROLINE [1]** 1/20
**case [103]**
**cases [59]** 2/5 4/7 4/21
5/21 11/18 16/13 16/19
21/18 23/3 23/18 25/12
25/12 25/22 26/1 26/2
26/9 26/12 26/16 26/18
27/5 28/2 28/12 28/19
28/20 28/22 31/17 31/20
38/11 38/15 40/9 41/10
41/14 42/21 52/18 52/19
52/22 54/25 59/3 60/11
64/23 64/24 65/1 66/12
68/14 77/2 77/5 80/25
83/1 83/16 83/17 83/18
83/25 84/24 85/1 85/14
85/14 85/17 86/4 92/24
**cash [2]** 43/2 43/9
**cat [1]** 65/1
**catastrophic [5]** 71/13
71/14 71/15 71/17 71/18
**cause [1]** 21/11

**causes [2]** 35/5 66/2
**cautious [1]** 9/22
**Central [2]** 24/4 40/12
**certain [7]** 12/21 57/25
57/25 61/24 61/25 74/12
83/10
**certainly [27]** 3/14 7/20
9/14 9/16 28/11 35/4
44/1 44/21 44/24 46/14
46/24 50/21 64/17 66/10
72/10 76/7 81/1 83/9
83/17 84/9 87/9 88/21
89/22 89/24 92/14 92/24
93/1
**CERTIFICATE [1]** 94/16
**certification [2]** 20/4
77/25
**Certified [1]** 95/4
**certifies [1]** 75/23
**certify [1]** 95/6
**chairs [1]** 8/4
**challenge [1]** 71/15
**chance [2]** 47/11 85/16
**change [2]** 29/20 30/5
30/23 56/2
**changes [4]** 30/7 42/6
51/7 65/5
**changing [2]** 30/24 65/5
**characterize [1]** 90/22
**charge [3]** 46/9 66/16
91/11
**child [3]** 70/20 70/22
70/22
**children [1]** 92/4
**choose [1]** 5/5
**chose [1]** 90/9
**Christian [1]** 40/11
**Christian's [1]** 40/24
**CHRISTINA [1]** 1/13
2/25
**Church [2]** 3/23 6/18
**Church-Missouri [1]**
3/23
**Cincinnati [1]** 11/22
**circuit [13]** 11/10 11/11
11/17 11/20 23/2 28/1
28/5 35/2 43/25 45/15
45/20 57/16 67/17 69/14
71/12 73/2 73/4 73/5
73/21 77/12 77/12 80/5
80/13 81/15 82/9 82/9
83/13 84/15 84/23 86/13
87/15 88/1 88/3 88/15
88/24 89/5 89/17 89/25
92/20 92/24 93/2 93/12
93/13
**Circuit's [1]** 71/8
**circumstances [2]** 73/9
73/13
**cite [4]** 14/21 40/19
55/20 69/11
**cited [18]** 14/12 14/14
15/1 17/11 18/11 18/19
25/11 26/11 28/19 28/20

30/10 41/12 42/21 52/20
54/13 72/16 72/19 85/24
**citing [3]** 26/16 26/18
29/20
**City [1]** 43/23
**CIVIL [4]** 1/4 2/4 10/18
11/19
**claim [1]** 10/21 36/4
40/8 54/18 54/20 54/20
57/8 59/23 83/1 83/5
83/10
**claims [1]** 20/1
**clarification [1]** 41/3
**clarified [1]** 94/3
**clarifies [2]** 30/9 31/14
**clarify [2]** 5/19 20/23
**clarity [1]** 90/17
**class [1]** 12/16
**clause [42]** 12/10 12/10
12/14 12/17 16/7 16/9
16/12 16/19 17/3 17/8
18/16 21/6 21/20 22/4
22/9 25/2 25/11 25/23
26/5 26/10 26/17 26/19
27/5 28/2 28/18 28/22
29/5 30/20 31/16 31/18
31/20 31/25 41/23 42/1
51/2 51/5 51/24 52/15
52/23 53/18 59/3 72/18
72/19
**clean [1]** 20/17
**cleaning [1]** 20/22
**cleanly [1]** 84/24
**clear [29]** 7/12 10/20
13/17 15/11 15/15 18/1
22/24 23/24 26/4 26/9
26/15 26/22 27/3 27/6
27/8 28/3 32/5 39/21
44/14 46/11 49/24 51/3
51/22 52/13 57/15 59/1
69/14 70/6 85/5
**clearly [8]** 12/25 15/20
23/2 26/25 42/19 44/5
60/25 70/6
**clerk [3]** 1/20 8/24 93/6
**client [13]** 6/14 6/17
6/18 7/1 65/10 65/20
70/1 80/24 81/5 81/5
81/8 81/25 90/2
**client's [3]** 80/5 81/4
94/1
**clients [2]** 54/25 60/16
**close [2]** 55/16 86/1
**closer [1]** 39/12
**Codefendant [1]** 3/23
**colleagues [4]** 74/10
74/18 87/7 89/18
**college [1]** 47/2 51/10
**colleges [1]** 51/11
**Columbia [1]** 22/18
**come [20]** 3/14 5/6 8/2
8/4 8/18 8/18 8/19 9/6
9/7 9/8 9/14 9/16 9/22
40/2 45/9 66/1 87/10
90/23 91/20 92/13

**comes [4]** 26/23 59/23
65/17 81/25
**comfort [1]** 89/13
**comfortable [1]** 12/5
**coming [4]** 26/17 36/18
42/14 59/10
**commenced [1]** 8/25
**comments [3]** 39/16
87/8 91/6
**common [2]** 14/4 27/10
**community [2]** 7/15
18/7
**companies [1]** 49/8
**Company [1]** 11/23
**compared [1]** 58/9
**complaint [8]** 4/20 5/12
5/20 5/23 32/9 36/24
37/10 68/20
**complaints [6]** 4/11
4/21 6/6 6/6 34/23 55/7
**completely [4]** 29/6
39/25 47/2 90/25
**complex [1]** 85/18
**complexity [1]** 61/12
**compliance [4]** 41/1
45/9 53/22 72/1
**complicated [2]** 54/11
55/4
**comply [2]** 55/3 56/3
**comprehensive [2]** 14/2
17/20
**Computer [1]** 1/22
**Computer-aided [1]**
1/22
**conceding [1]** 20/12
**concepts [1]** 54/11
**concern [2]** 40/16 47/23
**concerned [2]** 51/23
59/21
**concerns [3]** 47/25
47/25 88/22
**concluded [1]** 94/14
**conclusion [6]** 20/25
21/3 21/5 21/8 24/11
90/13
**conclusions [1]** 24/6
**CONCORDIA [18]** 1/5
2/8 3/19 4/8 4/10 17/22
18/10 20/2 44/9 48/5
48/12 48/13 49/2 49/15
51/19 53/5 56/17 78/13
**conduct [2]** 45/2 45/3
**conducting [1]** 90/20
**confer [1]** 42/15
**Conference [1]** 95/10
**confers [2]** 4/13 40/25
**conformance [1]** 95/10
**Congress [6]** 51/6 63/2
63/11 63/23 66/8 71/23
**congressional [1]** 63/18
**conjecture [1]** 69/10
**conjure [1]** 69/8
**Conrad [3]** 5/2 18/24
84/16

BUETTNER-HARTSOE, et al. v.
BALTIMORE LUTHERAN HIGH SCHOOL, et al.

MOTIONS HEARING - 9/1/2022

**C**

**consensus [1]** 63/9
**consider [4]** 40/15 54/16 54/16 54/17
**consideration [3]** 7/1 47/7 92/3
**considerations [3]** 28/16 90/16 93/14
**considered [2]** 49/1 85/8
**consistent [5]** 22/4 23/21 25/15 25/24 26/1
**consistently [1]** 47/24
**consolidated [2]** 2/5 4/7
**CONSTANCE [3]** 1/20 9/10 9/13
**constitute [11]** 13/9 14/2 14/4 17/20 20/13 20/18 24/11 37/9 45/22 76/22 78/9
**constituted [2]** 18/9 49/25
**constitutes [18]** 13/3 13/14 13/22 18/3 19/19 20/8 22/21 22/25 23/17 24/14 32/3 32/21 33/4 37/25 43/7 43/22 50/12 50/25
**constituting [1]** 33/21
**construct [3]** 17/2 21/17 31/16
**contained [2]** 64/9 64/18
**context [6]** 37/6 45/22 50/3 50/22 50/23 59/22
**continue [2]** 61/21 89/2
**continues [1]** 15/10
**continues through [1]** 15/10
**continuing [1]** 83/15
**contract [14]** 12/17 12/18 13/2 16/20 17/8 22/5 41/23 41/25 42/12 42/20 43/3 47/7 48/9 64/4
**contracted [1]** 48/15
**contracts [1]** 51/5
**contractual [9]** 24/19 24/20 25/17 42/1 42/3 48/10 49/10 49/11 63/23
**contributions [2]** 67/22 79/3
**controlling [11]** 14/24 15/16 15/20 16/5 17/3 17/14 75/24 76/20 76/21 82/21 88/9
**convoluted [1]** 43/15
**coordinator [2]** 54/4 54/5
**copy [1]** 40/18
**core [2]** 46/5 58/23
**corporations [1]** 49/8
**correct [37]** 5/16 5/17 6/8 6/9 6/10 6/19 6/20

7/2 8/7 8/8 12/2 14/22 15/6 15/9 15/13 17/10 19/4 19/10 19/15 21/22 22/19 31/13 33/2 59/18 61/10 61/11 61/17 63/19 64/16 66/7 67/10 77/1 87/15 87/16 88/6 88/10 95/7
**corrective [1]** 11/6
**correctly [6]** 2/6 5/1 12/1 22/12 60/2 89/7
**cost [3]** 81/4 81/7 81/10
**could [19]** 34/1 34/7 55/13 55/15 55/16 61/13 61/15 63/11 63/13 63/13 66/2 66/13 69/24 71/22 75/16 85/1 85/17 86/7 86/7
**counsel [26]** 2/20 2/23 3/15 7/17 8/3 8/12 9/3 9/5 9/9 9/19 9/23 38/23 39/16 44/1 45/6 46/21 47/12 50/15 60/4 62/25 65/4 69/1 87/17 87/22 90/14 94/13
**counsel's [1]** 49/11
**count [16]** 4/19 5/24 6/2 6/3 6/4 6/21 7/2 34/1 34/17 34/17 34/18 34/20 80/1 80/14 80/23 80/24
**country [2]** 61/8 65/15
**counts [5]** 5/23 6/7 6/14 6/14 83/3
**County [3]** 1/11 12 28/1 45/15
**coupled [1]** 43/24
**course [5]** 30/13 42/23 46/19 85/3 90/12
**court [71]** 1/1 2/12 2/22 11/11 11/16 11/18 12/9 12/12 12/23 13/5 13/7 13/11 13/11 14/7 16/11 21/24 22/23 24/10 25/25 27/14 29/3 29/4 30/11 30/12 31/16 34/9 35/1 38/12 38/13 38/17 40/17 40/23 40/24 41/24 42/7 42/23 43/20 44/1 44/3 44/7 45/10 46/20 50/6 50/11 66/11 68/21 69/4 72/23 73/9 74/7 74/9 74/16 75/18 75/22 76/2 78/14 83/6 83/8 83/12 83/22 84/2 85/5 85/15 85/17 85/20 89/2 89/17 90/5 92/19 94/12 95/5
**Court's [16]** 10/19 11/20 11/23 13/19 15/3 16/18 16/18 17/4 44/23 49/24 68/2 73/3 74/6 75/20 83/24 86/11
**courthouse [1]** 2/13
**courtroom [6]** 2/13 5/8 41/9 68/25 91/20 92/2

**courts [1]** 68/14
**cover [3]** 61/25 63/3 63/5
**covered [1]** 48/19
**COVID [2]** 18/23 32/11
**CPS [3]** 36/23 49/9 50/15
**CPS's [1]** 49/12
**crippling [1]** 71/17
**criteria [8]** 28/5 45/13 67/16 67/17 72/20 77/3 77/3 85/2
**CRR [2]** 1/23 95/16
**Cummings [29]** 12/11 12/23 13/11 14/8 14/24 15/10 15/16 15/20 15/21 16/12 16/21 16/22 16/23 16/24 17/9 17/23 21/12 22/23 25/15 26/11 29/19 29/22 29/24 31/14 39/24 41/21 42/5 72/16 85/24
**current [2]** 31/15 31/16
**cuts [1]** 81/25

**D**

**D.C [1]** 7/14
**d/b/a [1]** 1/5
**damages [7]** 15/13 41/22 41/24 42/2 42/3 42/3 85/22
**Damocles [2]** 80/6 80/23
**dark [1]** 44/11
**date [2]** 14/7 84/20
**Dated [1]** 95/12
**dates [1]** 19/5
**day [8]** 37/8 37/11 55/7 55/11 67/1 75/12 94/12 95/12
**days [3]** 26/11 40/13 72/17
**DC [1]** 87/23
**dead [15]** 30/12 30/13 31/4 31/8 31/11 73/18 73/18 73/20 74/14 74/17 74/22 74/22 75/3 75/4 75/5
**deal [14]** 10/2 10/3 31/20 37/3 38/22 39/15 40/15 41/21 53/3 65/19 65/20 69/4 69/8 93/24
**dealing [5]** 28/4 28/6 61/9 67/19 81/8
**deals [1]** 67/15
**dealt [2]** 37/20 38/2
**dearth [1]** 52/18
**decades [1]** 79/2
**decide [1]** 65/1
**decided [21]** 22/12 22/13 23/22 25/10 25/12 25/14 25/18 25/19 25/22 25/24 27/1 27/2 29/20 29/25 39/25 40/9 44/5 73/22 82/22 86/5 90/17

**deciding [1]** 85/10
**decision [8]** 25/14 55/12 72/23 78/12 82/13 86/11 89/22 92/22
**decisions [2]** 44/3 73/21
**deduct [1]** 58/22
**deductibility [1]** 67/22
**Defendant [8]** 1/15 6/21 6/21 7/4 40/8 41/9 44/10 45/1
**Defendants [5]** 1/6 3/17 3/17 45/25 76/5
**defending [1]** 81/13
**defense [5]** 9/7 10/8 49/11 73/12 87/17
**define [1]** 21/25
**definite [1]** 52/17
**definitely [1]** 14/13 77/10
**definition [1]** 54/19
**definitions [2]** 43/6 64/8
**delay [1]** 86/15
**delayed [1]** 80/12
**delegations [1]** 70/14
**deliberate [2]** 11/8 45/19
**Democratic [1]** 66/17
**demonstrate [1]** 73/11
**denied [1]** 35/23
**denying [3]** 4/18 75/20 75/21
**department [8]** 13/24 13/25 18/20 63/4 63/12 65/18 66/16 71/24
**dependent [2]** 46/12 46/13
**depending [2]** 33/5 83/10
**depends [1]** 88/8
**deprived [2]** 11/2 28/7
**depth [2]** 23/12 88/21
**describe [1]** 41/17
**described [3]** 13/5 14/1 17/19
**deserve [1]** 28/24
**designate [2]** 55/2 91/2
**designated [2]** 53/2 54/3
**designed [3]** 54/1 60/18 60/20
**despite [1]** 52/22
**determination [7]** 33/6 35/9 38/2 76/2 77/19 84/19 85/11
**determinative [1]** 86/12
**determine [2]** 39/20 88/24
**determines [1]** 57/9
**development [1]** 51/10
**did [19]** 15/25 16/1 16/2 16/3 23/10 24/11 27/16 27/17 32/23 40/15 40/16 40/17 40/20 40/21 41/20 48/12 59/11 60/12 63/2

**didn't [28]** 7/3 14/21 15/21 20/16 23/11 23/12 32/16 32/19 32/19 36/8 40/19 44/21 46/8 50/8 50/9 55/14 55/17 58/10 60/10 63/11 66/8 66/10 66/10 75/2 77/4 78/21 79/25 80/1
**difference [8]** 22/11 47/4 50/10 55/13 75/25 77/18 84/9 88/17
**differences [2]** 85/3 85/7
**different [19]** 4/7 12/11 12/14 12/22 17/3 20/11 24/7 29/6 29/10 29/11 54/9 54/10 55/2 55/21 61/12 61/13 81/25 84/5 92/12
**differs [1]** 50/5
**difficult [4]** 37/23 55/12 70/9 93/25
**difficulty [3]** 59/13 88/22 90/1
**dime [1]** 58/17
**direct [2]** 43/13 67/21
**directed [1]** 48/18
**directly [3]** 19/14 47/21 49/6
**directors [1]** 91/12
**disagree [7]** 23/4 30/19 35/2 38/5 44/4 50/16 77/7
**disagreed [1]** 30/25
**disagreement [1]** 74/6
**disbelief [1]** 70/16
**discovered [3]** 29/16 73/23 73/23
**discretion [4]** 2/14 15/10 83/7 83/24
**discrimination [4]** 25/4 27/16 31/23 86/18
**discriminatory [1]** 28/24
**discussed [3]** 12/14 16/21 85/3
**discussion [3]** 43/5 82/23 90/14
**dismiss [5]** 40/4 54/19 75/21 82/11 85/19
**dismissal [1]** 83/20
**dismissed [2]** 6/22 38/11
**dismissing [1]** 38/15
**disparate [1]** 25/7
**dispositive [1]** 86/1
**dispute [6]** 4/6 33/9 33/12 35/25 38/3 61/1
**disrespect [2]** 51/25 91/13
**disrespectful [2]** 27/19 74/24
**dissatisfaction [2]** 40/3 41/17
**distinction [2]** 19/16

---

Ronda J. Thomas, RMR, CRR - Federal Official Reporter    (4) consensus - distinction

BUETTNER-HARTSOE, et al. v.
BALTIMORE LUTHERAN HIGH SCHOOL, et al.

MOTIONS HEARING - 9/1/2022

**D**

**distinction... [1]** 50/10
**distress [4]** 6/5 15/12
34/18 42/3
**DISTRICT [14]** 1/1 1/1
3/24 6/19 21/22 22/17
24/4 24/5 40/12 73/3
75/20 75/22 95/5 95/6
**dive [1]** 13/15
**division [5]** 1/2 55/22
55/25 55/25 71/10
**do [65]** 2/21 5/5 5/18 7/4
10/2 10/15 15/12 17/18
20/10 20/13 20/14 21/13
23/23 26/19 26/21 31/18
31/19 34/16 39/1 39/18
43/8 44/10 46/16 48/15
49/15 49/15 49/15 49/15
50/12 54/10 55/5 55/7
55/25 55/25 56/15 58/2
58/4 58/15 59/2 62/18
64/7 64/14 66/18 67/21
68/19 69/25 70/18 71/25
72/17 75/10 75/17 77/5
79/13 80/1 80/18 81/2
81/5 85/19 87/1 87/2
88/2 89/2 90/10 92/21
95/6
**doctrines [1]** 51/25
**document [3]** 26/20
69/18 69/18
**Doe [3]** 11/11 28/1
45/15
**does [28]** 18/15 20/4
20/6 20/6 20/7 20/17
23/16 26/25 30/22 31/8
36/4 36/4 37/2 37/4
44/23 49/9 49/16 51/19
61/8 67/20 67/21 69/11
70/24 70/24 71/23 76/22
83/14 87/17
**doesn't [31]** 2/20 16/19
16/23 23/2 23/13 24/19
25/16 30/21 31/5 37/9
41/18 51/18 54/20 58/19
61/2 63/9 64/4 68/2
71/18 72/19 74/14 77/11
78/9 78/10 81/20 85/11
85/18 86/2 86/3 87/13
88/18
**doing [5]** 3/18 40/8
65/23 67/6 75/17
**don't [67]** 3/13 14/15
15/19 20/15 21/12 22/1
22/11 23/5 26/14 27/18
27/20 27/20 28/16 28/23
29/1 30/7 30/25 31/1
31/10 32/1 34/11 35/7
38/4 42/6 43/15 43/16
44/23 47/15 49/12 49/13
49/14 50/14 51/21 52/6
56/3 56/25 57/16 57/18
58/1 58/4 58/17 60/3
64/21 65/25 67/24 68/13
71/14 73/18 73/20 75/6
75/10 75/14 78/19 79/14
79/24 80/10 81/19 81/19
83/4 89/5 89/8 89/21
89/25 90/19 92/13 92/22
94/1
**donations [1]** 46/13
**done [4]** 13/7 69/21
72/10 93/20
**DONNA [3]** 1/3 4/25
5/16
**doubt [2]** 16/9 51/9
**down [15]** 2/18 2/20
3/13 40/12 41/12 51/15
52/6 52/12 57/10 57/20
64/1 89/6 89/16 92/19
93/2
**drafted [1]** 64/11
**draw [2]** 21/2 50/10
**drawing [1]** 13/16
**due [3]** 52/10 80/7 93/19
**during [4]** 19/14 29/23
36/22 37/11
**duties [2]** 12/21 16/16
**duty [1]** 12/16

**E**

**E.H [2]** 40/11 41/11
**earlier [8]** 17/11 40/20
41/16 72/15 77/4 83/2
91/6 92/8
**earth [4]** 52/3 71/6 71/7
88/25
**earth-shaking [4]** 52/3
71/6 71/7 88/25
**easier [2]** 2/21 8/25
**Eastern [1]** 24/5
**educated [1]** 53/9
**education [9]** 4/13 5/25
13/25 50/23 63/4 63/12
65/18 66/16 71/24
**educational [6]** 10/23
11/2 28/8 50/3 67/18
79/15
**effect [1]** 87/14
**effectively [2]** 55/8 72/2
**effort [1]** 52/22
**efforts [2]** 48/14 48/14
**eight [5]** 68/11 68/20
69/5 69/19 70/4
**either [3]** 7/18 21/18
50/11
**elect [1]** 85/1
**Eleventh [5]** 23/2 43/24
71/8 77/12 92/24
**eliminate [3]** 25/3 25/6
85/18
**else [4]** 47/10 60/14
65/17 76/18
**emotional [5]** 6/4 15/12
34/18 42/3 81/10
**emphasis [1]** 58/11
**emphasize [1]** 52/17
**emphatic [2]** 15/16 26/8

**employees [1]** 55/22
**empty [1]** 8/3
**en [2]** 42/5 89/25
**enacted [1]** 63/16
**enactment [2]** 63/12
66/1
**enacts [1]** 71/24
**encouraged [1]** 2/21
**end [2]** 86/1 92/1
**ended [1]** 40/23
**endorsement [1]** 23/10
**enjoy [2]** 93/7 93/7
**enjoyed [1]** 94/4
**enormously [1]** 59/4
**enough [4]** 43/25 44/1
66/22 74/6
**enrollment [2]** 35/25
56/17
**enter [2]** 89/14 89/15
**entered [2]** 40/10 83/19
**entertain [1]** 76/8
**entertained [1]** 70/13
**entire [2]** 55/22 82/11
**entities [11]** 17/25 18/18
18/18 21/4 21/5 21/9
28/23 45/7 48/22 60/20
60/21
**entitled [5]** 1/9 5/18
78/10 93/8 95/9
**entity [8]** 12/24 17/22
18/14 21/2 22/7 43/11
43/21 45/2
**entry [1]** 72/24
**enumerated [2]** 86/13
91/3
**enumerates [1]** 48/19
**equal [2]** 11/2 28/8
**equipped [1]** 55/5
**equivalent [2]** 43/4 81/9
**error [2]** 39/21 41/18
**Especially [1]** 82/10
**ESQUIRE [12]** 1/13 1/13
1/14 1/16 1/16 1/17 1/17
1/18 1/19 1/20 9/11 9/14
**essence [8]** 12/17 12/18
12/22 13/1 16/13 16/14
21/24 22/6
**essentially [19]** 4/21
5/22 10/13 10/17 11/16
17/7 23/12 24/6 30/5
38/10 38/18 54/23 57/9
72/18 72/21 72/22 76/6
80/3 80/25
**establish [1]** 10/21
**established [2]** 21/4
61/6
**establishes [1]** 73/15
**esteemed [2]** 87/7 89/18
**et [3]** 1/3 2/3 2/6
**Europe [1]** 70/16
**EVAN [2]** 1/17 8/11
**eve [1]** 84/1
**even [15]** 18/4 20/11
20/13 35/2 42/20 49/10

61/19 62/11 80/14 81/9
81/14 84/14 89/18 89/24
90/19
**event [1]** 88/25
**events [1]** 19/23
**ever [1]** 55/19
**every [13]** 44/25 55/7
55/11 64/4 65/17 67/1
67/1 69/2 69/14 70/8
70/16 71/2 90/10
**everyone [4]** 2/2 57/7
88/11 89/22
**everything [3]** 82/10
93/20 93/21
**everywhere [3]** 60/20
60/23 60/24
**evidence [7]** 29/16
48/25 73/23 73/24 78/7
85/21 85/22
**exact [1]** 40/22
**exactly [6]** 19/24 29/20
42/22 49/14 68/5 76/25
**examination [1]** 37/15
**example [4]** 23/1 37/7
53/1 56/12
**except [1]** 29/19
**exception [4]** 2/13 42/11
63/6 91/8
**exceptional [2]** 73/9
73/13
**exceptions [1]** 50/14
**exchange [6]** 12/20
16/15 22/8 42/15 42/16
47/6
**excuse [2]** 5/12 65/9
**executive [2]** 63/3 63/18
**exempt [35]** 4/16 17/16
17/25 18/9 18/14 18/18
19/12 19/18 20/8 20/17
21/1 21/15 22/20 22/25
23/17 24/13 26/2 32/3
32/20 33/4 37/25 40/15
40/25 48/23 49/25 50/8
50/9 50/11 63/10 64/20
66/20 67/25 76/22 78/9
84/25
**exemption [11]** 13/13
42/18 44/20 44/25 47/8
48/6 48/21 48/22 48/22
68/8 71/25
**exemptions [1]** 13/9
13/22 17/19 22/1
**exercise [2]** 83/16 84/2
**exercises [1]** 83/6
**exhausting [1]** 94/8
**exhaustive [1]** 21/13
**exist [1]** 66/2
**existence [2]** 46/5 46/7
**expenditures [1]** 91/22
**experience [1]** 65/3
**expert [3]** 18/4 87/18
90/23
**expertise [1]** 61/23
**explain [6]** 24/4 27/8

52/24 53/5 69/17 70/17
**explode [1]** 49/5
**exposed [1]** 69/15
**express [1]** 49/9
**expressly [1]** 21/24
**extend [1]** 56/6
**extensive [1]** 60/5
**extent [4]** 31/18 31/19
39/18 92/11
**extraneous [1]** 43/18
**extraordinary [1]** 73/8
**eyes [3]** 89/23 89/24
92/3

**F**

**F.3d [1]** 73/5
**F.4th [1]** 11/12
**F.Supp [2]** 74/8 74/18
**face [4]** 13/21 18/22
40/5 74/4
**fact [13]** 3/1 20/21 21/2
21/4 25/10 34/19 39/22
40/23 71/23 72/13 74/4
78/25 91/17
**fact-finding [1]** 71/23
**factor [3]** 27/6 34/9
86/12
**factors [4]** 29/14 29/15
45/19 86/13
**facts [4]** 19/25 41/6
77/18 84/10
**factual [15]** 5/11 20/15
32/16 33/7 33/9 33/12
33/25 34/2 34/21 36/9
37/15 38/3 83/11 84/12
84/19
**factually [2]** 20/11 42/22
**faculty [9]** 55/1 55/2
56/9 57/17 65/9 65/10
91/2 91/7 91/23
**fail [1]** 55/15
**failed [1]** 4/10
**failing [1]** 55/14
**fair [1]** 23/15
**fairest [1]** 92/21
**Fairfax [3]** 11/12 28/1
45/15
**fairly [3]** 28/12 61/23
74/12
**fairness [6]** 31/10 45/25
50/20 52/24 60/8 61/21
**faith [6]** 30/20 68/13
68/18 68/22 68/25 69/1
**fall [9]** 18/25 19/22
32/14 32/15 33/22 37/18
37/21 58/4 83/1
**falls [1]** 59/24
**false [1]** 40/16
**familiar [3]** 41/2 57/2
57/3
**fancy [1]** 91/13
**far [3]** 42/19 51/23 59/21
**fashion [4]** 7/2 10/11
43/13 52/2

BUETTNER-HARTSOE, et al. v.
BALTIMORE LUTHERAN HIGH SCHOOL, et al.

**MOTIONS HEARING - 9/1/2022**

**F**

**favor [2]** 64/2 82/9
**Fayetteville [1]** 73/4
**federal [81]** 1/24 4/14
4/15 4/17 10/18 10/23
11/19 12/19 12/19 12/24
13/4 13/9 13/13 13/14
13/22 14/3 16/15 17/17
17/21 18/3 18/9 19/19
20/9 20/13 20/18 21/1
21/15 21/25 22/8 22/21
23/17 24/11 24/14 26/3
27/25 28/17 32/3 32/7
32/21 33/4 33/21 34/16
37/8 37/10 37/25 40/25
43/7 43/13 43/21 43/22
45/22 49/1 49/4 49/25
50/12 51/1 55/12 59/22
61/1 61/3 61/8 61/17
64/5 66/5 67/19 67/20
67/21 68/1 76/22 78/9
83/12 83/14 85/17 88/16
88/18 88/18 90/5 90/7
90/8 90/19 95/16
**feds [1]** 51/21
**feel [1]** 80/9
**feeling [1]** 16/2
**few [2]** 16/2 46/6
**fields [1]** 91/12
**Fifteen [1]** 55/22
**figure [2]** 21/13 53/18
**file [4]** 7/23 30/25 31/1
75/15
**filed [22]** 5/12 7/11 7/13
7/15 7/22 8/10 8/10
10/15 14/14 15/15 15/7
15/18 38/13 38/14 46/2
46/15 53/9 68/21 69/20
72/17 80/6 90/4
**filing [6]** 5/22 9/24 29/12
80/7 80/8 92/18
**fill [1]** 55/3
**filled [1]** 67/5
**final [1]** 72/24
**financial [25]** 20/9 21/1
21/15 21/25 24/12 24/14
26/3 32/3 32/21 33/5
37/25 40/25 43/7 43/13
43/21 43/22 46/12 48/8
48/9 49/1 49/4 49/25
50/12 76/23 78/9
**financially [1]** 45/3
**find [6]** 57/10 57/16 60/3
65/1 71/16 74/21
**finding [1]** 71/23
**finds [1]** 83/13
**fine [13]** 5/18 7/23 12/7
39/3 39/11 39/12 45/6
47/9 47/10 87/24 90/10
91/18 93/3
**finish [1]** 58/3
**finished [1]** 94/7
**firm [4]** 7/16 8/12 71/21
89/19

**first [15]** 2/11 2/18 3/17
4/22 4/25 10/2 10/12
13/22 30/2 58/14 75/13
75/14 76/15 82/12 85/2
**fish [4]** 11/23 74/17
74/22 75/4
**five [18]** 4/7 4/7 4/10 5/7
5/21 19/13 26/11 37/9
60/11 72/17 74/17 83/1
83/11 83/17 85/14 85/14
85/16 90/4
**five-week-old [1]** 74/17
**flexibility [1]** 40/4
**flies [1]** 40/4
**floats [1]** 38/7
**Floor [1]** 1/24
**flush [2]** 92/12 93/10
**folks [1]** 90/22
**follow [2]** 10/14 87/4
**football [1]** 30/16
**footnote [2]** 23/8 43/25
**force [1]** 74/17
**foregoing [1]** 95/7
**forget [3]** 24/15 68/24
74/11
**forgiven [1]** 36/2
**form [1]** 60/16
**format [1]** 95/9
**former [3]** 4/8 8/24 93/6
**forth [4]** 8/1 37/22 65/22
66/12
**forward [6]** 5/6 8/18
42/14 59/10 86/1 86/4
**foundation [1]** 22/4
58/14 58/17 58/18
**foundations [2]** 58/18
58/19
**four [14]** 5/23 6/7 11/8
12/13 28/4 37/9 40/13
65/17 67/17 83/11 83/16
83/17 84/6 85/14
**fourth [38]** 11/10 11/11
11/17 11/20 28/1 28/5
35/2 45/15 45/20 57/16
67/17 69/14 71/12 73/2
73/4 73/5 73/21 77/12
80/4 80/13 81/15 82/8
83/12 84/15 84/23 86/13
87/15 87/25 88/3 88/15
88/24 89/5 89/17 89/25
92/20 93/2 93/12 93/13
**frame [2]** 37/5 48/21
**frankly [10]** 25/15 45/10
54/1 55/11 80/18 82/25
86/10 86/15 92/1 94/1
**fraud [2]** 29/16 73/25
**free [2]** 89/1 93/1
**frequently [1]** 18/11
**Friday [3]** 15/8 15/19
93/19
**frivolous [6]** 23/6 23/8
23/9 68/20 69/18 70/21
**front [1]** 8/2
**Fulani [1]** 44/3

**fulfill [1]** 67/3
**full [1]** 55/23
**fully [5]** 2/16 4/4 9/18
46/17 52/5
**funding [13]** 26/21 32/7
32/11 32/12 61/1 61/3
61/8 61/17 70/9 79/13
83/14 86/20 90/19
**fundraiser [1]** 50/7
**fundraising [6]** 46/9
46/12 48/14 48/14 50/6
52/16
**funds [45]** 4/15 4/17
10/24 12/19 12/19 12/24
13/4 13/9 13/13 13/14
13/22 14/3 16/15 17/17
17/21 18/3 18/9 19/2
19/14 19/19 20/13 20/18
22/8 22/21 23/17 25/18
27/25 28/17 33/21 33/24
34/16 37/8 37/8 37/10
45/22 51/1 55/12 59/22
63/24 67/19 67/20 67/22
68/1 91/17 91/18
**further [4]** 40/6 49/4
86/25 93/16

**G**

**gain [1]** 49/4
**garnered [1]** 79/10
**gather [3]** 31/11 81/18
94/6
**general [5]** 9/3 9/9 62/24
65/4 87/22
**Generally [1]** 19/9
**GENTH [10]** 1/17 7/16
7/18 62/18 62/21 66/4
68/4 68/18 69/25 72/9
**Genth's [1]** 88/21
**GEOFFREY [3]** 1/17
7/16 62/21
**get [20]** 10/15 23/12
30/23 32/1 51/20 58/14
58/17 61/1 61/2 61/17
65/13 65/14 65/16 75/10
75/11 89/5 89/6 90/3
92/16 94/3
**gets [2]** 44/25 84/24
**getting [9]** 18/14 35/12
36/20 37/14 37/21 51/11
55/23 63/13 63/14
**gift [2]** 43/2 43/9
**Gilman [4]** 78/2 79/1
79/6 79/9
**gist [1]** 72/7
**give [11]** 23/13 31/5
31/8 39/5 41/18 42/16
56/13 58/21 63/25 83/8
93/7
**given [5]** 44/15 44/15
56/8 83/5 83/24
**giving [3]** 19/25 34/25
36/24
**glad [16]** 7/9 9/7 12/3

39/3 41/2 47/9 49/22
53/8 74/20 75/8 76/10
76/13 78/16 81/21 82/1
87/6
**go [28]** 4/6 5/5 21/17
21/18 23/2 25/13 36/13
37/1 39/12 48/12 52/12
52/19 52/19 54/22 56/5
57/21 58/19 70/1 75/19
76/14 76/16 77/2 77/5
80/13 92/4 92/19 92/24
93/1
**goals [1]** 60/18
**God [3]** 88/17 88/18
94/8
**goes [10]** 20/18 57/20
65/21 71/8 72/10 73/3
77/10 77/12 89/16 91/15
**going [50]** 4/4 7/6 7/21
10/2 34/5 36/6 36/21
37/1 37/14 37/19 38/4
38/22 40/2 42/17 42/25
44/12 45/8 46/20 52/11
52/14 55/19 59/15 59/18
61/16 66/12 68/19 69/2
70/1 73/9 75/13 79/3
80/3 80/7 80/12 80/24
81/3 81/15 81/16 81/17
84/20 87/10 89/4 90/23
90/25 91/1 91/21 92/14
93/13 93/20 93/21
**Gomez [2]** 5/7 83/18
**good [18]** 2/2 2/25 3/6
3/10 3/20 3/22 42/16
47/20 53/10 59/2 63/21
66/18 66/24 67/6 78/22
79/12 86/5 93/12
**good-doing [1]** 67/6
**GOODMAN [12]** 1/16
3/23 4/1 6/11 6/16 47/12
76/10 78/18 78/20 78/25
86/7 94/6
**Goodman's [1]** 90/2
**got [15]** 8/24 16/1 22/6
31/6 36/17 38/25 42/14
45/6 48/16 64/1 64/22
65/8 65/13 66/14 75/16
**government [18]** 12/18
25/18 41/25 42/13 43/2
43/4 43/10 43/12 44/16
48/10 48/16 51/4 63/20
64/5 65/25 67/3 67/7
72/5
**Government's [1]** 49/7
**grades [2]** 56/18 56/19
**Graham [1]** 7/16
**grant [10]** 7/21 43/1
43/4 43/8 43/9 44/15
49/9 67/21 89/15 92/17
**granted [6]** 7/24 7/25
47/6 77/22 80/16 87/13
**granting [2]** 35/15 38/16
**GRAZIANO [18]** 1/13
3/1 3/3 5/9 39/7 58/3

58/10 59/17 67/11 78/16
81/21 83/5 86/24 87/1
89/4 89/14 92/7 94/2
**great [10]** 30/20 30/23
39/15 41/21 45/8 53/15
60/17 64/2 68/23 68/25
86/18
**greater [3]** 51/18 56/6
86/18
**GREGG [2]** 1/16 3/20
**ground [2]** 60/8 72/15
75/25
**group [1]** 62/17
**Grove [1]** 43/23
**guarantee [1]** 70/25
**guess [14]** 2/17 14/13
24/1 29/19 31/12 35/19
36/14 36/20 66/17 68/13
74/22 79/17 79/18 87/1
**guidance [1]** 78/11
**guided [2]** 10/17 11/16
**guides [3]** 11/20 11/23
73/3

**H**

**H.C [25]** 4/24 5/2 18/23
19/21 20/6 20/7 20/7
32/6 32/10 32/13 33/2
33/8 33/10 33/19 33/22
34/24 35/5 35/20 35/22
36/5 37/15 37/16 37/20
38/1 84/4
**H.C.'s [3]** 20/14 36/24
83/10
**had [15]** 7/1 7/3 7/11
11/6 12/25 15/12 34/13
36/23 37/20 58/13 59/5
59/6 62/24 68/23 90/14
**half [3]** 63/7 81/17 91/22
**handle [3]** 30/23
**handled [1]** 35/6
**hanging [2]** 80/5 81/4
**happen [4]** 70/25 73/20
86/9 86/9
**happened [3]** 19/21
37/17 68/10
**happening [1]** 80/25
**happy [4]** 12/6 39/18
50/15 86/22
**harassment [24]** 4/12
10/22 10/25 11/5 11/7
11/9 28/6 28/12 45/16
45/18 45/23 50/24 51/13
51/18 54/18 54/19 54/21
55/7 59/8 59/24 67/14
67/16 83/15 90/21
**hard [6]** 13/20 17/15
20/24 37/4 65/1 69/7
**hardly [1]** 23/9
**HARTSOE [6]** 1/3 2/3
2/6 4/25 5/12 5/16
**Harvey [1]** 68/24
**has [57]** 4/3 5/13 8/12
11/4 11/20 13/3 13/5
13/12 13/17 14/1 16/14

BUETTNER-HARTSOE, et al. v.
BALTIMORE LUTHERAN HIGH SCHOOL, et al.

MOTIONS HEARING - 9/1/2022

**H**

**has... [46]** 17/19 21/14 21/14 24/25 26/21 27/13 28/3 29/17 38/2 41/13 45/17 47/23 47/24 53/2 55/1 58/11 60/18 63/4 63/12 63/19 64/18 64/19 65/8 66/12 69/12 70/4 70/22 71/17 72/16 72/19 73/2 73/9 73/17 74/2 74/7 74/10 75/3 75/9 78/3 78/14 78/25 80/5 82/23 86/9 89/4 90/16
**have [150]**
**haven't [5]** 23/25 24/22 69/22 69/23 70/23
**having [13]** 13/5 27/7 37/4 38/11 53/2 61/23 66/24 72/17 84/23 88/23 92/9 93/17 94/4
**hawking [2]** 70/15 70/17
**he [2]** 68/24 79/2
**he's [2]** 88/18 89/8
**head [6]** 40/11 80/6 81/4 83/24 89/20 91/5
**headache [1]** 71/3
**hear [12]** 7/9 10/12 12/3 47/9 49/23 53/8 62/12 76/10 76/13 78/16 81/22 82/1
**heard [4]** 39/14 62/18 76/12 86/25
**hearing [8]** 1/9 7/6 27/7 38/24 38/25 41/13 79/24 94/14
**hearings [2]** 38/22 93/7
**heavily [1]** 25/11
**held [4]** 44/12 73/9 74/8 95/8
**her [11]** 4/25 5/2 5/3 5/16 18/24 35/25 36/13 69/6 75/12 75/13 89/20
**here [83]** 2/8 2/23 4/15 5/8 7/6 7/18 7/21 7/21 8/6 8/14 8/19 9/11 9/16 9/23 9/25 10/21 10/24 11/15 14/21 15/4 18/23 19/13 21/16 22/5 24/22 27/24 29/11 29/21 30/15 30/17 30/24 32/9 35/14 38/7 38/14 38/15 39/4 39/4 39/17 39/23 45/1 45/6 45/14 47/24 52/1 52/14 53/11 59/19 60/8 61/9 62/17 66/2 67/13 67/15 68/19 70/6 72/15 72/20 73/7 73/24 74/1 74/15 74/20 75/16 76/4 76/19 78/2 79/2 82/6 82/7 83/8 87/18 88/19 89/3 90/9 91/15 91/18 93/10 93/13 93/17 93/24 94/4 94/10
**here's [1]** 52/15 63/25

**hereby [1]** 95/6
**hide [1]** 30/18
**high [18]** 1/4 2/3 2/7 3/18 3/21 4/9 30/16 51/17 53/7 57/24 61/7 61/14 61/15 61/16 61/24 62/5 62/10 74/5
**higher [1]** 89/13
**highway [2]** 63/24 63/25
**him [3]** 8/25 46/24 74/21
**his [4]** 8/25 45/6 72/15 73/19
**history [2]** 12/13 22/22
**hit [4]** 40/10 42/10 83/23 91/5
**hold [2]** 80/4 86/8
**holding [1]** 40/17
**holds [2]** 26/2 40/24
**Honestly [1]** 14/15
**honor [137]**
**Honor's [4]** 40/10 44/21 62/23 85/6
**HONORABLE [1]** 1/10
**hook [1]** 44/16
**Hopefully [1]** 93/12
**Hopkins [2]** 55/20 60/4
**house [2]** 60/4 65/18
**how [46]** 16/3 24/4 25/24 29/9 29/10 33/6 33/15 33/16 35/6 35/19 36/4 36/4 37/2 37/4 37/5 41/22 45/2 48/5 48/12 49/16 50/1 50/5 50/14 53/5 53/24 54/2 56/7 57/16 59/15 59/17 64/7 68/5 69/10 69/18 70/8 70/8 75/17 80/17 82/21 82/21 83/25 85/23 89/5 90/18 90/21 91/21
**however [1]** 80/4
**huge [4]** 53/16 61/14 65/21 69/3
**hugely [1]** 65/8
**hung [3]** 36/20 37/14 37/21

**I**

**I'd [4]** 31/13 65/3 75/19 78/16
**I'll [26]** 2/18 2/22 7/25 8/20 10/12 10/14 39/5 39/10 39/14 44/10 47/9 49/22 57/21 58/3 66/21 75/10 76/10 76/13 76/14 76/14 77/14 78/24 81/21 82/1 82/3 82/12
**I'm [129]**
**I've [7]** 7/22 30/14 35/20 40/19 70/13 73/6 73/22
**Ice [1]** 77/11
**Icehouse [11]** 21/19 22/12 22/13 25/14 25/15 25/21 26/24 26/25 41/12 52/20 85/8

**idea [6]** 40/2 44/9 45/5 45/7 47/23 90/25
**idealistic [1]** 67/6
**identical [5]** 4/21 5/21 31/15 41/7 41/8
**identify [1]** 2/24
**ignore [2]** 52/13 89/21
**ignores [1]** 25/10
**ignoring [1]** 81/3
**Illinois [1]** 21/22
**illustrative [1]** 40/13
**imagine [1]** 58/12
**immediacy [1]** 82/15
**immediate [2]** 76/1 86/6
**impact [4]** 59/5 78/3 86/10 86/19
**impacted [1]** 84/21
**impactful [1]** 91/10
**impede [2]** 86/2 86/3
**implement [2]** 55/4 56/1
**implementation [1]** 57/23
**implemented [1]** 56/7
**implementing [2]** 53/1 54/3
**implicates [1]** 48/1
**implication [2]** 47/22 57/24
**implications [10]** 47/2 47/14 50/21 51/12 53/20 53/21 87/5 88/21 92/21 93/1
**implicit [1]** 48/9
**imply [1]** 27/5
**import [4]** 52/5 84/10 86/10 86/19
**importance [5]** 57/23 82/13 85/19 88/23 89/21
**important [16]** 13/10 31/21 32/1 34/7 35/1 46/4 47/18 51/7 61/6 71/11 82/18 89/3 90/15 92/15 92/25 93/23
**importantly [1]** 85/10
**imposes [1]** 12/15
**imposition [1]** 71/25
**impression [2]** 16/1 18/2
**inaccurate [1]** 19/5
**inaction [2]** 37/11 37/19
**inactions [1]** 37/2
**inactivity [1]** 34/22
**inadvertence [1]** 29/15 31/12 73/16
**inappropriately [1]** 79/24
**incidences [1]** 90/21
**incident [1]** 37/17
**incidents [1]** 84/11
**include [7]** 7/25 17/18 20/6 20/7 22/1 22/1 46/20
**Included [1]** 78/12
**includes [2]** 20/7 20/20

**including [7]** 12/21 25/12 26/10 42/18 51/13 63/21 92/24
**inconsistent [1]** 25/2
**incorporated [2]** 64/18
**incorrect [1]** 29/3
**incorrectly [4]** 22/13 23/22 25/10 25/19
**indeed [2]** 46/10 74/10
**independent [32]** 7/14 8/11 9/10 18/7 46/15 56/21 56/21 60/9 62/22 62/25 63/3 63/5 63/6 63/10 63/14 63/20 63/20 64/5 65/4 65/23 66/9 66/13 67/2 67/3 67/5 68/8 72/1 78/2 79/10 87/20 87/23 89/9
**indicate [2]** 10/13 24/8
**indicated [1]** 11/21
**indicates [1]** 20/25
**indifference [2]** 11/8 45/19
**individuals [2]** 49/8 86/16
**indulgence [1]** 15/3
**inescapable [1]** 21/8
**inexcusable [1]** 29/16
**inferential [1]** 85/7
**infliction [2]** 6/4 34/18
**informed [1]** 90/23
**inherent [2]** 18/7 18/17
**initials [1]** 4/24
**Injunctive [1]** 20/5
**input [1]** 47/19
**inquire [5]** 2/18 2/22 9/17 45/25 79/3
**instances [1]** 90/22
**instead [1]** 40/7
**institute [1]** 11/5
**institution [8]** 10/23 50/4 50/8 50/9 50/23 56/8 67/18 79/15
**institutions [5]** 4/14 47/3 54/25 64/19 86/11
**instructive [2]** 14/25 16/22
**Insurance [1]** 11/22
**intelligent [1]** 66/22
**intend [3]** 20/10 63/2 66/8
**intense [1]** 59/1
**intent [2]** 63/18 63/19
**intentional [2]** 6/4 34/18
**interest [2]** 82/24 94/2
**interested [1]** 57/2
**interesting [1]** 18/21
**interlocutory [25]** 2/10 10/4 20/5 20/19 33/2 34/10 35/15 72/25 75/20 75/22 76/7 77/25 80/3 80/15 81/1 82/1 82/8 82/15 84/21 84/23 86/14 87/13 89/16 92/14 92/18

**international [1]** 70/14
**interpretation [2]** 63/19 92/1
**interpretations [1]** 68/6
**interpreted [1]** 28/18
**interrupt [2]** 27/19 57/1
**interwoven [1]** 27/13
**investigate [1]** 54/6
**investigates [2]** 57/5 57/8
**investigations [1]** 90/20
**investigator [2]** 62/4 62/4 62/9
**investigators [1]** 55/23
**Investors [1]** 73/4
**invoked [1]** 73/8
**involved [4]** 24/10 67/15 80/14 93/14
**involves [3]** 4/7 15/11 75/24
**involving [2]** 50/15 83/18
**irrelevant [1]** 20/14
**IRS [1]** 28/22
**is [394]**
**isn't [6]** 25/16 39/17 73/25 80/24 87/15 88/3
**issue [54]** 4/15 12/12 19/17 20/17 20/19 22/24 23/5 23/12 25/25 27/1 31/14 32/19 32/19 32/23 36/9 37/24 38/1 38/7 38/15 38/16 39/17 39/21 40/23 42/5 43/20 45/7 45/14 59/7 59/7 60/19 67/13 72/9 72/18 74/1 76/20 76/24 79/23 81/3 81/16 81/24 82/10 82/16 84/8 84/15 84/22 85/2 85/11 86/5 89/2 92/13 92/15 92/15 92/19 92/25
**issued [7]** 4/18 18/5 40/9 41/4 42/10 46/18 50/21
**issues [12]** 37/20 38/11 53/3 67/1 72/14 77/21 78/1 79/14 85/18 88/24 90/11 92/13
**issuing [1]** 92/17
**it [253]**
**it's [127]**
**its [12]** 12/9 25/3 29/3 40/17 40/23 42/8 44/2 47/24 48/5 49/16 63/11 71/3
**itself [4]** 32/9 42/12 64/15 80/12

**J**

**January [1]** 30/3
**Jennifer [2]** 5/6 83/18
**jeopardized [3]** 46/7 46/7 58/14
**job [2]** 30/15 73/21

JA458

BUETTNER-HARTSOE, et al. v.
BALTIMORE LUTHERAN HIGH SCHOOL, et al.

MOTIONS HEARING - 9/1/2022

**J**

**jobs [1]** 65/23
**Johnny's [12]** 21/19
22/12 25/12 25/14 25/15
25/21 26/24 26/25 41/12
52/20 77/11 85/7
**Johns [2]** 55/20 60/4
**joke [1]** 88/16
**Jones [5]** 27/15 28/21
28/22 64/11 64/22
**judge [8]** 2/14 3/10 57/9
68/19 68/24 73/10 88/18
88/18
**judges [2]** 88/17 89/24
**judgment [17]** 4/19
29/17 29/17 35/23 36/17
38/16 40/4 72/24 74/2
74/2 74/13 75/21 83/19
84/1 84/18 86/2 93/19
**judgments [3]** 80/7 80/8
80/9
**judicial [9]** 54/24 66/24
68/10 68/18 68/23 68/25
69/5 78/25 95/10
**July [5]** 4/18 35/22
40/10 40/12 62/23
**July 21st [2]** 4/18 35/22
**July 25th [1]** 40/12
**jump [1]** 60/10
**June [1]** 24/6
**jurisdiction [16]** 4/14
23/11 34/8 35/4 38/8
38/18 66/6 83/7 83/9
83/16 83/22 84/3 85/14
90/5 90/7 90/8
**jurisdictional [1]** 77/21
**jury [4]** 33/16 34/1 36/6
36/13
**just [85]** 4/6 5/14 5/19
7/5 7/11 9/22 10/1 10/16
10/20 12/12 12/15 15/15
19/18 20/16 20/22 20/22
23/24 24/4 24/17 24/18
26/4 26/11 27/6 29/13
30/24 30/25 31/24 37/11
37/24 39/11 39/23 40/12
40/16 41/3 41/4 41/13
41/20 42/10 44/10 44/13
44/18 44/20 46/4 47/15
48/23 51/4 51/11 52/13
53/17 55/5 55/18 56/13
57/15 58/1 58/24 58/25
60/7 60/10 60/15 60/20
61/14 61/21 62/5 64/25
65/12 66/14 67/11 68/9
68/21 70/16 74/13 75/12
80/12 80/19 81/23 82/21
84/4 84/14 84/24 85/4
86/6 90/12 91/4 91/10
93/20
**Justice [1]** 18/20
**justifies [1]** 15/20
**justify [3]** 30/5 30/24
74/7

**justifying [2]** 29/18 74/3
**JUSTIN [2]** 1/14 3/11

**K**

**keep [3]** 13/11 81/18
92/3
**keeping [1]** 43/12
**keeps [1]** 26/16
**KETTERER [7]** 1/13 3/7
3/8 39/7 47/10 78/16
81/21
**key [3]** 10/24 66/4 66/5
**kids [1]** 91/24
**kind [6]** 20/1 22/14 53/6
53/21 68/14 84/11
**kinds [1]** 53/3
**KING [5]** 1/18 8/21 8/22
8/24 93/6
**Klepper [5]** 7/17 7/18
8/6 64/11 64/22
**knew [2]** 55/16 55/17
**know [55]** 7/15 13/3
14/10 16/14 27/4 30/19
30/20 30/21 33/5 34/7
40/6 42/23 43/25 44/7
44/18 45/5 45/6 46/25
49/12 49/13 49/14 49/15
56/11 58/6 58/8 59/6
59/8 60/6 65/13 67/9
68/23 69/4 69/6 70/11
70/12 70/13 75/1 78/21
79/4 79/19 80/19 81/15
82/5 82/8 83/4 85/3
85/23 85/23 88/11 89/5
89/25 90/4 91/21 93/8
93/9
**knowing [3]** 55/13 55/15
58/6
**knowingly [1]** 12/25
**knowledge [1]** 11/6
**known [1]** 4/9
**Kramon [1]** 7/16

**L**

**Labor [1]** 75/11
**lack [4]** 37/19 68/18
73/12 87/9
**laid [1]** 85/6
**land [1]** 49/9
**lands [1]** 49/9
**landscape [1]** 29/21
**language [3]** 17/23
74/11 74/18
**large [2]** 54/1 56/23
**larger [1]** 61/20
**last [13]** 2/17 11/9 11/10
11/22 15/15 15/7 15/18
24/5 28/1 45/20 59/9
93/18 94/11
**later [7]** 33/6 37/9 38/2
84/20 86/5 86/9 92/10
**laughing [8]** 30/17
74/15 74/20 75/2 75/8
77/5 77/9 88/19

**Laughter [4]** 9/1 75/7
77/8 89/12
**laundry [1]** 14/2 17/20
**law [38]** 1/20 7/16 8/12
8/24 13/21 14/24 20/17
20/20 20/24 21/10 21/13
21/15 30/5 30/7 30/9
31/7 33/16 33/18 35/18
35/19 37/24 39/22 48/25
52/15 52/16 54/11 59/6
66/3 66/5 66/23 75/24
76/20 76/25 77/18 83/3
89/18 89/19 93/6
**lawsuit [5]** 68/21 71/3
79/25 87/19 90/4
**lawsuits [1]** 69/19
**lawyer [1]** 71/1
**lawyers [8]** 55/24 58/7
70/15 70/17 70/18 70/19
91/18 93/9
**lead [4]** 2/5 4/20 5/22
7/12
**least [5]** 8/3 14/12 15/10
18/1 85/16
**leave [1]** 7/23
**led [1]** 84/11
**left [3]** 41/12 86/16
91/25
**legal [11]** 54/19 54/23
66/11 71/2 71/3 71/21
71/22 72/8 76/21 81/7
81/24
**legally [1]** 54/17
**legislation [44]** 12/10
12/11 12/11 12/14 12/15
12/15 12/17 16/8 16/10
16/12 16/19 17/3 17/8
18/16 21/6 21/20 22/4
22/9 25/11 25/23 26/5
26/10 26/17 26/19 26/23
27/5 28/2 28/18 28/22
29/5 30/21 31/17 31/25
41/23 51/2 51/24 52/3
59/3 59/4 59/23 66/23
70/9 72/4 72/18
**legislations [1]** 51/5
**legislative [1]** 22/22
**length [1]** 78/1
**less [2]** 69/1 88/9
**let [12]** 4/6 6/23 10/1
16/4 45/12 52/11 56/25
57/21 64/7 76/14 90/12
93/9
**let's [2]** 51/21 92/3
**letting [1]** 88/24
**level [3]** 41/18 82/14
89/14
**liability [1]** 85/21
**lifting [1]** 59/7
**light [1]** 33/23
**like [38]** 3/15 8/2 16/3
16/13 16/17 16/19 16/20
16/25 17/22 18/10 20/2
21/6 21/12 23/13 31/1

31/13 39/8 39/9 44/3
44/9 44/10 47/7 59/3
65/2 65/3 65/22 68/4
70/14 71/20 75/3 75/19
76/9 76/11 80/6 80/22
81/2 89/23 93/9
**likelihood [2]** 52/11
85/16
**limbo [1]** 86/18 87/9
87/12
**limit [3]** 45/21 52/2 64/1
**limitation [4]** 31/20
52/15 52/23 53/18
**limited [1]** 51/15
**limiting [1]** 67/25
**limits [1]** 64/3
**lines [1]** 49/12
**list [4]** 14/2 14/2 17/19
17/20
**listed [3]** 7/17 8/12
45/20
**literally [2]** 51/7 61/7
**litigate [1]** 91/7
**litigating [2]** 91/8 91/9
**litigation [12]** 59/14
68/5 68/17 69/12 70/4
71/5 76/2 77/20 82/11
82/17 82/21 85/12
**little [10]** 2/21 16/2
20/19 38/21 39/12 42/4
61/22 67/11 79/14 84/5
**loan [10]** 20/12 24/10
24/11 36/1 36/2 36/23
40/17 41/4 43/8 84/17
**loans [2]** 18/15 20/13
**local [2]** 46/15 47/17
**locker [2]** 37/6 37/16
**lockstep [1]** 91/3
**Lombard [1]** 1/24
**long [5]** 4/2 9/15 75/11
80/4 94/2
**long-term [1]** 94/2
**look [14]** 13/23 17/17
21/17 21/18 21/18 21/23
40/8 42/15 42/20 43/4
43/8 43/20 44/3 44/14
**looking [2]** 15/18 53/17
**losing [1]** 30/16
**lost [1]** 46/24
**lot [13]** 25/11 25/12 26/9
52/20 57/1 58/6 63/20
65/2 70/19 80/22 92/12
93/11 93/23
**lovely [1]** 74/11
**lower [3]** 44/3 64/2
69/19
**LUTHERAN [8]** 1/4 2/3
2/7 3/18 3/21 3/23 4/9
6/18
**Lynn [1]** 74/8

**M**

**M.H.D [1]** 23/2
**machinery [1]** 61/19

**made [7]** 11/13 11/21
29/21 43/5 79/4 92/10
93/11
**major [3]** 59/5 60/5
65/14
**majority [3]** 5/13 26/1
26/2
**make [23]** 6/23 15/15
20/16 23/13 23/24 26/7
26/8 26/15 28/22 33/6
38/2 44/21 45/12 51/15
51/21 52/12 55/11 57/7
68/20 73/21 78/12 80/19
88/11
**makes [6]** 20/2 20/23
22/11 22/24 50/11 71/3
**making [1]** 91/24
**malfeasance [2]** 34/22
37/3
**mandates [5]** 27/16
44/13 50/24 51/13 61/9
**manner [4]** 25/2 45/4
49/3 49/5
**manual [1]** 18/19
**many [12]** 26/12 26/18
45/8 49/8 49/8 49/8
52/19 52/21 60/5 68/4
69/18 70/13
**March [7]** 19/1 19/6 19/7
19/8 20/1 32/11 34/14
**March 2020 [1]** 34/14
**March/April [1]** 19/7
**market [1]** 70/25
**MARYLAND [12]** 1/1 1/7
1/25 7/14 9/10 47/1 60/9
62/22 62/25 87/2 87/23
95/6
**mask [4]** 2/17 2/20 3/13
4/4
**masks [1]** 2/12
**masse [1]** 42/5
**material [1]** 54/16
**materially [1]** 76/1
**matter [42]** 1/9 3/15
4/23 7/17 10/15 10/16
10/20 19/12 23/11 27/17
27/23 27/24 32/6 32/9
33/16 33/17 34/8 34/11
35/15 35/18 35/19 35/24
38/15 45/14 45/16 47/12
53/17 57/22 57/22 58/24
72/13 74/4 76/19 82/1
83/6 83/9 83/15 87/3
90/21 92/15 93/23 95/9
**matters [3]** 27/16 31/20
53/6
**MATTHEWS [2]** 1/19 9/2
35/18 34/21 35/1 38/5
45/22 58/22 58/22 61/24
62/4 62/10 66/25 70/13
72/23 75/22 76/1 79/6
79/18 83/4 83/4 83/9
83/19 83/22 89/11 89/11

BUETTNER-HARTSOE, et al. v.
BALTIMORE LUTHERAN HIGH SCHOOL, et al.

MOTIONS HEARING - 9/1/2022

**M**

**maybe [10]** 16/25 36/8 48/23 55/14 68/1 69/17 74/13 74/15 75/16 89/24
**McGlotten [15]** 22/13 22/14 22/16 23/20 24/17 24/18 24/21 24/25 25/9 25/11 25/16 25/16 25/18 27/2 44/4
**me [49]** 4/6 5/13 6/23 10/1 16/4 18/15 23/19 24/1 24/4 24/8 27/3 27/8 27/10 31/24 35/2 35/3 38/5 39/14 45/12 46/25 52/25 53/5 53/16 56/25 64/6 64/7 64/16 65/9 69/7 69/11 69/12 69/17 69/17 74/13 74/20 75/6 75/8 75/12 75/14 79/7 81/8 81/20 83/8 84/1 88/16 89/15 90/12 91/19 94/11
**mean [23]** 2/20 17/11 19/23 23/23 26/14 27/18 30/1 33/9 33/12 50/9 53/14 55/13 56/25 58/12 64/4 66/17 67/20 68/2 68/7 68/17 80/22 80/25 83/21
**meaningful [1]** 4/11
**means [2]** 8/24 67/25
**meant [4]** 19/6 19/7 63/12 66/20
**measure [1]** 70/24
**measures [1]** 11/6
**mechanism [1]** 84/19
**mechanisms [1]** 57/25
**meet [1]** 54/20
**meets [1]** 77/2
**MEGAN [2]** 1/19 9/2
**member [4]** 46/25 47/1 55/1 56/10
**members [9]** 55/1 55/3 56/22 57/17 60/17 65/9 65/10 91/2 91/7
**men [1]** 51/12
**mention [1]** 74/14
**mentioned [6]** 18/22 24/22 32/18 44/18 45/5 84/4
**mere [2]** 47/7 74/6
**merely [3]** 46/4 47/4 63/10
**merit [2]** 41/15 95/4
**merit-based [1]** 41/15
**meritorious [1]** 73/12
**merits [2]** 39/18 80/10
**met [3]** 73/14 75/9 77/25
**microphone [1]** 39/11
**microscope [1]** 47/22
**might [5]** 42/21 55/23 60/12 61/6 92/11
**mind [1]** 13/11
**mine [3]** 8/24 65/10

74/12
**minor [14]** 4/23 4/23 5/1 5/3 5/13 18/23 32/5 33/19 33/22 34/11 34/24 35/20 36/5 58/24 **minute [5]** 4/5 39/5 58/3 81/3 89/21
**minutes [1]** 16/2
**mirror [1]** 44/8
**misconduct [1]** 73/25
**misrepresentation [2]** 29/17 73/25
**miss [1]** 16/3
**missed [3]** 14/19 14/20 24/1
**missing [1]** 35/7
**mission [1]** 55/10
**missions [2]** 67/4 67/8
**Missouri [2]** 3/23 6/19
**Missouri-Synod [1]** 6/19
**mistake [3]** 29/15 31/12 73/15
**mistaken [1]** 6/7
**mistreated [1]** 70/20
**misunderstanding [1]** 68/2
**modeled [1]** 42/24
**moment [1]** 46/20
**Monarch [1]** 74/8
**money [20]** 14/5 22/8 34/15 43/12 44/15 48/17 48/17 49/7 51/20 55/13 55/15 58/15 58/17 58/21 64/1 70/2 81/13 91/22 91/23 92/12
**monies [1]** 86/20
**month [2]** 24/5 29/21
**months [3]** 12/13 37/9 86/8
**more [13]** 12/4 30/14 46/6 47/13 47/18 48/24 48/25 56/6 61/25 62/5 62/10 86/18 88/9
**most [6]** 46/11 56/8 61/6 67/5 85/10 93/8
**mostly [1]** 85/7
**mother [5]** 4/25 5/2 5/3 5/16 18/24
**motion [36]** 2/9 2/9 4/19 6/25 7/9 7/22 7/23 10/2 10/4 10/12 10/16 11/15 11/24 19/20 20/4 30/10 31/8 35/23 36/17 39/17 40/3 40/4 40/5 41/19 44/22 73/11 74/5 74/7 75/21 75/21 76/5 80/14 82/5 82/7 84/18 86/2
**motions [10]** 1/9 29/12 30/2 30/25 60/11 72/20 72/24 84/1 86/2 93/19
**move [3]** 20/16 85/25 86/4
**moved [3]** 7/2 19/17

19/18
**moving [5]** 40/1 40/1 43/18 73/11 73/14
**Mr [6]** 8/22 26/8 72/14 74/23 81/21 86/25
**Mr. [66]** 3/8 3/14 4/1 6/11 6/11 6/16 7/6 7/18 7/18 8/6 8/11 8/14 8/16 8/21 8/24 10/9 11/25 23/1 24/21 25/5 28/10 30/14 34/11 37/5 38/20 39/7 47/10 47/11 47/12 49/22 52/1 53/11 56/11 56/15 58/15 59/10 62/15 62/18 64/22 65/7 66/4 68/4 68/18 69/25 71/7 72/9 73/17 73/14 74/20 76/9 76/10 76/14 78/15 78/16 78/18 78/20 78/25 86/7 88/6 88/21 89/14 90/2 93/5 93/6 94/6
**Mr. Browne [1]** 3/14
**Mr. Evan [1]** 6/7
**Mr. Genth [7]** 7/18 62/18 66/4 68/4 68/18 69/25 72/9
**Mr. Genth's [1]** 88/21
**Mr. Goodman [10]** 4/1 6/11 6/16 47/12 76/10 78/18 78/20 78/25 86/7 94/6
**Mr. Goodman's [1]** 90/2
**Mr. Graziano [1]** 89/14
**Mr. Ketterer [4]** 3/8 39/7 47/10 78/16
**Mr. King [2]** 8/24 93/6
**Mr. Klepper [1]** 7/18 8/6 64/22
**Mr. Shea [9]** 8/14 8/16 53/11 56/11 58/15 60/14 62/15 65/7 88/6
**Mr. Viola [24]** 6/11 7/6 10/9 11/25 23/1 24/21 25/5 28/10 30/14 34/11 37/5 38/20 47/11 49/22 52/1 56/15 71/7 73/17 74/14 74/20 76/9 76/14 78/15 93/5
**Mr. Viola's [1]** 59/1
**Mr. William [1]** 8/21
**Ms. [23]** 2/22 3/3 5/9 9/2 9/15 9/20 9/22 39/7 58/3 58/10 59/17 67/11 75/12 78/16 81/21 83/5 86/24 87/1 87/18 87/20 89/4 92/7 94/2
**Ms. Baker [5]** 9/15 9/20 9/22 87/18 87/20
**Ms. Beleson [1]** 75/12
**Ms. Graziano [15]** 3/3 5/9 39/7 58/3 58/10 59/17 67/11 78/16 81/21 83/5 86/24 87/1 89/4

92/7 94/2
**Ms. Megan [1]** 9/2
**Ms. Thomas [1]** 2/22
**much [16]** 5/21 9/24 39/5 43/5 49/19 49/20 58/1 62/15 62/17 68/13 72/9 76/18 78/15 86/24 89/13 93/16
**muddies [1]** 85/2
**muddy [1]** 20/16
**multiple [1]** 91/11
**must [8]** 10/22 57/15 57/18 59/25 70/11 73/11 74/16 87/4
**my [84]** 2/17 4/4 6/14 7/1 10/13 10/15 11/13 14/13 18/1 23/25 24/3 24/7 29/21 30/24 30/24 31/7 33/20 35/19 35/21 35/21 36/4 38/21 39/15 39/16 39/25 40/14 40/19 41/13 41/20 41/23 43/5 43/17 44/1 44/4 44/22 45/5 46/21 47/4 52/5 52/19 59/11 60/16 62/12 64/10 64/16 65/3 69/5 69/8 71/6 71/9 71/13 71/21 73/6 73/21 73/24 74/10 74/18 76/6 77/10 77/12 79/4 79/14 80/5 80/20 83/13 83/15 83/25 85/24 86/7 87/7 87/24 88/2 88/20 88/20 88/22 89/7 89/18 89/18 90/14 91/15 92/9 92/21 92/24 93/6

**N**

**N.H [6]** 4/24 5/12 5/13 5/15 37/17 83/18
**nail [12]** 40/10 83/24 91/5
**name [3]** 5/1 11/25 24/15
**named [4]** 6/14 6/20 6/21 7/4
**names [1]** 2/6
**narrow [2]** 25/1 42/6 59/18
**narrowing [1]** 59/20
**narrowness [1]** 51/25
**national [7]** 8/11 9/3 46/15 56/20 60/9 87/19 87/20
**nationwide [1]** 45/7
**nature [5]** 34/16 37/10 42/2 49/10 49/11
**nauseam [1]** 54/22
**NCAA [1]** 43/23
**near [1]** 59/7
**necessarily [2]** 15/19 51/1
**necessary [1]** 92/23
**need [6]** 27/23 52/24 57/21 65/25 85/12 90/11

**needed [1]** 52/21
**needs [1]** 82/15
**negative [1]** 2/17
**neglect [1]** 29/16
**negligence [5]** 6/3 34/19 80/24 85/21 90/18
**negligent [3]** 6/2 34/17 80/23
**nervous [1]** 88/12
**never [4]** 63/4 63/7 64/6 66/19
**new [10]** 16/23 16/23 39/21 39/21 39/22 40/7 60/7 65/18 72/15 91/12
**newly [3]** 29/16 73/23 73/23
**next [4]** 80/6 91/21 92/16 93/19
**nice [19]** 3/3 3/4 3/5 3/8 3/9 3/12 3/16 4/1 8/9 8/16 8/17 8/22 9/15 9/16 9/22 53/11 79/20 93/17 94/4
**Nickerson [1]** 73/10
**no [53]** 5/10 7/3 10/7 10/10 15/14 16/9 18/8 19/25 20/10 20/20 21/9 24/17 26/7 34/2 35/24 37/3 37/20 51/9 51/25 52/2 59/13 60/15 60/16 61/4 64/14 64/21 66/5 66/12 69/10 69/25 70/7 70/11 71/10 72/15 73/23 75/2 77/12 78/15 81/4 81/7 83/5 83/22 86/4 86/6 86/8 86/24 88/1 88/5 88/22 88/25 90/1 90/21 91/13
**nodding [2]** 89/15 89/19
**non [1]** 48/9
**non-financial [1]** 48/9
**nonprofit [1]** 42/14
**North [1]** 24/5
**NORTHERN [2]** 1/2 21/21
**NOS [1]** 1/4
**not [213]**
**note [12]** 2/11 4/22 6/13 6/23 10/1 23/23 40/20 46/17 60/11 74/11 78/21 89/18
**noted [10]** 28/5 35/21 35/22 39/24 41/23 45/14 58/11 73/6 74/10 83/2
**notes [1]** 1/22
**nothing [12]** 7/9 16/23 19/25 21/10 22/20 22/21 22/22 36/22 37/16 58/9 81/2 81/5
**notice [9]** 11/6 13/5 13/6 17/22 21/9 21/10 24/21 44/12 78/25
**noting [1]** 45/21
**notion [4]** 59/12 60/1

USCA4 Appeal: 23-1453    Doc: 17    Filed: 06/05/2023    Pg: 465 of 610

BUETTNER-HARTSOE, et al. v.
BALTIMORE LUTHERAN HIGH SCHOOL, et al.

MOTIONS HEARING - 9/1/2022

**N**

**notion... [2]** 71/13 71/16
**November [2]** 36/3 36/3
**November 10 [1]** 36/3
**November 20 [1]** 36/3
**now [14]** 5/13 18/15
29/19 34/5 50/2 59/10
61/9 65/20 75/12 77/5
81/14 82/16 85/11 86/9
**nowhere [1]** 59/7
**number [9]** 7/25 8/10
14/4 43/7 48/11 48/12
56/23 62/25 70/23
**numbers [3]** 2/4 55/24
56/13
**nutshell [1]** 61/5

**O**

**objection [3]** 10/5 10/7
10/8
**objectively [3]** 11/1 28/7
45/17
**obligated [1]** 22/9
**obligates [1]** 41/1
**obligation [1]** 88/1
**obligations [3]** 13/1
13/4 13/6
**observe [1]** 12/15
**obvious [3]** 13/12 21/14
75/3
**obviously [5]** 16/9 30/25
35/11 55/21 82/23
**occasion [1]** 30/15
**occur [4]** 32/16 34/13
69/11 81/20
**occurred [4]** 19/22
32/15 33/10 66/19
**off [5]** 4/4 10/16 37/18
59/15 61/22
**offensive [3]** 11/1 28/7
45/17
**officers [1]** 67/12
**offices [1]** 60/6
**official [6]** 1/24 11/4
45/17 53/2 95/1 95/16
**often [2]** 69/11 73/9
**Oh [2]** 67/11 78/18
**okay [11]** 14/23 15/24
16/6 17/10 26/16 29/8
30/8 32/22 56/19 63/23
75/18
**old [5]** 68/20 69/5 74/17
88/16 89/18
**olds [3]** 68/11 69/19
70/4
**once [2]** 4/9 82/10
**one [49]** 10/22 13/10
13/15 14/4 18/12 18/23
19/13 25/18 29/22 30/10
30/14 32/9 43/7 45/1
46/25 48/6 48/11 54/3
55/1 56/21 57/5 57/6
61/7 61/25 62/5 62/10
65/11 66/12 70/16 72/16

73/15 73/15 74/10 74/11
74/18 76/6 77/1 78/1
82/14 82/18 83/8 84/25
84/25 85/16 89/18 90/13
90/16 92/9 93/18
**one-room [1]** 65/11
**onerous [16]** 45/9 52/9
52/25 53/5 53/15 54/2
57/16 59/12 60/1 60/3
65/8 69/15 69/16 70/8
71/17 91/21
**onerousness [3]** 53/21
90/15 91/6
**ones [2]** 31/24 90/19
**only [17]** 6/14 8/24
32/19 35/8 41/22 42/2
48/7 50/18 54/10 54/17
60/15 62/23 65/10 69/3
73/8 75/22 79/23
**open [1]** 89/2
**operating [1]** 78/8
**operative [2]** 4/20 5/20
**opinion [49]** 4/18 10/15
11/12 11/13 11/14 11/22
12/9 13/20 14/8 14/21
16/18 16/18 17/5 18/5
21/23 23/21 24/3 29/3
30/24 31/4 35/21 35/21
44/21 46/18 50/22 52/5
52/21 59/16 59/17 60/10
60/12 62/23 71/6 71/6
71/8 71/9 73/4 73/5
73/10 73/24 74/9 74/19
75/10 75/25 77/18 82/25
83/13 85/4 92/16
**opinions [3]** 31/1 73/6
85/7
**opportunities [2]** 11/2
28/8
**opportunity [1]** 34/25
**opposed [2]** 44/19
89/23
**opposing [1]** 73/13
**opposite [2]** 17/17 21/3
**opposition [1]** 44/22
**order [22]** 7/25 12/23
39/22 40/10 40/11 40/13
40/15 40/18 41/3 41/8
41/11 42/8 42/10 44/2
44/23 47/24 48/17 75/20
75/23 76/1 85/6 92/18
**orders [3]** 2/11 40/9
72/25
**organizations [4]** 4/15
42/14 46/15 60/10
**original [11]** 12/9 13/19
17/5 29/10 29/11 29/23
30/1 30/2 31/4 43/18
47/24
**other [36]** 5/4 5/5 5/7
12/11 12/15 12/15 13/10
16/12 19/24 20/3 24/15
25/13 25/22 29/18 31/6
42/21 48/8 49/13 49/14

50/18 53/21 66/15 73/6
73/25 74/3 78/1 80/13
81/2 83/2 84/5 84/18
86/11 86/15 88/23 90/13
90/14
**others [1]** 17/12
**otherwise [5]** 20/1
36/25 43/12 49/7 78/7
**our [17]** 13/8 14/12
14/12 18/11 19/21 44/22
51/20 53/20 53/23 54/25
55/20 64/11 76/18 81/18
84/9 90/23 92/3
**out [39]** 45/10 5/14 8/20
17/24 19/16 21/3 21/14
31/14 34/6 36/21 38/4
39/20 40/3 40/14 41/3
41/20 43/23 43/23 43/24
44/18 50/1 50/6 50/14
64/24 68/14 68/21 74/21
75/10 75/11 77/22 83/21
84/4 85/6 87/11 92/16
92/23 93/10 93/10 93/19
**outcome [1]** 40/3
**outlie [1]** 34/19
**outlier [1]** 24/3
**outputs [1]** 91/17
**outright [1]** 82/11
**outside [5]** 62/24 65/3
66/11 67/7 69/1
**over [15]** 4/6 4/14 41/14
41/14 41/14 41/14 56/18
59/9 68/17 69/19 70/4
72/14 80/5 81/4 83/16
**overlapped [1]** 36/9
**overlay [1]** 65/25
**overlooked [2]** 9/23
78/18
**overturning [1]** 39/22
**overwhelming [3]** 26/12
29/9 52/18

**P**

**p.m [3]** 1/8 2/1 94/14
**page [4]** 15/1 15/9 15/10
95/9
**Page 5 [1]** 15/9
**pair [1]** 89/23
**pairs [1]** 89/24
**pandemic [1]** 58/9
**panoply [3]** 42/17 42/17
48/13
**paper [3]** 7/25 8/10
14/14
**papers [6]** 18/11 30/11
40/1 43/18 45/6 53/2
**parallel [1]** 64/8
**paralyzed [1]** 17/12
**parcel [1]** 41/25
**parent [2]** 69/2 69/5
**parrots [1]** 24/18
**parse [5]** 19/16 50/1
51/15 51/23 52/6
**parsing [1]** 50/14

**part [8]** 21/20 25/9 29/2
34/23 41/25 43/17 59/11
88/1
**partial [3]** 4/19 35/23
40/4
**participants [1]** 2/14
**participating [1]** 59/14
**particular [6]** 19/17 29/7
32/2 40/15 48/19 50/14
**particularly [5]** 59/12
60/1 71/7 93/5 94/11
**parties [2]** 2/19 65/23
80/8 80/13 84/9 93/1
**parties' [2]** 86/3 86/4
**partner [1]** 64/10
**party [3]** 73/11 73/13
73/14
**passed [4]** 52/3 59/6
63/2 72/3
**past [1]** 8/23
**patterns [1]** 34/19
**pause [1]** 86/6
**pay [1]** 91/18
**Paycheck [2]** 18/12
32/24
**Payment [6]** 18/22 19/2
32/10 33/23 34/14 55/15
**pending [3]** 7/23 60/11
81/1
**Pennhurst [1]** 16/25
**penny [2]** 58/19 67/10
**people [14]** 12/16 17/25
46/11 47/16 54/4 54/10
54/10 57/2 60/2 60/3
65/2 65/12 67/6 94/10
**per [1]** 87/12
**percent [1]** 56/22 65/7
91/9
**perfectly [1]** 70/6
**perform [2]** 57/17 91/2
**perhaps [4]** 28/10 57/21
83/17 85/10
**period [6]** 19/14 35/25
37/12 86/10 86/18 87/9
**permission [1]** 71/21
**permits [1]** 76/3
**permitted [1]** 7/22
**permitting [1]** 92/18
**person [8]** 39/1 53/6
57/5 57/6 57/8 57/8 62/9
82/12
**persons [1]** 5/5
**perspective [1]** 53/23
**persuaded [1]** 71/7
**persuasive [2]** 43/19
88/9
**pervasive [3]** 11/1 28/7
45/16
**phone [2]** 38/23 65/20
**phrase [6]** 10/24 27/25
30/11 67/19 67/20 73/18
**phrases [1]** 68/6
**piece [1]** 59/4
**pigtails [3]** 69/6 69/19

70/22
**ping [1]** 65/22
**ping-pong [1]** 65/22
**place [7]** 13/23 33/13
34/3 37/7 55/9 61/8
88/25
**placed [1]** 53/16
**places [1]** 45/4
**plain [1]** 21/14
**plainly [1]** 13/12
**Plaintiff [15]** 1/3 1/12
4/24 5/2 5/3 10/22 18/24
32/6 33/19 33/22 34/24
35/20 35/22 36/5 84/12
**Plaintiff's [1]** 18/4
**Plaintiffs [15]** 2/23 3/1
3/7 4/22 4/23 5/4 5/7 5/8
10/5 18/23 19/13 38/12
74/4 83/12 86/15
**Plan [5]** 19/2 32/10
33/23 34/14 55/15
**play [3]** 39/23 66/1
83/21
**playground [1]** 68/11
**please [3]** 24/7 69/17
70/22
**pleases [1]** 39/19
**pleasure [2]** 53/12
62/24
**pocket [1]** 49/8
**pocketbook [1]** 49/6
**pockets [1]** 49/12
**podium [2]** 12/4 39/9
**point [43]** 5/10 5/14 6/10
8/20 10/5 14/13 22/15
28/15 30/4 31/14 36/4
44/18 44/22 45/21 47/4
51/21 53/25 60/13 60/22
62/8 65/8 66/4 66/15
67/22 71/13 74/22 75/9
76/11 77/9 80/10 84/4
87/24 88/4 88/6 88/20
88/22 88/22 89/21 89/25
**pointed [3]** 39/20 43/24
50/6
**policies [4]** 55/8 86/21
91/1 91/25
**policy [37]** 24/23 24/25
25/5 25/6 27/12 27/12
27/13 27/15 27/17 27/22
27/23 28/16 28/21 29/1
29/4 31/21 32/2 44/20
47/23 51/3 52/9 52/10
52/13 53/17 57/6 57/11
57/22 57/23 57/24 63/22
64/2 64/9 64/18 66/24
82/24 92/3 93/14
**political [1]** 65/22
**pong [1]** 65/22
**position [7]** 15/20 19/21
24/3 27/24 30/12 31/3
47/5
**positions [1]** 55/3

BUETTNER-HARTSOE, et al. v.
BALTIMORE LUTHERAN HIGH SCHOOL, et al.

**MOTIONS HEARING - 9/1/2022**

**P**

**positive [3]** 14/10 14/11 19/9
**possibility [2]** 63/17 66/15
**possible [1]** 78/11
**post [1]** 82/17
**posturing [1]** 71/4
**potential [3]** 20/19 71/5 77/21
**potentially [1]** 33/8
**pound [1]** 67/10
**PPP [12]** 18/15 20/12 20/12 24/10 24/11 36/1 36/23 40/16 41/4 63/6 84/8 84/17
**practice [1]** 28/24
**precedent [4]** 42/23 43/20 44/14 85/5
**precise [3]** 54/2 76/24 92/19
**precisely [1]** 53/19 67/23
**predecessor [1]** 2/8
**predicate [1]** 29/14
**predicates [2]** 73/15 83/11
**preferred [1]** 39/1
**prejudice [1]** 73/12
**prejudices [1]** 86/15
**Preliminary [1]** 20/5
**prelude [1]** 84/11
**Premier [1]** 25/16
**Premiere [1]** 12/12
**premise [1]** 64/23
**Prep [12]** 2/8 17/22 18/10 20/2 44/9 48/5 49/2 49/15 51/19 53/5 56/17 78/13
**preparation [1]** 30/15
**PREPARATORY [1]** 1/5 3/19 4/8
**prescriptive [1]** 55/18
**present [2]** 1/19 71/21
**presented [2]** 37/4 73/17
**presenting [2]** 85/20 85/21
**preside [2]** 62/9 62/10
**presiding [1]** 2/14
**pretty [12]** 5/21 14/17 15/16 26/7 29/12 30/18 38/24 46/11 49/24 70/24 76/24 79/22
**previous [1]** 39/22
**previously [4]** 11/21 18/8 73/6 74/8
**principle [1]** 67/25
**prior [2]** 29/13 74/12
**private [39]** 46/4 46/5 46/6 46/10 47/1 47/1 48/3 48/4 49/14 53/15 53/16 57/12 57/19 58/1 58/8 58/9 58/13 58/23

59/21 60/21 60/24 61/20 64/19 69/16 70/7 71/14 72/11 86/17 86/19 87/2 87/14 88/2 89/1 89/8 91/13 91/14 91/15 92/5 92/9
**privilege [5]** 54/12 54/12 54/15 62/24 68/23
**privileged [1]** 54/16
**pro [1]** 63/25
**probably [5]** 62/2 62/5 74/13 74/15 94/3
**problem [3]** 16/17 71/3 75/2
**Procedure [2]** 10/18 11/19
**procedures [7]** 55/5 55/8 56/1 65/14 86/21 91/1 91/25
**proceed [7]** 2/18 10/11 34/1 82/21 83/2 83/19 85/19
**proceeding [2]** 5/15 54/24
**proceedings [4]** 66/25 68/10 92/10 95/8
**proceeds [1]** 68/5
**process [2]** 42/7 69/5
**processes [1]** 87/4
**proclamation [1]** 44/24
**product [1]** 91/13
**profound [2]** 78/3 82/24
**program [4]** 18/12 18/22 20/12 32/24
**programs [1]** 25/4
**progress [1]** 93/11
**prohibitions [1]** 67/14
**project [1]** 68/5
**pronouncing [3]** 2/6 5/1 11/25
**proof [1]** 70/12
**proper [1]** 29/7
**properly [1]** 35/11
**property [1]** 14/5
**propose [1]** 10/1
**proposition [2]** 20/8 23/16
**propriety [1]** 78/6
**protect [3]** 48/1 55/6 55/17
**protected [2]** 53/25 91/24
**protecting [3]** 53/24 65/24 92/4
**protection [11]** 18/12 18/22 19/2 32/10 32/24 33/24 34/15 48/2 51/18 55/15 56/6
**protections [1]** 52/7
**provide [1]** 2/12
**provided [3]** 11/3 28/9 44/6
**provides [1]** 73/7
**province [1]** 33/15

**provisions [1]** 70/5
**public [53]** 2/12 10/20 24/22 24/25 25/5 25/6 27/12 27/12 27/13 27/15 27/17 27/22 27/23 28/16 28/21 29/1 29/4 31/21 32/2 47/23 49/16 51/3 52/9 52/10 52/13 53/17 57/13 57/22 57/23 57/23 57/24 60/25 61/2 61/7 61/14 61/15 61/16 61/24 63/22 64/2 64/9 64/17 66/24 69/11 69/12 69/14 70/7 70/10 71/15 71/18 82/24 92/3 92/5
**pudding [1]** 70/12
**pull [3]** 2/20 3/13 39/11
**pulled [1]** 2/18
**Pullen [2]** 5/6 83/18
**pure [4]** 20/20 24/13 37/24 76/25
**purely [2]** 35/18 35/19
**purpose [2]** 25/3 25/3
**purposely [2]** 20/15 32/23
**purposes [5]** 4/17 5/22 13/9 57/16 68/1
**pursuant [1]** 95/6
**pursue [1]** 67/7
**purview [1]** 86/21
**pushing [1]** 53/17
**put [3]** 80/3 86/20 93/10

**Q**

**qualify [1]** 4/16
**quality [1]** 62/16
**quarterback [1]** 30/16
**quasi [5]** 54/23 54/23 66/24 68/10 69/5
**quasi-judicial [2]** 66/24 69/5
**quasi-legal [1]** 54/23
**question [28]** 20/20 20/21 26/13 33/25 34/21 35/11 35/19 37/24 38/6 48/4 48/24 52/4 54/2 64/16 68/2 70/8 71/10 72/7 75/24 76/21 76/25 82/22 85/22 87/1 90/5 90/7 90/8 93/18
**questions [7]** 18/12 18/13 38/21 39/4 78/14 82/20 86/23
**quibble [1]** 53/23
**quick [2]** 75/10 75/17
**quickly [5]** 57/21 57/22 81/20 89/5 89/6
**quid [1]** 63/25
**quite [13]** 7/10 41/6 41/16 59/18 79/21 80/18 82/8 82/14 82/24 85/5 89/6 92/1 94/1
**quo [1]** 63/25
**quote [3]** 12/25 74/13

75/6

**R**

**racially [1]** 28/24
**raise [3]** 32/19 48/17 91/10
**raised [3]** 32/8 41/9 90/10
**ramifications [1]** 62/11
**rare [2]** 56/12 56/23
**RDB [2]** 1/5 2/5
**reach [3]** 20/25 21/5 23/5
**reached [3]** 5/13 22/3 24/10
**reaches [1]** 21/8
**reaching [1]** 42/8
**react [1]** 64/7
**reaction [2]** 46/1 57/19
**read [5]** 17/11 40/19 44/21 50/21 59/13
**reading [2]** 23/15 41/11
**reality [1]** 61/22
**realize [2]** 46/11 66/22
**really [23]** 31/19 38/22 39/16 40/13 42/6 42/10 43/15 43/15 48/1 51/15 53/9 57/2 57/18 68/19 72/15 76/3 78/21 80/21 82/18 91/5 91/20 92/13 93/11
**Realtime [1]** 95/5
**reason [18]** 12/8 17/4 22/13 25/9 29/3 29/18 33/8 38/7 43/17 45/10 51/20 63/21 64/14 69/10 74/3 86/5 86/6 86/8
**reasonable [1]** 21/2
**reasons [1]** 8/1
**recalls [1]** 41/11
**receipt [26]** 13/9 13/13 13/14 13/22 14/3 14/4 14/5 16/15 17/16 17/20 18/3 18/9 19/19 20/13 20/18 22/21 23/17 24/11 24/14 26/3 33/4 33/21 33/23 34/15 59/22 84/17
**receive [6]** 52/8 61/8 67/21 68/1 79/13 90/19
**received [8]** 19/2 19/8 19/15 32/12 34/15 36/1 36/23 37/8
**receives [1]** 12/24
**receiving [10]** 10/23 27/25 28/17 37/7 37/10 45/22 50/25 67/19 67/20 72/5
**recently [2]** 65/21 67/17
**recipient [10]** 4/14 12/18 12/19 13/3 13/5 16/14 25/17 43/13 43/21 66/20
**recipients [1]** 4/16
**recognition [2]** 18/8

24/19
**recognize [9]** 8/23 16/19 22/16 22/19 25/17 25/23 59/17 92/1 92/22
**reconsider [2]** 40/5 45/11
**reconsideration [26]** 2/9 7/1 10/3 10/12 10/17 11/16 11/24 19/17 19/18 19/20 29/12 30/6 30/10 31/1 31/6 31/9 32/20 33/1 39/17 41/19 72/21 72/25 74/5 74/7 76/6 82/6
**reconsidering [2]** 40/1 72/23
**record [41]** 2/24 3/15 6/13 7/12 8/1 8/13 8/23 9/5 9/23 10/10 10/20 18/1 19/1 21/5 23/24 26/9 26/18 26/21 34/4 34/4 36/21 36/22 37/15 37/18 38/23 38/23 46/17 51/3 51/22 52/13 53/10 57/15 57/16 58/25 69/13 70/6 71/11 78/8 80/20 92/17 93/12
**recourse [1]** 86/16
**Recovery [1]** 74/8
**recruited [1]** 51/11
**reference [4]** 11/13 11/21 92/8 92/10
**referring [2]** 22/17 26/9
**refile [1]** 38/12
**reflect [7]** 8/23 26/18 37/19 38/23 57/21 60/12 92/17
**reflected [1]** 26/22
**reflects [3]** 19/1 26/21 34/4
**reform [1]** 66/19
**Regan [5]** 27/13 28/21 42/25 43/8 43/23
**regard [5]** 32/24 33/3 45/13 52/6 64/5
**regarding [1]** 90/15
**regardless [5]** 33/20 36/5 36/6 82/21 92/4
**Registered [1]** 95/4
**regulation [2]** 28/23 63/21
**regulations [13]** 13/23 13/24 17/18 17/18 21/2 21/25 22/22 43/6 53/1 54/3 54/13 65/19 95/10
**regurgitate [1]** 29/13
**regurgitating [1]** 72/13
**Rehab [2]** 12/12 25/16
**Rehabilitation [3]** 15/12 16/8 22/10
**rehash [1]** 39/18
**reiterate [1]** 60/15
**rejected [1]** 85/9
**rejecting [1]** 25/1

BUETTNER-HARTSOE, et al. v.
BALTIMORE LUTHERAN HIGH SCHOOL, et al.

MOTIONS HEARING - 9/1/2022

**R**

**relate [2]** 20/6 72/19
**relationship [4]** 25/17 48/10 49/10 49/12
**relevance [2]** 54/17 84/11
**relevant [5]** 35/8 35/8 54/18 79/14 84/12
**relied [2]** 29/5 41/10
**relief [4]** 20/5 29/18 73/8 74/3
**relies [1]** 24/17
**relying [1]** 29/3
**remain [1]** 85/17
**remains [1]** 84/16
**remand [1]** 38/13
**remarkable [1]** 68/18
**reminds [1]** 88/16
**remiss [1]** 78/20
**remote [1]** 20/3
**removal [1]** 38/13
**remove [1]** 84/19
**reply [4]** 14/12 15/1 15/5 15/7
**report [1]** 65/3
**reported [2]** 1/23 95/8
**reporter [7]** 1/24 2/22 75/18 95/1 95/4 95/5 95/16
**reprehensible [1]** 91/19
**represent [2]** 56/22 72/11
**representation [1]** 27/14 69/8
**represented [3]** 62/23 72/14 78/3
**representing [1]** 89/8
**Republican [1]** 66/18
**requested [1]** 76/5
**require [5]** 16/20 54/3 54/4 54/5 54/5
**required [2]** 56/1 57/3
**requirements [4]** 44/13 55/18 73/14 77/24
**requiring [1]** 13/15
**research [2]** 69/21 71/22
**resolution [1]** 89/3
**resolved [2]** 90/3 93/24
**resources [1]** 86/20
**respect [21]** 4/22 6/25 26/10 26/20 32/5 32/8 32/25 33/20 33/21 35/4 35/21 41/4 51/2 51/3 52/11 69/25 72/20 83/10 87/2 89/1 91/16
**respectfully [19]** 12/8 13/19 17/4 22/11 23/4 23/16 29/2 30/13 37/13 63/17 66/3 66/8 66/9 66/10 66/21 70/3 70/3 72/2 78/11
**respond [4]** 39/5 47/11 47/11 47/13

**response [1]** 49/23
**responsible [1]** 69/3
**results [1]** 52/3
**retain [1]** 85/1
**retention [3]** 6/2 34/17 80/23
**revamp [1]** 91/1
**reverse [3]** 35/2 84/15 84/23
**reversed [1]** 77/23
**reverses [1]** 83/13
**review [3]** 18/1 21/13 73/22
**revised [1]** 72/23
**revolution [1]** 51/9
**RICHARD [1]** 1/10
**Richmond [3]** 52/12 57/20 89/17
**rid [1]** 84/24
**ridiculous [2]** 69/7 69/7
**right [47]** 5/15 7/5 7/10 14/23 15/4 17/10 17/14 17/14 21/23 24/24 25/8 28/15 30/4 31/3 31/12 35/17 39/6 41/6 41/12 41/16 42/11 43/2 47/17 48/6 50/5 51/14 58/2 58/4 60/5 60/24 61/5 64/22 64/24 65/8 65/16 72/6 76/16 77/7 77/16 79/21 81/7 82/7 87/21 87/24 88/13 90/10 91/8
**rightly [2]** 39/20 41/23
**rigorous [1]** 56/6
**ringing [1]** 23/10
**rise [7]** 19/25 23/13 31/5 31/8 36/24 41/18 83/1
**rises [1]** 82/14
**RMR [1]** 1/23 95/16
**robust [1]** 82/23
**role [1]** 57/17
**Ronda [4]** 1/23 75/17 95/4 95/16
**room [5]** 20/11 37/6 37/16 58/7 65/11
**row [2]** 7/21 8/2
**rule [20]** 10/17 11/18 11/18 11/19 11/23 23/13 29/14 31/10 31/11 37/1 39/21 40/20 47/18 72/21 72/22 73/2 73/7 73/11 73/19 80/5
**ruled [2]** 33/6 40/22
**rules [6]** 10/18 11/19 54/12 87/15 88/3 91/3
**ruling [14]** 7/1 10/13 18/6 39/21 33/20 41/18 49/24 50/11 74/6 76/6 79/5 84/25 88/20 89/9
**rulings [1]** 81/6
**run [1]** 22/15
**rural [4]** 61/15 61/19 61/24 62/3

**S**

**safest [1]** 92/20
**said [22]** 12/23 13/7 13/11 13/15 16/17 18/5 18/20 19/6 21/12 23/12 28/23 29/24 30/14 36/7 42/1 43/22 50/7 72/16 85/13 86/6 86/7 91/14
**sake [1]** 90/17
**same [14]** 6/7 14/1 24/6 40/20 40/22 41/14 41/14 43/1 43/2 43/9 53/6 61/9 85/21 85/21
**sanctions [2]** 23/14 58/1
**sane [1]** 69/2
**satisfied [2]** 29/18 74/3
**saw [2]** 53/1 54/14
**say [39]** 6/17 7/9 13/20 14/9 14/11 15/21 17/15 20/11 22/24 23/5 23/9 36/8 36/8 36/15 40/6 42/4 42/9 46/4 46/19 46/24 47/21 48/6 52/13 53/23 56/15 59/18 63/25 67/11 68/12 69/15 71/4 75/2 79/23 84/1 85/4 85/19 90/12 90/24 91/20
**saying [15]** 13/17 16/13 17/2 22/3 27/3 29/1 35/14 37/23 40/24 41/16 42/15 64/23 69/5 72/10 82/6
**says [11]** 17/9 17/16 21/12 21/24 31/11 40/14 74/15 74/16 75/5 77/10 82/20
**school [79]** 1/4 1/5 2/4 2/7 2/8 3/18 3/19 3/21 4/8 4/9 11/3 11/4 11/8 11/12 18/7 18/25 19/14 23/3 28/1 28/9 30/16 33/22 33/24 34/23 35/25 37/7 37/8 37/11 37/20 41/5 44/25 45/18 46/10 46/15 47/1 48/5 51/18 53/7 53/15 53/16 54/1 56/9 57/11 57/12 57/13 57/13 57/24 58/8 58/13 58/19 59/22 60/21 61/2 61/7 61/14 61/15 61/16 61/25 62/5 62/10 64/5 65/8 66/25 67/23 69/8 69/14 69/19 70/21 78/22 79/1 79/6 79/9 87/2 87/23 91/7 91/9 91/15 92/5 92/5
**School's [1]** 49/2
**schoolhouse [1]** 65/11
**schools [82]** 7/14 8/11 9/10 18/8 18/10 20/3 44/9 44/9 45/8 45/9 46/4 46/5 46/6 46/12 48/3 48/4 49/14 51/8 53/25 55/11 55/14 56/21 56/22

57/13 57/13 57/19 58/1 58/9 58/23 60/9 60/23 60/24 60/25 61/20 61/24 62/12 62/22 62/25 63/3 63/5 63/6 63/10 63/14 63/20 65/4 65/23 66/9 66/13 67/1 67/3 67/5 68/8 69/1 69/11 69/12 69/16 70/7 70/7 70/10 71/14 71/15 71/19 72/1 72/11 78/2 78/3 86/17 86/9 87/14 87/20 88/2 89/1 89/8 89/9 90/18 90/19 90/25 91/10 91/11 91/13 92/9 92/11
**scope [2]** 19/20 44/6
**screens [2]** 70/15 70/24
**se [1]** 87/12
**seated [2]** 4/5 9/25
**second [4]** 20/19 32/9 77/3 83/8
**secret [1]** 20/10
**section [2]** 45/23 48/14 67/15 83/15
**see [31]** 3/3 3/4 3/5 3/8 3/9 3/12 4/1 8/9 8/16 8/17 8/22 9/15 9/22 15/4 15/4 15/19 31/10 40/18 42/20 44/5 48/13 50/14 53/11 53/12 59/2 70/15 71/1 71/14 73/18 80/11 80/15
**seeking [2]** 35/15 38/10
**seem [2]** 15/16 71/18
**seems [1]** 78/7
**seen [2]** 70/19 70/23
**Selena [1]** 5/3
**sending [2]** 84/22 90/16
**sense [3]** 20/2 20/23 85/18
**sensitive [2]** 90/2 90/3
**sent [2]** 18/6 82/15
**September [1]** 1/7 95/12
**serious [2]** 38/24 93/14
**seriously [1]** 53/14
**seriousness [1]** 72/12
**served [1]** 58/12
**services [1]** 14/6
**serving [1]** 68/24
**set [1]** 8/1
**sets [1]** 57/6
**setting [1]** 67/7
**settlement [1]** 86/3
**seven [4]** 55/22 56/18 56/19 56/21
**severe [4]** 11/1 28/6 28/12 45/16
**severely [1]** 46/6
**sexes [1]** 25/7
**sexual [25]** 4/12 4/12 10/21 10/25 28/6 28/12 37/6 45/16 45/23 50/23 51/13 51/18 54/18 54/19 54/20 55/7 59/7 59/24

67/14 67/16 83/14 86/17 86/17 90/20 90/21
**shaking [4]** 52/3 71/6 71/7 88/25
**shape [1]** 60/16
**she [5]** 5/13 9/11 32/11 34/12 75/14
**she's [9]** 5/15 5/18 9/5 9/14 9/21 9/21 87/18 87/19 89/19
**SHEA [12]** 1/17 8/11 8/14 8/16 53/11 56/11 58/15 60/14 62/15 65/7 86/25 88/6
**shocked [1]** 70/14
**shocking [1]** 59/8
**shockwaves [1]** 18/6
**shoehorn [2]** 52/14 52/23
**shoehorned [1]** 59/2
**shoehorning [1]** 51/24
**short [1]** 60/13
**should [14]** 6/17 34/10 40/18 43/16 56/7 59/14 67/2 67/6 73/8 74/11 80/9 90/19 91/3 93/3
**shouldn't [1]** 81/14
**show [3]** 10/22 53/20 91/18
**sic [1]** 88/2
**side [2]** 21/18 92/8
**significant [6]** 51/6 51/7 59/4 59/16 59/17 81/8
**significantly [1]** 76/18
**similar [1]** 57/12
**similarly [1]** 86/16
**similarly-situated [1]** 86/16
**simple [2]** 72/13 74/4
**simply [1]** 21/16
**since [7]** 41/20 62/23 63/7 63/15 73/24 79/8 80/6
**sir [1]** 90/6
**sit [5]** 3/14 7/21 8/2 8/19 9/6
**sitting [1]** 80/12
**situated [1]** 86/16
**situation [3]** 37/3 90/3 92/1
**six [2]** 29/14 73/15
**size [2]** 55/9 61/13
**sizes [1]** 61/12
**skinned [1]** 39/2
**slice [1]** 43/11
**slightly [1]** 40/20
**small [8]** 18/13 19/2 36/1 56/9 61/14 61/15 61/19 91/9
**smaller [1]** 62/11
**smells [1]** 75/3
**so [129]**
**society [3]** 42/16 52/4 59/5

BUETTNER-HARTSOE, et al. v.
BALTIMORE LUTHERAN HIGH SCHOOL, et al.

**MOTIONS HEARING - 9/1/2022**

**S**

**solicited [1]** 47/5
**some [33]** 8/3 11/17
11/17 12/20 17/12 22/6
22/15 31/6 39/21 42/20
43/16 44/3 44/24 46/4
52/25 54/25 56/13 57/11
58/7 59/3 61/3 61/17
64/25 67/5 68/9 71/21
73/6 83/20 84/18 91/2
91/2 91/6 94/10
**somebody [1]** 65/17
**somehow [1]** 50/5
**someone [3]** 54/5 54/8
62/4
**something [14]** 14/19
17/6 24/2 29/6 35/8 47/5
55/5 55/18 56/16 64/7
68/10 81/13 84/20 89/3
**somewhere [2]** 53/1
71/16
**son [1]** 91/15
**soon [1]** 78/11
**sorry [11]** 4/24 9/4
13/13 14/8 15/2 19/8
27/21 36/3 56/15 78/18
83/23
**sort [9]** 47/25 50/8
53/17 60/7 61/3 61/17
63/23 71/23 83/20
**sound [2]** 23/24 45/11
**soundly [2]** 44/5 82/14
**sounds [1]** 69/6
**Southeastern [2]** 3/24
6/19
**speak [9]** 9/17 12/4 12/6
27/16 27/17 47/19 79/24
**speaking [2]** 3/13 41/21
**speaks [2]** 31/14 87/7
**specific [12]** 26/20 32/8
32/15 37/11 45/13 50/25
51/19 54/4 55/4 55/18
56/2 70/9
**specifically [10]** 17/18
28/4 28/5 35/22 48/15
48/18 49/12 52/22 67/15
83/17
**specificity [1]** 28/3
**specified [1]** 32/15
**specifies [1]** 48/19
**speculative [1]** 13/16
**speed [2]** 64/1 64/3
**spend [4]** 21/19 41/21
57/1 91/23
**spending [47]** 12/10
12/10 12/14 12/17 16/7
16/9 16/12 16/19 17/3
17/8 18/16 21/6 21/19
22/4 22/9 24/20 25/2
25/10 25/23 26/5 26/10
26/17 26/19 27/5 28/2
28/18 28/22 29/5 30/20
31/16 31/18 31/20 31/25
41/22 42/1 51/2 51/5

51/24 52/14 52/23 53/18
59/3 63/24 66/23 72/4
72/17 72/18
**spent [2]** 81/12
**split [1]** 92/22
**spoke [3]** 12/12 24/25
77/20
**sports [2]** 51/10 51/11
**spring [6]** 18/25 32/14
33/23 33/24 34/3 34/14
**staff [2]** 91/2 91/23
**stand [3]** 23/16 39/8
39/10
**standard [6]** 40/5 73/3
90/18 90/18 90/23 91/4
**standards [2]** 73/1 76/4
**standing [2]** 2/11 7/3
**stands [1]** 94/12
**stare [1]** 70/16
**start [1]** 93/6
**started [3]** 56/5 79/2
82/6
**starting [2]** 10/16 62/25
**starts [3]** 15/9 16/24
16/25
**state [12]** 13/16 16/23
20/24 38/12 38/13 51/20
61/18 66/3 66/5 79/13
83/3 85/15
**STATES [14]** 1/1 11/11
51/8 61/2 61/16 62/3
69/13 69/15 69/20 70/5
89/16 92/19 95/5 95/11
**statue [1]** 13/18
**status [65]** 2/19 4/16
17/16 17/25 18/2 18/9
18/18 19/12 19/18 20/8
20/17 21/1 21/15 22/20
22/25 23/17 24/13 26/2
28/25 32/3 32/7 32/20
33/4 33/20 35/20 37/25
40/16 40/25 41/5 42/12
43/3 44/10 44/19 45/2
45/3 45/22 46/3 46/8
46/10 46/12 46/14 47/5
47/22 48/6 48/8 48/16
50/25 58/10 58/14 58/20
58/23 59/21 63/11 64/20
66/20 67/25 76/22 78/9
79/10 83/13 84/16
**statute [8]** 13/8 13/12
13/21 17/15 21/15 22/20
48/20 66/1
**statutes [1]** 12/21
**stay [8]** 36/12 87/13
87/25 88/23 89/14 89/15
92/17 93/22
**stayed [3]** 81/1 81/16
93/22
**stays [1]** 85/23
**stenographically [1]**
95/8
**stenographically-report
ed [1]** 95/8

**stenotype [1]** 1/22
**step [1]** 22/3
**steps [1]** 37/3
**Steve [1]** 64/10
**Steven [1]** 7/16
**Stewart [2]** 25/22 77/14
**still [3]** 5/15 85/1 85/12
**stop [3]** 93/21 93/21
93/22
**stopping [1]** 93/21
**straight [1]** 51/20
**Street [1]** 1/24
**stretch [1]** 42/4
**strict [1]** 73/1
**strictly [2]** 28/18 37/5
**strike [1]** 74/16
**strong [1]** 73/17
**strongly [2]** 30/19 80/9
**student [10]** 10/21
10/22 32/13 34/12 59/24
59/24 61/20 67/16 67/16
67/18
**students [7]** 4/8 55/1
56/9 56/18 56/23 57/24
65/9
**subject [10]** 12/21 18/15
18/19 21/6 23/11 44/25
63/8 63/15 72/25 79/16
**subjected [1]** 70/10
**subjecting [1]** 18/10
**submissions [1]** 29/11
**submit [8]** 63/17 66/10
66/15 66/21 71/2 71/22
84/14 87/10
**submitted [2]** 34/21
53/20
**subsidy [1]** 43/1
**substance [1]** 79/25
**substantial [1]** 75/25
**succeed [1]** 74/5
**such [7]** 12/22 18/8
41/21 44/16 45/8 76/3
85/25
**suddenly [2]** 51/10
58/13
**sued [1]** 65/14
**suffer [1]** 86/17
**suffered [1]** 10/25
**suffering [1]** 28/6
**suggest [7]** 22/20 26/14
36/22 57/20 70/3 70/3
72/2
**suggested [2]** 72/14
73/2
**suggesting [5]** 15/25
33/17 34/4 62/11 68/16
**suggestion [1]** 52/25
**suit [1]** 80/10
**summarized [3]** 11/9
60/2 67/17
**summary [14]** 4/19
35/23 36/17 38/16 40/4
75/21 80/7 80/7 80/8
83/19 84/1 84/18 86/2

93/19
**summer [1]** 94/7
**supervision [3]** 6/2
34/17 80/23
**supplemental [9]** 34/8
35/3 38/8 38/17 83/7
83/9 83/16 84/2 85/13
**support [3]** 28/17 39/22
73/10
**supports [1]** 49/1
**Supreme [13]** 12/12
12/23 13/5 13/7 14/7
16/11 25/24 27/14 31/16
42/23 43/20 44/7 85/5
**sure [31]** 7/8 9/21 14/17
15/15 26/7 26/9 26/15
28/10 31/19 33/11 39/13
41/11 45/12 46/22 49/24
50/1 50/17 51/21 52/12
57/7 62/20 69/22 69/22
71/16 72/8 78/21 80/17
81/11 82/3 87/6 91/24
**surprise [1]** 29/15
**surprised [1]** 92/11
**surveys [1]** 13/16
**survive [1]** 36/5
**switch [1]** 65/19
**Sword [2]** 80/6 80/22
**Synod [4]** 3/24 6/19
80/11 81/9
**system [6]** 44/6 58/8
60/4 68/19 68/23 68/25
**systems [2]** 54/1 61/20

**T**

**table [8]** 3/15 8/3 9/7
12/4 12/6 39/8 39/10
93/10
**tailored [1]** 55/9
**take [14]** 4/4 4/11 27/1
30/12 31/3 32/23 37/3
42/17 48/23 49/4 55/14
75/16 78/24 93/7
**taken [1]** 46/10
**takes [2]** 80/4 88/25
**taking [2]** 27/24 60/19
**talk [5]** 16/4 21/19 50/18
70/20 86/3
**talked [6]** 22/6 76/20
76/21 78/1 81/24 82/5
**talking [18]** 16/24 22/5
23/10 24/15 37/16 40/7
41/24 42/11 42/11 42/22
44/19 45/1 51/4 51/6
52/1 56/8 70/7 82/7
**talks [2]** 16/7 72/4
**target [1]** 48/15
**task [1]** 69/15
**tax [52]** 4/16 13/9 13/13
13/21 17/16 17/19 17/25
18/9 18/14 18/18 19/12
19/18 20/8 20/17 20/25
21/15 22/1 22/20 22/25
23/17 24/13 26/2 32/3

93/19
**Taxation [1]** 27/13
**team [1]** 30/16
**teased [1]** 69/6
**teasing [1]** 75/1
**Technically [1]** 7/23
**telephone [1]** 70/23
**television [2]** 70/13 71/1
**tell [15]** 31/24 53/16
57/15 57/18 69/11 69/17
70/11 70/19 74/21 79/7
81/14 88/17 92/7 93/6
94/10
**telling [1]** 42/25
**tells [1]** 43/9
**Ten [1]** 65/10
**tendency [1]** 82/9
**term [1]** 94/2
**terminate [1]** 77/19
**termination [1]** 82/17
**terms [53]** 10/16 10/18
11/15 17/11 19/23 24/9
27/22 28/21 34/8 34/9
34/20 34/22 35/1 36/6
36/8 37/2 38/7 41/7 46/1
46/3 50/22 50/24 51/9
51/12 51/14 51/24 52/25
53/2 57/10 59/1 59/9
61/23 63/22 67/13 67/15
68/5 70/9 72/22 77/20
81/3 83/11 83/12 83/20
83/21 84/9 84/10 87/4
87/12 93/23
**tested [1]** 2/16
**than [18]** 12/11 12/14
16/2 24/7 30/14 46/6
47/13 47/18 48/25 48/25
51/19 61/20 61/25 62/5
62/10 81/2 84/5 86/19
**thank [33]** 6/24 8/5 8/20
9/24 38/20 39/4 39/12
39/13 49/18 49/19 49/19
49/21 49/22 62/14 62/15
62/15 62/16 62/17 72/9
72/9 72/10 78/15 79/20
81/23 86/22 86/24 92/6
92/7 93/4 93/16 94/5
94/8 94/13
**Thankfully [1]** 7/8
**that [621]**
**that'll [1]** 10/17
**that's [112]**
**theater [8]** 78/22 78/23
78/24 79/1 79/4 79/5
79/14 94/7
**their [25]** 11/3 16/15

BUETTNER-HARTSOE, et al. v.
BALTIMORE LUTHERAN HIGH SCHOOL, et al.

**T**

**their... [23]** 28/9 45/1
45/2 46/7 49/6 55/9 55/9
55/22 56/17 56/22 60/16
64/20 65/23 67/3 67/7
70/15 70/17 83/2 86/20
87/8 87/8 91/1 91/23
**them [23]** 11/2 21/10
21/11 27/6 28/7 45/4
47/13 52/23 54/9 54/13
55/2 55/4 55/13 60/12
61/8 65/13 66/20 70/16
70/18 73/15 81/10 81/14
93/9
**theme [1]** 27/10
**themselves [2]** 2/24
88/17
**then [44]** 4/4 5/1 5/2 5/4
6/2 9/14 10/3 10/13
10/14 10/25 17/5 22/3
24/4 27/12 27/20 27/20
32/25 33/2 33/5 33/19
38/11 38/12 38/16 42/2
42/4 43/22 44/3 62/9
65/13 65/17 65/19 73/21
74/16 76/25 77/3 77/18
79/7 83/6 85/10 88/25
89/16 91/19 92/10 93/22
**theory [1]** 34/13
**there [68]** 4/23 5/23 8/3
8/4 18/12 19/14 19/25
21/9 23/18 24/21 25/22
26/12 26/14 28/3 29/14
32/13 32/25 34/10 34/22
35/3 37/15 37/19 37/20
39/12 39/21 47/7 48/8
48/22 52/18 52/19 52/21
55/14 57/10 57/11 58/3
61/1 61/2 62/8 62/11
64/14 64/24 64/25 64/25
65/14 66/1 66/4 66/23
70/3 70/7 70/25 74/14
75/2 75/5 75/24 77/2
77/5 78/7 80/21 80/24
83/5 83/10 85/16 89/6
89/19 92/8 92/23 92/23
93/14
**there's [80]** 5/20 5/24
8/9 11/17 16/9 16/23
20/10 21/10 22/6 22/20
22/21 22/22 23/23 24/17
26/11 27/3 31/2 31/6
33/7 33/7 34/2 34/15
35/24 36/22 36/23 38/7
41/25 46/5 47/4 47/6
47/23 48/24 51/3 51/9
52/1 52/11 52/25 61/7
63/9 63/17 63/21 64/4
65/2 66/15 68/18 69/10
69/13 70/21 71/5 71/10
71/10 72/15 72/16 73/23
74/2 77/10 77/12 77/17
81/1 81/4 81/5 81/7 81/8
81/10 81/18 82/24 83/21

84/8 84/18 84/25 86/4
86/6 86/8 87/25 88/1
88/23 88/25 92/12 93/16
93/23
**therefore [1]** 63/9
**these [57]** 5/21 7/6
10/14 13/4 13/6 16/16
26/16 27/5 28/12 34/16
38/11 38/12 38/15 38/21
42/14 43/16 51/12 51/25
53/3 53/6 53/25 54/12
55/3 55/4 55/17 58/18
58/18 59/3 59/9 60/1
60/5 60/11 60/11 63/23
64/23 66/11 67/1 67/1
68/6 69/9 70/5 79/14
83/1 83/11 83/25 84/24
86/11 90/3 90/17 91/10
91/11 91/12 91/18 91/24
92/4 92/10 93/7
**they [121]**
**they'll [2]** 58/2 58/4
**they're [35]** 4/21 5/5
13/4 13/6 13/15 13/17
13/24 16/13 22/7 24/7
28/21 43/18 43/18 43/19
50/10 50/14 51/23 55/5
55/6 55/19 56/3 58/21
61/16 65/9 65/23 66/3
76/3 78/10 81/15 81/17
89/1 89/9 89/14 91/1
93/20
**they've [5]** 5/6 63/15
66/14 78/8 81/12
**thick [2]** 30/18 39/2
**thick-skinned [1]** 39/2
**thing [11]** 19/24 43/1
43/2 43/9 50/18 58/2
58/4 61/6 67/12 79/23
90/13
**things [17]** 13/10 13/15
14/2 14/3 17/20 48/18
60/17 60/18 64/25 66/19
68/4 69/9 71/24 77/24
82/18 91/13 93/23
**think [120]**
**thinking [2]** 93/8 93/9
**third [2]** 57/8 77/3
**thirdly [1]** 85/10
**this [216]**
**Thomas [4]** 1/23 2/22
95/4 95/16
**thorough [1]** 93/4
**those [25]** 2/6 18/17
21/8 25/23 25/24 27/18
35/5 45/19 48/14 50/24
53/8 55/2 57/2 67/12
67/17 68/14 73/1 77/24
78/3 83/16 83/17 85/1
85/17 91/3 91/17
**though [4]** 5/16 40/17
71/22 81/9
**thought [3]** 29/24 42/7
66/12

**three [16]** 3/12 4/23 9/6
11/4 54/4 54/9 54/10
55/2 57/2 57/17 60/2
60/3 65/12 68/16 89/24
89/24
**threshold [1]** 73/14
**through [21]** 4/24 4/25
5/2 5/3 5/5 5/16 11/4
12/13 13/16 15/10 18/6
18/24 21/17 36/1 44/6
54/22 60/7 66/17 66/25
66/25 75/13
**throughout [2]** 65/15
70/5
**throw [1]** 77/14
**throwing [1]** 68/14
**tile [1]** 4/2
**time [25]** 5/11 9/15
19/14 20/3 34/14 36/14
36/15 36/16 36/22 37/1
37/5 37/12 39/5 40/2
40/2 41/21 46/25 55/23
56/2 57/1 70/1 70/1
72/24 75/16 81/13
**timeline [2]** 84/10 84/13
**timeliness [1]** 73/12
**times [1]** 63/19
**tiny [1]** 66/25
**Title [122]**
**today [15]** 5/8 10/13
41/9 45/1 45/6 47/24
48/13 52/20 61/6 78/2
86/12 87/8 89/10 91/19
92/2
**today's [1]** 7/9
**together [1]** 22/15
**told [1]** 58/21
**tomorrow [2]** 10/15
75/11
**ton [1]** 64/24
**too [7]** 3/9 19/24 66/18
69/15 75/6 76/18 78/1
**took [4]** 32/20 33/13
34/3 37/7
**total [1]** 24/3
**totally [4]** 19/11 24/7
55/21 85/12
**touched [1]** 77/1
**tough [1]** 93/5
**towards [1]** 86/20
**Towson [2]** 51/17 53/7
**train [1]** 65/13
**trained [2]** 54/11 55/3
**training [1]** 91/23
**transcript [2]** 95/8 95/9
**transcription [1]** 1/22
**transgender [1]** 65/21
**treading [1]** 60/7
**Treasury [1]** 13/25
**treated [1]** 17/25
**treatises [1]** 13/16
**treatment [2]** 25/7 40/23
**tremendous [1]** 81/12
**trial [7]** 3/14 82/17 85/12

85/20 87/3 87/11 90/24
**tried [1]** 44/21
**tries [1]** 57/7
**trivial [1]** 90/22
**true [4]** 17/17 61/18
94/11 95/7
**truly [1]** 42/19
**trust [1]** 81/8
**try [4]** 7/21 38/22 52/22
82/3
**trying [24]** 5/19 15/15
20/22 26/7 26/8 26/15
27/8 30/18 30/23 35/10
35/13 36/8 37/23 45/20
45/25 48/1 50/1 50/10
51/23 52/8 71/4 74/24
90/2 93/10
**Tuesday [3]** 75/11 75/15
92/16
**tuition [1]** 91/11
**turf [1]** 91/12
**turn [1]** 46/24
**turns [1]** 11/18
**TV [2]** 70/15 70/23
**two [12]** 2/17 5/4 10/25
14/3 24/22 47/16 48/12
63/7 68/11 76/2 80/13
85/1
**type [1]** 45/23

**U**

**U.S.C [3]** 5/24 75/23
95/7
**ultimate [1]** 76/2
**ultimately [8]** 34/5 36/2
36/21 37/14 38/4 77/21
77/23 77/23
**unambiguous [5]** 13/8
13/21 22/25 44/8 44/11
**unambiguously [2]**
17/16 20/25
**unavailing [2]** 44/13
45/10
**under [35]** 7/2 18/2
19/12 20/24 22/23 29/14
29/14 32/11 39/20 45/4
47/22 47/22 53/4 54/19
56/22 60/16 61/9 64/8
64/9 66/3 66/5 67/14
72/21 72/21 73/7 73/8
73/11 73/14 74/8 75/23
78/8 83/14 90/5 90/7
90/8
**understand [43]** 13/1
15/21 17/13 25/20 26/20
27/11 29/8 29/8 29/9
30/19 31/5 36/19 38/6
38/9 38/19 45/12 45/21
46/1 46/2 46/14 47/2
47/14 51/15 52/5 52/8
52/12 57/19 58/25 63/11
66/10 67/24 72/8 72/11
73/17 73/19 80/17 80/18
80/21 80/22 88/20 89/7

89/22 92/25
**understanding [5]** 31/7
37/5 63/15 84/10 85/13
**understands [1]** 66/12
**understood [7]** 15/17
57/4 63/4 63/7 64/6
64/25 88/21
**undertake [1]** 57/25
**undertakes [1]** 12/21
**undertaking [3]** 13/4
13/6 16/16
**underwent [1]** 42/7
**unfair [1]** 73/12
**unheard [1]** 23/25
**uniform [1]** 9/20
**UNITED [14]** 1/1 11/10
51/8 61/2 61/16 62/3
69/13 69/14 69/20 70/5
89/16 92/19 95/5 95/11
**universe [1]** 65/5
**universities [3]** 54/1
60/5 65/15
**university [6]** 27/15
55/20 55/22 60/4 91/14
91/15
**unless [5]** 34/2 35/7
37/7 78/14 93/16
**unquote [1]** 12/25
**unrefrigerated [1]** 74/17
**until [3]** 87/14 88/2
88/25
**up [37]** 7/21 7/21 8/2 8/4
8/18 9/6 9/8 9/8 9/11
9/14 9/16 9/22 10/14
20/16 20/22 30/15 36/18
36/20 37/14 37/21 41/12
49/7 57/9 59/7 69/8 79/8
82/15 82/19 84/11 84/22
85/2 85/15 90/16 91/18
91/25 92/1 92/13
**upheld [1]** 82/25
**upon [11]** 29/5 33/6
41/10 46/13 46/13 53/16
57/22 60/12 70/5 83/10
87/14
**upset [2]** 41/17 81/17
**urban [1]** 61/14
**us [7]** 43/1 43/9 59/8
61/23 67/23 91/21 92/2
**use [9]** 12/4 48/12 48/17
48/23 49/3 49/3 49/16
50/6 50/9
**used [6]** 16/11 18/6
30/11 45/2 48/5 94/9
**using [1]** 17/23
**usually [1]** 93/8
**utilize [1]** 48/15
**utmost [1]** 91/16
**utter [1]** 68/22
**utterly [1]** 44/11

**V**

**vaccinated [9]** 2/15 2/16
3/1 3/7 3/11 3/21 3/24

BUETTNER-HARTSOE, et al. v.
BALTIMORE LUTHERAN HIGH SCHOOL, et al.

MOTIONS HEARING - 9/1/2022

**V**

vaccinated... **[2]** 9/18 9/21
vaccination **[1]** 2/19
vacuum **[1]** 93/24
valid **[1]** 66/3
Valley **[2]** 40/11 40/24
variance **[2]** 11/17 27/3
various **[2]** 26/16 45/7
Venable **[3]** 8/12 8/21 62/17
venue **[1]** 90/9
verbal **[1]** 4/12
verdict **[1]** 87/3
verification **[1]** 5/11
verifying **[1]** 7/5
versus **[1]** 47/7
very **[56]** 9/21 9/24 20/17 39/4 39/24 42/6 42/6 46/5 46/7 46/12 46/13 46/23 47/20 48/18 49/19 49/19 50/20 50/24 52/11 52/17 54/11 55/4 55/8 55/8 55/17 56/2 57/3 57/12 58/23 59/1 59/1 60/3 61/14 61/15 62/15 62/17 62/19 64/23 65/21 66/24 72/9 73/17 78/15 78/19 79/2 80/9 81/17 82/23 82/24 85/5 86/24 92/25 93/4 93/14 93/16 93/25
veterans **[1]** 17/12
VI **[12]** 18/19 22/10 22/14 23/21 42/21 42/24 44/7 44/8 64/8 64/9 64/17 64/18
viable **[1]** 84/16
Vic **[2]** 78/22 94/6
Victorian **[6]** 78/22 78/23 78/24 79/1 79/4 79/5
view **[12]** 6/10 10/5 28/15 33/1 49/16 59/11 62/13 67/22 88/2 88/4 88/7 88/23
views **[1]** 31/16
VIOLA **[30]** 1/16 3/20 6/11 7/6 10/9 11/25 12/2 23/1 24/21 25/5 26/8 28/10 30/14 34/11 37/5 38/20 47/11 49/22 52/1 56/15 71/7 72/14 73/17 74/14 74/20 74/23 76/9 76/14 78/15 93/5
Viola's **[1]** 59/1
violation **[4]** 5/24 34/20 56/4 57/11
violations **[1]** 34/13
voiced **[1]** 47/25
void **[2]** 29/17 74/2
vs **[1]** 1/4

**W**

wait **[2]** 81/2 81/5
waiting **[3]** 86/10 87/4 89/2
waive **[1]** 47/17
want **[32]** 7/20 9/17 14/9 14/11 27/11 27/12 40/8 41/17 41/20 42/16 46/9 47/15 47/18 50/7 50/8 50/18 52/8 52/12 53/9 55/17 56/15 60/14 62/18 69/18 75/17 79/24 80/10 80/11 80/15 86/25 90/22 93/4
wanted **[5]** 38/24 41/3 66/18 79/23 80/19
wants **[3]** 47/10 47/19 69/4
wares **[2]** 70/15 70/17
warrants **[1]** 41/19
was **[90]** 5/2 5/13 6/16 6/17 6/17 7/13 7/15 12/9 12/9 13/20 14/7 14/9 14/13 14/15 14/17 14/19 16/3 17/5 18/6 18/12 18/14 19/9 19/25 21/9 23/1 27/1 27/2 27/25 29/3 29/20 29/23 29/24 30/2 30/11 30/12 30/15 31/4 32/10 32/11 32/12 32/12 32/13 32/13 34/12 34/15 34/22 36/2 36/7 37/7 37/15 37/15 37/17 37/20 38/21 38/22 39/24 39/25 40/10 41/3 41/12 41/16 41/24 44/5 44/11 45/14 46/10 46/17 46/25 49/24 52/3 56/17 57/10 57/10 57/11 58/9 59/6 60/13 63/2 63/16 65/20 66/22 68/24 69/6 70/25 72/3 72/4 80/6 92/8 93/5 93/17
wasn't **[5]** 24/13 37/19 43/25 66/21 71/7
waste **[2]** 70/1 70/1
watch **[2]** 70/12 70/17
wave **[2]** 70/4 71/5
way **[34]** 13/7 14/8 17/24 18/21 23/2 25/13 25/18 28/16 40/20 40/22 43/11 48/17 49/3 52/2 52/19 52/19 56/8 60/16 60/17 62/12 64/6 65/5 66/7 67/1 71/3 71/9 77/11 77/12 78/20 81/18 82/25 90/12 92/21 92/25 93/17
ways **[2]** 77/2 77/6
we **[99]**
we'll **[7]** 9/7 10/3 63/25 75/11 75/15 92/15 93/22
we're **[46]** 7/4 10/2 26/4 26/15 27/7 29/10 30/17 37/14 37/21 39/4 39/16

39/20 40/2 40/6 41/13 42/10 42/11 42/17 44/19 44/22 44/23 45/1 50/1 51/4 51/6 52/1 52/14 60/7 61/9 61/22 67/19 70/6 74/14 77/9 79/19 80/1 80/7 80/14 83/25 85/20 85/21 86/1 86/1 88/19 91/8 91/8
we've **[11]** 19/16 19/17 36/17 38/24 45/6 61/6 72/13 75/16 78/1 81/24 85/3
wealth **[1]** 4/11
wearing **[1]** 70/22
website **[1]** 48/13
Wednesday **[2]** 15/19 92/16
week **[6]** 15/5 74/17 75/13 80/6 92/16 94/11
weekend **[2]** 75/12 75/14
weeks **[1]** 2/17
weight **[1]** 48/25
welcome **[8]** 3/3 7/20 8/1 8/4 8/18 8/19 9/14 47/13
well **[54]** 2/9 4/2 6/11 6/17 9/12 9/13 9/24 14/20 16/8 18/14 19/16 22/24 23/23 24/5 24/21 25/6 26/6 26/24 27/10 29/22 30/1 31/7 32/25 34/13 36/7 35/10 36/7 44/4 48/6 51/20 52/14 56/13 58/21 59/18 60/9 60/23 61/21 64/10 67/13 67/24 68/15 69/2 70/11 71/20 72/14 73/17 76/22 78/4 81/15 82/4 82/8 83/4 89/11 89/20
well-balanced **[1]** 69/2
well-presented **[1]** 73/17
went **[2]** 12/13 79/9
were **[28]** 6/21 6/22 10/22 11/1 18/18 18/18 19/2 19/14 20/2 20/3 21/6 32/8 35/2 38/13 38/14 38/24 41/8 41/10 44/10 44/12 44/15 44/15 46/14 51/7 60/11 63/8 67/17 79/8
weren't **[5]** 21/9 27/18 43/17 44/12 66/22
Westminster **[1]** 23/3
what **[85]** 10/1 10/13 13/17 14/1 14/7 15/1 16/13 16/24 17/9 17/13 17/19 19/21 20/10 21/25 22/5 22/23 23/1 23/5 23/7 25/5 26/20 29/10 29/20 30/19 30/23 31/15 31/19 34/3 34/12 35/10

35/14 36/7 36/15 37/23 38/10 40/5 41/24 43/7 43/22 45/24 47/14 47/21 48/1 48/13 49/14 49/15 49/15 52/1 52/8 54/7 54/18 54/23 58/9 59/11 60/6 60/19 63/11 65/3 65/13 65/20 65/25 67/20 68/11 69/1 69/4 70/12 70/14 70/24 71/4 71/22 71/23 71/24 72/8 72/10 73/19 73/22 81/13 81/15 85/13 87/1 87/4 87/7 88/8 93/8 93/9
what's **[10]** 28/12 28/14 34/5 47/22 56/7 67/14 67/23 88/9 88/17 91/19
whatever **[12]** 12/4 13/3 31/23 39/9 41/17 43/17 50/13 61/13 63/24 77/11 77/15 78/12
when **[30]** 17/19 19/14 21/17 26/22 30/1 32/12 33/9 33/12 35/20 37/6 37/10 41/25 42/5 42/20 43/20 43/21 44/14 46/18 50/21 58/12 59/6 59/23 71/23 81/25 82/5 82/8 82/10 86/13 86/17 91/25
where **[13]** 4/6 11/23 36/20 37/13 49/9 53/14 53/15 53/16 56/5 71/14 80/12 88/3 93/15
whether **[31]** 4/15 11/18 13/24 19/18 20/8 22/9 22/10 22/10 24/13 32/3 32/20 33/4 33/7 33/7 33/25 34/9 34/22 35/1 35/3 36/9 36/24 37/25 38/3 38/17 43/25 56/5 57/10 78/6 83/6 84/2 85/22
which **[39]** 2/7 5/20 8/24 11/13 12/19 18/5 25/3 26/11 28/23 31/24 34/3 40/7 40/11 40/16 42/12 43/4 43/9 43/16 44/4 47/5 47/23 49/3 53/3 55/20 56/21 66/15 66/16 71/8 72/11 74/11 77/1 79/10 81/9 82/13 85/8 90/10 91/6 92/4 92/11
while **[8]** 3/13 32/13 57/19 60/12 80/13 82/12 82/23 89/4
white **[2]** 65/8 82/20
who **[18]** 5/4 11/4 44/10 45/17 46/6 47/10 53/8 57/6 57/8 57/9 62/4 62/4 62/9 74/21 77/7 86/16 90/19 91/7
whoa **[3]** 91/20 91/20 91/20
whoever **[1]** 39/8

whole **[6]** 48/13 55/24 55/25 66/11 67/12 80/22
whom **[3]** 55/23 55/24 58/7
whose **[1]** 65/7
why **[30]** 12/14 13/19 16/4 16/18 16/22 17/2 22/12 22/13 24/8 25/21 27/7 27/8 29/1 37/21 38/24 39/4 39/16 52/9 52/17 52/25 53/19 71/11 76/21 82/6 82/7 86/5 89/22 90/8 90/15 90/15
will **[25]** 7/8 8/23 9/17 10/11 10/13 10/13 12/3 26/18 38/23 42/9 46/17 46/19 47/11 70/19 73/21 78/19 82/11 82/21 83/2 84/4 92/7 92/17 92/17 93/6 94/10
WILLIAM **[2]** 1/18 8/21
willing **[2]** 47/18 76/7
wind **[1]** 49/7
winding **[1]** 85/15
wish **[1]** 40/18
within **[10]** 2/17 11/9 28/18 44/6 48/9 48/19 58/5 59/24 83/7 86/2
without **[4]** 50/10 52/4 72/10 86/16
woman **[2]** 51/17 51/19
women **[15]** 4/8 4/10 48/2 51/8 51/8 51/10 51/11 52/7 53/24 53/24 55/7 55/17 56/6 65/24 90/4
won't **[2]** 80/21 91/23
word **[3]** 15/21 18/6 87/9
words **[2]** 24/22 79/20
work **[1]** 75/13
works **[1]** 75/14
world **[2]** 66/11 66/19
worn **[1]** 2/12
worried **[1]** 79/7
worry **[2]** 58/2 75/14
would **[84]** 2/11 2/23 4/22 5/10 8/2 9/11 13/8 17/22 17/23 21/2 21/11 22/23 22/23 22/24 23/20 25/25 25/25 28/10 28/11 30/5 30/12 30/24 33/1 33/3 33/25 33/25 34/21 35/3 35/6 36/8 36/12 36/13 38/17 39/1 39/8 39/9 40/6 40/8 43/12 44/18 46/4 46/6 46/7 47/21 49/7 53/8 53/23 58/10 62/8 62/9 64/14 68/11 71/1 71/2 71/15 71/20 71/21 71/22 72/2 76/9 76/11 77/19 78/20 80/11 80/15 80/17 80/25 83/8 83/19 83/21 83/24 84/2 84/14 84/19 85/4

BUETTNER-HARTSOE, et al. v.
BALTIMORE LUTHERAN HIGH SCHOOL, et al.

**W**

**would... [9]** 85/12 87/10 88/3 88/11 89/5 89/6 89/23 91/10 93/25
**wouldn't [3]** 46/9 50/7 84/2
**written [2]** 10/14 11/13
**wrong [26]** 12/9 13/20 16/18 17/5 27/9 30/12 30/13 31/4 31/8 31/11 55/24 63/13 63/14 64/17 65/14 66/14 73/18 73/19 73/20 74/13 74/14 74/15 74/16 74/22 75/3 75/6
**wrote [2]** 18/4 74/21

**X**

**XI [109]**
**XI's [1]** 54/3

**Y**

**yeah [3]** 5/12 36/10 91/1
**year [13]** 4/18 11/10 11/10 11/22 28/1 45/20 68/11 68/20 69/5 69/19 70/4 81/16 91/22
**years [13]** 8/23 52/3 59/9 63/1 63/2 63/7 65/17 65/25 66/8 68/17 72/3 79/9 86/8
**yes [27]** 3/8 3/12 4/1 6/12 6/13 7/19 8/15 8/22 9/4 9/19 9/20 19/9 33/14 33/14 34/2 54/14 56/19 58/16 62/1 64/13 74/23 78/5 84/7 86/12 88/5 90/6 94/8
**you [263]**
**you'd [1]** 3/15
**you're [36]** 2/21 3/15 7/6 7/20 8/18 8/19 14/22 17/10 19/9 22/17 24/15 26/7 26/9 26/16 26/18 27/24 29/19 35/14 37/16 38/10 41/6 51/14 56/8 60/5 64/24 67/10 67/10 67/25 71/4 75/1 75/8 79/7 79/15 79/16 90/9 93/8
**you've [8]** 28/19 42/14 52/9 52/20 60/2 64/1 65/12 72/10
**young [17]** 48/2 51/8 51/10 51/12 51/17 51/19 52/7 65/24 78/23 78/24 79/1 79/2 79/4 79/5 90/4 94/6 94/9
**your [203]**

JA467

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| DONNA BUETTNER-HARTSOE, *et al.*, | * | |
| Plaintiffs, | * | Civil Action No. RDB-20-3132 |
| v. | * | |
| BALTIMORE LUTHERAN HIGH SCHOOL ASSOCIATION, *d/b/a/* CONCORDIA PREPARATORY SCHOOL, | * * * | |
| Defendant. | * | |

\*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*

| | | |
|---|---|---|
| JENNIFER PULLEN, | * | |
| Plaintiff, | * | Civil Action No. RDB-20-3214 |
| v. | * | |
| BALTIMORE LUTHERAN HIGH SCHOOL ASSOCIATION, *d/b/a/* CONCORDIA PREPARATORY SCHOOL, | * * * | |
| Defendant. | * | |

\*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*

| | | |
|---|---|---|
| ANDREA CONRAD, *et al.*, | * | |
| Plaintiffs, | * | Civil Action No. RDB-20-3229 |
| v. | * | |
| BALTIMORE LUTHERAN HIGH SCHOOL ASSOCIATION, *d/b/a/* CONCORDIA PREPARATORY SCHOOL, and LUTHERAN CHURCH-MISSOURI SYNOD, | * * * | |

SOUTHEASTERN DISTRICT,

                                  *

    Defendants.

\*     \*     \*     \*     \*     \*     \*     \*     \*     \*     \*     \*

ARIANA GOMEZ,               *

    Plaintiff,              *          Civil Action No. RDB-20-3267

BALTIMORE LUTHERAN HIGH  *
SCHOOL ASSOCIATION, *d/b/a/*
CONCORDIA PREPARATORY    *
SCHOOL, and LUTHERAN CHURCH-
MISSOURI SYNOD,          *
SOUTHEASTERN DISTRICT,

                                    *

    Defendant.

\*     \*     \*     \*     \*     \*     \*     \*     \*     \*     \*     \*

SELENA BARBER, *et al.*,      *

    Plaintiffs,            *          Civil Action No. RDB-21-0691

    v.                    *

BALTIMORE LUTHERAN HIGH  *
SCHOOL ASSOCIATION, *d/b/a/*
CONCORDIA PREPARATORY    *
SCHOOL,

                                    *

    Defendants.

\*     \*     \*     \*     \*     \*     \*     \*     \*     \*     \*     \*

## <u>MEMORANDUM OPINION</u>

    These five cases are brought by five different women, all former students of Concordia

Preparatory School ("CPS"), previously known as Baltimore Lutheran High School. The

women make similar allegations of sexual assault and verbal sexual harassment by male

students at the school dating back to 2016. They allege that school officials failed to adequately

address their numerous complaints or take any meaningful action in response, thereby cultivating a hyper-sexualized culture at the school. In this series of cases, three minors, N.H., H.C., and A.G.—through their respective mothers, Donna Buettner-Hartsoe, Andrea Conrad, and Selena Barber—and two adults, Jennifer Pullen and Ariana Gomez (collectively, "Plaintiffs"), bring federal and state claims against Defendant Baltimore Lutheran High School Association, now doing business as Concordia Preparatory School, and Defendant Lutheran Church-Missouri Synod, Southeastern District ("LCMS").[1]

Presently pending before this Court is Defendant CPS's Motion for Reconsideration, or in the Alternative, Motion to Certify Order for Interlocutory Appeal. (ECF No. 132.)[2] Additionally before this Court are Motions for Leave to File Amicus Brief by several interested parties. (ECF Nos. 134, 136.)  The Court has reviewed the parties' submissions and held a hearing on September 1, 2022. *See* Local Rule 105.6 (D. Md. 2021). For the reasons set forth on the record at the hearing and for the reasons that follow, Defendant CPS's Motion is DENIED IN PART and GRANTED IN PART.  Specifically, CPS's Motion for Reconsideration is DENIED, but the Alternative Motion to Certify the Order for Interlocutory Appeal is GRANTED.  This case shall be STAYED pending a ruling by the United States Court of Appeals for the Fourth Circuit.  The Motions for Leave to File Amicus Brief ARE GRANTED.

---

[1] On May 18, 2021, all of these cases were assigned to the undersigned Judge. Through its June 23, 2021, Order, this Court consolidated these cases for discovery and motions. (RDB-20-3132, ECF No. 65; RDB-20-3214, ECF No. 48; RDB-20-3229, ECF No. 61; RDB-20-3267, ECF No. 101; RDB-21-0691, ECF No. 17.)
[2] Because the cases have been consolidated, the Court cites to the docket in the case filed first, RDB-20-3132.

3

## BACKGROUND

In a Memorandum Opinion dated June 23, 2021, this Court detailed Plaintiffs' factual allegations. (*E.g.*, RDB-20-3132, ECF No. 63 at 5-20.)[3]  On July 21, 2022, this Court denied Defendant CPS's Motion for Summary Judgment.[4]  (ECF Nos. 130, 131.)  In response, Defendant CPS filed the instant Motion for Reconsideration, or in the Alternative, Motion to Certify Order for Interlocutory Appeal (ECF No. 132).  Defendant's Motion largely reiterates arguments previously addressed by this Court.  In short, Defendant requests reconsideration on the basis of clear error and takes the position that the Court erred in holding that federal tax exemption under 501(c)(3) constitutes federal financial assistance for the purposes of Title IX.  (ECF No. 132-1 at 2-3.)  Plaintiffs astutely note that disagreement with the Court's Order is not a sufficient basis for reconsideration.  (ECF No. 140 at 26.)  As explained below, the Court DENIES the part of Defendant's Motion that seeks reconsideration.

Defendant's Motion alternatively seeks certification for an interlocutory appeal.  (ECF No. 132-1 at 18.)  Defendant argues that the requirements for interlocutory appeal have been met, namely that the issue of whether 501(c)(3) tax exemptions constitute federal financial assistance is a controlling question of law, and its immediate resolution would materially advance the outcome of litigation.  *Id.*  Plaintiffs oppose interlocutory appeal and characterize the issue as a mere disagreement that can be narrowed to the financial facts pertaining to CPS.

---

[3] This same Memorandum Opinion was docketed in each of the five consolidated cases. (*See* RDB-20-3132, ECF No. 63; RDB-20-3214, ECF No. 46; RDB-20-3229, ECF No. 59; RDB-20-3267, ECF No. 99; RDB-21-0691, ECF No. 15.) In that Memorandum Opinion, this Court denied Defendant CPS's motions to dismiss the Title IX claims of Plaintiffs H.C., Gomez, and A.G. (*E.g.,* RDB-21-0691, ECF No. 15 at 32–36.)

[4] CPS's Motions were styled as partial motions to dismiss under Fed. R. Civ. P. 12(b)(6) or, in the alternative, for summary judgment under Fed. R. Civ. P. 56. The Court considered matters outside of the pleadings and reviewed CPS's motions under the Fed. R. Civ. P. 56 standard.

(ECF No. 140 at 32-40.)  As stated on the record, the Court is mindful of the split in authority on this question and the implications of its analysis. Accordingly, this issue shall be certified for interlocutory appeal.

### STANDARD OF REVIEW

**I.    <u>Motion for Reconsideration</u>**

Pursuant to Rule 54(b) of the Federal Rules of Civil Procedure, "any order or other decision . . . that adjudicates fewer than all the claims or the rights and liabilities of fewer than all the parties . . . may be revised at any time before the entry of [final judgment]." Fed. R. Civ. P. 54(b). "Motions for reconsideration of interlocutory orders are not subject to the strict standards applicable to motions for reconsideration of a final judgment." *Am. Canoe Ass'n v. Murphy Farms, Inc.*, 326 F.3d 505, 514 (4th Cir. 2003). However, the Fourth Circuit has suggested that the Rule 60(b) standard guides the district court's analysis. *Fayetteville Investors v. Commercial Builders, Inc.*, 936 F.3d 1462, 1472 (4th Cir. 1991). As this Court has previously noted, "the court's analysis is guided by Rule 60(b) but is not bound by its strictures." *Cincinnati Ins. Co. v. Fish*, No. RDB-19-3355, 2022 WL 1225419, *1 (D. Md. Apr. 26, 2021).

"Rule 60(b) provides extraordinary relief and may only be invoked under 'exceptional circumstances.'"  *Mines v. United States*, No. WMN-10-520, 2010 WL 1741375, at *2 (D. Md. April 28, 2010) (quoting *Compton v. Alton Steamship Co., Inc.*, 608 F.2d 96, 102 (4th Cir. 1982)). To support a motion under Rule 60(b), the moving party must demonstrate "timeliness, a meritorious defense, a lack of unfair prejudice to the opposing party, and exceptional circumstances." *Hale v. Belton Assoc., Inc.*, 305 Fed. Appx. 987, 988 (4th Cir. 2009) (quoting

*Dowell v. State Farm Fire & Cas. Auto. Ins. Co.*, 993 F.2d 46, 48 (4th Cir. 1993)). If these threshold requirements are met, the moving party must then establish one of six predicates:

> (1) mistake, inadvertence, surprise, or excusable neglect;
> (2) newly discovered evidence which by due diligence could not have been discovered in time to move for a new trial under Rule 59(b);
> (3) fraud, misrepresentation or other misconduct of an adverse party;
> (4) the judgment is void;
> (5) the judgment has been satisfied, released, or discharged; or
> (6) any other reason justifying relief from the operation of the judgment.

Fed. R. Civ. P. 60(b). The moving party "must clearly establish the grounds therefore to the satisfaction of the district court," and those grounds "must be clearly substantiated by adequate proof." *In re Burnley*, 988 F.2d 1, 3 (4th Cir. 1992) (citations omitted).

## II.     Motion to Certify Order for Interlocutory Appeal

"A district court's order denying a motion for summary judgment or denying a motion to dismiss is interlocutory and may be appealed only (a) if the district court certifies under 28 U.S.C. § 1292(b) that the order involves a controlling question of law as to which there is substantial ground for difference of opinion and that an immediate appeal from the order may materially advance the ultimate termination of the litigation; and (b) the Court of Appeals permits such appeal." *Georgetown Coll. v. Madden*, 660 F.2d 91, 96–97 (4th Cir. 1981).

The district court has broad discretion to determine whether an interlocutory appeal is appropriate. *Swint v. Chambers Cnty. Comm'n*, 514 U.S. 35, 47 (1995). As § 1292(b) provides that a district court "shall" certify an appeal when its requirements are met, "[w]hen a district court determines that the statutory criteria are present, . . . it has a "duty . . . to allow an immediate appeal to be taken." *In re Trump*, 928 F.3d 360, 369 (4th Cir. 2019) (quoting *Ahrenholz v. Bd. of Trs. of the Univ. of Ill.*, 219 F.3d 674, 677 (7th Cir. 2000)). However, the Fourth Circuit has made

clear that Section 1292(b) "should be used sparingly and . . . its requirements must be strictly construed." *Myles v. Laffitte*, 881 F.2d 125, 127 (4th Cir. 1989).

## ANALYSIS

### I.   <u>Motion for Reconsideration</u>

Defendant faces a "high bar . . . to succeed on a Motion for Reconsideration." *Worsham v. Discount Power*, No. RDB-20-0008, 2021 WL 5742382, at *2 (D. Md. Dec. 1, 2021) (citation omitted). A litigant's "mere disagreement" with a court's ruling is not enough to justify a motion for reconsideration. *Lynn v. Monarch Recovery Mgmt.*, 953 F. Supp. 2d 612, 620 (D. Md. 2013) (citation omitted). Accordingly, "the prior judgment cannot be 'just maybe or probably wrong; it must . . . strike the court as wrong with the force of a five-week-old, unrefrigerated dead fish.'" *Fontell v. Hassett*, 891 F. Supp. 2d 739, 741 (D. Md. 2012) (citation omitted). In other words, the Court's previous judgment must be "dead wrong." *TFWS, Inc. v. Franchot*, 572 F.3d 186, 194 (4th Cir. 2009).

Defendant CPS's motion for reconsideration largely reiterates arguments previously addressed by the Court, such as its reliance on *Johnny's Icehouse Inc. v. Amateur Hockey Ass'n*, 134 F. Supp. 2d 965 (N.D. Ill. 2001), and its challenge to the scope of *Regan v. Taxation with Representation*, 461 U.S. 540 (1983). (ECF No. 132-1.) These arguments have already been decided, and are not a valid predicate for reconsideration under Rule 60(b), even under the more permissive construction afforded by Rule 54(b). However, Defendant does raise, for the first time, the impact of the DOJ regulations implementing Title IX, 34 C.F.R. § 106.2(g). (ECF No. 132-1 at 5-6.) Nonetheless, as the Central District of California recently noted in *E.H. v. Valley Christian Academy*, 2022 WL 2953681 (C.D. Cal. Jul. 25, 2022), although "the

regulations provide guidance on the types of funding that constitute federal financial assistance, the Title IX statute itself does not define the term." 2022 WL 2953681, at * 6–7. It is questionable that the DOJ regulations may interpret the statute to narrow the scope of the term "federal financial assistance" in a manner that is inconsistent with its purpose: "to eliminate discrimination in programs or activities benefitting from federal financial assistance." *McGlotten v. Connally*, 338 F. Supp. 448, 461 (D.D.C. 1972) (reaching analogous result under Title VI, and holding that "[d]istinctions as to the method of distribution of federal funds or their equivalent seem beside the point"). Accordingly, absent indication that this Court's Order was founded on "clear error", there is no basis for reconsideration and Defendant's request shall be DENIED.

## II.  <u>Motion to Certify Order for Interlocutory Appeal</u>

The Court finds that its Order "involves a controlling question of law as to which there is substantial ground for difference of opinion and that an immediate appeal from the order may materially advance the ultimate termination of the litigation." 28 U.S.C. § 1292(b). The Fourth Circuit defines a controlling question of law as "a pure question of law" or "an abstract legal issue that the court of appeals can decide quickly and cleanly." *Int'l Refugee Assistance Project v. Trump*, 404 F. Supp. 3d 946, 950 (D. Md. 2019) (quoting *United States ex rel. Michaels v. Agape Senior Cmty., Inc.*, 848 F.3d 330, 340 (4th Cir. 2017)). A pure issue of law raises "'a question of the meaning of a statutory or constitutional provision, regulation, or common law doctrine' – as opposed to 'whether the party opposing summary judgment had raised a genuine issue of material fact.'" *Coal. For Equity & Excellence in Md. Higher Educ. v. Md. Higher Educ. Comm'n*, No. CCB-06-2773, 2015 U.S. Dist. LEXIS 83741, at *13 (D. Md. June 29, 2015). To be

"controlling," the question of law must be "serious to the conduct of the litigation, either practically or legally." *Kayz v. Carte Blanche Corp.*, 496 F.2d 747, 755 (3d Cir. 1974); *see Kennedy v. St. Joseph's Ministries, Inc.*, 657 F.3d 189, 195 (4th Cir. 2011) ("We are faced with a pure question of law and our resolution of it terminates the case.").

To determine whether there is a substantial difference of opinion, there must be "'substantial doubt' that the district court's order was correct." *Goodman v. Archbishop Curley High Sch., Inc.*, 195 F. Supp. 3d 767, 774 (D. Md. 2016). "In deciding whether certification will materially advance the ultimate termination of the litigation, 'a district court should consider whether an immediate appeal would: (1) eliminate the need for trial, (2) eliminate complex issues so as to simplify the trial, or (3) eliminate issues to make discovery easier and less costly.'" *Ekstrom v. Cong. Bank*, No. ELH-20-1501, 2021 U.S. Dist. LEXIS 6628, at *8 (D. Md. Jan. 13, 2021) (quoting *Goodman v. Archbishop Curley High School, Inc.*, 195 F. Supp. 3d 767, 773 (D. Md. 2016)).

Here, the requirements for an interlocutory appeal are met. The issue of whether 501(c)(3) tax exempt status constitutes federal financial assistance under Title IX is a pure issue of law on which there are differing opinions that may seriously impact the litigation of this case. Although reversal of the issue in this Court's Order may not subject the case to remand as it relates to Plaintiff H.C.'s claims,[5] the parties recognize that this is an issue of first

---

[5] The Court's Memorandum denying Defendant's partial motion for summary judgement distinguished the rational for denial pertaining to Plaintiff H.C. (ECF No. 96 at 12.) This Court held that Defendant CPS admittedly received federal funding in March and April of 2020 in the form of a PPP loan. *Id.* In its Motion for Reconsideration, Defendant CPS has conceded that it received federal funding during at least some of the time period that Plaintiff H.C. attended school, but takes issue with the timing of events which indicate whether it availed itself to Title IX liability relating to H.C.'s claims. (ECF No. 98, Ex. 1 at 13.) This argument is not requested for appeal, and therefore remains an issue in this case regardless of the Fourth Circuit's decision.

impression with great significance to educational institutions. *Goodman*, 195 F. Supp. 3d at 774.

Moreover, Defendant aptly notes that resolving the Title IX issue definitively at this stage will

lend clarity to possible settlement discussions and pretrial preparation. (ECF No. 132-1.) As

a result, the Court GRANTS Defendant's request to certify the Court's Order (ECF Nos. 130,

131) for interlocutory appeal.

## CONCLUSION

For the reasons stated above, the Motions for Leave to File Amicus Brief (ECF Nos.

134, 136) are GRANTED as those briefs were considered, and Defendant CPS's Motion for

Reconsideration, or in the Alternative, Motion to Certify Order for Interlocutory Appeal (ECF

No. 132) is DENIED IN PART and GRANTED IN PART. Defendant's Motion is

DENIED IN PART as this Court will not reconsider its Order denying CPS's Motion for

Summary Judgment. (ECF Nos. 130, 131.) However, the Motion is GRANTED IN PART

and the Court certifies its Order (ECF Nos. 130, 131) for interlocutory appeal to the United

States Court of Appeals for the Fourth Circuit. The remainder of this case is consequently

STAYED pending review from the United States Court of Appeals for the Fourth Circuit.

A separate Order follows.

Dated: September 6, 2022                      _____/s/_____
                                             Richard D. Bennett
                                             United States District Judge

JA477

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| DONNA BUETTNER-HARTSOE, *et al.*, | * | |
| Plaintiffs, | * | Civil Action No. RDB-20-3132 |
| v. | * | |
| BALTIMORE LUTHERAN HIGH SCHOOL ASSOCIATION, *d/b/a/* CONCORDIA PREPARATORY SCHOOL, | * | |
| | * | |
| Defendant. | | |

\*      \*      \*      \*      \*      \*      \*      \*      \*      \*      \*      \*      \*

| | | |
|---|---|---|
| JENNIFER PULLEN, | * | |
| Plaintiff, | * | Civil Action No. RDB-20-3214 |
| v. | * | |
| BALTIMORE LUTHERAN HIGH SCHOOL ASSOCIATION, *d/b/a/* CONCORDIA PREPARATORY SCHOOL, | * | |
| | * | |
| Defendant. | | |

\*      \*      \*      \*      \*      \*      \*      \*      \*      \*      \*      \*      \*

| | | |
|---|---|---|
| ANDREA CONRAD, *et al.*, | * | |
| Plaintiffs, | * | Civil Action No. RDB-20-3229 |
| v. | * | |
| BALTIMORE LUTHERAN HIGH SCHOOL ASSOCIATION, *d/b/a/* CONCORDIA PREPARATORY SCHOOL, and LUTHERAN CHURCH-MISSOURI SYNOD, | * | |
| | * | |

SOUTHEASTERN DISTRICT,

      *

    Defendants.

\*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*

ARIANA GOMEZ,      *

    Plaintiff,      *      Civil Action No. RDB-20-3267

BALTIMORE LUTHERAN HIGH  *
SCHOOL ASSOCIATION, *d/b/a/*
CONCORDIA PREPARATORY  *
SCHOOL, and LUTHERAN CHURCH-
MISSOURI SYNOD,      *
SOUTHEASTERN DISTRICT,

      *

    Defendant.

\*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*

SELENA BARBER, *et al.*,    *

    Plaintiffs,      *      Civil Action No. RDB-21-0691

    v.      *

BALTIMORE LUTHERAN HIGH  *
SCHOOL ASSOCIATION, *d/b/a/*
CONCORDIA PREPARATORY  *
SCHOOL,

      *

    Defendants.

\*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*

## **ORDER**

For the reasons set forth on the record at the hearing of September 1, 2022, as well as stated in the accompanying Memorandum Opinion, it is hereby **ORDERED** this 6th day of September, 2022, that:

1. The Association of Independent Maryland & DC Schools' Motion for Leave to File Amicus Brief (RDB-20-3132, ECF No. 134) is **GRANTED**;

2

2.  The National Association of Independent Schools, National Business Officers Association, Association of Independent Schools of Greater Washington, Southern Association of Independent Schools, Virginia Association of Independent Schools, North Carolina Association of Independent Schools, and Palmetto Association of Independent Schools' Motion for Leave to File Amicus Brief (RDB-20-3132, ECF No. 136) is **GRANTED**;

3.  Defendant Concordia Preparatory School's Motion for Reconsideration, or in the Alternative, Motion to Certify Order for Interlocutory Appeal (RDB-20-3132, ECF No. 131; RDB-20-3214, ECF No. 82; RDB-20-3229, ECF No. 98; RDB-20-3267, ECF No. 134; RDB-21-0691, ECF No. 59) is **DENIED IN PART and GRANTED IN PART**:

    a.  Defendant's Motion for Reconsideration is **DENIED**; and,

    b.  Defendant's Motion to Certify Order for Interlocutory Appeal pursuant to 28 U.S. Code § 1292 is **GRANTED** and the Court certifies to the United States Court of Appeals for the Fourth Circuit an interlocutory appeal of the Court's ruling on Defendant's partial motion for summary judgment (RDB-20-3132, ECF Nos. 130, 131);

4.  The remainder of the case is **STAYED** pending review from the United States Court of Appeals for the Fourth Circuit.


_____/s/_____
Richard D. Bennett
United States District Judge

3

JA480

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| Donna Buettner-Hartsoe, et al., | |
| Plaintiffs, | |
| v. | Civil Action No. RDB-20-3132 |
| Baltimore Lutheran High School Association, d/b/a Concordia Preparatory School, | |
| Defendant. | |

**Amicus Brief of The Association of Independent Maryland & DC Schools in**
<u>**Support of Motion to Reconsider or to Certify Order for Interlocutory Appeal**</u>

### Identity and Interest of Amicus

The Association of Independent Maryland Schools, Inc. t/a The Association of Independent Maryland & DC Schools ("AIMS") is a vibrant association of 123 independent schools in Maryland and the District of Columbia.[1] Our Maryland members include 100 schools with over 42,000 students and 10,000 employees. Our District of Columbia members include 23 schools, with over 9,000 students and 2,500 employees. AIMS supports its members through professional development programs, accreditation services, and public advocacy.[2]

The Court's July 21 decision sent shockwaves through the independent school community. Whether to seek federal funds is a major decision. Federal money has strings attached. There are complicated and expensive administrative burdens and potential

---

[1] For a listing of AIMS' member schools, see http://www.aimsmddc.org/-resource/resmgr/aimsmembership/update_to_aims_school_direct.pdf.

[2] This case is consolidated with four other cases—numbers 20-3214, 20-3229, 20-3267, and 21-0691—for motions and discovery. AIMS intends this brief to support the reconsideration motions pending in each of the consolidated cases.

conflicts with schools' educational philosophies. With Title IX at the center of political controversies, schools receiving federal financial assistance can face whiplash when presidential administrations change. Under the Court's decision, schools would abruptly find themselves subject to the burdens but not the benefits of federal funding.

Although the Court's decision does not set precedent,[3] it creates grave uncertainty that AIMS members can ill afford. Some of our schools have only a few dozen students. They lack the economies of scale that help navigate uncertain legal waters or comply with such a complicated administrative set of procedures.

The Court should not keep its interlocutory decision in place and wait for an appeal from a final judgment. It should grant reconsideration or certify the question for interlocutory appeal.

## Argument

### A. Tax exemption is an acknowledgment of charitable institutions' historical status, not federal financial assistance.

Charities predate modern tax codes. Indeed, several AIMS members predate the Internal Revenue Code. Treating tax-exempt status as federal financial assistance turns history on its head.

When Congress enacted 26 U.S.C. § 501(c)(3) as part of the Tax Reform Act of 1969, it was not creating a new concept. "Tax exemptions for certain institutions thought beneficial to the social order of the country as a whole, or to a particular community, are deeply rooted in our history, as in that of England." *Bob Jones Univ. v. United States*, 461

---

[3] *Camreta v. Greene*, 563 U.S. 692, 709 n.7 (2011).

U.S. 574, 588 (1983). "The origins of such exemptions lie in the special privileges that have long been extended to charitable trusts." *Id.* When Congress enacted section 501(c)(3), it "was guided by the common law of charitable trusts." *Id.* at 588 n.12. Those same common law principles animated express charitable exemptions in every iteration of the federal tax code. *Id.* at 589–90. Money paid to charities fell outside taxation's purpose— raising money for the public good—because the donations already were for the public good. *Id.*

In Maryland as well, charitable institutions have long enjoyed special exemptions from many taxes and liabilities, owing to their special role in promoting the public good. *See City of Baltimore v. Grand Lodge A.F. & A.M.*, 60 Md. 280, 281 (1883) (tax exemptions); *Perry v. House of Refuge*, 63 Md. 20, 26–27 (1885) (tort immunity).

The IRS, after granting 501(c)(3) status to racially discriminatory schools, changed course in 1970. It announced a policy that racially discriminatory schools were not "charitable" under 26 U.S.C. §§ 170 and 501(c)(3), and were thus ineligible for tax-exempt status. *Bob Jones*, 461 U.S. at 578.

On that point, the Court misread the *Bob Jones* decision. That decision actually cuts against the Court's finding that tax-exempt status is a federal financial assistance under Title VI and IX. In *Bob Jones*, the Supreme Court affirmed the IRS's policy on grounds limited to racial discrimination in education. 461 U.S. at 592. "An unbroken line of cases following *Brown v. Board of Education* establishes beyond doubt this Court's view that racial discrimination in education violates a most fundamental national public policy, as

well as rights of individuals," placing a discriminatory school outside the common law definition of "charitable." *Id.*

If 501(c)(3) status were itself federal funding, none of *Bob Jones'* analysis would have been necessary. The Supreme Court simply could have held that every organization that applied for and received 501(c)(3) status voluntarily subjected itself to federal laws tied to the receipt of federal financial assistance.

That same term, however, the Supreme Court held that the federal government's general grant of a particular status, however valuable, is not federal financial assistance. The Rehabilitation Act of 1973, like Title VI, regulated private entities that receive federal financial assistance, and gave enforcement authority to the "agencies administering the federal financial assistance programs." *Cmty. Television of S. California v. Gottfried*, 459 U.S. 498, 509 (1983). The Supreme Court held that the FCC's act of granting broadcast licenses was not such assistance, and therefore the FCC lacked such primary enforcement power. *Id.* Under *Gottfried*, federal licenses and certifications are not federal financial assistance, even when they "provide benefits that are as valuable as direct financial assistance." *Herman v. United Bhd. of Carpenters & Joiners of Am., Loc. Union No. 971*, 60 F.3d 1375, 1381–82 (9th Cir. 1995).

The Supreme Court's decisions in *Bob Jones* and *Gottfried* implicitly rejected Judge Bazelon's finding in *McGlotten v. Connally*, 338 F. Supp. 448, 461 (D.D.C. 1972), that the grant of 501(c)(8) status to a fraternal order was federal financial assistance. The Department of Justice argued in 1985 that *McGlotten* "'has had no case law progeny,'" that *McGlotten*'s "discussion of Title VI and 'federal financial assistance' was merely

<center>4</center>

'dictum' in a case that was really about the state action doctrine and the equal protection clause," and that the Supreme Court's decision in *Regan v. Taxation with Representation*, 461 U.S. 540 (1983), "'conspicuously failed to invoke'" the *McGlotten* decision. *Paralyzed Veterans of Am. v. C.A.B.*, 752 F.2d 694, 709 (D.C. Cir. 1985), *rev'd*, 477 U.S. 597 (1986). Although Judge Bazelon took issue with the DOJ's argument, *id.* at 709 & n.107, no decision has endorsed *McGlotten*'s rationale.

In recent decades, the best that any court has said about *McGlotten*'s view of Section 501 tax exemptions is that such an argument is not so "wholly insubstantial and frivolous" as to negate federal question jurisdiction. *M.H.D. v. Westminster Sch.*, 172 F.3d 797, 802 n.12 (11th Cir. 1999); *Barrs v. S. Conf.*, 734 F. Supp. 2d 1229, 1232 (N.D. Ala. 2010). These holdings do not endorse *McGlotten*. They merely recognize that, because no decision has formally overruled *McGlotten*, an attorney may make such an argument without violating Rule 11 or bringing federal question jurisdiction into doubt. The DOJ continues to characterize *McGlotten* as an outlier: ""Typical tax benefits—tax exemptions, tax deductions, and most tax credits—are not considered federal financial assistance."[4]

Finally, even if *McGlotten*'s finding had some continued relevance for 501(c)(8) fraternal organizations, its rationale cannot apply to 501(c)(3) charitable organizations

---

[4] U.S. Dept. of Justice, Civil Rights Div., TITLE VI LEGAL MANUAL § V.C.1.d [p. 8] (updated Feb. 3, 2021) (citing, *inter alia*, *Johnny's Icehouse, Inca v. Amateur Hockey Ass'n of Ill., Inc.*, 134 F. Supp. 2d 965, 971–72 (N.D. Ill. 2001)). *McQuitty* is among only a "few courts" to find otherwise. *Id.* These "few courts" include, other than *McQuitty*, *M.H.D.*, and *Barrs*, only *Fulani v. League of Women Voters Educ. Fund*, 684 F. Supp. 1185 (S.D.N.Y. 1988). *Fulani*'s imprecise language is not instructive, because the defendant received money grants from two federal agencies. *Id.* at 1192.

5

generally or to independent schools in particular. As discussed above, charitable institutions have a special place in the English common law tradition, United States history, and Maryland history. Congress intended for Section 501(c)(3) to reflect these traditions, not to reconceptualize them as a legislative grant of federal financial assistance.

Requiring independent schools to comply with Title IX, as well as a wide range of other federal regulations, simply because they are 501(c)(3) organizations, would interfere with parents' long-recognized Fifth Amendment due process rights. Nearly a century ago, a unanimous Supreme Court held that states could not compel students to attend public school rather than private school, which unreasonably interfered with the "liberty of parents and guardians to direct the upbringing and education of [their] children." *Pierce v. Soc'y of the Sisters of the Holy Names of Jesus & Mary*, 268 U.S. 510, 534–35 (1925). "The child is not the mere creature of the state; those who nurture [children] and direct [their] destiny have the right, coupled with the high duty, to recognize and prepare [them] for additional obligations." *Id.* at 535. These same principles prevent the federal government, under the Fifth Amendment, from unwarranted intrusions on private schools' autonomy. *Farrington v. Tokushige*, 273 U.S. 284, 298 (1927). As discussed in the next section, there is no compelling reason to follow Title IX's particular procedures and accompanying burdens, which threaten the independence of AIMS' member schools and overwhelm lean administrations with complicated and expensive procedures and protocols.

6

**B. The Court should reconsider its decision, rather than waiting for an appeal from final judgment.**

So long as the Court's July 21 opinion remains in place, AIMS' member schools face potentially costly uncertainty. For background, AIMS' member schools are independent, not-for-profit, 501(c)(3) corporations, each governed by an independent, volunteer board of trustees. Each school has published and enacted non-discrimination policies in accordance with state and federal law. Each school seeks a socioeconomically diverse student body and awards financial aid based on financial need.

All AIMS member schools embrace a cyclical, recurring, and rigorous accreditation protocol, overseen by AIMS and endorsed by the International Council Advancing Independent School Accreditation. The standards and criteria for accreditation include requirements for robust and well-developed protocols for supporting student mental and physical health and well-being and for prevention and investigation of sexual harassment of students or employees—with clear evidence that those protocols are in use.

As part of their accreditation, AIMS schools must have policies and procedures to address issues of child sexual abuse and misconduct, sexual harassment, sexual assault and dating violence in our schools. AIMS schools seek at their core to keep all enrolled students—and all employees—physically and emotionally safe in school. Individual schools design their protocols and procedures, and their investigative and disciplinary policies, to align with their mission, their educational philosophy, their religious tradition, if applicable, and the involved students' developmental capacities. These

policies and procedures are integral to each school's educational program and unique culture.

Complying with Title IX requirements would threaten our schools' ability to determine how best to respond to misconduct, and would dictate the content and method for implementing these policies in our independent schools. All schools would be compelled to set up standardized and complicated grievance procedures that would represent a major intrusion into how our schools currently carry out such responses and would effectively turn them into mini-court hearings. It would require our schools' proceedings to become confrontational and litigious, rather than allowing for a range of approaches, including a restorative justice or counselling approach, consistent with each school's culture.

We recognize the importance of addressing the public policies underlying Title IX, but there is no compelling need to constrain and burden independent schools by binding them to Title IX's strictures. Our schools' accrediting bodies already require adherence to high standards for prevention and investigation of discrimination (including discrimination based on sex) and for student safety and well-being. Schools risk losing accreditation if such standards are not met. Accrediting bodies engage all aspects of a school's program and operation, including issues of child sexual abuse, sexual harassment, sexual misconduct and assault, and dating violence. Our schools have existing policies that are working.

Each independent school has its own institutional ethos and unique culture. That ethos and culture is a major part of what makes each independent school distinctive and

what allows each school to have a powerful community effect on its students and employees. A school's ethos shapes—and is shaped by—how it responds to conflict, dishonesty, rule-breaking, and any action or behavior that harms individuals or the community. Education is more powerful when it is steeped in community norms and community procedures that are consistent, predictable, humane, and well-understood. This dynamic is part of what makes independent schools so effective.

Further, community norms, expectations, and protocols need to be appropriate for the children's developmental stage. What is appropriate in first grade may not be appropriate for fifth grade or twelfth grade. Our independent schools serve a range of students, from nursery school at one end of the continuum to high school seniors at the other.

Our schools represent a range of sizes, resources, tuition levels, financial aid capabilities, and staffing and administrative capacities. For many of schools, adding administrative complexity—including appointing and training a Title IX administrative officer and conducting mini-hearings and full-scale investigations—would present a significant financial and logistical hardship and could mean increasing tuition or choosing to let go another administrator who is integral to the program and the school's ethos.

Title IX's administrative burdens would be enormous, inevitably drawing school administrators from the direct work of spending time with faculty and students on specific programs and concerns. Further, Title IX requirements would place an undue

burden on a school's budget drawing funds away from educational programming, counseling, and other support services.

Making these burdens worse, the Title IX landscape is subject to sudden shifts. For example, the Department of Education announced this summer that is reinstating guidance and policies that it rescinded just two years ago.[5] Compliance with Title IX would require constant monitoring of rapidly changing policies and standards and would intertwine our member schools' policies with deeply polarized national debates over the best ways to address sensitive issues.

The Court's July 21 decision creates grave uncertainty and anxiety for our member schools—100 of which are in this state—about their legal obligations. Neither the federal Executive nor Congress has ever sought to hold schools to Title IX based on mere 501(c)(3) status, and most federal courts to consider this issue have correctly concluded that tax-exempt status does not, by itself, subject independent schools to Title IX's extensive regulatory requirements. Reconsideration is thus appropriate.

---

[5] *See, e.g.,* Dustin Jones, *Biden's Title IX Reforms Would Roll Back Trump-Era Rules, Expand Victim Protections,* NPR June 23, 2022, https://www.npr.org/-2022/06/23/1107045291/title-ix-9-biden-expand-victim-protections-discrimination.

**Conclusion**

AIMS urges the Court to reconsider its July 21 order and hold that 501(c)(3) status

is not federal financial assistance under Title IX. Alternatively, the Court should certify

the question for interlocutory appeal.

Respectfully submitted:

*/s/ Geoffrey H. Genth*
James P. Ulwick, Bar No. 00536
Geoffrey H. Genth, Bar No. 08735
Steven M. Klepper, Bar No. 26664
Kramon & Graham, P.A.
One South Street, Suite 2600
Baltimore, Maryland 21202
(410) 752-6030
julwick@kg-law.com
ggenth@kg-law.com
sklepper@kg-law.com

Counsel for The Association of Independent
Maryland Schools, Inc. t/a The Association of
Independent Maryland & DC Schools

11

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

|  |  |  |
|---|---|---|
| | * | |
| DONNA BUETTNER-HARTSOE, *et al.*, | | |
| | * | |
| Plaintiffs, | | |
| | * | |
| v. | | Civil Action No. RDB-20-3132 |
| | * | |
| BALTIMORE LUTHERAN | | Hon. Richard D. Bennett |
| HIGH SCHOOL ASSOCIATION | * | |
| d/b/a/ CONCORDIA | | |
| PREPARATORY SCHOOL, | * | |
| | | |
| Defendant. | * | |

\*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*

## BRIEF OF *AMICI CURIAE* IN SUPPORT OF DEFENDANT'S MOTIONS FOR RECONSIDERATION OR, IN THE ALTERNATIVE, TO CERTIFY ORDER FOR INTERLOCUTORY APPEAL

*Amici Curiae* the National Association of Independent Schools ("NAIS"), the National Business Officers Association ("NBOA"), the Association of Independent Schools of Greater Washington ("AISGW"), the Southern Association of Independent Schools ("SAIS"), the Virginia Association of Independent Schools ("VAIS"), the North Carolina Association of Independent Schools ("NCAIS"), and the Palmetto Association of Independent Schools ("PAIS"), through undersigned counsel and pursuant to Local Rule 105.12 of this Court (D. Md. 2021), respectfully submit this Brief in Support of Defendant's Motions for Reconsideration or, in the alternative, to Certify Order for Interlocutory Appeal (the "Motions").[1]

## INTRODUCTION

*Amici Curiae* submit this brief because extending the reach of Title IX (and other statutes) to tax-exempt independent schools, and other nonprofit organizations that do not receive federal

---

[1] The Defendant has filed largely identical motions in each of the consolidated cases RDB-20-3132; RDB-20-3214; RDB-20-3229; RDB-20-3267; and RDB-21-0691.  This Brief is being submitted in support of the relief requested by Defendant in each of those consolidated matters.

funds, could impose massive, prescriptive compliance regimes that would overwhelm those entities, both financially and administratively. We request that the Court consider the broader regulatory context, crucial aspects of which have not yet been covered by the parties' briefing, and the implications of its ruling and grant the Defendant's Motions.

Independent schools have long played a crucial role in the diverse educational landscape that serves our country's children from preschool through high school. Beyond providing students quality schooling and ensuring the health and safety of those students and other community members, schools must also keep tuition affordable (including often providing financial assistance to those families in need) and provide competitive and fair salaries to teachers and staff. The issue currently before this Court—whether the tax exemption that nearly every independent school receives constitutes "Federal financial assistance" that subjects the school to Title IX and, potentially, a myriad of other statutes and regulations—threatens to upset that balance.

For many years, independent schools throughout the country have relied on federal regulations and a consensus among education lawyers and other professionals that, by foregoing federal funds, they would not be burdened with the requirements of Title IX and a host of other federal statutes that mandate strict and cumbersome regulatory infrastructures. The Department of Education's Title IX regulations include, among many other things, a specific and elaborate grievance procedure that mandates the hiring of a Title IX coordinator (and other staff trained to investigate and adjudicate sexual harassment and other misconduct allegations and apply complicated legal concepts), which could be extended to independent schools if they are brought under Title IX. Independent schools have protected their students and staff through different, but rigorous and effective, safeguards tailored to their size and mission.

*Amici Curiae*, seven associations of independent schools, submit this brief in support of the motions of the Concordia Preparatory School (ECF No. 132, in the above-captioned case).

Fifty-four (54) other nonprofit organizations have signed a letter in support of this brief, attached hereto to as <u>Exhibit 1</u>. *Amici Curiae* and those signatories represent the vast majority of the private school community, which includes approximately 30,500 private schools serving 4.6 million students. Together, we respectfully request that the Court reconsider its decision in light of the broader legal context laid out below, and the far reaching and unintended consequences the Court's decision could have. In the alternative, we ask that the Court permit Defendant to immediately appeal this issue to the United States Court of Appeals for the Fourth Circuit. Granting an appeal will ensure that the Fourth Circuit provides clarity on this important issue (and quickly) and may help to avoid or shorten what is certain to be a period of disruptive uncertainty around the law in the nonprofit community.

## **IDENTITY AND INTEREST OF *AMICI CURIAE***

*Amici Curiae*, the NAIS, NBOA, AISGW, SAIS, VAIS, NCAIS and PAIS, are each nonprofit membership associations dedicated to supporting the important missions of independent schools.[2] They represent approximately 2,500 independent, private schools serving preschool through high school students. These schools educate over 750,000 students and employ more than 60,000 teachers nationwide. Independent schools are nonprofit organizations, tax-exempt under Section 501(c)(3) of the Internal Revenue Code, and are each guided by their own missions, overseen by independent boards of trustees, and are primarily financed through tuition and charitable contributions.

---

[2] More information about each of these organizations can be found at:
https://www.nais.org/about/
https://www.nboa.org/
https://www.aisgw.org/
https://sais.org/
https://www.vais.org/
https://www.ncais.org/
https://palmettoschools.org/

3

## ARGUMENT

**I.** **Independent Schools Have Relied on Longstanding Authority that Tax Exemption is Not "Federal Financial Assistance"**

**A.**     **Title IX Regulations Do Not Include Tax Exemptions in Their Definitions of "Federal Financial Assistance"**

Regulations implementing Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681–1683 ("Title IX"), do not include tax exemptions in the definition of "Federal financial assistance." That fact alone controls any analysis of whether an institution's tax-exempt status brings it within Title IX's jurisdiction. Independent schools have long relied on this authority and specifically declined valuable federal funds for community development efforts because they knew they could not institute and sufficiently sustain elaborate and ever-changing compliance measures mandated by Title IX and other statutes triggered by Federal financial assistance.

Title IX prohibits discrimination on the basis of sex in connection with "any education program or activity receiving Federal financial assistance . . . ." *Id*. at § 1681. That statute does not define "Federal financial assistance," but the administrative enforcement provisions of Title IX direct each individual federal department and agency to promulgate its own rules and regulations to effectuate the provisions of Title IX with respect to each agency's individual programs.[3] The relevant regulations[4] define "Federal financial assistance" as follows:

---

[3] *See* 20 U.S.C. § 1682 (empowering agencies that extend grants or other assistance to education programs or activities to promulgate their own rules and regulations under Title IX).

[4] Both the Court in its July 21, 2022 Memorandum Opinion and the leading case on this issue, *Johnny's Icehouse, Inc. v. Amateur Hockey Ass'n Illinois, Inc*., 134 F. Supp. 2d 965, 971-72 (N.D. Ill. 2001) cite the Department of Education regulation 34 C.F.R. § 106.2(g) and its definition of "Federal financial assistance." The Court aptly noted, however, at footnote 9 of that Memorandum Opinion, that this definition pertains only to activities and programs *"authorized or extended under a law administered by [the Department of Education]."* (emphasis added). Tax exemptions under Section 501(c)(3) of the Internal Revenue Code, 26 U.S.C. § 501(c)(3), are administered by the Internal Revenue Service ("IRS"), a bureau of the Department of the Treasury. The appropriate authority to look to is thus the Department of Treasury's Title IX regulations. However, the result is the same. The definitions in the two regulations, along with those of 21 other agencies, are the same.

4

(1) A grant or loan of Federal financial assistance, including funds made available for:

(i) The acquisition, construction, renovation, restoration, or repair of a building or facility or any portion thereof; and

(ii) Scholarships, loans, grants, wages, or other funds extended to any entity for payment to or on behalf of students admitted to that entity, or extended directly to such students for payment to that entity.

(2) A grant of Federal real or personal property or any interest therein, including surplus property, and the proceeds of the sale or transfer of such property, if the Federal share of the fair market value of the property is not, upon such sale or transfer, properly accounted for to the Federal Government.

(3) Provision of the services of Federal personnel.

(4) Sale or lease of Federal property or any interest therein at nominal consideration, or at consideration reduced for the purpose of assisting the recipient or in recognition of public interest to be served thereby, or permission to use Federal property or any interest therein without consideration.

(5) Any other contract, agreement, or arrangement that has as one of its purposes the provision of assistance to any education program or activity, except a contract of insurance or guaranty.

31 C.F.R. § 28.105; 34 C.F.R. § 106.2(g).

Tax exemptions *are not on this list* and thus fall outside the definition of Federal financial assistance.[5]   As the Fourth Circuit explained in *Reyes–Gaona v. North Carolina Growers Ass'n*, 250 F.3d 861, 865 (4th Cir. 2001), "the doctrine of expressio unis est exclusio alterius instructs that where a law expressly describes a particular situation to which it shall apply, what was omitted or excluded was intended to be omitted or excluded."

---

[5] While the United States Supreme Court in *Regan v. Tax'n With Representation of Washington*, 461 U.S. 540, 544 (1983) commented that "[a] tax exemption has much the same effect as a cash grant," *Regan* was not a Title IX case – it decided whether the IRS denial of 501(c)(3) status to an entity that was substantially engaged in political lobbying violated the First Amendment.  It did not hold that a tax exemption constituted a "cash grant" for any purpose under federal law.  Moreover, the Court in *Regan* specifically noted in a footnote that "[i]n stating that exemptions and deductions, on one hand, are like cash subsidies, on the other, we of course do not mean to assert that they are in all respects identical."  *Id*. at 544 n.5.

5

JA496

As this Court observed in *Pasco v. Protus IP Sols., Inc.*, 826 F. Supp. 2d 825, 840–41 (D. Md. 2011), "in situations where [a] statute is silent or ambiguous with respect to [a] specific issue, under *Chevron U.S.A. Inc. v. Natural Resources Defense Council*, 467 U.S. 837 (1984), this Court must afford substantial deference to a federal agency's statutory interpretation." The agency's interpretation of the statute is presumptively valid "so long as it is 'reasonably related to the purposes of the enabling legislation.'" *Mourning v. Fam. Publications Serv., Inc.*, 411 U.S. 356, 369 (1973). Even where "*Chevron* deference is not appropriate," under *United States v. Mead Corp.*, 533 U.S. 218, 234–35 (2001), "the agency's decision is still entitled to respect based on its persuasiveness." *A.T. Massey Coal Co. v. Barnhart*, 381 F. Supp. 2d 469, 484 (D. Md. 2005), *aff'd sub nom. A.T. Massey Coal Co. v. Holland*, 472 F.3d 148 (4th Cir. 2006).

The conduct of the executive branch further confirms this view. To our knowledge, the federal government has never brought an enforcement action against a nonprofit that does not receive federal funds for failing to have a Title IX program.

Even if the federal government intended to extend the requirements of Title IX based on tax exemption alone, under Supreme Court precedent interpreting Congress's spending power, the government is required to do so "unambiguously," and the subject entities must "voluntarily and knowingly" accept those terms. *See Pennhurst State School and Hospital v. Halderman,* 451 U.S. 1, 17 (1981); *Cummings v. Premier Rehab Keller, P.L.L.C.*, 142 S. Ct. 1562, 1569 (2022). That has not occurred. As stated above, far from unambiguously extending Title IX based on tax exemption alone, the government has, through agency regulations, confirmed that tax exemption ***is not*** "Federal financial assistance." Moreover, there are requirements that recipients of federal funds receive notice from the federal government of the federal statutes applicable to them (by virtue of their receiving those funds). The IRS issues no such notification regarding tax-exempt status.

6

For these reasons, this Court should follow the applicable regulations and hold that tax-exempt status does not constitute "Federal financial assistance" under Title IX.

**B.     The Majority of Courts that Have Considered this Issue Have Held that Tax Exemptions Do Not Constitute "Federal Financial Assistance"**

Receipt of "Federal financial assistance" brings an entity under the jurisdiction of a web of federal statutes and regulations.  A number of United States District Courts have considered the question of whether tax-exempt status constitutes "Federal financial assistance" under Title IX, Title VI of the Civil Rights Act of 1964, 42 U.S.C. 2000d *et seq*. ("Title VI"), and/or The Rehabilitation Act of 1973, 29 U.S.C. § 701 *et seq*. (the "Rehabilitation Act"). A large majority of those Courts have held that tax-exempt status does not constitute "Federal financial assistance."

The leading case on this issue is *Johnny's Icehouse, Inc. v. Amateur Hockey Ass'n Illinois, Inc*., 134 F. Supp. 2d 965, 971-72 (N.D. Ill. 2001), which has been cited in the parties' briefs and in the Court's Memorandum Opinion of July 21, 2022.  In that case, the United States District Court for the Northern District of Illinois specifically held that tax-exempt status does not constitute "Federal financial assistance" under Title IX.  *Id*.  The Court relied on the common federal agency definition of "Federal financial assistance" quoted above and the United States Supreme Court's decision in *Department of Transp. v. Paralyzed Veterans of Am*., 477 U.S. 597, 606-07 (1986), in which the Supreme Court held that Title IX applies only to entities that receive federal money, not those that merely benefit economically from federal programs.

The *Johnny's Icehouse* decision represents the majority view of courts on this issue.  *See, e.g., Zimmerman v. Poly Prep Country Day Sch.*, 888 F. Supp. 2d 317, 332 (E.D.N.Y. 2012) (holding that tax-exempt status "does not constitute Federal financial assistance within the meaning of Title IX"); *Merrifield v. Beaven/Inter-Am. Companies, Inc*., No. 89 C 8436, 1991 WL 171376, at *3 (N.D. Ill. Aug. 30, 1991) ("The term 'assistance' [under the Rehabilitation Act]

connotes transfer of government funds by way of subsidy, not merely exemption from taxation."); *Martin v. Delaware L. Sch. of Widener Univ.*, 625 F. Supp. 1288, 1302 n.13 (D. Del. 1985), *aff'd*, 884 F.2d 1384 (3d Cir. 1989) ("'Assistance' [under the Rehabilitation Act] connotes the transfer of government funds by way of subsidy, not merely exemption from taxation."); *Bachman v. Am. Soc. of Clinical Pathologists*, 577 F. Supp. 1257, 1265 (D.N.J. 1983) (holding that plaintiff's tax-exempt status did not constitute "Federal financial assistance" for purposes of the Rehabilitation Act); *Stewart v. New York Univ.*, 430 F. Supp. 1305, 1314 (S.D.N.Y. 1976) (holding that various tax deductions and exemptions afforded law school by federal law did not constitute "Federal financial assistance" for purposes of Title VI.).

Other courts, while not directly ruling on the issue, have expressed skepticism that tax-exempt status qualifies as "Federal financial assistance."  *See, e.g., Russo v. Diocese of Greensburg*, No. CIV.A09-1169, 2010 WL 3656579, at *3 (W.D. Pa. Sept. 15, 2010) ("expressing doubt" that tax-exempt status qualified as "Federal financial assistance" for purposes of Title IX and the Rehabilitation Act); *Graham v. Tennessee Secondary Sch. Athletic Ass'n*, No. 1:95-CV-044, 1995 WL 115890, at *17 n.4 (E.D. Tenn. Feb. 20, 1995) (noting that it was not basing its holding that the defendant was subject to Title VI on the association's tax-exempt status qualifying as "Federal financial assistance," because that is a minority view).[6]

---

[6] We are aware of only three judicial opinions, aside from this Court's Memorandum Opinion of July 21, 2022, holding that tax exemptions do constitute "Federal financial assistance" for purposes of Title VI, Title IX, or the Rehabilitation Act.  *See E.H. v. Valley Christian Acad.*, No. 221CV07574MEMFGJSX, 2022 WL 2953681, at *7 (C.D. Cal. July 25, 2022); *Fulani v. League of Women Voters Educ. Fund*, 684 F. Supp. 1185, 1192–93 (S.D.N.Y. 1988), *aff'd*, 882 F.2d 621 (2d Cir. 1989) (noting, without analysis that the defendant was subject to Title IX because it "receives federal assistance indirectly through its tax exemption and directly through grants from the Department of Energy and EPA"); *McGlotten v. Connally*, 338 F. Supp. 448, 461 (D.D.C. 1972).  While the parties and the Court have cited to a footnote in *M.H.D. v. Westminster Sch.*, 172 F.3d 797 (11th Cir. 1999), the Eleventh Circuit in that case did not rule on whether tax exemptions constitute "Federal financial assistance" under any of those statutes.

8

The Supreme Court cases of *Grove City Coll. v. Bell*, 465 U.S. 555 (1984) and *National Collegiate Athletic Association v. Smith*, 525 U.S. 459 (1999), cited by Plaintiffs and in the Court's July 21, 2022 Memorandum Opinion, do not answer the question before this Court.  Both of those cases involved the separate question of whether the defendant was a "recipient" of "Federal financial assistance" (with both opinions concluding that an entity receiving either direct or indirect assistance may still qualify as a "recipient"). *Grove City*, 465 U.S. at 564; *Smith*, 525 U.S. at 468. In contrast, it is undisputed in this case that the Defendant is a "recipient" of a 501(c)(3) tax-exempt designation under federal law—the question is whether a tax exemption is "Federal financial assistance" for purposes of Title IX. As set forth above, it is not. While the "assistance" in both the *Grove City* and *Smith* cases involved an actual cash transfer from the federal government to the defendant, a tax exemption involves no actual receipt of funds from the federal government.  For these additional reasons, the Court should follow the majority rule and hold that tax-exempt status does not constitute "Federal financial assistance" under Title IX.

## II.    <u>Consequences of Extending Title IX Based on Tax-Exempt Status Alone</u>[7]

The Department of Education's Title IX regulations and accompanying guidance contain many burdensome requirements, including very elaborate obligations for responding to sexual harassment and other misconduct that could be extended to apply to independent schools should their tax-exempt status qualify as Federal financial assistance.  Additionally, because the definition of "Federal financial assistance" in regulations governing awards of federal grants is nearly identical to the definition under Title IX, application of the rule that tax exemption falls within that definition could also trigger a host of restrictions applicable to recipients of federal grants generally.  Those grant restrictions limit spending of federal funds to certain types of costs, and if

---

[7] The undersigned thanks the subject matter experts at *Amici Curiae,* Venable LLP, and Saul Ewing Arnstein & Lehr LLP, who assisted with the preparation of this brief.

applied, would be almost impossible for independent schools to comply with. Lastly, several other federal statutes and their accompanying obligations could likewise be triggered.

### A.     Title IX Compliance Programs

Title IX regulations include a host of ever-changing requirements that could, now or in the future, apply to tax-exempt schools and other nonprofits. The most complicated aspect of current Title IX compliance is the requirement to have a Title IX coordinator and adopt complex, legalistic grievance procedures for dealing with harassment complaints. *See* 34 C.F.R. § 106.8(a) (appointment of Title IX coordinator); (c) (requirement of grievance procedures); *see also id.* at § 106.45 (elements of grievance procedure). There are many others, including restrictions on athletics and donations to support a gender-specific cause or program.

As an initial matter, both the substantive and detailed procedural requirements imposed on schools change regularly, and a new presidential administration will often add its own new requirements and obligations. The Trump Administration issued new regulations, effective August 14, 2020, that significantly changed schools' obligations from the prior administration, and the current Department of Education has in turn issued a notice of its intention to issue yet another new set of regulations, likely within the next year. *See* 87 Fed. Reg. 41390 (July 12, 2022). The Trump-era regulations were accompanied by a nearly 2,000-page Preamble. The Biden notice of proposed rulemaking was accompanied by a nearly 700-page Preamble. Schools subject to Title IX must accordingly manage a constantly changing and increasingly intricate set of rules governing compliance.

Current regulations specify in granular detail requirements for investigating and adjudicating sexual harassment complaints. Some of the more detailed requirements are:

- The school must have at least three different staff members to serve as an investigator, a decision-maker for the initial finding, and the decision-maker for the appeal, respectively. *See* 34 C.F.R. §106.45(b)(8)(iii)(B). Each of those individuals must be trained on and

apply legal principles including, but not limited to, (1) privilege; (2) standards of proof; and (3) the rules of evidence. *See* 34 C.F.R. §106.45(b)(1)(iii). Additionally, they must know the legal definition of harassment and summarily dismiss cases that do not satisfy that definition, while being legally required to adjudicate cases that do satisfy it. *See* 34 C.F.R. §106.45(b)(3).

- The school must employ an elaborate investigation and adjudication process and implement what essentially amount to a prescribed set of rules of civil procedure. The regulations require robust notice requirements (34 C.F.R. § 106.45(b)(2)). The accused and complainant must have the opportunity to present witnesses (including fact and expert witnesses) and other inculpatory and exculpatory evidence, inspect and review evidence, and have others present at proceedings during the adjudication of complaints (34 C.F.R. § 106.45(b)(5)). The investigator must draft a written investigative report (34 C.F.R. § 106.45(b)(5)), and the decision-maker must make a written determination regarding responsibility that includes half a dozen different prescribed subsections, including findings of fact, application of the school's written sexual misconduct policy, and a rationale. 34 C.F.R. § 106.45(b)(7). An appeal must be allowed on one or more of three different prescribed grounds. 34 C.F.R. § 106.45(b)(8). And records of most of the above must be maintained for every complaint for seven years. 34 C.F.R. § 106.45(b)(10).

- While these elaborate proceedings are underway, the school can take no disciplinary action against the accused student unless the school finds that a student is an immediate threat to the physical health and safety of another student (a decision that can, itself, be challenged by the accused). 34 C.F.R. § 106.44 (a) & (c). This means under certain circumstances that a teacher cannot remove a disruptive student from class if he or she has been accused of sexual harassment until the procedures above have been completed, including an appeal.

Many of these directives would be nearly impossible for small or modest sized independent schools to comply with. Twelve percent of the members of the NAIS have an enrollment of fewer than 100 students.[8] None of the tasks described above can be taken on by a typical teacher or administrator without specialized training and enough available time to draft reports, entertain appeals, and understand and apply legal concepts such as privilege, relevance, legal definitions of sexual harassment, and standards of proof.[9]

---

[8] *See* https://www.nais.org/about/about-nais/

[9] Indeed, because Title IX is not limited to schools but applies to any "Education program or activity," it could conceivably apply to a two- or three-person tax-exempt educational advocacy group, such as a financial literacy or anti-smoking organization. *See* 20 U.S.C. § 1681. How could a two-person organization possibly satisfy the mandates described above?

11

Universities often have entire divisions dedicated to the investigation and adjudication of Title IX complaints. Johns Hopkins University, for instance, has a dedicated office for responding to Title IX complaints, the Office of Institutional Equity, with a staff of 15, 11 of whom have law degrees and 7 of whom are full time investigators.[10] Independent schools, on the other hand, have long been focused on regulating community health, safety, and conduct issues through the promulgation of policies that are legally compliant, mission-consistent, and tied to deeply held beliefs in the community.  Of note, these policies comply with other applicable discrimination laws that do not require the problematic infrastructure detailed in Title IX.  Rather, they permit independent schools to implement safeguards that are appropriate for their unique identity, culture, and community size and budget.

A requirement to employ individuals with these specialized skills, if applied to a small or even modest sized independent school with stretched finances and personnel, could force such an institution to employ staff in sexual harassment investigations that are undertrained in the specialized legal concepts.  Liability—not for failing to safeguard students and staff, but for failing to meet the intricate standards—would be inevitable.

## B.    Requirements on Federal Grant Recipients

The regulations implementing the Federal Grant and Cooperative Agreement Act of 1977 (31 U.S.C § 6301, et seq.), which authorizes the issuance of federal grants, has a very similar definition of "Federal financial assistance" as Title IX and its regulations. *See* 2 C.F.R.§ 200.1.[11] Those regulations have strict requirements about which costs can be covered by that assistance. For instance, only "Allowable Costs" are permitted to be covered by funds from a federal award, defined as the Federal financial assistance the recipient receives, which do not include state and

---

[10] *See* https://oie.jhu.edu/contact-us/oie-staff/index.html

local taxes. 2 C.F.R.§ 200.405; 200.423; 200.470; 200.1.  Those costs must also be "Reasonable," a definition that requires, among other things, that those costs be consistent with market prices. 2 C.F.R.§ 200.404.

Federal agencies have interpreted these regulations to mean that a federal grant recipient must segregate federal assistance and ensure that the assistance is used only for reasonable and allowed costs.[12]  If a tax exemption were to be deemed "Federal financial assistance," the funds involved would be entity money that the entity would have used to pay its federal taxes but for the exemption.  Because no school segregates such funds, the "federal" funds would be comingled with the rest of the school's funds, and thus none of the school's money could be used for unallowed costs such as state and local taxes.

### C.    Other Laws Triggered by Federal Financial Assistance

Liability under a host of other laws, including those implicated by the Family Education Rights and Privacy Act, the Age Discrimination Act, Section 504 of the Rehabilitation Act, and Title VI, are triggered by receipt of Federal financial assistance, the respective definition of which under those statutes, as noted above, is again very similar to Title IX.  If the definition of Federal financial assistance is extended to include tax exemption, independent schools and other non-profits could find themselves subject to those rules, and many others, overnight as well.

### III.    <u>Need for an Immediate Appeal</u>

Independent schools and other nonprofit organizations are in desperate need of clarity on this issue. Should the Court not reconsider its ruling, an immediate appeal is needed to avoid the severe consequences from uncertainty around the law that now exists.  To this point, the independent school community has relied on the regulations and precedent cited above and has

---

[12] *See. e.g.,* United States Department of Health and Human Services SF-424 Application Guide at 3.

not instituted the substantial, prescriptive measures required to comply with Title IX. Extending Title IX (and, therefore, a potential host of other federal laws and regulations) to all tax-exempt schools—and, indeed, all tax-exempt entities—regardless of whether they receive federal funds will thus have dire consequences. Proceeding without a clear rule, however, will lead to additional harmful consequences.

Leaving the decision as it stands will give independent schools around the country an impossible choice: 1) take the chance that the old consensus stands and they need not implement the infrastructure required by Title IX and the other statutes; or 2) implement a compliance program required by those statutes, altering the way they protect their students to the detriment of their missions, possibly being forced to increase tuition to cover those costs (and possibly losing students to schools that have elected to take their chances who do not need to raise tuition). An important decision such as this deserves attention from the Fourth Circuit.

## <u>CONCLUSION</u>

For all of these reasons, *Amici Curiae* respectfully request that the Court grant Defendant's

Motions for Reconsideration or, in the alternative, to Certify Order for Interlocutory Appeal.

August 11, 2022

<div align="right">

_____/s/ Evan T. Shea_____
Geoffrey R. Garinther, Esq. (Bar No. 4033)
grgarinther@venable.com
Evan T. Shea, Esq. (Bar No. 28677)
etshea@venable.com
William B. King, Esq. (Bar No. 19643)
wbking@venable.com
Venable LLP
750 E. Pratt St., Suite 900
Baltimore, MD 21202
Tel: (410) 244-7400
Fax: (410) 244-7742

J. Douglas Baldridge (Bar No. 11023)
jbaldridge@venable.com
Venable LLP
600 Massachusetts Avenue, NW
Washington, DC 20001

</div>

August 11, 2022

The Honorable Richard D. Bennett
United States District Court
   for the District of Maryland
101 West Lombard Street
Chambers 5D
Baltimore, Maryland 21201

      Re:    *Donna Buettner-Hartsoe, et al. v. Baltimore Lutheran High School Association d/b/a Concordia Preparatory School*, Civ. No. RDB-20-3132

Dear Judge Bennett:

      The undersigned are representatives of nonprofit organizations. We write on behalf of our respective organizations to express our support for the brief filed by *Amici Curiae* the National Association of Independent Schools ("NAIS"), the National Business Officers Association ("NBOA"), the Association of Independent Schools of Greater Washington ("AISGW"), the Southern Association of Independent Schools ("SAIS"), the Virginia Association of Independent Schools ("VAIS"), the North Carolina Association of Independent Schools ("NCAIS"), and the Palmetto Association of Independent Schools ("PAIS") in the above-referenced action.

<div align="center">Very truly yours,</div>

Michael Schuttloffel, Executive Director, Council for American Private Education

Garrett O'Day, Vice President, Maryland Council of American Private Education (Maryland CAPE)

Grace Creasey, Executive Director, Virginia Council for Private Education

Frank Moore, Executive Director, Atlanta Area Association of Independent Schools

Amy Ahart, Chief Operating Officer, International Boys' Schools Coalition

Philip J. Bossert, Executive Director, Hawaii Association of Independent Schools

Sarah Wilson, Executive Director, Tennessee Association of Independent Schools

Damian Kavanagh, President and CEO, Mid-South Independent School Business Officers

Mark Crotty, Executive Director, Northwest Association of Independent Schools

Deborah Dowling, Executive Director, California Association of Independent Schools

Susan Baldridge, Executive Director, The Association of Boarding Schools

David A. Madison, Executive Director National Association of Episcopal Schools

The Honorable Richard D. Bennett
August 11, 2022
Page 2

Vince Watchorn, Executive Director, New York State Association of Independent Schools

Drew Smith, Executive Director, Friends Council on Education

Mary Menacho, Executive Director, Independent Schools Association of the Central States

Rick Branson, Executive Director, Connecticut Association of Independent Schools

Carole Everett, Executive Director, New Jersey Association of Independent Schools

Lincoln Snyder, President and CEO, National Catholic Educational Association

Anne Stavney, Legal Liaison, Minnesota Association of Independent Schools

Mary Agnes Malter, President and CEO, PAISBOA

Heather Hoerle, Executive Director and CEO, Enrollment Management Association, Inc.

Abba Cohen, Vice President for Government Affairs and Washington Director, Agudath Israel of America

Alan Smiley, Executive Director, Association of Colorado Independent Schools

Gary J. Niels, Executive Director, Pennsylvania Association of Independent Schools

Larry Taylor, President, Association of Christian Schools International

Laura Colangelo, Executive Director, Texas Private Schools Association

Mark Siegel, Executive Director, Oregon Federation of Independent Schools

Steve Lindquist, Director of Accreditation and Member Services, Association of Christian Teachers and Schools

Suzanne Hanson, Executive Director, Washington Federation of Independent Schools

Brian D. Broderick, Executive Director, Michigan Association of Non-public Schools

Cory Newman, Executive Director, Evangelical Lutheran Education Association

Kristine Grelle, Executive Director, Arkansas Nonpublic School Accrediting Association

Joan Bouchard, Superintendent of Schools, Diocese of Fresno

Eric Frank, President, Ohio Council for American Private Education

Sufia Azmat, Executive Director, Council of Islamic Schools in North America

Richard Lukianuk, Secretary, Massachusetts Council for American Private Education

Mary Pat Donoghue, Executive Director of the Secretariat of Catholic Education, United States Conference of Catholic Bishops

The Honorable Richard D. Bennett
August 11, 2022
Page 3

Ron Reynolds, Executive Director
California Association of Private School
Organizations

William Stevens, Executive Director, Mid-
Atlantic Christian Schools Association

Shaza Khan, Executive Director, Islamic
Schools League of America

Michael McLendon, Executive Director,
Alabama Independent Schools Association

Dennis Poust, Executive Director, New
York State Catholic Conference

James Cultrara, Executive Secretary, New
York State Council of Catholic School
Superintendents

Wendy Shenk-Evans, Executive Director,
Montessori Public Policy Initiative

Thomas R. Rochon, President, Educational
Records Bureau

Robert Mattingly, Executive Director,
Center for Spiritual and Ethical Education

Dan Dodd, Executive Director, Ohio
Association of Independent Schools

Martha Ambros, Executive Director,
California Independent School Business
Officers Association

Scott Griggs, Executive Director,
Independent Schools Association of the
Southwest

Claire Leheny, Executive Director
Association of Independent Schools in New
England

Nathan J. Diament, Executive Director for
Public Policy, Union of Orthodox Jewish
Congregations of America

Bonnie J. Ricci, Executive Director,
International Council Advancing
Independent School Accreditation

Rebecca Moskowitz, Executive Director,
Advancement, Association of Waldorf
Schools of North America

Sharon Schmeling, Executive Director,
Wisconsin Council of Religious and
Independent Schools

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

_____

Case No.

_____

BALTIMORE LUTHERAN HIGH SCHOOL ASSOCIATION, D/B/A
CONCORDIA PREPARATORY SCHOOL,

Petitioner,

v.

DONNA BUETTNER-HARTSOE, AND N.H., A MINOR, BY AND
THROUGH HER PARENT AND NEXT FRIEND, DONNA BUETTNER-
HARTSOE,

Respondents.

_____

*On Petition from the United States District Court for the District of
Maryland, Case No. 1:20-cv-03132 (Bennett, R.)*

_____

**PETITION FOR LEAVE TO APPEAL PURSUANT TO 28 U.S.C. §
1292(B)**

_____

Gregg E. Viola
Mark P. Johnson
Eccleston and Wolf, P.C.
7240 Parkway Drive, 4th Floor
Hanover, MD  21076
410-752-7474
viola@ewmd.com
johnson@ewmd.com
*Attorneys for Petitioner*

## CORPORATE DISCLOSURE STATEMENT

Baltimore Lutheran High School Association d/b/a Concordia Preparatory School, by and through undersigned counsel, and pursuant to Local Rule 26.1, states that there is no parent corporation of Baltimore Lutheran High School Association, Inc. ("BLSHA"), and no publicly held corporation owns 10% or more of the stock of BLSHA.

Baltimore Lutheran School Holdings, L.L.C. ("BLSH") is a Maryland limited liability company of which BLSHA is the sole member.  BLSH was organized to manage and lease BLHSA's athletic facilities pursuant to a non-exclusive master lease.

BLSHA is insured by Philadelphia Indemnity Insurance Company, which may have a financial interest in the outcome of the litigation.

# TABLE OF CONTENTS

Page(s)

TABLE OF AUTHORITIES ......................................................... iii

STATEMENT OF FACTS AND OF THE CASE ........................... 1

QUESTION CERTIFIED ............................................................. 2

ARGUMENT SUMMARY ........................................................... 2

ARGUMENT ................................................................................ 4

    I.    THE DISTRICT COURT ERRED IN CONCLUDING THAT TAX EXEMPTION UNDER 26 U.S.C. § 501(C)(3) CONTITUTES RECEIPT OF FEDERAL FINANCIAL ASSISTANCE UNDER TITLE IX ......................................................................... 4

    II.    THE PETITION SHOULD BE GRANTED BECAUSE § 501(B)'S SALUTARY PURPOSE IS SATISFIED ........................................... 8

        A.    The District Court's Order involves a controlling question of law of critical importance to private independent schools and non-profit entities who need guidance on their legal obligations under Title IX...……………………………………9

        B.    The Certified Question involves an issue of first impression in the Circuit and there is a substantial ground for difference of opinion across district courts...………………………………..13

        C.    An immediate appeal of the District Court's Order would materially advance the ultimate termination of this litigation (and the four other cases against Petitioner)..………………………14

CONCLUSION..................................................................... 18

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*Ahrenholz v. Board of Trustees*, 219 F.3d 674 (7th Cir. 2000) ........................................ 13

*Associated Mills, Inc. v. Drake Hotel, Inc.*, 334 N.E.2d 746 (Ill. App. 1975) ................. 23

*Bachman v. Am. Soc. of Clinical Pathologists*, 577 F. Supp. 1257 (D.N.J. 1983) .......... 11

*Barnes v. Gorman*, 536 U.S. 181 (2002) ......................................................................... 6, 7

*Bergeron v. Atl. Pac. Marine*, 899 F. Supp. 1544, 1550 (W.D. La. 1993) ...................... 16

*Chevron U.S.A. Inc. v. Natural Resources Defense Council*, 467 U.S. 837 (1984) ........ 4, 9

*Cummings v. Premier Rehab Keller, P.L.L.C.*, 142 S. Ct. 1562 (2022) ......................... 6, 7

*Davis v. Monroe Cty. Bd. of Educ.*, 526 U.S. 629 (1999) ............................................... 6, 7

*E.H. v. Valley Christian Acad.*, No. 221CV07574MEMFGJSX, 2022 WL 2953681 (C.D. Cal. July 25, 2022) .......................................................................................... 21, 25

*Fannin v. CSX Transp. Inc.*, 1989 U.S. App. LEXIS 20859 (4th Cir. April 26, 1989) .... 13

*Forest Grove Sch. Dist. v. T. A.*, 557 U.S. 230 (2009) ....................................................... 7

*Fulani v. League of Women Voters Educ. Fund*, 684 F. Supp. 1185 (S.D.N.Y. 1988), *aff'd*, 882 F.2d 621 (2d Cir. 1989) ................................................................................... 21

*Gebser v. Lago Vista Independent School Dist.*, 524 U.S. 274 (1998) ............................... 6

*Graham v. Tennessee Secondary Sch. Athletic Ass'n*, No. 1:95-CV-044, 1995 WL 115890 (E.D. Tenn. Feb. 20, 1995) .................................................................................. 11

*In re Cement Antitrust Litig.*, 673 F.2d 1020 (9th Cir. 1982) ......................................... 15

*In re Facebook, Inc.*, 986 F. Supp. 2d 524 (S.D.N.Y. 2014) ........................................... 17

*In re Microsoft Corp. Antitrust Litig.*, 274 F. Supp. 2d 741 (D. Md. 2003) .................... 17

*In re Trump*, 928 F.3d 360 (4th Cir. 2019) .................................................... 12, 15, 20, 22

*Johnny's Icehouse, Inc. v. Amateur Hockey Ass'n*, 134 F. Supp. 2d 965 (N.D. Ill. 2001); ................................................................................................................................ 10

*Johnson v. Burken*, 930 F.2d 1202 (7th Cir. 1991) ........................................... 15

*Katz v. Carte Blanche Corp.*, 496 F.2d 747 (3d Cir.), *cert. denied*, 419 U.S. 885 (1974) 15

*Keena v. Groupon, Inc.*, 886 F.3d 360 (4th Cir. 2018) ..................................... 13

*Lau v. Nichols*, 414 U.S. 563 (1974) ................................................................ 6

*M.H.D. v. Westminster Sch.*, 172 F.3d 797 (11th Cir. 1999) ............................ 22

*Mamani v. Berzain*, 825 F.3d 1304 (11th Cir. 2016) ........................................ 14

*Martin v. Delaware L. Sch. of Widener Univ.*, 625 F. Supp. 1288 (D. Del. 1985), *aff'd*, 884 F.2d 1384 (3d Cir. 1989) ................................................................ 10

*McFarlin v. Conseco Servs., LLC*, 381 F.3d 1251 (11th Cir. 2004) ........................ 15, 22

*McNeil v. Aguilos*, 820 F. Supp. 77 (S.D.N.Y. 1993)). .................................... 17

*Merrifield v. Beaven/Inter-Am. Companies, Inc.*, No. 89 C 8436, 1991 WL 171376 (N.D. Ill. Aug. 30, 1991) ....................................................................................... 10

*Mohawk Indus. v. Carpenter*, 558 U.S. 100 (2009) ......................................... 14

*Mourning v. Family Publ'ns Serv.*, 411 U.S. 356 (1973) ................................... 9

*Pennhurst State Sch. & Hosp. v. Halderman*, 451 U.S. 1 (1981) .................................. 6, 7

*President and Directors of Georgetown v. Madden*, 660 F.2d 91 (4th Cir. 1981) ..... 12, 13

*Reese v. BP Exploration (Alaska) Inc.*, 643 F.3d 681 (9th Cir. 2011) ............................. 20

*Russo v. Diocese of Greensburg*, No. CIV.A09-1169, 2010 WL 3656579 (W.D. Pa. Sept. 15, 2010) ......................................................................................................... 11

*Scott v. Ruston La. Hosp. Co.*, No. 16-0376, 2017 U.S. Dist. LEXIS 56138 (W.D. La. Apr. 12, 2017) ......................................................................................................... 24

*South Dakota v. Dole*, 483 U.S. 203 (1987) ...................................................... 7

*Sterk v. Redbox Automated Retail, LLC*, 672 F.3d 535 (7th Cir. 2012) ........................... 24

*Stewart v. New York Univ.*, 430 F. Supp. 1305 (S.D.N.Y. 1976) ...................... 11

*Thorpe v. Housing Authority of the City of Durham*, 393 U.S. 268 (1969) ...................... 9

*Tidewater Oil Co. v. United States*, 409 U.S. 151 (1972) ................................... 12

*United States ex rel. Michaels v. Agape Senior Cmty., Inc*., 848 F.3d 330 (4th Cir. 2017) ...................................................................................................................... 14

*United States v. UPS Customhouse Brokerage, Inc.*, 30 C.I.T. 1612 (Ct. Int'l Trade 2006) .................................................................................................................... 16

*Zimmerman v. Poly Prep Country Day Sch.*, 888 F. Supp. 2d 317 (E.D.N.Y. 2012) ....... 10

**Statutes**

20 U.S.C. § 1682 ................................................................................................ 6

20 U.S.C.S. § 1681 ............................................................................................ 2

**Regulations**

34 C.F.R. § 106.2 .............................................................................................. 7

34 C.F.R. § 106.45 ............................................................................................ 14

## STATEMENT OF FACTS AND OF THE CASE

On October 28, 2020, Respondents Donna Buettner-Hartsoe, individually and on behalf of her daughter N.H., filed a Complaint against Petitioner Baltimore Lutheran High School Association, Inc., doing business as Concordia Preparatory School. Respondents' Complaint arose from allegations of student-on-student bullying and harassment, and the Petitioner's response thereto, while N.H. a student at Petitioner's school during the 2017-2018 school year. Respondents asserted causes of action against Petitioner including for violation of 20 U.S.C. § 1681, *et. seq.*, Title IX of the Education Amendments Act. Petitioner is a small, Lutheran-based, independent school located in Towson, Maryland. It is undisputed that Petitioner has tax-exempt status under 26 U.S.C. § 501(c)(3).[1]

Title IX is what is known as Spending Clause legislation, applicable to schools and educational programs receiving "Federal financial assistance." Title IX provides generally that "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to

---

[1] Respondents' Complaint is one of five cases against Petitioner pending in the United States District Court for the District of Maryland. The other four cases are *Donna Buettner-Hartsoe, et al. v. Baltimore Lutheran High School Association, Inc., et al.*, Case No. 1:21-cv-00691; *Andrea Conrad, et al. v. Baltimore Lutheran High School Association, Inc., et al.*, Case No. 1:20-cv-03229; *Ariana Gomez v. Baltimore Lutheran High School Association, Inc., et al.*, Case No. 1-20-CV-03267; and *Jennifer Pullen v. Baltimore Lutheran High School Association, Inc., et al.*, Case No. 1:20-cv-03214. The Order and Memorandum Opinion upon which this Petition for Leave to Appeal is based was entered in all five cases.

discrimination under any education program or activity receiving *Federal financial assistance*." 20 U.S.C.S. § 1681 (emphasis added).

After the conclusion of fact discovery, Petitioner filed a Partial Motion to Dismiss or in the alternative for Summary Judgment on the Title IX claim arguing that Petitioner had not received federal financial assistance during the time period in which N.H. was a student at the school such that Respondents could not assert a cause of action for violation of Title IX. The United States District Court for the District of Maryland, Judge Bennett presiding, construed Petitioner's Motion as seeking partial summary judgment, and denied the Motion holding that Petitioner's 26 U.S.C. § 501(c)(3) tax exemption constitutes federal financial assistance for the purposes of Title IX. Copies of the District Court's Memorandum Opinion and Order, dated July 21, 2022, are attached as Exhibits 1 and 2.

Petitioner filed a Motion for Reconsideration, or in the Alternative, Motion to Certify Order for Interlocutory Appeal. After a hearing, on September 6, 2022 the District Court denied the Motion for Reconsideration but granted the Motion to Certify Order for Interlocutory Appeal. Copies of the District Court's Memorandum Opinion and Order, dated September 6, 2022, are attached as Exhibits 3 and 4.

This Petition for Leave to Appeal follows the denial of Petitioner's Motion for Reconsideration, and is being filed timely pursuant to 28 U.S.C. § 1292(B). This Court should grant the Petition because the question certified is an important and

controlling question of law, which has not previously been decided in this Circuit, and over which there are now conflicting opinions in District Courts, and because the question certified is of critical importance to private independent schools, and non-profit entities, across the country that currently have grave uncertainty and anxiety about their legal obligations under Title IX.

## QUESTION CERTIFIED

Does tax exemption under 26 U.S.C. § 501(c)(3) constitute receipt of federal financial assistance for purposes of Title IX of the Education Amendments Act of 1972?

## ARGUMENT SUMMARY

This Court should grant the Petition for Leave to Appeal, and it is in the public's interest to do so because the District Court has created bad law on a discrete legal issue that would have a profound impact on legal obligations of private independent schools and other non-profit organization regarding Title IX and other Spending Clause legislation. The Supreme Court has repeatedly characterized Title IX and other Spending Clause legislation as contractual in nature – in exchange for federal financial assistance, the recipient agrees to comply with federally imposed conditions such as, under Title IX, an agreement not to discriminate on the basis of sex. With that contract analogy, the Supreme Court has held that if Congress intends to impose a condition on the grant of federal moneys, it must do so unambiguously.

Congress, however, did not define what constitutes federal financial assistance, and the issue in this case is whether that term includes tax exemption under exemption under 26 U.S.C. § 501(c)(3). Instead, Congress delegated authority to federal agencies to create regulations governing Title IX, and the Department of Education, as well as twenty-two (22) other Federal agencies, have adopted a comprehensive definition of federal financial assistance that does not include tax exemptions within the definition of federal financial assistance. Moreover, to Petitioner's knowledge, the federal government has never brought an enforcement action against a § 501(c)(3) tax exempt non-profit entity that does not receive federal funding for failing to have a Title IX program. In short, there is no administrative or regulatory guidance supporting the District Court's decision that tax exempt status under § 501(c)(3) is federal financial assistance, and the District Court's decision amounts to legislative public policy violative of the substantial deference afforded to federal agencies under *Chevron U.S.A. Inc. v. Natural Resources Defense Council*, 467 U.S. 837, 843-45 (1984).

Moreover, for many years private independent schools across the country, many of which enjoy tax exempt status under § 501(c)(3), have made a conscious decision not to accept loans, grants, or other federal assistance, and by doing so, have relied on Title IX regulations and a consensus among education lawyers and other professionals that, by foregoing federal funds, they would not be burdened with the

requirements of Title IX and other Spending Clause legislation that mandate complicated and expensive administrative measures. The District Court's decision has created significant tension and uncertainty in the private independent school community regarding whether their tax exempt status constitutes federal financial assistance.  Schools need appellate guidance on whether Title IX applies based solely upon tax exempt status so that school administrators can evaluate whether to take time away from educating students and supporting faculty to devise plans to comply with the administratively complex and rigorous mandates of Title IX.

## **ARGUMENT**

## I.    **THE DISTRICT COURT ERRED IN CONCLUDING THAT TAX EXEMPTION UNDER 26 U.S.C. § 501(C)(3) CONTITUTES RECEIPT OF FEDERAL FINANCIAL ASSISTANCE UNDER TITLE IX.**

The District Court's decision that tax exemption under 26 U.S.C. § 501(c)(3) constitutes receipt of federal financial assistance for purposes of application of Title IX is fundamentally incorrect and inconsistent with the scope and nature of Spending Clause legislation.  The Supreme Court has long recognized, for more than 40 years, that legislation enacted by Congress pursuant to the spending power, such as Title IX, "is much in the nature of a contract" between the recipient of that spending and the Federal government.  *Pennhurst State Sch. & Hosp. v. Halderman*, 451 U.S. 1, 17 (1981).  *See also Cummings v. Premier Rehab Keller, P.L.L.C.*, 142 S. Ct. 1562, 1570 (2022); *Barnes v. Gorman*, 536 U.S. 181, 186 (2002); *Davis v. Monroe Cty.*

*Bd. of Educ.*, 526 U.S. 629, 658-59 (1999); *Gebser v. Lago Vista Independent School Dist.*, 524 U.S. 274, 286 (1998); *Lau v. Nichols*, 414 U.S. 563, 568-69 (1974). As recently stated in *Cummings*, "[u]nlike ordinary legislation, which 'imposes congressional policy' on regulated parties 'involuntarily,' Spending Clause legislation operates based on consent: 'in return for federal funds, the [recipients] agree to comply with federally imposed conditions.'" 142 S. Ct. at 1570 (quoting *Pennhurst*, 451 U.S. at 16).

The Supreme Court has also noted that, like other types of contracts, there can be no knowing acceptance of the contract attendant with Spending Clause legislation if the recipient of federal funds "is unaware of the conditions or is unable to ascertain what is expected of it. Accordingly, if Congress intends to impose a condition on the grant of federal moneys, it must do so unambiguously." *Pennhurst*, 451 U.S. at 17. *See also Cummings*, 142 S. Ct. at 1570; *Forest Grove Sch. Dist. v. T. A.*, 557 U.S. 230, 246 (2009) (stating that "conditions attached to a State's acceptance of funds must be stated unambiguously"); *Barnes*, 536 U.S. at 186; *Davis*, 526 U.S. at 637; *South Dakota v. Dole*, 483 U.S. 203, 207 (1987).

The Title IX statute, however, does not define what constitutes "Federal financial assistance." Instead, Congress directed agencies that extend federal grants, loans, or other assistance to education programs or activities to promulgate their own rules and regulations consistent with the objectives of Title IX. 20 U.S.C. § 1682.

Based upon that authority, the Department of Education and twenty-two (22) other

Federal agencies have enacted similar comprehensive definitions of federal financial

assistance; the Department of Education's regulation, 34 C.F.R. § 106.2(g), states:

> (g) Federal financial assistance means any of the following, when authorized or extended under a law administered by the Department:
> (1) A grant or loan of Federal financial assistance, including funds made available for:
>> (i) The acquisition, construction, renovation, restoration, or repair of a building or facility of any portion thereof; and
>> (ii) Scholarships, loans, grants, wages or other funds extended to any entity for payment to or on behalf of students admitted to that entity, or extended directly to such students for payment to that entity.
> (2) A grant of Federal real or personal property or any interest therein, including surplus property, and the proceeds of the sale or transfer of such property, if the Federal share of the fair market value of the property is not, upon such sale or transfer, properly accounted for to the Federal Government.
> (3) Provision of the services of Federal personnel.
> (4) Sale or lease of Federal property or any interest therein at nominal consideration, or at consideration reduced for the purpose of assisting the recipient or in recognition of public interest to be served thereby, or permission to use Federal property or any interest therein without consideration.
> (5) Any other contract, agreement, or arrangement which has as one of its purposes the provision of assistance to any education program or activity, except a contract of insurance or guaranty.

Conspicuous by its absence from this definition is tax exempt status under §

501(c)(3).  To the contrary, the definition of federal financial assistance in the

regulations encompass only transfers of federal money, property or services from

the government.  In situations where a statute is silent or ambiguous with respect to

a specific issue, courts must afford substantial deference to a federal agency's

statutory interpretation when that interpretation is not unreasonable. *Chevron U.S.A. Inc.*, 467 U.S. at 843-45, Specifically, an agency's interpretation of a statute is valid if it is "'reasonably related to the purpose of the enabling legislation.'" *Mourning v. Family Publ'ns Serv.*, 411 U.S. 356, 369 (1973) (quoting *Thorpe v. Housing Authority of the City of Durham*, 393 U.S. 268, 280-81 (1969). The District Court ignored that substantial deference and imposed its own public policy and interpretation of the definition of federal financial assistance that has not been adopted by any agency of the federal government. To Petitioner's knowledge, the federal government has never brought an enforcement action against a § 501(c)(3) tax exempt non-profit entity that does not receive federal funding for failing to have a Title IX program.

Not only is the District Court's decision contrary to the regulations developed by twenty-three Federal agencies, and violative of the applicable *Chevron* deference, it is also contrary to the decisions rendered by a majority of courts that have considered the issue holding that tax exemptions do not constitute federal financial assistance for Title IX and other Spending Clause legislation. *Johnny's Icehouse, Inc. v. Amateur Hockey Ass'n*, 134 F. Supp. 2d 965, 971-72 (N.D. Ill. 2001); *Zimmerman v. Poly Prep Country Day Sch.*, 888 F. Supp. 2d 317, 332 (E.D.N.Y. 2012); *Merrifield v. Beaven/Inter-Am. Companies, Inc.*, No. 89 C 8436, 1991 WL 171376, at *3 (N.D. Ill. Aug. 30, 1991); *Martin v. Delaware L. Sch. of Widener*

*Univ.*, 625 F. Supp. 1288, 1302 n.13 (D. Del. 1985), *aff'd*, 884 F.2d 1384 (3d Cir. 1989); *Bachman v. Am. Soc. of Clinical Pathologists*, 577 F. Supp. 1257, 1265 (D.N.J. 1983); *Stewart v. New York Univ.*, 430 F. Supp. 1305, 1314 (S.D.N.Y. 1976). Other courts, while not directly ruling on the issue, have expressed skepticism that tax-exempt status qualifies as federal financial assistance. *See, e.g.*, *Russo v. Diocese of Greensburg*, No. CIV.A09-1169, 2010 WL 3656579, at *3 (W.D. Pa. Sept. 15, 2010); *Graham v. Tennessee Secondary Sch. Athletic Ass'n*, No. 1:95-CV-044, 1995 WL 115890, at *17 n.4 (E.D. Tenn. Feb. 20, 1995).

Given the foundation of Spending Clause legislation, and the absence of tax exempt status in the Federal regulations and any administrative guidance, a private independent school such as Petitioner could not have knowingly and voluntarily agreed to be subject to Title IX by the mere fact of its non-profit charitable § 501(c)(3) status. This is borne out by the record, which demonstrates that virtually all private, independent schools were operating under the well-reasoned belief that tax exempt status did not constitute Federal financial assistance. The District Court's decision is incorrect, fatally flawed, and should be reviewed and reversed.

## II.    THE PETITION SHOULD BE GRANTED BECAUSE § 1292(B)'S SALUTARY PURPOSE IS SATISFIED

Whether an immediate appeal of an interlocutory order certified under 28 U.S.C. § 1292(b) is granted or denied is at the sole discretion of this Court. *See Tidewater Oil Co. v. United States*, 409 U.S. 151, 167 (1972); *President and*

*Directors of Georgetown v. Madden*, 660 F.2d 91, 97 (4th Cir. 1981). That discretion, however, is limited by the express language of the statute because when the three statutory criteria are met, this Court has a "'duty. . . to allow an immediate appeal to be taken.'" *In re Trump*, 928 F.3d 360, 369 (4th Cir. 2019) (quoting *Ahrenholz v. Board of Trustees*, 219 F.3d 674, 677 (7th Cir. 2000)). Specifically, this Court has stated: "The statute by its terms requires us independently to determine: (1) whether the lower court's order indeed turned on a 'controlling question of law'; (2) whether there is 'substantial ground for difference of opinion' with respect to the applicable legal principles; and (3) whether an immediate appeal would 'materially advance the ultimate termination of the litigation.'" *Fannin v. CSX Transp. Inc.*, 1989 U.S. App. LEXIS 20859, at *4 (4th Cir. April 26, 1989) (citing *Madden*, 660 F.2d at 96-97). *See also Keena v. Groupon, Inc.*, 886 F.3d 360, 363 (4th Cir. 2018) ("With those criteria satisfied, the court of appeals can exercise its jurisdiction and review the question that is certified.").

Moreover, the Supreme Court has stated that the preconditions for § 1292(b) review "are most likely to be satisfied when a privilege ruling involves a new legal question or is of special consequence, and district courts should not hesitate to certify an interlocutory appeal in such cases." *Mohawk Indus. v. Carpenter*, 558 U.S. 100, 110-11 (2009). This is one of those cases.

A.   **The District Court's Order involves a controlling question of law of critical importance to private independent schools and non-profit entities who need guidance on their legal obligations under Title IX.**

The first element under § 1292(b) is that the case present a controlling question of law, defined as a "'pure question of law,' i.e., 'an abstract legal issue that the court of appeals can decide quickly and cleanly.'" *United States ex rel. Michaels v. Agape Senior Cmty., Inc*., 848 F.3d 330, 340 (4th Cir. 2017) (quoting *Mamani v. Berzain*, 825 F.3d 1304, 1312 (11th Cir. 2016)). A pure question of law does not require the appellate court "to delve beyond the surface of the record in order to determine the facts." *Agape Senior Cmty, Inc*., 848 F.3d at 341 (quoting *McFarlin v. Conseco Servs., LLC*, 381 F.3d 1251, 1259 (11th Cir. 2004)).

For the question of law to be "controlling," it does not have to resolve the action in its entirety; instead, a controlling question of law includes those that are "'serious to the conduct of the litigation, either practically or legally.'" *In re Trump*, 928 F.3d at 371 (quoting *Johnson v. Burken*, 930 F.2d 1202, 1206 (7th Cir. 1991)). *See also In re Cement Antitrust Litig*., 673 F.2d 1020, 1026 (9th Cir. 1982) ("[A]ll that must be shown in order for a question to be 'controlling' is that resolution of the issue on appeal could materially affect the outcome of litigation in the district court."); *Katz v. Carte Blanche Corp*., 496 F.2d 747, 755 (3d Cir.), *cert. denied*, 419 U.S. 885 (1974) (stating that "on the practical level, saving of time of the district

court and of expense to the litigants was deemed by the sponsors to be a highly relevant factor" to whether the question presented is controlling).

In this case, the certified question is a pure question of law on an abstract legal issue that can decided quickly and cleanly without delving into the factual record. The only relevant fact is that CPS is a tax-exempt § 501(c)(3) entity, and that fact is undisputed. Thus, the legal issue of whether that tax exemption constitutes federal financial assistance for purposes of Title IX is a pure question of law or abstract legal issue that can be decided without any consideration of the factual record.

Additionally, the question of law is controlling because the District Court's Order, if erroneous, would be reversible on appeal. If tax-exempt status under § 501(c)(3) does not constitute receipt of federal financial assistance under Title IX, CPS need not comply with Title IX, and Plaintiffs cannot state a cause of action for violation of the statute. Whether a party can pursue a legal claim as a matter of law is a quintessential example of a legal issue that could significantly and materially affect the conduct and outcome of the litigation, *see, e.g.*, *United States v. UPS Customhouse Brokerage, Inc.*, 30 C.I.T. 1612, 1618–1619 (Ct. Int'l Trade 2006) (question of whether certain damages were available under statute); *Bergeron v. Atl. Pac. Marine*, 899 F. Supp. 1544 (W.D. La. 1993) (question of whether a claim for punitive damages or loss of consortium was available to plaintiff or his wife), and this is especially true for alleged claims under Title IX because Title IX involves

unique elements, burden of proof, and available damages. If this Court finds that a CPS has not received federal financial assistance as defined under Title IX, such that Title IX does not apply to the school, it would significantly and materially affect the litigation because it would remove a significant part of Respondents' case against CPS, including damages that are recoverable under Title IX but not under Respondents' other tort theories.

Courts have also defined a controlling question of law as "'one that substantially affects a large number of cases.'" *In re Microsoft Corp. Antitrust Litig.*, 274 F. Supp. 2d 741, 742 (D. Md. 2003) (quoting *McNeil v. Aguilos*, 820 F. Supp. 77, 79 (S.D.N.Y. 1993)). *See also In re Facebook, Inc.*, 986 F. Supp. 2d 524, 536 (S.D.N.Y. 2014) (stating that "[t]he impact an appeal will have on other cases need not be large, but it 'is a factor that [the court] may take into account'"). The resolution of the certified question, whether tax exemption under 26 U.S.C. § 501(c)(3) constitutes receipt of federal financial assistance for purposes of Title IX, is of critical importance to the five cases pending against Petitioner because it will resolve whether the plaintiffs in the five cases can pursue Title IX claims against Petitioner for all incidents that occurred while they were students at CPS.[2]

---

[2] Relevant to one of the five cases against Petitioner, CPS received federal funding in 2020 in the form a PPP loan. Whether Title IX applied to Petitioner before receipt of that loan is a significant issue given the timing of the alleged misconduct giving rise to the Title IX claim.

Moreover, the question of law is controlling because its resolution on appeal will have a significant impact on independent private schools across this jurisdiction who need guidance on their legal obligations under Title IX. Independent private schools have a variety of means and methods in place for addressing incidents such as student-on-student misconduct, but the issue in this case revolves around how those schools must address gender discrimination. The Department of Education's regulations governing and providing guidance on Title IX contain many burdensome requirements including obligations for responding to sexual harassment and other forms of gender-based misconduct, including having a Title IX coordinator, and staff trained on applying legal principles such as privilege, burden of proof, and rules of evidence, who are responsible for implementing complex and legalistic grievance procedures for receiving, investigating, and adjudicating sexual harassment complaints. *See, e.g.,* 34 C.F.R. § 106.45. Title IX regulations contain robust notice requirements and the complainant and person accused must have the right to present witnesses and evidence, after which the investigator must draft a report, the decision-maker must issue a written determination, and an appeal can be noted, during which time the school can take no disciplinary action against the accused unless certain findings are made. *Id.* Compliance with these, and all of Title IX's requirements, would require enormous endeavors by independent private schools, or other non-profit entities with any educational program or activity, if § 501(c)(3) tax exempt

status qualifies as federal financial assistance.  Furthermore, Title IX's substantive and procedural requirements change regularly from administration to administration, and under the District Court's rationale, tax exempt non-profit entities would have the same obligations to keep up with changes in Title IX practices as large universities that have entire divisions dedicated to compliance.  This is all not to mention the many other laws and regulations that contain restrictions and burdens on entities that receive federal financial assistance, all of which would become applicable to independent private schools if § 501(c)(3) tax exempt status qualifies as federal financial assistance.  As a result, CPS and other independent private schools are in desperate need for clarity on this issue presented, and the Petition should be granted for an immediate appeal of the District Court's interlocutory decision.  That significant potential impact cannot be overstated, as even Respondents' expert has described the District Court's Order as a decision that "will likely soon be sending shockwaves through private K-12 education, and religiously affiliated schools."[3] If Respondents' own expert described the District Court's decision as "sending shockwaves" through the education community, it cannot seriously be disputed that this is a controlling legal question that should be addressed on appeal sooner rather than later.

---

[3]    Available  at  https://www.jdsupra.com/legalnews/are-private-k-12-schools-subject-to-8012462 (last visited September 6, 2022).

**B.    The Certified Question involves an issue of first impression in the Circuit and there is a substantial ground for difference of opinion.**

The second  element under § 1292(b) is that there is a substantial ground for difference of opinion on the issue presented.  "'A substantial ground for difference of opinion exists where reasonable jurists might disagree on an issue's resolution.'" *In re Trump*, 928 F.3d at 371 (quoting *Reese v. BP Exploration (Alaska) Inc.*, 643 F.3d 681, 688 (9th Cir. 2011)).

It is evident that there is a substantial ground for difference of opinion on whether tax exemption under 26 U.S.C. § 501(c)(3) constitutes receipt of federal financial assistance for purposes of Title IX.  This is an issue of first impression in this Circuit and the Supreme Court has not addressed the question.  Additionally, there are conflicting decisions between district courts in various circuits.  As noted above, there are six cases in which district courts have concluded that § 501(c)(3) tax exempt status does not equal federal financial assistance, and three other cases that have expressed doubt on the issue.  Conversely, there are three district court decisions that have reached the opposite conclusion, *see E.H. v. Valley Christian Acad.*, No. 221CV07574MEMFGJSX, 2022 WL 2953681 (C.D. Cal. July 25, 2022); *Fulani v. League of Women Voters Educ. Fund*, 684 F. Supp. 1185 (S.D.N.Y. 1988), *aff'd*, 882 F.2d 621 (2d Cir. 1989); *McGlotten*, 338 F. Supp. at 461, and one Court of Appeals case that has noted the argument is not frivolous for purposes of asserting federal question jurisdiction.  *See M.H.D. v. Westminster Sch.*, 172 F.3d 797 (11th

Cir. 1999). In light of this case law, the certified question is a prototypical example of an issue on which there is substantial grounds for difference of opinion warranting interlocutory review.

**C.    An immediate appeal of the District Court's Order would materially advance the ultimate termination of this litigation (and the four other cases against Petitioner).**

The third and final element under § 1292(b) is that prompt appellate resolution could "materially advance the ultimate termination of the litigation." *In re Trump*, 928 F.3d at 371 (citing *McFarlin*, 381 F.3d at 1259 (stating that "the text of § 1292(b) requires that resolution of a 'controlling question of law . . . may materially advance the ultimate termination of the litigation.' This is not a difficult requirement to understand. It means that resolution of a controlling legal question would serve to avoid a trial or otherwise substantially shorten the litigation").

This Court should grant the Petition because resolution of the question certified could materially advance the ultimate termination of this litigation by substantially shortening the litigation by eliminating the complex issues surrounding Title IX and simplifying trial. If this Court holds that the tax exemption is not federal financial assistance, it would eliminate the need for further proceedings relative to Title IX. The litigation would be narrowed and proceed in a more efficient and streamlined manner, and the parties would avoid trial on Title IX issues and all attendant preparation including motion *in limine* practice, drafting of jury

instructions and *voir dire* on Title IX, and certain witness preparation. At a minimum, knowing the result of the appeal and what damages are recoverable based upon the claims asserted would undoubtably materially advance the termination of the case. *See U.S. Philips Corp. v. Sears Roebuck & Co.*, Miscellaneous Docket No. 361, 1992 U.S. App. LEXIS 37824, at *5 (Fed. Cir. Dec. 10, 1992) ("[R]eviewing these interlocutory appeals will determine with finality which claims will proceed to trial and, thus, may materially advance the ultimate termination of the litigation."); *Associated Mills, Inc. v. Drake Hotel, Inc.*, 334 N.E.2d 746, 748 (Ill. App. 1975) (certifying question for appellate review because "it will determine whether the defendant is exposed to liability in the amount of $ 87,122.80, as contended by plaintiff, or $ 250 or some lesser sum, as contended by defendant").

By the same token, not knowing the result of the appeal will also hamstring the parties and have an impact on any future settlement discussions. Recoverable damages on the Title IX claim differ from the recoverable damages under Maryland state law negligence and tort claims, and the parties need to know the result of the appeal to know the ceiling or range of recoverable damages to limit or frame future settlement discussions. Going into settlement negotiations without knowing the result of the appeal would impair the parties' ability to reach a potential resolution and would protract the litigation because it would require the parties to litigate all five cases through trial and then appeal. Thus, granting the interlocutory appeal,

regardless of the eventual decision, would advance the termination of the litigation. *See Sterk v. Redbox Automated Retail, LLC*, 672 F.3d 535, 536 (7th Cir. 2012) (stating that "uncertainty" about whether a claim asserted was viable "may delay settlement . . . and by doing so further protract the litigation. That is enough to satisfy the 'may materially advance' clause of section 1292(b)."); *Scott v. Ruston La. Hosp. Co.*, No. 16-0376, 2017 U.S. Dist. LEXIS 56138, at *15-16 (W.D. La. Apr. 12, 2017) ("The Court also finds that a decision on this issue may help to advance settlement, a factor that courts have found significant in permitting interlocutory appeals to proceed.").

Moreover, this is one of five cases pending against Petition that present the same issue regarding whether Petitioner's tax-exempt status under 26 U.S.C. § 501(c)(3) constitutes federal financial assistance for purposes of Title IX. It would be far more efficient to know the result of the appeal now and whether Title IX applies to Petitioner in the five cases based upon their tax exemption status, as opposed to trying five cases over many weeks and then appealing each of the cases.

Furthermore, it cannot be lost that the resolution of the certified question is of critical importance to private independent schools and non-profit entities who need guidance on whether Title IX and other Spending Clause legislation apply based solely upon tax exempt status. Currently, there is disputed case law on this issue, and legal practitioners could exploit that dispute and file lawsuits against private

independent schools and other non-profit entities with education programs for failing to comply with Title IX when such entities never believed they were required to comply with the statute because they made a conscious decision not to accept federal funding. While history would only tell whether a spike in Title IX lawsuits will follow the District Court's Order (and the recent decision in *Valley Christian Academy*), because the District Court's Order represents new law on an issue of first impression in this Circuit, this Court should grant the Petition and allow an immediate interlocutory appeal.

## **CONCLUSION**

Petitioner respectfully requests that the Court grant this Petition for Leave to Appeal Pursuant to 28 U.S.C. § 1292(B).

Dated: September 14, 2022                    Respectfully submitted,


*/s/Gregg E. Viola*                          */s/Mark P. Johnson*
Gregg E. Viola (25737)                       Mark P. Johnson (29091)
ECCLESTON & WOLF, P.C.                        ECCLESTON & WOLF, P.C.
Baltimore-Washington Law Center              Baltimore-Washington Law Center
7240 Parkway Drive, 4th Floor                7240 Parkway Drive, 4th Floor
Hanover, MD 21076-1378s                      Hanover, MD 21076-1378
(410) 752-7474 (phone)                       (410) 752-7474
(410) 752-0611 (fax)                         (410) 752-0611 (fax)
E-mail: viola@ewmd.com                       E-mail: johnson@ewmd.com
*Attorney for Petitioner*                    *Attorney for Petitioner*

## CERTIFICATE OF COMPLIANCE

This document was printed in 14 point Times New Roman. This document complies with Fed. R. App. P. 5(c)(1) because, excluding the parts of the document exempted by Fed. R. App. P. 32(f), this document contains 4,938 words.

*/s/Mark P. Johnson*
Mark P. Johnson (29091)

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 14th day of September, 2022, copies of the foregoing were served by e-mail, to:

Christina Graziano, Esq.
Justin Browne, Esq.
Brian Ketterer, Esq.
Ketterer, Browne & Associates, LLC
336 S. Main Street
Bel Air, Maryland 21014
Christina@KBAattorneys.com
Justin@KBAattorneys.com
Brian@KBAattorneys.com
*Attorneys for Respondents*

Brian S. Goodman, Esq.
Goodman & Donohue LLC
9199 Reisterstown Road, Suite 213 C
Owings Mills, MD 21117
brian@goodmandonohue.com
*Attorneys for Lutheran Church-Missouri Synod, Southeastern District*

*/s/Mark P. Johnson*
Mark P. Johnson (29091)

# EXHIBIT 1

Case 1:20-cv-03132-RDB   Document 130   Filed 07/21/22   Page 1 of 13

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| DONNA BUETTNER-HARTSOE, *et al.*, | * | |
| Plaintiffs, | * | Civil Action No. RDB-20-3132 |
| v. | * | |
| BALTIMORE LUTHERAN HIGH SCHOOL ASSOCIATION, *d/b/a/* CONCORDIA PREPARATORY SCHOOL, | * * * | |
| Defendant. | | |

\*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*

| | | |
|---|---|---|
| JENNIFER PULLEN, | * | |
| Plaintiff, | * | Civil Action No. RDB-20-3214 |
| v. | * | |
| BALTIMORE LUTHERAN HIGH SCHOOL ASSOCIATION, *d/b/a/* CONCORDIA PREPARATORY SCHOOL, | * * * | |
| Defendant. | | |

\*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*

| | | |
|---|---|---|
| ANDREA CONRAD, *et al.*, | * | |
| Plaintiffs, | * | Civil Action No. RDB-20-3229 |
| v. | * | |
| BALTIMORE LUTHERAN HIGH SCHOOL ASSOCIATION, *d/b/a/* CONCORDIA PREPARATORY SCHOOL, and LUTHERAN CHURCH-MISSOURI SYNOD, | * * * | |

JA538

SOUTHEASTERN DISTRICT,

    Defendants.

\*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*

ARIANA GOMEZ,

    Plaintiff,　　　　　　　*　Civil Action No. RDB-20-3267

BALTIMORE LUTHERAN HIGH
SCHOOL ASSOCIATION, *d/b/a/*
CONCORDIA PREPARATORY
SCHOOL, and LUTHERAN CHURCH-
MISSOURI SYNOD,
SOUTHEASTERN DISTRICT,

    Defendant.

\*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*

SELENA BARBER, *et al.*,

    Plaintiffs,　　　　　　　*　Civil Action No. RDB-21-0691

    v.

BALTIMORE LUTHERAN HIGH
SCHOOL ASSOCIATION, *d/b/a/*
CONCORDIA PREPARATORY
SCHOOL,

    Defendants.

\*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*

## **MEMORANDUM OPINION**

These five cases are brought by five different women, all former students of Concordia

Preparatory School ("CPS"), previously known as Baltimore Lutheran High School. All of the

women make similar allegations of sexual assault and verbal sexual harassment by male

students at the school dating back to 2016. They allege that school officials failed to adequately

2

address their numerous complaints or take any meaningful action in response, thereby cultivating a hyper-sexualized culture at the school. In this series of cases, three minors, N.H., H.C., and A.G.—through their respective mothers, Donna Buettner-Hartsoe, Andrea Conrad, and Selena Barber—and two adults, Jennifer Pullen and Ariana Gomez (collectively, "Plaintiffs"), bring federal and state claims against Defendant Baltimore Lutheran High School Association, now doing business as Concordia Preparatory School, and Defendant Lutheran Church-Missouri Synod, Southeastern District ("LCMS").[1]

Presently pending before this Court are Defendant Concordia Preparatory School's Partial Motions to Dismiss, or in the Alternative, for Summary Judgment. (RDB-20-3132, ECF No. 108; RDB-20-3214, ECF No. 60; RDB-20-3229, ECF No. 75; RDB-20-3267, ECF No. 112; RDB-21-0691, ECF No. 37.)[2] These Motions relate to Plaintiffs' claims in Count I of their respective Amended Complaints under Title IX of the Education Amendments Act of 1972 ("Title IX"),[3] 20 U.S.C. § 1681, *et seq.* (RDB-20-3132, Am. Compl., ECF No. 69; RDB-20-3214, Am. Compl., ECF No. 53; RDB-20-3229, Am. Compl., ECF No. 24; RDB-20-3267, Am. Compl., ECF No. 26; RDB-21-0691, Am. Compl., ECF No. 29.) In these Motions, the Defendant contends that it is not subject to Title IX jurisdiction as it was not a direct recipient of federal financial assistance during the relevant time periods. This argument is without merit, as the tax-exempt status of the Defendant under 26 U.S.C. § 501(c)(3) constitutes federal financial assistance for the purposes of Title IX. The parties' submissions have been reviewed,

---

[1] On May 18, 2021, all of these cases were assigned to the undersigned Judge. Through its June 23, 2021 Order, this Court consolidated these cases for discovery and motions. (RDB-20-3132, ECF No. 65; RDB-20-3214, ECF No. 48; RDB-20-3229, ECF No. 61; RDB-20-3267, ECF No. 101; RDB-21-0691, ECF No. 17.)

[2] The Motions, Responses, and Replies, along with supporting exhibits, filed in all five cases are nearly identical.

[3] Title IX of the Education Amendments of Act of 1972 protects individuals from discrimination on the basis of sex in education programs or activities that receive federal financial assistance. 20 U.S.C. § 1681(a).

3

and no hearing is necessary. *See* Local Rule 105.6 (D. Md. 2021). For the reasons that follow, Defendant CPS's Motions, construed as Partial Motions for Summary Judgment, are DENIED.

## BACKGROUND

In a Memorandum Opinion dated June 23, 2021, this Court detailed Plaintiffs' factual allegations. (*E.g.*, RDB-21-0691, ECF No. 15 at 5-20.)[4] The presently pending Motions relate only to whether there is a genuine dispute of fact as to whether CPS received federal financial assistance and was subject to Title IX requirements at the times relevant to Plaintiffs' claims. Accordingly, this Court provides the following summary of facts necessary to resolve the Motions at issue.

Concordia Preparatory School, originally known as Baltimore Lutheran High School, is a religiously affiliated private school that is exempt from federal income taxes under Section 501(c)(3) of the Internal Revenue Code. (*E.g.*, RDB-21-0691, Financial Statements, ECF No. 39 *SEALED*.) Plaintiff N.H. attended CPS from Fall 2017 through Spring 2018. (RDB-20-3132, ECF No. 69 ¶¶ 11, 64, 84.) Plaintiff Pullen attended CPS from Fall 2014 through Spring 2019. (RDB-20-3214, ECF No. 53 ¶¶ 9, 68, 91.) Plaintiff H.C. attended CPS from Fall 2019 through Spring 2020. (RDB-20-3229, ECF No. 24 ¶¶ 11, 90, 114.) Plaintiff Gomez attended CPS from Fall 2017 through Spring 2019. (RDB-20-3267, ECF No. 26 ¶¶ 10, 72, 96.) Plaintiff A.G. attended CPS from Winter 2016 through May 2019. (RDB-21-0691, ECF No. 29 ¶¶ 11, 106, 117.)

---

[4] This same Memorandum Opinion was docketed in each of the five consolidated cases. (*See* RDB-20-3132, ECF No. 63; RDB-20-3214, ECF No. 46; RDB-20-3229, ECF No. 59; RDB-20-3267, ECF No. 99; RDB-21-0691, ECF No. 15.) In that Memorandum Opinion, this Court denied Defendant CPS's motions to dismiss the Title IX claims of Plaintiffs H.C., Gomez, and A.G. (*E.g.,* RDB-21-0691, ECF No. 15 at 32–36.)

USCA4 Appeal: 23-1453     Doc: 17          Filed: 06/05/2023     Pg: 546 of 610

USCA4 Appeal: 22-272     Doc: 2-2      Filed: 09/14/2022     Pg: 6 of 14      Total Pages:(33 of 60)
Case 1:20-cv-03132-RDB   Document 130   Filed 07/21/22   Page 5 of 13

From 2014 through 2020, CPS received funding from the State of Maryland in the form of grants to aging schools, textbook and technology grants, and a grant from the State of Maryland Field House Emergency Fund. (*E.g.*, RDB-21-0691, Def. Answers to Interrogs. 23–26, ECF No. 39-3 *SEALED\*.)[5] CPS did not apply for federal funding until March or April 2020, when it applied for a Paycheck Protection Program ("PPP") loan from the United States Small Business Administration ("SBA"). (*E.g.*, RDB-21-0691, Johnson Tr. 394, ECF No. 39-1 *SEALED\*.) This request was made in the face of the COVID-19 pandemic. (*E.g., id.*; RDB-21-0691, Def. Answers to Interrogs. 23–26, ECF No. 39-3 *SEALED\*.) On April 8, 2020, CPS received a loan from the SBA in the amount of $483,400.00. (*E.g.*, RDB-21-0691, SBA Confirmation, ECF No. 39-10 *SEALED\*.) That loan was forgiven as of November 10, 2020. (*E.g.*, RDB-21-0691, Def. Answers to Interrogs. 26, ECF No. 39-3 *SEALED\*.)

## STANDARD OF REVIEW

CPS's Motions are styled as partial motions to dismiss under Fed. R. Civ. P. 12(b)(6) or, in the alternative, for summary judgment under Fed. R. Civ. P. 56. A motion styled in this manner implicates the court's discretion under Rule 12(d) of the Federal Rules of Civil Procedure. *See Kensington Vol. Fire Dept., Inc. v. Montgomery Cty.*, 788 F. Supp. 2d 431, 436-37 (D. Md. 2011). Ordinarily, a court "is not to consider matters outside the pleadings or resolve factual disputes when ruling on a motion to dismiss." *Bosiger v. U.S. Airways*, 510 F.3d 442, 450

---

[5] CPS also received state government funding in the form of: 5 Broadening Options & Opportunities for Students Today (BOOST) scholarships from the Maryland Department of Education in 2016; "Title II Preparing, Training, and Recruiting High-Quality Teachers, Principals, or Other School Leaders" grants from 2016 through 2020; payment for "Easement/Loss of Use – SHA Project Income" in 2018; a School Safety Grant from the Maryland Department of Education in 2020, and; Elementary and Secondary School Emergency Relief (ESSER) and Governor's Emergency Education Relief (GEER) grants through Baltimore County Public Schools in 2020. (RDB-21-0691, Def. Answers to Interrogs. 23–26, ECF No. 39-3 *SEALED\*.)

USCA4 Appeal: 23-1453    Doc: 17    Filed: 06/05/2023    Pg: 547 of 610

USCA4 Appeal: 22-272    Doc: 2-2    Filed: 09/14/2022    Pg: 7 of 14    Total Pages:(34 of 60)
Case 1:20-cv-03132-RDB   Document 130   Filed 07/21/22   Page 6 of 13

(4th Cir. 2007). However, a court, in its discretion, may consider matters outside of the pleadings, pursuant to Rule 12(d). If the court does so, "the motion must be treated as one for summary judgment under Rule 56." Fed. R. Civ. P. 12(d). When the movant expressly captions its motion "in the alternative" as one for summary judgment, and submits matters outside the pleadings for the court's consideration, the parties are deemed to be on notice that conversion under Rule 12(d) may occur; the court "does not have an obligation to notify parties of the obvious." *Laughlin v. Metro. Wash. Airports Auth.*, 149 F.3d 253, 261 (4th Cir. 1998).

Under Rule 56 of the Federal Rules of Civil Procedure, a court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The same standard applies for a motion for partial summary judgment. *See Gill v. Rollins Protective Servs. Co.*, 773 F.2d 592, 595 (4th Cir. 1985). "A fact is material if it 'might affect the outcome of the suit under the governing law.'" *Libertarian Party of Va. v. Judd*, 718 F.3d 308, 313 (4th Cir. 2013) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). A genuine dispute over a material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248. In considering a motion for summary judgment, this Court must consider the facts and all reasonable inferences "in the light most favorable to the nonmoving party." *Libertarian Party of Va.*, 718 F.3d at 312; *see also Scott v. Harris*, 550 U.S. 372, 378 (2007). Additionally, this Court "must not weigh evidence or make credibility determinations." *Foster v. Univ. of Md.-Eastern Shore*, 787 F.3d 243, 248 (4th Cir. 2015) (citing *Mercantile Peninsula Bank v. French*, 499 F.3d 345, 352 (4th Cir. 2007)); *see also Jacobs v. N.C.*

*Admin. Off. of the Courts*, 780 F.3d 562, 569 (4th Cir. 2015) (explaining that a trial court may not make credibility determinations at the summary judgment stage).

This Court considers, and the parties rely upon, matters outside of the pleadings, including Plaintiffs' exhibits attached to their Responses to CPS's Motions. *See Miller v. Md. Dep't of Nat. Res.*, 813 Fed App'x 869, 873 (4th Cir. 2020) (concluding that a declaration attached to a response in opposition to a dispositive motion "is plainly outside the pleadings"). Because CPS styled its Motions as a partial motion to dismiss, or in the alternative, for summary judgment, CPS was on notice that the Court could treat the Motions as motions for summary judgment and rule on that basis. Accordingly, the Court will review CPS's Motions under the Rule 56(a) standard.

## ANALYSIS

CPS argues that it is entitled to summary judgment as to Plaintiffs' Title IX claims because there is no dispute that it was not a recipient of federal financial assistance during the relevant time periods. (*E.g.*, RDB-21-0691, CPS Mem. 4–8, ECF No. 37-1.) Plaintiffs argue CPS's tax-exempt status under 26 U.S.C. § 501(c)(3) represents federal financial assistance sufficient to subject the school to the requirements of Title IX. (*E.g.*, RDB 21-0691, Plaintiffs' Resp. 3–5, ECF No. 38.) The tax-exempt status of a private school subjects it to the same requirements of Title IX imposed on any educational institution. CPS cannot avail itself of federal tax exemption but not adhere to the mandates of Title IX.

Title IX of the Education Amendments Act of 1972 provides that "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity

receiving Federal financial assistance."[6] 20 U.S.C. § 1681(a). As the United States Court of Appeals for the Fourth Circuit has held:

> To establish a Title IX claim based on student-on-student sexual harassment, a plaintiff must show that:
>
> > (1) they were a student at an educational institution receiving federal funds;
> >
> > (2) they suffered sexual harassment that was so severe, pervasive, and objectively offensive that it deprived them of equal access to the educational opportunities or benefits provided by their school;
> >
> > (3) the school, through an official who has authority to address the alleged harassment and to institute corrective measures, had actual notice or knowledge of the alleged harassment; and
> >
> > (4) the school acted with deliberate indifference to the alleged harassment.

*Doe v. Fairfax Cty. Sch. Bd.*, 1 F.4th 257, 263–64 (4th Cir. 2021). Title IX's regulations clarify that a "recipient" of federal funds is any entity or person "to whom Federal financial assistance is extended directly or through another recipient and which operates an education program or activity which receives such assistance." 34 C.F.R. § 106.2(i).

At issue in the presently pending motions is whether CPS, as a tax-exempt educational institution, qualifies as an educational institution receiving federal funds. Under 26 U.S.C. § 501(c)(3), "[c]orporations, and any community chest, fund, or foundation, organized and operated exclusively for . . . religious . . . or educational purposes" are exempt from federal income taxation. Neither the Supreme Court nor the United States Court of Appeals for the

---

[6] The United States Supreme Court has held that Title IX is enforceable through an implied private right of action. *See Cannon v. University of Chicago,* 441 U.S. 677, 717 (1979).

Fourth Circuit have directly addressed whether tax-exempt status under § 501(c)(3) constitutes federal financial assistance for purposes of Title IX. However, key decisions of both courts support this Court's conclusion that federal tax exemption qualifies as federal financial assistance under Title IX.

In a pair of opinions, the United States Supreme Court has considered when an entity qualifies as a recipient of federal financial assistance for the purposes of Title IX. In *Grove City Coll. v. Bell*, 465 U.S. 555 (1984), the Court held that "Title IX coverage is not foreclosed because federal funds are granted to [the school's] students rather than directly to one of the [school's] educational programs." 465 U.S. at 569–70. Notably, the Court determined that "[t]here is no basis in the statute for the view that only institutions that themselves apply for federal aid or receive checks directly from the federal government are subject to regulation [under Title IX]." *Id.* at 564. In *Nat'l Collegiate Athletic Ass'n v. Smith*, 525 U.S. 459 (1999), the Supreme Court held that "dues payments from recipients of federal funds" do not "suffice to subject [an entity] to suit under Title IX." 525 U.S. at 470. In so holding, the Court reasoned that "[e]ntities that receive federal assistance, whether directly or through an intermediary, are recipients within the meaning of Title IX; entities that only benefit economically from federal assistance are not." *Id.* at 468; *see also Jennings v. Univ. of N.C.*, 444 F.3d 255, 268 n.9 (4th Cir. 2006*), overruled on other grounds by* 482 F.3d 686 (4th Cir. 2007) (en banc). These opinions confirm that an institution still qualifies as a recipient of federal assistance under Title IX even if it did not apply for the aid or the aid is indirectly provided.

The Supreme Court has also considered the purpose and scope of tax exemptions. In *Regan v. Taxation with Representation*, 461 U.S. 540 (1983), the Supreme Court ruled that the

provision in 26 U.S.C. § 501(c)(3) prohibiting tax exempt status for organizations that seek to influence legislation does not violate the First Amendment. 461 U.S. at 550–51. In its analysis, the Court discussed the nature of tax exemptions and tax deductions and concluded that:

> Both tax exemptions and tax-deductibility are a form of subsidy that is administered through the tax system. A tax exemption has much the same effect as a cash grant to the organization of the amount of tax it would have to pay on its income . . . . Congress chose not to subsidize lobbying as extensively as it chose to subsidize other activities that non profit organizations undertake to promote the public welfare.

*Id.* at 544. The Supreme Court has therefore recognized § 501(c)(3) status as a form of Congressional subsidy and the equivalent of a cash grant.

Additionally, and equally as important, the Supreme Court has held that tax exempt institutions "must demonstrably serve and be in harmony with the public interest." *Bob Jones Univ. v. United States*, 461 U.S. 574, 592 (1983). Similarly, in *Green v. Connally*, 330 F. Supp. 1150 (D.D.C. 1971), the District Court for the District of Columbia held that schools that discriminate on the basis of race are not entitled to federal tax exemptions. 330 F. Supp. at 1156. The court recognized that there is a "well-established principle that the Congressional intent in providing tax deductions and exemptions is not construed to be applicable to activities that are either illegal or contrary to public policy." *Id.* at 1161. This Court believes the same principle applies to discrimination on the basis of sex. Indeed, the Supreme Court in *Cannon v. Univ. of Chicago*, 441 U.S. 667 (1979), noted that Title VI served as a "model" for Title IX and concluded that "Congress intended to create Title IX remedies comparable to those available under Title VI . . . ." 441 U.S. at 704.

Plaintiffs have noted Eleventh Circuit case law to support their position that CPS is subject to Title IX requirements due to its tax-exempt status. In *M.H.D. v. Westminster Sch.*,

172 F.3d 797 (11th Cir. 1999), the Eleventh Circuit concluded that the appellant's allegation that tax exempt qualifies as "federal financial assistance" under Title IX provisions was "neither immaterial nor wholly frivolous." 172 F.3d at 802 n.12.[7] Plaintiffs also observe that tax exempt organizations are subject to the requirements under Title VI of Civil Rights Act of 1964, 42 U.S.C. 2000d *et seq.*, and note that Title IX was modeled after Title VI. *See McGlotten v. Connally,* 338 F. Supp. 448, 461 (D.D.C.1972) (holding that "assistance provided through the tax system is within the scope of Title VI of the 1964 Civil Rights Act"); *Fulani v. League of Women Voters Educ. Fund,* 684 F. Supp. 1185, 1192 (S.D.N.Y.1988) (noting that an entity was subject to Title VI *and* Title IX enforcement because it "receive[d] federal assistance indirectly through its tax exemption and directly through grants" from federal agencies).[8]

CPS rejects Plaintiffs' argument that its tax-exempt status subjects it to the mandates of Title IX, relying primarily on *Johnny's Icehouse, Inc. v. Amateur Hockey Ass'n*, 134 F. Supp. 2d 965 (N.D. Ill. 2001). In *Johnny's Icehouse*, a women's hockey team contended that Amateur Hockey Association was subject to Title IX because its 501(c)(3) status qualified as a form of federal assistance. 134 F. Supp. 2d. at 966. The district court denied this argument, referring to the Title IX regulations that define "federal financial assistance" and observing that income tax exemptions are "conspicuously absent from that laundry list." *Id.* at 971 (citing 34 C.F.R.

---

[7] *See also Barrs v. S. Conference*, 734 F. Supp. 2d 1229, 1232 (N.D. Ala. 2010) (adopting the reasoning of *M.H.D.* and concluding that plaintiff's claim that a tax exemption constitutes federal financial assistance under Title IX "is not so wholly insubstantial and frivolous that subject matter jurisdiction is inappropriate").

[8] *See also Cannon.*, 441 U.S. at 694-95 ("Title IX was patterned after Title VI of the Civil Rights Act of 1964. Except for the substitution of the word 'sex' in Title IX to replace the words 'race, color, or national origin' in Title VI, the two statutes use identical language to describe the benefited class."); *Gebser v. Lago Vista Indep. Sch. Dist.*, 524 U.S. 274, 286 (1998) (noting that Title IX and Title VI "operate in the same manner").

11

§ 106.2(g)).[9] The court concluded that "'federal financial assistance' encompasses only direct transfers of federal money, property or services from the government to a program" and that "[e]xemption from taxation just does not equate to such direct transfers."[10] *Id.* at 972.

In light of the Supreme Court's holdings in *Regan*, *Grove City College*, *Smith,* and *Cannon*, as discussed *supra*, this Court holds that § 501(c)(3) tax exemption constitutes federal financial assistance for the purposes of Title IX. Enforcing the mandates of Title IX in schools with 501(c)(3) status aligns with and protects the principal objectives of Title IX: "to avoid the use of federal resources to support discriminatory practices" and "to provide individual citizens effective protection against those practices." *Cannon,* 441 U.S. at 704.

There is no dispute that CPS received federal financial assistance in the form of § 501(c)(3) income tax exemption in the years Plaintiffs or their daughters attended the school. (*E.g.*, RDB-21-0691, Financial Statements, ECF No. 39 *SEALED*.) Additionally, as to Plaintiff H.C., CPS's Motion is denied because there is no dispute that H.C. enrolled at CPS in Fall 2019 and remained a student there through at least Spring 2020. (RDB-20-3229, ECF No. 21 ¶¶ 11, 90, 114.) CPS applied for and received a PPP loan through the SBA between

---

[9] The Department of Education's Title IX regulations define "federal financial assistance" by enumerating the types of grants and aid that qualify "when authorized or extended under a law administered by the Department." 34 C.F.R. § 106.2(g). Neither party raises any argument as to whether § 501(c)(3) status qualifies as assistance administered by the Department of Education. *Id.* Moreover, this Court is not convinced that this regulation precludes a finding that § 501(c)(3) status qualifies as "federal financial assistance" in the Title IX context, given the statute's shared objectives with Title VI and the Supreme Court's conclusion that tax exemptions are a form of subsidy and the equivalent of a cash grant. *See Cannon,* 441 U.S. at 704; *Regan v. Taxation with Representation,* 461 U.S. 520, 550–51 (1983).

[10] In its Reply, CPS cites several other district court opinions that lend support for its position, but do not announce a holding in support of that position as clearly as the decision in *Johnny's Icehouse. See, e.g., Stewart v. N.Y. Univ.,* 430 F. Supp. 1305, 1314 (S.D.N.Y. 1976); *Zimmerman v. Poly Prep Country Day Sch.,* 888 F. Supp. 2d 317, 322 n.2 (E.D.N.Y. 2012); *Bachman v. Am. Soc'y of Clinical Pathologists,* 577 F. Supp. 1257 (D.N.J. 1983). (RDB-21-0691, ECF No. 45 at 8-9.)

USCA4 Appeal: 23-1453     Doc: 17     Filed: 06/05/2023     Pg: 554 of 610

USCA4 Appeal: 22-272     Doc: 2-2     Filed: 09/14/2022     Pg: 14 of 14     Total Pages:(41 of 60)
Case 1:20-cv-03132-RDB   Document 130   Filed 07/21/22   Page 13 of 13

March and April 2020, and that loan was forgiven as of November 10, 2020.[11] (*E..g*, RDB-20-3229, Johnson Tr. 394, ECF No. 77-1 *SEALED* ; SBA Award Confirmation, ECF No. 77-10 *SEALED*; Def. Answers to Interrogs. 26, ECF No. 77-3 *SEALED*.) CPS argues that all of the events giving rise to H.C.'s Title IX claim occurred before it accepted the SBA funding on April 8, 2020, but there is no evidence in the record supporting that claim. Accordingly, all of CPS's Motions are DENIED.

## CONCLUSION

For the reasons stated above, Defendant Concordia Preparatory School's Partial Motions for Summary Judgment as to the Title IX claims asserted in Count I of the Amended Complaints of Plaintiffs N.H., Pullen, H.C., Gomez, and A.G. (RDB-20-3132, ECF No. 108; RDB-20-3214, ECF No. 60; RDB-20-3229, ECF No. 75; RDB-20-3267, ECF No. 112; RDB-21-0691, ECF No. 37) are DENIED.

A separate Order follows.

Dated: July 21, 2022

_____/s/_____
Richard D. Bennett
United States District Judge

---

[11] The parties agree that on April 8, 2020, CPS received a loan from the SBA through the Paycheck Protection Program established by the Coronavirus Aid, Relief, and Economic Security ("CARES") Act. The parties also agree that this loan constitutes federal financial assistance for the purposes of Title IX. It is undisputed that Plaintiffs N.H., Pullen, Gomez, and A.G. had stopped attending CPS well before the school applied for and received the SBA loan. Pursuant to 13 C.F.R. 113.3(a), "recipients of financial assistance [from the SBA] may not: (a) Discriminate with regard to goods, services, or accommodations offered or provided by the aided business or other enterprise, whether or not operated for profit, because of race, color, religion, sex, handicap, or national origin of a person, or fail or refuse to accept a person on a nonsegregated basis as a patient, student, visitor, guest, customer, passenger, or patron." Once an SBA loan is forgiven, however, a recipient is no longer subject to "any legal obligations [it] incur[s] through [its] receipt of [the] loan." (RDB-20-3229, SBA Faith-Based Organizations FAQ 2, ECF No. 83-2.)

# EXHIBIT 2

USCA4 Appeal: 23-1453     Doc: 17        Filed: 06/05/2023     Pg: 556 of 610

USCA4 Appeal: 22-272     Doc: 2-3       Filed: 09/14/2022     Pg: 2 of 4        Total Pages:(43 of 60)
Case 1:20-cv-03132-RDB   Document 131   Filed 07/21/22   Page 1 of 3

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

DONNA BUETTNER-HARTSOE,          *
*et al.*,
                                 *
        Plaintiffs,              *        Civil Action No. RDB-20-3132

        v.                       *

BALTIMORE LUTHERAN HIGH          *
SCHOOL ASSOCIATION,
*d/b/a/* CONCORDIA PREPARATORY   *
SCHOOL,
                                 *
        Defendant.

    *       *       *       *       *       *       *       *       *       *       *       *       *

JENNIFER PULLEN,                 *

        Plaintiff,               *        Civil Action No. RDB-20-3214

        v.                       *

BALTIMORE LUTHERAN HIGH          *
SCHOOL ASSOCIATION,
*d/b/a/* CONCORDIA PREPARATORY   *
SCHOOL,
                                 *
        Defendant.

    *       *       *       *       *       *       *       *       *       *       *       *       *

ANDREA CONRAD, *et al.*,         *

        Plaintiffs,              *        Civil Action No. RDB-20-3229

        v.                       *

BALTIMORE LUTHERAN HIGH          *
SCHOOL ASSOCIATION, *d/b/a/*
CONCORDIA PREPARATORY            *
SCHOOL, and LUTHERAN CHURCH-
MISSOURI SYNOD,                  *

SOUTHEASTERN DISTRICT,

        *

    Defendants.

\*  \*  \*  \*  \*  \*  \*  \*  \*  \*  \*  \*  \*

ARIANA GOMEZ,                *

    Plaintiff,              *      Civil Action No. RDB-20-3267

BALTIMORE LUTHERAN HIGH     *
SCHOOL ASSOCIATION, *d/b/a/*
CONCORDIA PREPARATORY      *
SCHOOL, and LUTHERAN CHURCH-
MISSOURI SYNOD,            *
SOUTHEASTERN DISTRICT,

        *

    Defendant.

\*  \*  \*  \*  \*  \*  \*  \*  \*  \*  \*  \*  \*

SELENA BARBER, *et al.,*       *

    Plaintiffs,             *      Civil Action No. RDB-21-0691

    v.                   *

BALTIMORE LUTHERAN HIGH     *
SCHOOL ASSOCIATION, *d/b/a/*
CONCORDIA PREPARATORY      *
SCHOOL,

        *

    Defendants.

\*  \*  \*  \*  \*  \*  \*  \*  \*  \*  \*  \*  \*

**<u>ORDER</u>**

For the reasons stated in the accompanying Memorandum Opinion, it is hereby

**ORDERED** this 21st day of July, 2022, that:

    1.   Defendant Concordia Preparatory School's Partial Motions to Dismiss, or in
        the Alternative, for Summary Judgment, (RDB-20-3132, ECF No. 108; RDB-
        20-3214, ECF No. 60; RDB-20-3229, ECF No. 75; RDB-20-3267, ECF No.
        112; RDB-21-0691, ECF No. 37), are construed as Partial Motions for Summary

USCA4 Appeal: 23-1453     Doc: 17          Filed: 06/05/2023     Pg: 558 of 610

USCA4 Appeal: 22-272     Doc: 2-3          Filed: 09/14/2022     Pg: 4 of 4          Total Pages:(45 of 60)
Case 1:20-cv-03132-RDB   Document 131   Filed 07/21/22   Page 3 of 3

Judgment, and as to the Title IX claims asserted in Count I of the Amended Complaints of Plaintiffs N.H., Pullen, H.C., Gomez, and A.G., are **DENIED**;

2. The Clerk shall transmit copies of this Order and the accompanying Memorandum Opinion to the parties.


_____/s/_____
Richard D. Bennett
United States District Judge

3

# EXHIBIT 3

USCA4 Appeal: 23-1453   Doc: 17   Filed: 06/05/2023   Pg: 560 of 610

USCA4 Appeal: 22-272   Doc: 2-4   Filed: 09/14/2022   Pg: 2 of 11   Total Pages:(47 of 60)
Case 1:20-cv-03132-RDB   Document 146   Filed 09/06/22   Page 1 of 10

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| DONNA BUETTNER-HARTSOE, *et al.*, | * | |
| Plaintiffs, | * | Civil Action No. RDB-20-3132 |
| v. | * | |
| BALTIMORE LUTHERAN HIGH SCHOOL ASSOCIATION, *d/b/a/* CONCORDIA PREPARATORY SCHOOL, | * | |
| | * | |
| Defendant. | * | |

\*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*

| | | |
|---|---|---|
| JENNIFER PULLEN, | * | |
| Plaintiff, | * | Civil Action No. RDB-20-3214 |
| v. | * | |
| BALTIMORE LUTHERAN HIGH SCHOOL ASSOCIATION, *d/b/a/* CONCORDIA PREPARATORY SCHOOL, | * | |
| | * | |
| Defendant. | * | |

\*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*

| | | |
|---|---|---|
| ANDREA CONRAD, *et al.*, | * | |
| Plaintiffs, | * | Civil Action No. RDB-20-3229 |
| v. | * | |
| BALTIMORE LUTHERAN HIGH SCHOOL ASSOCIATION, *d/b/a/* CONCORDIA PREPARATORY SCHOOL, and LUTHERAN CHURCH-MISSOURI SYNOD, | * | |
| | * | |

JA556

USCA4 Appeal: 23-1453    Doc: 17    Filed: 06/05/2023    Pg: 561 of 610

USCA4 Appeal: 22-272    Doc: 2-4    Filed: 09/14/2022    Pg: 3 of 11    Total Pages:(48 of 60)
Case 1:20-cv-03132-RDB    Document 146    Filed 09/06/22    Page 2 of 10

SOUTHEASTERN DISTRICT,

       *

    Defendants.

\*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*

ARIANA GOMEZ,        *

    Plaintiff,        *        Civil Action No. RDB-20-3267

BALTIMORE LUTHERAN HIGH        *
SCHOOL ASSOCIATION, *d/b/a/*
CONCORDIA PREPARATORY        *
SCHOOL, and LUTHERAN CHURCH-
MISSOURI SYNOD,        *
SOUTHEASTERN DISTRICT,

       *

    Defendant.

\*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*

SELENA BARBER, *et al.*,        *

    Plaintiffs,        *        Civil Action No. RDB-21-0691

    v.        *

BALTIMORE LUTHERAN HIGH        *
SCHOOL ASSOCIATION, *d/b/a/*
CONCORDIA PREPARATORY        *
SCHOOL,

       *

    Defendants.

\*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*

## **MEMORANDUM OPINION**

These five cases are brought by five different women, all former students of Concordia

Preparatory School ("CPS"), previously known as Baltimore Lutheran High School. The

women make similar allegations of sexual assault and verbal sexual harassment by male

students at the school dating back to 2016. They allege that school officials failed to adequately

USCA4 Appeal: 23-1453    Doc: 17    Filed: 06/05/2023    Pg: 562 of 610

USCA4 Appeal: 22-272    Doc: 2-4    Filed: 09/14/2022    Pg: 4 of 11    Total Pages:(49 of 60)
Case 1:20-cv-03132-RDB   Document 146   Filed 09/06/22   Page 3 of 10

address their numerous complaints or take any meaningful action in response, thereby cultivating a hyper-sexualized culture at the school. In this series of cases, three minors, N.H., H.C., and A.G.—through their respective mothers, Donna Buettner-Hartsoe, Andrea Conrad, and Selena Barber—and two adults, Jennifer Pullen and Ariana Gomez (collectively, "Plaintiffs"), bring federal and state claims against Defendant Baltimore Lutheran High School Association, now doing business as Concordia Preparatory School, and Defendant Lutheran Church-Missouri Synod, Southeastern District ("LCMS").[1]

Presently pending before this Court is Defendant CPS's Motion for Reconsideration, or in the Alternative, Motion to Certify Order for Interlocutory Appeal. (ECF No. 132.)[2] Additionally before this Court are Motions for Leave to File Amicus Brief by several interested parties. (ECF Nos. 134, 136.)  The Court has reviewed the parties' submissions and held a hearing on September 1, 2022. *See* Local Rule 105.6 (D. Md. 2021). For the reasons set forth on the record at the hearing and for the reasons that follow, Defendant CPS's Motion is DENIED IN PART and GRANTED IN PART.  Specifically, CPS's Motion for Reconsideration is DENIED, but the Alternative Motion to Certify the Order for Interlocutory Appeal is GRANTED.  This case shall be STAYED pending a ruling by the United States Court of Appeals for the Fourth Circuit.  The Motions for Leave to File Amicus Brief ARE GRANTED.

---

[1] On May 18, 2021, all of these cases were assigned to the undersigned Judge. Through its June 23, 2021, Order, this Court consolidated these cases for discovery and motions. (RDB-20-3132, ECF No. 65; RDB-20-3214, ECF No. 48; RDB-20-3229, ECF No. 61; RDB-20-3267, ECF No. 101; RDB-21-0691, ECF No. 17.)

[2] Because the cases have been consolidated, the Court cites to the docket in the case filed first, RDB-20-3132.

3

## BACKGROUND

In a Memorandum Opinion dated June 23, 2021, this Court detailed Plaintiffs' factual allegations. (*E.g.*, RDB-20-3132, ECF No. 63 at 5-20.)[3]  On July 21, 2022, this Court denied Defendant CPS's Motion for Summary Judgment.[4]  (ECF Nos. 130, 131.)   In response, Defendant CPS filed the instant Motion for Reconsideration, or in the Alternative, Motion to Certify Order for Interlocutory Appeal (ECF No. 132).  Defendant's Motion largely reiterates arguments previously addressed by this Court.  In short, Defendant requests reconsideration on the basis of clear error and takes the position that the Court erred in holding that federal tax exemption under 501(c)(3) constitutes federal financial assistance for the purposes of Title IX.  (ECF No. 132-1 at 2-3.)  Plaintiffs astutely note that disagreement with the Court's Order is not a sufficient basis for reconsideration.  (ECF No. 140 at 26.)  As explained below, the Court DENIES the part of Defendant's Motion that seeks reconsideration.

Defendant's Motion alternatively seeks certification for an interlocutory appeal.  (ECF No. 132-1 at 18.)  Defendant argues that the requirements for interlocutory appeal have been met, namely that the issue of whether 501(c)(3) tax exemptions constitute federal financial assistance is a controlling question of law, and its immediate resolution would materially advance the outcome of litigation.  *Id.*  Plaintiffs oppose interlocutory appeal and characterize the issue as a mere disagreement that can be narrowed to the financial facts pertaining to CPS.

---

[3] This same Memorandum Opinion was docketed in each of the five consolidated cases. (*See* RDB-20-3132, ECF No. 63; RDB-20-3214, ECF No. 46; RDB-20-3229, ECF No. 59; RDB-20-3267, ECF No. 99; RDB-21-0691, ECF No. 15.) In that Memorandum Opinion, this Court denied Defendant CPS's motions to dismiss the Title IX claims of Plaintiffs H.C., Gomez, and A.G. (*E.g.,* RDB-21-0691, ECF No. 15 at 32–36.)

[4] CPS's Motions were styled as partial motions to dismiss under Fed. R. Civ. P. 12(b)(6) or, in the alternative, for summary judgment under Fed. R. Civ. P. 56. The Court considered matters outside of the pleadings and reviewed CPS's motions under the Fed. R. Civ. P. 56 standard.

4

USCA4 Appeal: 23-1453    Doc: 17    Filed: 06/05/2023    Pg: 564 of 610

USCA4 Appeal: 22-272    Doc: 2-4    Filed: 09/14/2022    Pg: 6 of 11    Total Pages:(51 of 60)
Case 1:20-cv-03132-RDB    Document 146    Filed 09/06/22    Page 5 of 10

(ECF No. 140 at 32-40.) As stated on the record, the Court is mindful of the split in authority on this question and the implications of its analysis. Accordingly, this issue shall be certified for interlocutory appeal.

<div align="center">

**STANDARD OF REVIEW**

</div>

I.  <u>**Motion for Reconsideration**</u>

Pursuant to Rule 54(b) of the Federal Rules of Civil Procedure, "any order or other decision . . . that adjudicates fewer than all the claims or the rights and liabilities of fewer than all the parties . . . may be revised at any time before the entry of [final judgment]." Fed. R. Civ. P. 54(b). "Motions for reconsideration of interlocutory orders are not subject to the strict standards applicable to motions for reconsideration of a final judgment." *Am. Canoe Ass'n v. Murphy Farms, Inc.*, 326 F.3d 505, 514 (4th Cir. 2003). However, the Fourth Circuit has suggested that the Rule 60(b) standard guides the district court's analysis. *Fayetteville Investors v. Commercial Builders, Inc.*, 936 F.3d 1462, 1472 (4th Cir. 1991). As this Court has previously noted, "the court's analysis is guided by Rule 60(b) but is not bound by its strictures." *Cincinnati Ins. Co. v. Fish*, No. RDB-19-3355, 2022 WL 1225419, *1 (D. Md. Apr. 26, 2021).

"Rule 60(b) provides extraordinary relief and may only be invoked under 'exceptional circumstances.'" *Mines v. United States*, No. WMN-10-520, 2010 WL 1741375, at *2 (D. Md. April 28, 2010) (quoting *Compton v. Alton Steamship Co., Inc.*, 608 F.2d 96, 102 (4th Cir. 1982)). To support a motion under Rule 60(b), the moving party must demonstrate "timeliness, a meritorious defense, a lack of unfair prejudice to the opposing party, and exceptional circumstances." *Hale v. Belton Assoc., Inc.*, 305 Fed. Appx. 987, 988 (4th Cir. 2009) (quoting

<div align="center">

5

</div>

USCA4 Appeal: 23-1453     Doc: 17     Filed: 06/05/2023     Pg: 565 of 610

USCA4 Appeal: 22-272     Doc: 2-4     Filed: 09/14/2022     Pg: 7 of 11     Total Pages:(52 of 60)
Case 1:20-cv-03132-RDB   Document 146   Filed 09/06/22   Page 6 of 10

*Dowell v. State Farm Fire & Cas. Auto. Ins. Co.*, 993 F.2d 46, 48 (4th Cir. 1993)).   If these

threshold requirements are met, the moving party must then establish one of six predicates:

> (1) mistake, inadvertence, surprise, or excusable neglect;
> (2) newly discovered evidence which by due diligence could not have been discovered in time to move for a new trial under Rule 59(b);
> (3) fraud, misrepresentation or other misconduct of an adverse party;
> (4) the judgment is void;
> (5) the judgment has been satisfied, released, or discharged; or
> (6) any other reason justifying relief from the operation of the judgment.

Fed. R. Civ. P. 60(b).   The moving party "must clearly establish the grounds therefore to the

satisfaction of the district court," and those grounds "must be clearly substantiated by adequate

proof."   *In re Burnley*, 988 F.2d 1, 3 (4th Cir. 1992) (citations omitted).

## II.   <u>Motion to Certify Order for Interlocutory Appeal</u>

"A district court's order denying a motion for summary judgment or denying a motion

to dismiss is interlocutory and may be appealed only (a) if the district court certifies under 28

U.S.C. § 1292(b) that the order involves a controlling question of law as to which there is

substantial ground for difference of opinion and that an immediate appeal from the order may

materially advance the ultimate termination of the litigation; and (b) the Court of Appeals

permits such appeal." *Georgetown Coll. v. Madden*, 660 F.2d 91, 96–97 (4th Cir. 1981).

The district court has broad discretion to determine whether an interlocutory appeal is

appropriate. *Swint v. Chambers Cnty. Comm'n*, 514 U.S. 35, 47 (1995). As § 1292(b) provides that

a district court "shall" certify an appeal when its requirements are met, "[w]hen a district court

determines that the statutory criteria are present, . . . it has a "duty . . . to allow an immediate

appeal to be taken." *In re Trump*, 928 F.3d 360, 369 (4th Cir. 2019) (quoting *Ahrenholz v. Bd. of*

*Trs. of the Univ. of Ill.*, 219 F.3d 674, 677 (7th Cir. 2000)). However, the Fourth Circuit has made

USCA4 Appeal: 23-1453    Doc: 17    Filed: 06/05/2023    Pg: 566 of 610

USCA4 Appeal: 22-272    Doc: 2-4    Filed: 09/14/2022    Pg: 8 of 11    Total Pages:(53 of 60)
Case 1:20-cv-03132-RDB    Document 146    Filed 09/06/22    Page 7 of 10

clear that Section 1292(b) "should be used sparingly and . . . its requirements must be strictly construed." *Myles v. Laffitte*, 881 F.2d 125, 127 (4th Cir. 1989).

## ANALYSIS

### I.    <u>Motion for Reconsideration</u>

Defendant faces a "high bar . . . to succeed on a Motion for Reconsideration." *Worsham v. Discount Power*, No. RDB-20-0008, 2021 WL 5742382, at *2 (D. Md. Dec. 1, 2021) (citation omitted). A litigant's "mere disagreement" with a court's ruling is not enough to justify a motion for reconsideration. *Lynn v. Monarch Recovery Mgmt.*, 953 F. Supp. 2d 612, 620 (D. Md. 2013) (citation omitted). Accordingly, "the prior judgment cannot be 'just maybe or probably wrong; it must . . . strike the court as wrong with the force of a five-week-old, unrefrigerated dead fish.'" *Fontell v. Hassett*, 891 F. Supp. 2d 739, 741 (D. Md. 2012) (citation omitted). In other words, the Court's previous judgment must be "dead wrong." *TFWS, Inc. v. Franchot*, 572 F.3d 186, 194 (4th Cir. 2009).

Defendant CPS's motion for reconsideration largely reiterates arguments previously addressed by the Court, such as its reliance on *Johnny's Icehouse Inc. v. Amateur Hockey Ass'n*, 134 F. Supp. 2d 965 (N.D. Ill. 2001), and its challenge to the scope of *Regan v. Taxation with Representation*, 461 U.S. 540 (1983). (ECF No. 132-1.) These arguments have already been decided, and are not a valid predicate for reconsideration under Rule 60(b), even under the more permissive construction afforded by Rule 54(b). However, Defendant does raise, for the first time, the impact of the DOJ regulations implementing Title IX, 34 C.F.R. § 106.2(g). (ECF No. 132-1 at 5-6.) Nonetheless, as the Central District of California recently noted in *E.H. v. Valley Christian Academy*, 2022 WL 2953681 (C.D. Cal. Jul. 25, 2022), although "the

regulations provide guidance on the types of funding that constitute federal financial assistance, the Title IX statute itself does not define the term." 2022 WL 2953681, at * 6–7. It is questionable that the DOJ regulations may interpret the statute to narrow the scope of the term "federal financial assistance" in a manner that is inconsistent with its purpose: "to eliminate discrimination in programs or activities benefitting from federal financial assistance." *McGlotten v. Connally*, 338 F. Supp. 448, 461 (D.D.C. 1972) (reaching analogous result under Title VI, and holding that "[d]istinctions as to the method of distribution of federal funds or their equivalent seem beside the point"). Accordingly, absent indication that this Court's Order was founded on "clear error", there is no basis for reconsideration and Defendant's request shall be DENIED.

## II.    **Motion to Certify Order for Interlocutory Appeal**

The Court finds that its Order "involves a controlling question of law as to which there is substantial ground for difference of opinion and that an immediate appeal from the order may materially advance the ultimate termination of the litigation." 28 U.S.C. § 1292(b). The Fourth Circuit defines a controlling question of law as "a pure question of law" or "an abstract legal issue that the court of appeals can decide quickly and cleanly." *Int'l Refugee Assistance Project v. Trump*, 404 F. Supp. 3d 946, 950 (D. Md. 2019) (quoting *United States ex rel. Michaels v. Agape Senior Cmty., Inc.*, 848 F.3d 330, 340 (4th Cir. 2017)). A pure issue of law raises "'a question of the meaning of a statutory or constitutional provision, regulation, or common law doctrine' – as opposed to 'whether the party opposing summary judgment had raised a genuine issue of material fact.'" *Coal. For Equity & Excellence in Md. Higher Educ. v. Md. Higher Educ. Comm'n*, No. CCB-06-2773, 2015 U.S. Dist. LEXIS 83741, at *13 (D. Md. June 29, 2015). To be

USCA4 Appeal: 23-1453     Doc: 17     Filed: 06/05/2023     Pg: 568 of 610

USCA4 Appeal: 22-272     Doc: 2-4     Filed: 09/14/2022     Pg: 10 of 11     Total Pages:(55 of 60)
Case 1:20-cv-03132-RDB   Document 146   Filed 09/06/22   Page 9 of 10

"controlling," the question of law must be "serious to the conduct of the litigation, either practically or legally." *Kayz v. Carte Blanche Corp.*, 496 F.2d 747, 755 (3d Cir. 1974); *see Kennedy v. St. Joseph's Ministries, Inc.*, 657 F.3d 189, 195 (4th Cir. 2011) ("We are faced with a pure question of law and our resolution of it terminates the case.").

To determine whether there is a substantial difference of opinion, there must be "'substantial doubt' that the district court's order was correct." *Goodman v. Archbishop Curley High Sch., Inc.*, 195 F. Supp. 3d 767, 774 (D. Md. 2016). "In deciding whether certification will materially advance the ultimate termination of the litigation, 'a district court should consider whether an immediate appeal would: (1) eliminate the need for trial, (2) eliminate complex issues so as to simplify the trial, or (3) eliminate issues to make discovery easier and less costly.'" *Ekstrom v. Cong. Bank*, No. ELH-20-1501, 2021 U.S. Dist. LEXIS 6628, at *8 (D. Md. Jan. 13, 2021) (quoting *Goodman v. Archbishop Curley High School, Inc.*, 195 F. Supp. 3d 767, 773 (D. Md. 2016)).

Here, the requirements for an interlocutory appeal are met. The issue of whether 501(c)(3) tax exempt status constitutes federal financial assistance under Title IX is a pure issue of law on which there are differing opinions that may seriously impact the litigation of this case. Although reversal of the issue in this Court's Order may not subject the case to remand as it relates to Plaintiff H.C.'s claims,[5] the parties recognize that this is an issue of first

---

[5] The Court's Memorandum denying Defendant's partial motion for summary judgement distinguished the rational for denial pertaining to Plaintiff H.C. (ECF No. 96 at 12.) This Court held that Defendant CPS admittedly received federal funding in March and April of 2020 in the form of a PPP loan. *Id.* In its Motion for Reconsideration, Defendant CPS has conceded that it received federal funding during at least some of the time period that Plaintiff H.C. attended school, but takes issue with the timing of events which indicate whether it availed itself to Title IX liability relating to H.C.'s claims. (ECF No. 98, Ex. 1 at 13.) This argument is not requested for appeal, and therefore remains an issue in this case regardless of the Fourth Circuit's decision.

USCA4 Appeal: 23-1453    Doc: 17        Filed: 06/05/2023      Pg: 569 of 610

USCA4 Appeal: 22-272     Doc: 2-4       Filed: 09/14/2022    Pg: 11 of 11      Total Pages:(56 of 60)
Case 1:20-cv-03132-RDB   Document 146   Filed 09/06/22   Page 10 of 10

impression with great significance to educational institutions. *Goodman*, 195 F. Supp. 3d at 774. Moreover, Defendant aptly notes that resolving the Title IX issue definitively at this stage will lend clarity to possible settlement discussions and pretrial preparation. (ECF No. 132-1.) As a result, the Court GRANTS Defendant's request to certify the Court's Order (ECF Nos. 130, 131) for interlocutory appeal.

## CONCLUSION

For the reasons stated above, the Motions for Leave to File Amicus Brief (ECF Nos. 134, 136) are GRANTED as those briefs were considered, and Defendant CPS's Motion for Reconsideration, or in the Alternative, Motion to Certify Order for Interlocutory Appeal (ECF No. 132) is DENIED IN PART and GRANTED IN PART. Defendant's Motion is DENIED IN PART as this Court will not reconsider its Order denying CPS's Motion for Summary Judgment. (ECF Nos. 130, 131.) However, the Motion is GRANTED IN PART and the Court certifies its Order (ECF Nos. 130, 131) for interlocutory appeal to the United States Court of Appeals for the Fourth Circuit. The remainder of this case is consequently STAYED pending review from the United States Court of Appeals for the Fourth Circuit.

A separate Order follows.

Dated: September 6, 2022                         _____/s/_____
                                                 Richard D. Bennett
                                                 United States District Judge

10

# EXHIBIT 4

USCA4 Appeal: 23-1453     Doc: 17     Filed: 06/05/2023     Pg: 571 of 610

USCA4 Appeal: 22-272     Doc: 2-5     Filed: 09/14/2022     Pg: 2 of 4     Total Pages:(58 of 60)
Case 1:20-cv-03132-RDB   Document 147   Filed 09/06/22   Page 1 of 3

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

DONNA BUETTNER-HARTSOE,
*et al.*,                                    *

    Plaintiffs,                          *                Civil Action No. RDB-20-3132

    v.                                   *

BALTIMORE LUTHERAN HIGH          *
SCHOOL ASSOCIATION,
*d/b/a/* CONCORDIA PREPARATORY   *
SCHOOL,
                                             *
    Defendant.

*     *     *     *     *     *     *     *     *     *     *     *     *

JENNIFER PULLEN,                             *

    Plaintiff,                           *                Civil Action No. RDB-20-3214

    v.                                   *

BALTIMORE LUTHERAN HIGH          *
SCHOOL ASSOCIATION,
*d/b/a/* CONCORDIA PREPARATORY   *
SCHOOL,
                                             *
    Defendant.

*     *     *     *     *     *     *     *     *     *     *     *     *

ANDREA CONRAD, *et al.*,                     *

    Plaintiffs,                          *                Civil Action No. RDB-20-3229

    v.                                   *

BALTIMORE LUTHERAN HIGH          *
SCHOOL ASSOCIATION, *d/b/a/*
CONCORDIA PREPARATORY            *
SCHOOL, and LUTHERAN CHURCH-
MISSOURI SYNOD,                              *

SOUTHEASTERN DISTRICT,                    *

    Defendants.

\*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*

ARIANA GOMEZ,                             *

    Plaintiff,                            *    Civil Action No. RDB-20-3267

BALTIMORE LUTHERAN HIGH                   *
SCHOOL ASSOCIATION, *d/b/a/*
CONCORDIA PREPARATORY                     *
SCHOOL, and LUTHERAN CHURCH-
MISSOURI SYNOD,                           *
SOUTHEASTERN DISTRICT,
                                  *

    Defendant.

\*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*

SELENA BARBER, *et al.*,                   *

    Plaintiffs,                           *    Civil Action No. RDB-21-0691

    v.                                    *

BALTIMORE LUTHERAN HIGH                   *
SCHOOL ASSOCIATION, *d/b/a/*
CONCORDIA PREPARATORY                     *
SCHOOL,
                                  *

    Defendants.

\*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*

## **ORDER**

    For the reasons set forth on the record at the hearing of September 1, 2022, as well as

stated in the accompanying Memorandum Opinion, it is hereby **ORDERED** this <u>6th</u> day of

<u>September, 2022,</u> that:

      1.  The Association of Independent Maryland & DC Schools' Motion for Leave to
          File Amicus Brief (RDB-20-3132, ECF No. 134) is **GRANTED**;

USCA4 Appeal: 23-1453     Doc: 17     Filed: 06/05/2023     Pg: 573 of 610

USCA4 Appeal: 22-272     Doc: 2-5     Filed: 09/14/2022     Pg: 4 of 4     Total Pages:(60 of 60)
Case 1:20-cv-03132-RDB   Document 147   Filed 09/06/22   Page 3 of 3

2.  The National Association of Independent Schools, National Business Officers Association, Association of Independent Schools of Greater Washington, Southern Association of Independent Schools, Virginia Association of Independent Schools, North Carolina Association of Independent Schools, and Palmetto Association of Independent Schools' Motion for Leave to File Amicus Brief (RDB-20-3132, ECF No. 136) is **GRANTED**;

3.  Defendant Concordia Preparatory School's Motion for Reconsideration, or in the Alternative, Motion to Certify Order for Interlocutory Appeal (RDB-20-3132, ECF No. 131; RDB-20-3214, ECF No. 82; RDB-20-3229, ECF No. 98; RDB-20-3267, ECF No. 134; RDB-21-0691, ECF No. 59) is **DENIED IN PART and GRANTED IN PART**:

    a.  Defendant's Motion for Reconsideration is **DENIED**; and,

    b.  Defendant's Motion to Certify Order for Interlocutory Appeal pursuant to 28 U.S. Code § 1292 is **GRANTED** and the Court certifies to the United States Court of Appeals for the Fourth Circuit an interlocutory appeal of the Court's ruling on Defendant's partial motion for summary judgment (RDB-20-3132, ECF Nos. 130, 131);

4.  The remainder of the case is **STAYED** pending review from the United States Court of Appeals for the Fourth Circuit.

                                                                           _____/s/_____

                                                                           Richard D. Bennett
                                                                           United States District Judge

3

No. 22-272

IN THE UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

DONNA BUETTNER-HARTSOE, et al.

*Plaintiffs - Appellees,*

v.

BALTIMORE LUTHERAN HIGH SCHOOL ASSOCIATION, d/b/a/
CONCORDIA PREPARATORY SCHOOL,

*Defendant - Appellant.*

Appeal from the United States District Court
For the District of Maryland
No. 1:20-cv-03132
Hon. Richard Bennett

**APPELLEES' OPPOSITION TO APPELLANT'S PETITION FOR LEAVE
TO APPEAL PURSUANT TO 28 U.S.C. § 1292(B)**

**Jenner Law, P.C.**

Robert K. Jenner
Jenner Law, P.C.
3600 Clipper Mill Road, Suite 240
Baltimore, Maryland 21211
Phone: (410) 413-2155
Facsimile: (410) 982-0122
rjenner@jennerlawfirm.com
Attorney(s) for Plaintiffs/Appellees

**Ketterer, Browne & Associates**

Justin Browne
Christina Graziano
Brian Ketterer
Ketterer, Browne & Associates, LLC
336 S. Main Street
Bel Air, Maryland 21014
Phone: (855) 522-5297
Facsimile: (855) 334-5626
Justin@KBAattorneys.com
Christina@KBAattorneys.com
Brian@KBAattorneys.com
Attorney(s) for Plaintiffs/Appellees

# TABLE OF CONTENTS

Page

TABLE OF CONTENTS ................................................................ i

TABLE OF AUTHORITIES ........................................................ iii

BRIEF OF PLAINTIFFS-APPELLEES ........................................ 1

STATEMENT OF FACTS AND OF THE CASE ........................... 1

QUESTION CERTIFIED ........................................................... 2

ARGUMENT SUMMARY .......................................................... 3

ARGUMENT ............................................................................ 3

I. The District Court did Not Err in Concluding that § 501(c)(3)
Tax Exempt Status Constitutes "Federal Financial Assistance"
Under Title IX ............................................................... 3

  A. It is Well-Established Law that a Tax Exemption under
  § 501(c)(3) Constitutes Federal Financial Assistance under
  Title VI and Title IX .................................................... 4

    1. Supreme Court and Federal Circuit Court Precedent is Clear
    Guidance on this Issue .............................................. 4

    2. Imposing the Mandates of Title IX on Tax-Exempt Schools
    is Consistent with the Objectives of Title IX and Other
    Anti-Discrimination Statutes .................................... 6

II. This Court should Deny Defendant-Appellant CPS's Petition for
Leave to Appeal where CPS Failed to Meet the Applicable
Standard because the Issue at Hand is Not a Controlling
Question of Law to Which there is a Substantial Ground for
Difference of Opinion, Nor would an Appeal Materially
Advance the Termination of the Instant Litigation .................... 8

  A. Defendant-Appellant CPS's Disagreement with the District
  Court's Ruling Provides No Basis for Certification of an
  Extraordinary Interlocutory Appeal ............................ 10

    1. The District Court's Order Contains No Controlling
    Question of Law Regarding Whether Title IX Applies to
    § 501(c)(3) Entities ................................................. 11

B.   There is Not a Sufficiently Substantial Ground for Difference
     of Opinion ............................................................................. 15

C.   Defendant-Appellant CPS's Argument that an Interlocutory
     Appeal would Materially Advance this Litigation Fails ...................... 17

     CONCLUSION ........................................................................... 20

CERTIFICATE OF COMPLIANCE ....................................................... 21

CERTIFICATE OF SERVICE ............................................................. 22

# TABLE OF AUTHORITIES

Page

**Cases:**

*Ahrenholz v. Bd. of Trs. of Univ. of Ill.*
219 F.3d 674 (7th Cir. 2000) ........................................... 12

*Beck v. Commc'ns Workers of Am.*
468 F.Supp. 93 (D. Md. 1979) ........................................ 8

*Brooks v. Circuit City Stores, No. DKC–95–3296*
1997 WL 679899 (D.Md. Sept.16 1997) ........................... 16

*Butler v. DirectSAT USA, LLC*
307 F.R.D. 445 (D. Md. 2015) ........................................ 9, 13

*Cannon v. Univ. of Chicago*
441 U.S. 677 (1979) ........................................................ 4, 5, 6

*Carbotrade v. Bureau Veritas*
1993 WL 60567 (S.D.N.Y. March 2, 1993) ....................... 17

*David v. Alphin*
No. 07–cv–11–RJC–DLH, 2009 WL 3633889 (W.D.N.C. Oct.30
2009) ............................................................................... 16

*E.H. v. Valley Christian Acad.*
2022 WL 2953681 (C.D. Cal. July 25, 2022) .................... 6

*Fannin v. CSX Transp., Inc.*
1989 WL 42583 (4th Cir. 1989)
[873 F.2d 1438] ............................................................... 12, 18, 19

*Fannin v. CSX Transp., Inc.*
No. 88–8120, 1989 WL 42583 (4th Cir. Apr. 26, 1989) ......... 10, 12

*Flor v. BOT Fin. Corp. (In re Flor)*
79 F.3d 281 (2d Cir. 1996) ............................................. 15, 16

*Fulani v. League of Women Voters Educ. Fund*
684 F.Supp. 1185 (S.D.N.Y. 1988) .................................. 7

*Garber v. Office of the Comm'r of Baseball*
120 F. Supp. 3d 334 (S.D.N.Y. 2014) ............................. 9

iii

*Gebser v. Lago Vista Indep. Sch. Dist.*
   524 U.S. 274 (1998) ................................................... 7

*Goodman v. Archbishop Curley High Sch., Inc.*
   195 F. Supp. 3d 767 (D. Md. 2016) ............................... 15

*Grove City Coll. v. Bell*
   465 U.S. 555 (1984) ................................................... 4

*Hall v. Greystar Mgmt. Servs., L.P.*
   193 F. Supp. 3d 522 (D. Md. 2016) ............................... 10

*HeiTech Servs., Inc. v. Rowe, GJH–17–1319*
   2017 WL 4838750 (D. Md. Oct. 24, 2017) ...................... 9

*In re Air Cargo, Inc., CCB–080587*
   2008 WL 2415039 (D. Md. June 11, 2008) ...................... 9

*In re Nichols, No. 14–0625*
   2014 WL 4094340 (D. Md. Aug. 15, 2014) ...................... 16

*In re Swann Ltd. P'ship*
   128 B.R. 138 (D.Md. 1991) ......................................... 19

*In re Text Messaging Antitrust Litig.*
   630 F.3d 622 (7th Cir. 2010) ....................................... 13

*Joe Doe One, et al., v. CVS Pharmacy, Inc., et al.*
   No. 18-cv-01031-EMC, 2022 WL 3139516 (N.D. Cal. Aug. 5, 2022) ........ 7, 8

*Johnson v. Cent. Collections, No. ELH-19–2821*
   2020 WL 2306452 (D. Md. May 8, 2020) ........................ 9

*Keena v. Groupon, Inc.*
   886 F.3d 360 (4th Cir. 2018) ....................................... 9

*Kennedy v. St. Joseph's Ministries, Inc.*
   657 F.3d 189 (4th Cir. 2011) ....................................... 11, 12

*Kennedy v. Villa St. Catherine, Inc., No. 09–3021*
   2010 WL 9009364 (D. Md. June 16, 2010) ...................... 15

*LaFleur v. Dollar Tree Stores, Inc.*
   No. 2:12–CI–00363, 2014 WL 2121721 (E.D.Va. May 20, 2014) ............... 13

*Lizarbe v. Rondon, No. 07–1809*
   2009 WL 2487083 (D. Md. Aug. 12, 2009) ...................... 15

iv

*Lynn v. Monarch Recovery Mgmt., Inc.*
   953 F. Supp. 2d 612 (D. Md. 2013) ............................................... 11, 12, 13, 18

*M.H.D. v. Westminster Sch.*
   172 F.3d 797 (11th Cir. 1999) ........................................................... 5

*McGlotten v. Connally*
   338 F.Supp. 448 (D.D.C. 1972) ......................................................... 7

*Moffett v. Computer Sci. Corp.*
   No. 05–1547, 2010 WL 348701 (D. Md. Jan. 22, 2010) ............................... 11

*Mohawk Indus., Inc. v. Carpenter*
   130 S.Ct. 599 (2009) ......................................................................... 10

*Myles v. Laffitte*
   881 F.2d 125 (4th Cir. 1989) ............................................................. 9

*N.J. Dep't of Treas. v. Fuld*
   2009 WL 2905432 (D.N.J. Sept.8 2009) ............................................... 19

*Nat'l Collegiate Athletic Ass'n v. Smith*
   525 U.S. 459 (1999) .......................................................................... 4

*North Carolina v. W.R. Peele, Sr. Trust*
   889 F.Supp. 849 (E.D.N.C. 1995) ........................................... 9, 13, 16

*Palandjian v. Pahlavi*
   782 F.2d 313 (1st Cir. 1986) .............................................................. 13

*Randolph v. ADT Sec. Servs., Inc.*
   2012 WL 273722 (D. Md. Jan. 30, 2012) ..................................... 11, 15

*Regan v. Taxation with Representation*
   461 U.S. 520 (1983) ....................................................................... 4, 5

*United States v. Lawrence*
   201 F.3d 536 (4th Cir. 2000) ............................................................. 8

*United States v. Under Seal*
   835 F.3d 706 (4th Cir. 2017) ............................................................. 8

*White v. Nix*
   43 F.3d 374 (8th Cir. 1994) ............................................................... 15

v

**Statutes:**

20 U.S.C. § 1681 ................................................................ 7

26 U.S.C. § 501 ............................................................ *passim*

28 U.S.C. § 1292 .......................................................... *passim*

42 U.S.C. § 2000d ........................................................ 6, 7

42 U.S.C. § 6101 ............................................................. 7

42 U.S.C. § 18116 ........................................................... 7

**Other:**

16 CHARLES A. WRIGHT, ET AL., FED. PRAC. & PROC. § 3930
  (1977) ................................................................... 16

## BRIEF OF PLAINTIFFS-APPELLEES

NOW COME Plaintiffs-Appellees, Donna Buettner-Hartsoe and N.H., a minor, by and through their attorneys, and respectfully move this Court to deny Defendant-Appellant Baltimore Lutheran High School Association d/b/a Concordia Preparatory School's ("CPS") Petition for Leave to Appeal Pursuant to 28 U.S.C. § 1292(B), and in support thereof state as follows:

## STATEMENT OF FACTS AND OF THE CASE

Mrs. Donna Buettner-Hartsoe and her daughter, N.H., a minor at the time this suit was commenced, filed a 26-page Amended Complaint against Defendant Baltimore Lutheran High School Association d/b/a Concordia Preparatory School ("CPS") alleging discrimination on the basis of sex in violation of Title IX of the Education Amendments of 1972 ("Title IX"). N.H. was a student at CPS, which Plaintiffs-Appellees allege received federal funds in the form of tax-exempt status under 26 U.S.C. § 501(c)(3) ("501(c)(3)").

After the conclusion of fact discovery, Defendant-Appellant filed a Partial Motion to Dismiss or in the alternative for Summary Judgment on the Title IX claim arguing that Petitioner had not received federal financial assistance during the time period in which N.H. was a student at the school, such that Plaintiffs-Appellees could not assert a cause of action for violation of Title IX. The United States District Court for the District of Maryland, Judge Bennett presiding, construed Petitioner's Motion as seeking partial summary judgment, and denied

the Motion holding that Petitioner's 26 U.S.C. § 501(c)(3) tax exemption constitutes federal financial assistance for the purposes of Title IX. (Copies of the District Court's Memorandum Opinion and Order, dated July 21, 2022, are attached as Exhibits 1 and 2 to Defendant-Appellant's Motion.)

Defendant-Appellant CPS filed a Motion for Reconsideration, or in the Alternative, Motion to Certify Order for Interlocutory Appeal. After a hearing, on September 6, 2022 the District Court denied the Motion for Reconsideration but granted the Motion to Certify Order for Interlocutory Appeal. (Copies of the District Court's Memorandum Opinion and Order, dated September 6, 2022, are attached as Exhibits 3 and 4 to Defendant-Appellant's Motion.) Defendant-Appellant then filed the Petition for Leave to Appeal now before this Court. This Court should decline to accept Defendant-Appellant's Petition because the District Court correctly decided the issue of Title IX applicability to institutions with tax-exempt status under § 501(c)(3) and because this issue does not warrant interlocutory appeal pursuant to 28 U.S.C. § 1292(b).

## QUESTION CERTIFIED

Does tax exemption under 26 U.S.C. § 501(c)(3) constitute receipt of federal financial assistance for purposes of Title IX of the Education Amendments Act of 1972?

## ARGUMENT SUMMARY

Defendant-Appellant CPS presents two arguments in support of its Petition for Leave to Appeal: First, that the District Court erred by concluding that CPS's § 501(c)(3) tax-exempt status is "federal financial assistance" for purposes of Title IX; and second, that the issue presented satisfies 28 U.S.C. § 1292(b)'s salutary purpose. Neither of these arguments warrants an immediate appeal and this Court should exercise its discretion in summarily affirming the decision of the District Court, preserving the issue for appeal at the conclusion of the litigation.

## ARGUMENT

### I. The District Court did Not Err in Concluding that § 501(c)(3) Tax Exempt Status Constitutes "Federal Financial Assistance" Under Title IX

In its Petition, Defendant-Appellant CPS argues that the District Court's prior Order exhibits clear error because the Court's decision incorrectly concluded that a tax exemption, authorized and extended under a law administered by the Internal Revenue Service, constitutes federal financial assistance for purposes of Title IX. This argument plainly fails.

The District Court correctly analogized the definition of federal financial assistance with antidiscrimination public policy from both Title VI and Title IX. Moreover, the case law and facts establish that Defendant-Appellant CPS cannot

avail itself of the benefits of federal tax exemption but avoid the costs by not adhering to Title IX's mandates. Thus, the District Court's Order is devoid of error and should be upheld.

### A. It is Well-Established Law that a Tax Exemption under § 501(c)(3) Constitutes Federal Financial Assistance under Title VI and Title IX

#### 1. Supreme Court and Federal Circuit Court Precedent is Clear Guidance on this Issue

As the District Court made clear in its Memorandum Order, and consistent with Supreme Court precedent on this issue, § 501(c)(3) tax exemption constitutes federal financial assistance for the purposes of Title IX. *See Cannon v. Univ. of Chicago*, 441 U.S. 677, 717 (1979) (Schools with tax-exempt status should be held to the mandates of Title IX "to avoid the use of federal resources to support discriminatory practices"); *Regan v. Taxation with Representation*, 461 U.S. 520, 550–51 (1983) ("A tax exemption has much the same effect as a cash grant to the organization"); *Grove City Coll. v. Bell*, 465 U.S. 555, 564 (1984) ( "[t]here is no basis in the statute for the view that only institutions that themselves apply for federal aid or receive checks directly from the federal government are subject to regulation [under Title IX]"); *Nat'l Collegiate Athletic Ass'n v. Smith*, 525 U.S. 459, 461 (1999) ("[E]ntities that receive federal assistance, whether directly or through an intermediary, are recipients within the meaning of Title IX"). On this basis alone, this Court should deny Defendant-Appellant CPS's Petition.

Other Circuit courts have reached this same conclusion, as illustrated in the Eleventh Circuit decision in *M.H.D. v. Westminster Sch.*, 172 F.3d 797 (11th Cir. 1999). In *Westminster,* the Georgia district court found that a private high school's tax-exempt status constituted federal financial assistance to render it subject to Title IX. *Id.* The facts presented by Defendant-Appellant CPS are the same as those presented in *Westminster*: that this tax-exempt status was the sole form of federal financial assistance the defendant school received. *Id.* at 801. The *Westminster* court found that "exemption from federal taxes produces the same result as a direct federal grant—Westminster possesses funds that otherwise would belong to the Government." *Id.* at fn. 12. Thus, the Court found in agreement with the plaintiff's argument that it logically follows that "a direct grant and a tax exemption should be treated the same; because a grant constitutes 'Federal financial assistance' under Title IX, tax-exempt status also should satisfy this element of the statute." *Id.*

Indeed, it is well-settled that § 501(c)(3) status confers upon the beneficiary of said status the mandates and requirements of Title IX and other spending clause statutes. This is of course true in other contexts. *See, e.g., Cannon*, 441 U.S. at 704 (tax exemptions are a form of subsidy and the equivalent of a cash grant in Title VI context); *Regan v. Taxation with Representation*, 461 U.S. at 550–551 (Recognizing, in first amendment context, that § 501(c)(3) is a form of Congressional subsidy and the equivalent of a cash grant.). As such, this Court must deny Defendant-Appellant CPS's Petition.

**2. Imposing the Mandates of Title IX on Tax-Exempt Schools is Consistent with the Objectives of Title IX and Other Anti-Discrimination Statutes**

Imposing the requirements of Title IX in schools with § 501(c)(3) status is congruent with the principal objectives of Title IX: "to avoid the use of federal resources to support discriminatory practices" and "to provide individual citizens effective protection against those practices." *Cannon*, 441 U.S. at 704. This reasoning is consistent with a holding reached in the Central District of California on July 25, 2022, mere days after the District Court entered its Memorandum Order. In *E.H. v. Valley Christian Acad.*, 2022 WL 2953681, at *7 (C.D. Cal. July 25, 2022), the district court considered and rejected the defendant school's arguments that, under *Johnny's Icehouse* and similar arguments posited by Defendant-Appellant CPS, it could not be deemed to have received federal financial assistance for purposes of Title IX simply because of its status as a tax-exempt entity. *Id.* The district court held that the school's tax-exempt status confers a federal financial benefit that obligates compliance with Title IX. *Id.*

Categorizing tax-exempt status as a form of "federal financial assistance" covered by Title IX is consistent with how tax-exemption is treated in other avenues, including other anti-discrimination statutory constructs such as Title VI of Civil Rights Act of 1964, 42 U.S.C. § 2000d *et seq.* ("Title VI"), to which Title IX was closely modeled. *See Cannon*, 441 U.S. at 694–95 ("Title IX was patterned after Title VI... Except for the substitution of the word 'sex' in Title IX to replace the words 'race, color, or national origin' in Title VI, the two statutes use identical

language to describe the benefited class."); *McGlotten v. Connally*, 338 F.Supp. 448, 461 (D.D.C. 1972) (holding that "assistance provided through the tax system is within the scope of Title VI"); *Fulani v. League of Women Voters Educ. Fund*, 684 F.Supp. 1185, 1192 (S.D.N.Y. 1988) (noting that an entity was subject to Title VI and Title IX because it "receive[d] federal assistance indirectly through its tax exemption"); *Gebser v. Lago Vista Indep. Sch. Dist.*, 524 U.S. 274, 286 (1998) (Title IX and Title VI "operate in the same manner").

In *Joe Doe One, et al., v. CVS Pharmacy, Inc., et al.*, No. 18-cv-01031-EMC, 2022 WL 3139516 (N.D. Cal. Aug. 5, 2022), a district court decision reached just weeks after the entry of the District Court's Memorandum Order, the Court discussed the mandates of Section 1557 (the nondiscrimination provision of the Affordable Care Act (ACA)), which states that "[a]n individual shall not, on the ground prohibited under Title VI of the Civil Rights Act of 1964 (42 U.S.C. § 2000d et seq.), Title IX of the Education Amendments of 1972 ( 20 U.S.C. § 1681 et seq.), the Age Discrimination Act of 1975 (42 U.S.C. § 6101 et seq.), or section 794 of title 29, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under, any health program or activity, any part of which is receiving federal financial assistance." *Id.* at *1 (citing 42 U.S.C. § 18116(a)). In its discussion of whether the defendant pharmacy was in fact a recipient of federal financial assistance, the *Doe* court denied defendant's motion to dismiss, holding that an entity is deemed to have received federal funding where the entity receives "credits, subsidies, or contracts of insurance" from the federal

7

government, consistent with "the federal funding cases under the Rehabilitation Act and Title IX". *Id.* at *12. Surely, a tax break is a form of a "credit" from the federal government.

Here, consistent with the rulings in the analogous cases involving other spending clause statutes, the District Court properly held that Defendant-Appellant CPS's receipt of a § 501(c)(3) tax exemption is precisely the kind of credit or subsidy from the government sufficient to trigger Title IX implications. Accordingly, Defendant-Appellant CPS's Petition must be denied.

> **II.   This Court should Deny Defendant-Appellant CPS's Petition for Leave to Appeal where CPS Failed to Meet the Applicable Standard because the Issue at Hand is Not a Controlling Question of Law to Which there is a Substantial Ground for Difference of Opinion, Nor would an Appeal Materially Advance the Termination of the Instant Litigation**

This Court should not grant Defendant-Appellant CPS's Petition for Leave to Appeal because Defendant-Appellant CPS also fails to meet its burden to justify a departure from the longstanding rule against this extraordinary relief. "Section 1292(b) [which provides] a narrow exception to the longstanding rule against piecemeal appeals, is limited to exceptional cases." *Beck v. Commc'ns Workers of Am.*, 468 F.Supp. 93, 95– 96 (D. Md. 1979). Tellingly, interlocutory appeals are generally disfavored in the Fourth Circuit. *United States v. Under Seal*, 835 F.3d 706, 716 (4th Cir. 2017) (quoting *United States v. Lawrence*, 201 F.3d 536, 537 (4th Cir. 2000)).

The procedural requirements of § 1292(b) are to be strictly construed and applied. *Myles v. Laffitte*, 881 F.2d 125, 127 (4th Cir. 1989). To determine whether a court should hear a petition for interlocutory appeal, courts apply the multi-part test established by the language of § 1292(b). First, courts must determine whether there is a "controlling question of law as to which there is a substantial ground for difference of opinion." *North Carolina v. W.R. Peele, Sr. Trust*, 889 F.Supp. 849, 852 (E.D.N.C. 1995) (holding that "the interlocutory appeal mechanism was not intended to be used in ordinary suits and was not designed "to provide early review of difficult rulings in hard cases"). Next, courts must inquire as to whether an interlocutory appeal would "materially advance the ultimate termination of the litigation." *Id.*; *see also Johnson v. Cent. Collections, No. ELH-19–2821*, 2020 WL 2306452, at *5 (D. Md. May 8, 2020) (quoting *HeiTech Servs., Inc. v. Rowe, GJH-17–1319*, 2017 WL 4838750, at *2 (D. Md. Oct. 24, 2017)); *Keena v. Groupon, Inc.*, 886 F.3d 360, 362–63 (4th Cir. 2018); *cf.* 28 U.S.C. § 1292(b) (same elements required for leave to file interlocutory appeal of district court order).

Each and every factor must be met before leave shall be granted. *Johnson*, 2020 WL 2306452, at *2 (citing *In re Air Cargo, Inc., CCB-080587*, 2008 WL 2415039, at *3 (D. Md. June 11, 2008)). While all three elements must be present for the district court to grant certification, *Butler v. DirectSAT USA, LLC*, 307 F.R.D. 445, 452 (D. Md. 2015), "'even when the elements of Section 1292(b) are satisfied, the district court retains "unfettered discretion" to deny certification,'" *Garber v. Office of the Comm'r of Baseball*, 120 F. Supp. 3d 334, 337 (S.D.N.Y. 2014)

(citation omitted); accord *Hall v. Greystar Mgmt. Servs., L.P.*, 193 F. Supp. 3d 522, 525 (D. Md. 2016). In essence, interlocutory review should be reserved for "a narrow question of pure law whose resolution will be completely dispositive of the litigation." *Fannin v. CSX Transp., Inc., No. 88–8120*, 1989 WL 42583, at \*5 (4th Cir. Apr. 26, 1989) (unpublished opinion).

Indeed, section 1292(b) is not a fast-forward button for impatient parties, to be pressed when all else fails. Defendant-Appellant CPS will have ample opportunity to appeal adverse rulings on the merits in due course, and as of right, at the end of the case. *See Mohawk Indus., Inc. v. Carpenter*, 130 S.Ct. 599, 605 (2009) (emphasizing the "general rule that a party is entitled to a single appeal, to be deferred until final judgment has been entered") (internal quotation marks omitted). For reasons stated below, the factors required for interlocutory appeal are not met here, and Defendant-Appellant CPS's Petition should accordingly be denied.

### A. Defendant-Appellant CPS's Disagreement with the District Court's Ruling Provides No Basis for Certification of an Extraordinary Interlocutory Appeal

Defendant-Appellant CPS's disagreement with the District Court's ruling is inadequate to establish that the Court's order involves a "controlling question of law as to which there is a substantial ground for difference of opinion." *Id*. "The mere presence of a disputed issue that is a question of first impression, standing alone, is insufficient to demonstrate a substantial ground for difference of opinion."

*Lynn v. Monarch Recovery Mgmt., Inc.*, 953 F. Supp. 2d 612, 624 (D. Md. 2013). For if mere disagreement were sufficient, "every contested decision would be appropriate for immediate interlocutory appeal," which would make this extraordinary relief the norm rather than the exception. *Id.* at 626. Instead, "[a]n issue presents a substantial ground for difference of opinion if courts, as opposed to parties, disagree on a controlling legal issue." *Id.* at 624 (quoting *Randolph v. ADT Sec. Servs., Inc.*, 2012 WL 273722, at *6 (D. Md. Jan. 30, 2012)).

Here, Defendant-Appellant CPS identifies no disagreement among Fourth Circuit or District of Maryland courts – let alone any *substantial* disagreement – warranting this unusual remedy.

### 1.  The District Court's Order Contains No Controlling Question of Law Regarding Whether Title IX Applies to § 501(c)(3) Entities

A "controlling question of law" is an issue that would, decided differently, terminate, or substantially alter the suit. *See, e.g., Kennedy v. St. Joseph's Ministries, Inc.*, 657 F.3d 189, 195 (4th Cir. 2011) (issue is a controlling question where the appellate court's "resolution of it terminates the case"); *Moffett v. Computer Sci. Corp.*, No. 05–1547, 2010 WL 348701, at *2 (D. Md. Jan. 22, 2010)("[C]ontrolling questions . . . determine whether there should be any future proceedings at all with respect to Plaintiffs' claims."). For purposes of the § 1292(b) analysis, a "controlling question of law" is a question directed to the "meaning of a statutory or constitutional provision, regulation, or common law

doctrine," as opposed to a question heavily freighted with the need for factual assessment. *Id*. at 452 (quoting *Lynn*, 953 F. Supp. 2d at 623); cf. *Fannin v. CSX Transp., Inc.*, 1989 WL 42583, at *5 [873 F.2d 1438] (4th Cir. 1989) (unpublished table decision) ("Certainly the kind of question best adapted to discretionary interlocutory review is a narrow question of pure law whose resolution will be *completely dispositive of the litigation*, either as a legal or practical matter, whichever way it goes.")(emphasis added)).

The question of whether a § 501(c)(3) exempt entity has received federal financial assistance by virtue of its tax break for purposes of imputing Title IX requirements is not a "controlling question of law" within the meaning of section 1292(b). As the District Court has explained, "the kind of question best adapted to discretionary interlocutory review is a narrow question of *pure law*". *Fannin*, 1989 WL 42583, at *5 (emphasis added); *see also Kennedy v. St. Joseph's Ministries, Inc.*, 657 F.3d at 195 (finding the "controlling question of law" criterion met since the Court was "faced with a pure question of law"). Questions requiring this Court to apply case-specific facts do not qualify. *See Ahrenholz v. Bd. of Trs. of Univ. of Ill.*, 219 F.3d 674, 677 (7th Cir. 2000) ("The idea was that if a case turned on a pure question of law, something the court of appeals could decide quickly and cleanly without having to study the record, the court should be enabled to do so without having to wait till the end of the case.").

Here, the facts inextricably mattered to the District Court's ruling on whether tax-exempt status is sufficient to trigger the requirements of Title IX. In reaching its decision, the District Court considered and weighed the facts and evidentiary

record relating to Defendant-Appellant CPS's financial standing. (Mem. Order at 12, citing RDB-21–0691, Financial Statements, ECF No. 39 *SEALED*). Where this Court necessarily had to make factual determinations in order to reach a decision on the legal question presented, the issue for appeal is not purely legal in nature; thus, [s]Such 'questions of law' have usually been thought not the kind of 'controlling' question proper for interlocutory review under § 1292(b) [,]" because they "inflict[ ] upon courts of appeals an unaccustomed and illsuited role as factfinders." *Lynn*, 953 F. Supp. 2d at 623; see also *In re Text Messaging Antitrust Litig.*, 630 F.3d 622, 626 (7th Cir. 2010) ("[A] pure question of law [is] something the court of appeals could decide quickly and cleanly without having to study the record[.]").

   Similarly, "[t]he mere fact that its resolution at this time may save pre-trial and trial effort and expense is not determinative; that of course can be said of any interlocutory appeal." *Lynn*, 953 F. Supp. 2d at 623 (citing *Palandjian v. Pahlavi*, 782 F.2d 313, 314 (1st Cir. 1986)). Even a reversal by this Court could merely result in a remand of this case for further proceedings on the remainder of Plaintiffs' claims against Defendant-Appellant CPS. Questions like this are not "controlling" because "litigation will 'necessarily continue regardless of how [these procedural] questions [are] decided.'" *Butler v. DirectSAT USA, LLC*, 307 F.R.D. at 453; citing *LaFleur v. Dollar Tree Stores, Inc., No. 2:12–CI–00363*, 2014 WL 2121721, at *2 (E.D.Va. May 20, 2014) (quoting *North Carolina v. W.R. Peele, Sr. Trust*, 889 F.Supp. at 853 (E.D.N.C.1995)(Questions are not "controlling" because "litigation will 'necessarily continue regardless of how

13

[these procedural] questions [are] decided.'"). The District Court's ruling on Plaintiffs' Title IX claims thus does not contain a section 1292(b) "controlling question of law."

Defendant-Appellant CPS further argues that the question of law [as to whether tax-exemption constitutes federal financial assistance under Title IX] is controlling because its resolution on appeal will have a significant impact on implementation of processes and procedures in independent private schools across this jurisdiction. The facts underlying Defendant-Appellant CPS's § 501(c)(3) status and its use of this tax-exemption as a proactive tool are unique to this particular school; it may not be the case that each and every independent, private school in the Fourth Circuit is impacted by this Court's decision; either way, Defendant-Appellant CPS's argument that some schools may have to change their policies and procedures to align with Title IX is not sufficient to justify reconsideration or interlocutory appeal. Indeed, the Court's decision in its Memorandum Order – and the attendant wake-up call that it gave to Maryland and middle states' private and independent schools that tax-exemption may constitute a form of federal financial assistance for purposes of Title IX – is not sufficient grounds to certify an appeal.

For the reasons stated herein, Defendant-Appellant CPS has failed to satisfy even the first prong of the test for interlocutory appeal.

## B.    There is Not a Sufficiently Substantial Ground for Difference of Opinion

Even if Defendant-Appellant CPS's argument could be construed as a controlling legal question, there is no substantial ground for difference of opinion as to whether this statutory safe harbor applies here. That the question of whether tax-exempt status constitutes federal financial assistance for purposes of Title IX has been decided by the Supreme Court, despite lower court rulings that parse out exceptions to the rule (See Mem. Order at 12–13). This falls short of the necessary section-1292(b) showing. *See, e.g.*, *Flor v. BOT Fin. Corp. (In re Flor)*, 79 F.3d 281, 284 (2d Cir. 1996) (warning that "the mere presence of a disputed issue that is a question of first impression, standing alone, is insufficient to demonstrate a substantial ground for difference of opinion"); *White v. Nix*, 43 F.3d 374, 378 (8th Cir. 1994) (noting that a "dearth of cases" doesn't count).

A question is one "to which there is a substantial ground for a difference of opinion" when there is "'substantial doubt' that the district court's order was correct." *Goodman v. Archbishop Curley High Sch., Inc.*, 195 F. Supp. 3d 767, 774 (D. Md. 2016) (quoting *Kennedy v. Villa St. Catherine, Inc., No. 09–3021*, 2010 WL 9009364, at *2 (D. Md. June 16, 2010)). A litigant's own disappointment or disagreement with the outcome of an order does not rise to the level of substantial doubt. *See Lizarbe v. Rondon, No. 07–1809*, 2009 WL 2487083, at *3 (D. Md. Aug. 12, 2009). Rather, as a general matter, "'[a]n issue presents a substantial ground for difference of opinion if courts, as opposed to parties, disagree on a controlling legal issue.'" *Goodman*, at 774 (quoting *Randolph v. ADT Sec. Servs.,*

*Inc.*, 2012 WL 273722, at \*6); *see also In re Nichols, No. 14–0625*, 2014 WL 4094340, at \*3 (D. Md. Aug. 15, 2014) ("In other words, for interlocutory appeals, it matters not whether the lower court simply got the law wrong, but whether courts themselves disagree as to what the law is." (citation omitted)).

Here, Defendant-Appellant CPS cites only district court cases from other circuits in support of its arguments that to § 501(c)(3) status does not constitute receipt of federal financial assistance for purposes of imputing Title IX's requirements. Plaintiffs, in their Memorandum of Law in Support of their Opposition to Defendant-Appellant CPS's Motion to Dismiss and/or Motion for Partial Summary Judgment (Dkt. 109), along with the District Court in its Memorandum Order, present Supreme Court and Eleventh Circuit precedent that deal squarely with this exact issue (Mem. Order at 12–13). Simply put, there is no substantial ground for difference of opinion at play here; the pertinent courts have reached consensus.

Similarly, that this issue is one of first impression within the Fourth Circuit is insufficient to meet the test for interlocutory appeal. It is true that "[c]ases of first impression do not necessarily create 'a substantial ground for difference of opinion.'" *Brooks v. Circuit City Stores, No. DKC–95–3296*, 1997 WL 679899, at \*1 (D.Md. Sept.16 1997) (citing *In re Flor*, 79 F.3d at 284); *see also David v. Alphin*, No. 07–cv–11–RJC–DLH, 2009 WL 3633889, at \*4 (W.D.N.C. Oct.30 2009) (same); *North Carolina v. W.R. Peele, Sr. Trust*, 889 F.Supp. at 852 ("District courts have not been bashful about refusing to find substantial reason to question a ruling of law, even in matters of first impression.'") (quoting 16

CHARLES A. WRIGHT, ET AL., FED. PRAC. & PROC. § 3930, at 157 (1977));

*Carbotrade v. Bureau Veritas*, 1993 WL 60567, at *1 (S.D.N.Y. March 2, 1993)

(stating that the fact that the issue is one of first impression "does not, without

more, suffice to present a 'substantial ground for difference of opinion'"; noting

that "[t]he legislative history of 28 U.S.C. § 1292(b) indicates that the statutory

prerequisite of "substantial ground for difference of opinion" is satisfied only when

there is " 'substantial doubt" that the district court's order was correct'").

   Of import, and as discussed throughout this Memorandum and in the District

Court's Memorandum Order, the Supreme Court and our sister circuits have ruled

on this exact legal issue. (Mem. Order at 12–13.) The facts of this case, together

with the precedent set by the Courts in *Regan, Grove City College, Smith,* and

*Cannon,* as discussed supra, do not present the sort of unique situation where

interlocutory appeal is warranted. Since Defendant-Appellant CPS has presented

no reason to find that the District Court's Order is a more novel or difficult

question beyond the Court's purview, this Court should decline to find that it

demands interlocutory appeal.

### C.  Defendant-Appellant CPS's Argument that an Interlocutory Appeal would Materially Advance this Litigation Fails

   Nor does Defendant-Appellant CPS credibly show that an interlocutory appeal

would materially advance this litigation. *See* § 1292(b). As to this factor,

Defendant-Appellant CPS simply claims that an interlocutory appeal will allow

this litigation to conclude more expeditiously. To the contrary, an interlocutory

appeal premised on bare disagreement with the District Court's rulings, where there is no pressing, substantial disagreement of the courts, would only needlessly drag out the resolution of this litigation. In determining whether certification would materially advance the ultimate termination of the litigation, courts consider whether an immediate appeal would: "(1) eliminate the need for trial, (2) eliminate complex issues so as to simplify the trial, or (3) eliminate issues to make discovery easier and less costly." *Lynn*, 953 F. Supp. 2d at 626. None of these factors are implicated here. Courts have denied similar requests for interlocutory appeal. *See, e.g., id.* (movant's claim that an interlocutory appeal would simply "speed up the litigation" was insufficient to establish that an immediate appeal would materially advance the litigation). Indeed, the "potential for avoiding court costs in the event of later appellate reversal is true of nearly every district court order, and the 'mere fact' that an interlocutory appeal 'at this time may save pre-trial and trial effort and expense is not determinative; that of course can be said of any interlocutory appeal.'" *Fannin*, 1989 WL 42583, at 1438.

It is simply not the case here that an appellate court's decision in favor of Defendant-Appellant CPS's position will lead to an absolute terminus of the five consolidated cases currently pending against Defendant-Appellant CPS. As Defendant-Appellant CPS conceded to the District Court in its briefing, even if the Title IX count were dismissed, this Court could extend supplemental jurisdiction over the cases and allow the litigations to proceed in federal court. To wit, H.C.'s Title IX claim survives even if the Court were to overturn its prior Order

concerning tax-exemption. The remaining counts of Plaintiffs' Amended Complaints remain viable against Defendant-Appellant CPS and have survived multiple rounds of dispositive motions practice.

Typically, this test is only met when the moving party can show that *all counts, indeed the entire litigation*, would be disposed of by a contrary ruling on the contested legal issue. *See Fannin*, 1989 WL 42583, at *5; *See also In re Swann Ltd. P'ship*, 128 B.R. 138, 140–41 (D.Md. 1991) (Interlocutory appeal does not promote termination of litigation if decision on issue would result in case being transferred to a venue "where a judge unfamiliar with the litigation would have to start from scratch. Such delay is not in keeping with the requirement that an interlocutory appeal be accepted only if it will help terminate or shorten litigation and keep expenses down."); *N.J. Dep't of Treas. v. Fuld*, 2009 WL 2905432, at *2 (D.N.J. Sept.8 2009) (Third element necessary for interlocutory appeal may be satisfied only when movant can show that summary judgment should have been granted on all counts, and litigation will end, without need for a trial and the associated costs and time commitments). Plaintiffs' claims against Defendant-Appellant CPS do not rise and fall on the Title IX claim, and the litigation will continue even if the Title IX count were to be dismissed. Indeed, there would not be much of a cognizable difference between the case presented to the jury here with or without Title IX. As such, Defendant-Appellant CPS has not met the requirements of the third element for interlocutory appeal.

## CONCLUSION

Based on the foregoing, Defendant-Appellant CPS's Petition for Leave to Appeal should be denied.

Jenner Law, P.C.

Respectfully submitted,

Dated: September 26, 2022          By: /s/ Robert K. Jenner

Robert K. Jenner

Attorney for Plaintiffs
Donna Buettner-Hartsoe, N.H., a Minor

## CERTIFICATE OF COMPLIANCE

Pursuant to Fed. R. App. P. 32(a)(7)(C), I hereby certify that this brief complies with the type-volume limitation because it contains **4,811** words, excluding the parts exempted by Fed. R. App. P. 32(a)(7)(B)(iii) and Cir. R. 32(a)(1). I further certify that this brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the typeface style requirements of Fed. R. App. P. 32(a)(6) because the brief was prepared in 14-point Times New Roman font using TypeLaw.com's legal text editor.


Jenner Law, P.C.

Dated: September 26, 2022          By:  /s/ Robert K. Jenner
                                        _____
                                        Robert K. Jenner

                                        Attorney for Plaintiffs
                                        Donna Buettner-Hartsoe, N.H., a
                                        Minor

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 26th day of September, 2022, a copy of the foregoing document was served via ECF on all counsel of record:

Gregg E. Viola, Esq.
Mark P. Johnson, Esq.
Eccleston and Wolf
7240 Parkway Drive, 4th Floor
Hanover, MD 21076
410-752-7474
**viola@ewmd.com**
**johnson@ewmd.com**
Counsel for Defendant Concordia Preparatory School

Brian S. Goodman, Esq.
Goodman & Donohue LLC
9199 Reisterstown Road, Suite 213 C
Owings Mills, MD 21117
443-824-0659
**brian@goodmandonohue.com**
Counsel for Defendant Lutheran Church Missouri Synod Southeast District

|  |  |
|---|---|
|  | Jenner Law, P.C. |
| Dated: September 26, 2022 | By: /s/ Robert K. Jenner |
|  | Robert K. Jenner |
|  | Attorney for Plaintiffs Donna Buettner-Hartsoe, N.H., a Minor |

22

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

_____

No. 22-272

_____

BALTIMORE LUTHERAN HIGH SCHOOL ASSOCIATION, D/B/A
CONCORDIA PREPARATORY SCHOOL,

Petitioner,

v.

DONNA BUETTNER-HARTSOE, AND N.H., A MINOR, BY AND THROUGH
HER PARENT AND NEXT FRIEND, DONNA BUETTNER-HARTSOE,

Respondents.

_____

*On Petition from the United States District Court for the District of Maryland,
Case No. 1:20-cv-03132 (Bennett, R.)*

_____

**REPLY TO OPPOSITION TO PETITION FOR LEAVE TO APPEAL
PURSUANT TO 28 U.S.C. § 1292(B)**

_____

Gregg E. Viola
Mark P. Johnson
Eccleston and Wolf, P.C.
7240 Parkway Drive, 4th Floor
Hanover, MD  21076
410-752-7474
viola@ewmd.com
johnson@ewmd.com
*Attorneys for Petitioner*

Petitioner Baltimore Lutheran High School Association, Inc., doing business as Concordia Preparatory School, pursuant to Federal Rule of Appellate Procedure 27, hereby respectfully submits this Reply to Opposition to Petition for Leave to Appeal Pursuant to 28 U.S.C. § 1292(b).

Respondents' Opposition argues that this Court should deny the Petition because the Supreme Court and the Eleventh Circuit Court of Appeals have "deal[t] squarely with this exact issue" of whether tax exemption under 26 U.S.C. § 501(c)(3) constitute receipt of federal financial assistance for purposes of Title IX of the Education Amendments Act of 1972. *See* Doc. 13 at p.16. This could not be further from an accurate recitation of the law. The Supreme Court has never addressed the issue, and the District Court's Memorandum Opinion, upon which Respondents rely, reaches the same conclusion. *See* Doc. 2-2 at p.8-9 ("Neither the Supreme Court nor the United States Court of Appeals for the Fourth Circuit have directly addressed whether tax-exempt status under § 501(c)(3) constitutes federal financial assistance for purposes of Title IX.").

Moreover, Respondents' reference to the Eleventh Circuit is to the decision in *M.H.D. v. Westminster Sch.*, 172 F.3d 797, 802 n.12 (11th Cir. 1999), in which the court addressed a subject matter jurisdiction question and stated that the "allegation that tax-exempt status constitutes 'Federal financial assistance' is neither immaterial nor wholly frivolous." Even a cursory review of the footnote cited by Respondents

2

leads to the conclusion that, contrary to Respondents' suggestion, the Eleventh Circuit has not "found that a private high school's tax-exempt status constituted federal financial assistance to render it subject to Title IX." *See* Doc. 13 at p.5.

Based upon the case law cited in the pending Petition, it is clear that there are opposing decisions in District Court across the county on the question presented such that there is a substantial ground for difference of opinion warranting immediate interlocutory appeal. *See* Doc. 2-1 at p.16 (citing six cases in which district courts have concluded that § 501(c)(3) tax exempt status does not equal federal financial assistance, and three other cases that have expressed doubt on the issue, and three district court decisions that have reached the opposite conclusion).

Lastly, Respondents' Opposition argues that this Court should deny the Petition because an interlocutory appeal would not materially advance the litigation because Respondents have non-Title IX claims that would have to proceed in court. This narrow view of what constitutes material advancement of litigation is not supported by case law. As this Court recently stated in *In re Trump*, 928 F.3d 360, 371 (4th Cir. 2019) (citing *McFarlin v. Conseco Servs., LLC*, 381 F.3d 1251, 1259 (11th Cir. 2004), the "may materially advance the ultimate termination of the litigation" standard "is not a difficult requirement to understand. It means that resolution of a controlling legal question would serve to avoid a trial **or otherwise substantially shorten the litigation**." (emphasis added). This Court should grant

the Petition because resolution of the question presented could materially advance the ultimate termination of this litigation by substantially shortening the litigation by eliminating the complex issues surrounding Title IX.  If this Court holds that the tax exemption is not federal financial assistance, it would simplify litigation and eliminate the need for further proceedings relative to Title IX. The litigation would be narrowed and proceed in a more efficient and streamlined manner, and the parties would avoid trial on Title IX issues and all attendant preparation including motion in limine practice, drafting of jury instructions and voir dire on Title IX, and certain witness preparation.

Conversely, not knowing the result of the appeal will also hamstring the parties and have an impact on any future settlement discussions. Recoverable damages on the Title IX claim differ from the recoverable damages under Maryland state law negligence and tort claims, and the parties need to know the result of the appeal to know the ceiling or range of recoverable damages to limit or frame future settlement discussions. Going into settlement negotiations without knowing the result of the appeal would impair the parties' ability to reach a potential resolution and would protract the litigation because it would require the parties to litigate all five cases through trial and then appeal.

Furthermore, it cannot be lost that the resolution of the certified question is of critical importance to private independent schools and non-profit entities who need

guidance on whether Title IX and other Spending Clause legislation apply based solely upon tax exempt status.  Although Respondents attempt to argue that the question presented is inextricably tied to the facts of the case, the plain and unambiguous language of the question certified by the District Court requires the opposition conclusion.  As evidenced by the gravitas of the multiple amici briefs filed before this Court, the certified question raises a controlling legal issue that should be decided on an interlocutory basis.

WHEREFORE, for the foregoing reasons, and those previously stated in its Petition, Petitioner respectfully requests that the Court grant this Petition for Leave to Appeal Pursuant to 28 U.S.C. § 1292(B).

Dated: September 29, 2022                    Respectfully submitted,


*/s/Gregg E. Viola*                          */s/Mark P. Johnson*
Gregg E. Viola (25737)                       Mark P. Johnson (29091)
ECCLESTON & WOLF, P.C.                        ECCLESTON & WOLF, P.C.
Baltimore-Washington Law Center              Baltimore-Washington Law Center
7240 Parkway Drive, 4th Floor                7240 Parkway Drive, 4th Floor
Hanover, MD 21076-1378s                      Hanover, MD 21076-1378
(410) 752-7474 (phone)                       (410) 752-7474
(410) 752-0611 (fax)                         (410) 752-0611 (fax)
E-mail: viola@ewmd.com                       E-mail: johnson@ewmd.com
*Attorney for Petitioner*                    *Attorney for Petitioner*

**CERTIFICATE OF COMPLIANCE**

This document was printed in 14 point Times New Roman. This document complies with Fed. R. App. P. 5(c)(1) because, excluding the parts of the document exempted by Fed. R. App. P. 32(f), this document contains 856 words.

*/s/Mark P. Johnson*
Mark P. Johnson (29091)

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on this 29th day of September, 2022, copies of the foregoing were served by ECF on all counsel of record.

*/s/Mark P. Johnson*
Mark P. Johnson (29091)

FILED: April 26, 2023

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

_____

No. 22-272
(1:20-cv-03132-RDB)
_____

BALTIMORE LUTHERAN HIGH SCHOOL ASSOCIATION, d/b/a Concordia
Preparatory School

        Petitioner

v.

DONNA BUETTNER-HARTSOE; N.H., by and through her Parent and Next
Friend Donna Buettner-Hartsoe

        Respondents

------------------------------

ASSOCIATION OF INDEPENDENT MARYLAND SCHOOLS, INC., trading
as Association of Independent Maryland & DC Schools; NATIONAL
ASSOCIATION OF INDEPENDENT SCHOOLS; NATIONAL BUSINESS
OFFICERS ASSOCIATION; ASSOCIATION OF INDEPENDENT SCHOOLS
OF GREATER WASHINGTON; SOUTHERN ASSOCIATION OF
INDEPENDENT SCHOOLS; VIRGINIA ASSOCIATION OF INDEPENDET
SCHOOLS; NORTH CAROLINA ASSOCIATION OF INDEPENDENT
SCHOOLS; PALMETTO ASSOCIATION OF INDEPENDENT SCHOOLS

        Amici Supporting Petitioner

_____

# O R D E R

_____

Upon consideration of submissions relative to the petition of Baltimore Lutheran High School Association for permission to appeal pursuant to 28 U.S.C. § 1292 (B), the court grants the petition. This case is transferred to the regular docket and assigned docket number 23-1453. The record shall be retained in the court below unless requested by this court.

A copy of this order shall be sent to the clerk of the district court.

For the Court

/s/ Patricia S. Connor, Clerk