No. 23-1453

# In the United States Court of Appeals for the Fourth Circuit

DONNA BUETTNER-HARTSOE, et al.,

*Plaintiffs – Appellees*,

v.

BALTIMORE LUTHERAN HIGH SCHOOL ASSOCIATION,
d/b/a CONCORDIA PREPARATORY SCHOOL,

*Defendant – Appellant.*

On Appeal from the U.S. District Court for the
District of Maryland, Case No. 1:20-cv-03132

**Brief of Association of Christian Schools International, American
Association of Christian Schools, Association for Biblical Higher
Education, and International Alliance for Christian Education as
*Amici Curiae* Supporting Defendant-Appellant and Reversal**

John J. Bursch
Gregory S. Baylor
Ali Kilmartin
ALLIANCE DEFENDING FREEDOM
44180 Riverside Parkway
Lansdowne, Virginia 20176
Telephone: (571) 707-4655

Stephen J. Hammer
GIBSON, DUNN & CRUTCHER LLP
2001 Ross Avenue, Suite 2100
Dallas, Texas 75201
Telephone: (214) 698-3100

Thomas G. Hungar
*Counsel Of Record*
Russell Balikian
Lavi M. Ben Dor*
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, N.W.
Washington, D.C. 20036
Telephone: (202) 955-8500

COUNSEL FOR *AMICI CURIAE*

---

 * Admitted only in New York and Pennsylvania; practicing under the
supervision of principals of the firm.

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

**DISCLOSURE STATEMENT**

- In civil, agency, bankruptcy, and mandamus cases, a disclosure statement must be filed by **all** parties, with the following exceptions: (1) the United States is not required to file a disclosure statement; (2) an indigent party is not required to file a disclosure statement; and (3) a state or local government is not required to file a disclosure statement in pro se cases. (All parties to the action in the district court are considered parties to a mandamus case.)
- In criminal and post-conviction cases, a corporate defendant must file a disclosure statement.
- In criminal cases, the United States must file a disclosure statement if there was an organizational victim of the alleged criminal activity. (See question 7.)
- Any corporate amicus curiae must file a disclosure statement.
- Counsel has a continuing duty to update the disclosure statement.


No. _23-1453_        Caption: _Buettner-Hartsoe v. Baltimore Lutheran High School Association_

Pursuant to FRAP 26.1 and Local Rule 26.1,

_Association of Christian Schools International_
(name of party/amicus)

_____

 who is _____Amicus_____, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)


1.     Is party/amicus a publicly held corporation or other publicly held entity?     ☐YES ☑NO


2.     Does party/amicus have any parent corporations?                     ☐YES ☑NO
       If yes, identify all parent corporations, including all generations of parent corporations:




3.     Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity?                                 ☐YES ☑NO
       If yes, identify all such owners:

4.  Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation? ☐YES ☑NO
    If yes, identify entity and nature of interest:

5.  Is party a trade association? (amici curiae do not complete this question) ☐YES ☐NO
    If yes, identify any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity, or state that there is no such member:

6.  Does this case arise out of a bankruptcy proceeding? ☐YES ☑NO
    If yes, the debtor, the trustee, or the appellant (if neither the debtor nor the trustee is a party) must list (1) the members of any creditors' committee, (2) each debtor (if not in the caption), and (3) if a debtor is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of the debtor.

7.  Is this a criminal case in which there was an organizational victim? ☐YES ☑NO
    If yes, the United States, absent good cause shown, must list (1) each organizational victim of the criminal activity and (2) if an organizational victim is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of victim, to the extent that information can be obtained through due diligence.

Signature: /s/ Thomas G. Hungar                    Date:        06/12/2023

Counsel for: Association of Christian Schools International

Print to PDF for Filing

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

**DISCLOSURE STATEMENT**

- In civil, agency, bankruptcy, and mandamus cases, a disclosure statement must be filed by **all** parties, with the following exceptions: (1) the United States is not required to file a disclosure statement; (2) an indigent party is not required to file a disclosure statement; and (3) a state or local government is not required to file a disclosure statement in pro se cases. (All parties to the action in the district court are considered parties to a mandamus case.)
- In criminal and post-conviction cases, a corporate defendant must file a disclosure statement.
- In criminal cases, the United States must file a disclosure statement if there was an organizational victim of the alleged criminal activity. (See question 7.)
- Any corporate amicus curiae must file a disclosure statement.
- Counsel has a continuing duty to update the disclosure statement.


No. 23-1453     Caption: Buettner-Hartsoe v. Baltimore Lutheran High School Association

Pursuant to FRAP 26.1 and Local Rule 26.1,

American Association of Christian Schools
(name of party/amicus)


who is _____Amicus_____, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)


1.     Is party/amicus a publicly held corporation or other publicly held entity? ☐ YES ☑ NO

2.     Does party/amicus have any parent corporations? ☐ YES ☑ NO
    If yes, identify all parent corporations, including all generations of parent corporations:

3.     Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity? ☐ YES ☑ NO
    If yes, identify all such owners:

4.  Is there any other publicly held corporation or other publicly held entity that has a direct
    financial interest in the outcome of the litigation?               ☐YES ☑NO
    If yes, identify entity and nature of interest:

5.  Is party a trade association? (amici curiae do not complete this question)    ☐YES ☐NO
    If yes, identify any publicly held member whose stock or equity value could be affected
    substantially by the outcome of the proceeding or whose claims the trade association is
    pursuing in a representative capacity, or state that there is no such member:

6.  Does this case arise out of a bankruptcy proceeding?               ☐YES ☑NO
    If yes, the debtor, the trustee, or the appellant (if neither the debtor nor the trustee is a
    party) must list (1) the members of any creditors' committee, (2) each debtor (if not in the
    caption), and (3) if a debtor is a corporation, the parent corporation and any publicly held
    corporation that owns 10% or more of the stock of the debtor.

7.  Is this a criminal case in which there was an organizational victim?      ☐YES ☑NO
    If yes, the United States, absent good cause shown, must list (1) each organizational
    victim of the criminal activity and (2) if an organizational victim is a corporation, the
    parent corporation and any publicly held corporation that owns 10% or more of the stock
    of victim, to the extent that information can be obtained through due diligence.

Signature: /s/ Thomas G. Hungar                Date: _____06/12/2023_____

Counsel for: American Association of Christian Schools

- 2 -

[Print to PDF for Filing]

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

**DISCLOSURE STATEMENT**

- In civil, agency, bankruptcy, and mandamus cases, a disclosure statement must be filed by **all** parties, with the following exceptions: (1) the United States is not required to file a disclosure statement; (2) an indigent party is not required to file a disclosure statement; and (3) a state or local government is not required to file a disclosure statement in pro se cases. (All parties to the action in the district court are considered parties to a mandamus case.)
- In criminal and post-conviction cases, a corporate defendant must file a disclosure statement.
- In criminal cases, the United States must file a disclosure statement if there was an organizational victim of the alleged criminal activity. (See question 7.)
- Any corporate amicus curiae must file a disclosure statement.
- Counsel has a continuing duty to update the disclosure statement.


No. _23-1453_    Caption: _Buettner-Hartsoe v. Baltimore Lutheran High School Association_

Pursuant to FRAP 26.1 and Local Rule 26.1,

_Association for Biblical Higher Education_
(name of party/amicus)

_____

 who is _____Amicus_____, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)


1.    Is party/amicus a publicly held corporation or other publicly held entity?  ☐YES ☑NO


2.    Does party/amicus have any parent corporations?                ☐YES ☑NO
      If yes, identify all parent corporations, including all generations of parent corporations:




3.    Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity?                              ☐YES ☑NO
      If yes, identify all such owners:

4. Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation? ☐YES ☑NO
   If yes, identify entity and nature of interest:

5. Is party a trade association? (amici curiae do not complete this question) ☐YES ☐NO
   If yes, identify any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity, or state that there is no such member:

6. Does this case arise out of a bankruptcy proceeding? ☐YES ☑NO
   If yes, the debtor, the trustee, or the appellant (if neither the debtor nor the trustee is a party) must list (1) the members of any creditors' committee, (2) each debtor (if not in the caption), and (3) if a debtor is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of the debtor.

7. Is this a criminal case in which there was an organizational victim? ☐YES ☑NO
   If yes, the United States, absent good cause shown, must list (1) each organizational victim of the criminal activity and (2) if an organizational victim is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of victim, to the extent that information can be obtained through due diligence.

Signature: /s/ Thomas G. Hungar          Date: 06/12/2023

Counsel for: Association for Biblical Higher Education

- 2 -

Print to PDF for Filing

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

## DISCLOSURE STATEMENT

- In civil, agency, bankruptcy, and mandamus cases, a disclosure statement must be filed by **all** parties, with the following exceptions: (1) the United States is not required to file a disclosure statement; (2) an indigent party is not required to file a disclosure statement; and (3) a state or local government is not required to file a disclosure statement in pro se cases. (All parties to the action in the district court are considered parties to a mandamus case.)
- In criminal and post-conviction cases, a corporate defendant must file a disclosure statement.
- In criminal cases, the United States must file a disclosure statement if there was an organizational victim of the alleged criminal activity. (See question 7.)
- Any corporate amicus curiae must file a disclosure statement.
- Counsel has a continuing duty to update the disclosure statement.


No. <u>23-1453</u>      Caption: <u>Buettner-Hartsoe v. Baltimore Lutheran High School Association</u>

Pursuant to FRAP 26.1 and Local Rule 26.1,

<u>International Alliance for Christian Education</u>
(name of party/amicus)

_____

 who is _____Amicus_____, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)


1.    Is party/amicus a publicly held corporation or other publicly held entity?    ☐YES ☑NO


2.    Does party/amicus have any parent corporations?                                              ☐YES ☑NO
      If yes, identify all parent corporations, including all generations of parent corporations:




3.    Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity?                                                                ☐YES ☑NO
      If yes, identify all such owners:

4. Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation? ☐YES ☑NO
   If yes, identify entity and nature of interest:

5. Is party a trade association? (amici curiae do not complete this question) ☐YES ☐NO
   If yes, identify any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity, or state that there is no such member:

6. Does this case arise out of a bankruptcy proceeding? ☐YES ☑NO
   If yes, the debtor, the trustee, or the appellant (if neither the debtor nor the trustee is a party) must list (1) the members of any creditors' committee, (2) each debtor (if not in the caption), and (3) if a debtor is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of the debtor.

7. Is this a criminal case in which there was an organizational victim? ☐YES ☑NO
   If yes, the United States, absent good cause shown, must list (1) each organizational victim of the criminal activity and (2) if an organizational victim is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of victim, to the extent that information can be obtained through due diligence.

Signature: /s/ Thomas G. Hungar          Date: 06/12/2023

Counsel for: International Alliance for Christian Education

Print to PDF for Filing

# TABLE OF CONTENTS

Page

Table of Authorities ................................................................. iii

Statement of Interest ............................................................... 1

Introduction and Summary of Argument .................................. 3

Argument ................................................................................. 6

    I.    Tax-Exempt Status Under § 501(c)(3) Is Not "Receiving Federal Financial Assistance" Under Title IX ...................... 6

        A.    Title IX Does Not Reach Entities Based Solely on Their Tax-Exempt Status. ............................................. 6

        B.    Congress Did Not Unambiguously Require Tax-Exempt Entities to Comply with Title IX, as the Spending Clause Requires. .......................................... 11

        C.    Supreme Court Precedent Makes Clear That Tax-Exempt Status Is an Indirect Economic Benefit That Does Not Constitute Federal Financial Assistance. ..................................................................... 14

    II.   Longstanding Supreme Court Precedent Distinguishes Between Tax Exemptions and Subsidies. ........................... 16

        A.    Tax Exemptions for Religious Institutions Are Deeply Rooted Features of American Society. ............ 16

        B.    The Supreme Court's Establishment Clause Jurisprudence Has Consistently Distinguished Tax Exemptions from Subsidies. ................................. 20

        C.    These Precedents Preclude Treating Tax Exemptions as Equivalent to Federal Financial Assistance Under Title IX. ......................................... 22

    III.  The District Court's Decision Would Have Far-Reaching, Enormously Disruptive Effects. .......................... 24

i

**TABLE OF CONTENTS**
(continued)

A.  The Decision Below Would Impose Multiple Federal Regulatory Regimes on Hundreds of Thousands of Religious Organizations—and Millions of Other Not-for-Profits..................................25

B.  Complying with These Regulatory Regimes Would Be Enormously Burdensome for Often Cash-Strapped Religious Organizations. ...........................30

Conclusion.............................................................................35

# TABLE OF AUTHORITIES

Page(s)

## Cases

*Action All. of Senior Citizens of Greater Phila. v. Heckler*,
    789 F.2d 931 (D.C. Cir. 1986) ....................................................... 27

*Aremu v. Dep't of Homeland Sec.*,
    450 F.3d 578 (4th Cir. 2006) .......................................................... 30

*Ariz. Christian Sch. Tuition Org. v. Winn*,
    563 U.S. 125 (2011) ......................................................................... 22

*Bachman v. Am. Soc'y of Clinical Pathologists*,
    577 F. Supp. 1257 (D.N.J. 1983) .................................................... 8

*Carson v. Makin*,
    142 S. Ct. 1987 (2022) .................................................................... 22

*County of Maui v. Hawaii Wildlife Fund*,
    140 S. Ct. 1462 (2020) .................................................................... 8

*Cummings v. Premier Rehab Keller, P.L.L.C.*,
    142 S. Ct. 1562 (2022) .................................................. 11, 12, 13, 15

*DOT v. Paralyzed Veterans of Am.*,
    477 U.S. 597 (1986) .............................................................. 12, 15

*Fitzgerald v. Barnstable Sch. Comm.*,
    555 U.S. 246 (2009) ......................................................................... 15

*Hammons v. Univ. of Md. Med. Sys. Corp.*,
    2023 WL 121741 (D. Md. Jan. 6, 2023) ..................................... 34

*Lemon v. Kurtzman*,
    403 U.S. 602 (1971) ......................................................................... 21

*McAdams v. Robinson*,
    26 F.4th 149 (4th Cir. 2022) ........................................................ 7

*N. Haven Bd. of Ed. v. Bell*,
    456 U.S. 512 (1982) ......................................................................... 15

*NCAA v. Smith*,
    525 U.S. 459 (1999) ............................................................. *passim*

<u>Page(s)</u>

*Pennhurst State Sch. & Hosp. v. Halderman*,
451 U.S. 1 (1981)............................................................ 11, 14

*Regan v. Taxation with Representation of Wash.*,
461 U.S. 540 (1983)................................................................ 8

*Walz v. Tax Comm'n of City of N.Y.*,
397 U.S. 664 (1970).................................................... *passim*

*West Virginia v. EPA*,
142 S. Ct. 2587 (2022) ......................................................... 11

*Whitman v. Am. Trucking Ass'ns*,
531 U.S. 457 (2001)............................................................. 35

*Williams v. Carvajal*,
63 F.4th 279 (4th Cir. 2023) ................................................. 6

**Constitutional Provisions**

U.S. Const. art. I, § 8, cl. 1.................................................... 11

**Statutes**

20 U.S.C. § 1681 .............................................................. 3, 7

20 U.S.C. § 1682 .......................................................... 8, 9, 13

26 U.S.C. § 162 ................................................................. 30

26 U.S.C. § 163 ................................................................. 30

26 U.S.C. § 167 ................................................................. 30

26 U.S.C. § 501 ....................................................... *passim*

29 U.S.C. § 794 ................................................................. 26

42 U.S.C. § 2000d ............................................................. 25

42 U.S.C. § 2000d-1 .......................................................... 26

42 U.S.C. § 6102 ............................................................... 27

Page(s)

42 U.S.C. § 12116 ...................................................... 26

42 U.S.C. § 18116 ................................................ 27, 28

Act of May 3, 1802, ch. 52, 2 Stat. 193 ...................... 18

Act of June 17, 1870, ch. 131, 16 Stat. 153 ............... 18

Revenue Act of 1894, Ch. 349, 28 Stat. 509 .............. 19

Payne-Aldrich Tariff Act of 1909, Pub. L. No. 61-5, 36 Stat. 11 .............. 19

Revenue Act of 1913, Pub. L. No. 63-16, 38 Stat. 114 ........................... 19

## Regulations

29 C.F.R. § 1640.12 .................................................. 26

31 C.F.R. pt. 22 ........................................................ 26

31 C.F.R. § 22.4 ....................................................... 31

31 C.F.R. § 22.5 ....................................................... 31

31 C.F.R. § 22.6 ....................................................... 31

31 C.F.R. § 22.7 ....................................................... 31

31 C.F.R. § 22.8 ................................................. 26, 31

31 C.F.R. pt. 23 ........................................................ 27

31 C.F.R. § 23.32 ..................................................... 32

31 C.F.R. § 23.33 ..................................................... 32

31 C.F.R. § 23.34 ..................................................... 32

31 C.F.R. pt. 28 ................................................. 13, 24, 31

31 C.F.R. § 28.105 ................................................... 10

34 C.F.R. § 106.2 ..................................................... 10

45 C.F.R. pt. 90 ........................................................ 27

45 C.F.R. § 90.44 ..................................................... 32

Page(s)

45 C.F.R. § 90.49 ....................................................................... 32

Exec. Order No. 14,058, 86 Fed. Reg. 71,357 (Dec. 16, 2021) ................. 33

Nondiscrimination in Health Programs and Activities, 81 Fed. Reg. 31,375 (May 18, 2016) ...................................................................... 28

Nondiscrimination on the Basis of Sex in Education Programs or Activities Receiving Federal Financial Assistance, 65 Fed. Reg. 52,858 (Aug. 30, 2000).................................................... 9, 10, 32

Treasury Decision No. 110 (1863) ............................................... 19

## Other Authorities

Greta Anderson, *New Requirements, More Costs*, Insider Higher Ed (June 9, 2020), https://www.insidehighered.com/news/2020/06/10/community-colleges-burdened-new-title-ix-regulations ....................................... 32

Boris I. Bittker & George K. Rahdert, *The Exemption of Nonprofit Organizations from Federal Income Taxation*, 85 Yale L.J. 299 (1976) .................................................................. 23

Simon G. Brauer, *How Many Congregations Are There? Updating a Survey-Based Estimate*, 56 J. for Scientific Study Relig. 438 (2017) . 29

Evelyn Brody, *All Charities Are Property-Tax Exempt, but Some Charities Are More Exempt than Others*, 44 New Eng. L. Rev. 621 (2010) ........................................................ 18

John D. Colombo, *Why Is Harvard Tax-Exempt? (And Other Mysteries of Tax Exemption for Private Educational Institutions)*, 35 Ariz. L. Rev. 841 (1993) ..................................................... 17

*COVID Depletes Collection Plates at Churches Nationwide*, CBS News (Jan. 17, 2022), https://www.cbsnews.com/news/covid-19-churches-financial-difficulty/......................................................... 33

# TABLE OF AUTHORITIES
## (continued)

Page(s)

Brian J. Grim & Melissa E. Grim, *The Socio-economic Contribution of Religion to American Society: An Empirical Analysis*, 12 Interdisc. J. Rsch. on Religion, no. 3, 2016, http://www.religjournal.com/pdf/ijrr12003.pdf .................................... 28

IRS, *Internal Revenue Service Data Book, 2022* (2023), https://www.irs.gov/pub/irs-pdf/p55b.pdf ............................................ 29

IRS Publication 1828, *Tax Guide for Churches & Religious Organizations* (rev. 2015), https://www.irs.gov/pub/irs-pdf/p1828.pdf .................................................................................. 29

Dean M. Kelley*, Why Churches Should Not Pay Taxes* (1977) ......... 22, 23

Erika King, *Tax Exemptions and the Establishment Clause*, 49 Syracuse L. Rev. 971 (1999) ................................................. 17, 18, 20

*The New Oxford Dictionary of English* (1998) ......................................... 7

John W. Whitehead, *Tax Exemption and Churches: A Historical and Constitutional Analysis*, 22 Cumb. L. Rev. 521 (1992) ........................ 19

## STATEMENT OF INTEREST[1]

The Association of Christian Schools International serves more than 5,300 Christian member-schools worldwide, including 2,200 preschools, elementary, and secondary schools and 90 post-secondary institutions in the United States. ACSI member-schools support a vibrant Christian education for more than five million students.

The American Association of Christian Schools is an association of 38 state and regional associations working together to promote high-quality Christian education and to produce Christlike students. It represents more than 700 primary and secondary schools, which enroll over 118,000 students.

The Association for Biblical Higher Education is an association of more than 150 institutions of biblical higher education, which enroll more than 63,000 students. It seeks to promote a biblical worldview through traditional residential, extension, and distance-learning models.

---

[1] No counsel for a party authored this brief in whole or in part, no party or party's counsel contributed money that was intended to fund preparing or submitting the brief, and no person or entity—other than *amici*, their members, and their counsel—made a monetary contribution intended to fund preparing or submitting this brief. All parties have consented to the filing of this brief.

The International Alliance for Christian Education helps member-schools promote biblical leadership, foster intellectual discipleship, and cultivate worldview formation. It serves seminaries, colleges, and universities; parachurch organizations; and other education providers.

These associations and nearly all of their members operate on a not-for-profit basis and in accordance with biblical principles. They have a strong interest in stewarding their limited resources to advance their religious and educational purposes while avoiding costly, burdensome, and unnecessary government regulation.

## INTRODUCTION AND SUMMARY OF ARGUMENT

**I.**   The text and structure of Title IX of the Education Amendments of 1972 unambiguously demonstrate that tax-exempt status under § 501(c)(3) of the Internal Revenue Code does not constitute "receiving Federal financial assistance" under Title IX.   20 U.S.C. § 1681(a).   Receiving federal financial assistance means taking funding in some form from the federal government, such as grants, loans, or contracts.   Tax exemption is nothing like those forms of funding—no federal dollars are disbursed or received when an entity is deemed tax exempt.

Further, Supreme Court precedent establishes that when Congress legislates pursuant to its Spending Clause authority (as it did in Title IX), it must unambiguously put recipients of federal funds on notice of the obligations they are accepting.   Neither Title IX nor § 501(c)(3) gives any hint that tax-exempt entities are signing up for the full panoply of Title IX obligations.

Finally, the Supreme Court has made clear that Title IX does not apply to entities that "only benefit economically from federal assistance,"

rather than actually receiving federal dollars earmarked for that purpose. *NCAA v. Smith*, 525 U.S. 459, 468 (1999).

**II.** The Supreme Court's Establishment Clause jurisprudence confirms that tax exemptions are not subsidies. Tax exemptions for religious institutions run deep in American history, and today all 50 States and the federal government provide them. In recognition of this unbroken historical practice, the Supreme Court held more than five decades ago in *Walz v. Tax Commission of City of New York*, 397 U.S. 664 (1970), that a tax exemption for religious institutions does not constitute an impermissible religious subsidy under the Establishment Clause. Instead, a tax exemption "simply spar[es] the exercise of religion from the burden of … taxation levied on private profit institutions." *Id.* at 673.

The distinction between tax exemptions and direct financial support recognized in *Walz* confirms that tax exemptions do not themselves qualify as "Federal financial assistance" under Title IX. Tax-exempt status "does not transfer part of [the government's] revenue to churches but simply abstains from demanding that the church support the state." *Walz*, 397 U.S. at 675. The district court erred by disregarding this critical distinction.

**III.** If allowed to stand, the district court's expansive interpretation of Title IX will have significant ramifications for private non-profit institutions across the country—and not just religious schools. A battery of federal statutes and regulations applies to entities "receiving Federal financial assistance," including Title IX, Title VI of the Civil Rights Act of 1964, Section 504 of the Rehabilitation Act of 1973, the Age Discrimination Act of 1975, and Section 1557 of the Affordable Care Act. If tax-exempt status itself constituted federal financial assistance, then churches, mosques, synagogues, temples, and other houses of worship across the country would *automatically* be swept into a host of new regulatory obligations because of their tax-exempt status, whether or not they request that status. Privately funded religious schools, associations, charities, clinics, and other non-profit organizations would likewise be subjected to intrusive federal regulations that neither the organizations nor the agencies implementing those regulations expected and that Congress never intended.

Tax-exempt religious groups—many of which are small and operate with tight, limited budgets—would suddenly and unexpectedly be forced to divert enormous amounts of time, energy, and funding to

implementing byzantine federal regulations that were never intended for them, raising major free-exercise and government-entanglement concerns. The Court should reject this sweeping, unprecedented, after-the-fact expansion of federal authority.

*Amici* respectfully urge the Court to reverse the decision below.

## ARGUMENT

### I. Tax-Exempt Status Under § 501(c)(3) Is Not "Receiving Federal Financial Assistance" Under Title IX.

The district court profoundly erred in concluding that Concordia Preparatory School's tax-exempt status under § 501(c)(3) of the Internal Revenue Code brings it within the scope of Title IX. The court's decision departs from the plain language of Title IX, disregards the requirement that Spending Clause legislation unambiguously notify recipients of their obligations, and fails to adhere to precedent governing Title IX's reach.

#### A. Title IX Does Not Reach Entities Based Solely on Their Tax-Exempt Status.

This Court "enforce[s] plain and unambiguous statutory language according to its terms." *Williams v. Carvajal*, 63 F.4th 279, 286 (4th Cir. 2023). Here, Title IX unambiguously applies only to education programs and activities that affirmatively receive federal funds—*i.e.*, that

"receiv[e] Federal financial assistance"—and thus does not cover all tax-exempt entities merely because the federal government has declined to subject them to certain tax liabilities.

Title IX prohibits discrimination on the basis of sex in any education program or activity "receiving Federal financial assistance," subject to a few exceptions. 20 U.S.C. § 1681(a). Under the "ordinary, contemporary, common meaning" of these words, *McAdams v. Robinson*, 26 F.4th 149, 156 (4th Cir. 2022), Title IX applies only to entities that take in some form of funding from the federal government—not entities like Concordia Preparatory School that are merely "exempt from [federal] taxation." 26 U.S.C. § 501(a), (c)(3).

To "receiv[e]" means to "be given, presented with, or paid (something)," not simply to *avoid* having an obligation imposed. *The New Oxford Dictionary of English* 1548 (1998). And "assistance" means "the provision of money, resources, or information to help someone," not just the *withholding* of a burden. *Id.* at 101. If a pickpocket takes the wallet of one passerby but as a matter of grace or discretion leaves the next unmolested, the latter has not "received" any "assistance" from the pickpocket in the ordinary meaning of the words.

Just so here. When the government declines to require nonprofits to pay taxes on their *own* income, the nonprofits are not "given, presented with, or paid" any government "money" or "resources." *See Bachman v. Am. Soc'y of Clinical Pathologists*, 577 F. Supp. 1257, 1264 (D.N.J. 1983) ("The term 'assistance' connotes a transfer of government funds by way of subsidy."). It does not matter that declining to impose tax liability on an entity may have "much the same *effect* as a cash grant" in the amount of the forgone tax payments. *Regan v. Taxation with Representation of Wash.*, 461 U.S. 540, 544 (1983) (emphasis added). Title IX requires that the entity actually "receiv[e]" funds from the federal Treasury, and tax exemption involves no such transaction. *See infra* Part II.A (religious organizations have historically been tax *exempt*).

The structure of Title IX confirms the point. *See County of Maui v. Hawaii Wildlife Fund*, 140 S. Ct. 1462, 1471 (2020) (looking to "the structure of the statute" for evidence of its meaning). Congress provided for administrative enforcement of Title IX by directing federal agencies to adopt implementing regulations and to terminate financial assistance to noncomplying recipients. 20 U.S.C. § 1682. Crucially, however, that enforcement authority is conferred *only* to the extent the agencies provide

"grant[s], loan[s], or contract[s]." *Id*. Under the plain language of Title IX, therefore, Congress left no room for administrative enforcement against mere recipients of tax exemptions. If the substantive provisions of Title IX reached all education programs and activities that enjoy tax-exempt status, it would have been passing strange for Congress to disallow enforcement by the Treasury Department (the agency that administers tax exemptions) based on that status. The district court's ruling would thus produce a bizarre and inexplicable gap in Congress's comprehensive enforcement scheme.

The plain meaning of Title IX is reinforced by consistent and longstanding agency interpretations defining "Federal financial assistance." In 2000, the Treasury Department and 20 other federal agencies issued a common rule providing for Title IX enforcement pursuant to 20 U.S.C. § 1682. *See* Nondiscrimination on the Basis of Sex in Education Programs or Activities Receiving Federal Financial Assistance, 65 Fed. Reg. 52,858 (Aug. 30, 2000). The common rule was "model[ed]" on the Department of Education's Title IX regulations adopted in 1980. *Id.* at 52,859.

The common rule followed the Department of Education in defining

"Federal financial assistance" to mean five types of funding:

- "A grant or loan of Federal financial assistance,"

- "A grant of Federal real or personal property or any interest therein,"

- "Provision of the services of Federal personnel,"

- "Sale or lease of Federal property or any interest therein at nominal [or reduced] consideration," and

- "Any other contract, agreement or arrangement which has as one of its purposes the provision of assistance to any education program or activity."

*Id.* at 52,866 (codified by Treasury Department at 31 C.F.R. § 28.105); *see*

34 C.F.R. § 106.2(g) (identical Department of Education definition). Each

of these five types of funding involves transferring something of value

from the government to the recipient. None of them mentions tax-exempt

status or any other withholding of a burden—a glaring omission, given

the broad sweep of tax exemptions in American society. *See infra* Part

II.A.

It is particularly telling that the Treasury Department—which, per

the district court, supposedly provides "Federal financial assistance" via

tax exemptions—did not believe its Title IX enforcement authority

10

encompassed tax-exempt entities. An agency's "established practice" and the "want of assertion of power by those who presumably would be alert to exercise it" are "significant in determining whether such power was actually conferred." *West Virginia v. EPA*, 142 S. Ct. 2587, 2610 (2022).

## B. Congress Did Not Unambiguously Require Tax-Exempt Entities to Comply with Title IX, as the Spending Clause Requires.

The district court went further astray by failing to consider the contract-like nature of federal laws like Title IX that are enacted pursuant to Congress's Spending Clause powers. Congress adopted Title IX by "[e]xercising" its "broad power under the Spending Clause" to "fix the terms on which it shall disburse federal money." *Cummings v. Premier Rehab Keller, P.L.L.C.*, 142 S. Ct. 1562, 1568–69 (2022) (quoting *Pennhurst State Sch. & Hosp. v. Halderman*, 451 U.S. 1, 17 (1981)); *see* U.S. Const. art. I, § 8, cl. 1. Spending Clause statutes create a bargain in which parties receive federal dollars and, in exchange, agree to comply with federal regulations. *Cummings*, 142 S. Ct. at 1568–69.

The district court's interpretation is irreconcilable with Title IX's status as a Spending Clause statute. In the first place, a tax exemption is not an exercise of Congress's spending power at all—it involves no

appropriation and no outlay of money from the Treasury. Without a predicate "disburse[ment] [of] federal money," the Spending Clause cannot authorize the imposition of conditions on tax-exempt entities. *Cummings*, 142 S. Ct. at 1569.

Second, and equally fatal, Congress did not speak with the clarity required to impose obligations on tax-exempt entities through Spending Clause legislation. When it enacts Spending Clause statutes, "Congress enters into an arrangement in the nature of a contract with the recipients of the funds: the recipient's acceptance of the funds triggers coverage under the nondiscrimination provision." *DOT v. Paralyzed Veterans of Am.*, 477 U.S. 597, 605 (1986). These laws "operat[e] based on consent: 'in return for federal funds,'" recipients agree to comply with congressional strictures. *Cummings*, 142 S. Ct. at 1570.

Critically, therefore, recipients of federal funding under Spending Clause statutes must have "voluntarily and knowingly accept[ed]" the terms of the contract. *Cummings*, 142 S. Ct. at 1570. That means Congress must speak "unambiguously" to put "receiving entit[ies] … [on] notice that [they] will be liable" if they do not comply. *Id.* The key

question is whether a party considering accepting federal dollars would have been "aware that it would face … liability." *Id.* at 1570–71.

The answer here is plainly no. Religious schools had no clue—much less "unambiguou[s]" notice—that receiving an exemption from income taxation would bring them under Title IX's purview. Nothing in either Title IX or the Internal Revenue Code warns schools (much less unambiguously) that by seeking tax-exempt status they are agreeing to the full range of Title IX obligations and liabilities, potentially including Treasury Department regulatory oversight of every aspect of their operations—employment, admissions, and recruitment practices, athletics programs, course offerings, and more—and the risk of losing tax-exempt status or facing a Justice Department lawsuit if they are found in violation of Title IX or agency regulations. *See* 20 U.S.C. § 1682; 31 C.F.R. pt. 28.[2] That silence is particularly significant in light of the fact that entities receiving tax-exempt status *do* agree to other

---

[2] To be sure, because tax-exempt status is not a "grant, loan, or contract," it would be unlawful for the Treasury Department to enforce its regulations against tax-exempt entities under 20 U.S.C. § 1682. *See supra* pp. 8–9. But the district court's flawed analysis might lead the agency to try—and religious schools might feel compelled to comply to avoid protracted litigation.

restrictions, such as rules regarding lobbying, politicking, and finances. 26 U.S.C. § 501(c)(3).  The silence is also significant in light of the United States' long and unbroken history of tax exemptions for religious institutions and other organizations, which long predate Title IX.  *Infra* Part II.A.  Congress was undoubtedly aware of those exemptions, yet it failed to specify that schools that accept them must, in exchange, obey Title IX.

Congress never intended to put religious schools to the choice of forgoing a tax exemption or complying with Title IX, and certainly did not express such an intent unambiguously.  Because Congress did not "speak with a clear voice" on this issue, the Court should not hold religious schools to a bargain they did not know they were entering into.  *Pennhurst*, 451 U.S. at 17.

### C.  Supreme Court Precedent Makes Clear That Tax-Exempt Status Is an Indirect Economic Benefit That Does Not Constitute Federal Financial Assistance.

Precedent further confirms that the common-sense reading of Title IX is the correct one.  In *NCAA v. Smith*, 525 U.S. 459 (1999), the Supreme Court rejected the argument that the NCAA was subject to Title IX by virtue of receiving dues from member institutions that were

federally funded. The Court noted that there was "no allegation that NCAA members paid their dues with federal funds earmarked for that purpose." *Id.* at 468. The showing that the NCAA "indirectly benefit[ed] from the federal assistance afforded its members" was "insufficient to trigger Title IX coverage." *Id.*

That holding requires reversal here. As *Smith* recognized, 525 U.S. at 466–67, Title IX covers various forms of federal aid that flow to educational institutions, be it "disbursements from [a] … fund," *Paralyzed Veterans of Am.*, 477 U.S. at 604, or other "federal grants, loans, or contracts," *N. Haven Bd. of Ed. v. Bell*, 456 U.S. 512, 520 (1982). But in any of those scenarios, something of added value flows from the U.S. government into the hands of the entity that receives it. This is precisely how the Supreme Court has for decades consistently described recipients of "Federal financial assistance." *E.g.*, *id.* at 540 ("federally funded program"); *Cummings*, 142 S. Ct. at 1570–71 ("funding recipient … 'accept[ing]' federal dollars"); *Fitzgerald v. Barnstable Sch. Comm.*, 555 U.S. 246, 257 (2009) ("institutions and programs that receive federal funds").

The outflow of federal funds did not happen when federally funded member schools paid dues to the NCAA, and it does not happen here, where the IRS merely recognizes an entity as tax exempt under § 501(c)(3). No "federal funds earmarked for educational expenses" flow into the non-profit organization's coffers. *Smith*, 525 U.S. at 466. Schools that enjoy tax exemptions thus do not "receiv[e]" financial assistance or anything else of added value from the federal government that would trigger Title IX coverage.

## II. Longstanding Supreme Court Precedent Distinguishes Between Tax Exemptions and Subsidies.

The district court's holding that tax-exempt status qualifies as "receiving Federal financial assistance" is especially unpersuasive because it directly conflicts with longstanding Establishment Clause jurisprudence holding the opposite—that tax-exempt status is *not* a government subsidy.

### A. Tax Exemptions for Religious Institutions Are Deeply Rooted Features of American Society.

The United States has an "unbroken practice" of granting tax-exempt status to religious organizations that "covers our entire national existence and indeed predates it." *Walz v. Tax Comm'n of City of N.Y.*,

397 U.S. 664, 678 (1970). Before the American Revolution, tax exemptions for religious institutions were common. *See* Erika King, *Tax Exemptions and the Establishment Clause*, 49 Syracuse L. Rev. 971, 978 (1999). For example, established churches were exempt from the "ecclesiastical taxes" imposed on other churches, and property dedicated to religious and other charitable uses was often exempted from taxes such as poor rates, education rates, and charity taxes. *Id.* Religious and educational institutions were thus largely "exempted from local taxes from the beginning." John D. Colombo, *Why Is Harvard Tax-Exempt? (And Other Mysteries of Tax Exemption for Private Educational Institutions)*, 35 Ariz. L. Rev. 841, 844 (1993); *see also Walz*, 397 U.S. at 682 (Brennan, J., concurring) (religious tax exemptions were "widespread during colonial days").

These exemptions continued after the Revolution. Most States "left in place, enacted, or reenacted statutes either permitting or mandating charitable and religious exemptions from local property tax," even as the movement to disestablish state churches spread rapidly throughout the country. King, *supra*, at 976–78. Challenges to these exemptions as "vestiges of religious establishment" "were uniformly rejected" by state

courts. King, *supra*, at 979 n.35 (collecting cases). Today, "[a]ll of the 50 States provide for tax exemption of places of worship, most of them doing so by constitutional guarantees." *Walz*, 397 U.S. at 676; *see* Evelyn Brody, *All Charities Are Property-Tax Exempt, but Some Charities Are More Exempt than Others*, 44 New Eng. L. Rev. 621, 671–732 (2010) (compiling 50-state survey of property-tax exemptions for charitable organizations).

The historical practice of the federal government has been much the same. In 1802, Congress provided a tax exemption for churches in the County of Alexandria, Virginia, and the City Council of Washington, D.C. (under congressional authority) exempted church property from real and personal property assessments. *Walz*, 397 U.S. at 677 (citing Act of May 3, 1802, ch. 52, § 6, 2 Stat. 193, 194). In 1813, Congress "refunded import duties paid by religious societies on the importation of religious articles." *Id.* And in 1870, Congress exempted all churches in Washington "from any and all taxes or assessments, national, municipal, or county." *Id.* at 677–68 (quoting Act of June 17, 1870, ch. 131, 16 Stat. 153, 153).

The first federal income tax, which was imposed during the Civil War, exempted "[t]he income of literary, scientific, or other charitable organizations." John W. Whitehead, *Tax Exemption and Churches: A Historical and Constitutional Analysis*, 22 Cumb. L. Rev. 521, 541 (1992) (quoting Treasury Decision No. 110 (1863)). Subsequent income taxes followed suit. The Revenue Act of 1894 exempted "corporations, companies, or associations organized and conducted solely for charitable, religious, or educational purposes." Ch. 349, § 32, 28 Stat. 509, 556. The Payne-Aldrich Tariff Act of 1909 did much the same. Pub. L. No. 61-5, § 38, 36 Stat. 11, 112–13. And following the ratification of the Sixteenth Amendment, the Revenue Act of 1913 likewise provided a tax exemption for "any corporation or association organized and operated exclusively for religious, charitable, scientific, or educational purposes." Pub. L. No. 63-16, § II(G), 38 Stat. 114, 172.

In short, "[f]or so long as federal income taxes have had any potential impact on churches[,] … religious organizations have been expressly exempt from the tax." *Walz*, 397 U.S. at 676. "Indeed, every federal income tax law since the Revenue Act of 1894 has contained the religious and charitable organization exemption that eventually became

§ 501 of the Internal Revenue Code." King, *supra*, at 980. This unbroken practice of "benevolent neutrality" is thus "deeply embedded in the fabric of our national life." *Walz*, 397 at 676–77; *see also id.* at 681 (Brennan, J., concurring) (noting "the undeviating acceptance given religious tax exemptions from our earliest days as a Nation").

**B. The Supreme Court's Establishment Clause Jurisprudence Has Consistently Distinguished Tax Exemptions from Subsidies.**

In light of the Nation's continuous history of religious tax exemptions, it comes as little surprise that the Supreme Court has long held that such exemptions are consistent with the Establishment Clause. Importantly for this case, the Court has reached that conclusion by distinguishing tax exemptions from government subsidies, which it has often viewed more restrictively.

*Walz* involved a challenge to a New York property-tax exemption for "real or personal property used exclusively for religion, educational or charitable purposes." 397 U.S. at 666–67. The plaintiff, an owner of real estate in New York, argued that the tax exemption "indirectly require[d] [him] to make a contribution to religious bodies" and thereby violated the Establishment Clause. *Id.*

The Supreme Court categorically rejected that argument, holding that a tax exemption for religious institutions is not a subsidy of religion. The Court distinguished the exemption from a "direct money subsidy" and explained that, rather than "attempting to establish religion[,] it is simply sparing the exercise of religion from the burden of property taxation levied on private profit institutions." *Walz*, 397 U.S. at 673–75. "The grant of a tax exemption is not sponsorship since the government does not transfer part of its revenue to churches but simply abstains from demanding that the church support the state." *Id.* at 675.

The Court found confirmation for this conclusion in the overwhelming historical practice of granting tax exemptions to religious entities at both the state and federal level. *Walz*, 397 U.S. at 676–78; *see supra* Part II.A. Such "[a]n unbroken practice of according the exemption to churches" was "not something to be lightly cast aside." *Walz*, 397 U.S. at 678.

Notably, the Court decided *Walz* at a time when it viewed any "financial support" for religious activity as prohibited by the Establishment Clause. 397 U.S. at 668; *see Lemon v. Kurtzman*, 403 U.S. 602, 621 (1971). While the Court has subsequently repudiated that view,

*see, e.g.*, *Carson v. Makin*, 142 S. Ct. 1987, 1997–98 (2022), the key point is that the Court saw a fundamental difference between tax exemptions and subsidies at a time when that distinction was central to the Establishment Clause inquiry. As a result, the difference between tax exemptions and subsidies was firmly established when Congress enacted Title IX a year after *Walz*, and remains so to this day. *See Ariz. Christian Sch. Tuition Org. v. Winn*, 563 U.S. 125, 141–42 (2011) (rejecting argument that tax credit constituted a "governmental expenditure").

## C. These Precedents Preclude Treating Tax Exemptions as Equivalent to Federal Financial Assistance Under Title IX.

The lesson from *Walz* is that religious tax exemptions are historically, practically, and doctrinally distinct from direct financial support for religious organizations. As one scholar explained, "'refraining from taxation' is not philosophically or operationally equivalent to subsidizing." Dean M. Kelley*, Why Churches Should Not Pay Taxes* 12 (1977). A "tax exemption, in and of itself, conveys no money whatever to an organization, which cannot build a birdhouse or buy a bathmat with it." *Id.* At the same time, "[n]o one is compelled by tax exemption to support the organization, as they would be by taxation and

appropriation." *Id.* A tax exemption merely "permit[s] the full value of [religious supporters'] contributions to go to the purposes intended without diversion to the government." *Id.* A tax exemption is therefore "neither a special privilege nor a hidden subsidy." Boris I. Bittker & George K. Rahdert, *The Exemption of Nonprofit Organizations from Federal Income Taxation*, 85 Yale L.J. 299, 357 (1976).

For the same reasons, the tax exemption enjoyed by Concordia Preparatory School and other not-for-profit schools by virtue of § 501(c)(3) cannot be deemed "receiving Federal financial assistance" within the meaning of Title IX. As with the tax exemption in *Walz*, the tax exemption in § 501(c)(3) "does not transfer part of [the government's] revenue to churches but simply abstains from demanding that the church support the state." *Walz*, 397 U.S. at 675. While a tax exemption may, in some sense, "afford an indirect economic benefit" to religious organizations if the baseline is deemed payment of taxes, *id.* at 674, historically the baseline for religious organizations has been *exemption* from taxes. *Supra* Part II.A. And in any event, "benefit[ing] economically from federal assistance" is qualitatively different than receiving "federal funds earmarked for that purpose." *Smith*, 525 U.S. at 467–68. Title IX

applies only to the latter. *Id.* If anything, tax exemptions serve to "*restric[t]* the fiscal relationship between church and state." *Walz*, 397 U.S. at 676 (emphasis added). Under these precedents, tax exemption cannot trigger Title IX coverage.

## III. The District Court's Decision Would Have Far-Reaching, Enormously Disruptive Effects.

The district court's holding that Title IX covers *any* education program or activity with tax-exempt status under § 501(c)(3) would have profound consequences in its own right. By virtue of their tax-exempt status alone, educational organizations would be subject to the requirements and liabilities imposed by Title IX and, potentially, the Treasury Department's host of Title IX regulations. *See* 31 C.F.R. pt. 28. But the logic underlying the decision cannot be cabined there. The district court's interpretation of "Federal financial assistance" would unexpectedly impose several other federal regulatory regimes on hundreds of thousands of houses of worship and not-for-profit religious organizations as well, solely because of their tax-exempt status—to say nothing of millions of other not-for-profit entities. The Court should reject this unprecedented result, which raises serious First Amendment

concerns and would impose crushing burdens on entities that had no reason to expect federal regulation.

**A.    The Decision Below Would Impose Multiple Federal Regulatory Regimes on Hundreds of Thousands of Religious Organizations—and Millions of Other Not-for-Profits.**

The import of the district court's decision cannot be limited to religious schools and Title IX.  Under the logic of the court's view that tax-exempt status counts as "receiving Federal financial assistance," that same status would subject *all* not-for-profit organizations to multiple sets of federal regulations under a variety of federal statutes.  And those schemes, unlike Title IX, are not limited to educational institutions, so hundreds of thousands, if not millions, of private non-profit entities could suddenly find themselves facing the obligations and burdens these laws create.

***Title VI of the Civil Rights Act of 1964*** provides that "[n]o person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance."  42 U.S.C. § 2000d.  Extending the district court's reasoning to Title VI would potentially empower the Treasury

Department to impose its Title VI regulations on every single tax-exempt entity and then "terminat[e]" or "refus[e] to grant or to continue" tax exemptions for noncompliance.  42 U.S.C. § 2000d-1; *see* 31 C.F.R. pt. 22. The Treasury Department could also refer suspected violators to the Department of Justice for the initiation of enforcement proceedings.  31 C.F.R. § 22.8(a)(1).

*Section 504 of the Rehabilitation Act* provides that "[n]o otherwise qualified individual with a disability in the United States … shall, solely by reason of her or his disability, be excluded from the participation in, be denied benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance."  29 U.S.C. § 794(a).  Under the district court's reasoning, tax-exempt entities would need to comply with any regulations the Treasury Department adopts under its Section 504 authority.  *Id.*  They would also be required to comply with the Equal Opportunity Employment Commission's rules carrying out the Americans with Disabilities Act, from which Section 504 adopts its standard of liability.  *Id.* § 794(d); 42 U.S.C. § 12116; 29 C.F.R. § 1640.12.

***The Age Discrimination Act of 1975*** provides that "no person in the United States shall, on the basis of age, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under, any program or activity receiving Federal financial assistance." 42 U.S.C. § 6102. It tasks the Secretary of Health and Human Services ("HHS") with issuing "government-wide regulations" and reviewing and approving the implementing regulations of "each federal agency that administers any program of financial assistance" to promote "consistent implementation of the Act" across the entire federal government. *Action All. of Senior Citizens of Greater Phila. v. Heckler*, 789 F.2d 931, 935 (D.C. Cir. 1986) (Ginsburg, J.). So tax-exempt entities would also be required to comply with Treasury Department and certain HHS Age Discrimination Act regulations. *See* 31 C.F.R. pt. 23; 45 C.F.R. pt. 90.

Finally, ***Section 1557 of the Affordable Care Act*** prohibits discrimination "on the ground prohibited under" Title IV, Title IX, Section 504 of the Rehabilitation Act, or the Age Discrimination Act by "any health program or activity, any part of which is receiving Federal financial assistance." 42 U.S.C. § 18116(a). HHS is authorized to

implement this statute, *id.* § 18116(c), and it has issued regulations that purport to require covered entities to provide services that many religious entities would object to. *See*, *e.g.*, Nondiscrimination in Health Programs and Activities, 81 Fed. Reg. 31,375, 31,379–80 (May 18, 2016) (noting religious objections to requirement that entities covered under section 1557 "provide ... gender transition services").

The district court's ruling would thrust many of these legal obligations—in particular, Title VI, Section 504 of the Rehabilitation Act, and the Age Discrimination Act, all of which apply to all "program[s] or activit[ies] receiving Federal financial assistance"—onto all non-profit organizations across the country. By any estimate, hundreds of thousands of religious organizations across the United States enjoy tax-exempt status under § 501(c)(3). One study across multiple faiths found that 72% of surveyed houses of worship—almost 250,000—had filed for 501(c)(3) status with the IRS. Brian J. Grim & Melissa E. Grim, *The Socio-economic Contribution of Religion to American Society: An Empirical Analysis*, 12 Interdisc. J. Rsch. on Religion, no. 3, 2016, at 17, http://www.religjournal.com/pdf/ijrr12003.pdf. The true number of tax-exempt religious bodies is much higher. The IRS treats every "place of

worship" as automatically entitled to 501(c)(3) status, regardless of whether it applies for recognition. IRS Publication 1828, *Tax Guide for Churches & Religious Organizations* 1–2 (rev. 2015), https://www.irs.gov/pub/irs-pdf/p1828.pdf. A leading study estimates that there are more than 380,000 houses of worship across all religions in the United States. Simon G. Brauer, *How Many Congregations Are There? Updating a Survey-Based Estimate*, 56 J. for Sci. Study Relig. 438, 445 (2017).

Further, tax-exempt status is not limited to houses of worship—it embraces all religiously driven non-profit organizations, including conventions and associations of churches, subdivisions of churches, schools, charities, clinics, and other entities (like *amici*) dedicated to faith-based goals. *See* IRS Publication 1828, *supra*, at 2, 27–34. Nor is 501(c)(3) status limited to religious organizations—*any* corporation "organized and operated exclusively for religious, charitable, scientific, testing for public safety, literary, or educational purposes" qualifies. 26 U.S.C. § 501(c)(3). All told, the district court's opinion has far-reaching implications for millions of not-for-profit organizations, including innumerable churches, synagogues, mosques, temples, and religious schools, charities, and associations of all faiths or no faith. *See* IRS,

*Internal Revenue Service Data Book, 2022*, at 30 (2023), https://www.irs.gov/pub/irs-pdf/p55b.pdf (IRS recognized nearly 1.5 million new 501(c)(3) organizations in 2022).

In fact, under the district court's rationale, *all* entities in the United States would logically be deemed recipients of federal financial assistance. After all, by imposing tax rates lower than those it could have imposed (and has imposed in the past), Congress has conferred a tax "benefit" on every organization in the country. Moreover, millions of American organizations benefit from various tax deductions. *See*, *e.g.*, 26 U.S.C. § 162 (business expenses); *id.* § 163 (interest); *id.* § 167 (depreciation). The district court's rationale thus would extend the obligations of several of the Spending Clause statutes discussed above to every entity in the Nation. This Court should not embrace an interpretation that leads to such "absurd results." *Aremu v. Dep't of Homeland Sec.*, 450 F.3d 578, 583 (4th Cir. 2006).

**B. Complying with These Regulatory Regimes Would Be Enormously Burdensome for Often Cash-Strapped Religious Organizations.**

Complying with each of these programs would be extremely expensive and difficult for many of the hundreds of thousands of affected

religious institutions across the country. Each of these statutes speaks in extraordinarily broad terms, leaving it to federal agencies to define what conduct is covered by the many circumstances in which the laws might apply, to impose detailed and burdensome compliance regulations, and to take action against entities deemed to be noncompliant.

These agencies have readily embraced this authority, promulgating and enforcing comprehensive guidelines that are often backed by substantial fines. For example, in its Title VI rules, the Treasury Department enumerates a whole host of conduct it deems discriminatory; requires recipients of federal aid to maintain compliance records and turn them over to the government and to inform "interested persons" of the relevant legal framework; and demands assurances of compliance when applying for or before receiving federal funds. 31 C.F.R. §§ 22.4–22.8. Its Title IX rules work in much the same way. *See* 31 C.F.R. pt. 28.

HHS's whole-of-government rules implementing the Age Discrimination Act authorize federal agencies—including the Treasury Department—to "conduct compliance reviews, pre-award reviews, and other similar procedures" to root out violations by entities receiving agency funding and then order "any remedial action which the agency

may require to overcome the effects of the discrimination." 45 C.F.R. §§ 90.44(a), 90.49(a). Consistent with that approach, the Treasury Department requires entities receiving agency funding to "sign a written assurance" of compliance, keep records to allow the Treasury Department to investigate "to the extent Treasury determines is necessary," and, if ordered by the agency, complete "a written self-evaluation" of their practices and "take corrective action" if violations are found. 31 C.F.R. §§ 23.32–23.34.

The rules promulgated by agencies under these statutes often demand significant investments of time, resources, and money to achieve compliance. To take just one example, the Department of Education generated a "big challenge and cost" for community colleges when it ordered compliance in 2020 with a new version of its Title IX rules— which "are the model" for the Title IX regulations of many agencies including the Treasury Department. *See* Nondiscrimination on the Basis of Sex in Education Programs, 65 Fed. Reg. at 52,859; Greta Anderson, *New Requirements, More Costs*, Insider Higher Ed (June 9, 2020), https:// www.insidehighered.com/news/2020/06/10/community-colleges- burdened-new-title-ix-regulations. Community colleges, "many of which

are experiencing budget shortfalls," had to "allocat[e] precious time, energy and resources" to implementing those rules, experiencing "acute" "compliance burdens" that put a strain on their operations. Anderson, *supra*. Should the Treasury Department adopt similar rules, the burden on newly regulated non-profits would be severe.

To be clear, *amici* fully support the goal of eliminating invidious discrimination throughout society. But religious and other nonprofit organizations have limited resources with which to advance their important charitable purposes, and the costs of complying with these regulatory regimes would be enormous. *See* Exec. Order No. 14,058, 86 Fed. Reg. 71,357, 71,357 (Dec. 16, 2021) (recognizing that "the annual paperwork burden imposed by executive departments and agencies … on the public" exceeds "9 billion hours"). Tax-exempt religious institutions come in all shapes and sizes, and for many—especially small churches, charities, schools, and associations—these regulatory burdens would be ruinous. *See*, *e.g.*, *COVID Depletes Collection Plates at Churches Nationwide*, CBS News (Jan. 17, 2022), https://www.cbsnews.com/ news/covid-19-churches-financial-difficulty/ (chronicling the "untold

number of congregations across the country that have struggled to stay afloat financially and minister to their flocks during the pandemic").

Religious groups seek to steward limited financial resources for a higher purpose. The dramatic growth of Executive-branch oversight of religious institutions would inevitably entangle the government in religion and lead to conflicts between federal regulators and newly regulated religious organizations that seek to exercise their religious beliefs freely and without government interference or imposition. The federal regulations at issue have already led to major disputes from faith-based groups who, upon actually receiving federal funds, were forced to choose between adhering to their religious beliefs and complying with accompanying federal regulatory mandates. *See*, *e.g.*, *Hammons v. Univ. of Md. Med. Sys. Corp.*, 2023 WL 121741, at *2–4, *15–18 (D. Md. Jan. 6, 2023), *appeal filed*, No. 23-1452 (4th Cir. Apr. 26, 2023) (rejecting Catholic hospital's defense to section 1557 suit based on its religious opposition to provision of certain medical services). Expanding these regulatory schemes to reach every single house of worship and religious charity, school, and association would multiply the number of conflicts

exponentially, especially since these regulatory regimes were never intended to govern many of these entities.

Ultimately, the district court failed to appreciate the full magnitude of regulatory chaos its ruling will unleash on religious tax-exempt organizations. Far from being limited to tax-exempt religious schools and Title IX, the decision threatens to subject the full gamut of 501(c)(3) exempt religious organizations to a broad range of burdensome regulations, many of which may come into direct conflict with these groups' beliefs and missions. Congress cannot have meant to hide these "elephants" in the "mousehol[e]" of an income-tax exemption that long predates Title IX itself. *Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 468 (2001). *Amici* urge the Court to reject a reading of federal law that would impose on all religious institutions the massive administrative costs and compliance burdens necessary to satisfy the regulations implementing these statutes—without the attendant benefit of receiving any actual funds from the federal government.

## CONCLUSION

This Court should reverse the decision below.

Dated:   June 12, 2023

John J. Bursch
Gregory S. Baylor
Ali Kilmartin
ALLIANCE DEFENDING FREEDOM
44180 Riverside Parkway
Lansdowne, Virginia  20176
Telephone: (571) 707-4655
Facsimile:  (571) 707-4790
*jbursch@adflegal.org*
*gbaylor@adflegal.org*
*akilmartin@adflegal.org*

Stephen J. Hammer
GIBSON, DUNN & CRUTCHER LLP
2001 Ross Avenue, Suite 2100
Dallas, Texas  75201
Telephone: (214) 698-3100
Facsimile:  (214) 571-2900
*shammer@gibsondunn.com*

Respectfully submitted,

 */s/ Thomas G. Hungar*
Thomas G. Hungar
Russell Balikian
Lavi M. Ben Dor*
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, N.W.
Washington, D.C.  20036
Telephone: (202) 955-8500
Facsimile:  (202) 467-0539
*thungar@gibsondunn.com*
*rbalikian@gibsondunn.com*
*lbendor@gibsondunn.com*

COUNSEL FOR *AMICI CURIAE*

---

 * Admitted only in New York and Pennsylvania; practicing under the supervision of principals of the firm.

**UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT**

No. 23-1453       **Caption:** Buettner-Hartsoe v. Baltimore Lutheran High School Association

## CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMIT
Type-Volume Limit, Typeface Requirements, and Type-Style Requirements

**Type-Volume Limit for Briefs if Produced Using a Computer:** Appellant's Opening Brief, Appellee's Response Brief, and Appellant's Response/Reply Brief may not exceed 13,000 words or 1,300 lines. Appellee's Opening/Response Brief may not exceed 15,300 words or 1,500 lines. A Reply or Amicus Brief may not exceed 6,500 words or 650 lines. Amicus Brief in support of an Opening/Response Brief may not exceed 7,650 words. Amicus Brief filed during consideration of petition for rehearing may not exceed 2,600 words. Counsel may rely on the word or line count of the word processing program used to prepare the document. The word-processing program must be set to include headings, footnotes, and quotes in the count. Line count is used only with monospaced type. See Fed. R. App. P. 28.1(e), 29(a)(5), 32(a)(7)(B) & 32(f).

**Type-Volume Limit for Other Documents if Produced Using a Computer:** Petition for permission to appeal and a motion or response thereto may not exceed 5,200 words. Reply to a motion may not exceed 2,600 words. Petition for writ of mandamus or prohibition or other extraordinary writ may not exceed 7,800 words. Petition for rehearing or rehearing en banc may not exceed 3,900 words. Fed. R. App. P. 5(c)(1), 21(d), 27(d)(2), 35(b)(2) & 40(b)(1).

**Typeface and Type Style Requirements:** A proportionally spaced typeface (such as Times New Roman) must include serifs and must be 14-point or larger. A monospaced typeface (such as Courier New) must be 12-point or larger (at least 10½ characters per inch). Fed. R. App. P. 32(a)(5), 32(a)(6).

This brief or other document complies with type-volume limits because, excluding the parts of the document exempted by Fed. R. App. R. 32(f) (cover page, disclosure statement, table of contents, table of citations, statement regarding oral argument, signature block, certificates of counsel, addendum, attachments):

[✓] this brief or other document contains _____6,468_____ [*state number of*] words

[ ] this brief uses monospaced type and contains _____ [*state number of*] lines

This brief or other document complies with the typeface and type style requirements because:

[✓] this brief or other document has been prepared in a proportionally spaced typeface using
Microsoft Word _____ [*identify word processing program*] in
Size 14, New Century Schoolbook LT [*identify font size and type style*]; **or**

[ ] this brief or other document has been prepared in a monospaced typeface using
_____ [*identify word processing program*] in
_____ [*identify font size and type style*].

(s) Thomas G. Hungar _____

Party Name _Association of Christian Schools International, American Association of Christian Schools,_
_Association for Biblical Higher Education, and International Alliance for Christian Education_
Dated: 06/12/23 _____