NO. 24-1453

In The
**U**nited **S**tates **C**ourt of **A**ppeals
For The Fourth Circuit

DONNA BUETTNER-HARTSOE; N.H., by and through her Parent and Next
Friend Donna Buettner-Hartsoe

Plaintiffs - Appellees

v.

BALTIMORE LUTHERAN HIGH SCHOOL ASSOCIATION, d/b/a
Concordia Preparatory School

Defendant - Appellant

ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF MARYLAND

**Brief of Appellant**

**Baltimore Lutheran High School Association**

Gregg E. Viola
Mark P. Johnson
Eccleston and Wolf, P.C.
7240 Parkway Drive, 4th Floor
Hanover, MD  21076
410-752-7474
Counsel for Defendant - Appellant

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

## DISCLOSURE STATEMENT

- In civil, agency, bankruptcy, and mandamus cases, a disclosure statement must be filed by **all** parties, with the following exceptions: (1) the United States is not required to file a disclosure statement; (2) an indigent party is not required to file a disclosure statement; and (3) a state or local government is not required to file a disclosure statement in pro se cases. (All parties to the action in the district court are considered parties to a mandamus case.)
- In criminal and post-conviction cases, a corporate defendant must file a disclosure statement.
- In criminal cases, the United States must file a disclosure statement if there was an organizational victim of the alleged criminal activity. (See question 7.)
- Any corporate amicus curiae must file a disclosure statement.
- Counsel has a continuing duty to update the disclosure statement.

No. 23-1453     Caption: Hartsoe, et al. v. Baltimore Lutheran High School Association

Pursuant to FRAP 26.1 and Local Rule 26.1,

Baltimore Lutheran High School Association, d/b/a Concordia Prepartory School
(name of party/amicus)

_____

who is _____ Appellant _____ , makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)

1. Is party/amicus a publicly held corporation or other publicly held entity? ☐YES ☑NO

2. Does party/amicus have any parent corporations? ☐YES ☑NO
   If yes, identify all parent corporations, including all generations of parent corporations:

3. Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity? ☐YES ☑NO
   If yes, identify all such owners:

4. Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation? ☑YES☐NO
If yes, identify entity and nature of interest:

Baltimore Lutheran High School Association, Inc. d/b/a Concordia Preparatory School is insured by Philadelphia Indemnity Insurance Company, which may have a financial interest in the outcome of the litigation.

5. Is party a trade association? (amici curiae do not complete this question) ☐YES☑NO
If yes, identify any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity, or state that there is no such member:

6. Does this case arise out of a bankruptcy proceeding? ☐YES☑NO
If yes, the debtor, the trustee, or the appellant (if neither the debtor nor the trustee is a party) must list (1) the members of any creditors' committee, (2) each debtor (if not in the caption), and (3) if a debtor is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of the debtor.

7. Is this a criminal case in which there was an organizational victim? ☐YES☑NO
If yes, the United States, absent good cause shown, must list (1) each organizational victim of the criminal activity and (2) if an organizational victim is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of victim, to the extent that information can be obtained through due diligence.

Signature: /s/ Gregg E. Viola          Date:    5/10/2023

Counsel for: Appellant

- 2 -

Print to PDF for Filing

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ..................................................................................1

JURISDICTIONAL STATEMENT ......................................................................3

ISSUE PRESENTED FOR REVIEW ...................................................................3

STATEMENT OF THE CASE ..............................................................................4

SUMMARY OF ARGUMENT ..............................................................................5

ARGUMENT .........................................................................................................7

    STANDARD OF REVIEW ...........................................................................7

    DISCUSSION ...............................................................................................8

    I.     THE DISRICT COURT ERRED IN DENYING APPELLANT'S
           PARTIAL MOTION TO DISMISS OR IN THE ALTERNATIVE FOR
           SUMMARY JUDGMENT ...................................................................8

           A.    Tax exemption under 26 U.S.C. § 501(c)(3) does not constitute
                  receipt of Federal financial assistance under Title IX. ...............8

           B.    The District Court's rationale ignored the foundation of
                  Spending Clause legislation and conflated public policy in favor
                  of eliminating discrimination with receipt of Federal financial
                  assistance.................................................................................26

    II.    REQUIRING ALL 26 U.S.C. § 501(C)(3) TAX EXEMPT ENTITIES
           WITH SOME EDUCATION PURPOSE TO COMPLY WITH TITLE
           IX WOULD CAUSE SIGNIFICANT HARM TO THE PRIVATE
           SCHOOL AND NON-PROFIT COMMUNITIES ...........................32

CONCLUSION.....................................................................................................35

REQUEST FOR ORAL ARGUMENT................................................................35

CERTIFICATE OF COMPLIANCE ..................................................................37

CERTIFICATE OF SERVICE ...........................................................................38

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*Arlington Central Sch. Dist. Bd. of Ed. v. Murphy*, 548 U.S. 291 (2006) ........................ 12

*Bachman v. Am. Soc. of Clinical Pathologists*, 577 F. Supp. 1257 (D.N.J. 1983) ..... 22, 23

*Barnes v. Gorman*, 536 U.S. 181 (2002) ............................................ 9, 10, 11, 12

*Bob Jones Univ. v. United States*, 461 U.S. 574 (1983) ................................ 28, 29, 31, 32

*Cannon v. University of Chicago*, 441 U.S. 677, 694-95 (1979) ............................... 15, 18

*Chaplin v. Consol. Edison Co.*, 628 F. Supp. 143, 146 (S.D.N.Y. 1986) ........................ 22

*Community Television of Southern California v. Gottfried*, 459 U.S. 498 (1983) ............ 23

*Cummings v. Premier Rehab Keller, P.L.L.C.*, 142 S. Ct. 1562 (2022) .................... passim

*Davis v. Monroe Cty. Bd. of Educ.*, 526 U.S. 629 (1999) ............................................ 9, 10

*Doe v. Fairfax Cty. Sch. Bd.*, Civil Action No. 1:18-cv-00614-MSN-IDD, 2023 U.S. Dist. LEXIS 13886 (E.D. Va. Jan. 25, 2023) ................................................................. 10

*E.H. v. Valley Christian Academy*, 616 F. Supp. 3d 1040 (C.D. Cal. 2022) .................... 26

*Forest Grove Sch. Dist. v. T. A.*, 557 U.S. 230 (2009) ...................................................... 10

*Fulani v. League of Women Voters Educ. Fund*, 684 F. Supp. 1185 (1988) ................... 25

*Gebser v. Lago Vista Independent School Dist.*, 524 U.S. 274 (1998) ............. 9, 11, 12, 18

*Graham v. Tennessee Secondary Sch. Athletic Ass'n*, No. 1:95-CV-044, 1995 U.S. Dist. LEXIS 3211, 1995 WL 115890 (E.D. Tenn. Feb. 20, 1995) ................................. 20

*Johnny's Icehouse, Inc. v. Amateur Hockey Ass'n*, 134 F. Supp. 2d 965 (N.D. Ill. 2001); ........................................................................................................................ 20, 21

*Litman v. George Mason Univ.*, 186 F.3d 544, 551 (4th Cir. 1999) .............................. 8, 9

*M.H.D. v. Westminster Schools*, 172 F.3d 797 (11th Cir. 1999) ...................................... 24

*Martin v. Delaware L. Sch. of Widener Univ.*, 625 F. Supp. 1288 (D. Del. 1985), aff'd, 884 F.2d 1384 (3d Cir. 1989) ........................................................................................ 23

*McGlotten v. Connally*, 338 F. Supp. 448 (D.D.C. 1972) ..................................... 15, 24, 25

*Merrifield v. Beaven/Inter-Am. Companies, Inc.*, No. 89 C 8436, 1991 U.S. Dist. LEXIS 12128, 1991 WL 171376 (N.D. Ill. Aug. 30, 1991) ............................................... 23

*Mourning v. Family Publ'ns Serv.*, 411 U.S. 356 (1973) .................................................. 18

*Pennhurst State Sch. & Hosp. v. Halderman*, 451 U.S. 1 (1981) .................... 9, 10, 11, 12

*Regan v. Taxation with Representation*, 461 U.S. 540 (1983) ......................................... 27

*Russo v. Diocese of Greensburg*, No. CIV.A09-1169, 2010 U.S. Dist. LEXIS 96338, 2010 WL 3656579 (W.D. Pa. Sept. 15, 2010) ................................................................. 20

*S.B. v. Bd. of Educ.*, 819 F.3d 69, 75 (4th Cir. 2016). ........................................................ 8

*South Dakota v. Dole*, 483 U.S. 203 (1987) ...................................................................... 10

*Stewart v. New York Univ.*, 430 F. Supp. 1305 (S.D.N.Y. 1976) ...................................... 21

*Thorpe v. Housing Authority of the City of Durham*, 393 U.S. 268 (1969) ..................... 18

*Zimmerman v. Poly Prep Country Day Sch.*, 888 F. Supp. 2d 317 (E.D.N.Y. 2012) ....... 20

## Statutes

20 U.S.C. § 1681 ...............................................................................................................4, 8

20 U.S.C. § 1682 .................................................................................................................. 14

42 U.S.C. § 2000e .................................................................................................................. 11

U.S. Const. art. I, § 8, cl. 1 .................................................................................................... 8

## Regulations

31 C.F.R. § 28.105 ................................................................................................................ 16

34 C.F.R. § 106.2 .................................................................................................................. 16

# JURISDICTIONAL STATEMENT

This case was initially filed by Plaintiffs-Appellees Donna Buettner-Hartsoe and N.H. in the United States District Court for the District of Maryland against Defendant-Appellant Baltimore Lutheran High School Association, Inc., doing business as Concordia Preparatory School. The District Court had federal question jurisdiction pursuant to 28 U.S.C. § 1331 over Plaintiffs-Appellees' sex discrimination claim filed under Title IX of the Education Amendments Act, 20 U.S.C. § 1681, *et. seq*., and the District Court had supplemental jurisdiction over the Maryland state law claims pursuant to 28 U.S.C. § 1367.

After fact discovery concluded, Appellant filed a Partial Motion to Dismiss or in the alternative for Summary Judgment on the Title IX claim. The District Court entered an Order denying Defendant-Appellant's Motion on July 21, 2022. The District Court denied Defendant-Appellant's Motion for Reconsideration, but granted its Motion to Certify Order for Interlocutory Appeal on September 6, 2022. Defendant-Appellant timely filed a Petition for Leave to Appeal on September 14, 2022, which this Court granted on April 26, 2023. This Court has jurisdiction pursuant to 28 U.S.C. § 1292(B).

# ISSUE PRESENTED FOR REVIEW

Did the District Court err in denying Appellant's Partial Motion to Dismiss or in the alternative for Summary Judgment based upon its conclusion that tax

exemption under 26 U.S.C. § 501(c)(3) constitutes receipt of Federal financial assistance for purposes of Title IX of the Education Amendments Act of 1972?

## STATEMENT OF THE CASE

On October 28, 2020, Plaintiffs-Appellees Donna Buettner-Hartsoe and N.H. filed a Complaint against Defendant-Appellant Baltimore Lutheran High School Association, Inc., doing business as Concordia Preparatory School. JA1-23.

Appellant is a small, non-profit, religiously affiliated private school with tax exempt status under 26 U.S.C. § 501(c)(3). JA94.

Appellees brought federal and state claims arising from allegations of student-on-student bullying and harassment, and Appellant's response thereto while N.H. was a student at Appellant's school during the 2017-2018 school year. JA1-23. Appellees' Complaint included a cause of action for violation of 20 U.S.C. § 1681, *et. seq.*, Title IX of the Education Amendments Act. JA12-14. Title IX is known as Spending Clause legislation, applicable to schools and educational programs receiving "Federal financial assistance." Title IX provides generally that "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C. § 1681.

After the conclusion of fact discovery, Appellant filed a Partial Motion to Dismiss or in the alternative for Summary Judgment on the Title IX claim arguing

that Appellant had not received Federal financial assistance during the time period in which N.H. was a student at the school so that Appellees could not assert a cause of action for violation of Title IX. JA24-37. The United States District Court for the District of Maryland construed Appellant's Motion as seeking partial summary judgment, and denied the Motion based upon the legal conclusion that Appellant's 26 U.S.C. § 501(c)(3) tax exemption constitutes Federal financial assistance for the purposes of Title IX. JA102.

Appellant filed a Motion for Reconsideration, or in the Alternative, Motion to Certify Order for Interlocutory Appeal. JA107-279. After a hearing, on September 6, 2022 the District Court denied the Motion for Reconsideration but granted the Motion to Certify Order for Interlocutory Appeal. JA343-355, 385-495. Appellant timely filed a Petition for Leave to Appeal, which this Court granted on April 26, 2023 to address the legal issue whether tax exemption under 26 U.S.C. § 501(c)(3) constitutes receipt of Federal financial assistance for purposes of Title IX of the Education Amendments Act of 1972.

## SUMMARY OF ARGUMENT

The District Court erred when it concluded that Appellant's tax exemption under 26 U.S.C. § 501(c)(3) constitutes receipt of Federal financial assistance for purposes of application of Title IX.

The Supreme Court has repeatedly characterized Title IX and other Spending Clause legislation as contractual in nature meaning that in exchange for Federal financial assistance the recipient agrees to comply with federally imposed conditions such as, under Title IX, an agreement not to discriminate on the basis of sex. Based upon that contract analogy, the Supreme Court has held that if Congress intends to impose a condition on the grant of federal moneys, it must do so unambiguously.

There are a number of reasons why it is hard to credibly argue that Congress unambiguously imposed on tax exempt entities a requirement to comply with Title IX. First, the Title IX statute does not mention, infer, or imply that tax exemption constitutes receipt of Federal financial assistance for purposes of application of the statute. There is nothing in the statute upon which it could be concluded that Congress unambiguously intended to require all tax exempt entities to comply with Title IX. Additionally, the enforcement provisions of Title IX do not mention tax exemption, or that tax exempt status can be revoked if a tax exempt entity does not comply with Title IX.

Second, the administrative agencies charged with implementing and enforcing Title IX and other Spending Clause legislation have uniformly agreed and adopted a comprehensive definition of Federal financial assistance that does not include tax exemptions. The agencies charged with implementing Congress' intention with Title IX clearly do not think that Congress intended to equate tax exemption with Federal

financial assistance. It would defy logic to think that Congress's intention was unambiguous and that all agencies failed to recognize this unambiguous intention.

Third, a majority of courts that have considered the issue have held that tax exemptions do not constitute Federal financial assistance for Title IX and other Spending Clause legislation, and no Circuit Court has reached the contrary conclusion.

Fourth, the District Court's decision has created an untenable rule that would require tax exempt non-profit entities to have the same obligations to keep up with changes in Title IX practices as large universities that have entire divisions dedicated to compliance, not to mention the many other laws and regulations that contain restrictions and burdens on entities that receive Federal financial assistance.

The District Court's decision should be reversed.

## ARGUMENT

## STANDARD OF REVIEW

This Court reviews a district court's decision on summary judgment under a *de novo* standard of review, applying the same legal standard as the district court and viewing the facts in a light most favorable to the nonmoving party. *Zoroastrian Ctr. & Darb-E-Mehr of Metro. Wash., D.C. v. Rustam Guiv Found. of N.Y.*, 822 F.3d 739, 747 (4th Cir. 2016); *FDIC v. Cashion*, 720 F.3d 169, 173 (4th Cir. 2013). A moving party is entitled to summary judgment "if the pleading, depositions, answers

to interrogatories, and admissions on file, together with the affidavits, if any, show

that there is no genuine issue as to material fact and that the moving party is entitled

to judgment as a matter of law." Fed. R. Civ. Pro. 56(c). *Shaw v. Stroud*, 13 F.3d

791, 798 (4th Cir. 1994).

## DISCUSSION

I.   **THE DISRICT COURT ERRED IN DENYING APPELLANT'S PARTIAL MOTION TO DISMISS OR IN THE ALTERNATIVE FOR SUMMARY JUDGMENT**

A.   **Tax exemption under 26 U.S.C. § 501(c)(3) does not constitute receipt of Federal financial assistance under Title IX.**

Title IX of the Education Amendments of 1972 states in relevant part that

"[n]o person in the United States shall, on the basis of sex, be excluded from

participation in, be denied the benefits of, or be subjected to discrimination under

any education program or activity receiving Federal financial assistance." 20 U.S.C.

§ 1681(a).

Title IX "was enacted under the Spending Clause of the Constitution, U.S.

Const. art. I, § 8, cl. 1 ('The Congress shall have Power To lay and collect Taxes .. .

to . . . provide for the . . . general Welfare of the United States')." *Litman v. George

Mason Univ.*, 186 F.3d 544, 551 (4th Cir. 1999). *See also S.B. v. Bd. of Educ.*, 819

F.3d 69, 75 (4th Cir. 2016) ("Title IX is what is known as Spending Clause

legislation, applying to schools and educational programs that receive federal

funds.").

The Supreme Court has long recognized, for more than 40 years, that legislation enacted by Congress pursuant to the Spending Clause "is much in the nature of a contract" between the recipient of that spending and the Federal government. *Pennhurst State Sch. & Hosp. v. Halderman*, 451 U.S. 1, 17 (1981). *See also Cummings v. Premier Rehab Keller, P.L.L.C.*, 142 S. Ct. 1562, 1570 (2022); *Barnes v. Gorman*, 536 U.S. 181, 186 (2002); *Davis v. Monroe Cty. Bd. of Educ.*, 526 U.S. 629, 658-59 (1999); *Gebser v. Lago Vista Independent School Dist.*, 524 U.S. 274, 286 (1998). "In other words, in exercising its spending power, the federal government 'conditions an offer of federal funding on a promise by the recipient not to discriminate, in what amounts essentially to a contract between the Government and the recipient of funds.'" *Litman*, 186 F.3d at 551-52 (quoting *Gebser*, 524 U.S. at 286).

Because Spending Clause legislation such as Title IX is effectively a contract between the government and the recipient of the federal funds whereby the recipient agrees that, in exchange for the funds, it is bound to comply with the Spending Clause legislation, the Supreme Court has noted that, like other types of contracts, there can be no knowing acceptance of the contract attendant with Spending Clause legislation if the recipient of federal funds "is unaware of the conditions or is unable to ascertain what is expected of it. Accordingly, if Congress intends to impose a condition on the grant of federal moneys, it must do so unambiguously." *Pennhurst*,

451 U.S. at 17. *See also Forest Grove Sch. Dist. v. T. A.*, 557 U.S. 230, 246 (2009) (stating that "conditions attached to a State's acceptance of funds must be stated unambiguously"); *Barnes*, 536 U.S. at 186; *Davis*, 526 U.S. at 637; *South Dakota v. Dole*, 483 U.S. 203, 207 (1987).

Most recently, in *Cummings*, the Supreme Court addressed this contract analogy when considering whether emotional distress damages were available in a disability discrimination case brought under Spending Clause statutes the Rehabilitation Act of 1973 and the Patient Protection and Affordable Care Act. The Supreme Court's decision and more importantly its rationale implicated all Spending Clause legislation that prohibits recipients of Federal financial assistance from discriminating based upon certain protected grounds because "the Rehabilitation Act and the Affordable Care Act . . . each expressly incorporates the rights and remedies provided under Title VI." 142 S. Ct. at 1568-69. *See also Doe v. Fairfax Cty. Sch. Bd.*, Civil Action No. 1:18-cv-00614-MSN-IDD, 2023 U.S. Dist. LEXIS 13886, at *10 (E.D. Va. Jan. 25, 2023) (applying the holding in *Cummings* to a Title IX claim, and drawing support from the fact that "district courts across the country since *Cummings* have uniformly held that its holding applies to Title IX claims and precluded emotional distress damages accordingly").

In *Cummings*, the Supreme Court began its analysis by observing that Spending Clause legislation like Title IX operates "by 'conditioning an offer of

federal funding on a promise by the recipient not to discriminate, in what amounts essentially to a contract between the Government and the recipient of funds.'" *Id.* at 1570 (quoting *Gebser*, 524 U.S. at 286). The Supreme Court explained that, "[u]nlike ordinary legislation, which 'imposes congressional policy' on regulated parties 'involuntarily,' Spending Clause legislation operates based on consent: 'in return for federal funds, the [recipients] agree to comply with federally imposed conditions." *Id.* [1] (quoting *Pennhurst*, 451 U.S. at 16. The Supreme Court further explained that, "For that reason, the 'legitimacy of Congress' power' to enact Spending Clause legislation rests not on its sovereign authority to enact binding laws, but on 'whether the [recipient] voluntarily and knowingly accepts the terms of th[at] contract.'" *Id.* (quoting *Barnes*, 536 U.S. at 186); (quoting in turn *Pennhurst*, 451 U.S. at 17). The Court recognized the obvious proposition that, "Recipients cannot 'knowingly accept' the deal with the Federal Government unless they 'would clearly understand . . . the obligations' that would come along with doing so." *Id.*

---

[1] The contrast between "ordinary legislation" and Spending Clause legislation was perhaps best summarized with the example in *Gebser* in which the Supreme Court distinguished Title IX from Title VII of the Civil Rights Act of 1964 (42 U.S.C. § 2000e), stating that Title VII, which "applies to all employers" and "aims broadly to eradicate discrimination throughout the economy," "is framed in terms not of a condition but of an outright prohibition." *Gebser*, 524 U.S. at 286. "Title VII, moreover, seeks to 'make persons whole for injuries suffered through past discrimination.'" *Id.* "Thus, whereas Title VII aims centrally to compensate victims of discrimination, Title IX focuses more on 'protecting' individuals from discriminatory practices carried out by recipients of federal funds." *Id.*

(quoting *Arlington Central Sch. Dist. Bd. of Ed. v. Murphy*, 548 U.S. 291, 296 (2006)). The Court noted that it therefore construes "the reach of Spending Clause conditions with an eye toward 'ensuring that the receiving entity of federal funds [had] notice that it will be liable.'" *Id.* (quoting *Gebser*, 524 U.S. at 287).

The Court continued by noting that, "when considering whether to accept federal funds, a prospective recipient would surely wonder . . . what rules it must follow. . . ." *Id.* The Supreme Court expounded that a recipient of federal funding must be "*on notice* that, by accepting federal funding, it exposes itself to liability of that nature." *Id.* (quoting *Barnes*, 536 U.S. at 188) (emphasis in original)). The Court concluded that "'if Congress intends to impose a condition on the grant of federal moneys, it must do so unambiguously'":

> After all, when considering whether to accept federal funds, a prospective recipient would surely wonder not only what rules it must follow, but also what sort of penalties might be on the table. A particular remedy is thus "appropriate relief" in a private Spending Clause action "only if the funding recipient is on notice that, by accepting federal funding, it exposes itself to liability of that nature." Only then can we be confident that the recipient "exercise[d its] choice knowingly, cognizant of the consequences of [its] participation" in the federal program.

*Id.* (quoting *Pennhurst*, 451 U.S. at 17).

In *Cummings*, it was undisputed that the defendant received Federal financial assistance because it was a rehabilitation center that accepted Medicare. The Supreme Court held that emotional distress damages are not recoverable under

Spending Clause statutes because recipients of federal funding would not be on notice of the recoverability of such damages given those damages are not specified in the statute or generally recoverable under contract law. *Id.* at 1570-76. Because the recovery of emotional distress damages in the Spending Clause statutes was not unambiguously set forth in the law under which the defendant knowingly accepted Federal financial assistance, it could not be said that the defendant clearly understood that such damages were recoverable. *Id.* Of note, when the Supreme Court examined what constituted being unambiguously set forth in the law, it recognized that, "No dive through the treatises, 50-state survey, or speculative drawing of analogies is required." *Id.* at 1573.

What damages are recoverable is not an issue here, but the clear application of *Cummings* and the precedents cited above to the instant case is that the current Supreme Court held that, for Spending Clause legislation like Title IX to be applicable to any given defendant, its application must be unambiguous under the law, such that the defendant would clearly understand, and knowingly accept, its obligations. It would be absurd to suggest that a recipient of federal funds did not have notice of available damages, but that the same analysis did not apply to whether an entity was subject to the statute at all.

Because the *Cummings* opinion makes clear that, for a § 501(c)(3) tax exemption to constitute Federal financial assistance for statutes such as Title IX to

apply, Congress must have unambiguously conditioned the extension of that tax exemption on the application of Title IX, such that an entity such as Appellant in the instant case would "clearly understand" and be "on notice" that its tax exemption was conditioned upon its adherence to Title IX, the analysis should start with the language and purpose of Title IX. This is a high standard, which can only be met with language that clearly evidences Congress's intent. There is no such language in Title IX, let alone language that is unambiguous.

The Title IX statute does not mention, infer, or imply that tax exemption equates to receipt of Federal financial assistance. The statute is wholly silent and does not discuss tax exempt status in any respect whatsoever. Because of this, there is nothing in the statute to suggest that Congress intended to require all tax exempt entities to comply with Title IX, and certainly nothing that rises to the level of unambiguously puts entities like Appellant on notice that its tax exemption mandates compliance with Title IX.

Similarly, the enforcement provisions of Title IX do not mention or discuss tax exemption. The enforcement language in 20 U.S.C. § 1682 refers to Federal departments and agencies ability to terminate or refuse to grant or continue assistance if an entity fails to comply with a requirement improved by Title IX.[2] The

---

[2] 20 U.S.C. § 1682 states in relevant part:

enforcement language, however, does not mention, infer, or imply that an entity's tax exempt status can be revoked for failure to comply with Title IX requirements. Again, there is nothing in the enforcement provisions that suggests that Congress intended for tax exempt entities to comply with Title IX, let alone did so unambiguously.

The absence of legislative history on this point is also instructive. Congress enacted Title IX with two principal objectives in mind: to avoid the use of federal resources to support discriminatory practices in education programs, and to provide individual citizens effective protection against those practices. *See Cannon v. University of Chicago*, 441 U.S. 677, 704 (1979). There is no discussion in the legislative history of the 1964 Civil Rights Act to suggest that tax exemptions constituted Federal financial assistance. *See McGlotten v. Connally*, 338 F. Supp.

---

Compliance with any requirement adopted pursuant to this section may be effected (1) by the termination of or refusal to grant or to continue assistance under such program or activity to any recipient as to whom there has been an express finding on the record, after opportunity for hearing, of a failure to comply with such requirement, but such termination or refusal shall be limited to the particular political entity, or part thereof, or other recipient as to whom such a finding has been made, and shall be limited in its effect to the particular program, or part thereof, in which such noncompliance has been so found, or (2) by any other means authorized by law: Provided, however, That no such action shall be taken until the department or agency concerned has advised the appropriate person or persons of the failure to comply with the requirement and has determined that compliance cannot be secured by voluntary means.

448, 461 (D.D.C. 1972).[3] Therefore, the legislative history does not reveal that Congress unambiguously conditioned the extension of a tax exemption on an agreement whereby the tax exempt entity would clearly understand and be on notice that Title IX applied to it.

Absent plain language in the statute addressing this issue, and any legislative history, it is instructive that Congress directed agencies that extend federal grants, loans, or other assistance to education programs or activities to promulgate their own rules and regulations consistent with the objectives of Title IX. Based upon that authority, the Department of Education, the Department of the Treasury, and twenty-one (21) other Federal agencies have enacted similar comprehensive definitions of Federal financial assistance; the Department of Education's regulation, 34 C.F.R. § 106.2(g), and the Department of the Treasury's regulation, 31 C.F.R. § 28.105, state:

> Federal financial assistance means any of the following, when authorized or extended under a law administered by the Department:
> (1) A grant or loan of Federal financial assistance, including funds made available for:
> (i) The acquisition, construction, renovation, restoration, or repair of a building or facility of any portion thereof; and
> (ii) Scholarships, loans, grants, wages or other funds extended to any entity for payment to or on behalf of students admitted to that entity, or extended directly to such students for payment to that entity.

---

[3] *But see* JA83-84. (The Private Schools Nondiscrimination and Due Process Act of 1979, S.B. 995, reprinted in 1979 Cong. Rec. S8436 (daily ed. Apr. 24, 1979), stating in the "Declaration of Congressional Policy" that "various Acts of Congress which condition Federal financial assistance to grantees, such as Title VI of the Civil Rights Act of 1964 and Title IX of the Education Amendments of 1972, do not apply to organizations simply because they are tax-exempt").

(2) A grant of Federal real or personal property or any interest therein, including surplus property, and the proceeds of the sale or transfer of such property, if the Federal share of the fair market value of the property is not, upon such sale or transfer, properly accounted for to the Federal Government.

(3) Provision of the services of Federal personnel.

(4) Sale or lease of Federal property or any interest therein at nominal consideration, or at consideration reduced for the purpose of assisting the recipient or in recognition of public interest to be served thereby, or permission to use Federal property or any interest therein without consideration.

(5) Any other contract, agreement, or arrangement which has as one of its purposes the provision of assistance to any education program or activity, except a contract of insurance or guaranty.

This regulatory definition of Federal financial assistance proves that the administrative agencies charged with implementing congressional policy have agreed that only five types of government assistance qualify as Federal financial assistance for purpose of application of Title IX, each involving the transfer of funds or something of value, i.e., a cash grant or loan, a grant of property, receipt of federal services, etc. The regulatory definition of "Federal financial assistance" does not include tax exemptions.  This is highly persuasive because if Congress has unambiguously equated tax exempt status with Federal financial assistance, the administrative agencies charged with implementing Title IX certainly would have included tax exemption within the administrative definition of that term. The fact that the administrative agencies did not believe that Congress intended for Federal financial assistance to include tax exempt status means that those entities with tax exempt status could not have clearly understood that was Congress' intention, and

were certainly not on notice that its tax exemption was conditioned upon its adherence to Title IX. Contrary to making it "unambiguous" that tax exempt status constitutes Federal financial assistance, the fact that tax exempt status is not mentioned at all in the regulatory definition makes clear that these agencies did not believe that Congress intended that tax exemption equates to Federal financial assistance. The analysis of these agencies is highly persuasive, given the deference paid to a federal agency's statutory interpretation under *Chevron U.S.A. Inc. v. Natural Resources Defense Council*, 467 U.S. 837, 843-45 (1984).[4]

In addition to published regulations, this conclusion is further supported by the Department of Justice Title VI Legal Manual,[5] which in part concludes that tax benefits are not Federal financial assistance "because they are not contractual in nature":

---

[4] An agency's interpretation of a statute is valid if it is "'reasonably related to the purpose of the enabling legislation.'" *Mourning v. Family Publ'ns Serv.*, 411 U.S. 356, 369 (1973) (quoting *Thorpe v. Housing Authority of the City of Durham*, 393 U.S. 268, 280-81 (1969). The District Court ignored that substantial deference afforded to the regulations defining "Federal financial assistance" and imposed its own public policy and interpretation that has not been adopted by any agency of the federal government. To Appellant's knowledge, the federal government has never brought an enforcement action against a § 501(c)(3) tax exempt non-profit entity that does not receive federal funding for failing to have a Title IX program.

[5] Title VI is relevant to the analysis because "Title IX was patterned after Title VI of the Civil Rights Act of 1964. Except for the substitution of the word 'sex' in Title IX to replace the words 'race, color, or national origin' in Title VI, the two statutes use identical language to describe the benefited class." *Cannon*, 441 U.S. at 694-95. *See also Gebser*, 524 U.S. at 286 (noting that Title IX and Title VI "operate in the same manner").

> Typical tax benefits, tax exemptions, tax deductions, and most tax credits are not considered federal financial assistance. Unlike grants, most typical tax benefits are not included in the statutory or regulatory definitions of federal financial assistance because they are not contractual in nature. *See, e.g.*, 42 U.S.C. § 2000d-1; 28 C.F.R. § 42.102(c); 31 C.F.R. § 28.105. Most courts that have considered the issue have concluded that typical tax benefits are not federal assistance.

JA162. To that end, the Department of Justice confirmed that, when determining whether an entity has received Federal financial assistance, "the clearest means . . . is to determine whether the entity has voluntarily entered into a relationship with the federal government and receives federal assistance under a condition or assurance of compliance with Title VI (and/or other nondiscrimination obligations)." JA169. Because the Department of Justice, which is charged with coordination of federal agency implementation and enforcement of Title IX (and Title VI), has concluded that § 501(c)(3) tax exemption is not the same as voluntarily entering into a relationship with the federal government agreeing to comply with nondiscrimination statutes in exchange for federal assistance, such that tax exemption is not Federal financial assistance, it cannot be said that Congress has unambiguously stated that tax exempt status constitutes Federal financial assistance for purposes of application of Title IX.

Furthermore, the majority of courts that have considered the issue have held that tax exemptions do not constitute Federal financial assistance for Title IX and other Spending Clause legislation. *E.g. Johnny's Icehouse, Inc. v. Amateur Hockey*

*Ass'n*, 134 F. Supp. 2d 965, 971-72 (N.D. Ill. 2001);; *Zimmerman v. Poly Prep Country Day Sch.*, 888 F. Supp. 2d 317, 332 (E.D.N.Y. 2012) ("Courts have held, however, that [tax exempt] status does not constitute Federal financial assistance within the meaning of Title IX."). Other courts, while not directly ruling on the issue, have also expressed skepticism that tax exempt status qualifies as Federal financial assistance. *See, e.g., Russo v. Diocese of Greensburg*, No. CIV.A09-1169, 2010 U.S. Dist. LEXIS 96338, 2010 WL 3656579, at *3 (W.D. Pa. Sept. 15, 2010) ("[W]e are inclined to express our doubt, without necessarily deciding, that Russo could prove that either coordinating educational services with the public school district or obtaining tax-exempt status would transform a private, parochial school into a recipient of Federal Financial Assistance for purposes of Title IX and/or the Rehabilitation Act."); *Graham v. Tennessee Secondary Sch. Athletic Ass'n*, No. 1:95-CV-044, 1995 U.S. Dist. LEXIS 3211, 1995 WL 115890, at *17 n.4 (E.D. Tenn. Feb. 20, 1995) ("In concluding that TSSAA is a program or activity receiving federal financial assistance, the Court does not rely on plaintiffs' contention that TSSAA receives federal financial assistance by way of its tax-exempt status under 26 U.S.C. § 501(c)(3).").

*Johnny's Icehouse* is most consistent with *Cummings* because it is based upon the "foundation" of and the "contractual basis for imposing . . . requirements" of Spending Clause legislation; "when the government offers to transfer money or

property to an entity to support an educational program or activity, the intended recipient has the choice whether or not to accept the assistance and the concomitant obligation not to discriminate on the basis of sex." 134 F. Supp. 2d at 969, 972. The District Court for the Northern District of Illinois further noted that "[w]hile Congress may condition tax exempt status on an organization's conforming to the specific categories in Section 501(c)(3) . . .that was not the power that Congress invoked to subject entities to the nondiscrimination requirements of Title IX." Otherwise stated, Congress has not unambiguously conditioned tax exempt status with mandatory Title IX compliance, and thus, the "foundation" of Spending Clause legislation is missing. Given the foundation of Spending Clause legislation, and the absence of tax exempt status in the Federal regulations and any administrative guidance, a private independent school such as Appellant could not have knowingly and voluntarily agreed to be subject to Title IX by the mere fact of its non-profit charitable § 501(c)(3) status.

Similarly, in *Stewart v. New York Univ.*, 430 F. Supp. 1305, 1314 (S.D.N.Y. 1976), the Southern District of New York concluded that "granting of tax deductions and exemptions" which "'creates only a minimal and remote involvement' by the government in the activities of the recipient" does not rise to the "degree of governmental involvement" to allow a cause of action under Title IX. Although it is undisputed that the impact of a tax exemption is a financial benefit, it creates only a

minimal and remote involvement by the government, unlike a quasi-contractual relationship whereby the government conditions acceptance of money or property upon an entity's agreement to not engage in discrimination. If tax exempt status creates minimal and remote involvement by the government, it cannot be said that tax exempt entities are burdened with the requirements of Title IX and a host of other federal statutes that mandate strict and cumbersome regulatory infrastructures. The Department of Education's Title IX regulations include, among many other things, a specific and elaborate grievance procedure that mandates the hiring of a Title IX coordinator (and other staff trained to investigate and adjudicate sexual harassment and other misconduct allegations and apply complicated legal concepts). Such onerous and detailed requirements to comply with Title IX, not to mention the other Spending Clause legislation, runs directly contrary to the conclusion that tax exemption creates only minimal and remote involvement by the government. *See also Chaplin v. Consol. Edison Co.*, 628 F. Supp. 143, 146 (S.D.N.Y. 1986) ("The investment tax credit does not subject Con Ed to the *in-depth regulation* plaintiffs propose.") (emphasis added).

Furthermore, in *Bachman v. Am. Soc. of Clinical Pathologists*, 577 F. Supp. 1257, 1264 (D.N.J. 1983), the District Court held "that the Rehabilitation Act was not intended to cover tax-exempt institutions absent any further affirmative federal financial assistance." To reach that conclusion, the District Court first noted that "not

every item of economic value granted by the federal government counts as financial assistance within the meaning of section 504 of the Rehabilitation Act," citing *Community Television of Southern California v. Gottfried*, 459 U.S. 498 (1983) for support where the Supreme Court held that, while broadcast licenses possess economic value, Congress did not intend the FCC's renewal of a broadcast license to be considered a form of Federal financial assistance. *Bachman*, 577 F. Supp. at 1263-64 (D.N.J. 1983). Instead, the court noted that the plain meaning of the term "assistance" in Federal financial assistance "connotes a transfer of government funds by way of subsidy, not merely an exemption from taxation." *Bachman*, 577 F. Supp. at 1264. *See also Merrifield v. Beaven/Inter-Am. Companies, Inc.*, No. 89 C 8436, 1991 U.S. Dist. LEXIS 12128, 1991 WL 171376, at *3 (N.D. Ill. Aug. 30, 1991); *Martin v. Delaware L. Sch. of Widener Univ.*, 625 F. Supp. 1288, 1302 n.13 (D. Del. 1985), *aff'd*, 884 F.2d 1384 (3d Cir. 1989)   Further explaining the distinction between tax exemption and the necessary transfer of government funds, services, or property to constitute Federal financial assistance, the *Bachman* court stated "such an organization must be the recipient of federal grants, contracts, or loans, *or be party to a cooperative agreement with the government*." *Bachman*, 577 F. Supp. at 1264 (emphasis added). Thus, the *Bachman* decision is also consistent with the Supreme Court's analysis of the foundation of Spending Clause legislation and the contractual or "cooperative agreement" whereby the entity accepts government

assistance in exchange for an agreement to comply with certain non-discriminatory laws.

There is no Circuit Court decision holding that tax exemption equates to Federal financial assistance. In *M.H.D. v. Westminster Schools*, 172 F.3d at 802 n. 12, the Eleventh Circuit Court of Appeals stated in *dicta*, in a footnote, that the argument that tax exempt status constituted Federal financial assistance "was neither immaterial nor wholly frivolous." To the extent that the *M.H.D* court recognized that it was not bad faith to argue that tax exempt status constituted Federal financial assistance, the court did not hold that it was, and there was no discussion or recognition of the contractual analogy or foundation of Spending Clause legislation set forth fully in *Cummings*.

In contrast to the well-reasoned majority opinions that are consistent with Supreme Court precedent and Department of Justice interpretation, the sparse case law concluding that tax exempt status is Federal financial assistance does not address the foundation of Spending Clause legislation, and it is inconsistent with the contract analogy. The *dicta* in *McGlotten v. Connally*, which predated *Cummings* by over 50 years, is entirely inconsistent with *Cummings*, and reveals the unreliability of its *dicta*. Specifically, the *McGlotten* court recognized that the applicable regulations of Title VI excluded tax exemptions from the definition of Federal financial assistance. 338 F. Supp. at 461. The court also recognized that there was no

discussion in the "massive legislative history" of the 1964 Civil Rights Act to suggest that tax exemptions constituted Federal financial assistance. *Id.* Nevertheless, the Court said that, "[d]istinctions as to the method of distribution of federal funds or their equivalent seem beside the point….," and relied on the "plain purpose" of the statute to eliminate discrimination to suggest that tax exemptions constituted Federal financial assistance. *Id.* That general purpose is "beside the point" because, while it is in the best interests of the public to prevent discrimination based upon race, color, national origin, sex, gender, age, disability, sexual orientation, etc., and the Federal government has enacted laws protecting individuals from such discriminatory practices, those laws do not apply to all persons and entities. The question is not whether tax exempt entities should not engage in sex discrimination, but whether tax exempt entities, by reason of that tax exempt status, clearly understand and are on notice that they must comply with Title IX.

In *Fulani v. League of Women Voters Educ. Fund*, 684 F. Supp. 1185, 1192 (1988), there is no discussion whatsoever of why a tax exemption met the definition of Federal financial assistance and the determination was immaterial and *dicta* given that the defendant in that case received federal grants from the Department of Energy and the EPA. *Fulani* also did not mention the contract analogy giving rise to application of Spending Clause legislation.

Similarly, in *E.H. v. Valley Christian Academy*, 616 F. Supp. 3d 1040 (C.D. Cal. 2022), the court inverted the foundation of Spending Clause legislation by starting with the proposition that tax exemption confers a financial benefit that obligates compliance with Title IX. Without acknowledging the regulatory definitions of "Federal financial assistance," the District Court in California defined the plain purpose of Title IX as "controlling" because there was no controlling precedent in the Ninth Circuit and there was no "strong legislative history to the contrary" that tax exempt status should not constitute Federal financial assistance. *Id.* at 1050. This analysis turns the foundation of Spending Clause legislation on its head and is entirely inconsistent with *Cummings* which required unambiguous authority such that the recipient of Federal financial assistance knowingly and voluntarily accepts the obligations of Title IX (not that the recipient should expect to be bound by Title IX absent congressional intent otherwise). The fact that *Valley Christian Academy* did not mention *Cummings*, decided only three months earlier, or its progeny about the contractual underpinning of Spending Clause legislation highlights its lack of persuasiveness.

**B.    The District Court's rationale ignored the foundation of Spending Clause legislation and conflated public policy in favor of eliminating discrimination with receipt of Federal financial assistance.**

Because exemption from taxation is not mentioned in Title IX, or the regulations and guidance from the Federal administrative agencies charged with

implementing and enforcing the statute, the District Court's reliance upon an extraneous quote in *Regan v. Taxation with Representation*, 461 U.S. 540, 544 (1983), that "tax exemptions and tax-deductibility are a form of subsidy" and "has much the same effect as a cash grant to the organization," was misguided. The issue in *Regan* was not the import or form of a tax exemption, and was not whether a tax exemption or tax benefit constitutes Federal financial assistance; the case did not involve Title IX or any Spending Clause legislation. Instead, the issue was the constitutionality of a provision in § 501(c)(3) of the Internal Revenue Code granting tax exemption to certain nonprofit organizations with "no substantial part of the activities of which is carrying on propaganda, or otherwise attempting to influence legislation." A nonprofit lobbying group challenged the constitutionality of that limitation on First Amendment and equal protection grounds, and the Supreme Court upheld the provision because Congress did not infringe on the rights of the nonprofit lobbying group when it chose to support certain activities. *Id.* at 544. The Supreme Court concluded its opinion by stating "the issue in these cases is not whether TWR must be permitted to lobby, but whether Congress is required to provide it with public money with which to lobby. For the reasons stated above, we hold that it is not." *Id.* at 551

*Regan* did not hold, conclude, or even address whether tax exemptions, deductions or other tax benefits under the tax system are a form of Federal financial

assistance under Title IX or other Spending Clause legislation, and the random quotation utilized by the District Court in its decision here was not even pertinent to the specifics of the Supreme Court's decision. There is absolutely nothing in the *Regan* decision that gives any indication that the Supreme Court intended its use of the phrases "a form of subsidy" and "a cash grant" to have precedential value to the present issue, or that the Supreme Court was equating tax benefits to Federal financial assistance under Spending Clause legislation.

The District Court also relied on *Bob Jones Univ. v. United States*, 461 U.S. 574 (1983), for the principle that "tax exempt institutions 'must demonstrably serve and be in harmony with the public interest.'" JA100. The District Court concluded that because Appellant is a § 501(c)(3) tax exempt entity, it must not engage in illegal or activities contrary to public policy, and because discrimination on the basis of sex is both, Appellant is bound by the requirements of Title IX. The public policy against discrimination based on sex, however, does not mean that tax exempt entities must comply with Title IX; those are two separate and distinct issues.

The impetus for *Bob Jones University* was the IRS' issuance of Revenue Ruling 71-447 which stated that "[a] private school that does not have a racially nondiscriminatory policy as to students does not qualify for [a § 501(c)(3)] exemption." Stated otherwise, the IRS Revenue Ruling was that a school could not have § 501(c)(3) status if it had a policy that discriminated based on race. After

issuance of the Revenue Ruling, the IRS revoked the tax exempt status of two schools (Bob Jones University and Goldsboro Christian Schools). Both schools challenged the IRS' decision but the Supreme Court rejected their arguments. The Supreme Court concluded that the intent of the § 501(c)(3) tax exemption is that "an institution seeking tax-exempt status must serve a public purpose and not be contrary to established public policy" and must meet "certain common-law standards of charity." *Id.* at 587. "Congress sought to provide tax benefits to charitable organizations, to encourage the development of private institutions that serve a useful public purpose or supplement or take the place of public institutions of the same kind." *Id.* at 588. The Supreme Court then noted a "corollary of the public benefit principle" being that "the purpose of a charitable trust may not be illegal or violate established public policy." *Id.* at 590. Thus, the Supreme Court stated:

> History buttresses logic to make clear that, to warrant exemption under § 501(c)(3), an institution must fall within a category specified in that section and must demonstrably serve and be in harmony with the public interest. The institution's purpose must not be so at odds with the common community conscience as to undermine any public benefit that might otherwise be conferred.

*Id.* at 591-92.

*Bob Jones University*, however, did not hold, conclude or even address whether a § 501(c)(3) tax exemption is a form of Federal financial assistance under Title IX or other Spending Clause legislation such that all tax exempt entities must comply with Title IX. Instead, the Supreme Court's holding was that an

organization's purpose must be charitable to obtain the tax exemption and that the charitable organization cannot have racially discriminatory practices in violation of a most fundamental national public policy. Neither that holding, nor the rationale behind it, is applicable in this case because there is no allegation of any racially discriminatory admissions policies in this case. The allegations in the operative Complaint are that Appellant failed to adequately prevent and remedy student-on-student sexual harassment. JA15. Incidents of alleged student-on-student harassment, and Appellant's response thereto, is wholly different than a school admissions policy that discriminates based upon race and was created, enacted, and enforced by those responsible for operating the school, such that the purpose of the school could be deemed to be discriminatory.

While the racially discriminatory admissions policies in *Bob Jones University* rendered the purposes of those educational institutions so at odds with public policy and "common community conscience" that those schools could not be considered to express the common law standards of charity, the same cannot be said for Appellant. Appellant "is a community devoted to excellent education, leadership, and Christian service." JA872. Its school moto is "All to the Glory of God!" as "The school's philosophy of education is based on the Holy Scriptures as the Word of God" with "[a] college preparatory curriculum is determined by the requirements of a complex and changing society, by the needs and aptitudes of the students, and the spirit and

substance of the Gospel of Christ." JA872. Appellant has non-discrimination policies and procedures in its handbooks stating that "Concordia Prep does not discriminate on the basis of race, color, sex, national or ethnic origin in the administration of its educational policies, admission policies, and athletic and other school-administered programs, and guarantees to all the rights, privileges, programs and activities generally accorded or made available to students at the school." JA874. Appellant further has a policy against sexual harassment stating that the school "is committed to maintaining a learning environment that is free from all forms of sexual harassment and in which all employees and students can work and study together comfortably and productively. Concordia Prep prohibits and will not condone, permit or tolerate any form of sexual harassment." JA874. Thus, unlike the schools at issue in *Bob Jones University*, Appellant's purpose is not "so at odds with the common community conscience as to undermine any public benefit that might otherwise be conferred." 461 U.S. at 591-592. Stated conversely, under the rationale of *Bob Jones University*, Appellant's tax exempt status is well founded and appropriate.

Moreover, even if a nonprofit charitable entity such as Appellant violated or allegedly violated the requirements of Title IX, it does not mean that Appellant's purpose violates a fundamental national public policy. It does not automatically or necessarily follow that if an entity is not in compliance with all obligations under

Title IX regulations, such as a specific and elaborate grievance procedure that mandates the hiring of a Title IX coordinator, that entity's purpose becomes "so at odds with the common community conscience as to undermine any public benefit that might otherwise be conferred." *Id.* If this were the law it would mean that every § 501(c)(3) entity would lose that tax status if it was accused and proven to have failed to prevent harassment, as distinct from having a policy that mandated discrimination. To make that connection is reductive reasoning and defies logic.

## II. <u>REQUIRING ALL 26 U.S.C. § 501(C)(3) TAX EXEMPT ENTITIES WITH SOME EDUCATION PURPOSE TO COMPLY WITH TITLE IX WOULD CAUSE SIGNIFICANT HARM TO THE PRIVATE SCHOOL AND NON-PROFIT COMMUNITIES</u>

Because the foundation of Spending Clause legislation requires that Congress must clearly and unambiguously condition the acceptance of Federal financial assistance on the agreement to comply with, in this case, Title IX, the conclusion that a private independent school such as Appellant did not knowingly and voluntarily agree to be subject to Title IX by the mere fact of its non-profit charitable § 501(c)(3) status is borne out by the record, which demonstrates that virtually all private, independent schools were operating under the well-reasoned belief that tax exempt status did not constitute Federal financial assistance. JA368, 379-80. The *amici curiae* briefs submitted to the District Court are instructive, including the brief from the National Association of Independent Schools, the National Business Officers Association, the Association of Independent Schools of Greater

Washington, the Southern Association of Independent Schools, the Virginia Association of Independent Schools, the North Carolina Association of Independent Schools, and the Palmetto Association of Independent Schools, which was also supported by fifty-four (54) other nonprofit organizations and represented the vast majority of the private school community including approximately 30,500 private schools. That *amici curiae* brief expressly stated that "[t]he independent school community has relied on the regulations and precedent cited above and has not instituted the substantial, prescriptive measures required to comply with Title IX": "For many years, independent schools throughout the country have relied on federal regulations and a consensus among education lawyers and other professionals that, by foregoing federal funds, they would not be burdened with the requirements of Title IX and a host of other federal statutes that mandate strict and cumbersome regulatory infrastructures." JA368, 379-380.

Title IX's substantive and procedural requirements are elaborate and complicated, and change regularly from administration to administration. Under the District Court's rationale, tax exempt non-profit entities would have the same obligations to keep up with changes in Title IX practices as large universities that have entire divisions dedicated to compliance. "Many of these directives would be nearly impossible for small or modest sized independent schools to comply with" given the modest size of many independent school. JA502.

Of course, this is not to say that an entity exempt from taxation under § 501(c)(3) is permitted to discriminate on the basis of sex or ignore reports of incidents of sexual harassment. To the contrary, "Independent schools have protected their students and staff through different, but rigorous and effective, safeguards tailored to their size and mission." JA493. Additionally, there are common law principles and claims to address those issues as demonstrated by the fact that Appellees have pled various negligence theories under tort law. JA28-36.

However, on the operative question, the consensus in the legal community means that it cannot be concluded that it is clear and unambiguous that a § 501(c)(3) entity's tax exempt status constitutes Federal financial assistance to put those tax exempt entities on notice that they must follow the anti-discrimination requirements of Title IX. In fact, the lack of clarity created by the outlier judicial decisions mentioned above, which contain no sound legal analysis, illustrates at best uncertainly which means that it cannot be said that an entity accepting tax exempt status is knowingly and voluntarily accepting the obligation to comply with Title IX and other Spending Clause legislation.

Independent schools such as Appellant had no expectation that they were recipients of Federal financial assistance by reason of being tax exempt. The District Court's conclusion that Appellant knowingly and voluntarily agreed to abide by

Title IX via acceptance of its § 501(c)(3) tax exempt status was patently incorrect and should be reversed.

## CONCLUSION

Appellant respectfully requests that the Court reverse the District Court of Maryland and hold that tax exemption under 26 U.S.C. § 501(c)(3) does not constitute receipt of Federal financial assistance for purposes of Title IX of the Education Amendments Act of 1972.

## REQUEST FOR ORAL ARGUMENT

Appellant respectfully requests oral argument in this matter and submits that oral argument would be helpful to the Court in resolving the important issues presented with respect to the application of Title IX of the Education Amendments Act of 1972 to an entity based upon the entity's tax exempt status under 26 U.S.C. § 501(c)(3).

Dated: June 5, 2023                          Respectfully submitted,


/s/Gregg E. Viola                            /s/Mark P. Johnson
Gregg E. Viola                               Mark P. Johnson
ECCLESTON & WOLF, P.C.                        ECCLESTON & WOLF, P.C.
Baltimore-Washington Law Center              Baltimore-Washington Law Center
7240 Parkway Drive, 4th Floor                7240 Parkway Drive, 4th Floor
Hanover, MD 21076-1378s                      Hanover, MD 21076-1378
(410) 752-7474 (phone)                       (410) 752-7474
(410) 752-0611 (fax)                         (410) 752-0611 (fax)
E-mail: viola@ewmd.com                       E-mail: johnson@ewmd.com
*Attorney for Defendant - Appellant*         *Attorney for Defendant - Appellant*

## CERTIFICATE OF COMPLIANCE

This document complies with type-volume limits because, excluding the parts of the document exempted by Fed. R. App. P. 32(f) (coverage page, disclosure statement, table of contents, table of citations, statement regarding oral argument, signature block, certificates of counsel, addendum, attachments, this document contains 8,058 words.

This document complies with the typeface requirements because this document has been prepared in a proportional spaced typeface using Microsoft Word in 14 point Times New Roman.

Dated: June 5, 2023                          Respectfully submitted,


                                             /s/Mark P. Johnson
                                             Mark P. Johnson
                                             *Attorney for Defendant - Appellant*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 12th day of June, 2023, I electronically filed the foregoing Brief with the Clerk of the Court for the U.S. Court of Appeals for the Fourth Circuit by using the appellate CM/ECF system. Participants in the case are registered CM/ECF users, and service will be accomplished by the appellate CM/ECF system.

/s/Mark P. Johnson
Mark P. Johnson
*Attorney for Defendant - Appellant*