No. 23-1453

---

# IN THE UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

---

Donna Buettner-Hartsoe; N.H., by and through her Parent and Next Friend Donna Buettner-Hartsoe,

                              Plaintiffs–Appellees,

v.

Baltimore Lutheran High School Association, d/b/a Concordia Preparatory School,

                              Defendant–Appellant.

---

On Appeal from the United States District Court for the District of Maryland
Case No.: 1:20-cv-03132
The Honorable Richard D. Bennett

---

# BRIEF OF *AMICI CURIAE* CIVIL RIGHTS AND SURVIVOR ADVOCACY ORGANIZATIONS IN SUPPORT OF AFFIRMANCE

---

Sean Ouellette
Shariful Khan
Adele P. Kimmel
PUBLIC JUSTICE
1620 L Street NW, Suite 630
Washington, DC 20036
(202) 797-8600
souellette@publicjustice.net
skhan@publicjustice.net
akimmel@publicjustice.net

*Counsel for* Amici Curiae

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Rule 26.1 of the Federal Rules of Appellate Procedure, *amici curiae* state that no *amicus* has a parent corporation and that no publicly held company owns 10% or more of the stock of any *amicus*.

# TABLE OF CONTENTS

CORPORATE DISCLOSURE STATEMENT ............................................i

TABLE OF CONTENTS ..........................................................ii

TABLE OF AUTHORITIES.................................................... iii

INTERESTS OF *AMICI CURIAE* ............................................ 1

STATEMENT REGARDING ORAL ARGUMENT ................................2

INTRODUCTION..................................................................3

ARGUMENT ......................................................................4

I.    Section 501(c)(3) Tax Benefits Are "Federal Financial Assistance" Under Title IX...........................................................4

    A.    The ordinary meaning of "federal financial assistance" plainly includes the grant of § 501(c)(3) tax benefits. ............................4

    B.    Decades of Supreme Court and lower court precedent confirm that § 501(c)(3) tax benefits are federal aid. ..............................8

    C.    Tax-exempt schools "receive" federal financial assistance.......15

    D.    Title IX's structure and regulations show that § 501(c)(3) benefits are "Federal financial assistance."............................20

    E.    Title IX's legislative history reinforces that § 501(c)(3) benefits are "Federal financial assistance.". ...........................................25

II.   Appellant and Its *Amici* Exaggerate Title IX's Burden on Schools and Ignore Sexual Violence's Costs to Students.............................30

CONCLUSION .................................................................32

# TABLE OF AUTHORITIES

## Cases

*Allen v. Wright,*
  468 U.S. 737 (1984) .................................................................. 15, 21, 24

*Bob Jones Univ. v. United States,*
  461 U.S. 574 (1983) ..................................................................... *passim*

*Bob Jones Univ. v. United States.*
  639 F.2d 147 (4th Cir. 1980) ........................................................ *passim*

*Bostock v. Clayton Cnty.,*
  140 S. Ct. 1731 (2020) ...................................................................... 4, 26

*Cannon v. Univ. of Chicago,*
  441 U.S. 677 (1979) .............................................................................. 8

*Comm. for Pub. Educ. & Religious Liberty v. Nyquist,*
  413 U.S. 756 (1973) .................................................................. 14, 15, 28

*Comm'r. v. Sullivan,*
  356 U.S. 27 (1958) .............................................................................. 10

*Cooper Indus., Inc. v. Aviall Servs., Inc.,*
  543 U.S. 157 (2004) ............................................................................ 19

*Geisinger Health Plan v. Comm'r,*
  985 F.2d 1210 (3d Cir. 1993) ............................................................ 18

*Green v. Connally,*
  330 F. Supp. 1150 (D.D.C. 1971), *aff'd, Coit v. Green,* 404
  U.S. 997 (1971) ................................................................. 8, 11, 15, 27

*Green v. Kennedy,*
  309 F. Supp. 1127 (D.D.C 1970) ................................................. *passim*

*Grimm v. Gloucester Cnty. Sch. Bd.,*
  972 F.3d 586 (4th Cir. 2020) ............................................................ 23

*Grove City Coll. v. Bell*,
465 U.S. 555 (1984) ................................................................ *passim*

*Jackson v. Birmingham Bd. of Educ.*,
544 U.S. 167 (2005) .............................................................. 4, 19, 20

*Jeldness v. Pearce*,
30 F.3d 1220 (9th Cir. 1994) ......................................................... 20

*Kisor v. Wilkie*,
139 S. Ct. 2400 (2019) ................................................................. 25

*Davis ex rel. LaShonda D. v. Monroe Cnty. Bd. of Educ.*,
526 U.S. 629 (1999) ................................................................ 19, 30

*McGlotten v. Connally*,
338 F. Supp. 448 (D.D.C. 1972) ............................................... *passim*

*N. Haven Bd. of Educ. v. Bell*,
456 U.S. 512 (1982) ..................................................................... 26

*Nat'l Fed'n of Indep. Bus. v. Sebelius*,
567 U.S. 519 (2012) ..................................................................... 18

*NCAA v. Smith*,
525 U.S. 459 (1999) ..................................................................... 18

*Paralyzed Veterans of Am. v. C.A.B.*,
752 F.2d 694 (D.C. Cir. 1985), *rev'd on other grounds*, 477
U.S. 597 (1986) ............................................................................ 8

*Peltier v. Charter Day Sch., Inc.*,
37 F.4th 104 (4th Cir. 2022) ..................................................... 20, 25

*Pennhurst State Sch. & Hosp. v. Halderman*,
451 U.S. 1 (1981) ..................................................................... 17, 19

*Regan v. Tax'n with Representation*,
461 U.S. 540 (1983) ............................................................... *passim*

*Rosenberger v. Rector & Visitors of Univ. of Virginia*,
515 U.S. 819 (1995) ..................................................................... 14

iv

*Steward Mach. Co. v. Davis*,
   301 U.S. 548 (1937)............................................................... 17, 19

*Texas Monthly, Inc. v. Bullock*,
   489 U.S. 1 (1989)...................................................................... 14

*Trinidad v. Sagrada Orden de Predicadores*,
   263 U.S. 578 (1924)............................................................ 8, 10, 28

*U.S. Dep't of Transp. v. Paralyzed Veterans of America*,
   477 U.S. 597 (1986).......................................................... 5, 16, 18, 22

*Walz v. Tax Commission of City of New York*,
   397 U.S. 664, 699 (1970)........................................................ *passim*

*Whitman v. Am. Trucking Ass'ns*,
   531 U.S. 457 (2001)..................................................................... 21

*Ysleta Del Sur Pueblo v. Texas*,
   142 S. Ct. 1929 (2022)................................................................ 28

## Statutes

20 U.S.C. § 1681 .......................................................................5, 15

20 U.S.C. § 1682 .................................................................... 21, 24

20 U.S.C. § 1686 .................................................................... 22, 23

26 U.S.C. § 170 ............................................................................. 6

42 U.S.C. § 18116 .......................................................................... 7

## Other Authorities

31 C.F.R. § 28.105 ........................................................... *passim*

31 C.F.R. §§ 28.135, 28.140................................................... 30

34 C.F.R. § 106.2 ...................................................................... 24

34 C.F.R. §§ 106.33, 106.41.................................................... 22

117 Cong. Rec. 30408 (1971) ................................................. 26

117 Cong. Rec. 39256 (1971) ................................................. 26

121 Cong. Rec. S16059-60 (daily ed. May 22, 1975) ............................ 27

134 Cong. Rec. 4771 (1988) ................................................. 29

AMERICAN HERITAGE DICTIONARY OF THE ENGLISH LANGUAGE 80 (1973) .......................................................... 5

AMERICAN HERITAGE DICTIONARY OF THE ENGLISH LANGUAGE 492 (1973) .......................................................... 5

BLACK'S LAW DICTIONARY 568 (5th ed., rev. 1979) ............................... 5

BLACK'S LAW DICTIONARY (11th ed. 2019) .................................. 6

Ctrs. for Disease Control & Prevention, Nat'l Ctr. for Injury Prevention & Control, *Preventing Sexual Violence* (2022) ............... 31

Dana Bolger, *Gender Violence Costs: Schools' Financial Obligations Under Title IX*, 125 Yale L.J. 2106, 2118 (2016) ...................................................................... 31

David A. Brennen, *Tax Expenditures, Social Justice, and Civil Rights: Expanding the Scope of Civil Rights Laws to Apply to Tax-Exempt Charities*, 2001 B.Y.U. L. Rev. 167, 223 (2001) ................................................................ 6, 7

Fed. R. App. P. 29 ........................................................... 1, 2

Fed. R. App. P. 32 ............................................................. 1

H.R. Res. 190, 98th Cong., 1st Sess. (1983) .................................. 3, 4, 29

Hearings Before the S. Comm. on Lab. & Hum. Res. on the Supreme Court's Decision in Grove City v. Bell, 99th ...................... 28

Hearings before the Subcomm. on the Const. of the S. Comm. on the Judiciary on a Bill to Clarify Title IX ..................... 28

vi

Hearings before the Subcomm. on Postsecondary Educ. of the Comm. on Educ. & Lab. of the House of Representatives, 94th Cong., 175 (1976)............................................27

John D. Colombo, *Why Is Harvard Tax-Exempt? (and Other Mysteries of Tax Exemption For Private Educational Institutions),* 35 Ariz. L. Rev. 841, 870 (1993) (citing 26 U.S.C. § 145) ....................................................................... 6, 7

Nondiscrimination on the Basis of Sex in Education Programs or Activities Receiving Federal Financial Assistance, 87 Fed. Reg. 41390 (proposed July 12, 2022) ................... 22, 30

S. Rep. No. 100-64 (June 5, 1987) ............................................. 3, 4, 9, 20

S. Rep. No. 91-552 (1969) ........................................................ 10

Stanley S. Surrey, *Federal Income Tax Reform: The Varied Approaches Necessary to Replace Tax Expenditures with Direct Governmental Assistance*, 84 Harv. L. Rev. 352, 384 (1970).................................................................................. 7

Stanley S. Surrey, *Pathways to Tax Reform: The Concept of Tax Expenditures* 6-7 (1973)................................................. 9

U.S. Dep't of Just., Title VI Legal Manual, https://www.justice.gov/media/1121301/dl?inline ............................ 25

Webster's Seventh New Collegiate Dictionary 53, 313 (1971)................................................................................. 5

Webster's Third New International Dictionary of the English Language 132 (1961)............................................. 5

## INTERESTS OF *AMICI CURIAE*

*Amici* are civil rights and gender justice organizations that work to promote sex equality and safety in education. Some litigate Title IX cases on behalf of survivors of sex-based violence; others advocate for policies that benefit student-victims. From their significant experience, *amici* recognize that judicial enforcement of Title IX that realizes the statute's full breadth and promise is crucial to protecting all students' rights to learn and thrive free of gender-based violence. Amici are:

> Equal Rights Advocates
> Maryland Coalition Against Sexual Assault
> National Alliance to End Sexual Violence
> National Council of Jewish Women
> Public Justice
> Rocky Mountain Victim Law Center
> Stop Sexual Assault in Schools
> Women's Law Project

The parties consent to the filing of this brief. Consistent with Federal Rule of Appellate Procedure 29(a)(4)(E), *amici*'s counsel authored this brief, no party's counsel authored the brief in whole or in part, and no party beyond *amici* contributed money towards the brief.

## STATEMENT REGARDING ORAL ARGUMENT

*Amici curiae* respectfully seek leave to participate in oral argument because their participation may be helpful to the Court in addressing the important issue presented by this appeal. *See* Fed. R. App. P. 29(a)(8).

**INTRODUCTION**

Title IX is a landmark civil rights law with a sweeping goal: "to eliminate discrimination on the basis of sex . . . throughout the American educational system." H.R. Res. 190, 98th Cong., 1st Sess. (1983); S. Res. 149, 98th Cong., 1st Sess. (1983). It sought to do so "by ending federal subsidies of such discrimination." S. REP. NO. 100-64, at *7 (June 5, 1987), *as reprinted in* 1988 U.S.C.C.A.N. at *9. To follow through on that promise, Congress enacted "broad" and "all-inclusive language" that reaches "all forms of federal aid to education, direct or indirect." *Grove City Coll. v. Bell*, 465 U.S. 555, 564 (1984). This case asks whether that broad reach covers a "subsidy that is administered through the tax system," *Regan v. Tax'n with Representation*, 461 U.S. 540, 544-45 (1983)—a "monetary benefit" and "form of government support" that private schools have used to finance discrimination since long before Title IX was passed. *Bob Jones Univ. v. United States*. 639 F.2d 147, 153 n.7 (4th Cir. 1980); *see also Green v. Kennedy*, 309 F. Supp. 1127, 1135 (D.D.C 1970).

Title IX plainly covers such aid. Its text, structure, history, and regulations, and decades of Supreme Court precedent, all show that § 501(c)(3) tax benefits are "Federal financial assistance" under Title IX.

3

## ARGUMENT

I. **Section 501(c)(3) Tax Benefits Are "Federal Financial Assistance" Under Title IX.**

### A. The ordinary meaning of "federal financial assistance" plainly includes the grant of § 501(c)(3) tax benefits.

Statutory interpretation starts with the text. More precisely, it starts with the "ordinary public meaning" of the law's "terms at the time of its enactment." *Bostock v. Clayton Cnty.*, 140 S. Ct. 1731, 1738, 1749 (2020). When that meaning "is plain, [the Court's] job is at an end." *Id.* That is precisely the case here. Title IX is a "broadly written" law with a deliberately "broad reach." *Jackson v. Birmingham Bd. of Educ.*, 544 U.S. 167, 175 (2005). And the Supreme Court has repeatedly directed courts to "accord [it] a sweep as broad as its language," and to avoid adding "limitation[s] not apparent on [the statute's] face." *Grove City*, 465 U.S. at 564 (quoting *N. Haven Bd. of Educ. v. Bell,* 456 U.S. 512, 521 (1982)). Likewise, when Congress amended Title IX in 1987, it urged courts to give it "the broadest interpretation" possible. S. REP. NO. 100-64, at *7 (June 5, 1987), *as reprinted in* 1988 U.S.C.C.A.N. 3, 9; *see also*, *e.g.*, H.R. Res. 190, 98th Cong., 1st Sess. (1983) (explaining that Congress "intended that [Title IX] be applied comprehensively and in a manner

4

designed to eliminate discrimination on the basis of sex . . . throughout the American educational system").

Title IX's broad language plainly covers institutions that receive tax benefits through § 503(c)(3). Title IX applies to "any education program or activity receiving Federal financial assistance." 20 U.S.C. § 1681(a). "Financial assistance" meant the same thing in 1972 as it does today: "help," "support" or "aid" "relating to" finances. *See*, *e.g.*, WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY OF THE ENGLISH LANGUAGE 132, 851 (1961) (*financial*: "relating to finance or financiers"; *assistance*: "the help supplied or given; support" or "aid").[1] The Supreme Court has interpreted those words to "encompass all forms of federal aid to education, direct or indirect," *Grove City*, 465 U.S. at 564—not just grants of "funds." *See U.S. Dep't of Transp. v. Paralyzed Veterans of America*, 477 U.S. 597, 607 fn.11 (1986) ("[F]ederal financial assistance may take nonmoney

---

[1] *Accord* AMERICAN HERITAGE DICTIONARY OF THE ENGLISH LANGUAGE 80, 492 (1973) (*financial*: "of or pertaining to finances or those who deal with finances"; *assistance*: "the act of assisting"; assist: "to aid, help," or "give aid or support"); *see also* WEBSTER'S SEVENTH NEW COLLEGIATE DICTIONARY 53, 313 (1971) (*financial*: "relating to finance"; *assistance*: "aid" or "support"); BLACK'S LAW DICTIONARY 568 (5th ed., rev. 1979) (same definition of *financial*). In choosing "financial," Congress chose the "broadest . . . application" among synonyms like "pecuniary" or "monetary." AMERICAN HERITAGE DICTIONARY OF THE ENGLISH LANGUAGE 492 (1973).

5

form" and may include any "thing of value."); *accord Financial Assistance*, BLACK'S LAW DICTIONARY (11th ed. 2019) ("Any economic benefit . . . given by one person or entity to another."). In short, under both the ordinary meaning and the case law, an entity receives "Federal financial assistance" if it receives any "direct or indirect financial benefit from a government source" that "Congress intends to benefit" the entity. David A. Brennen, *Tax Expenditures, Social Justice, and Civil Rights: Expanding the Scope of Civil Rights Laws to Apply to Tax-Exempt Charities*, 2001 B.Y.U. L. Rev. 167, 223 (2001).

Section 501(c)(3) tax benefits plainly meet that definition. They obviously help institutions with their finances: the charitable exemption saves organizations money on their taxes, and the charitable contribution deduction helps them obtain financing. *See* 26 U.S.C. § 170(a); *infra* pp. 10-11. Tax-exempt status also allows schools to issue tax-exempt bonds "to borrow money on terms more favorable than for-profit counterparts, a benefit that private schools have used extensively." John D. Colombo, *Why Is Harvard Tax-Exempt? (and Other Mysteries of Tax Exemption For Private Educational Institutions)*, 35 Ariz. L. Rev. 841, 870 (1993) (citing 26 U.S.C. § 145). All just as Congress intended. *Infra* § I.B.

Thus, "[t]he grant of [§ 503(c)(3)] tax exempt status to any institution necessarily confers upon it a kind of monetary benefit and constitutes a form of government support," as this Court held four decades ago in *Bob Jones University v. United States*. 639 F.2d 147, 153 n.7 (4th Cir. 1980); s*ee also* Stanley S. Surrey, *Federal Income Tax Reform: The Varied Approaches Necessary to Replace Tax Expenditures with Direct Governmental Assistance*, 84 Harv. L. Rev. 352, 384 (1970) (charitable deduction is "a method of providing federal financial assistance" to charities); Brennen, *Tax Expenditures*, 2001 B.Y.U. L. Rev. at 212 ("[T]here is no logical (or legal) reason for treating the tax benefits received by charities as anything other than equivalent to government grants or loans for purposes of interpreting relevant civil rights statutes.").[2] Indeed, just months before Congress passed Title IX, a three-judge court held that a § 501(c) exemption and the charitable deduction were both "federal financial

---

[2] Indeed, at least one federal Spending Clause statute—the Affordable Care Act § 1557, which cross-references Title IX—expressly states that "Federal financial assistance" includes tax credits. 42 U.S.C. § 18116(a).

assistance" under Title VI, the model for Title IX. *McGlotten v. Connally*, 338 F. Supp. 448, 461 (D.D.C. 1972).[3] Just as the plain meaning required.

### B. Decades of Supreme Court and lower court precedent confirm that § 501(c)(3) tax benefits are federal aid.

This principle—that § 501(c)(3) tax benefits are forms of federal aid—is the cornerstone of decades of Supreme Court doctrine. *See Regan*, 461 U.S. at 545 ("[B]oth tax exemptions and tax-deductibility [for charities] are a form of subsidy that is administered through the tax system."); *Bob Jones Univ. v. United States*, 461 U.S. 574, 587-88, 591 & n.10 (1983) ("[I]n enacting both § 170 and § 501(c)(3), Congress sought to provide tax benefits to charitable organizations[ ] to encourage [their] development," which made "other taxpayers . . . indirect and vicarious 'donors.'"); *Trinidad v. Sagrada Orden de Predicadores*, 263 U.S. 578, 581 (1924) (holding that 501(c)(3) is "intended to aid" organizations that serve the public interest); *Green v. Connally*, 330 F. Supp. 1150, 1164 (D.D.C. 1971), *aff'd*, *Coit v. Green*, 404 U.S. 997 (1971); *see also Paralyzed Veterans of Am. v. C.A.B.*, 752 F.2d 694, 709 (D.C. Cir. 1985), *rev'd on other grounds*, 477

---

[3] *See Cannon v. Univ. of Chicago*, 441 U.S. 677, 694-95 & nn.16-19 (1979) (Title IX was "patterned" on Title VI with "identical language" and Congress "explicitly assumed" courts would interpret them the same way).

U.S. 597 (1986) ("Both in *Regan* and *Bob Jones* . . . the Supreme Court affirmed *McGlotten*'s fundamental approach."). This long line of precedent confirms that § 501(c)(3) tax benefits are just the kind of "subsidy" Congress meant to withhold from schools that discriminate. S. REP. NO. 100-64, at *7 (June 5, 1987), *as reprinted in* 1988 U.S.C.C.A.N. at *9.

The nature of § 501(c)(3) tax benefits as subsidies intended to aid their recipients sets them apart from other tax exemptions and deductions, as this Court explained in *Bob Jones*. 639 F.2d at 151-52. The federal tax system includes "two parts:" one "comprises the structural provisions necessary to implement the income tax"; the other "comprises a system of tax expenditures under which . . . financial assistance programs are carried out through special tax provisions rather than through direct Government expenditures." Stanley S. Surrey, *Pathways to Tax Reform: The Concept of Tax Expenditures* 6-7 (1973). In other words, some exemptions and deductions are "computational provision[s]" designed to make sure the IRS taxes only "net income" (i.e., "earnings and profits less expenses and losses") and not "gross" revenue. *Bob Jones*, 639 F.2d at 151-52 (citation omitted); *McGlotten*, 338 F. Supp. at 457 ("Certain deductions" are not "matching grants," but "merely attempts to provide for an

equitable measure of net income" or to structure taxes based on "ability to pay").[4] These provisions may not constitute "financial assistance." *See McGlotten*, 338 F. Supp. at 457. Sections 503(c)(3) and 170, in contrast, are "tax *benefits*" that provide "preferential treatment" and subsidize organizations if they serve the public interest. *Bob Jones*, 461 U.S. at 589 (emphasis added). Unlike other provisions, they are "intended to aid" select organizations, even if they earn a profit that Congress generally meant to tax. *Trinidad*, 263 U.S. at 581; *see also* S. REP. NO. 91-552 (1969), *as reprinted in* 1969 U.S.C.C.A.N. at 2027, 2073 ("The grant of current tax benefits to donors and exempt organizations usually is justified on the basis that charity will benefit from the gifts.").

Like *McGlotten*, both *Green* and *Bob Jones* relied on this distinction to hold that the IRS could deny charitable tax benefits to discriminatory institutions. Both cases concerned the use of tax-exempt status to finance discriminatory schools. In the 1950s and 60s, the whites-only private schools that spread to evade desegregation used § 501(c)(3)'s perks to fund their growth. "[O]fficials of the private segregated schools

---

[4] The deduction for ordinary expenses necessary to run a business, for example, simply ensures that the Code taxes businesses on "net income" and not "gross receipts." *See Comm'r. v. Sullivan*, 356 U.S. 27, 29 (1958).

10

considered it important to obtain the support involved in the obtaining of certification of tax exemption" because it was (in their words) "a 'significant factor' that would 'aid the school in obtaining finances.'" *Kennedy*, 309 F. Supp. at 1135. Based in part on that testimony, just two years before Title IX was enacted, a three-judge district court held that granting tax-exempt status to discriminatory schools violated the Equal Protection Clause, *id.* at 1134, 1136, and breached the Internal Revenue Code because it frustrated the federal "policy against Federal support for private schools that practice racial discrimination" embodied in Title VI. *Connally*, 330 F. Supp. at 1164. Granting tax benefits to discriminatory schools violated this policy, the Court held, because the tax exemption was a form of federal "support" and the deduction effectively a "matching grant." *Id.* at 1165. The Supreme Court affirmed. *Coit*, 404 U.S. at 997. One year later, *McGlotten* used the same rationale—that tax benefits are federal aid—to hold that tax benefits were "financial assistance" under Title VI. 338 F. Supp. at 461.

This Court used the same reasoning to hold that the grant of § 501(c)(3) status was a "monetary benefit" and "form of government support," such that the IRS could lawfully withdraw it from discriminatory

11

schools. *Bob Jones*, 639 F.2d at 152 n.7. In response to the nationwide injunctions in *Green* and *McGlotten*, the IRS denied § 501(c)(3) status to schools that discriminated based on race, reasoning (as *Green* did) that such schools were not "charitable" because race discrimination violated public policy. *Id.* at 150. This Court agreed. To grant such schools tax-exempt status, it held, would violate "the government policy against *subsidizing* racial discrimination in education, public or private." *Id.* at 151 (emphasis added). Empowering the IRS to revoke tax exempt status thus "assure[d] that Americans [did not] provid[e] indirect support for any educational organization that discriminates" based on race. *Id.* at 152 & n.7.

The Supreme Court affirmed. It too agreed that § 501(c)(3) status is a subsidy, so granting it to discriminatory schools violates the "governmental interest . . . in denying public support to racial discrimination in education." *Bob Jones*, 461 U.S. at 604 n.29. Reviewing centuries of legislative history, from the Statute of Charitable Uses of 1601 through the first federal income tax law in 1898, the Court agreed that tax-exempt status is not just a means of measuring taxable income; rather, Congress meant it to provide an economic benefit to organizations that served the

public interest. *Id.* at 587-88 & n.10. It added that other taxpayers pay for that benefit when they make up the difference necessary to pay for government services. *See id.* at 591 ("When the Government grants exemptions or allows deductions[,] all taxpayers are affected" because "the very fact of the exemption or deduction for the donor means that other taxpayers can be said to be indirect and vicarious 'donors.'"). Thus, the Court reasoned, "grant[ing] the benefit of tax-exempt status to racially discriminatory educational entities" would turn § 501(c)(3) against its own design: instead of subsidizing institutions that serve the common good, it would subsidize schools that discriminate "by having all taxpayers share in their support by way of special tax status." *Id.* at 595.

The Court later relied on the same point to uphold a provision that denied tax-exempt status to organizations engaged in lobbying, reiterating that "both tax exemptions and tax-deductibility are a form of subsidy that is administered through the tax system." *Regan*, 461 U.S. at 544-45. As in *Bob Jones*, this was the lynchpin of *Regan*'s holding: the Court held that although government ordinarily could not place content-based burdens on political speech, the First Amendment did not require it to "subsidize" that speech through the § 501(c)(3) exemption. *Id.*

The Court's Establishment Clause cases also rest on the understanding that tax breaks are "financial assistance" when intended "subsidize" religion. *Comm. for Pub. Educ. & Religious Liberty v. Nyquist*, 413 U.S. 756, 759, 761, 790-93 (1973) (holding that a tax deduction for the payment of parochial school tuition violated the Establishment Clause because there was "little difference, for purposes of determining whether such aid has the effect of advancing religion," between the tax deduction and a "tuition grant"); *see also Texas Monthly, Inc. v. Bullock*, 489 U.S. 1, 14 (1989) (plurality) (holding that sales tax exemption for religious publications violated the Establishment Clause because it "provide[d] unjustifiable awards of assistance to religious organizations"); *id.* at 42 (Scalia, J., dissenting) ("Quite obviously, a sales tax exemption aids religion, since it makes it less costly for religions to disseminate their beliefs."); *accord Rosenberger v. Rector & Visitors of Univ. of Virginia*, 515 U.S. 819, 859 & fn.5 (1995) (Thomas, J., concurring) ("A tax exemption in many cases is economically and functionally indistinguishable from a direct monetary subsidy.").

Contrary to Baltimore Lutheran and its *amici*'s contentions, *Walz v. Tax Commission of City of New York* supports the same point. 397 U.S.

14

664, 699 (1970). In upholding a property tax exemption for churches, the Court acknowledged that the exemption was a form of "aid," *Nyquist*, 413 U.S. at 792-93 (quoting *Walz*, 397 U.S. at 676), but held that it did not violate the Establishment Clause because "the *level* of government support conferred by the [tax] exemption was within permissible limits" and avoided excessive government entanglement with religion. *Bob Jones*, 639 F.2d at 152 n.7 (distinguishing *Walz*, 397 U.S. at 674) (emphasis added). Nevertheless, "[a]ll the opinions in *Walz* analyzed [the] tax exemption[ ] as providing an economic benefit[]—'that exemptions do not differ from subsidies as an economic matter.'" *Green*, 330 F. Supp. at 1168 (quoting *Walz*, 397 U.S. at 699 (Harlan, J., concurring)). And all the justices agreed on the point relevant here: that "[t]ax exemptions and general subsidies . . . both provide economic assistance." *Walz*, 397 U.S. at 690 (Brennan, J. concurring).

## C. Tax-exempt schools "receive" federal financial assistance.

Baltimore Lutheran is thus subject to Title IX because it "receiv[es] Federal financial assistance" through § 501(c)(3) tax benefits. 20 U.S.C. § 1681(a). It is, of course, natural to say that an institution "receives" a tax exemption. *Allen v. Wright*, 468 U.S. 737, 744 (1984) (private schools

15

"*receive* tax exemptions" through § 503(c)(3) (emphasis added)); *Bob Jones*, 461 U.S. at 609, 612 (Powell, J., concurring) ("nonprofit groups *receive* tax exemptions" and "*receive* tax-exempt status under § 501(c)(3)" (emphasis added)); *Walz*, 397 U.S. at 689 (Brennan, J. concurring) (same). Contrary to the other side's contentions, Title IX's roots in the Spending Clause do not suggest otherwise.

Congress limited the scope of Title IX and other Spending Clause statutes "to those who actually 'receive' federal financial assistance because it sought to impose [the laws'] coverage as a form of contractual cost"—or "quid pro quo"—for "the recipient's agreement to accept the federal funds" or "whatever thing of value is extended by the grant statute." *Paralyzed Veterans*, 477 U.S. at 605, 607 n.11 (cleaned up). In doing so, it extended Title IX's coverage to "those who are in a position to accept or reject" its obligations while excluding bystanders that "merely benefit" from the "economic ripple effects" of aid granted to the intended recipient. *Id.* at 606, 607. This distinction reflects that "legislation enacted pursuant to the spending power is much in the nature of a contract," and "the legitimacy of Congress' power to legislate under [that] power thus rests on whether the [recipient] voluntarily and knowingly accepts the terms

16

of the 'contract.'" *Pennhurst State Sch. & Hosp. v. Halderman*, 451 U.S. 1, 17 (1981).

An institution's decision to accept tax benefits is no less "contractual" than an agreement to accept a grant of federal funds. Indeed, in the very case *Pennhurst* cited to hold that Spending Clause legislation is "in the nature of a contract," the "contract" was the state's decision to accept a *tax break* in exchange for compliance with federal conditions. *Pennhurst*, 451 U.S. at 17 (citing *Steward Mach. Co. v. Davis*, 301 U.S. 548, 585-98 (1937)). In *Steward*, the Court held that a provision of the Social Security Act which offered tax credits on the condition that a state establish an unemployment insurance program was not unduly "coercive" because the state voluntarily chose to accept the tax break, and if it no longer wished to comply with the conditions, it could end the program, "terminate the credit," and "place itself where it was before the credit was accepted." *Id.* at 592-93. Thus, the conditional tax break, like conditional funding, was a valid exercise of the "spending power." *Pennhurst*, 451 U.S. at 17 (citing *Steward*, 301 U.S. at 585-98).[5]

---

[5] That said, there is no reason the analysis would change if a tax subsidy did not arise from Congress's spending power. Congress may act under

17

As the *Bob Jones* litigation makes clear, this is especially true of tax benefits granted under § 501(c)(3). Just like a grant of funds, "charitable exemptions from income taxation constitute a *quid pro quo:* the public is willing to relieve an organization from paying income taxes because the organization is providing a benefit to the public," *Geisinger Health Plan v. Comm'r*, 985 F.2d 1210, 1215 (3d Cir. 1993), and accepts an obligation to serve public policy—and not to discriminate—in exchange for the exemption. *See Bob Jones*, 461 U.S. at 595. Unlike in *Paralyzed Veterans* or *NCAA v. Smith*—where the alleged recipients could not refuse the aid because they "merely benefit[ed]" from "economic ripple effects" of funds earmarked for other entities, *Paralyzed Veterans*, 477 U.S. at 607 (quoting *Grove City,* 465 at 572); *NCAA v. Smith*, 525 U.S. 459, 466 (1999)—organizations may forgo applying for those tax benefits or forfeit them later if they refuse to comply with the conditions.[6]

---

multiple sources of authority, and it may exercise the taxing power without expressly invoking that power. *See*, *e.g.*, *Nat'l Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519, 564-65 (2012).

[6] Amicus Napa wrongly suggests that *NCAA v. Smith* indicates that tax benefits are not financial assistance because the NCAA is tax-exempt. The Court did not consider this question in *NCAA v. Smith* or any of the other cases Napa cites. The Supreme Court has long warned that its

Appellant and its *amici* also suggest that *Pennhurst* demands reversal because Title IX does not give clear enough notice to recipients that tax benefits are "Federal financial assistance." But as explained above, charitable tax benefits are unambiguously federal financial assistance. And the Court has never required Congress to specify each application that falls within Title IX's broad terms. Just the opposite: in *Jackson*, the Court held Title IX covers retaliation even though the statute only refers to "discrimination," 544 U.S. at 183; and in *Davis*, it held that Title IX covers student-on-student harassment even though it was not mentioned in the statute, its legislative history, or regulations. *Davis ex rel. LaShonda D. v. Monroe Cnty. Bd. of Educ.*, 526 U.S. 629, 643 (1999); *id.* at 669-70 (Kennedy, J., dissenting). In those cases, schools were "put on notice by the fact that [the Court's] cases . . . have consistently interpreted Title IX's private cause of action broadly to encompass diverse forms of intentional sex discrimination." *Jackson*, 544 U.S. at 183. The same is true here: precedent gave schools ample notice that "federal

precedents should not be read to have decided matters that merely "lurk[ed] in the record" and were not "brought to the attention of the court nor ruled upon." *Cooper Indus., Inc. v. Aviall Servs., Inc.*, 543 U.S. 157, 170 (2004) (quoting *Webster v. Fall*, 266 U.S. 507, 511 (1925)).

[financial] assistance" sweeps broadly to "encompass *all* forms of federal aid to education," *Grove City*, 465 U.S. at 564 (citation omitted), and that tax benefits are forms of federal aid. *Supra* § I.B.

### D. Title IX's structure and regulations show that § 501(c)(3) benefits are "Federal financial assistance."

Title IX's structure also reinforces that § 501(c)(3) tax benefits are "Federal financial assistance." "Title IX is a broadly written general prohibition on discrimination, followed by specific, narrow exceptions to that broad prohibition." *Jackson*, 544 U.S. at 175. Based on that structure, courts have repeatedly rejected efforts to place implied limitations Title IX's scope. *See id.*; *see also Peltier v. Charter Day Sch., Inc.,* 37 F.4th 104, 128-29 (4th Cir. 2022) ("[W]e view Congress' decision to include specific exceptions in Title IX as a deliberate choice to 'limit[ ] the statute to the [exceptions] set forth'" therein. (citation omitted)); *Jeldness v. Pearce*, 30 F.3d 1220, 1225 (9th Cir. 1994) (Because Title IX lists specific exemptions to its broad prohibition, others "are not to be judicially implied.").

Appellant's *amici* try the same tactic that failed in these prior cases: they ask the Court to infer an implied exception to the plain sweep of "Federal financial assistance" based on their strained interpretation of Title IX's ancillary provisions and regulations. *See*, *e.g.*, Amicus Br. of

Napa Inst. Legal Found. at 9-13 ("Napa Br."). But Congress "does not alter the fundamental details of a regulatory scheme in . . . ancillary provisions." *Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 468 (2001). And there is no reason to believe it did so in Title IX.

Indeed, all of the ancillary provisions *amici* cite are consistent with treating tax-exempt status as federal financial assistance. They first point to 20 U.S.C. § 1682, which vests authority to enforce Title IX in agencies that are "empowered to extend Federal financial assistance to any education program or activity, by way of grant, loan, or contract." Napa Br. at 10. But nothing in § 1682 suggests that the word "grant" refers only to *cash* grants, or that it excludes the grant of tax exemptions and deductions by the IRS. *See Bob Jones*, 461 U.S. at 577-78 (noting the IRS "*granted* tax-exempt status to private schools . . . under § 501(c)(3) . . . and *granted* charitable deductions for contributions to such schools under § 170." (emphasis added)); *id.* at 587 n.10 (characterizing charitable exemption and deduction as a "grant of tax benefits"); *see also Allen*, 468 U.S. at 756 (referring to the "grant of a tax exemption")*; Walz*, 397 U.S. at 675 (same).

21

Napa next points to 20 U.S.C. § 1686, which makes clear that Title IX does not "prohibit any educational institution receiving funds under this Act [the Education Amendments of 1972] from maintaining separate [sex] living facilities." Napa Br. at 9-10. Since this exemption only refers to institutions "receiving funds," Napa suggests "federal financial assistance" must only cover "funds." *Id.* But the Supreme Court long ago rejected this conclusion. *See Paralyzed Veterans*, 477 U.S. at 607 n.11 ("[F]ederal financial assistance may take nonmoney form."). And so do the regulations. *See*, *e.g.*, 31 C.F.R. § 28.105 (providing that federal "financial assistance" includes "the services of Federal personnel" and discounts on sales or rentals of federal property).[7]

---

[7] Napa suggests that if Title IX covers schools that receive non-monetary assistance, then § 1686 must create "bizarre dichotomy" because it only exempts single-sex living facilities in schools that receive federal "funds" and not in schools receiving nonmonetary aid. Napa Br. at 10. But there is no such disparity: § 1686 simply expresses one example of the general principle that Title IX does not prohibit the maintenance of sex-separate facilities *per se*, no matter what form of aid the school receives. *See*, *e.g.*, 34 C.F.R. §§ 106.33, 106.41 (providing that Title IX allows schools to have sex-separate athletic teams and bathrooms); Nondiscrimination on the Basis of Sex in Education Programs or Activities Receiving Federal Financial Assistance, 87 Fed. Reg. 41390, 41534 (proposed July 12, 2022) ("2022 NPRM") ("[T]hose regulatory provisions [reflect] that in certain situations, the fact that a recipient employs a sex-based distinction or separation does not, as such, amount to 'discrimination' that Title IX

The other provisions Napa cites in fact support Plaintiffs' case, not Baltimore Lutheran's. Section 1681(a)(6)—which permits single-sex social organizations (like sororities or the Girl Scouts) to remain single-sex when they operate for charitable purposes under § 503(c)(3)—confirms that Congress had Title IX's application to § 501(c)(3) organizations in mind but chose not to exempt their tax benefits from the definition of "Federal financial assistance." And § 1681(b)—which appears to use the phrase "federally supported program or activity" as short-hand for "program or activity receiving Federal financial assistance"—bolsters the conclusion that tax benefits are financial assistance. *See Bob Jones*, 639 F.2d at 152 n.7 ("The grant of [§ 503(c)(3)] tax exempt status to any institution . . . constitutes a form of government support."); *accord Bob Jones*, 461 U.S. at 595, 604 n.29.

Title IX's regulations are also entirely consistent with the conclusion that tax benefits are financial assistance. Contrary to Baltimore

---

forbids in the first place" because it "imposes no harm or only de minimus harm" on students); *Grimm v. Gloucester Cnty. Sch. Bd.*, 972 F.3d 586, 618 & n.16 (4th Cir. 2020) (explaining that § 1686 expresses that "sex-separated living facilities are not unlawful" unless schools "act in an arbitrary or discriminatory manner when dividing students into those sex-separated facilities").

Lutheran's contention, those regulations are not exhaustive: they make clear that any "grant of federal financial assistance" by the Department of the Treasury (including the IRS) subjects an entity to Title IX. 31 C.F.R. § 28.105(1); *see Bob Jones*, 461 U.S. at 577-78 (the IRS "grant[s]" tax-exempt status); *accord Allen*, 468 U.S. at 756; *Walz*, 397 U.S. at 675. The rule also specifically covers "[a]ny . . . arrangement that has as one of its purposes the provision of assistance to any education program or activity," with only one specified (and inapplicable) exception. 31 C.F.R. § 28.105(5). That the regulations do not specifically identify tax benefits is no more significant than the fact that the *statute* does not do so. Most federal agencies that enforce Title IX (such the Department of Education) do not grant tax exemptions and cannot enforce their conditions—so they would have no reason to identify them in a regulation. *See* 20 U.S.C. § 1682; 34 C.F.R. § 106.2(g) ("Federal financial assistance means any of the following, *when authorized or extended under a law administered by the Department.*" (emphasis added)). And given that the IRS has long been able to revoke § 501(c)(3) status from discriminatory schools under § 501(c)(3) itself, *see Bob Jones*, 461 U.S. at 589, Treasury has had little incentive to clarify that it may also do so under other statues like Title

24

IX. Finally, even if Appellant were right about the regulations, an agency cannot create an exception to Title IX's plain text. *See Peltier*, 37 F.4th at 129 (holding that regulation was not entitled to deference even if it supported recipient's position because Title IX was unambiguous).[8]

### E. Title IX's legislative history reinforces that § 501(c)(3) benefits are "Federal financial assistance."

With no real support in Title IX's text or structure, the other side turns to the legislative history, noting that legislators discussed "funds" but not tax exemptions in the debates before Title IX's passage. Napa Br. at 16-17. But even if Congress did not specifically have tax benefits in mind when it passed Title IX, that would not justify creating an implied

---

[8] The other side points to DOJ's statement that "typical tax benefits . . . are not considered federal financial assistance," but it is not clear whether the DOJ views § 501(c)(3) perks as "typical": in the same section, DOJ also notes that "courts have found instances where a tax benefit *would* be considered federal financial assistance," citing *McGlotten* and another case that held 501(c)(3) tax exemptions were federal financial assistance. U.S. Dep't of Just., Title VI Legal Manual at 8, https://www.justice.gov/media/1121301/dl?inline (citing *Fulani v. League of Women Voters Educ. Fund*, 684 F. Supp. 1185, 1192 (S.D.N.Y. 1988), *aff'd*, 882 F.2d 621 (2d Cir. 1989)) (emphasis added). And even if the DOJ disagreed with Appellees, its interpretation of another agency's (Treasury's) regulations is not entitled to deference. *See Kisor v. Wilkie*, 139 S. Ct. 2400, 2412 (2019) (explaining that courts defer to agency's interpretation of its "*own* [ambiguous] regulations [as part] of the agency's delegated lawmaking powers" (emphasis added)).

25

exemption to the statute's plain text. As the Court recently reiterated, that a statute's plain language covers "situations not expressly anticipated by Congress does not demonstrate ambiguity"; "it simply demonstrates the breadth of a legislative command. And it is ultimately the provisions of those legislative commands rather than the principal concerns of our legislators by which we are governed." *Bostock*, 140 S. Ct. at 1749 (cleaned up).

Here, however, Title IX's legislative history confirms that it applies to tax benefits. In the sessions leading to Title IX's passage, the statute's chief architects made clear that they intended to give the statute an expansive reach. Representative Edith Green, who chaired the hearings that led to Title IX, stated outright that "[t]he purpose of Title [IX] is to end discrimination in *all* institutions of higher education . . . across the board." 117 Cong. Rec. 39256 (1971) (emphasis added). And Senator Birch Bayh—whose statements are "an authoritative guide to the statute's construction" as "the sponsor of the language ultimately enacted," *N. Haven*, 456 U.S. at 526-27—remarked that he "doubt[ed] very much whether even one institution of higher education today, private or public, is not receiving some Federal assistance." 117 Cong. Rec. 30408 (1971).

While legislators did not discuss tax exemptions specifically in 1972, they acknowledged that federal aid that frees institutional funds for other uses—as tax exemptions do—constitutes financial assistance. As Senator Bayh remarked during the post-enactment hearings on the proposed Title IX regulations: "[i]f Federal aid benefits a discriminatory program by freeing funds for that program, the aid assists it, and I think that is rather clear." Review of Regs. to Implement Title IX: Hearings before the Subcomm. on Postsecondary Educ. of the Comm. on Educ. & Lab. of the House of Representatives, 94th Cong., 175 (1976). To support that point, Bayh submitted a law review article arguing that *McGlotten* and *Green* suggest that Title IX prohibits discrimination "in programs benefiting indirectly—by favorable tax treatment—from federal financial assistance." 121 Cong. Rec. S16059-60 (daily ed. May 22, 1975) (quoting James C. Todd, *Title IX of the 1972 Education Amendments: Preventing Sex Discrimination in Public Schools*, 53 Tex. L. Rev. 103, 111 (1974)).

By 1987, when Congress amended Title IX to confirm its breadth, it knew that the Supreme Court had affirmed four times that § 501(c)(3) tax benefits were forms of "aid," or "subsid[ies]," *see Regan*, 461 U.S. at 544-45; *Bob Jones*, 461 U.S. at 589; *Coit*, 404 U.S. at 997, *aff'ing*, *Green*,

27

330 F. Supp. at 1164; *Trinidad*, 263 U.S. at 581—and that a similar tax break constituted "financial assistance," *Nyquist*, 413 U.S. at 759. And it knew that a three-judge court had enjoined the grant of charitable deductions and a § 501(c) tax exemption because they were both "financial assistance" under Title VI. *McGlotten*, 338 F. Supp. at 461.

The Supreme "Court generally assumes that, when Congress enacts statutes, it is aware of th[e] Court's relevant precedents." *Ysleta Del Sur Pueblo v. Texas*, 142 S. Ct. 1929, 1940 (2022). Here, though, no assumption is needed. *See Bob Jones*, 461 U.S. at 601-02 & n.26 (noting that Congress amended the tax code in response to *McGlotten* and left its "financial assistance" holding intact). Legislators explicitly referenced those decisions in the hearings leading to the amendment. *See, e.g.*, Hearings Before the S. Comm. on Lab. & Hum. Res. on the Supreme Court's Decision in Grove City v. Bell, 99th Cong. 189 (1985) (statement of Chairman Orrin Hatch) ("[T]he famous 1972 case of *McGlotten v. Connolly* held that the provision of a tax deduction for charitable contributions constitutes a grant of Federal financial assistance within the scope of the 1964 Civil Rights Act."); Hearings before the Subcomm. on the Const. of the S. Comm. on the Judiciary on a Bill to Clarify Title IX of the Educ. Amends.

28

of 1972, Section 504 of the Rehabilitation Act of 1973, the Age Discrimination Act of 1975, and Title VI of the Civil Rights Act of 1974, 98th Cong. 156 (1984) (testimony of Professor Charles Fried) (noting that the view that *Bob Jones* and *Grove City* together suggested "that tax benefits and tax exemptions . . . constitute . . . an indirect form of Federal aid" had been "forcefully argued" by Professor Laurence Tribe). And throughout the debates, religious and other organizations unsuccessfully urged Congress to reject the 1987 amendment because they believed that Supreme Court caselaw indicated that § 501(c)(3) tax benefits were "federal financial assistance" under Title IX as written. *See*, *e.g.*, 134 Cong. Rec. 4771 (1988).

Still, knowing that courts had repeatedly found tax benefits were forms of federal aid, Congress not only continued to use the same broad term to define Title IX's coverage, but also directed courts to give it the "broadest interpretation" possible. S. REP. NO. 100-64, at 7; H.R. RES. NO. 190, 98th Cong. (1983) (same). The only conclusion consistent with this history, Title IX's text, and Supreme Court precedent is that § 501(c)(3) tax benefits are "federal financial assistance" under Title IX.

## II.   Appellant and Its *Amici* Exaggerate Title IX's Burden on Schools and Ignore Sexual Violence's Costs to Students.

Out of legal arguments, Baltimore Lutheran and its *amici* try to stoke fear that the costs of compliance with Title IX would be "crippling." But thousands of small schools that receive federal funds already comply with Title IX without facing substantial burdens. *See* 2022 NPRM, 87 Fed. Reg. at 41564-65 (finding that the Department of Education's proposed Title IX regulations would not place substantial burdens on small schools). And as explained above, tax-exempt schools that refuse federal money must already practice nondiscrimination to keep their tax benefits. Title IX imposes only two additional obligations. First, schools must comply with Treasury's Title IX regulations. Those rules impose simple and manageable requirements: publish a nondiscrimination policy, have a "prompt and equitable" process to address complaints, and designate an employee to coordinate these functions. 31 C.F.R. §§ 28.135, 28.140. Second, a school may be liable if it intentionally discriminates against a student or remains deliberately indifferent to sexual harassment and causes compensable injuries. *See Davis*, 526 U.S. at 643. But neither Appellant nor any of its *amici* point to evidence that either of those things impose unmanageable—or unintended—costs on private schools.

Worse, Appellant's *amici*'s one-sided economics ignores the costs schools impose on students when schools permit discrimination. Students who experience unremedied sexual violence don't just suffer lasting psychological harm, they must also bear substantial—often crippling—financial costs. *See* Dana Bolger, *Gender Violence Costs: Schools' Financial Obligations Under Title IX*, 125 Yale L.J. 2106, 2118 (2016) ("Violence—and institutional indifference in its wake—changes the courses of survivors' lives, with educational and employment consequences following them far into the future."). "Recent estimates put the lifetime cost of rape at $122,461 per victim." Ctrs. for Disease Control & Prevention, Nat'l Ctr. for Injury Prevention & Control, *Preventing Sexual Violence* (2022), https://www.cdc.gov/violenceprevention/pdf/sv/SV-factsheet_2022.pdf. Survivors who suffer sexual violence in school "report costs ranging from mental health services to medical treatment, lost tuition to lost income, transportation costs to housing expenses." Bolger, *Gender Violence Costs*, *supra*, at 2116. Denying students Title IX's protection would leave students to bear those costs without recourse, even when their school imposes them through deliberate indifference to harassment, and even while the school receives valuable benefits from the federal government.

31

Title IX demands more.

## CONCLUSION

This Court should affirm the district court's decision.

/s/ Sean Ouellette
Sean Ouellette
Shariful Khan
Adele P. Kimmel
PUBLIC JUSTICE
1620 L Street NW, Suite 630
Washington, DC 20036
(202) 797-8600
souellette@publicjustice.net
skhan@publicjustice.net
akimmel@publicjustice.net

*Counsel for* Amici Curiae

## CERTIFICATE OF COMPLIANCE

In accordance with Federal Rule of Appellate Procedure 32(g)(1) and Circuit Rule 32, I certify that this brief:

(i) complies with the type-volume limitation of Federal Rule of Appellate Procedure 29(a)(5) because it contains 6,489 words, including footnotes and excluding the parts of the brief exempted by Rule 32(f)); and

(ii) complies with the typeface requirements of Rule 32(a)(5) and the type-style requirements of Rule 32(a)(6) because it has been prepared using Microsoft Word for Office 365, Version 2305, set in Century Schoolbook 14-point type.

_/s/ Sean Ouellette_
Sean Ouellette

## CERTIFICATE OF SERVICE

I certify that on August 11, 2023, this brief was filed using the Court's CM/ECF system. All participants in the case are registered CM/ECF users and will be served electronically via that system.

*/s/ Sean Ouellette*
Sean Ouellette
Shariful Khan
Adele P. Kimmel
PUBLIC JUSTICE
1620 L Street NW, Suite 630
Washington, DC 20036
(202) 797-8600
souellette@publicjustice.net
skhan@publicjustice.net
akimmel@publicjustice.net

*Counsel for* Amici Curiae