NO. 23-1453

---

In The

**U**nited **S**tates **C**ourt of **A**ppeals
For The Fourth Circuit

---

DONNA BUETTNER-HARTSOE; N.H., by and through her Parent and Next
Friend Donna Buettner-Hartsoe

Plaintiffs - Appellees

v.

BALTIMORE LUTHERAN HIGH SCHOOL ASSOCIATION, d/b/a
Concordia Preparatory School

Defendant - Appellant

ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF MARYLAND

---

**Reply Brief of Appellant**

**Baltimore Lutheran High School Association**

---

Gregg E. Viola
Mark P. Johnson
Eccleston and Wolf, P.C.
7240 Parkway Drive, 4th Floor
Hanover, MD  21076
410-752-7474
Counsel for Defendant - Appellant

**TABLE OF CONTENTS**

PRELIMINARY STATEMENT ...........................................................................1

ARGUMENT ....................................................................................................4

      I.     Forty years of Supreme Court precedent requires Congress to unambiguously set forth conditions accompanying Spending Clause legislation. ........................................................................................4

      II.    Not all economic benefits created and granted by the Federal government constitute "Federal Financial assistance" for purposes of Title IX. ..............................................................................................16

      III.   The majority of courts that have addressed this issue have held that "Federal financial assistance" does not include tax-exempt status.....20

      IV.   Requiring all tax exempt entities with some education purpose or program to comply with Title IX would cause significant harm to the independent private school and non-profit communities....................23

CONCLUSION...............................................................................................25

CERTIFICATE OF COMPLIANCE ...............................................................26

CERTIFICATE OF SERVICE ........................................................................27

## TABLE OF AUTHORITIES

**Cases**

*Arlington Central Sch. Dist. Bd. of Ed. v. Murphy*, 548 U.S. 291 (2006) .......................... 5

*Bachman v. Am. Soc. of Clinical Pathologists*, 577 F. Supp. 1257 (D.N.J. 1983) .......... 18

*Barnes v. Gorman*, 536 U.S. 181 (2002) ................................................ 4, 6, 8

*Cannon v. University of Chicago*, 441 U.S. 677, 694-95 (1979) .................................... 12

*Community Television of Southern California v. Gottfried*, 459 U.S. 498 (1983) ........... 18

*Cummings v. Premier Rehab Keller, P.L.L.C.*, 142 S. Ct. 1562 (2022) ............... 4, 5, 6, 17

*Davis v. Monroe Cty. Bd. of Educ.*, 526 U.S. 629 (1999) ................................................ 4

*E.H. v. Valley Christian Academy*, 616 F. Supp. 3d 1040 (C.D. Cal. 2022) .................... 23

*Fitzgerald v. Barnstable Sch. Comm.*, 555 U.S. 246, 257 (2009) .................................... 17

*Forest Grove Sch. Dist. v. T. A.*, 557 U.S. 230 (2009) ...................................................... 5

*Franklin v. Gwinnett County Pub. Sch.*, 503 U.S. 60 (1992) ........................................... 24

*Fulani v. League of Women Voters Educ. Fund*, 684 F. Supp. 1185 (1988) ................... 22

*Gebser v. Lago Vista Independent School Dist.*, 524 U.S. 274 (1998) .................... 4, 5, 17

*Graham v. Tennessee Secondary Sch. Athletic Ass'n*, No. 1:95-CV-044, 1995 U.S. Dist. LEXIS 3211, 1995 WL 115890 (E.D. Tenn. Feb. 20, 1995) ................................ 20

*Green v. Connally*, 330 F. Supp. 1150 (D.D.C. 1971) ..................................................... 18

*Grove City College v. Bell*, 465 U.S. 555 (1984) .............................................. 5, 10, 13, 17

*Halscott Megaro, P.A. v. McCollum*, 66 F.4th 151, 158 (4th Cir. 2023) ......................... 10

*Laramore v. Illinois Sports Facilities Authority*, 722 F. Supp. 443, 451 (N.D. Ill. 1989) 21

*M.H.D. v. Westminster Schools*, 172 F.3d 797 (11th Cir. 1999) ...................................... 22

*Marx v. Gen. Revenue Corp.*, 133 S. Ct. 1166 (2013) ..................................................... 11

*Morgan v. Sebelius*, 694 F.3d 535, 538 (4th Cir. 2012) ................................................... 11

*N. Haven Bd. of Ed. v. Bell*, 456 U.S. 512, 520 (1982) .................................................. 17

*NCAA v. Smith*, 525 U.S. 459, 466 (1999) ....................................................................... 17

*Pennhurst State Sch. & Hosp. v. Halderman*, 451 U.S. 1 (1981) ............................. passim

*Regan v. Taxation with Representation*, 461 U.S. 540 (1983) .......................................... 18

*Russo v. Diocese of Greensburg*, No. CIV.A09-1169, 2010 U.S. Dist. LEXIS 96338, 2010 WL 3656579 (W.D. Pa. Sept. 15, 2010) .................................................................. 20

*Stanescu v. Connecticut Ass'n of Sch., Inc.*, 57 F.4th 43, 54 (2d Cir. 2022) ..................... 16

United States DOT v. Paralyzed Veterans of Am., 477 U.S. 597, 604 (1986) ................ 17

*United States Nat'l Bank of Oregon v. Independent Ins. Agents of Am., Inc.*, 508 U.S. 439, 455 (1993) ..................................................................................................... 11

*Walz v. Tax Com. of New York*, 397 U.S. 664, 674-75 (1970) ......................................... 19

*Yates v. U.S.*, 135 S. Ct. 1074 (2015) ............................................................................... 11

**Statutes**

20 U.S.C. § 1682 .......................................................................................................... 3, 11

**Other Authorities**

134 Cong. Rec. H4752-53 (1988) ..................................................................................... 13

134 Cong. Rec. H4760 (1988) .......................................................................................... 14

Boris I. Bittker & Kenneth M. Kaufman, *Taxes and Civil Rights: "Constitutionalizing" the Internal Revenue Code*, 82 Yale L.J. 51, 83 (1972) ................................................ 13

ProPublica, *Nonprofit Explorer: Grove City College*, https://projects.propublica.org/nonprofits/organizations/251065148 (last visited September 7, 2023) ................................................................................................ 10

## PRELIMINARY STATEMENT

This appeal presents a pure question of law – whether tax exemption under 26 U.S.C. § 501(c)(3) constitutes receipt of Federal financial assistance for purposes of Title IX of the Education Amendments Act of 1972. [1] Otherwise stated, the question is whether tax exempt entities are subject to potential civil liability under Title IX absent receiving another form of Federal financial assistance. Analyzed under the contract analogy attendant with Spending Clause legislation such as Title IX, the correct conclusion is that tax exemption, in and of itself, does not constitute Federal financial assistance for purposes of Title IX because Congress has not unambiguously imposed on tax exempt entities potential civil liability under Title IX.

The central premise of Plaintiffs-Appellees' Brief is that the contract analogy applicable to Spending Clause legislation only applies when the question is whether liability exists for certain conduct, and what damages are available as remedies if liability exists. Under Plaintiffs-Appellees' theory, a private independent school such as Appellant does not need to be on notice that it is potentially liable under a

---

[1] Plaintiffs-Appellees go to great lengths in their "Relevant Factual History" to describe as "critically important" the allegations in the operative Complaint. The allegations of wrongdoing in the Complaint, however, are irrelevant to the pure question of law presented in this appeal.  Moreover, Appellant has denied liability and the relevant allegations lodged in this case; discovery has been conducted, and many of the allegations were not borne out with evidence and testimony.

specific statute, only what conduct is prohibited by the statute and what damages are recoverable. This makes no sense because it is not meaningful for an entity to know what conduct is prohibited by a statute, and what damages are available as remedies for a violation, without first knowing from the outset that entity is responsible for and subject to potential liability under the statute. Title IX operates based on consent, i.e., in return for federal funds, the recipients agree to comply with federally imposed conditions, and it is obvious that the recipient must know that its actions trigger the federally imposed conditions and potential liability under Title IX. Plaintiffs-Appellees concede (as they must) that an entity has to unambiguously be advised of the damages to which it is subject under Title IX, but argue that the same entity does not have to be unambiguously advised whether the entity is subject to civil liability under Title IX. This defies logic and would lead to a nonsensical result. The Supreme Court has stated for more than forty years that "if Congress intends to impose a *condition* on the grant of federal moneys, it must do so unambiguously." *Pennhurst State Sch. & Hosp. v. Halderman*, 451 U.S. 1, 17 (1981) (emphasis added).

Disregarding the contract analogy, Plaintiffs-Appellees' argument is that because tax exempt status, like all other favorable tax treatments, provides some measure of financial assistance or benefit to the entity, it obviously constitutes some Federal financial assistance under Title IX. This argument fails upon legitimate scrutiny for several reasons.

The Title IX statute does not mention, infer, or imply that tax exemption equates to receipt of Federal financial assistance. The enforcement provision of Title IX speaks to termination of Federal financial assistance by means of ending a grant, loan, or contract to an entity that does not comply with the statutory requirements. 20 U.S.C. § 1682. None of those enforcement remedies apply to tax exemption, and it makes no sense for Congress to have provided an enforcement provision that allowed the Federal government to terminate federal funding to an entity that violates Title IX, but not to rescind an entity's tax exempt status if such status gave rise to potential liability under Title IX. It makes no sense that Congress would provide an enforcement provision applicable to terminate some, but not all, Federal financial assistance. Moreover, the enforcement provision is consistent with Supreme Court case law which has repeatedly described recipients of Federal financial assistance as entities that receive some federal dollars, grants, loans, or contracts (which necessarily can be taken away if the entity does not comply with the Title IX requirements). Title IX. Plaintiffs-Appellees wholly ignore and fail this law.

Plaintiffs-Appellees also fail to address the legislative history that supports the conclusion that Federal financial assistance takes the form of expenditure of public funds, and not tax exempt status. Particularly persuasive to the question of law presented in this case is that in 1988, a colloquy occurred in the House of

Representatives in which it was stated that tax exempt status does not constitute Federal financial assistance. While this was subsequent to when Title IX was passed, the fact that the question was even raised, and decided in the negative, is persuasive evidence that Congress did not clearly intend, or certainly did not unambiguously tell, tax exempt entities to comply with Title IX.

Under proper and necessary legal interpretation and scrutiny, it is clear that the District Court's conclusion that Appellant's tax exemption constitutes receipt of Federal financial assistance for purposes of application of Title IX was incorrect and must be reversed.

## **ARGUMENT**

### I. **FORTY YEARS OF SUPREME COURT PRECEDENT REQUIRES CONGRESS TO UNAMBIGUOUSLY SET FORTH CONDITIONS ACCOMPANYING SPENDING CLAUSE LEGISLATION.**

Supreme Court precedent has clearly stated that legislation enacted by Congress pursuant to the Spending Clause, such as Title IX, "is much in the nature of a contract" between the recipient of that spending and the Federal government. *Pennhurst State Sch. & Hosp. v. Halderman*, 451 U.S. 1, 17 (1981). *See also Cummings v. Premier Rehab Keller, P.L.L.C.*, 142 S. Ct. 1562, 1570 (2022); *Barnes v. Gorman*, 536 U.S. 181, 186 (2002); *Davis v. Monroe Cty. Bd. of Educ.*, 526 U.S. 629, 658-59 (1999); *Gebser v. Lago Vista Independent School Dist.*, 524 U.S. 274, 286 (1998). "In other words, in exercising its spending power, the federal

government 'conditions an offer of federal funding on a promise by the recipient not to discriminate, in what amounts essentially to a contract between the Government and the recipient of funds.'" *Litman*, 186 F.3d at 551-52 (quoting *Gebser*, 524 U.S. at 286).

Because of this contract analogy, it is well-settled that the entity making the decision whether to accept federal funds must be aware of the conditions accompanying those federal funds and what is expected of it. "[I]f Congress intends to impose a condition on the grant of federal moneys, it must do so unambiguously." *Pennhurst*, 451 U.S. at 17. *See also Forest Grove Sch. Dist. v. T. A.*, 557 U.S. 230, 246 (2009) (stating that "conditions attached to a State's acceptance of funds must be stated unambiguously"); *Grove City College v. Bell*, 465 U.S. 555, 575 (1984) (stating that "Congress is free to attach reasonable and unambiguous conditions to federal financial assistance that educational institutions are not obligated to accept"). Most recently, in *Cummings*, the Supreme Court stated that "Spending Clause legislation operates based on consent" and "Recipients cannot 'knowingly accept' the deal with the Federal Government unless they 'would clearly understand . . . the obligations' that would come along with doing so." *Id.* (quoting *Arlington Central Sch. Dist. Bd. of Ed. v. Murphy*, 548 U.S. 291, 296 (2006)). The Supreme Court expounded that a recipient of federal funding must be "*on notice* that, by accepting

federal funding, it exposes itself to liability." *Id.* (quoting *Barnes*, 536 U.S. at 188) (emphasis in original)). The Court concluded:

> After all, when considering whether to accept federal funds, a prospective recipient would surely wonder not only what rules it must follow, but also what sort of penalties might be on the table. A particular remedy is thus "appropriate relief" in a private Spending Clause action "only if the funding recipient is on notice that, by accepting federal funding, it exposes itself to liability of that nature." Only then can we be confident that the recipient "exercise[d its] choice knowingly, cognizant of the consequences of [its] participation" in the federal program.

*Id.* (quoting *Pennhurst*, 451 U.S. at 17).

The clear application of *Cummings* and its precedents to this case is that for a § 501(c)(3) tax exemption to constitute Federal financial assistance for statutes such as Title IX to apply, Congress must have unambiguously conditioned the extension of that tax exemption on the application of Title IX, such that an entity such as Appellant in the instant case would "clearly understand" and be "on notice" that its tax exemption was conditioned upon its adherence to Title IX. This is a high standard, which can only be met with language that clearly evidences Congress's intent. There is no such language in Title IX, legislative history, or administrative regulations implementing Title IX.

Plaintiffs-Appellees' argument that this "unambiguously clear" requirement applies only to the questions of what conduct is prohibited by statute, and what penalties exist for prohibited conduct, is illogical and contrary to the premise

underlying Spending Clause legislation. *Pennhurst* is instructive, as that case involved interpretation of the Developmentally Disabled Assistance and Bill of Rights Act, which was "a federal-state grant program whereby the Federal Government provides financial assistance to participating States to aid them in creating programs to care for and treat the developmentally disabled." *Id.* at 11. The statute, like Spending Clause legislation, was "voluntary and the States are given the choice of complying with the conditions set forth in the Act or forgoing the benefits of federal funding." *Id.* . The Commonwealth of Pennsylvania elected to participate in the program, but when sued by a resident for violating the "bill of rights" portion of the statute by not providing minimally adequate habitation in the least restrictive environment, the Commonwealth argued that the statute did not impose an obligation to provide, at their own expense, certain kinds of treatment. *Id.* at 15. The Supreme Court applied the contract analogy attendant to Spending Clause legislation, examined the statute and the legislative history, and concluded that the statute did not create specific mandates for states to spend certain amounts on care for the developmentally disabled, but only encouraged the provision of better services to the developmentally disabled. *Id.* at 17-19. This was not a question of whether the Commonwealth's conduct violated the statute; it was not disputed for purposes of the appeal that the conditions at the Pennhurst facility violated federal and state statutory rights. *Id.* at 9-10. Likewise, this was not a question of whether

the relief ordered by the lower court was appropriate for the statutory violations; that question was posed on appeal but was not answered. *Id.* at 10-11. The issue in *Pennhurst*, was whether the relevant statute created obligations on the Commonwealth of Pennsylvania when it accepted certain Federal funds. The Supreme Court applied the contract analogy to address that question, and thus, Plaintiffs-Appellees' argument to limit that analogy to what constitutes a statutory violation and what remedies are available fails.

This makes sense because Spending Clause legislation like Title IX operates as a contract, which requires offer and acceptance of its terms. "Just as a valid contract requires offer and acceptance of its terms, 'the legitimacy of Congress' power to legislate under the spending power . . . rests on whether the [recipient] voluntarily and knowingly accepts the terms of the "contract."'" Accordingly, if Congress intends to impose a condition on the grant of federal moneys, it must do so unambiguously." *Barnes v. Gorman*, 536 U.S. 181, 186 (2002) (quoting *Pennhurst*, 451 U.S. at 17. *See also Pennhurst*, 451 U.S. at 25 (stating that the "crucial inquiry" is "whether Congress spoke so clearly that we can fairly say that the State could make an informed choice").  If the terms of the "contract" must be voluntarily and knowingly accepted, it cannot reasonably be disputed that an entity must know what obligations are attendant to holding a 501(c)(3) tax exemption. If Congress intends to impose compliance with Title IX on 501(c)(3) tax-exempt

entities, it must do so unambiguously. To that end, the Internal Revenue Code contains a litany of different requirements placed on entities that obtain tax-exempt status, and failure to follow those requirements can result in an entity losing that tax-exempt status. Nowhere, however, in the Internal Revenue Code, or elsewhere, has Congress stated that 501(c)(3) tax-exempt entities must comply with Title IX.

Recognizing the most basic nature of the contract analogy, it is absurd to suggest that a recipient of federal funds is not liable for damages when it did not have notice of available damages, but that the same analysis does not apply to whether an entity is even subject to the statute at all. Under Plaintiffs-Appellees' theory, a private independent school such as Appellant does not need to be on notice that it is potentially liable under a specific statute, only what conduct is prohibited by the statute and what damages are recoverable. This makes no sense because it is not meaningful for an entity to know what conduct is prohibited by a statute, and what damages are available as remedies for a violation, without first knowing from the outset that entity is responsible for and subject to potential liability under the statute. Title IX operates based on consent, i.e., in return for federal funds, the recipients agree to comply with federally imposed conditions, and it is obvious that the recipient must know that its actions trigger the federally imposed conditions and potential liability under Title IX. While resolution of that question is often easy (such

as a school agreeing to accept financial aid from students with Federal grants), that does not render the analysis unnecessary.[2]

As set forth in Appellant's Opening Brief, Congress has not made it unambiguously clear that entities that are tax exempt under 501(c)(3) must comply with Title IX, and entities with tax exempt status could not have clearly understood that was Congress' intention. The Title IX statute does not mention, infer, or imply that tax exemption equates to receipt of Federal financial assistance. The statute is wholly silent and does not discuss tax exempt status in any respect whatsoever. Because of this, there is nothing in the statute itself to suggest that Congress intended that all tax exempt entities face potential liability under Title IX.

It is a well-settled principle of statutory construction that when considering the language of a statute, it is necessary to address the context and surrounding

---

[2] Plaintiffs-Appellees point to the Supreme Court's language in *Grove City College v. Bell*, in which the Court noted that the school could choose to "terminate its participation in the [Basic Educational Opportunity Grants] BEOG program and thus avoid the requirements of" Title IX. The problem for Plaintiffs-Appellees is that Grove City College is a 501(c)(3) tax exempt entity, and has been 1942. *See* ProPublica, *Nonprofit Explorer: Grove City College*, https://projects.propublica.org/nonprofits/organizations/251065148 (last visited September 7, 2023). Grove City's Form 990 tax filings are publicly available documents such that the Court can take judicial notice of their contents, i.e., that Grove City has been tax exempt for many years. *Halscott Megaro, P.A. v. McCollum*, 66 F.4th 151, 158 (4th Cir. 2023) Thus, under Plaintiffs-Appellees' position, Grove City College could not have simply chosen to terminate its participation in the BEOG program to avoid Title IX requirements, which is the opposite of what the Supreme Court stated.

provisions. *See, e.g., Yates v. U.S.*, 135 S. Ct. 1074 (2015); *Marx v. Gen. Revenue Corp.*, 133 S. Ct. 1166 (2013); *Morgan v. Sebelius*, 694 F.3d 535, 538 (4th Cir. 2012) (stating that "'[i]n expounding a statute, we must not be guided by a single sentence or member of a sentence, but look to the provisions of the whole law'") (quoting *United States Nat'l Bank of Oregon v. Independent Ins. Agents of Am., Inc.*, 508 U.S. 439, 455 (1993)). The administrative enforcement provision of Title IX is particularly persuasive because it speaks to termination of federal funding "by way of grant, loan, or contract other than a contract of insurance or guaranty," if an entity fails to comply with the requirements of Title IX. 20 U.S.C. § 1682. None of those enforcement remedies apply to exemption from taxation. It makes no sense for Congress to have provided an enforcement remedy that allowed the Federal government to terminate federal funding to an entity that violates Title IX, but not to rescind an entity's tax exempt status if such status gave rise to potential liability under Title IX. Because Congress' intention was to stop the flow of public funds and services if an entity violated Title IX, not to regulate or revoke the entity's tax status, it is evident that Congress did not equate 501(c)(3) tax exempt status with "Federal financial assistance." Congress was clearly aware of nonprofit tax exempt status when Title IX was passed, and could have easily enacted a provision in Title IX, or within the Internal Revenue Code, stating that entities with 501(c)(3) tax exempt

status are obligated to comply with Title IX. Congress did not and has not done so.[3] The enforcement provision in the statute, instead, reflects that Federal financial assistance means expenditure of public funds, whether the provision of grants, loans, or services.

Legislative history also supports this distinction between the provision of money or services and exemption from taxation provided to charitable entities. In *Cannon v. University of Chicago*, 441 U.S. 677, 704 n.36 (1979), the Supreme Court quoted legislators that "'[the] purpose of title VI is to make sure that *funds* of the United States are not used to support racial discrimination" and "'Any college or university which has [a] . . . policy which discriminates against women applicants . . . is free to do so under [Title IX] but such institutions should not be asking the taxpayers of this country to *pay* for this kind of discrimination. Millions of women *pay taxes* into the Federal treasury and we collectively resent that *these funds* should be used for the support of institutions to which we are denied equal access.'" (emphasis added). These repeated references to government funds and payments, coupled with the absence of discussion about tax exemptions, support the conclusion that Congress' intention with enacting Title IX was to focus on preventing the expenditure of government resources, not tax exemption, on entities that

---

[3] It cannot be disputed that there is a litany of requirements that tax-exempt entities must comply with, or the tax exemption can be revoked. None mention compliance with Title IX.

discriminate or violate Title IX's conditions. This is also consistent with the Yale

Law Journal, which addressed the legislative history of Title VI (upon which Title

IX was based), and noted:

> There is, however, evidence that if "tax subsidies" were embraced by the statutory language, the legislators were unaware of that fact. Thus, when the House Judiciary Committee reported the bill that became the Civil Rights Act of 1964 (with no mention in the committee report of the possibility that tax allowances constituted "federal financial assistance"), there were a number of separate and dissenting statements by committee members that clearly assumed that "federal financial assistance" referred to grants of funds and loans by federal agencies.

Boris I. Bittker & Kenneth M. Kaufman, *Taxes and Civil Rights: "Constitutionalizing" the Internal Revenue Code*, 82 Yale L.J. 51, 83 (1972).

Moreover, after the enactment of Title IX, Congress passed the Civil Rights

Restoration Act of 1987 to supersede the Supreme Court's decision in *Grove City College*, which held that only the particular program in an educational institution

receiving Federal financial assistance had potential civil liability under Title IX. To

alleviate potential loopholes for educational institutions to continue discriminatory

practices in programs that did not receive federal funding, the Civil Rights

Restoration Act of 1987 required institutions that receive federal funding to, across

the board, comply with federal civil rights laws. In response to the bill's passage,

President Reagan vetoed it out of concern that it was too broad and "would

unjustifiably expand the power of the Federal government over the decisions and

affairs of private organizations." 134 Cong. Rec. H4752-53 (1988). During debates

on the presidential veto, the United States House of Representatives debated the scope of the bill and the following colloquy occurred between a representative from Alabama and a representative from Massachusetts about whether many of the "private organizations" are already bound by Title IX:

> Mr. HARRIS. Mr. Speaker, I would like to engage a member of the committee in a colloquy concerning a certain question that I have, and the question is: Does tax exempt status constitute "Federal financial assistance" or any other "benefit" so as to bring a recipient institution under the coverage of this act? For example, would a private religious school with tax exempt status be covered by this act?
> Mr. FRANK. Mr. Speaker, will the gentleman yield?
> Mr. HARRIS. I yield to the gentleman from Massachusetts.
> Mr. FRANK. Mr. Speaker, the answer is "No." Tax exemption in and of itself will not trigger that, and as the gentleman would note, under our first amendment, we have restrictions on helping directly religious organizations. If a simple tax exemption were considered a form of Federal financial assistance, Madeline Mary O'Hara would have been in and out of court all the time. A simple tax exemption does not trigger any obligation under this act whatsoever. So a school which gets no Federal financial assistance in any way and simply has a tax exemption is not covered at all.

134 Cong. Rec. H4760 (1988). Although this congressional debate occurred approximately 16 years after Title IX was enacted, it is persuasive because if Congress had clearly intended that tax exempt status constituted Federal financial assistance for purposes of Spending Clause legislation, this colloquy would not have been necessary, and the answer given would have been different.[4]

---

[4] For the same reason, JA83-84 (The Private Schools Nondiscrimination and Due Process Act of 1979, S.B. 995, reprinted in 1979 Cong. Rec. S8436 (daily ed. Apr. 24, 1979), in persuasive as a subsequent publication of a "Declaration of

This conclusion is bolstered by agency regulations implementing Title IX. Although Plaintiffs-Appellees argue that the regulations are irrelevant because the language in Title IX is unambiguous, that misses the point. The Department of Education, the Department of the Treasury, and twenty-one (21) other Federal agencies have enacted similar comprehensive definitions of Federal financial assistance, none of which include tax exempt status. *See, e.g.,* 34 C.F.R. § 106.2(g); 31 C.F.R. § 28.105. These regulatory definitions of Federal financial assistance establish that the administrative agencies charged with implementing congressional policy have agreed that only five types of government assistance qualify as Federal financial assistance for purpose of application of Title IX, each involving the transfer of funds or something of value to the recipient, i.e., a cash grant or loan, a grant of property, receipt of federal services, etc. The administrative agencies were plainly aware of tax-exempt status when the regulations were adopted, yet none included any reference to tax exempt status in the regulatory language. This is highly persuasive because if Congress had unambiguously equated tax exempt status with Federal financial assistance, the administrative agencies charged with implementing Title IX certainly would have included tax exemption within the administrative

---

Congressional Policy" that "various Acts of Congress which condition Federal financial assistance to grantees, such as Title VI of the Civil Rights Act of 1964 and Title IX of the Education Amendments of 1972, do not apply to organizations simply because they are tax-exempt."

definition of that term. Instead, the fact that tax exempt status is not mentioned at all in the regulatory definition makes clear that these agencies did not believe that Congress intended that tax exemption equates to Federal financial assistance, and that tax exempt entities were not on notice that they would have to comply with Title IX solely as a result of their tax exempt status. *See Stanescu v. Connecticut Ass'n of Sch., Inc.*, 57 F.4th 43, 54 (2d Cir. 2022) (holding that school athletic conference could not be liable under Title IX for allowing female transgender athletes to complete as females in competitions because the school was not on notice, including via regulations implementing Title IX, that such action would be a violation).[5] If Congress intended that all tax exempt entities could face potential civil liability under Title IX, solely as a result of that tax status, it would have said so clearly; it did not do so.

## II.  NOT ALL ECONOMIC BENEFITS CREATED AND GRANTED BY THE FEDERAL GOVERNMENT CONSTITUTE "FEDERAL FINANCIAL ASSISTANCE" FOR PURPOSES OF TITLE IX.

---

[5] The same is true for the Department of Justice Title VI Legal Manual which states that "[t]ypical tax benefits" and "tax exemptions . . . are not considered federal financial assistance." JA176. The Legal Manual then states that "a few courts have found instances where tax benefits would be considered federal financial assistance." JA176. If the Department of Justice, which is charged with coordination of federal agency implementation and enforcement of Title IX (and Title VI), recognizes that "typical" tax benefits and exemptions are not federal financial assistance, but "a few courts" have found that some tax benefits are, it cannot reasonably be said that Congress has unambiguously stated that tax exempt status constitutes Federal financial assistance for purposes of application of Title IX, such that Appellants and other nonprofit private independent schools would know that.

Plaintiffs-Appellees' argument that because Section 501(c)(3) tax exempt status confers an economic benefit on the entity holding that status it is Federal financial assistance under Title IX is overly simplified and fails under legal scrutiny for statutory interpretation.

The Supreme Court has consistently described recipients of Federal financial assistance as entities that receive some federal dollars, grants, loans, or contracts; whether funds or services are received directly from the government, or indirectly from funds paid or services provided by the government to third-parties, the constant is the Federal government affirmatively providing dollars, grants, loans, or contracts. *See, e.g., Cummings*, 142 S. Ct. at 1570-71 ("funding recipient … 'accept[ing]' federal dollars"); *Fitzgerald v. Barnstable Sch. Comm.*, 555 U.S. 246, 257 (2009) ("institutions and programs that receive federal funds"); *NCAA v. Smith*, 525 U.S. 459, 466 (1999) (NCAA not covered by Title IX because it did not receive "federal funds earmarked" for dues payments like in *Grove City College* where the school enrolled students who received federal funds earmarked to pay for educational expenses charged by the school); *Gebser*, 524 U.S. at 287 ("Title IX focuses more on 'protecting' individuals from discriminatory practices carried out by recipients of federal funds."); *United States DOT v. Paralyzed Veterans of Am.*, 477 U.S. 597, 604 (1986) ("grants of federal funds"); *N. Haven Bd. of Ed. v. Bell*, 456 U.S. 512, 520 (1982) ("federal grants, loans, or contracts"). Those are obvious examples of

Federal financial assistance when the Federal government provides something of added value to the entity that receives it.

Tax exemption's "effect" on those receiving that status is certainly something of value; tax exemption can be an economic benefit and increase the money the potential taxpayer has in its coffers as a result of income not being subject to taxation. *See, e.g., Regan v. Taxation with Representation*, 461 U.S. 540, 544 (1983) ("tax exemptions and tax-deductibility are a form of subsidy" and "has much the same effect as a cash grant to the organization"); *Green v. Connally*, 330 F. Supp. 1150 (D.D.C. 1971) (stating that "tax exemptions and deductions certainly constitute a Federal Government benefit and support"). Those cases, however, had nothing to do with the meaning of Title IX, or tying 501(c)(3) entities to all Spending Clause legislation.

Moreover, overreading the quotations from those cases misses the mark because not all economic benefits created by the Federal government are created equal such that they rise to the level of "Federal financial assistance." *See Bachman v. Am. Soc. of Clinical Pathologists*, 577 F. Supp. 1257, 1264 (D.N.J. 1983) ("[N]ot every item of economic value granted by the federal government counts as financial assistance within the meaning of section 504 of the Rehabilitation Act.") To reach that conclusion, *Bachman* cited *Community Television of Southern California v. Gottfried*, 459 U.S. 498 (1983) where the Supreme Court held that, while broadcast

licenses possess economic value, Congress did not intend the FCC's renewal of a broadcast license to be considered a form of Federal financial assistance. Economic value provided or granted by the Federal government does not equate to Federal financial assistance.

The question is not whether the tax exemption provides an economic benefit or has a positive financial effect on the tax exempt entity, but whether tax exemption is the same as the Federal government awarded a cash grant. On that question, the Supreme Court has spoken and distinguished those economic benefits. *See Walz v. Tax Com. of New York*, 397 U.S. 664, 674-75 (1970), in which the Supreme Court held that "[g]ranting tax exemptions to churches necessarily operates to afford an indirect economic benefit" but that is not the same as "a direct money subsidy [that] would be a relationship pregnant with involvement and, as with most governmental grant programs, could encompass sustained and detailed administrative relationships for enforcement of statutory or administrative standards." *See also id.* at 675 ("The grant of a tax exemption is not sponsorship since the government does not transfer part of its revenue to churches but simply abstains from demanding that the church support the state. No one has ever suggested that tax exemption has converted libraries, art galleries, or hospitals into arms of the state or put employees 'on the public payroll.'").

It also makes logical sense that not all economic benefits provided via the Federal government are Federal financial assistance for purposes of Title IX, because otherwise, the illogical result would be that every entity that operates an educational program or activity, and which takes a deduction on its federal income tax return, would be obligated to comply with Title IX. That, of course, is not the law and demonstrates the fallacy of Plaintiffs-Appellees' argument.

### III. THE MAJORITY OF COURTS THAT HAVE ADDRESSED THIS ISSUE HAVE HELD THAT "FEDERAL FINANCIAL ASSISTANCE" DOES NOT INCLUDE TAX-EXEMPT STATUS.

The Supreme Court has never addressed whether tax-exempt status constitutes Federal financial assistance under Spending Clause legislation, and Appellant's Opening Brief cited and described the overwhelming majority of courts that have held, or stated in dicta,[6] that tax-exempt status does not constitute "Federal financial assistance." *See* Brief at 19-24.

In response, Plaintiffs-Appellees rely on dicta and case law that does not address the contractual foundation of Spending Clause legislation. The *dicta* in *McGlotten v. Connally* is entirely inconsistent with the contract analogy. The

---

[6] *See, e.g., Russo v. Diocese of Greensburg*, No. CIV.A09-1169, 2010 U.S. Dist. LEXIS 96338, 2010 WL 3656579, at *3 (W.D. Pa. Sept. 15, 2010); *Graham v. Tennessee Secondary Sch. Athletic Ass'n*, No. 1:95-CV-044, 1995 U.S. Dist. LEXIS 3211, 1995 WL 115890, at *17 n.4 (E.D. Tenn. Feb. 20, 1995), all of which did not directly rule on the issue, but expressed skepticism that tax exempt status qualifies as Federal financial assistance. The number of courts that have expressed this skepticism, coupled with the majority decisions, is persuasive.

*McGlotten* court recognized that the applicable regulations of Title VI excluded tax exemptions from the definition of Federal financial assistance. 338 F. Supp. at 461. The court also recognized that there was no discussion in the "massive legislative history" of the 1964 Civil Rights Act to suggest that tax exemptions constituted Federal financial assistance. *Id.* Nevertheless, the court ignored the lack of supporting legislative history, and regulations promulgated at Congress' instruction, and concluded that because tax exemption is a benefit provided by the Federal government, and that the "plain purpose" of Title IX "is clearly to eliminate discrimination in programs or activities benefitting from federal financial assistance," "[d]istinctions as to the method of distribution of federal funds or their equivalent seem beside the point" and "assistance provided through the tax system is within the scope of Title VI."[7] That analysis has never been cited with approval because the general purpose of Title IX is "beside the point" of whether it applies to particular entities. It is in the best interests of the public to prevent discrimination based upon race, color, national origin, sex, gender, age, disability, sexual orientation, etc., but the question is not whether tax exempt entities should not

---

[7] However, the *McGlotten* court concluded that not all tax benefits constitute Federal financial assistance. *See Laramore v. Illinois Sports Facilities Authority*, 722 F. Supp. 443, 451 (N.D. Ill. 1989) (noting that *McGlotten* "held that certain tax deductions constituted federal financial assistance where those deductions met certain criteria").

engage in sex discrimination.[8] The question is whether tax exempt entities, by reason of that tax exempt status, clearly understand and are on notice that they must comply with Title IX. On this issue, *McGlotten* is an outlier because of its faulty analysis.

Plaintiffs-Appellees also rely on the Eleventh Circuit Court of Appeal's comment in *M.H.D. v. Westminster Schools*, 172 F.3d 797, 802 n.12, that the argument that tax exempt status constituted Federal financial assistance "was neither immaterial nor wholly frivolous." This was *dicta* because, as Plaintiffs-Appellees concede, the Eleventh Circuit "express[ed] no view on the question whether a federal tax exemption actually constitutes 'Federal financial assistance' under Title IX." *Id.* Because the Court did not delve at all into the pure question of law presented in this appeal, *M.H.D.* is wholly unpersuasive.

Plaintiffs-Appellees also rely on *Fulani v. League of Women Voters Educ. Fund*, 684 F. Supp. 1185, 1192 (1988), where there was no discussion whatsoever of why a tax exemption met the definition of Federal financial assistance and the determination was immaterial and *dicta* given that the defendant in that case received federal grants from the Department of Energy and the EPA. *Fulani* also did not mention the contract analogy giving rise to application of Spending Clause legislation.

---

[8] Tax-exempt independent schools, such as Appellant, protect their students and staff through their own anti-discrimination policies, procedures, and safeguards tailored to their size and mission.

Similarly, Plaintiffs-Appellees' reliance on *E.H. v. Valley Christian Academy*, 616 F. Supp. 3d 1040 (C.D. Cal. 2022), is misguided because the court inverted the foundation of Spending Clause legislation by starting with the proposition that tax exemption confers a financial benefit that obligates compliance with Title IX, not asking whether that was Congress' intent or whether Congress unambiguously conveyed that entities, as a condition of applying for and accepting tax exempt status, must comply with Title IX. Without acknowledging the enforcement provision in Title IX, or the regulatory definitions of "Federal financial assistance," the District Court in California defined the plain purpose of Title IX as "controlling" because there was no controlling precedent in the Ninth Circuit and there was no "strong legislative history to the contrary" that tax exempt status should not constitute Federal financial assistance. *Id.* at 1050. This analysis turns the established Supreme Court case law on its head and is entirely inconsistent with forty years of Supreme Court precedent that Congress must unambiguously identify the conditions accompanying Federal financial assistance.

## IV.   REQUIRING ALL TAX EXEMPT ENTITIES WITH SOME EDUCATION PURPOSE OR PROGRAM TO COMPLY WITH TITLE IX WOULD CAUSE SIGNIFICANT HARM TO THE INDEPENDENT PRIVATE SCHOOL AND NON-PROFIT COMMUNITIES.

The amici briefs in support of Appellants have collectively described the significant impact and harm to the private school and non-profit communities that would be caused if all tax exempt entities with some education purpose or program

must comply with Title IX. In response, Plaintiffs-Appellees simply state that the private school and non-profit entities can forfeit their 501(c)(3) tax exempt status. That, however, does not address the issue whatsoever of the burden associated with complying with Title IX. It is also not a meaningful choice for small, independent, private schools.

Compared to the Atlanta-area public school system at tissue in *Franklin v. Gwinnett County Pub. Sch.*, 503 U.S. 60 (1992) that operated numerous public schools accepting federal funds, Appellant and the other independent schools as described in the Brief of *Amici Curiae* The National Association of Independent Schools, the National Business Officers Association, the Association of Independent Schools of Greater Washington, the Southern Association of Independent Schools, the Virginia Association of Independent Schools, the North Carolina Association of Independent Schools, and the Palmetto Association of Independent Schools are in an entirely different position. Small, independent, private schools have made the decision to be independent and not accept any forms of enumerated Federal financial assistance. Moreover, because Gwinnett County operates multiple public schools, it can pool resources to comply with Title IX and does not face the same financial limitations or pressures as the small, private, independent school community. As described in the *Amici Curiae*, when considered from the point of view of similar, small, private, independent schools, the district court's decision stands, it could

impose massive, prescriptive, and frequently changing Title IX requirements on small, independent, private schools that threaten to overwhelm them financially and administratively. In short, the benefits that the small, independent, private schools provide to their communities could be lost as the small and modest sized independent schools without financial and administrative resources to satisfy Title IX's requirements would be forced to close.

## CONCLUSION

Appellant respectfully requests that the Court reverse the District Court of Maryland and hold that tax exemption under 26 U.S.C. § 501(c)(3) does not constitute receipt of Federal financial assistance for purposes of Title IX of the Education Amendments Act of 1972.

Dated: September 15, 2023                     Respectfully submitted,

*/s/Gregg E. Viola*                              */s/Mark P. Johnson*
Gregg E. Viola                                   Mark P. Johnson
ECCLESTON & WOLF, P.C.                           ECCLESTON & WOLF, P.C.
Baltimore-Washington Law Center                  Baltimore-Washington Law Center
7240 Parkway Drive, 4th Floor                    7240 Parkway Drive, 4th Floor
Hanover, MD 21076-1378s                          Hanover, MD 21076-1378
(410) 752-7474 (phone)                           (410) 752-7474
(410) 752-0611 (fax)                             (410) 752-0611 (fax)
E-mail: viola@ewmd.com                           E-mail: johnson@ewmd.com
*Attorney for Defendant - Appellant*             *Attorney for Defendant - Appellant*

## <u>CERTIFICATE OF COMPLIANCE</u>

This document complies with type-volume limits because, excluding the parts of the document exempted by Fed. R. App. P. 32(f) (coverage page, disclosure statement, table of contents, table of citations, statement regarding oral argument, signature block, certificates of counsel, addendum, attachments, this document contains 6,233 words.

This document complies with the typeface requirements because this document has been prepared in a proportional spaced typeface using Microsoft Word in 14 point Times New Roman.

Dated: September 15, 2023                    Respectfully submitted,


                                             */s/Mark P. Johnson*
                                             Mark P. Johnson
                                             *Attorney for Defendant - Appellant*

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that on this 15th day of September, 2023, I electronically filed the foregoing Brief with the Clerk of the Court for the U.S. Court of Appeals for the Fourth Circuit by using the appellate CM/ECF system. Participants in the case are registered CM/ECF users, and service will be accomplished by the appellate CM/ECF system.

*/s/Mark P. Johnson*
Mark P. Johnson
*Attorney for Defendant - Appellant*